## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| UNIVERSAL BUILDING PRODUCTS, INC., *et al.*,[1] | Case No. 10-12453 (___) |
| Debtors. | Joint Administration Requested |

## MOTION FOR ORDER (A) APPROVING BID PROCEDURES RELATING TO SALE OF THE DEBTORS' ASSETS; (B) SCHEDULING HEARING TO CONSIDER SALE AND APPROVING THE FORM AND MATTER OF NOTICES; (C) APPROVING EXPENSE REIMBURSEMENT PROVISION AND BREAK-UP FEE; AND (D) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "*Debtors*") hereby move the Court (the "*Motion*"), pursuant to sections 105(a), and 363 of title 11 of the United States Code (the "*Bankruptcy Code*"), for entry of an order (a) approving bid procedures (the "*Bid Procedures*") relating to a sale of the Debtors' assets (the "*Asset Sale*") as set forth below and in that certain Asset Purchase Agreement (the "*Agreement*") by and between the Debtors and UBP Acquisition Corp. ("*Purchaser*"); (b) scheduling a hearing (the "*Sale Hearing*") to consider the sale and approving the form and matter of notices including notices relating to (i) an auction (the "*Auction*") and (ii) an objection deadline with respect to the Asset Sale; (c) approving the Expense Reimbursement provision and Break-Up Fee as defined herein;

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Universal Building Products, Inc. (7884); (ii) Accubrace, Inc. (3418); (iii) Don De Cristo Concrete Accessories, Inc. (7547); (iv) Form-Co, Inc. (0079); and (v) Universal Form Clamp, Inc. (3003). The address of the Debtors' corporate headquarters is 15172 Goldenwest Circle, Westminster, California 92683.

and (d) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:[2]

## Jurisdiction

1.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*).

## Background

3.     On the date hereof (the *"Petition Date"*), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the *"Chapter 11 Cases"*).  The Debtors are functioning as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     Collectively, the Debtors operated one of the largest privately-owned concrete form and accessory manufacturing businesses in North America, manufacturing and delivering a complete assortment of premium concrete accessories to residential and commercial construction projects.  As further discussed in the First Day Declaration, the Debtors' business has significantly diminished since 2007 in light of the downturn in the construction industry.  As a result of severe contractions in their liquidity position, the Debtors have determined that a chapter 11 bankruptcy presents the most efficient strategy for resolving the Debtors' financial

---

[2]     The facts and circumstances supporting this Motion are set forth in the *Declaration of Gregory D. Waller, Chief Financial Officer of Universal Building Products, Inc., in Support of First Day Motions* (the *"First Day Declaration"*), filed contemporaneously herewith.

596350.1 8/4/10

affairs. As of the close of business on August 3, 2010, only Debtors Accubrace, Inc. and Form-Co., Inc. continue to conduct business, and will continue to do so in the Chapter 11 Cases subject to any cash collateral or other financing orders approved by the Court. As further discussed in the First Day Declaration, the Debtors will be seeking to conduct an efficient bidding process to sell substantially all of their assets and seek confirmation and consummation of a liquidating chapter 11 plan.

## Background Related to the Sale

5. Beginning in 2007, the Debtors' operations began to be impacted by the deteriorating real estate market. The construction industry continued to contract through 2008 and the first half of 2009 due to both excessive supply, owing to high inventory levels, and insufficient demand, as credit became increasingly tight. The Debtors began to experience difficulties meeting certain financial covenants under their prepetition credit agreement dated as of April 28, 2006 (as amended, restated, supplemented or otherwise modified from time to time, including any replacement agreement therefore, the "*Credit Agreement*"), and commenced these Chapter 11 Cases to conduct an orderly wind-down of their business and to maximize the value of their estates.

6. The Debtors are close to exhausting their cash resources and do not believe they will be able to continue in business unless they receive a cash infusion of approximately $6,002,673 (the "*DIP Facility*"), which Purchaser has agreed to provide pursuant to the terms of that certain Senior Secured Super-Priority Debtor-in-Possession Promissory Note (the "*DIP Note*").

7. Although the DIP Facility should allow the Debtors to continue to operate their business for the short term for the purpose of winding down operations, the Debtors believe the

3

only viable solution which will preserve the value of the assets and business of the Debtors is through a sale pursuant to section 363 of the Bankruptcy Code.

8.    Pursuant to the prepetition Credit Agreement, as evidenced by its related documents, the Debtors are jointly and severally liable and have granted security interests in and liens upon substantially all of their property, including, without limitation, bank accounts, cash and cash equivalents, chattel paper (including electronic chattel paper), certain deposit accounts, copyright licenses, copyrights, deposit accounts, documents, equipment, fixtures, general intangibles, goods, instruments, intellectual property, inventory, investment property, letter-of-credit rights, material contracts, payment intangibles, patent licenses, patents, trademark licenses, trademarks, software, supporting obligations, and other tangible and intangible personal property (including any setoff rights described in the Credit Agreement and arising by operation of law). The lenders under the Credit Agreement were unable to extend additional liquidity in light of the Debtors defaults under the Credit Agreement. Moreover, the Debtors had no basis to secure any funding from any alternative source while the prepetition Credit Agreement remained in place. Consequently, the Debtors intensified their search for a buyer.

9.    Approximately four months before the Petition Date, the Debtors engaged Scouler and Company ("*Scouler*") to, among other things, identify prospective buyers for the Debtors' business. The Debtors, through the assistance of Scouler, (i) conducted a robust marketing process with respect to the sale of the Debtors' businesses in order to maximize value, and (ii) solicited the interest of various potential strategic and financial buyers and entertained offers for purchases of the Debtors' assets and the satisfaction of the outstanding obligations under the Credit Agreement. Numerous potential buyers conducted due diligence with respect to a potential transaction and certain potential buyers provided letters of intent with respect to

4

potential transactions. The Purchaser ultimately presented the highest and best offer with respect to a transaction by acquiring the outstanding debt under the Credit Agreement. The Purchaser then offered to credit bid a portion of the outstanding debt under the Credit Agreement and serve as the stalking horse in the sale process. In particular, the Purchaser agreed to credit bid $25,000,000 of the $40,331,692.45 outstanding under the pre-petition Credit Agreement.

10. In light of the sale process previously conducted, the Debtors believe that the value of their businesses and assets is substantially less than the amount of the outstanding obligations under the Credit Agreement.

11. The Purchaser and the Debtors have negotiated an agreement for Purchaser to purchase substantially all of the assets of the Debtors and, from the Petition Date through the closing, provide funding for the Debtors' operations through the DIP Facility.

12. The Debtors believe it is in the best interests of their estates, creditors, customers, and employees to commence a bidding process immediately, as the Debtors have limited funding and resources to try to maximize the value of their assets. Indeed, the DIP Facility is available only for a finite period of time.

13. Additionally, the Debtors considered pursuing alternative restructuring options including a stand-alone plan of reorganization, but determined that such course of action would not be the best strategy to maximize recoveries for their creditors. The Debtors determined that a sale of their assets is in the best interests of their estates and their creditors, customers, employees, and other stakeholders after a thorough analysis of all of these factors and other considerations.

14. The Debtors are filing this Motion for approval of the Bid Procedures in connection with the Auction in an effort to maximize the likelihood of higher and better bids

5

being made for the Debtors' assets. The Debtors believe that the Bid Procedures will permit interested parties reasonable opportunities, consistent with the financial constraints of the Debtors, to evaluate whether to propose a bid for the Debtors' assets that is higher and better than the Agreement entered into by the Debtors and Purchaser.

## The Proposed Sale of the Assets to Purchaser

15. The material terms of the business deal between the Debtors and Purchaser are that Purchaser has agreed, if not outbid at the Auction, to purchase substantially all of the Debtors' assets (the "*Acquired Assets*") for approximately $25 million, free and clear of liens (if any), claims, encumbrances, and interests (collectively, the "*Encumbrances*"), with such Encumbrances to attach to the proceeds of the Asset Sale, if any.

16. The section summarizes the significant terms of Agreement, but are qualified in their entirety by reference to the actual Agreement:[3]

> (a) Purchase Price. (i) $25,000,000 in the form of a credit bid, under section 363(k) of the Bankruptcy Code, on account of the obligations owed to Purchaser under the Credit Agreement and /or the DIP Note;
>
> (b) Acquired Assets means, other than the Excluded Assets, all rights, titles and interests of every kind and nature of the Debtors (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise), whether tangible or intangible, wherever located and by whomever possessed, including:
>
>> (i) all tangible personal property, including all machinery, equipment (including all transportation and office equipment), vehicles, computers, mobile phones, personal digital assistants, fixtures, trade fixtures, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible personal property of any kind, in each case owned by the Debtors, wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by any Debtor or any other space where any of the Debtors' properties and

---

[3] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

596350.1 8/4/10

or any other assets may be situated, and including all Permits and warranties, to the extent relating (directly or indirectly) to the foregoing;

(ii)     all Inventory;

(iii)    all concrete forms, braces, beams, joists, walers, turnbuckles, lifting systems, forming accessories, ties, safety equipment and brackets, shoring equipment and bridge brackets owned by any Seller;

(iv)    all Accounts Receivable and all claims, including deposits, advances, prepaid and other current assets, rights under warranties and guaranties, rights in respect of promotional allowances, vendor rebates and to other refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether known or unknown or contingent or non-contingent); the right to receive and retain mail, Accounts Receivable payments and other communications of any Debtor; and the right to bill and receive payment for products shipped or delivered and services performed but unbilled or unpaid as of the Closing;

(v)     all Intellectual Property owned by any Debtor, along with all income, royalties, damages and payments due or payable to any Debtor as of the Closing or thereafter, including damages and payments for past, present or future infringements or misappropriations thereof or other conflicts therewith, the right to sue and recover for past, present or future infringements or misappropriations thereof or other conflicts therewith, and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including all copies and tangible embodiments of any such Intellectual Property in any Debtor's possession or control (collectively, the "*Acquired Intellectual Property*");

(vi)    all Books and Records and all advertising, marketing and promotional materials and all other printed or written materials;

(vii)   all cash and cash equivalents of the Sellers as of the Closing (including all amounts required to be held in a lock box pursuant to the Cash Collateral Order), excluding any amounts received by the Sellers pursuant to the DIP Facility; and

(viii)  any rights, claims or causes of action of any Debtor against Third Parties arising out of events occurring prior to the Closing Date (including, for the avoidance of doubt, those arising out of events

7

occurring prior to the Petition Date) and relating to the Acquired Assets identified in <u>Section 2.1(a)-(g)</u> of the Agreement.

(c) <u>Excluded Assets</u> means all of the Debtors' right, title and interest in and to the following assets:

    (i) any equity interests held by any Debtor in any Person (including any other Debtor or any subsidiary thereof); and

    (ii) all land, together with all buildings, structures, fixtures and other improvements located thereon owned by any Debtor, and any part or parcel thereof.

(d) <u>Liabilities</u>. Purchaser shall not be the successor of any or all of the Debtors, and each Debtor acknowledges and agrees that Purchaser will not assume, nor in any way be liable or responsible for, any claim or Liability of any Debtor or relating to or arising out of the business of the Debtors, the Excluded Assets or the Acquired Assets (including Liabilities relating to the pre-petition or post-petition operation of the business of the Debtors, the Excluded Assets or to the Acquired Assets (or the use thereof)), whether or not listed below, including any Indebtedness, Employee Benefit Plan, Collective Bargaining Agreement or other Liability of any Debtor or any predecessor or Affiliate of any Seller whatsoever or any ERISA Affiliate (any and all such obligations or Liabilities, "*Excluded Liabilities*"); *provided*, that, in furtherance and not in limitation of the foregoing, Purchaser is expressly not assuming, any of the following Liabilities, whenever or wherever arising:

    (i) all claims or Liabilities of any Debtor that relate to any of the Excluded Assets, including executory Contracts and unexpired Leases;

    (ii) all Liabilities of any Debtor relating to Taxes;

    (iii) all accounts payable arising prior to the Closing;

    (iv) all Liabilities in respect of Indebtedness;

    (v) all Environmental Liabilities regardless of whether such Liabilities accrue or attach to the Debtors or to any other Person in the first instance;

    (vi) all Liabilities that may exist or may in the future arise pursuant to the WARN Act relating to any action or inaction of the Debtors prior to or upon the Closing;

    (vii) all Liabilities of the Debtors resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of any

8

Debtor (or any of its current or former officers, directors, employees or agents) anywhere or ownership or lease of any properties or assets or any properties or assets previously used by any Debtor at any time, or other actions, omissions or events occurring prior to the Closing and which (i) constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of any Law or (ii) relate to any and all Proceedings against any Debtor whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened;

(viii)  all Liabilities arising out of any Proceeding commenced against any Debtor or any predecessor or Affiliate of any Debtor after the Closing and arising out of or relating to any occurrence or event happening prior to the Closing;

(ix)    all Liabilities arising out of or relating to any infringement or misappropriation of, or other conflict with, the Intellectual Property of any Third Party arising out of or related to the conduct of the business of the Debtors or any act or omission of any Debtor or any predecessor or Affiliate of any Debtor prior to the Closing;

(x)     all Liabilities arising out of, or relating to, any indemnification obligations of any Debtor, including indemnification obligations pursuant to supply agreements, service agreements, purchase agreements, leases and any other type of Contract, and Liabilities to indemnify, reimburse or advance amounts to any officer, director, employee or agent of any Debtor or any of their respective Affiliates;

(xi)    all Liabilities with respect to the employees or former employees, or both (or their representatives) of any Debtor arising prior to the Closing Date, including payroll, wages, salaries, bonuses, commissions, benefits, retention or stay bonus arrangements, other compensation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit sharing plans, health care plans or benefits, or any other employee plans or benefits or other compensation of any kind to any employee, and obligations of any kind, including Liabilities arising under any Collective Bargaining Agreement, or employment, severance, retention or termination agreement with any employee, consultant or contractor (or their representatives) of any Debtor;

(xii)   all Liabilities relating to or arising under or in connection with any Employee Benefit Plan or any other employee benefit or compensation plan, program, agreement or arrangement at any time maintained, sponsored or contributed or required to be

9

contributed to by any Debtor or any ERISA Affiliate, or with respect to which any Debtor or any ERISA Affiliate has any Liability;

(xiii)  all Liabilities arising out of or relating to services, products or product or service warranties of any Debtor or any predecessor or Affiliate of any Debtor to the extent provided, developed, designed, manufactured, marketed, sold or distributed prior to the Closing;

(xiv)  all Liabilities of any Debtor to any current, former or prospective stockholder or other equity interest holder of any Debtor, including all Liabilities of any Debtor related to the right to or issuance of any capital stock or other equity securities;

(xv)  all Liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by any Debtor in connection with, resulting from or attributable to the transactions contemplated by this Agreement, the Chapter 11 Cases or otherwise; provided, however, that nothing herein shall affect Purchaser's obligations under the Cash Collateral Order or the DIP Order;

(xvi)  all Liabilities of any Debtor or any predecessor or Affiliate of any Debtor based upon such Person's acts or omissions occurring after the Closing; and

(xvii)  all Liabilities of any Debtor to Purchaser, its Affiliates, and its Affiliates' agents, advisors and representatives, whether under the Transaction Agreements or otherwise.

(e)  <u>Indemnification</u>. The Debtors, jointly and severally, agree to indemnify and hold Purchaser and each of its Affiliates and each of their respective officers, directors, managers, equity holders, partners, employees, agents and representatives and any Person claiming by or through any of them harmless with respect to the Excluded Assets and Excluded Liabilities, including any loss, damage, Liability, cost or expense (including legal fees and expenses and court costs) arising out of or in connection with, or otherwise relating to, the Excluded Assets and the Excluded Liabilities.

(f)  <u>Expense Reimbursement</u>. If this Agreement is terminated prior to the Closing for any reason other than validly by the Debtors pursuant to <u>Section 8.1(c)</u> of the Agreement, the Debtors shall, concurrently with any such termination by the Debtors, and no later than two (2) Business Days following any such termination by Purchaser, immediately pay to Purchaser in cash, by wire transfer of immediately available funds to an

account designated in writing by Purchaser, an amount equal to the costs and out-of-pocket expenses incurred by Purchaser in connection with its business, legal and accounting due diligence and the preparation and negotiation of this Agreement up to a maximum of eight hundred and fifty thousand dollars ($850,000) (the "*Expense Reimbursement*").

(g) <u>Break-Up Fee</u>. In addition to any Expense Reimbursement, upon the first to occur of (i) the date any Debtor consummates a sale of any of the Acquired Assets to an entity other than Purchaser or (ii) the date any Debtor consummates a plan under the Bankruptcy Code without first selling the Acquired Assets to Purchaser, the Sellers shall immediately pay to Purchaser in cash, by wire transfer of immediately available funds to an account designated in writing by Purchaser, a breakup fee in an amount equal to four hundred thousand dollars ($400,000) (the "*Breakup Fee*"); *provided, however*, that the Breakup Fee shall not be payable to Purchaser if the Agreement is validly terminated by the Sellers pursuant to <u>Section 8.1(c)</u> of the Agreement.

17.    The Debtors evaluated the terms of Purchaser's offer with the assistance of their professionals and, in their reasoned business judgment, concluded that Purchaser's proposal offered the best opportunity to initiate a sale process that will maximize creditor recoveries (both in terms of purchase price and in terms of cutting-off operational losses). The Debtors have marketed and will continue marketing their assets and business in an effort to solicit further interest from strategic acquirers, financial buyers, and investors. The Agreement is subject to higher or better offers and is conditioned in part upon Purchaser receiving the bid protections described herein.

<b><u>Relief Requested</u></b>

18.    By this Motion, the Debtors seek entry of an order (the "*Proposed Order*") approving the Bid Procedures and proposed Auction process for a sale of substantially all of the Debtors' assets.

19.    More particularly, the Debtors respectfully request entry of an order (a) approving the Bid Procedures; (b) scheduling the Sale Hearing to consider the sale and approving the form and matter of notices including notices relating to (i) the Auction and (ii) objection deadline with

11

respect to the Asset Sale; and (c) approving the Expense Reimbursement provision and Break-Up Fee.

### A. **Auction**

20. Under Bankruptcy Rule 6004(f)(1), the Debtors may sell property outside the ordinary course of business by private sale or by public auction. In this case, the Debtors believe that an auction will expose the Acquired Assets to a broad and diverse market and ensure a sale to the highest and best offer. The Debtors propose to conduct an Auction on September 2, 2010.

### B. **Proposed Bid Procedures**

21. The Debtors desire to receive the greatest value for the Acquired Assets. Although the Debtors believe the Agreement with Purchaser is fair and reasonable and reflects the highest and best value for the Acquired Assets as of the date of this Motion, and although they marketed their Acquired Assets prepetition, the Debtors nevertheless desire to place the Agreement to the test of the broader public marketplace in the hope that higher and better offers are generated for all or portions of the Acquired Assets.

22. If the proposed Bid Procedures are approved, the Debtors will contact other parties that previously expressed interest in a potential transaction and other parties that may be interested in the Acquired Assets. The Bid Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders and the Debtors, the receipt, negotiation, and qualification of bids received, the conduct of any auction, and the selection and approval of any ultimately successful bidders.

23. The Bid Procedures were developed consistent with the Debtors' competing needs to expedite the sale process and promote participation and active bidding. Moreover, the Bid

596350.1 8/4/10

Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion.

24. This section summarizes key provisions of the Bid Procedures, but are qualified in their entirety by reference to the Bid Procedures attached hereto as **Exhibit A**.

    (a)     <u>Bid Deadline</u>. The deadline for submitting bids by a Qualified Bidder shall be August 30, 2010, at 12:00 p.m. (Eastern Time) (the "*Bid Deadline*"). Prior to the Bid Deadline, a Qualified Bidder that desires to make an offer, solicitation, or proposal (a "*Bid*") shall deliver written copies of its cash bid to: (i) Universal Building Products, Inc., 15172 Goldenwest Circle, Westminster, California 92683, Attn: Jeff Church; (ii) counsel for the Debtors, K&L Gates LLP, 70 West Madison Street, Suite 3100, Chicago, Illinois 60602-4207, Attn: Sven T. Nylen and Saul Ewing LLP, 222 Delaware Avenue, Suite 1200, P.O. Box 1266, Wilmington, Delaware 19899, Attn: Mark Minuti; (iii) UBP Acquisition Corp., 333 S. Grand Avenue, 28th Floor, Los Angeles, California 90071, Attn: Jordon L. Kruse and David Quick, with a copy to Kirkland and Ellis LLP, 300 N. LaSalle Street, Chicago, Illinois 60654, Attn: Christopher J. Greeno, P.C. and David A. Agay; and (iv) counsel for any official committee of unsecured creditors appointed in this case (collectively, the "*Notice Parties*"). A bid proposal received after the Bid Deadline shall not constitute a Qualified Bid.

    (b)     <u>Qualified Bid</u>. A "*Qualified Bidder*" is a Potential Bidder (or combination of Potential Bidders whose bids for assets do not overlap and who agree to have their bids combined for purposes of the determination of whether such Potential Bidders together constitute a Qualified Bidder, and who shall also be referred to herein as a single Qualified Bidder) that delivers the Participant Requirements described in subparagraphs (a) and (b) above, and that the Debtors in their discretion and with assistance from their advisors determine is reasonably likely to submit a *bona fide* offer that would result in greater net value to the estate than under the Agreement and to be able to consummate a sale if selected as a Successful Bidder (as defined below).

    (c)     <u>Bid Requirements</u>. To be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid (other than Purchaser and its Bid) must be determined by the Debtors to satisfy each of the following conditions:

        (i)     <u>Good Faith Deposit</u>. Each Bid must be accompanied by a deposit (the "*Good Faith Deposit*") in the form of a certified check or cash payable to the order of the Debtors in the amount of $2,500,000.

596350.1 8/4/10

(ii) <u>Minimum Overbid</u>. The consideration proposed by the Bid can include only cash. The aggregate consideration must equal or exceed the sum of (i) the Purchase Price; (ii) $250,000; (iii) the Break-Up Fee; and (iv) the Expense Reimbursement. The contemplated transaction must provide for the immediate payment of the Break-Up Fee and Expense Reimbursement to Purchaser in cash from the proceeds of the purchase price of such Bid.

(iii) <u>Irrevocable</u>. A bid must be irrevocable until two (2) business days after the Acquired Assets have been sold pursuant to the Closing of the sale or sales approved by the Bankruptcy Court (the "*Termination Date*").

(iv) <u>The Same or Better Terms</u>: The Bid must be on terms that, in the Debtors' business judgment, are substantially the same or better than the terms of the Agreement.[4] A Bid must include executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "*Contemplated Transaction Documents*"). A Bid shall include a copy of the Agreement marked to show all changes requested by the Bidder (including those related to the Purchase Price). The Contemplated Transaction Documents must include a commitment to close by the Termination Date. A Bid should propose a contemplated transaction involving at least 90%, by value, of the Acquired Assets.

(v) <u>Contingencies</u>: A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Agreement.

(vi) <u>Financing Sources</u>: A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtors with appropriate contact information for such financing sources.

(vii) <u>No Fees payable to Qualified Bidder</u>: No Bid, other than a Bid submitted by Purchaser, may request or entitle the Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.

---

[4] For purposes of the Bid Procedures, a Bid is more favorable than the Agreement if it results in a higher net value for the Debtors' estates.

14

(d)     A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements, and that satisfies the Bid Deadline requirements, shall constitute a "*Qualified Bid*," if the Debtors believe, in their reasonable discretion, that such bid would be consummated if selected as the Successful Bid.

(e)     Only if a Qualified Bid (other than Purchaser's) is received by the Bid Deadline, shall the Debtors conduct an auction (the "*Auction*") to determine the highest and best bid with respect to the Acquired Assets. The Debtors shall provide Purchaser and all Qualified Bidders with copies of all Qualified Bids at least twenty-four (24) hours prior to the Auction. The Auction shall commence on September 2, 2010 at 9:00 a.m. (prevailing Central Time) at the offices of K&l Gates LLP, 70 W. Madison St., Suite 3100, Chicago, Illinois 60602.

(f)     No later than August 31, 2010, the Debtors will notify all Qualified Bidders of (i) the highest, best, and otherwise financially superior Qualified Bid, as determined in the Debtors' discretion (the "*Baseline Bid*"), and (ii) the time and place of the Auction, and provide copies of all submitted bids to all Qualified Bidders. If Purchaser's Qualified Bid constitutes the Baseline Bid, then the Expense Reimbursement and Break-Up Fee shall be added to the Qualified Bid for purposes of the Auction.

(g)     If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held, Purchaser will be the Successful Bidder, the Agreement will be the Successful Bid, and, at the Sale Hearing, the Debtors will seek approval of and authority to consummate the Proposed Sale contemplated by the Agreement.

(h)     <u>Auction</u>.  The Auction shall be conducted according to the following procedures:

(i)     <u>Participation at the Auction</u>:  Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. Only the authorized representative of each of the Qualified Bidders and the Debtors shall be permitted to attend.

(ii)    During the Auction, bidding shall begin initially with the highest Baseline Bid and subsequently continue in minimum increments of at least $250,000. Other than otherwise set forth herein, the Debtors, may conduct the Auction in the manner they determine will result in the highest, best, or otherwise financially superior offer for the Acquired Assets.

(iii)   The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. The determination of which

15

Qualified Bid constitutes the Baseline Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estate, including, *inter alia*, the following: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities, if any; (iii) the ability of the Qualified Bidder to close the proposed transaction; (iv) the proposed Closing Date and the likelihood, extent, and impact of any potential delays in Closing; (v) any purchase price adjustments; (vi) the impact of the contemplated transaction on any actual or potential litigation; (vii) the net economic effect of any changes from the Agreement, if any, contemplated by the contemplated transaction documents; and (viii) the net after-tax consideration to be received by the Debtors' estates, taking into account Purchaser's rights to the Break-Up Fee and Expense Reimbursement (collectively, the "*Bid Assessment Criteria*"). All Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid.

(i)     Terms of Overbids.

    (i)     An "*Overbid*" is any bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the conditions specified in the Bid Procedures.

(j)     Additional Procedures

    (i)     The Debtors, in their reasonable discretion, may adopt rules for the Auction at or prior to the Auction that, in their reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order. All such rules will provide that all bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (i.e., the Principals of any Qualified Bidder specifically formed for the purpose of effectuating the contemplated transaction) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

596350.1 8/4/10

(k)     Closing the Auction

        (i)     Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale, and (ii) immediately identify the highest, best, or otherwise financially superior offer for the Acquired Assets (the "*Successful Bid*") and the entity submitting such Successful Bid, the "*Successful Bidder*"), which highest, best, or otherwise financially superior offer will provide the greatest amount of net value to the Debtors, and the next highest or otherwise best offer after the Successful Bid (the "*Back-up Bid*"), and advise the Qualified Bidders of such determination. If Purchaser's final bid is deemed to be highest and best at the conclusion of the Auction, Purchaser will be the Successful Bidder, and such bid, the Successful Bid.

C.     **Buyer Protections/Expense Reimbursement/Break-Up Fee**

25.     Without the buyer protections sought herein, Purchaser would not be proceeding with this proposed acquisition. Accordingly, the Debtors have agreed to provide, and to seek at this time, this Court's approval of certain bid protections provided to Purchaser pursuant to the Agreement. In addition to the above requirements, if the Agreement is terminated under certain circumstances under the Agreement, then Purchaser shall be entitled to payment of the documented actual out-of-pocket costs and expenses (including, without limitation, actual fees and expenses of counsel) (the "*Expense Reimbursement*") incurred by Purchaser or its Affiliates in connection with the negotiation, documentation, and implementation of the Agreement and the transactions contemplated hereby and participation in the Chapter 11 Cases, up to a maximum of $850,000.00.

26.     In accordance with the terms of the Agreement and proposed Bid Procedures, Purchaser may also be entitled to the Break-Up Fee in the amount of $400,000 if certain conditions occur at the Auction.

17

27.     If the Debtors become obligated to pay Purchaser's Expense Reimbursement and the Break-Up Fee, then such obligations shall constitute a super-priority administrative expense obligation under section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject to any super-majority claims of the Debtors' postpetition lenders, and shall be payable without further order of this Court as provided for above.

28.     Other protections, such as minimum Overbid amounts, were also negotiated with Purchaser. These present themselves in the proposed Bid Procedures and the Bid Procedures Order, both of which are themselves the product of negotiations with Purchaser.

29.     The Debtors submit that implementation of the Bid Procedures will not chill the bidding (if any) for all or portions of the Acquired Assets. Quite the contrary, approval of the Bid Procedures is in the best interests of the Debtors, their estates, and their creditors in that the Bid Procedures provide a structure and format for other potentially interested parties to formulate a bid for all or portions of the Acquired Assets.

30.     Failure to approve the Bid Procedures may jeopardize the sale of the Debtors' assets to the detriment of the Debtors' creditors, employees, customers, and vendors.

**D.      Notice of Sale Hearing, Auction, Bid Procedures, and Objection Dates**

31.     To preserve the Debtors' going-concern value, the Debtors wish to proceed to the Auction and Sale Hearing as expeditiously as the Court's calendar will allow, while providing the requisite notice of the proposed Sale as required under Bankruptcy Rule 2002.

32.     The Debtors propose to hold the Auction at the offices of K&L Gates LLP, 70 West Madison Street, Suite 3100, Chicago, Illinois 60602-4207 on September 2, 2010 at 9:00 a.m. (prevailing Central Time).

18

33.     The Debtors request that the Court schedule the Sale Hearing on September 3, 2010, with an objection deadline for such Sale Hearing set for August 24, 2010 at 4:00 p.m., (prevailing Eastern Time).

34.     In accordance with Bankruptcy Rule 2002, the Debtors propose to give notice of the Bid Procedures, the Bid Procedures Order, the Auction, and the proposed Sale in the following form and manner:

(a)     Not later than two (2) days after the entry of an Order approving this Motion, the Debtors will cause the Auction and Sale Notice attached hereto as **Exhibit B** to be sent by first-class mail, postage prepaid to (i) Universal Building Products, 15172 Goldenwest Circle, Westminster, California 92683, Attn: Jeff Church; (ii) counsel for the Debtors, K&L Gates LLP, 70 W. Madison St., Suite 3100, Chicago, Illinois 60602-4207, Attn: Sven T. Nylen; (iii) UBP Acquisition Corp., 333 S. Grand Avenue, 28th Floor, Los Angeles, California 90071, Attn: Jordon L. Kruse and David Quick, with a copy to Kirkland and Ellis LLP, 300 N. LaSalle Street, Chicago, Illinois 60654, Attn: Christopher J. Greeno, P.C. and David A. Agay; (iv) counsel for any official committee of unsecured creditors appointed in this case; (v) all entities known to have asserted any lien, claim, interest or encumbrance in or upon and of the Acquired Assets; (vi) all taxing authorities or recording offices which have a reasonably known interest in the Debtors, including the Internal Revenue Service; (vii) the Environmental Protection Agency; (viii) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (ix) the Debtors' landlords; (x) all entities known to have expressed a *bona fide* interest in acquiring all or portions of the Acquired Assets and (xi) the Office of the United States Trustee for the District of Delaware (collectively, the "*Notice Parties*").

(b)     The Debtors will coordinate with its proposed claims agent, The Garden City Group, Inc., to serve notice of the filing on this Motion and the Sale Motion, on all parties referenced in this Motion.

(c)     As soon as possible after the entry of an Order approving this Motion, the Debtors shall cause the Auction and Sale Notice, to be published in one daily edition of the Wall Street Journal, national edition.

35.     Concurrently herewith, the Debtors have filed the Sale Motion. Objections, if any, to the Sale Motion or the relief requested therein (the "*Sale Objections*") must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed

19

with the clerk of the Bankruptcy Court for the District of Delaware, 3rd Floor, 824 Market Street, Wilmington, Delaware 19801, on or before 4:00 p.m. (prevailing Eastern Time) on August 24, 2010; and (d) be served so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon (i) counsel to the Debtors, K&L Gates, 70 West Madison Street, Chicago, IL 60602, Attn: Sven T. Nylen; (ii) UBP Acquisition Corp., 333 S. Grand Avenue, 28th Floor, Los Angeles, California 90071, Attn: Jordon L. Kruse and David Quick, with a copy to: Kirkland and Ellis LLP, 300 N. LaSalle St., Illinois 60654, Attn: Christopher J. Greeno, P.C. and David A. Agay; and (iii) counsel for any official committee of unsecured creditors appointed in this case.

36. The Debtors submit that the foregoing notice is reasonably calculated to provide timely and adequate notice to the Debtors' creditors and other parties in interest, along with parties that have expressed interest (or may express interest) in bidding on the Acquired Assets, of the Bid Procedures, the Auction, the Sale, and all proceedings to be held thereon.

37. Based upon the foregoing, the Debtors submit that the relief requested herein is necessary and appropriate, is in the best interests of the Debtors and their estates, and should be granted in all respects.

## Basis for Relief

### A. Conducting the Auction Pursuant to the Bid Procedures is in the Best Interests of the Debtors' Estates

38. The Debtors believe that the Auction and proposed Bid Procedures will promote active bidding from seriously interested parties and will identify the best or highest offer(s) for the Acquired Assets. The proposed Bid Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Debtors believe that the

20

Bid Procedures are: (a) sufficient to encourage bidding for the Acquired Assets; (b) consistent with other procedures previously approved by the Court; and (c) appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. Further, the Bid Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale process consistent with the timeline available to the Debtors under the Agreement and the terms of the DIP Facility.

39. Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

40. Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. *See, e.g.*, *Integrated Res.*, 147 B.R. at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

41. The paramount goal in any proposed auction of property of the estate is to maximize the proceeds received by the estate. *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to

21

enhance the value of the estate at hand"); *Integrated Res.*, 147 B.R. at 659 ("[i]t is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

42.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., Integrated Res.*, 147 B.R. at 659 (such procedures "encourage bidding and [] maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991), ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

43.    The Debtors believe that the Bid Procedures will establish the parameters under which the value of the Proposed Sale with Purchaser may be tested at the Auction. The Bid Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' estates. The proposed procedures contain terms typical for a process through which a sale of this nature is consummated and will increase the likelihood that the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

44.    As additional support, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As described above, approval of the Bid Procedures will greatly assist the Debtors in maximizing the value that they may obtain for all or

portions of the Assets. Consequently, the Debtors respectfully submit that granting the requested relief is "appropriate" under the circumstances.

45. Similar procedures have been previously approved by this Court. *See, e.g., In re Radnor Holdings Corp.*, Case No. 06-10894 (Walsh, J.) (Bankr. D. Del. Sept. 22, 2006); *In re Russell-Stanley Holdings, Inc.*, Case No. 05-12339 (Walrath, J.) (Bankr. D. Del. Sept. 9, 2005); *In re Ultimate Elecs., Inc.*, No. 05-10104 (Walsh, J.) (Bankr. D. Del. March 24, 2005); *In re Polaroid Corp.*, No. 01-10864 (Walsh, J.) (Bankr. D. Del. Nov. 19, 2001).

**B.** **The Bid Protections are in the Best Interests of the Debtors' Estates**

46. Because the Purchaser has expended the time, energy, and resources necessary to submit a stalking horse bid, the Debtors have agreed to provide, and seek this Court's approval of, certain bid protections provided to Purchaser under the Agreement.

47. Subject to the DIP Facility, as such term is defined in the First Day Declaration, and Court approval, the Debtors have agreed to provide Purchaser Expense Reimbursement of up to $850,000 and a Break-Up Fee of $400,000, if conditions specified in the Agreement occur.

48. The Expense Reimbursement and Break-Up Fee are material inducements for, and conditions of, Purchaser's entry into the Agreement. The Debtors believe that the Expense Reimbursement and Break-Up Fee are fair and reasonable in view of (a) the analysis and negotiation undertaken by Purchaser in connection with the transaction and (b) the fact that, if the Expense Reimbursement and Break-Up Fee are triggered, Purchaser's efforts will have triggered the chances that the Debtors will receive the highest or otherwise best offer for the Assets, to the benefit of the Debtors' creditors, customers, and employees.

49. The Third Circuit has held that although bidding incentives in favor of a stalking horse are measured against a business judgment standard, in order to receive administrative expense priority pursuant to section 503(b) of the Bankruptcy Code, the bidding incentive must

23

provide some postpetition benefit to the estate. *See In re O'Brien Envtl Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999). The *O'Brien* Court identified two instances in which such a benefit to the estate may be found. First, if the incentive promoted a more competitive bidding process, "such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Second, where bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as the floor bid on which other bidders can rely.

50. The amount of the Expense Reimbursement and Break-Up Fee in the Agreement are reasonable and appropriate in light of the size and nature of the transaction. Specifically, the Break-Up Fee constitutes 3.4% of the total purchase price, and the total of the Break-Up Fee and Expense Reimbursement constitute 5% of the total purchase price. Moreover, the Expense Reimbursement and Break-Up Fee are consistent with the Third Circuit's test above; the Expense Reimbursement and Break-Up Fee provisions were a material consideration without which Purchaser would not have entered into the Agreement. Additionally, Purchaser required such Expense Reimbursement and Break-Up Fee as inducements to conduct the costly research necessary to provide a competitive floor bid.

51. The Debtors submit that the Expense Reimbursement and Break-Up Fee are normal, and oftentimes necessary, components of sales outside the ordinary course of business under section 363 of the Bankruptcy Code. *See, e.g., In re Kupp Acquisition Corp.*, Case No. 96-1223 (PJW) (Bankr. D. Del. March 3, 1997); *In re Kmart*, Case No. 02-B-02474 (SPS) (Bankr. N.D. Ill. May 10, 2002) (authorizing a termination fee and overbid amounts for potential bidders); *In re Comdisco, Inc.*, Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, *inter alia*, an actual and necessary cost and expense of preserving the Debtor's estate, of substantial benefit to the Debtor's estate, and a necessary

inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving an overbid requirement in an amount equal to the approved break-up fee).

52.     Moreover, the amount of the Expense Reimbursement and Break-Up Fee are reasonable and appropriate in light of the size and nature of the Sale of the Acquired Assets and the efforts that have been and will be expended by the Purchaser. *See, e.g., In re Financial News Network*, 980 F.2d 165, 167 (2d Cir. 1992) (approving over 5% break-up fee); *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 536 (3rd Cir. 1999) (noting that combined break-up fee and expense reimbursement of approximately 4-5% was "within the range of fees approved by some courts"); *In re Fruit of the Loom, Inc.*, Case No. 99-04497 (PJW) (Bankr. D. Del. Dec. 29, 1999) (allowing a 3% break-up fee); *In re Ameriserve Food Distribution, Inc.*, 00-00358 (PJW) (Bankr. D. Del. January 31, 2000) (allowing a 3.6% break-up fee).

53.     In sum, the Debtors' ability to offer the Expense Reimbursement and Break-Up Fee to Purchaser enable the Debtors to ensure the sale of substantially all of the Acquired Assets to Purchaser at a price they believe to be fair while, at the same time, providing the Debtors with the potential of even greater benefit to the estates.    Thus, the Expense Reimbursement and Break-Up Fee provisions should be approved.

54.     Moreover, payment of the Expense Reimbursement and Break-Up Fee will not diminish the assets of the estates available for distribution to creditors, employees, and customers. The Debtors do not intend to terminate the Agreement if to do so would incur an obligation to pay the Expense Reimbursement and Break-Up Fee, unless to accept an alternative bid, which bid must exceed the consideration offered by Purchaser by an amount sufficient to pay the Expense Reimbursement and Break-Up Fee.

596350.1 8/4/10

55. Subject to the DIP Facility, the Debtors request that the Court authorize payment of the Expense Reimbursement and Break-Up Fee, pursuant to the terms and conditions of the Agreement.

## Notice

56. Notice of this Motion has been given to (a) the Office of the United States Trustee, (b) counsel to the Agent for the Debtors' prepetition secured lenders, (c) the Debtors' largest thirty (30) unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions, (d) the Office of the United States Attorney for the District of Delaware, and (e) the Internal Revenue Service. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

## No Prior Request

57. No prior motion for the relief requested herein has been made to this or any other court.

596350.1 8/4/10

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein and granting such other and further relief as is just and proper.

Dated: August 4, 2010

K&L GATES LLP
Harley J. Goldstein
Sven T. Nylen
70 West Madison Street, Suite 3100
Chicago, IL 60602
Telephone: (312) 372-1121
Facsimile: (312) 827-8000

-and-

SAUL EWING LLP

Mark Minuti (DE Bar No. 2659)
Teresa K.D. Currier (DE Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873

-and

MaryJo Bellew (DE Bar No. 4519)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7144
Facsimile: (215) 972-2292

*Proposed Co-Counsel for Debtors
and Debtors in Possession*

596350.1 8/4/10