**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| UNIVERSAL BUILDING PRODUCTS, INC., et al.,[1] | ) | Case No. 10-12453 (___) |
|  | ) |  |
|  | ) | Joint Administration Requested |
| Debtors. | ) |  |
|  | ) |  |

**MOTION FOR ORDER UNDER SECTIONS 105(a), 363, AND 1146(c) OF THE BANKRUPTCY CODE (A) AUTHORIZING THE SALE(S) OF CERTAIN OR ALL OF THE DEBTORS' ASSETS, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (B) APPROVING ASSET PURCHASE AGREEMENT, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "*Debtors*") hereby move the Court (the "*Sale Motion*") for the entry of an order under sections 105(a), 363, and 1146(c) of title 11 of the United States Code (the "*Bankruptcy Code*") (a) authorizing the sale (the "*Sale*") of certain or all of the Debtors' assets, free and clear of liens, claims, encumbrances and interests to UBP Acquisition Corp. (the "*Purchaser*"); and (b) approving the asset purchase agreement (the "*Agreement*") attached hereto as **Exhibit A**, subject to higher and better offers. In support of the Sale Motion, the Debtors respectfully state as follows:[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Universal Building Products, Inc. (7884); (ii) Accubrace, Inc. (3418); (iii) Don De Cristo Concrete Accessories, Inc. (7547); (iv) Form-Co, Inc. (0079); and (v) Universal Form Clamp, Inc. (3003). The address of the Debtors' corporate headquarters is 15172 Goldenwest Circle, Westminster, California 92683.

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of Gregory D. Waller, Chief Financial Officer of Universal Building Products, Inc., in Support of First Day Motions* (the "*First Day Declaration*"), filed contemporaneously herewith.

## Jurisdiction

1.      This Court has jurisdiction over this Sale Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Sale Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105, 363 and 1146(c) of the Bankruptcy Code and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*).

## Background

3.      On the date hereof (the *"Petition Date"*), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the *"Chapter 11 Cases"*). The Debtors are functioning as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      Collectively, the Debtors operated one of the largest privately-owned concrete form and accessory manufacturing businesses in North America, manufacturing and delivering a complete assortment of premium concrete accessories to residential and commercial construction projects.    As further discussed in the First Day Declaration, the Debtors' business has significantly diminished since 2007 in light of the downturn in the construction industry. As a result of severe contractions in their liquidity position, the Debtors have determined that a chapter 11 bankruptcy presents the most efficient strategy for resolving the Debtors' financial affairs. As of the close of business on August 3, 2010, only Debtors Accubrace, Inc. and Form-Co., Inc. continue to conduct business, and will continue to do so in the Chapter 11 Cases subject to any cash collateral or other financing orders approved by the Court. As further discussed in

the First Day Declaration, the Debtors will be seeking to conduct an efficient bidding process to sell substantially all of their assets and seek confirmation and consummation of a liquidating chapter 11 plan.

### Debtors' Prepetition Efforts to Solicit Potential Buyers for the Debtors' Assets

5.      Beginning in 2007, the Debtors' operations began to be impacted by the deteriorating real estate market. The construction industry continued to contract through 2008 and the first half of 2009 due to both excessive supply, owing to high inventory levels, and insufficient demand, as credit became increasingly tight. The Debtors began to experience difficulties meeting certain financial covenants under their prepetition credit agreement dated as of April 28, 2006 (as amended, restated, supplemented or otherwise modified from time to time, including any replacement agreement therefor, the "*Credit Agreement*"), and commenced these Chapter 11 Cases to conduct an orderly wind-down of their business and to maximize the value of their estates.

6.      The Debtors are close to exhausting their cash resources and do not believe they will be able to continue in business unless they receive a cash infusion of approximately $6,002,673 (the "*DIP Facility*"), which Purchaser has agreed to provide pursuant to the terms of that certain Senior Secured Super-Priority Debtor-in-Possession Promissory Note (the "*DIP Note*").

7.      Although the DIP Facility should allow the Debtors to continue to operate their business for the short term for the purpose of winding down operations, the Debtors believe the only viable solution which will preserve the value of the assets and business of the Debtors is through a sale pursuant to section 363 of the Bankruptcy Code.

3

8.     Pursuant to the prepetition Credit Agreement, as evidenced by its related documents, the Debtors are jointly and severally liable and have granted security interests in and liens upon substantially all of their property, including, without limitation, bank accounts, cash and cash equivalents, chattel paper (including electronic chattel paper), certain deposit accounts, copyright licenses, copyrights, deposit accounts, documents, equipment, fixtures, general intangibles, goods, instruments, intellectual property, inventory, investment property, letter-of-credit rights, material contracts, payment intangibles, patent licenses, patents, trademark licenses, trademarks, software, supporting obligations, and other tangible and intangible personal property (including any setoff rights described in the Credit Agreement and arising by operation of law). The lenders under the Credit Agreement were unable to extend additional liquidity in light of the Debtors' defaults under the Credit Agreement. Moreover, the Debtors had no basis to secure any funding from any alternative source while the prepetition Credit Agreement remained in place. Consequently, the Debtors intensified their search for a buyer.

9.     Approximately four months before the Petition Date, the Debtors engaged Scouler and Company ("*Scouler*") to, among other things, identify prospective buyers for the Debtors' business. The Debtors, through the assistance of Scouler, (i) conducted a robust marketing process with respect to the sale of the Debtors' businesses in order to maximize value, and (ii) solicited the interest of various potential strategic and financial buyers and entertained offers for purchases of the Debtors' assets and the satisfaction of the outstanding obligations under the Credit Agreement. Numerous potential buyers conducted due diligence with respect to a potential transaction and certain potential buyers provided letters of intent with respect to potential transactions. The Purchaser, which holds the senior secured debt pursuant to the Credit Agreement, ultimately presented the highest and best offer in the form of a credit bid for a

4

portion of the outstanding debt under the Credit Agreement and/or the DIP Note and serve as the stalking horse in the sale process. In particular, the Purchaser agreed to credit bid $25,000,000 of the $40,331,692.45 (without fees and interest) outstanding under the pre-petition Credit Agreement.

10.     The Purchaser and the Debtors engaged in arms' length, good faith negotiations, which culminated in a comprehensive agreement for Purchaser to purchase substantially all of the assets of the Debtors and for the Purchaser to provide DIP financing for the purposes of funding the Debtors' orderly wind-down through chapter 11 and the consummation of a chapter 11 plan.

11.     As a result, on August 3, 2010, the Debtors and Purchaser executed the Agreement, a copy of which is attached hereto as **Exhibit A**. Pursuant to the Agreement, the Acquired Assets (as defined therein) are to be sold free and clear of all liens, claims, encumbrances, and other interests.[3]

12.     The following briefly summarizes certain provisions of the Agreement attached hereto as **Exhibit A**:[4]

| Purchase of the Assets | Acquired Assets means, other than the Excluded Assets, all rights, titles and interests of every kind and nature of the Debtors (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise), whether tangible or intangible, wherever located and by whomever possessed, including: |
| --- | --- |

---

[3] The Agreement does not contemplate the Purchaser assuming or assigning any executory contracts or unexpired leases.

[4] The description of the Agreement is intended as a summary only. Any conflict between the description of the Agreement in this Sale Motion and the Agreement should be resolved in favor of the Agreement. Capitalized terms used in the summary of the Agreement that are not defined herein shall have the meaning given in the Agreement.

(i) all tangible personal property, including all machinery, equipment (including all transportation and office equipment), vehicles, computers, mobile phones, personal digital assistants, fixtures, trade fixtures, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible personal property of any kind, in each case owned by the Debtors, wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by any Debtor or any other space where any of the Debtors' properties and or any other assets may be situated, and including all Permits and warranties, to the extent relating (directly or indirectly) to the foregoing;

(ii) all Inventory;

(iii) all concrete forms, braces, beams, joists, walers, turnbuckles, lifting systems, forming accessories, ties, safety equipment and brackets, shoring equipment and bridge brackets owned by any Seller;

(iv) all Accounts Receivable and all claims, including deposits, advances, prepaid and other current assets, rights under warranties and guaranties, rights in respect of promotional allowances, vendor rebates and to other refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether known or unknown or contingent or non-contingent); the right to receive and retain mail, Accounts Receivable payments and other communications of any Debtor; and the right to bill and receive payment for products shipped or delivered and services performed but unbilled or unpaid as of the Closing;

(v) all Intellectual Property owned by any Debtor, along with all income, royalties, damages and payments due or payable to any

| | Debtor as of the Closing or thereafter, including damages and payments for past, present or future infringements or misappropriations thereof or other conflicts therewith, the right to sue and recover for past, present or future infringements or misappropriations thereof or other conflicts therewith, and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including all copies and tangible embodiments of any such Intellectual Property in any Debtor's possession or control (collectively, the "*Acquired Intellectual Property*"); |
|---|---|
| | (vi) all Books and Records and all advertising, marketing and promotional materials and all other printed or written materials; |
| | (vii) all cash and cash equivalents of the Sellers as of the Closing (including all amounts required to be held in a lock box pursuant to the Cash Collateral Order), excluding any amounts received by the Sellers pursuant to the DIP Facility; and |
| | (viii) any rights, claims or causes of action of any Debtor against Third Parties arising out of events occurring prior to the Closing Date (including, for the avoidance of doubt, those arising out of events occurring prior to the Petition Date) and relating to the Acquired Assets identified in Section 2.1(a)-(g) of the Agreement. |
| **Excluded Assets** | Excluded Assets means all of the Debtors' right, title and interest in and to the following assets: |
| | (i) any equity interests held by any Debtor in any Person (including any other Debtor or any subsidiary thereof); and |
| | (ii) all land, together with all buildings, structures, fixtures and other improvements located thereon owned by any Debtor, and any part or parcel thereof. |

596352.1 8/4/10

| | |
|---|---|
| **Liabilities** | Purchaser shall not be the successor of any or all of the Debtors, and each Debtor acknowledges and agrees that Purchaser will not assume, nor in any way be liable or responsible for, any claim or Liability of any Debtor or relating to or arising out of the business of the Debtors, the Excluded Assets or the Acquired Assets (including Liabilities relating to the pre-petition or post-petition operation of the business of the Debtors, the Excluded Assets or to the Acquired Assets (or the use thereof)), whether or not listed below, including any Indebtedness, Employee Benefit Plan, Collective Bargaining Agreement or other Liability of any Debtor or any predecessor or Affiliate of any Seller whatsoever or any ERISA Affiliate (any and all such obligations or Liabilities, *"Excluded Liabilities"*); *provided*, that, in furtherance and not in limitation of the foregoing, Purchaser is expressly not assuming, any of the following Liabilities, whenever or wherever arising:<br><br>(i) all claims or Liabilities of any Debtor that relate to any of the Excluded Assets, including executory Contracts and unexpired Leases;<br><br>(ii) all Liabilities of any Debtor relating to Taxes;<br><br>(iii) all accounts payable arising prior to the Closing;<br><br>(iv) all Liabilities in respect of Indebtedness;<br><br>(v) all Environmental Liabilities regardless of whether such Liabilities accrue or attach to the Debtors or to any other Person in the first instance;<br><br>(vi) all Liabilities that may exist or may in the future arise pursuant to the WARN Act relating to any action or inaction of the Debtors prior to or upon the Closing;<br><br>(vii) all Liabilities of the Debtors resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of any Debtor |

(or any of its current or former officers, directors, employees or agents) anywhere or ownership or lease of any properties or assets or any properties or assets previously used by any Debtor at any time, or other actions, omissions or events occurring prior to the Closing and which (i) constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of any Law or (ii) relate to any and all Proceedings against any Debtor whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened;

(viii) all Liabilities arising out of any Proceeding commenced against any Debtor or any predecessor or Affiliate of any Debtor after the Closing and arising out of or relating to any occurrence or event happening prior to the Closing;

(ix) all Liabilities arising out of or relating to any infringement or misappropriation of, or other conflict with, the Intellectual Property of any Third Party arising out of or related to the conduct of the business of the Debtors or any act or omission of any Debtor or any predecessor or Affiliate of any Debtor prior to the Closing;

(x) all Liabilities arising out of, or relating to, any indemnification obligations of any Debtor, including indemnification obligations pursuant to supply agreements, service agreements, purchase agreements, leases and any other type of Contract, and Liabilities to indemnify, reimburse or advance amounts to any officer, director, employee or agent of any Debtor or any of their respective Affiliates;

(xi) all Liabilities with respect to the employees or former employees, or both (or their representatives) of any Debtor arising prior to the Closing Date, including payroll, wages, salaries, bonuses, commissions, benefits, retention or stay bonus arrangements, other compensation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option

596352.1 8/4/10

or profit sharing plans, health care plans or benefits, or any other employee plans or benefits or other compensation of any kind to any employee, and obligations of any kind, including Liabilities arising under any Collective Bargaining Agreement, or employment, severance, retention or termination agreement with any employee, consultant or contractor (or their representatives) of any Debtor;

(xii) all Liabilities relating to or arising under or in connection with any Employee Benefit Plan or any other employee benefit or compensation plan, program, agreement or arrangement at any time maintained, sponsored or contributed or required to be contributed to by any Debtor or any ERISA Affiliate, or with respect to which any Debtor or any ERISA Affiliate has any Liability;

(xiii) all Liabilities arising out of or relating to services, products or product or service warranties of any Debtor or any predecessor or Affiliate of any Debtor to the extent provided, developed, designed, manufactured, marketed, sold or distributed prior to the Closing;

(xiv) all Liabilities of any Debtor to any current, former or prospective stockholder or other equity interest holder of any Debtor, including all Liabilities of any Debtor related to the right to or issuance of any capital stock or other equity securities;

(xv) all Liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by any Debtor in connection with, resulting from or attributable to the transactions contemplated by this Agreement, the Chapter 11 Cases or otherwise; provided, however, that nothing herein shall affect Purchaser's obligations under the Cash Collateral Order or the DIP Order;

(xvi) all Liabilities of any Debtor or any predecessor or Affiliate of any Debtor based

| | upon such Person's acts or omissions occurring after the Closing; and |
|---|---|
| | (xvii) all Liabilities of any Debtor to Purchaser, its Affiliates, and its Affiliates' agents, advisors and representatives, whether under the Transaction Agreements or otherwise. |
| **Purchase Price (the "*Purchase Price*")** | $25,000,000 in the form of a credit bid, under Bankruptcy Code § 363(k), on account of the obligations owed to Purchaser under the Credit Agreement and/or the DIP Note |
| **Representations, Warranties, and Covenants** | The Agreement contains usual and customary representations, warranties, and covenants for similar bankruptcy transactions involving non-going concern asset sales. |
| **Termination** | The Agreement may be terminated prior to the Closing as follows: |
| | (i) by mutual written agreement of Purchaser and the Sellers; |
| | (ii) by Purchaser or the Debtors if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; |
| | (iii) by Purchaser or the Debtors (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants or agreements set forth in this Agreement on the part of the other party, which, in the case of any such breach that is curable prior to the Closing, is not cured within five (5) days following written notice to the party committing such breach; |
| | (iv) by Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that |

one or more conditions set forth in Section 7.2 has not been and cannot be fulfilled or satisfied on or prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied);

(v) by Purchaser if the Debtors (i) designate any Person other than Purchaser as the Successful Bidder, (ii) seeks or supports Bankruptcy Court approval of an Acquisition Proposal (other than to or by Purchaser) or (iii) executes and delivers an agreement or understanding of any kind with respect to an Acquisition Proposal;

(vi) by Purchaser or the Debtors if the Bankruptcy Court enters an order approving any Acquisition Proposal (other than the sale of the Acquired Assets to Purchaser);

(vii) by Purchaser as a result of (a) the failure of the Bankruptcy Court to have entered the Bid Procedures Order by no later than the Bid Procedures Order Deadline Date (or such later date as Purchaser may determine in its sole discretion), or (b) following the entry of the Bid Procedures Order but prior to the entry of the Sale Order, the Bid Procedures Order ceases to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction;

(viii) by Purchaser as a result of the failure of the Debtors to require that Bids be submitted no later than the Bid Deadline (or such later date as Purchaser may determine in its sole discretion);

(ix) by Purchaser as a result of the failure of the Debtors to have held the Auction by no later than the Auction Deadline Date (or such later date as Purchaser may determine in its sole discretion);

(x) by Purchaser as a result of (a) the failure of the Bankruptcy Court to enter the Sale Order by no later than the Sale Order Deadline, or (b) the Sale Order ceasing to be in full force and effect,

596352.1 8/4/10

| | or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction; |
| --- | --- |
| | (xi) by Purchaser on any day on or after the Termination Date if the Closing shall not have been consummated by such date; |
| | (xii) by Purchaser if there has been a default or event of default under the DIP Facility (unless waived by Purchaser) or if the DIP Facility is otherwise terminated, or if a Termination Date has occurred pursuant to the Cash Collateral Order, or if the Debtors' right to use Purchaser's cash collateral is otherwise terminated; |
| | (xiii) by the Debtors (provided that no Debtor is then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one (1) or more conditions set forth in Section 7.3 has not been and cannot be fulfilled or satisfied on or prior to the Closing Date; and |
| | (xiv) by Purchaser if the Chapter 11 Cases are dismissed or converted into one or more cases under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for the Sellers and such trustee rejects the transactions contemplated by this Agreement. |

### The Bid Procedures

13.     On the Petition Date, the Debtors sought to establish procedures for the Sale of the Acquired Assets by filing the Motion for Order (A) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (B) Scheduling a Hearing to Consider Sale and Approving the Form and Matter of Notices; (C) Approving Expense Reimbursement Provision; and (D) Granting Related Relief (the "*Bid Procedures Motion*").

596352.1 8/4/10

14. Pursuant to the Bid Procedures, parties interested in bidding on the Acquired Assets must submit a Qualified Bid (as defined in the Bid Procedures Motion) in accordance with the Bid Procedures. Prior to the Auction, the Debtors shall evaluate each Qualified Bid (as defined in the Bid Procedures Motion) they have received, including the Purchaser's Bid, and shall select the bid that the Debtors determine to be the highest and best offer.

15. In accordance with the Bid Procedures, bidders who have made a Qualified Bid, including Purchaser, will be invited to the Auction to compete to make the highest and best offer for the Acquired Assets. The bid that the Debtors select as the highest and best offer that constitutes the Baseline Bid (as defined in the Bid Procedures Motion) for the Acquired Assets will serve as the opening bid(s) at the Auction. The Auction will commence and attendees will be invited to offer a bid that is higher and better than the opening bid(s). If no Qualified Bids are submitted other than Purchaser's bid, the Auction will be cancelled and Purchaser's bid as set forth in the Agreement will be the Successful Bid (as defined below).

### After the Auction

16. After the Auction, the bid for the Acquired Assets that the Debtors determine, in their sole discretion, to be the highest and best offer(s) (collectively, the "*Successful Bid*") will be submitted to the Court at the hearing to consider the Sale Motion (the "*Sale Hearing*"). The Debtors shall seek approval of the Successful Bid at the Sale Hearing.

### Applicable Authority

**I.     The Proposed Sale(s) Is Proper and Should Be Approved**

17. The Debtors submit that ample authority exists for the approval of the proposed Sale of the Acquired Assets pursuant to the executed form of the Agreement (the "*Final Asset Purchase Agreement*"). Section 363(b)(1) of the Bankruptcy Code, which authorizes a debtor to sell assets of the estate other than in the ordinary course of business free and clear of liens,

14

claims and encumbrances, provides, in relevant part, as follows: "The [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* FED. R. BANKR. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

18.     Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of proeprt of the estate, bankruptcy courts routinely authorize sales of the debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 39 (3rd Cir. 1996); *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. April 2, 2001); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

19.     Courts typically consider the following factors in determing whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re Delaware & Hudson Ry.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *In re United Healthcare Sys., Inc.*, No. 97-1159, 1997 U.s. Dist. LEXIS 5090, at * 13-14 and n.2 (D.N.J. March 26, 1997). The Delaware & Hudson Railway court further held that:

> [o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser [or proposed purchaser] is proceeding in good faith.

*In re Delaware & Hudson Ry.*, 124 B.R. at 176.

15

20.     A sound business purpose dictates the relief requested herein, which is also supported by adequate and reasonable notice, a fair and reasonable sale price and a Sale negotiated in good faith.

### A.     A "Sound Business Purpose" Supports the Sale

21.     Before the Petition Date, the Debtors' operations were not generating sufficient revenue to maintain the Debtors' businesses as a going concern, and Debtors concluded that the best way to maximize value to the Debtors' estates is through a sale of substantially all of the Debtors's assets.  In addition to the thorough marketing efforts that were conducted prepetition, the Bid Procedures have provided the Debtors with a mechanism to seek out potential purchasers of the Acquired Assets that will compete to purchase such assets at the Auction.  This enables the Debtors to test the market value for the Acquired Assets and ensure that the Sale will maximize the value of such assets.

### B.     Ample Notice of the Proposed Sale(s) Will Be Provided to Interested Parties

22.     The Debtors will employ various methods of notification to ensure that all interested parties will be informed of the Sale and to maximize the exposure to interested parties. In order to generate the greatest number of bidders possible for the Acquired Assets and to satisfy the requirements of Bankruptcy Rule 2002, the Debtors propose to serve by first class mail, not later than two days after the entry of the Order approving the Bid Procedures Motion (the "*Bid Procedures Order*") and the Auction and Sale Notice (as defined in the Bid Procedures Motion), upon (i) Purchaser and its counsel; (ii) counsel for any official committee of unsecured creditors appointed in this case; (iii) all entities known to have asserted any lien, claim, interest or encumbrance in or upon and of the Acquired Assets; (iv) all taxing authorities or recording offices which have a reasonably known interest in the Debtors, including the Internal Revenue Service; (v) the Environmental Protection Agency; (vi) the state/local environmental agencies in

16

the jurisdictions where the Debtors own or lease real property; (vii) the Debtors' landlords; (viii) all entities known to have expressed a *bona fide* interest in acquiring all or portions of the Acquired Assets and (ix) the Office of the United States Trustee for the District of Delaware; (x) all of the Debtors' known creditors and interest holders (collectively, the "*Notice Parties*").

23.     In addition, as soon as practicable after the date the Court enters the Bid Procedures Order, the Debtors propose to cause notice to be published in one daily edition of The Wall Street Journal, national edition.

### C.     The Proposed Sale Is For a Fair and Reasonable Price

24.     The Debtors, with the assistance of Scouler (i) conducted a robust marketing process with respect to the sale of the Debtors' businesses in order to maximize value, and (ii) solicited the interest of various potential strategic and financial buyers and entertained offers for purchases of the Debtors' assets and the satisfaction of the outstanding obligations under the Credit Agreement.     Numerous potential buyers conducted due diligence with respect to a potential transaction and certain potential buyers provided letters of intent with respect to potential transactions.     In addition, the Debtors have established the Bid Procedures in order to further market the Acquired Assets.

25.     Because the purchase price of the Acquired Assets will be determined by the Auction, it will be fair and reasonable as contemplated by section 363 of the Bankruptcy Code. *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d. Cir. 1986) (finding that "[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt"); *In re National Health & Safety Corp.*, 1999 WL 703208 *2 (Bankr. E.D.Pa. Sept. 02, 1999) (citing *Abbotts Dairies* for the proposition that an auction may be

17

sufficient to establish that one has paid value for the assets of a debtor and relying upon the result from the auction to verify that the purchase price represented value).

**D.    The Proposed Sale(s) Will Be Negotiated in Good Faith**

26.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to 'an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

27.    Although the Bankruptcy Code does not define "good faith purchaser," courts construing section 363(m) of the Bankruptcy Code have stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." *Abbotts Dairies*, 788 F.2d at 147. To constitute lack of good faith, a court must find fraud or collusion between a purchaser and a debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith. *See Kabro Assocs. of West Islip v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [purchaser]'s good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); *see also 255 Park Plaza Assocs. Ltd. P'shp. v. Connecticut Gen. Life Ins.*, 100 F.3d 1214 (6th Cir. 1996) (citing *In re Onouli-Kona Land Co.*, 846 F.2d 1170, 1173 (9th Cir. 1988)). *See also Miami Ctr. Ltd. Partnership v. Bank of New York*, 838 F.2d 1547 (11th Cir. 1988); *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 56 (7th Cir. 1983); *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *Matter of Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, concentrating on the

"integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *Rock Indus. Mach.*, 572 F.2d at 1198).

28.     As required by section 363(m) of the Bankruptcy Code, the Debtors and the Purchaser have engaged in intense, arm's length negotiations and will continue to act in good faith with respect to the Final Asset Purchase Agreement. The Final Asset Purchase Agreement will be the product of good faith, arm's length negotiations between the Debtors and the Purchaser, and will be negotiated with the active involvement of the Debtors' officers and representatives.

29.     The Bid Procedures establish a process whereby interested parties compete to establish the value of the Acquired Assets. The Auction will result in a bid(s) for the Acquired Assets that represents substantial value to the Debtors' estates because it will provide favorable terms for the disposition of such assets for a price that represents the market values of the assets. *See Abbotts Dairies*, 788 F.2d at 149. Accordingly, the Debtors request that the Court make a finding that the Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code.

## II.     Sale of the Acquired Free and Clear of Liens, Claims, Encumbrances and Interests

30.     The Debtors propose to sell the Acquired Assets pursuant to section 363(b) and (f) of the Bankruptcy Code which, among other things, authorizes a debtor to sell property outside of the ordinary course of business, free and clear of any interest, lien, claim, encumbrance or security interest of any other party, including, but not limited to, any administrative expense or priority claim asserted in these Chapter 11 Cases (collectively, "*Liens*"). Specifically, section 363(f) of the Bankruptcy Code states:

596352.1 8/4/10

(f)     The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the subsections is met); *In re Shary*, 152 B.R. 724, 725 (Bankr. N.D. Ohio 1993).

31.     As set forth in the First Day Declaration, in accordance with the arrangement with the Purchaser, the Purchaser shall consent to sale of the Acquired Assets free and clear of any Liens subject to the terms of the DIP Facility and the Bid Procedures.[5]

32.     The Sale satisfies the criteria set forth in section 363(f) of the Bankruptcy Code. The Debtors will provide notice of the Sale to all creditors and therefore all parties who could potentially assert Liens against the Acquired Assets. Any holder of an alleged Lien against the Acquired Assets could be compelled, in a legal or equitable proceeding, to accept a monetary satisfaction equal to the amount of their claim, or interests in, such assets.

33.     Accordingly, the Debtors submit that the Sale of the Acquired Assets free and clear of any Liens satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

---

[5]     The Purchaser is not acquiring any property of the Debtors which is not subject to the Purchaser's first priority liens.

## III.    Exemption from Transfer Taxes

34.    Pursuant to section 1146 of the Bankruptcy Code, the "transfer... or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp or similar tax."    11 U.S.C. § 1146(a). Notwithstanding the Supreme Court's holding in *Florida Dept. of Reveneu v. Piccadilly Cafeterias, Inc.*, 128 S.Ct. 2326 (2008) that the Bankruptcy Code's stamp-tax exemption does not apply to transfers made before a plan is confirmed under Chapter 11, the court in *In re New 118th Inc.*, 398 B.R. 791, 797 (Bankr. S.D.N.Y. 2009) found that the Supreme Court "did not address whether the exemption could apply to a pre-confirmation sale that closed post-confirmation." *New 118th*, 398 B.R. at 797 (finding that "the post-confirmation delivery of the deed, and hence, the transfer, satisfies *Piccadilly's* "simple, bright-line rule).

35.    The Debtors will file a chapter 11 plan of liquidation shortly after the petition.  It is anticipated that the Debtors will confirm the plan either contemporaneously with or shortly after the Closing.  Further, the Agreement, the funding of the DIP Facility, and the Debtors' use of Purchaser's cash collateral are all part of an integrated restructuring plan that includes the Debtors' formulation, confirmation, and consummation of a plan of liquidation, and, as such, the plan will go effective only upon closing of the Sale.  Moreover, the Sale is a critical component of an overall restructuring that will ultimately result in a confirmed plan and, for all the foregoing reasons qualifies for the section 1146(c) exemption from transfer taxes.

## IV.    The Court Should Waive or Reduce the Ten Day Stay Periods Required by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure

36.    Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order, see FED. R. BANKR. P. 6004(h). The

21

purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. *See* Advisory Committee Notes to Bankruptcy Rule 6004(g).

37. Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for 14 days, unless the court orders otherwise.

38. To preserve the value of the Acquired Assets and limit the costs of administering and preserving such assets, it is critical that the Debtors close the Sale of the Acquired Assets as soon as possible after all closing conditions have been met or waived. In particular, in light of the limited funding provided by the DIP Facility, it is in the best interest of the Debtors' bankruptcy estates to consummate a sale in accorance with the Agreement, Bid Procedures, and the DIP Facility so that the affirmative funding arrangement under the DIP does not terminate as a result of timing defaults or excess costs that might be incurred in connection with a prolonged process, thereby possibly thwarting the Debtors' ability to consummate a chapter 11 plan. Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) or in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal to allow the Sale to close as provided under the Final Asset Purchase Agreement.

39. Based upon the foregoing, the Debtors submit that the relief requested herein is necessary and appropriate, is in the best interests of the Debtors and their estates, and should be granted in all respects.

22

## Notice

40.     Notice of this Motion has been given to the Notice Parties, which includes all creditors.

## No Prior Request

41.     No previous motion for the relief requested herein has been made to this or any other court.

596352.1 8/4/10

WHEREFORE the Debtors respectfully request that the Court enter an order (i) (a) authorizing the Debtors' Sale of the Acquired Assets, free and clear of liens, claims, encumbrances and interests subject to higher and better offers, (b) approving the Agreement; and (ii) granting such other and further relief as the Court deems appropriate.

Dated: August 4, 2010

K&L GATES LLP
Harley J. Goldstein
Sven T. Nylen
70 West Madison Street, Suite 3100
Chicago, IL 60602
Telephone: (312) 372-1121
Facsimile: (312) 827-8000

-and-

SAUL EWING LLP

Mark Minuti (DE Bar No. 2659)
Teresa K.D. Currier (DE Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873

-and-

MaryJo Bellew (DE Bar No. 4519)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7144
Facsimile: (215) 972-2292

*Proposed Co-Counsel for the Debtors and Debtors in Possession*