# Exhibit A

Asset Purchase Agreement

ASSET PURCHASE AGREEMENT

dated as of August 3, 2010

among

UBP ACQUISITION CORP.,

UNIVERSAL BUILDING PRODUCTS, INC.

AND

THE OTHER SELLERS NAMED HEREIN

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND RULES OF CONSTRUCTION ................................................1
    1.1    Definitions.................................................................................................1
    1.2    Rules of Construction ..............................................................................9

ARTICLE II PURCHASE AND SALE ................................................................................9
    2.1    Purchase and Sale of Assets....................................................................9
    2.2    Excluded Assets .....................................................................................10
    2.3    No Liabilities Assumed...........................................................................10

ARTICLE III CLOSING .................................................................................................13
    3.1    Purchase Price.........................................................................................13
    3.2    Closing ....................................................................................................13
    3.3    Deliveries by the Sellers ........................................................................13
    3.4    Deliveries by Purchaser ..........................................................................14
    3.5    Further Assurances..................................................................................14
    3.6    Allocation of Purchase Price...................................................................14

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS......................14
    4.1    Organization, Standing ...........................................................................14
    4.2    Validity of Agreement; Power.................................................................15
    4.3    No Conflicts or Violations ......................................................................15
    4.4    Title to Assets .........................................................................................15
    4.5    Brokers ....................................................................................................15
    4.6    Bank Accounts Schedule ........................................................................16
    4.7    Information Accurate and Complete; Reliance........................................16
    4.8    Closing Date............................................................................................16

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER .........................16
    5.1    Organization............................................................................................16
    5.2    Validity of Agreement; Power.................................................................16
    5.3    No Conflicts or Violations ......................................................................17

ARTICLE VI PRE-CLOSING COVENANTS .....................................................................17
    6.1    Consents and Approvals ..........................................................................17
    6.2    Access to Information and Facilities........................................................17
    6.3    Notification of Certain Matters ...............................................................17
    6.4    Bankruptcy Actions ................................................................................18
    6.5    Other Bids ...............................................................................................19
    6.6    Bankruptcy Matters.................................................................................19
    6.7    Compliance with Orders .........................................................................20
    6.8    Credit Bid Direction................................................................................20

ARTICLE VII CONDITIONS TO CLOSING..................................................................20
    7.1    Conditions to Parties' Obligations............................................20
    7.2    Conditions to Purchaser's Obligations.......................................20
    7.3    Conditions to the Sellers' Obligations ........................................22

ARTICLE VIII TERMINATION .................................................................................22
    8.1    Termination..................................................................................22
    8.2    Expense Reimbursement and Breakup Fee...................................24
    8.3    Effect of Termination or Breach ..................................................24

ARTICLE IX POST-CLOSING COVENANTS ..........................................................24
    9.1    Certain Consents .........................................................................25
    9.2    Name Changes .............................................................................25
    9.3    Accounts Receivable; Collections ...............................................25
    9.4    Confidentiality .............................................................................25
    9.5    Taxes ............................................................................................26
    9.6    Access ..........................................................................................26

ARTICLE X MISCELLANEOUS ..............................................................................26
    10.1    Non-Survival of Representations and Warranties........................26
    10.2    Expenses .....................................................................................27
    10.3    Amendment...................................................................................27
    10.4    Waivers .........................................................................................27
    10.5    Notices .........................................................................................27
    10.6    Counterparts; Electronic Execution ...........................................28
    10.7    Headings ......................................................................................28
    10.8    SUBMISSION TO JURISDICTION; WAIVER OF TRIAL BY JURY .............28
    10.9    Governing Law .............................................................................29
    10.10    Binding Nature; Assignment.......................................................29
    10.11    No Third Party Beneficiaries ......................................................29
    10.12    Severability ..................................................................................29
    10.13    Construction.................................................................................29
    10.14    Public Announcements ................................................................30
    10.15    Entire Understanding ..................................................................30
    10.16    Closing Actions............................................................................30
    10.17    Conflict Between Transaction Documents ..................................30

**EXHIBITS**

Exhibit A                   Form of Bid Procedures Order
Exhibit B                   Form of Bill of Sale
Exhibit C                   Form of Intellectual Property Assignment
Exhibit D                   Form of Assignment and Assumption Agreement

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into as of this 3 day of August, 2010, by and among (i) UBP Acquisition Corp., a Delaware corporation ("Purchaser"), (ii) Universal Building Products, Inc., a Delaware corporation ("Parent"), and (iii) Universal Form Clamp, Inc., a Delaware corporation, FORM-CO, Inc., a Delaware corporation, Accubrace, Inc., a Delaware corporation, and Don De Cristo Concrete Accessories, Inc., a California corporation (Parent, together with the parties listed in this clause (iii), each, a "Seller" and collectively, the "Sellers").

WHEREAS, Purchaser is the holder of senior secured claims against Parent and the other Sellers, in an aggregate original principal amount of $42,331,692.45.

WHEREAS, Seller desires to sell, contribute, convey, assign, transfer and deliver to Purchaser, and Purchaser desires to purchase, acquire and take assignment and delivery of, all of the Acquired Assets (as defined herein).

NOW THEREFORE, In consideration of the mutual covenants, agreements and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

1.1     Definitions.  Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"Accounts Receivable" means all accounts and notes receivable (whether current or non-current) in respect of goods shipped, products sold or services rendered prior to the Closing Date.

" Acquired Assets" has the meaning set forth in Section 2.1.

"Acquired Intellectual Property" has the meaning set forth in Section 2.1(e).

"Acquisition Proposal" means a proposal (other than by Purchaser or its Affiliates) relating to any merger, consolidation, business combination, sale or other disposition of any of the Acquired Assets pursuant to one or more transactions, the sale of any of the outstanding shares of capital stock or equity interests of any Seller (including by way of a tender offer, foreclosure or plan of reorganization or liquidation) or a similar transaction or business combination involving one or more Third Parties and any Seller, in each case excluding sales of inventory in the Ordinary Course of Business to the extent permitted by the Cash Collateral Order and the DIP Facility.

"Administrative Agent" means OCM FIE, L.P., as administrative agent under the Pre-Petition Credit Agreement.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether by contract, through the ownership of voting securities or otherwise.

"Agreement" means this Asset Purchase Agreement, including all of the Exhibits hereto, as the same may be amended from time to time in accordance with its terms.

"Allocation" has the meaning set forth in Section 3.6.

"Auction" means the auction conducted by the Sellers pursuant to the Bid Procedures Order for the Acquired Assets in the event a Qualified Bid is timely received prior to the Bid Deadline (as defined in the Bid Procedures Order).

"Auction Deadline Date" means the date that is twenty nine (29) days after the Petition Date.

" Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bid Deadline" means the date that is twenty six (26) days after the Petition Date.

"Bid Procedures" means the bidding procedures attached as an exhibit to the Bidding Procedures Order.

"Bid Procedures Order" means the order of the Bankruptcy Court, in the form of Exhibit A or such other form consented to by Purchaser in its sole discretion.

"Bid Procedures Order Deadline Date" means the date that is fourteen (14) days after the Petition Date.

"Bids" has the meaning set forth in Section 6.5.

"Bidders" has the meaning set forth in Section 6.5.

"Books and Records" means all books, ledgers, files, reports, plans, drawings and operating records of every kind, including all records and lists of the Sellers relating to (i) inventory, merchandise analysis, product, business and marketing plans, marketing reports, research and development materials and creative material, (ii) customers, suppliers or personnel of any Seller (including customer lists, mailing lists, e-mail address lists, recipient lists, sales records, correspondence with customers, customer files and account histories, supply lists and records of purchases from and correspondence with suppliers), and (iii) accounting records, Tax records and Tax Returns; provided, however, that "Books and Records" shall not include the originals of any Seller's minute books, stock books or Tax Returns.

"Breakup Fee" has the meaning set forth in Section 8.2(b).

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in the State of New York are authorized by Law to close.

"Cash Collateral Order" means an order (including a Final Order) to be entered by the Bankruptcy Court, authorizing the Sellers to use Purchaser's cash collateral and providing the Lenders with adequate protection pursuant to sections 361, 362 and 363 of the Bankruptcy Code, on an interim basis.

"Chapter 11 Cases" means the cases commenced by the Sellers under chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 3.2.

"Closing Date" has the meaning set forth in Section 3.2.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" means any Contract or other binding agreement or arrangement (written or oral) with any labor union or organization, works council or other employee representative.

"Contract" means any agreement, license, contract, commitment, Collective Bargaining Agreement or other binding arrangement or understanding, whether written or oral, and with respect to any Contract to which any Seller is a party, such contract which any Seller is permitted under the Bankruptcy Code to assume and assign other than an Employee Benefit Plan.

"Credit Bid" means the credit bid of Credit Party Obligations under, and as defined in, the Pre-Petition Credit Agreement, in the Credit Bid Amount, such that upon consummation of the Closing, such Credit Party Obligations shall be satisfied and all liens with respect thereto shall be released.

"Credit Bid Amount" means $25,000,000 (or such higher amount as may be indicated by Purchaser from time to time in a Credit Bid Direction).

"Credit Bid Direction" means a written direction by Purchaser to the Administrative Agent to, among other things, (i) credit bid up to the Credit Bid Amount toward the purchase of the Acquired Assets on the terms and subject to the conditions contained herein and therein, (ii) accept the Acquired Assets on the terms and subject to the conditions contained herein in exchange for the Credit Bid Amount, and (iii) assign its right to receive the Acquired Assets on the terms and subject to the conditions contained herein to Purchaser.

"DIP Facility" means the credit facility governed by the DIP Loan Documents and the DIP Order.

"DIP Loan Documents" means the Senior Secured Super-Priority Debtor-In-Possession Promissory Note, made by and among the Sellers in favor of the Purchaser, the DIP Guaranty (as defined therein), the security agreements and each of the other agreements, documents and instruments delivered to or in favor of Purchaser or any holder in connection with any of the foregoing, as the same may be amended from time to time in accordance with their respective terms.

"DIP Order" means, collectively, those certain final orders entered by this Court approving the DIP Facility.

"Electronic Delivery" has the meaning set forth in Section 10.6.

"Employee Benefit Plan" means any "employee benefit plan" (as defined in ERISA §3(3)) and any other benefit or compensation plan, program, agreement or arrangement maintained, sponsored, or contributed or required to be contributed to by any Seller or any ERISA Affiliate or with respect to which any Seller or any ERISA Affiliate has any Liability.

"Environmental Laws" means, whenever in effect, all federal, state, provincial, local and foreign statutes, Laws (including CERCLA and analogous state Laws), ordinances, directives and other provisions having the force or effect of law, all judicial and administrative Orders and determinations, all contractual obligations and all common law, in each case concerning public health and safety, worker health and safety, or pollution or protection of the environment. For purposes of the foregoing, "CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) and any Laws promulgated thereunder.

"Environmental Liabilities" means any and all Liability (including any investigatory, corrective or remedial obligation) arising under Environmental Laws, including any such Liability relating to (i) any Seller or any predecessor or Affiliate of any Seller, (ii) the operation of the business of any Seller prior to the Closing, (iii) any property, asset or interest of any Seller (whether an Acquired Asset or Excluded Asset), (iv) any property, facility, or location, or (v) any operations, events, facts, conditions, or circumstances occurring or existing on or prior to the Closing Date, including any Release, threatened Release, treatment, storage, disposal, or arrangement for disposal of or any exposure of any Person to Hazardous Substances occurring or existing on or prior to the Closing Date (whether or not constituting a breach of any representation or warranty herein).

"ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with any Seller for purposes of Code § 414.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.3.

"Exhibits" means the exhibits attached hereto.

"Expense Reimbursement" has the meaning set forth in Section 8.2(a).

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or taxing authority, or arbitral body.

"Hazardous Substances" means any wastes, pollutants, contaminants or chemicals, any industrial, toxic or otherwise hazardous materials, substances or wastes, any explosive or radioactive substances, and any other substance with respect to which Liability or standards of conduct may be imposed under Environmental Laws, including petroleum and petroleum related substances, products, by products and wastes, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon, urea, formaldehyde, mold, lead based paint, noise, odor and radiation.

"Indebtedness" means, with respect to any Person as of any date of determination, without duplication: (i) all obligations of such Person for borrowed money or in respect of loans or advances, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or debt securities, (iii) all obligations in respect of letters of credit and bankers' acceptances issued for the account of such Person, (iv) all obligations arising from cash/book overdrafts, (v) all obligations arising from deferred compensation arrangements, (vi) all obligations of such Person secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, (vii) all guaranties or assurances of such Person in connection with any of the foregoing, (viii) all capital lease obligations, (ix) all deferred rent, (x) all indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise, (xi) all obligations under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (xii) all obligations (determined on the basis of actual, not notional, obligations) with respect to interest rate protection agreements, interest rate swap agreements, foreign currency exchange agreements, or other interest or exchange rate hedging agreements or arrangements, (xiii) all other liabilities classified as liabilities in accordance with GAAP as of the date of determination of such Indebtedness, and (xiv) all fees, accrued and unpaid interest, premiums or penalties related to any of the foregoing.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, divisionals, extensions and reexaminations thereof, (ii) trademarks, service marks, designs, trade dress, logos, slogans, trade names, internet

17465192.2

domain names, corporate names, all applications, registrations and renewals in connection therewith, and all translations, adaptations, derivations and combinations of any of the foregoing, together with all goodwill associated with any of the foregoing, (iii) copyrights, mask works and copyrightable works, and all applications, registrations and renewals in connection therewith, (iv) trade secrets and confidential information (including formulations, ideas, research and development, information, know-how, inventions, technology, formulas, compositions, manufacturing and production processes and techniques, technical, product and marketing data, financial and marketing plans, customer and supplier lists, customer and product sales history and information, designs, drawings, plans, proposals and specifications), (v) computer software and systems (including source code, executable code, data, databases and related documentation), websites, URLs, email addresses, and telephone numbers, (vi) copies and tangible embodiments of any of the foregoing in whatever form or medium and (vii) other proprietary and intellectual property rights.

"Inventory" means all inventory of any kind or nature, whether or not prepaid, and wherever located, held or owned by any Seller, including all raw materials, work in process, semi-finished and finished products, replacement and spare parts, packaging materials, operating supplies, in-transit or consigned inventory and other similar items.

"Law" means any law, statute, regulation, code, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

"Liability" means any obligation or liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether determined or determinable, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes, product liability, infringement liability or Environmental Liability.

"Lien" or "Liens" means any claim, lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, right of pre-emption, right of first refusal or other Third Party right, Tax (including foreign, federal, state and local Tax), Order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that Purchaser is a successor, transferee or continuation of any or all Sellers, and (iv) any leasehold interest, license or other right, in favor of a Third Party or a Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Material Adverse Effect" means, any event, change, condition or matter that, individually or in the aggregate, is or could reasonably be expected to be materially adverse to, or materially impairs the value of, the Acquired Assets, or which materially impairs the ability of any Seller to perform its obligations under this Agreement or has a material adverse effect on or

prevents or materially delays the consummation of the transactions contemplated hereby; provided, that the act of filing the Chapter 11 Cases in and of itself shall not constitute a Material Adverse Effect.

"Notice" means any summons, citation, directive, Order, claim, litigation, proceeding, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or any other Governmental Authority, or any other entity or any individual, and shall include the imposition of any Lien on property owned, leased, occupied or used by any Seller pursuant to any Environmental Law.

"Order" means any award, decision, decree, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

"Ordinary Course of Business" means the operation of the business of the Sellers in the usual and ordinary course in the manner operated prior to the cessation of operations that occurred on August 3, 2010 (including with respect to quantity and frequency).

"Parent" has the meaning set forth in the preamble hereto.

"Permits" means licenses, permits, approvals, franchises, bonds, accreditations, certificates of occupancy, authorizations, operating permits, registrations, plans and the like.

"Person" means any corporation, partnership (including any limited partnership and any limited liability partnership), joint venture, limited liability company, organization, trust, entity, authority or natural person.

"Petition Date" means the date of the filing of the chapter 11 petitions of the Sellers.

"Pre-Petition Credit Agreement" means Credit Agreement dated as of April 28, 2006, among the Administrative Agent, the lenders party thereto and the certain Sellers signatories thereto, as amended, restated, supplemented and heretofore modified.

"Proceeding" means any action, claim, charge, complaint, dispute, demand, grievance, action, litigation, audit, investigation, review, inquiry, arbitration, liability, damage, suit in equity or at law, administrative, regulatory or quasi-judicial proceeding, account, cost, expense, setoff, contribution, attorney's fee or cause of action of whatever kind or character.

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchaser" has the meaning set forth in the preamble hereto.

"Qualified Bid" or "Qualified Bids" has the meaning set forth in Section 6.4(b).

"Release" means any release, emission, disposal, leaching, spilling, pumping, emptying, discharging, injecting, escaping, dumping, leaking or migration into the environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Substances) or any structure, facility or property.

"Restricted Names" has the meaning set forth in Section 9.2.

"Rule" or "Rules" means the Federal Rules of Bankruptcy Procedure.

"Sale Motion" has the meaning set forth in Section 6.4(a).

"Sale Order" means the Final Order of the Bankruptcy Court, in form and substance acceptable to Purchaser in its sole discretion, to be entered by the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code, which Final Order, amongst other approvals, approves the sale of the Acquired Assets to Purchaser free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code.

"Sale Order Deadline" means the date that is thirty (30) days after the Petition Date.

"Seller" and "Sellers" have the meanings set forth in the preamble hereto.

"Tax" and, with correlative meaning, "Taxes" mean with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated, gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock, franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, customs duty or other tax, governmental fee or other like assessment, charge or tax of any kind whatsoever and denominated by any name whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (domestic or foreign), whether such Tax is disputed or not, (ii) Liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (iii) Liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any "affiliated group" (as such term is defined in Section 1504 of the Code) or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax Law of which any Seller is or has been a member, or being included (or required to be included) in any Tax Return relating thereto.

"Tax Return" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by any Person relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Termination Date" means: (x) if the Sale Order is not subject to Rule 6004(h) under the Bankruptcy Code, the date that is four (4) days following the Sale Order Deadline, or (y) if the Sale Order is subject to Rule 6004(h) under the Bankruptcy Code, the date that is fourteen (14) days following the Sale Order Deadline.

"Third Party" means any Person other than the Sellers, Purchaser or any of their respective Affiliates.

17465192.2

"Transaction Documents" means this Agreement, and all other agreements, instruments, certificates and other documents to be entered into or delivered by any party in connection with the transactions contemplated to be consummated pursuant to this Agreement.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar foreign, state, or local Law, regulation or ordinance.

    1.2    Rules of Construction. Unless the context otherwise clearly indicates, in this Agreement:

        (a)    the singular includes the plural;

        (b)    "includes" and "including" are not limiting;

        (c)    "may not" is prohibitive and not permissive; and

        (d)    "or" is not exclusive.

<h2 style="text-align:center">ARTICLE II<br>PURCHASE AND SALE</h2>

    2.1    Purchase and Sale of Assets. Subject to the terms and conditions set forth in this Agreement, at the Closing, the Sellers shall sell, contribute, convey, assign, transfer and deliver to Purchaser, free and clear of all Liens, whether arising prior to, on or subsequent to the Petition Date, and Purchaser shall purchase, acquire and take assignment and delivery of, for the Purchase Price, all rights, titles and interests of every kind and nature of the Sellers (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise) listed below of the Sellers as of the Closing Date, whether tangible or intangible, wherever located and by whomever possessed (collectively, the "Acquired Assets"):

        (a)    all tangible personal property, including all machinery, equipment (including all transportation and office equipment), vehicles, computers, mobile phones, personal digital assistants, fixtures, trade fixtures, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible personal property of any kind, in each case owned by the Sellers, wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by any Seller or any other space where any of the Sellers' properties and or any other assets may be situated, and including all Permits and warranties, to the extent relating (directly or indirectly) to the foregoing;

        (b)    all Inventory;

        (c)    all concrete forms, braces, beams, joists, walers, turnbuckles, lifting systems, forming accessories, ties, safety equipment and brackets, shoring equipment and bridge brackets owned by any Seller;

(d)     all Accounts Receivable and all claims, including deposits, advances, prepaid and other current assets, rights under warranties and guaranties, rights in respect of promotional allowances, vendor rebates and to other refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether known or unknown or contingent or non-contingent); the right to receive and retain mail, Accounts Receivable payments and other communications of any Seller; and the right to bill and receive payment for products shipped or delivered and services performed but unbilled or unpaid as of the Closing;

(e)     all Intellectual Property owned by any Seller, along with all income, royalties, damages and payments due or payable to any Seller as of the Closing or thereafter, including damages and payments for past, present or future infringements or misappropriations thereof or other conflicts therewith, the right to sue and recover for past, present or future infringements or misappropriations thereof or other conflicts therewith, and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including all copies and tangible embodiments of any such Intellectual Property in any Seller's possession or control (collectively, the "Acquired Intellectual Property");

(f)     all Books and Records and all advertising, marketing and promotional materials and all other printed or written materials;

(g)     all cash and cash equivalents of the Sellers as of the Closing (including all amounts required to be held in a lock box pursuant to the Cash Collateral Order), excluding any amounts received by the Sellers pursuant to the DIP Facility; and

(h)     any rights, claims or causes of action of any Seller against Third Parties arising out of events occurring prior to the Closing Date (including, for the avoidance of doubt, those arising out of events occurring prior to the Petition Date) and relating to the Acquired Assets identified in Section 2.1(a)-(g).

2.2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, each of the properties, assets and rights (contractual or otherwise) of the Sellers, whether tangible or intangible, wherever located and by whomever possessed, whether or not listed below but including for the avoidance of doubt all of the properties, assets and rights identified in this Section 2.2, but specifically excluding the Acquired Assets, shall be retained by the Sellers and shall not be sold or transferred to, or purchased by, Purchaser (all of the properties, assets and rights excluded pursuant to this Section 2.2, collectively, the "Excluded Assets"):

(i)     any equity interests held by any Seller in any Person (including any other Seller or any subsidiary thereof); and

(ii)     all land, together with all buildings, structures, fixtures and other improvements located thereon owned by any Seller, and any part or parcel thereof.

2.3     No Liabilities Assumed.

(a)     Purchaser shall not be the successor of any or all of the Sellers, and each Seller acknowledges and agrees that Purchaser will not assume, nor in any way be liable or responsible for, any claim or Liability of any Seller or relating to or arising out of the business of

10

the Sellers, the Excluded Assets or the Acquired Assets (including Liabilities relating to the pre-petition or post-petition operation of the business of the Sellers, the Excluded Assets or to the Acquired Assets (or the use thereof)), whether or not listed below, including any Indebtedness, Employee Benefit Plan, Collective Bargaining Agreement or other Liability of any Seller or any predecessor or Affiliate of any Seller whatsoever or any ERISA Affiliate (any and all such obligations or Liabilities, "Excluded Liabilities"); provided, that, in furtherance and not in limitation of the foregoing, Purchaser is expressly not assuming, any of the following Liabilities, whenever or wherever arising:

(i)     all claims or Liabilities of any Seller that relate to any of the Excluded Assets, including executory Contracts and unexpired Leases;

(ii)     all Liabilities of any Seller relating to Taxes;

(iii)     all accounts payable arising prior to the Closing;

(iv)     all Liabilities in respect of Indebtedness;

(v)     all Environmental Liabilities regardless of whether such Liabilities accrue or attach to the Sellers or to any other Person in the first instance;

(vi)     all Liabilities that may exist or may in the future arise pursuant to the WARN Act relating to any action or inaction of the Sellers prior to or upon the Closing;

(vii)     all Liabilities of the Sellers resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of any Seller (or any of its current or former officers, directors, employees or agents) anywhere or ownership or lease of any properties or assets or any properties or assets previously used by any Seller at any time, or other actions, omissions or events occurring prior to the Closing and which (i) constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of any Law or (ii) relate to any and all Proceedings against any Seller whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened;

(viii)     all Liabilities arising out of any Proceeding commenced against any Seller or any predecessor or Affiliate of any Seller after the Closing and arising out of or relating to any occurrence or event happening prior to the Closing;

(ix)     all Liabilities arising out of or relating to any infringement or misappropriation of, or other conflict with, the Intellectual Property of any Third Party arising out of or related to the conduct of the business of the Sellers or any act or omission of any Seller or any predecessor or Affiliate of any Seller prior to the Closing;

(x)     all Liabilities arising out of, or relating to, any indemnification obligations of any Seller, including indemnification obligations pursuant to supply agreements, service agreements, purchase agreements, leases and any other type of Contract, and Liabilities to indemnify, reimburse or advance amounts to any officer, director, employee or agent of any Seller or any of their respective Affiliates;

11

(xi)    all Liabilities with respect to the employees or former employees, or both (or their representatives) of any Seller arising prior to the Closing Date, including payroll, wages, salaries, bonuses, commissions, benefits, retention or stay bonus arrangements, other compensation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit sharing plans, health care plans or benefits, or any other employee plans or benefits or other compensation of any kind to any employee, and obligations of any kind, including Liabilities arising under any Collective Bargaining Agreement, or employment, severance, retention or termination agreement with any employee, consultant or contractor (or their representatives) of any Seller;

(xii)    all Liabilities relating to or arising under or in connection with any Employee Benefit Plan or any other employee benefit or compensation plan, program, agreement or arrangement at any time maintained, sponsored or contributed or required to be contributed to by any Seller or any ERISA Affiliate, or with respect to which any Seller or any ERISA Affiliate has any Liability;

(xiii)    all Liabilities arising out of or relating to services, products or product or service warranties of any Seller or any predecessor or Affiliate of any Seller to the extent provided, developed, designed, manufactured, marketed, sold or distributed prior to the Closing;

(xiv)    all Liabilities of any Seller to any current, former or prospective stockholder or other equity interest holder of any Seller, including all Liabilities of any Seller related to the right to or issuance of any capital stock or other equity securities;

(xv)    all Liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by any Seller in connection with, resulting from or attributable to the transactions contemplated by this Agreement, the Chapter 11 Cases or otherwise; provided, however, that nothing herein shall affect Purchaser's obligations under the Cash Collateral Order or the DIP Order;

(xvi)    all Liabilities of any Seller or any predecessor or Affiliate of any Seller based upon such Person's acts or omissions occurring after the Closing; and

(xvii)    all Liabilities of any Seller to Purchaser, its Affiliates, and its Affiliates' agents, advisors and representatives, whether under the Transaction Agreements or otherwise.

(b)    The Sellers, jointly and severally, agree to indemnify and hold Purchaser and each of its Affiliates and each of their respective officers, directors, managers, equity holders, partners, employees, agents and representatives and any Person claiming by or through any of them harmless with respect to the Excluded Assets and Excluded Liabilities, including any loss, damage, Liability, cost or expense (including legal fees and expenses and court costs) arising out of or in connection with, or otherwise relating to, the Excluded Assets and the Excluded Liabilities.

## ARTICLE III
## CLOSING

3.1    <u>Purchase Price</u>.  The aggregate consideration for the Acquired Assets shall be the Credit Bid (the "<u>Purchase Price</u>").

3.2    <u>Closing</u>.    Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "<u>Closing</u>") will take place at the offices of Kirkland & Ellis LLP, 333 South Hope Street, Los Angeles, California 90071 at 10:00 a.m. as soon as practicable after the date on which the conditions set forth in <u>Article VII</u> have been satisfied or waived but no later than three (3) days thereafter; or on such other date or place as Purchaser and Parent may determine (the "<u>Closing Date</u>").

3.3    <u>Deliveries by the Sellers</u>.  At the Closing, the Sellers shall deliver or procure delivery to Purchaser of:

(a)    physical possession of all of the Acquired Assets capable of passing by delivery, it being understood that title in such Acquired Assets shall pass to Purchaser at the Closing notwithstanding any delay or failure in such delivery;

(b)    one (1) or more bills of sale, in the form attached hereto as <u>Exhibit B</u>, duly executed by the Sellers, conveying in the aggregate all of the owned personal property of the Sellers included in the Acquired Assets;

(c)    Intellectual Property assignments in the forms attached hereto as <u>Exhibit C</u>, each duly executed by the Sellers and each in recordable form to the extent necessary to assign such rights;

(d)    certificates of title and title transfer documents to all titled motor vehicles;

(e)    an assignment and assumption agreement, in the form of <u>Exhibit D</u>, with respect to the Sellers' Permits and warranties, to the extent relating (directly or indirectly) to the Acquired Assets;

(f)    certified copies of the resolutions of the board of directors of each Seller authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby;

(g)    all of the Books and Records;

(h)    evidence, reasonably satisfactory to Purchaser, of the required name changes of the Sellers and each of their respective Affiliates as more fully set forth in <u>Section 9.2</u>;

(i)    such other instruments as are necessary to vest in Purchaser good and marketable title in and to the Acquired Assets in accordance with the provisions hereof; and

(j) such other documents or instruments as are required to be delivered by any Seller at the Closing pursuant to the terms hereof or that Purchaser reasonably requests prior to the Closing Date to effect the transactions contemplated hereby.

3.4 <u>Deliveries by Purchaser</u>. At the Closing, Purchaser will deliver to the Sellers:

(a) an assignment and assumption agreement, in the form of <u>Exhibit D</u>, with respect to the Sellers' Permits and warranties, to the extent relating (directly or indirectly) to the Acquired Assets; and

(b) such other documents, instruments and certificates as the Sellers may reasonably request.

3.5 <u>Further Assurances</u>. From time to time prior to and after the Closing and without further consideration, the Sellers, upon the request of Purchaser, shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably request in order to consummate more effectively the purchase and sale of the Acquired Assets as contemplated hereby, to vest in Purchaser title to the Acquired Assets transferred hereunder and to permit Purchaser to perfect, record or protect its interests in the Acquired Assets, or to otherwise more fully consummate the transactions contemplated by this Agreement.

3.6 <u>Allocation of Purchase Price</u>. Purchaser shall, within the later of (i) ninety (90) days after the Closing Date, or (ii) thirty (30) days prior to the date by which the Sellers' federal income Tax Returns must be filed, prepare and deliver to the Sellers a schedule allocating the amount treated as the purchase price for federal, state and other applicable income tax purposes among the Acquired Assets (such schedule, the "<u>Allocation</u>"), in accordance with Section 1060 of the Code and the Treasury regulations thereunder (and any similar provision of state, local, or foreign Law). The Allocation (including the amount of the purchase price for tax purposes) shall be binding upon the Sellers. Purchaser and the Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) in a manner that is consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith unless required by applicable Law. Purchaser and the Sellers shall cooperate in the filing of any forms (including Internal Revenue Service Form 8594 under Section 1060 of the Code) with respect to such Allocation. Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 3.6</u> shall survive the Closing without limitation.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers, jointly and severally, represent and warrant on the date of this Agreement and on the Closing Date to Purchaser that the statements contained in this <u>Article IV</u> are materially correct and complete to the best of the knowledge of each officer and director of each of the Sellers.

4.1 <u>Organization, Standing</u>. Each Seller is a legal entity duly organized, validly existing and in good standing under the Laws of the state of its organization, is qualified to do business in every jurisdiction in which it is required to be qualified and has all requisite corporate or similar power and authority and all Permits necessary to own, lease and operate its properties

14

and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing or with active status as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified, in good standing or to have such power or authority, has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.2     Validity of Agreement; Power.  Subject to any necessary authorization from the Bankruptcy Court, each Seller has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The board of directors of each Seller has duly approved the Transaction Documents to which such Person is a party and has duly authorized the execution and delivery of such Transaction Documents and the consummation of the transactions contemplated thereby. No other corporate or organizational proceedings on the part of any Seller are necessary to approve and authorize the execution and delivery of the Transaction Documents to which such Seller is a party and the consummation by such Seller of the transactions contemplated thereby. Subject to any necessary authorization from the Bankruptcy Court, all Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of the Sellers, enforceable against the Sellers in accordance with their terms.

4.3     No Conflicts or Violations.  The execution, delivery and, subject to the approval of the Bankruptcy Court, performance of the Transaction Documents and the consummation of the transactions contemplated thereby, by the Sellers do not and shall not conflict with, result in any breach, default or violation of, give rise to a right of modification, termination, acceleration or loss of a material benefit under, result in the creation of any Lien or Liability under, require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Governmental Authority, under (i) any provision of the certificate of incorporation or bylaws of any Seller, (ii) any Contract to which any Seller is a party to or by which it is bound or (iii) any determination or Order of any Governmental Authority or Law applicable to any Seller or its property or assets.

4.4     Title to Assets.

(a)     The Sellers have good and marketable title to, and own and possess all rights and interests in, including the right to use, each of the Acquired Assets, including all Acquired Intellectual Property.

(b)     Subject to Bankruptcy Court approval, the Sellers have the power and the right to sell, assign and transfer and, at the Closing, the Sellers will sell and deliver to Purchaser and Purchaser will acquire from the Sellers, good and marketable title to the Acquired Assets, free and clear of all Liens.

4.5     Brokers.  The Sellers have not incurred any Liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby for which Purchaser or any of its Affiliates could become liable.

4.6   Bank Accounts Schedule.   The Sellers have provided Purchaser with a true and complete list of all bank accounts, safety deposit boxes and lock boxes (designating each authorized signatory with respect thereto) of the Sellers.

4.7   Information Accurate and Complete; Reliance.   Without limiting the specific language of any other representation or warranty herein, all information furnished or to be furnished by, or on behalf of, the Sellers to Purchaser in this Agreement or otherwise delivered or disclosed or to be delivered or disclosed by, or on behalf of, the Sellers to Purchaser or any of Purchaser's Affiliates is or will be accurate and complete, includes or will include all material facts required to be stated therein and does not or will not contain any untrue statement of a material fact or omit any material fact necessary to make the statements therein not misleading. There is no fact which has not been disclosed to Purchaser which has or could reasonably be expected to have a Material Adverse Effect.

4.8   Closing Date.   All of the representations and warranties contained in this Article IV are true and correct on the date of this Agreement and shall be true and correct on the Closing Date as though then made and as though the Closing Date was substituted for the date of this Agreement throughout such representations and warranties.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Sellers on the date of this Agreement and on the Closing Date that the statements contained in this Article V are materially correct and complete to the best of the knowledge of each officer and director of Purchaser.

5.1   Organization.   Purchaser is a corporation validly existing and in good standing under the Laws of the State of Delaware and has the full power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.

5.2   Validity of Agreement; Power.   Purchaser has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.   The board of directors of Purchaser has duly approved the Transaction Documents to which Purchaser is a party and has duly authorized the execution and delivery of such Transaction Documents and the consummation of the transactions contemplated thereby.   No other corporate or organizational proceedings on the part of Purchaser are necessary to approve and authorize the execution and delivery of the Transaction Documents to which Purchaser is a party or the consummation by Purchaser of the transactions contemplated thereby. The Transaction Documents to which Purchaser is a party constitute valid and binding agreements of Purchaser, enforceable against Purchaser in accordance with their terms (except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar laws affecting creditors' rights generally and by general equitable principles).

17465192.2

5.3     No Conflicts or Violations.  The execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby, by Purchaser do not and shall not conflict with, result in any breach, default or violation of, give rise to a right of modification, termination, acceleration or loss of a material benefit under, result in the creation of any Lien or Liability under, require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Governmental Authority other than the Bankruptcy Court, under (i) any provision of the certificate of incorporation or bylaws of Purchaser, (ii) any contract to which Purchaser is a party to or by which it is bound or (iii) any determination or Order of any Governmental Authority or Law applicable to Purchaser or its property or assets.

**ARTICLE VI**
**PRE-CLOSING COVENANTS**

6.1     Consents and Approvals.

(a)     Consents.  The Sellers shall, at their sole cost and expense, use reasonable best efforts to (i) obtain all necessary consents and approvals to consummate the purchase and sale of the Acquired Assets, together with any other necessary consents and approvals to consummate the transactions contemplated hereby, including obtaining entry of the Bid Procedures Order and Sale Order without modification except as Purchaser may in its sole discretion consent, and (ii) make, as reasonably requested by Purchaser, all filings, applications, statements and reports to all authorities that are required to be made prior to the Closing Date by or on behalf of the Sellers or any of their respective Affiliates pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby.

(b)     Governmental Consents.  Each of the parties shall give any other notices to, make any other filings with, and use reasonable best efforts to obtain, any other authorizations, consents and approvals of any Governmental Authority in connection with the matters contemplated by this Agreement.

6.2     Access to Information and Facilities.  The Sellers agree that, prior to the Closing Date, Purchaser, each of Purchaser's Affiliates, and each of their respective representatives shall have full and complete access to all facilities of any Seller and shall be entitled to make such investigation of the properties, businesses and operations of any Seller (including conducting a physical inventory of the Inventory) and such examination of the Books and Records and financial condition of any Seller as any of them may in its sole discretion request and to make extracts and copies of the Books and Records; provided, that no investigation pursuant to this Section 6.2 shall affect any representations or warranties made herein or the conditions to the obligations of the respective parties to consummate the transactions contemplated by this Agreement.

6.3     Notification of Certain Matters.

(a)     The Sellers shall give notice to Purchaser of (i) the occurrence or nonoccurrence of any event that would be likely to cause either (A) any representation or

warranty of the Sellers contained in this Agreement, or in connection with the transactions contemplated hereunder, to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing or (B) directly or indirectly, any Material Adverse Effect, and (ii) any material failure of any Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder. Notwithstanding the foregoing, the delivery of any notice pursuant to this <u>Section 6.3(a)</u> shall not be deemed to cure any breach of any representation, warranty, covenant or agreement or to satisfy any condition, or limit or otherwise affect the remedies available to Purchaser hereunder.

(b)     The Sellers shall add Purchaser, and Purchaser's counsel, to the Sellers' list of entities entitled to notice pursuant to Rule 2002 and otherwise provide notice to Purchaser of all matters that are required to be served on the Sellers' creditors pursuant to the Bankruptcy Code and Rules.

6.4     <u>Bankruptcy Actions</u>.

(a)     Within two days following filing of the motion for entry of the Bid Procedures Order, the Sellers shall file with the Bankruptcy Court a motion, in form and substance approved by Purchaser, to approve the transactions contemplated hereby ("<u>Sale Motion</u>"), which motion shall seek the Bankruptcy Court's approval of this Agreement and each Seller's performance under this Agreement.

(b)     The Sellers shall use their best efforts to: (i) obtain entry of the Bid Procedures Order by the Bid Procedures Order Deadline Date, (ii) require that Bids be submitted no later than the Bid Deadline, (iii) ensure that the Auction (in the event that more than one Qualified Bid is submitted by the Bid Deadline), during which the Sellers will consider qualified bids ("<u>Qualified Bids</u>") from other prospective purchasers for the sale of at least ninety percent (90%), by value, of the Acquired Assets, on terms and conditions that are the same as or more favorable to the Sellers than the terms and conditions in this Agreement, and in accordance with the procedures set forth in the Bid Procedures Order, shall be held no later than the Auction Deadline Date, (iv) obtain entry of the Sale Order by no later than the Sale Order Deadline, and (v) consummate the Closing as soon as practicable after the approval of the Sale Order and no later than three (3) days following the date on which the Sale Order becomes a final, non-appealable order.

(c)     The Sellers will provide Purchaser with a reasonable opportunity to review and comment upon all motions and supporting papers prepared by the Sellers (including forms of Orders and Notices to interested parties) that relate to the transactions contemplated in this Agreement prior to the filing thereof in the Chapter 11 Cases. All motions, applications, petitions, schedules and supporting papers prepared by the Sellers and relating (directly or indirectly) to the transactions contemplated by this Agreement to be filed by or on behalf of the Sellers after the date hereof must be in form and substance satisfactory to Purchaser in its sole discretion.

(d)     The Sellers agree that they will promptly take such actions as are reasonably requested by Purchaser to assist in obtaining entry of the Sale Order and the Bid Procedures Order, including furnishing affidavits or other documents or information for filing

with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by the Sellers of their obligations under this Agreement and the Transaction Documents and demonstrating that Purchaser is a good faith buyer under Section 363(m) of the Bankruptcy Code.

(e)     The Sellers shall execute such documents and use their best efforts to take or cause to be taken all actions and do or cause to be done all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement (including to put Purchaser in actual possession and operating control of the Acquired Assets, to effectuate, record or perfect the transfer of the Acquired Assets to Purchaser, to confirm the title of the Acquired Assets in Purchaser, to assist Purchaser in exercising rights relating thereto, to obtain all consents, approvals and authorizations of Third Parties and to make all filings with and give all notices to Third Parties which may be necessary or required in order to effectuate the transactions contemplated hereby). The Sellers shall use their best efforts to fulfill or obtain the fulfillment of the conditions set forth in Sections 7.1 and 7.2.

6.5     Other Bids. Purchaser acknowledges that pursuant to the Bid Procedures Order, and after entry of the Bid Procedures Order, the Sellers will solicit bids ("Bids") from other prospective purchasers (collectively, "Bidders") for the sale of at least ninety percent (90%), by value, of the Acquired Assets, on terms and conditions substantially the same as or more favorable to the Sellers than this Agreement and in accordance with the procedures set forth in the Bid Procedures Order; provided, however, that following completion of the Auction until the Closing, no Seller shall, directly or indirectly, through any officer, director, employee, agent, professional or advisor, solicit any Acquisition Proposal or participate in any negotiations or discussions with respect to any Acquisition Proposal, and no Seller or any of its Affiliates shall (i) enter into a Contract with respect to an Acquisition Proposal or (ii) seek or support Bankruptcy Court approval of a motion or Order inconsistent in any material respect with the transactions contemplated by this Agreement.

6.6     Bankruptcy Matters.

(a)     The Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. The Sellers and Purchaser acknowledge that to obtain such approval, the Sellers must demonstrate that its has taken reasonable steps to obtain the highest and otherwise best offer possible for the Acquired Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and interested parties as ordered by the Bankruptcy Court.

(b)     In the event an appeal is taken or a stay pending appeal is requested, from either the Bid Procedures Order or the Sale Order, the Sellers shall immediately notify Purchaser of such appeal or stay request and shall promptly provide to Purchaser a copy of the related Notice of appeal or Order of stay. The Sellers shall also provide Purchaser with written notice of any motion or application filed by the Sellers in connection with any appeal from either of such Orders.

(c)     From and after the date hereof, the Sellers shall not take any action which is intended to (or could reasonably be expected to), or fail to take any action the intent (or a

reasonably expected result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Bidding Procedures Order or this Agreement. If Purchaser is the Successful Bidder (as defined in the Bid Procedures Order) at the Auction, the Sellers shall not take any action which is intended to (or could reasonably be expected to), or fail to take any action the intent (or a reasonably expected result) of which failure to act is to, result in the reversal, vacatur, voiding, modification or staying of the Sale Order or this Agreement.

6.7    Compliance with Orders. From the date hereof through the earlier to occur of the Closing or the termination of this Agreement pursuant to Section 8.1, the Sellers shall comply in all respects with each of the Bid Procedures Order, the Cash Collateral Order and the DIP Order.

6.8    Credit Bid Direction. Subject to the satisfaction or waiver by Purchaser of the conditions set forth in Section 7.1 and Section 7.2, at or prior to the Closing, Purchaser shall give the Credit Bid Direction to the Administrative Agent and shall otherwise take such actions as may be reasonably necessary to facilitate the consummation of the Credit Bid.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1    Conditions to Parties' Obligations. The obligations of Purchaser and the Sellers to consummate the purchase and sale of the Acquired Assets contemplated hereunder are subject to satisfaction of the following conditions precedent on or before the Closing Date:

(a)    Required Approvals. The Bankruptcy Court shall have entered an order approving this Agreement and the consummation by the Sellers of the transactions contemplated hereby, and such order shall not be subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

(b)    No Order. No Order shall have been issued by any Governmental Authority restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

7.2    Conditions to Purchaser's Obligations. The obligations of Purchaser to consummate the purchase of the Acquired Assets contemplated hereunder are subject to satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived (but only in writing) by Purchaser:

(a)    Accuracy of Representations and Warranties. All of the representations and warranties set forth in Article IV shall be true and correct in all material respects as of the Closing Date.

(b)    Performance of Covenants. The Sellers shall have performed and complied with in all material respects the obligations and covenants required by this Agreement to be performed or complied with by the Sellers on or prior to the Closing Date.

(c)    Officer's Certificate. The Sellers shall deliver to Purchaser a certificate signed by an executive officer of each Seller, dated the date of the Closing Date, in form and

substance reasonably satisfactory to Purchaser, certifying that the conditions specified in Sections 7.1 and 7.2 have been satisfied as of the Closing;

(d)    Bankruptcy Condition.

(i)    The Bid Procedures Order shall have been entered by the Bankruptcy Court as soon as practicable and no later than the Bid Procedures Order Deadline Date. The Sale Order shall have been entered by the Bankruptcy Court as soon as practicable and no later than the Sale Order Deadline and shall have become a Final Order. The Cash Collateral Order shall have been entered by the Bankruptcy Court as soon as practicable and no later than two (2) days after the Petition Date and the DIP Order shall have been entered by the Bankruptcy Court as soon as practicable and no later than fourteen (14) days after the Petition Date.

(ii)    Notwithstanding Sections 7.1, 7.2 and 3.2, nothing in this Agreement shall preclude Purchaser or the Sellers from consummating the transactions contemplated hereby if Purchaser, in its sole discretion, waives the requirement that the Sale Order or any other Order shall have become Final Orders. No notice of such waiver of this or any other condition to Closing need be given except to any official committee appointed in the Chapter 11 Cases and the United States Trustee, it being the intention of the parties hereto that Purchaser shall be entitled to, and is not waiving, the protection of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of Final Orders.

(e)    Receipt of Required Consents. The Sellers shall have delivered duly executed copies of all Third Party approvals, if any, necessary for the consummation of the transactions contemplated by this Agreement, each in form and substance reasonably satisfactory to Purchaser.

(f)    Credit Bid Approval. The Bankruptcy Court shall have entered an Order, binding on all parties in interest in the Chapter 11 Cases (which Order may be the DIP Order or Sale Order) unconditionally allowing a Claim by Purchaser in an amount equal to Purchaser's claims under the Pre-Petition Credit Agreement, and authorizing and approving the Credit Bid pursuant to Section 363(k) of the Bankruptcy Code.

(g)    Closing Deliveries. The Sellers shall have delivered to Purchaser the items set forth in Section 3.3.

(h)    DIP Loan Documents. There shall not have occurred a default or event of default under any of the DIP Loan Documents (unless waived by Purchaser, as lender thereunder), and the Sellers shall be in compliance in all material respects with each of the DIP Loan Documents.

(i)    Additional Matters. Purchaser shall have received such additional documents, instruments or items of information reasonably requested by it from the Sellers in respect of any aspect or consequence of the transactions contemplated hereby. All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the

transactions contemplated by this Agreement or by the other agreements referred to herein shall be reasonably satisfactory in form and substance to Purchaser and its counsel.

7.3     Conditions to the Sellers' Obligations.     The obligations of the Sellers to consummate the sale of the Acquired Assets contemplated hereunder are subject to the satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived (but only in writing) by the Sellers:

(a)     Accuracy of Representations and Warranties.     All of the representations and warranties set forth in Article V shall be true and correct in all material respects as of the Closing Date.

(b)     Performance of Covenants.     Purchaser shall have performed and complied with in all material respects the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

(c)     Officer's Certificate.     Purchaser shall deliver to the Sellers a certificate signed by an executive officer of Purchaser, dated the date of the Closing Date (in form and substance reasonably satisfactory to the Sellers), certifying that the conditions specified in Section 7.3 have been satisfied as of the Closing;

(d)     Closing Deliveries.     Purchaser shall have delivered to the Sellers the items set forth in Section 3.4.

## ARTICLE VIII
## TERMINATION

8.1     Termination.     This Agreement may be terminated prior to the Closing as follows:

(a)     by mutual written agreement of Purchaser and the Sellers;

(b)     by Purchaser or the Sellers if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(c)     by Purchaser or the Sellers (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants or agreements set forth in this Agreement on the part of the other party, which, in the case of any such breach that is curable prior to the Closing, is not cured within five (5) days following written notice to the party committing such breach;

(d)     by Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one or more conditions set forth in Section 7.2 has not been and cannot be fulfilled or satisfied on or prior to the date specified in such condition (if such

22

condition specifies a date other than the Closing Date by which such condition must be satisfied);

(e)  by Purchaser if the Sellers (i) designate any Person other than Purchaser as the Successful Bidder, (ii) seeks or supports Bankruptcy Court approval of an Acquisition Proposal (other than to or by Purchaser) or (iii) executes and delivers an agreement or understanding of any kind with respect to an Acquisition Proposal;

(f)  by Purchaser or the Sellers if the Bankruptcy Court enters an order approving any Acquisition Proposal (other than the sale of the Acquired Assets to Purchaser);

(g)  by Purchaser as a result of (i) the failure of the Bankruptcy Court to have entered the Bid Procedures Order by no later than the Bid Procedures Order Deadline Date (or such later date as Purchaser may determine in its sole discretion), or (ii) following the entry of the Bid Procedures Order but prior to the entry of the Sale Order, the Bid Procedures Order ceases to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction;

(h)  by Purchaser as a result of the failure of the Sellers to require that Bids be submitted no later than the Bid Deadline (or such later date as Purchaser may determine in its sole discretion);

(i)  by Purchaser as a result of the failure of the Sellers to have held the Auction by no later than the Auction Deadline Date (or such later date as Purchaser may determine in its sole discretion);

(j)  by Purchaser as a result of (i) the failure of the Bankruptcy Court to enter the Sale Order by no later than the Sale Order Deadline, or (ii) the Sale Order ceasing to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction;

(k)  by Purchaser on any day on or after the Termination Date if the Closing shall not have been consummated by such date;

(l)  by Purchaser if there has been a default or event of default under the DIP Facility (unless waived by Purchaser) or if the DIP Facility is otherwise terminated, or if a Termination Date has occurred pursuant to the Cash Collateral Order, or if the Sellers' right to use Purchaser's cash collateral is otherwise terminated;

(m)  by the Sellers (provided that no Seller is then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one (1) or more conditions set forth in Section 7.3 has not been and cannot be fulfilled or satisfied on or prior to the Closing Date; and

(n)  by Purchaser if the Chapter 11 Cases are dismissed or converted into one or more cases under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is

appointed for the Sellers and such trustee rejects the transactions contemplated by this Agreement.

8.2    Expense Reimbursement and Breakup Fee.

(a)    If this Agreement is terminated prior to the Closing for any reason other than validly by the Sellers pursuant to Section 8.1(c), the Sellers shall, concurrently with any such termination by the Sellers, and no later than two (2) Business Days following any such termination by Purchaser, immediately pay to Purchaser in cash, by wire transfer of immediately available funds to an account designated in writing by Purchaser, an amount equal to the costs and out-of-pocket expenses incurred by Purchaser in connection with its business, legal and accounting due diligence and the preparation and negotiation of this Agreement up to a maximum of eight hundred and fifty thousand dollars ($850,000) (the "Expense Reimbursement").

(b)    In addition to any Expense Reimbursement paid pursuant to Section 8.2(a), upon the first to occur of (i) the date any Seller consummates a sale of any of the Acquired Assets to an entity other than Purchaser or (ii) the date any Seller consummates a plan under the Bankruptcy Code without first selling the Acquired Assets to Purchaser, the Sellers shall immediately pay to Purchaser in cash, by wire transfer of immediately available funds to an account designated in writing by Purchaser, a breakup fee in an amount equal to four hundred thousand dollars ($400,000) (the "Breakup Fee"); provided, however, that the Breakup Fee shall not be payable to Purchaser if this Agreement is validly terminated by the Sellers pursuant to Section 8.1(c).

(c)    The parties acknowledge that the agreements contained in this Section 8.2 are an integral part of the transactions contemplated by this Agreement and constitute liquidated damages and not a penalty, and that, without these agreements, Purchaser would not have entered into this Agreement. The obligations of the Sellers under this Section 8.2 shall survive any termination or expiration of this Agreement; provided, however, that the Sellers shall have no obligation to pay the Expense Reimbursement or the Breakup Fee if this Agreement has been validly terminated by the Sellers pursuant to Section 8.1(c).

8.3    Effect of Termination or Breach. If the transactions contemplated hereby are not consummated and this Agreement is terminated (a) this Agreement shall become null and void and of no further force and effect, except (i) for Section 8.2, (ii) the applicable provisions of Article X, and (iii) that the termination of this Agreement for any reason shall not relieve any party hereto from any Liability which at the time of termination had already accrued to the other party hereto or which thereafter may accrue in respect of any act or omission of such party prior to such termination; and (b) if this Agreement is terminated for any reason other than validly by the Sellers pursuant to Section 8.1(c), the Sellers shall not be entitled to any damages, losses, or payment from Purchaser, and Purchaser shall have no further Liability of any kind to any Seller, any of its Affiliates, or any Third Party on account of this Agreement.

## ARTICLE IX
## POST-CLOSING COVENANTS

9.1     Certain Consents.  If a consent of a Third Party which is required in order to assign any Acquired Asset (or claim, right or benefit arising thereunder or resulting therefrom) is not obtained prior to the Closing Date, or if an attempted assignment would be ineffective or would adversely affect the ability of the Sellers to convey its interest in question to Purchaser, the Sellers will cooperate with Purchaser and use commercially reasonable efforts in any lawful arrangement to provide that Purchaser shall receive the interests of the Sellers in the benefits of such Acquired Asset.  If any consent or waiver is not obtained before the Closing Date and the Closing is nevertheless consummated, the Sellers agree to continue to use commercially reasonable efforts to obtain all such consents as have not been obtained prior to such date.

9.2     Name Changes.  On the Closing Date, the Sellers shall take all necessary action to change their names and the names of all of their respective Affiliates to one or more names that do not include the words "Universal," "UBP," "Don De Cristo Concrete Accessories," "Universal Form Clamp," "FORMCO," "FORM-CO," "Accubrace," "Universal Building Products," "Fairwinds" or any other name or mark included in the Acquired Intellectual Property or any translations, adaptations, derivations, variations or combinations of any of the foregoing or any name or mark confusingly similar thereto (collectively, the "Restricted Names").  The Sellers shall promptly notify Purchaser of such name change(s) and the new name(s) chosen by the Sellers and all of their respective Affiliates, as applicable.  From and after Closing, except in furtherance of consummation of the Chapter 11 Cases, the Sellers and all of their respective Affiliates shall cease all use of any Restricted Name, including by removing all Restricted Names from all letterhead, stationary, signage and tangible assets included in the Excluded Assets.

9.3     Accounts Receivable; Collections.  After the Closing, the Sellers shall permit, and hereby authorize, Purchaser to collect, in the name of the Sellers, all Accounts Receivable and to endorse with the name of any applicable Seller for deposit in Purchaser's account any checks or drafts received in payment thereof.  The Sellers shall promptly deliver to Purchaser any cash, checks or other property that it may receive after the Closing in respect of any Accounts Receivable or other asset constituting part of the Acquired Assets.

9.4     Confidentiality.  Following the Closing, the Sellers shall, and shall cause each of their respective Affiliates, and each such Person's respective directors, officers, employees and representatives to, maintain as confidential and not use or disclose (except as required by Law or as authorized in writing by Purchaser) (a) any information or materials relating to the Acquired Assets, or (b) any materials developed by Purchaser or any of its representatives (including its accountants, advisors, environmental, labor, employee benefits and any other consultants, lenders and legal counsel).  Except as otherwise permitted and provided above in this Section 9.4, in the event any Seller is required by Law to disclose any such confidential information after the Closing, such Seller shall promptly notify Purchaser in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall reasonably cooperate with Purchaser to obtain a protective order and otherwise preserve the confidentiality of such information consistent with applicable Law.  Information subject to the confidentiality obligations in this Section 9.4 does not include any information which (x) at the time of disclosure is generally available to or known by the public (other than as a result of its disclosure in breach of this Agreement or any other confidentiality obligation) or (y) becomes

available on a non-confidential basis from a Person who is not known to be bound by a confidentiality agreement or obligation with respect to the disclosed information.

9.5 <u>Taxes</u>.

(a) On or prior to the Closing, the Sellers shall pay all sales taxes, use taxes, payroll taxes, and other Taxes owed or owing with respect to the Acquired Assets and attributable to taxable periods or portions thereof prior to the Closing.

(b) Purchaser and the Sellers shall cooperate in providing each other with appropriate resale exemption certification and other similar tax and fee documentation.

(c) Purchaser and the Sellers shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns and any audit, litigation or other Proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information that are reasonably relevant to any such audit, litigation or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. All costs and expenses incurred in connection with this <u>Section 9.5(c)</u> shall be borne by the party that is subject to such Proceeding.

(d) The parties hereto intend that the transactions contemplated by this Agreement be treated for federal income tax and other applicable income tax purposes as a taxable sale of the Acquired Assets by the Sellers to Purchaser in exchange for the Purchase Price, including the discharge of an amount of Indebtedness equal to the Credit Bid Amount. Each of the parties hereto shall prepare and file all applicable income Tax Returns in a manner consistent with the foregoing and none of the parties hereto shall take any position (whether in audits, on Tax Returns or otherwise) that is inconsistent with the foregoing unless required to do so by applicable Law.

9.6 <u>Access</u>. From and after the Closing, each Seller shall preserve intact all Acquired Assets then in its possession or otherwise not yet delivered to Purchaser hereunder, and each Seller shall ensure that Purchaser and each of its Affiliates, agents and representatives have full and complete access to each of the Sellers' premises and to each other location where any Acquired Assets may be located, in order to allow Purchaser and/or any of its Affiliates, agents and representatives to take possession and delivery of all of the Acquired Assets.

## ARTICLE X
## MISCELLANEOUS

10.1 <u>Non-Survival of Representations and Warranties</u>. The representations and warranties respectively made by the Sellers and Purchaser in this Agreement and in any certificate delivered hereunder will expire as of the Closing. Subsequent to Closing, no claim with respect to any breach of any representation or warranty contained in this Agreement may be pursued or maintained (either hereunder or otherwise) against either party. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

17465192.2

10.2    Expenses.

(a)    Except as otherwise provided herein, each party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby. Notwithstanding the foregoing, in the event of any Proceeding to interpret or enforce this Agreement, the prevailing party in such Proceeding (i.e., the party who, in light of the issues contested or determined in the Proceeding, was more successful) shall be entitled to have and recover from the non-prevailing party such costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing party may incur in the pursuit or defense thereof.

(b)    The parties hereto agree that if any claims for commissions, fees or other compensation, including brokerage fees, finder's fees, or commissions are ever asserted against Purchaser or the Sellers in connection with the transactions contemplated hereby, all such claims shall be handled and paid by the party whose actions form the basis of such claim and such party shall indemnify (with counsel reasonably satisfactory to the party(ies) entitled to indemnification) and hold the other harmless from and against any and all such claims or demands asserted by any Person in connection with the transaction contemplated hereby.

10.3    Amendment.  This Agreement may not be amended, modified or supplemented except by a written instrument signed by Purchaser and Parent.

10.4    Waivers.  The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by Parent, in the case of a waiver by any Seller, or Purchaser, in the case of a waiver by Purchaser, and no waiver in any one (1) or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

10.5    Notices.  All notices, requests, demands and other communications permitted or required to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed conclusively to have been given (a) when personally delivered, (b) when sent by facsimile (with hard copy to follow) prior to 5:00 p.m. local time of the recipient on a Business Day (or otherwise on the next Business Day), (c) one (1) Business Day after being sent by reputable overnight express courier (charges prepaid), or (d) three (3) Business Day following mailing by certified or registered mail, postage prepaid and return receipt requested.  Unless another address is specified in writing, notices, requests, demands and communications to the parties shall be sent to the addresses indicated below:

To any Seller:         Universal Building Products, Inc.
                       15172 Goldenwest Circle
                       Westminster CA 92683
                       Facsimile: (714) 901-5995
                       Attention:  Chief Executive Officer

27

| with copy to: | K&L Gates LLP |
| | 70 West Madison Street, Ste. 3100 |
| | Chicago, Illinois 60602 |
| | Facsimile: (312) 345-9979 |
| | Attention: Sven T. Nylen |

To Purchaser:  UBP Acquisition Corp.
c/o Oaktree Capital Management, L.P.
333 South Grand Avenue, 28th Floor
Los Angeles, California 90071
Facsimile: (213) 830-6394
Attention: Jordon L. Kruse
David Quick

With copies to:  Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Facsimile: (312) 862-2200
Attention: Christopher J. Greeno P.C.
David A. Agay

10.6    Counterparts; Electronic Execution.  This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, may be executed in counterparts, all of which shall constitute one and the same instrument. Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .peg or similar attachment to electronic mail (any such delivery, an "Electronic Delivery") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each other party hereto or thereto shall re-execute the original form of this Agreement and deliver such form to all other parties. No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

10.7    Headings.  The headings preceding the text of the Articles and Sections of this Agreement are for convenience only and shall not be deemed part of this Agreement.

10.8    SUBMISSION TO JURISDICTION; WAIVER OF TRIAL BY JURY.  THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING, CROSS-CLAIM, OR COUNTERCLAIM IN ANY COURT

(WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH (I) THIS AGREEMENT OR THE VALIDITY, PERFORMANCE, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF OR (II) THE ACTIONS OF THE PARTIES IN THE NEGOTIATION, AUTHORIZATION, EXECUTION, DELIVERY, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

10.9    Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

10.10    Binding Nature; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties; except (a) that Purchaser may assign any of its rights and obligations hereunder to any of its Affiliates and, following the Closing, in whole or in part to any successor-in-interest or to any Person acquiring all or any portion of the Acquired Assets; provided, however, that Purchaser shall not be relieved of any liability or obligation hereunder; (b) the rights and interests of the Sellers hereunder may be assigned to a trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code; (c) this Agreement may be assigned to any entity appointed as a successor to the Sellers pursuant to a confirmed Chapter 11 plan; and (d) as otherwise provided in this Agreement. The Sellers hereby agree that Purchaser may grant a security interest in its rights and interests hereunder to its lenders, and the Sellers will sign a consent with respect thereto if so requested by Purchaser or its lenders, and that the terms of this Agreement shall be binding upon any subsequent trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code.

10.11    No Third Party Beneficiaries.  This Agreement is solely for the benefit of the parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and permitted assigns, any rights, remedies, obligations, claims, or causes of action under or by reason of this Agreement.

10.12    Severability.  Each provision of this Agreement is integral and of essence to the Agreement.  If any provision of this Agreement is held to be prohibited by or invalid under applicable Law, or is stricken or revised by any court with jurisdiction over the transactions contemplated by this Agreement, then this Agreement shall be deemed invalid, void and terminated in all respects unless the parties hereto agree otherwise in writing.

10.13    Construction.  The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party.  Any reference to any federal, state, local or foreign statute or Law shall be deemed also to refer to all rules and Laws promulgated thereunder, unless the context requires otherwise. Whenever a party's consent, approval or satisfaction is required under this Agreement, the decision as to whether or not to consent or approve or be satisfied shall be in the sole and exclusive discretion of such party, and such party's decision shall be final and conclusive.

17465192.2

10.14 Public Announcements. Except as required by Law or in connection with the Chapter 11 Cases, neither the Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other parties hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, delayed or conditioned. Prior to making any public disclosure required by applicable Law, the disclosing party shall give the other party a copy of the proposed disclosure and reasonable opportunity to comment on the same. Notwithstanding the foregoing, Purchaser shall not be restricted from making any public announcements or issuing any press releases after the Closing.

10.15 Entire Understanding. This Agreement, including the Exhibits hereto, sets forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and this Agreement, including the Exhibits hereto, supersedes all prior agreements, arrangements and understandings relating to the subject matter hereof and is not intended to confer upon any other Person any rights or remedies hereunder.

10.16 Closing Actions. All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

10.17 Conflict Between Transaction Documents. The parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other agreement or document referred to herein, this Agreement shall govern and control.

*[Remainder of Page Intentionally Left Blank]*

17465192.2

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

**PURCHASER:**

**UBP ACQUISITION CORP.**

By: _____
    Name:
    Title:     **David Quick**
             **Authorized Signatory**

**SELLERS:**

**UNIVERSAL BUILDING PRODUCTS, INC.**

By: _____
    Name:
    Title:

**DON DE CRISTO CONCRETE ACCESSORIES, INC.**

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

PURCHASER:

UBP ACQUISITION CORP.

By: _____
    Name:
    Title:


SELLERS:

UNIVERSAL BUILDING PRODUCTS, INC.

By: _____
    Name:
    Title:


DON DE CRISTO CONCRETE ACCESSORIES, INC.

By: _____
    Name:
    Title:

UNIVERSAL FORM CLAMP, INC.

By: _____
   Name:
   Title:

FORM-CO, INC.

By: _____
   Name:
   Title:

ACCUBRACE, INC.

By: _____
   Name:
   Title:

## Exhibit A

## Form of Bid Procedures Order

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| UNIVERSAL BUILDING PRODUCTS, INC., *et al.*,[1] | ) Case No. 10-_____ (____) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

## BID PROCEDURES

Universal Building Products, Inc., and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>") have filed chapter 11 cases pending in the Bankruptcy Court[2] and jointly administered under Case No. _____. By motion dated August [4], 2010 (the "<u>Motion</u>"), the Debtors sought, among other things, approval of the process and procedures set forth below (the "<u>Bid Procedures</u>"), through which they will determine the highest, best and otherwise financially superior offer for the assets identified as Acquired Assets in the Agreement (as defined below) (the "<u>Acquired Assets</u>"). On August [__], 2010, the Bankruptcy Court entered its order (the "<u>Bidding Procedures Order</u>") which, among other things, approved the Bid Procedures.

On [_____], 2010, as further described in these Bid Procedures, in the Motion and in the Bid Procedures Order, the Bankruptcy Court shall conduct the Sale Hearing at which the Debtors shall seek entry of the Sale Order authorizing and approving the sale of the Acquired Assets (the "<u>Proposed Sale</u>") to Purchaser (defined below) or to one or more other Qualified Bidders (defined below) that the Debtors determine to have made the highest, best and otherwise financially superior offer.

*Agreement*

On August [3], 2010, the Debtors entered into an asset purchase agreement (the "<u>Agreement</u>") with UBP Acquisition Corp. ("<u>Purchaser</u>"), pursuant to which Purchaser proposes to acquire the Acquired Assets. Pursuant to the Agreement, Purchaser would provide consideration for the Acquired Assets equal to the following (the "<u>Purchase Price</u>"): $25,000,000.00. Such Purchase Price will be in the form of a credit bid, under Bankruptcy Code § 363(k), on account of the obligations owed to Purchaser under the Credit Agreement dated as of April 28, 2006 and/or the Senior Secured Super-Priority Debtor-in-Possession Promissory

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Universal Building Products, Inc. (7884); (ii) Accubrace, Inc. (3418); (iii) Don De Cristo Concrete Accessories, Inc. (7547); (iv) Form-Co, Inc. (0079); and (v) Universal Form Clamp, Inc. (3003). The address of the Debtors' corporate headquarters is 15172 Goldenwest Circle, Westminster, California 92683.

[2] NTD: Link defined terms with motion.

Note dated August [3], 2010 (the "DIP Note"). The transaction contemplated by the Agreement is subject to competitive bidding as set forth herein, and approval by the Bankruptcy Court pursuant to Bankruptcy Code § 363.

*Assets for Sale*

The Debtors are offering the Acquired Assets for sale in one or more transactions.

*Participation Requirements*

In order to participate in the bidding process and to otherwise be considered for any purpose hereunder, a person interested in all or portions of the Acquired Assets other than Purchaser (a "Potential Bidder") must:

a.  execute a confidentiality agreement in form and substance acceptable to the Debtors and their counsel (such form attached as Exhibit 1 hereto); and

b.  No later than August 23, 2010, submit a non-binding letter of intent ("LOI") satisfactory to the Debtors, which includes (i) an explanation of the contemplated transaction, including the assets proposed to be acquired, the proposed purchase price, contingencies and conditions precedent to closing; (ii) the appropriate corporate approvals for the contemplated transaction; and (iii) written evidence that the Debtors reasonably conclude demonstrates the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed (if any) in such contemplated transaction.

*Access to Diligence*

After delivery of a confidentiality agreement in form and substance acceptable to the Debtors and their counsel, a Potential Bidder is eligible to receive due diligence access or additional non-public information. If the Debtors determine that a Potential Bidder does not constitute a Qualified Bidder (as defined below), then such Potential Bidder's right to receive due diligence access or additional non-public information shall terminate. The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as hereinafter defined). The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with the sale of the Acquired Assets.

If the Debtors furnish or make available to any Qualified Bidder any information related to the Debtors not theretofore given to Purchaser, then the Debtors shall concurrently furnish or make available all such information to Purchaser and each other Qualified Bidder.

*Due Diligence from Bidders*

Each Potential Bidder and Qualified Bidder (collectively, a "Bidder") shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction. Failure by a Potential Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that the Potential Bidder is not a Qualified Bidder. Failure by

a Qualified Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder is not a Qualified Bid.

*Designation as Qualified Bidder*

A "<u>Qualified Bidder</u>" is a Potential Bidder (or combination of Potential Bidders whose bids for assets do not overlap and who agree to have their bids combined for purposes of the determination of whether such Potential Bidders together constitute a Qualified Bidder, and who shall also be referred to herein as a single Qualified Bidder) that delivers the Participant Requirements described in subparagraphs (a) and (b) above, and that the Debtors in their discretion and with assistance from their advisors determine is reasonably likely to submit a *bona fide* offer that would result in greater net value to the estate than under the Agreement and to be able to consummate a sale if selected as a Successful Bidder (defined below).

Upon the receipt from a Potential Bidder of the information required under subparagraphs (a) and (b) above, the Debtors, as soon as is practicable, shall determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

Purchaser is a Qualified Bidder.

## Bidding Process

The Debtors and their advisors shall: (a) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions above; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Acquired Assets (collectively, the "<u>Bidding Process</u>"). The Debtors shall have the right to adopt such other rules for the Bidding Process (including rules that may depart from those set forth herein) that will better promote the goals of the Bidding Process and that are not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order.

*Bid Deadline*

**The deadline for submitting bids by a Qualified Bidder shall be [August 30], 2010 at 12:00 p.m. (Eastern time) (the "<u>Bid Deadline</u>").**

Prior to the Bid Deadline, a Qualified Bidder that desires to make an offer, solicitation or proposal (a "<u>Bid</u>") shall deliver written copies of its cash bid to (a) Universal Building Products, 15172 Goldenwest Circle, Westminster, California 92683, Attn: Jeffrey Church; (b) counsel for the Debtors, K&L Gates LLP, 70 W. Madison St., Suite 3100, Chicago, Illinois 60602-4207, Attn: Sven T. Nylen; (c) UBP Acquisition Corp., 333 S. Grand Avenue, 28th Floor, Los Angeles, California 90071, Attn: Jordon L. Kruse and David Quick, with a copy to Kirkland and Ellis LLP, 300 N. LaSalle Street, Chicago, Illinois 60654, Attn: Christopher J. Greeno, P.C. and David A. Agay; and (d) counsel for any official committee of unsecured creditors appointed in this case.

A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

*Bid Requirements*

To be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid (other than Purchaser and its Bid) must be determined by the Debtors to satisfy each of the following conditions:

a. <u>Good Faith Deposit</u>. Each Bid must be accompanied by a deposit (the "<u>Good Faith Deposit</u>") in the form of a certified check or cash payable to the order of the Debtors in an amount equal to $2,500,000.00.

b. <u>Minimum Overbid</u>. The consideration proposed by the Bid can include only cash. The aggregate consideration must equal or exceed the sum of (i) the Purchase Price; (ii) $250,000.00; (iii) the Breakup Fee; and (iv) the Expense Reimbursement. The contemplated transaction must provide for the immediate payment of the Breakup Fee and Expense Reimbursement to Purchaser in cash from the proceeds of the purchase price of such Bid.

c. <u>Irrevocable</u>. A bid must be irrevocable until two (2) business days after the Acquired Assets have been sold pursuant to the Closing of the sale or sales approved by the Bankruptcy Court (the "<u>Termination Date</u>").

d. <u>The Same or Better Terms</u>: The Bid must be on terms that, in the Debtors' business judgment, are substantially the same or more favorable to the Debtors than the terms of the Agreement.[3] A Bid must include executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "<u>Contemplated Transaction Documents</u>"). A Bid shall include a copy of the Agreement marked to show all changes requested by the Bidder (including those related to the Purchase Price). The Contemplated Transaction Documents must include a commitment to close by the Termination Date. A Bid should propose a contemplated transaction involving at least 90%, by value, of the Acquired Assets.

e. <u>Contingencies</u>: A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Agreement.

f. <u>Financing Sources</u>: A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtors with appropriate contact information for such financing sources.

g. <u>No Fees payable to Qualified Bidder</u>: No Bid, other than a Bid submitted by Purchaser, may request or entitle the Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.

---

[3] For purposes of these Bid Procedures, a Bid is more favorable than the Agreement if it results in a higher net value to the Debtors' estate.

A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements, and that satisfies the Bid Deadline requirement above, shall constitute a "Qualified Bid," if the Debtors believe, in their reasonable discretion, that such bid would be consummated if selected as the Successful Bid. For purposes hereof, the Agreement shall constitute a Qualified Bid.

In the event that any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, the Potential Bidder shall be refunded its deposit and all accumulated interest thereon within three (3) business days after that determination.

## Auction

Only if a Qualified Bid (other than Purchaser's) is received by the Bid Deadline, shall the Debtors conduct an auction (the "Auction") to determine the highest and best bid with respect to the Acquired Assets. The Debtors shall provide Purchaser and all Qualified Bidders with copies of all Qualified Bids at least 24 hours prior to the Auction. The Auction shall commence on [September 2], 2010 at 9:00 a.m. (prevailing Central Time) at the offices of K&L Gates LLP, 70 W. Madison St., Suite 3100, Chicago, Illinois 60602.

No later than [August 31], 2010, the Debtors will notify all Qualified Bidders of (i) the highest, best and otherwise financially superior Qualified Bid, as determined in the Debtors' discretion (the "Baseline Bid") and (ii) the time and place of the Auction, and provide copies of all submitted bids to all Qualified Bidders. If Purchaser's Qualified Bid constitutes the Baseline Bid, then the Expense Reimbursement and Breakup Fee shall be added to the Qualified Bid for purposes of the Auction.

If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held, Purchaser will be the Successful Bidder, the Agreement will be the Successful Bid, and, at the Sale Hearing, the Debtors will seek approval of and authority to consummate the Proposed Sale contemplated by the Agreement.

The Auction shall be conducted according to the following procedures:

a. Participation at the Auction

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. Only the authorized representatives of each of the Qualified Bidders and the Debtors shall be permitted to attend.

During the Auction, bidding shall begin initially with the highest Baseline Bid and subsequently continue in minimum increments of at least $250,000.00. Other than otherwise set forth herein, the Debtors may conduct the Auction in the manner they determine will result in the highest, best and otherwise financially superior offer for the Acquired Assets.

b. The Debtors Shall Conduct the Auction

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction the Debtors shall describe the terms of the Baseline Bid. The determination of

which Qualified Bid constitutes the Baseline Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estate, including, *inter alia*, the following: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities if any; (iii) the ability of the Qualified Bidder to close the proposed transaction; (iv) the proposed Closing Date and the likelihood, extent and impact of any potential delays in Closing; (v) any purchase price adjustments; (vi) the impact of the contemplated transaction on any actual or potential litigation; (vii) the net economic effect of any changes from the Agreement, if any, contemplated by the contemplated transaction documents; and (viii) the net after-tax consideration to be received by the Debtors' estates, taking into account Purchaser's rights to the Breakup Fee and Expense Reimbursement and repayment of the DIP Note (collectively, the "Bid Assessment Criteria"). All Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid.

c.  Terms of Overbids

An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

1.  Minimum Overbid Increment

Any Overbid after the Baseline Bid shall be made in increments of at least $250,000.00. Additional consideration in excess of the amount set forth in the Baseline Bid may include only cash; provided, however, notwithstanding the foregoing, any Overbid by Purchaser may be a credit bid under Bankruptcy Code § 363(k), either in full or in part; provided further, however, that any Overbid by Purchaser will reflect the fact that the Break-Up Fee is not payable in each round of bidding with respect to Purchaser's bids.

2.  Remaining Terms are the Same as for Qualified Bids

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline and the Initial Minimum Overbid Increment shall not apply. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (a) the Debtors accept a higher Qualified Bid as an Overbid and (b) such Overbid is not selected as the Back-up Bid (as defined below).

To the extent not previously provided (which shall be determined by the Debtors), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

3.  Announcing Overbids

6

The Debtors shall announce at the Auction the material terms of such Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtors' estate based on *inter alia*, the Bid Assessment Criteria.

   4. Consideration of Overbids

The Debtors reserve the right, in their reasonable business judgment, to make one or more adjournments in the Auction to, among other things: (a) facilitate discussion between the Debtors and the individual Qualified Bidders; (b) allow individual Qualified Bidders to consider how they wish to proceed; and (c) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment may require, that the Qualified Bidder (other than Purchaser) has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

   d. Additional Procedures

The Debtors, in their reasonable discretion, may adopt rules for the Auction at or prior to the Auction that, in their reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order. All such rules will provide that all bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (i.e., the Principals of any Qualified Bidder specifically formed for the purpose of effectuating the contemplated transaction) shall be fully disclosed to all other Qualified Bidders, and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

   e. Consent to Jurisdiction as Condition to Bidding.

All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's contemplated transaction documents, as applicable.

   f. Closing the Auction

Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale, and (ii) immediately identify the highest, best and otherwise financially superior offer for the Acquired Assets (the "<u>Successful Bid</u>" and the entity submitting such Successful Bid, the "<u>Successful Bidder</u>"), which highest, best and otherwise financially superior offer will provide the greatest amount of net value to the Debtors, and the next highest and otherwise best offer after the Successful Bid (the "<u>Back-up Bid</u>"), and advise the Qualified Bidder of such determination. If Purchaser's final bid is deemed to be the highest and best at the conclusion of the Auction, Purchaser will be the Successful Bidder and such bid, the Successful Bid.

## Acceptance of Successful Bid

The Debtors shall sell the Acquired Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing. The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Debtors' selection of the Successful Bidder.

## Credit Bidding

Only Purchaser may credit bid some or all of its claims, and may do so to the full extent permitted by Bankruptcy Code § 363(k).

## Bid Protections

Purchaser is entitled to: (i) the Breakup Fee in the amount of $400,000.00; and (ii) the Expense Reimbursement up to $850,000.00, in each case, pursuant to the terms of the Asset Purchase Agreement.

## "As Is, Where Is"

The sale of the Acquired Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or their estates except to the extent set forth in the Agreement or the purchase agreement of another Successful Bidder. Purchaser and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures or, (a) as to Purchaser, the terms of the sale of the Acquired Assets shall be set forth in the Agreement, or (b) as to another Successful Bidder, the terms of the sale of the Acquired Assets shall be set forth in the applicable purchase agreement.

## Free of Any and All Interests

Except as otherwise provided in the Agreement or another Successful Bidder's purchase agreement, all of Debtors' right, title and interest in and to the Acquired Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Interests"), in accordance with Bankruptcy Code § 363, with such Interests to attach to the net proceeds of the sale of the Acquired Assets.

## Sale Hearing

The Sale Hearing shall be conducted by the Bankruptcy Court on a day that is one (1) business day following the Auction or on such date as may be established by the Bankruptcy Court. Following the approval of the sale of the Acquired Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale within fourteen (14) days after entry of an Order approving the Sale, the Debtors shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such Bid without further order of the Bankruptcy Court.

## Return of Good Faith Deposit

Good Faith Deposits of the Successful Bidder shall be applied to the purchase price of such transaction at Closing. Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until five (5) days after Closing of the transactions contemplated by the Successful Bid, and thereafter returned to the respective bidders. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by the Successful Bidder.

## Modifications

These Bid Procedures may not be modified except with the express written consent of the Debtors and Purchaser.

The Debtors may (a) determine which Qualified Bid, if any, is the highest, best and otherwise financially superior offer; and (b) reject at any time any Bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures or the terms and conditions of sale; or (iii) contrary to the best interests of the Debtors, their estates and creditors.

At or before the Sale Hearing, the Debtors may impose such other terms and conditions as the Debtors may determine to be in the best interests of the Debtors' estate, their creditors and other parties in interest.

## Exhibit B

## Form of Bill of Sale

## FORM OF

## BILL OF SALE

This Bill of Sale (this "Bill of Sale") is made and entered into as of [＿＿＿＿], 2010, by and among Universal Building Products, Inc., a Delaware corporation, Universal Form Clamp, Inc., a Delaware corporation, FORM-CO, Inc., a Delaware corporation, Accubrace, Inc., a Delaware corporation, and Don De Cristo Concrete Accessories, Inc., a California corporation (each a "Transferor and, collectively, the "Transferors"), and UBP Acquisition Corp., a Delaware corporation ("Transferee").

WHEREAS, pursuant to the Asset Purchase Agreement, dated as of August [3], 2010, by and among the Transferors and Transferee (the "Asset Purchase Agreement"), each Transferor shall sell, contribute, convey, assign, transfer and deliver to Transferee, and Transferee shall purchase, acquire and take assignment and delivery of, all of the owned personal property of such Transferor included in the Acquired Assets (such owned personal property, the "Transferred Personal Property"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Transferors and Transferee hereby agree as follows:

1.     Transfer.  Each Transferor hereby contributes, conveys, assigns, transfers and delivers  to Transferee, and Transferee hereby purchases, acquires and takes assignment and delivery from each Transferor of, good and valid title to, and all rights and interests in, such Transferor's Transferred Personal Property, free and clear of all Liens and Liabilities of any Transferor, to have and hold such Transferred Personal Property unto Transferee and its successors and assigns for their use forever.

2.     General.

(a)     Governing Law.  This Bill of Sale shall be governed by and construed in accordance with the Laws of the State of Delaware without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

(b)     Entire Agreement.  This Bill of Sale, the Asset Purchase Agreement and the documents referred to herein and therein constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations by or among the Parties, written or oral, that may have related in any way to the subject matter hereof.

(c)     Amendments and Waivers.  No amendment of any provision of this Bill of Sale shall be valid unless the same shall be in writing and signed by each of the Parties. No waiver by any Party of any default or breach hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

17475703.2

(d)     Construction.  The language used in this Bill of Sale shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

(e)     Counterparts.  This Bill of Sale may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Bill of Sale and any amendments hereto, to the extent signed and delivered by means of digital imaging and electronic mail or a facsimile machine, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

*[Remainder of Page Intentionally Left Blank]*

2

IN WITNESS WHEREOF, the parties hereto have duly executed this Bill of Sale on the date first above written.

**TRANSFEREE:**

UBP ACQUISITION CORP.

By: _____
      Name:
      Title:

**TRANSFERORS:**

UNIVERSAL BUILDING PRODUCTS, INC.

By: _____
      Name:
      Title:

DON DE CRISTO CONCRETE ACCESSORIES, INC.

By: _____
      Name:
      Title:

UNIVERSAL FORM CLAMP, INC.

By: _____
     Name:
     Title:


FORM-CO, INC.

By: _____
     Name:
     Title:


ACCUBRACE, INC.

By: _____
     Name:
     Title:

# Exhibit C

# Form of Intellectual Property Assignment

**FORM OF**

**INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

This INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "Agreement"), is made and entered into as of this [ ] day of [        ], 2010, by and among (i) Universal Building Products, Inc., a Delaware corporation, Universal Form Clamp, Inc., a Delaware corporation, FORM-CO, Inc., a Delaware corporation, Accubrace, Inc., a Delaware corporation, and Don De Cristo Concrete Accessories, Inc., a California corporation (each, an "Assignor," and collectively, "Assignors"), and (ii) UBP Acquisition Corp., a Delaware corporation ("Assignee"). Assignors and Assignee are collectively referred to herein as the "Parties" and each individually as a "Party."

**WITNESSETH:**

WHEREAS, pursuant to the Asset Purchase Agreement, dated as of August [3], 2010, by and among Assignors and Assignee (the "Asset Purchase Agreement"), each Assignor shall sell, contribute, convey, assign, transfer and deliver to Assignee the Assigned Intellectual Property (as defined below). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor and Assignee hereby agree as follows:

**ARTICLE I.**

**ASSIGNMENT**

1.1.    Assignment of Intellectual Property Rights.  For good and valuable consideration received pursuant to the Asset Purchase Agreement, each Assignor hereby sells, assigns, transfers, conveys and delivers to Assignee and its successors and assigns, and Assignee hereby purchases, acquires and accepts from each Assignor, all right, title and interest in and to the Assigned Intellectual Property.  For purposes of the foregoing, "Assigned Intellectual Property" means the Acquired Intellectual Property, including, without limitation, the patents and patent applications set forth on Schedule A attached hereto, the trademarks, trademark applications and registrations set forth on Schedule B attached hereto, the copyright registrations set forth on Schedule C attached hereto, and the domain name registrations set forth on Schedule D attached hereto.

**ARTICLE II.**

**MISCELLANEOUS**

2.1.    Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

2.2.    Entire Agreement.   This Agreement, the Asset Purchase Agreement and the documents referred to herein and therein constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations by or among the Parties, written or oral, that may have related in any way to the subject matter hereof.

2.3.    Amendments and Waivers.   No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the Parties.  No waiver by any Party of any default or breach hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

2.4.    Construction.   The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

2.5.    Counterparts.   This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement and any amendments hereto, to the extent signed and delivered by means of digital imaging and electronic mail or a facsimile machine, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

[*signature page follows*]

17477907 v2

IN WITNESS WHEREOF, the Parties have executed this Intellectual Property Assignment Agreement as of the date first written above.

**ASSIGNEE:**

UBP ACQUISITION CORP.


By: _____
      Name:
      Title:

**ASSIGNORS:**

UNIVERSAL BUILDING PRODUCTS, INC.


By: _____
      Name:
      Title:

DON DE CRISTO CONCRETE ACCESSORIES, INC.


By: _____
      Name:
      Title:

UNIVERSAL FORM CLAMP, INC.

By: _____
     Name:
     Title:

FORM-CO, INC.

By: _____
     Name:
     Title:

ACCUBRACE, INC.

By: _____
     Name:
     Title:

## SCHEDULE A

## PATENT AND PATENT APPLICATIONS

### Universal Building Products, Inc.

| Title | Jurisdiction | Filing Date | App. No. | Pub. or Grant Date | Pub. or Patent No. | Owner |
|---|---|---|---|---|---|---|
| Cap For Anchor On Tilt-Up Concrete Slabs | US | 5/3/2006 | 29/259074 | 1/8/2008 | D559499 | Universal Building Products, Inc. |
| Anchor For Tilt-Up Concrete Slabs | US | 5/3/2006 | 29/259151 | 1/29/2008 | D560872 | Universal Building Products, Inc. |
| Flat Anchor For Tilt-Up Concrete Slabs | US | 5/3/2006 | 29/259075 | 5/13/2008 | D569071 | Universal Building Products, Inc. |

### Universal Form Clamp, Inc.

| Title | Jurisdiction | Filing Date | App. No. | Pub. or Grant Date | Pub. or Patent No. | Owner |
|---|---|---|---|---|---|---|
| Adjustable Support Brace And Mounting Shoe | US | 1/3/2003 | 10/336449 | 2/15/2005 | 6854222 | Universal Form Clamp, Inc. |
| Sandwich Erection Lift Anchor With Welding Plate Assembly | US | 12/19/2002 | 10/324293 | 4/25/2006 | 7032354 | Universal Form Clamp, Inc. |
| Concrete Anchor | US | 2/11/2004 | 10/776906 | 6/27/2006 | 7065925 | Universal Form Clamp, Inc. |

| Title | Jurisdiction | Filing Date | App. No. | Pub. or Grant Date | Pub. or Patent No. | Owner |
|---|---|---|---|---|---|---|
| Passthrough Concrete Anchor | US | 2/11/2004 | 10/776907 | 9/26/2006 | 7111432 | Universal Form Clamp, Inc. |
| Pass Through Concrete Anchor | US | 4/21/2005 | 29/228297 | 5/9/2006 | D520649 | Universal Form Clamp, Inc. |
| Pass Through Concrete Anchor | US | 4/21/2005 | 29/228294 | 5/16/2006 | D521159 | Universal Form Clamp, Inc. |
| W Foot Anchor | US | 4/25/2006 | 29/246583 | 4/17/2007 | D540657 | Universal Form Clamp, Inc. |
| Ring Lift Anchor | US | 3/10/2006 | 29/255659 | 7/24/2007 | D547524 | Universal Form Clamp, Inc. |

## FORM-CO, Inc.

None.

## Accubrace, Inc.

None.

## Don De Cristo Concrete Accessories, Inc.

| Title | Jurisdiction | Filing Date | App. No. | Pub. or Grant Date | Pub. or Patent No. | Owner |
|---|---|---|---|---|---|---|
| Protective Cover For Concrete Reinforcing Bars | US | 5/18/1994 | 08/245018 | 1/17/1995 | 5381636 | Don De Cristo Concrete Accessories, Inc. |

17477907 v2

| Title | Jurisdiction | Filing Date | App. No. | Pub. or Grant Date | Pub. or Patent No. | Owner |
|---|---|---|---|---|---|---|
| Method For Manufacturing A Protective Cover For A Reinforcing Bar | US | 10/13/1994 | 08/322160 | 6/4/1996 | 5523043 | Don De Cristo Concrete Accessories, Inc. |
| Protective Cover For Covering An End Of A Concrete Reinforcing Bar | US | 2/6/1996 | 08/591836 | 10/29/1996 | 5568708 | Don De Cristo Concrete Accessories, Inc. |
| Protective Cover For Concrete Reinforcing Bar | US | 4/9/1996 | 08/629549 | 3/24/1998 | 5729941 | Don De Cristo Concrete Accessories, Inc. |
| Method For Molding A Protective Cover For An Exposed End Of A Bar | US | 12/5/1995 | 08/567166 | 10/20/1998 | 5824253 | Don De Cristo Concrete Accessories, Inc. |
| Protective Cover For Concrete Reinforcing Bar | US | 9/10/1998 | 09/150338 | 8/31/1999 | 5943836 | Don De Cristo Concrete Accessories, Inc. |
| Reinforcing Bar Protective Cover | US | 7/11/1997 | 08/893572 | 9/7/1999 | 5946871 | Don De Cristo Concrete Accessories, Inc. |
| Protective Cover For Concrete Reinforcing Bars | Canada | 11/17/1994 | 2136112 | 11/24/1998 | 2136112 | Don De Cristo Concrete Accessories, Inc. |

-7-

17477907 v2

## SCHEDULE B

## TRADEMARKS, TRADEMARK APPLICATIONS AND REGISTRATIONS

**Accubrace, Inc.**

| Trademark | Jurisdiction | Registration Number | Registration Date | Owner |
|---|---|---|---|---|
| Accubrace | US | 3371777 | 1/22/2008 | Accubrace, Inc. |
| Accubrace Shoring, LLC | US | 3368062 | 1/15/2008 | Accubrace, Inc. |
| Accubrace Shoring, LLC Total Bracing Systems | US | 3375196 | 1/29/2008 | Accubrace, Inc. |

**Don De Cristo Concrete Accessories, Inc.**

| Trademark | Jurisdiction | Registration Number | Registration Date | Owner |
|---|---|---|---|---|
| Suprotek | US | 2963833 | 6/28/2005 | Don De Cristo Concrete Accessories, Inc. |
| Suprotek | US | 1955413 | 2/6/1996 | Don De Cristo Concrete Accessories, Inc. |
| Suprotek | US - State California | 099435 | 10/7/1994 | Don De Cristo Concrete Accessories, Inc. |
| Suprotek | Canada | TMA463182 | 9/6/1996 | Don De Cristo Concrete Accessories, Inc. |
| Suprotek | International Register | 824186 | 1/12/2004 | Don De Cristo Concrete Accessories, Inc. |

**FORM-CO, Inc.**

None.

**Universal Building Products, Inc.**

None.

**Universal Form Clamp, Inc.**

| Trademark | Jurisdiction | Registration Number | Registration Date | Owner |
|---|---|---|---|---|
| Universal Building Products | US - State Wisconsin | 20085900649 | 10/15/2008 | Universal Form Clamp, Inc. |

17477907 v2

## SCHEDULE C

## COPYRIGHT REGISTRATIONS

**Universal Building Products, Inc.**

None.

**Universal Form Clamp, Inc.**

None.

**FORM-CO, Inc.**

None.

**Accubrace, Inc.**

None.

**Don De Cristo Concrete Accessories, Inc.**

None.

-10-

## SCHEDULE D

## DOMAIN NAME REGISTRATIONS

**Universal Building Products, Inc.**

| Domain Name | Expires | Owner | Registrar |
|---|---|---|---|
| accubrace.net | 1/19/2011 | Universal Building Products | GoDaddy.com, Inc. |
| ubp-usa.com | 6/25/2012 | Universal Building Products | GoDaddy.com, Inc. |

**Universal Form Clamp, Inc.**

None.

**FORM-CO, Inc.**

None.

**Accubrace, Inc.**

None.

**Don De Cristo Concrete Accessories, Inc.**

None.

## Exhibit D

## Form of Assignment and Assumption Agreement

**FORM OF**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Assignment and Assumption Agreement (this "Agreement") is made and entered into as of [_____], 2010, by and among Universal Building Products, Inc., a Delaware corporation, Universal Form Clamp, Inc., a Delaware corporation, FORM-CO, Inc., a Delaware corporation, Accubrace, Inc., a Delaware corporation, and Don De Cristo Concrete Accessories, Inc., a California corporation (each an "Assignor" and, collectively, the "Assignors"), and UBP Acquisition Corp., a Delaware corporation ("Assignee").

WHEREAS, pursuant to the Asset Purchase Agreement, dated as of August [3], 2010, by and among the Assignors and Assignee (the "Asset Purchase Agreement"), each Assignor shall assign and transfer to Assignee, and Assignee shall assume, all Permits and warranties relating, directly or indirectly, to any of the Acquired Assets (such Permits and warranties, the "Assigned Assets"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Assignors and Assignee hereby agree as follows:

1.      Assignment and Assumption.  Each Assignor hereby assigns and transfers to Assignee, and Assignee hereby assumes from each Assignor of all rights and interests in such Assignor's Assigned Assets, free and clear of all Liens or Liabilities.

2.      General.

(a)      Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

(b)      Entire Agreement.  This Agreement, the Asset Purchase Agreement and the documents referred to herein and therein constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations by or among the Parties, written or oral, that may have related in any way to the subject matter hereof.

(c)      Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the Parties. No waiver by any Party of any default or breach hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

(d)      Construction.  The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

(e)　　Counterparts.　This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.　This Agreement and any amendments hereto, to the extent signed and delivered by means of digital imaging and electronic mail or a facsimile machine, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the date first above written.

ASSIGNEE:

UBP ACQUISITION CORP.


By: _____
    Name:
    Title:


ASSIGNORS:

UNIVERSAL BUILDING PRODUCTS, INC.

By: _____
    Name:
    Title:


DON DE CRISTO CONCRETE ACCESSORIES, INC.

By: _____
    Name:
    Title:

UNIVERSAL FORM CLAMP, INC.

By: _____
     Name:
     Title:


FORM-CO, INC.

By: _____
     Name:
     Title:


ACCUBRACE, INC.

By: _____
     Name:
     Title: