# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| UNIVERSAL BUILDING PRODUCTS, INC., *et al.*,[1] | Case No. 10-12453 (___) |
| Debtors. | Joint Administration Requested |

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) (I) AUTHORIZING AND APPROVING DEBTORS' POST-PETITION FINANCING; (II) GRANTING LIENS AND SECURITY INTERESTS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING USE OF CASH COLLATERAL AND AFFORDING ADEQUATE PROTECTION; (IV) MODIFYING AUTOMATIC STAY; AND (V) SCHEDULING FINAL HEARING

The above-captioned debtors and debtors-in-possession (collectively, the *"Debtors"*) hereby move the Court (the *"Motion"*), by and through their proposed undersigned counsel, pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code (the *"Bankruptcy Code"*) and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*) for entry of interim and final orders (together, the *"DIP Orders"*) (i) authorizing the Debtors to obtain postpetition secured financing; (ii) granting liens and security interests and providing superpriority administrative expense status to the Debtors' obligations under the DIP Credit Facility (as hereinafter defined); (iii) authorizing the use of cash collateral and granting adequate protection to the Prepetition Lenders (as hereinafter defined); (iv) scheduling a final hearing on the Motion

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i)Universal Building Products, Inc. (7884); (ii)Accubrace, Inc. (3418); (iii)Don De Cristo Concrete Accessories, Inc. (7547); (iv)Form-Co, Inc. (0079); and (v)Universal Form Clamp, Inc. (3003). The address of the Debtors' corporate headquarters is 15172 Goldenwest Circle, Westminster, California 92683.

pursuant to Rule 4001(b) and (c) of the Bankruptcy Rules; and (v) granting related relief. In further support of the Motion, the Debtors respectfully represent as follows:[2]

## JURISDICTION

1.     This Court has jurisdiction over this Motion under 28 U.S.C. § § 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief sought herein are sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, Rules 2002, 4001 and 9014 of the Bankruptcy Rules, and Rules 2002-1(b) and 4001-2 of the Local Rules of Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*").

## GENERAL BACKGROUND

3.     On the date hereof (the "*Petition Date*"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "*Chapter 11 Cases*"). The Debtors are functioning as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     Collectively, the Debtors operated one of the largest privately-owned concrete form and accessory manufacturing businesses in North America, manufacturing and delivering a complete assortment of premium concrete accessories to residential and commercial construction projects. As further discussed in the First Day Declaration, the Debtors' business has significantly diminished since 2007 in light of the downturn in the construction industry. As

---

[2]     The facts and circumstances supporting this Motion are set forth in the *Declaration of Gregory D. Waller, Chief Financial Officer of Universal Building Products, Inc., in Support of First Day Motions* (the "*First Day Declaration*"), filed contemporaneously herewith.

a result of severe contractions in their liquidity position, the Debtors have determined that a chapter 11 bankruptcy presents the most efficient strategy for resolving the Debtors' financial affairs. As of the close of business on August 3, 2010, only Debtors Accubrace, Inc. and Form-Co., Inc. continue to conduct business, and will continue to do so in the Chapter 11 Cases subject to any cash collateral or other financing orders approved by the Court. As further discussed in the First Day Declaration, the Debtors will be seeking to conduct an efficient bidding process to sell substantially all of their assets and seek confirmation and consummation of a liquidating chapter 11 plan.

## DEBTORS' PREPETITION SECURED INDEBTEDNESS

5. On April 28, 2006, Debtors Universal Building Products, Inc., Don De Cristo Concrete Accessories, Inc., and Universal Form Clamp, Inc. entered into a Credit Agreement (as amended, supplemented or modified prior to the Petition Date, the *"Prepetition Credit Agreement"* and, together with all other agreements, instruments, and documents relating thereto, as amended, supplemented or modified prior to the Petition Date, the *"Prepetition Loan Documents"*) with the several lenders from time to time party thereto which, as of the Petition Date, consisted solely of UBP Acquisition Corp. (collectively, the *"Prepetition Lenders"*), and OCM FIE L.P., as the successor to the administrative agent for the Prepetition Lenders (in such capacity, the *"Prepetition Agent"*).[3] The Credit Agreement provides for aggregate borrowings of up to $106.0 million, consisting of (a) a six-year term loan (the *"Term Loan"*) of $81.0 million and (b) a five-year revolving credit facility (the *"Revolver"*) of up to $25.0 million (including letter of credit and swingline subfacilities of $7.5 million and $3.0 million). As of the Petition Date, the Debtors owe the Lenders an aggregate principal amount of not less than

---

[3] The remaining Debtors, Form-Co, Inc. and Accubrace, Inc., were subsequently added as "Subsidiary Borrowers" pursuant to Joinder Agreements dated November 29, 2007 and March 28, 2008, respectively.

596353.1 8/4/10

$40,331,692.45 (together with all accrued and unpaid interest thereon, any cash management obligations owed to the Prepetition Lenders, and any fees and expenses, the *"Prepetition Indebtedness"*).[4]

  6. The Term Loan has a stated maturity date under the Credit Agreement of April 28, 2012 (five years after the date of the Credit Agreement), while the Revolver matures on April 28, 2011 (five years after the date of the Credit Agreement).

  7. The Credit Agreement has been amended three times. The first amendment (the *"First Amendment"*) is dated as of March 26, 2009, a time when the Debtors were not in default, but were concerned about possible future problems complying with financial covenants. Pursuant to the First Amendment, among other things, the Debtors were given expanded rights to offer to repurchase portions of the Lenders' debt, and the Lenders were authorized to retain a financial advisor. Pursuant to the repurchase terms of the First Amendment, the Debtors subsequently repurchased approximately $32 million of the Lenders' debt in two separate transactions, both times at a discount.

  8. The Credit Agreement was amended again (the *"Second Amendment"*) on April 13, 2009. At that time, the Debtors were out of compliance with certain financial covenants under the Credit Agreement. Pursuant to the Second Amendment, the Lenders waived the existing defaults on a one-time basis and prospectively relaxed certain financial covenants. In exchange, the Lenders were granted, among other things, a substantial interest rate increase.

  9. The latest amendment to the Credit Agreement (the *"Third Amendment"*) occurred on January 29, 2010, again, after the Debtors were unable to meet certain financial

---

[4] The most the Debtors ever borrowed under the Credit Agreement was approximately $95 million. This was reduced through ordinary course payments, a paydown resulting from an insurance payout received in 2007, and a 2009 debt repurchase in the approximate amount of $32 million (discussed below).

covenants. The Third Amendment resulted in the imposition of additional reporting requirements and substantial new lending fees. A borrowing base concept was also built in, which limited availability under the Credit Agreement based on the value of the Debtors' assets. The Prepetition Lenders again waived the Debtors' existing defaults under the Credit Agreement.

10.     Pursuant to the Prepetition Loan Documents, the Prepetition Indebtedness is secured by valid, binding, enforceable and perfected first-priority liens and security interests (collectively, the "*Prepetition Liens*") in substantially all of the Debtors' tangible and intangible personal property, subject to, without limitation, certain Permitted Liens (as defined in the Prepetition Credit Agreement) (the "*Prepetition Collateral*").

## IMMEDIATE NEED FOR POSTPETITION FINANCING

11.     As discussed above, the Debtors are seeking to conduct an efficient auction process to sell substantially all of their assets with the goal of confirming and consummating a liquidating chapter 11 plan. In order to manage and preserve their assets and properties while achieving an orderly liquidation, preserve value by allowing Debtors Accubrace, Inc. and Form-Co., Inc. to continue to operate pending consummation of the Proposed Sale, and fund other costs needed to allow the Debtors to consummate a chapter 11 plan liquidation, the Debtors desperately need liquidity and working capital.

12.     However, the Debtors have no further availability under the Prepetition Credit Agreement and do not have sufficient available sources of working capital to continue to operate their businesses without additional financing. Simply put, without an immediate infusion of working capital, the Debtors would have no choice but to liquidate their assets immediately in a "free fall" bankruptcy. This would destroy the Debtors' remaining businesses and harm the Debtors' employees, customers, trade vendors and other creditors.

596353.1 8/4/10

13.     In light of the Debtor's financial condition and the fact that the Prepetition Lenders were woefully undersecured, the Debtors were unable to obtain additional equity financing or unsecured financing prior to the Petition Date.  The undersecured nature of the Prepetition Indebtedness became particularly apparent when Debtors engaged in a prepetition sale process with the help of their financial advisors, which only resulted in offers that were substantially below the amount owed to the Prepetition Lenders.[5]  It became apparent that the Debtors would not be able to obtain secured financing junior to the liens of the Prepetition Agent.  The Prepetition Agent would not consent to the Debtors obtaining third party financing secured by liens in the Prepetition Collateral senior to, or *pari passu* with, the liens of the Prepetition Agent, and the Prepetition Lenders would only agree to provide further financing in the context of a chapter 11 debtor-in-possession ("*DIP*") facility.

14.     Accordingly, the Debtors negotiated in good faith with the Prepetition Agent on the terms of a possible DIP facility and were ultimately able to procure a commitment from the DIP Lenders, on behalf of itself and the Prepetition Lenders, for postpetition financing (the "*DIP Facility*") on the terms and conditions set forth in the DIP Note and Final Order (as such terms are hereinafter defined).  The purpose of the DIP Facility is to permit, among other things, (i) the management and preservation of the Debtors' assets and properties, (ii) a sale of certain of those assets (the "*Proposed Sale*") at an auction (the "*Auction*") pursuant to an order entered by the Court approving bid procedures (the "*Bid Procedures*") related thereto, and

---

[5]     In early 2009, the Debtors, in consultation with Wachovia Bank, N.A. ("*Wachovia*"; at that time the administrative agent under the Prepetition Credit Agreement), determined that the Debtors could not sustain long-term viability as a going concern without alternative funding.  Wachovia was unwilling to provide such financing, and the Debtors were unable to otherwise obtain financing.  In light of these circumstances, the Debtors retained Dan Scouler and Scouler & Company ("*Scouler*") as chief restructuring officer.  The Debtors, together with Scouler and Wachovia, (i) conducted a robust marketing process aimed at maximizing the value of the Debtors' assets and (ii) solicited the interest of various potential strategic and financial buyers and entertained offers for purchases of the Debtors' assets and outstanding obligations under the Credit Agreement.

(iii) the Debtors to confirm and effectuate a chapter 11 plan of liquidation on the terms agreed to by the Prepetition Lenders and Debtors (the "*Plan*").

15.    The Debtors, with the assistance of, and in consultation with, their financial advisors, have prepared a budget (as amended from time to time to the extent permitted under the DIP Note (as hereinafter defined), the "*Budget*")[6] that shows the Debtors' projected operating cash expenditures during the period from the Petition Date to October 1, 2010 (as may be extended from time to time, the "*Budget Period*") and estimates the period in which such cash expenditures will either need to be paid or accrue.  The Debtors anticipate that their cash on hand as of the Petition Date and receipts from operations will be insufficient to satisfy their operating cash needs during the Budget Period.  Accordingly, additional financing is necessary in order to permit the Debtors to conduct their Chapter 11 Cases.  Given their financial circumstances, the Debtors believe that the DIP Facility is the only available source of such financing.

16.    The terms of the DIP Facility are reasonable under the circumstances, and the terms and conditions of the DIP Note (as defined below) were:  (a) negotiated by the parties in good faith and at arm's length; and (b) instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11, consummate the Proposed Sale in accordance with the Bid Procedures, and to consummate a chapter 11 plan of liquidation.  In the absence of such financing, the Debtors will suffer immediate and irreparable harm because they will be forced to wind down their operations and liquidate their assets piecemeal, which will undoubtedly yield less value for the Debtors' estates than sale of the assets through the Proposed Sale.

---

[6]    The Budget is attached as Exhibit 2 to the proposed Interim Order.

## RELIEF REQUESTED

17.     By this Motion, the Debtors request entry of an interim order (the "*Interim Order*"), substantially in the form attached to this Motion:

(a)     authorizing the Debtors to obtain postpetition financing pursuant to the terms set forth in the Senior Secured Super-Priority Debtor-In-Possession Promissory Note (the "*DIP Note*"),[7] substantially in the form attached to the proposed Interim Order as Exhibit 1, in an aggregate maximum amount of $6,002,673 (unless increased pursuant to the terms and conditions of the DIP Note and other DIP Facility Documents);

(b)     providing that, pursuant to Bankruptcy Code § § 364(c) and (d) all financing under the DIP Note shall have priority over any and any claims of any entity, including, without limitation, any claims specified in or ordered pursuant to Bankruptcy Code § § 105, 326, 330, 331, 503(b), 506(c), 507, 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out; and shall be secured by all prepetition and postpetition assets of the Debtors, whether now existing or hereafter acquired, including all of the real, personal (tangible and intangible) and mixed property (including equity interests) and all monies and other property of any kind received on account thereof, and all products and proceeds thereof (including, upon and following the approval of the Final Order by the Bankruptcy Court, any Avoidance Actions and proceeds or property recovered in respect thereof) in which DIP Facility Liens are granted whether pursuant to the Final Order, or otherwise, in each case as security for the DIP Facility Obligations (each of the foregoing, the "*Collateral*"), but specifically (i) being subject solely to the Carve-Out to the extent provided for in the Interim and Final Orders, and (ii) receiving a junior lien on all Collateral encumbered by the Prior Liens (as such term is defined in the Interim Order), pursuant to Bankruptcy Code § 364(c)(2);

(c)     authorizing the Debtors' use of the Prepetition Lenders' cash collateral and granting the Prepetition Lenders adequate protection of their interests in the Prepetition Collateral;

(d)     Granting relief from, the automatic stay of Bankruptcy Code § 362 in order to allow (i) the DIP Lenders, to exercise remedies in the

---

[7]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Note or the Interim Order, as applicable.

event of a default and (ii) the Prepetition Agent, on behalf of the Prepetition Lenders, to, in its sole discretion, file such financing statements, mortgages (including ship mortgages), leasehold mortgages, notices of liens and other similar documents, as it deems appropriate with respect to its Adequate Protection Liens;

(e)     authorizing the Debtors, on an interim basis, to obtain financing in an amount up to $965,099 pursuant to the terms of the DIP Note; and

(f)     scheduling a final hearing (the "*Final Hearing*") pursuant to Bankruptcy Rule 4001 within fifteen (15) days of the entry of the Interim Order for this Court to consider entry of a final order (the "*Final Order*") authorizing and approving the balance of the terms of the DIP Note.

## TERMS AND CONDITIONS OF DIP CREDIT FACILITY AND PROPOSED ADEQUATE PROTECTION PACKAGE FOR THE PREPETITION LENDER

**A.     Summary of Material Terms of the DIP Note[8]**

18.     The material terms of the DIP Note are as follows, which is presented by way of summary only and is qualified in its entirety by the terms of the DIP Note, which control:

| Borrower: | Universal Building Products, Inc. (in such capacity, the "*Borrower*") |
|---|---|
| Guarantors: | Accubrace, Inc.; Don De Cristo Concrete Accessories, Inc.; Form-Co, Inc.; and Universal Form Clamp, Inc. (collectively, in such capacity, the "*Guarantors*," and together with the Borrower, the "*Loan Parties*") |
| DIP Lenders: | UBP Acquisition Corp., and other lenders from time to time party to the DIP Note (in such capacity, collectively, the "*DIP Lenders*") |
| Type and Amount of the DIP Facility: | Secured, multi-draw term loan credit facility in the aggregate principal amount of $6,002,673 (with $965,099 available on an interim basis) available in multiple Borrowings (in accordance with the Budget) |

---

[8]     To the extent that there are any conflicts between this summary and the Interim Order or the DIP Note, the terms of the Interim Order or the DIP Note shall govern, as applicable.

| | |
|---|---|
| **Maturity:** | October 29, 2010, provided that such date may be extended on a week-to-week basis (or, in the sole discretion of the DIP Lenders, on such longer basis) provided that (i) Borrower has provided Payee at least one Business Day's written notice of such requested extension, (ii) Borrower has provided Payee with an updated budget through such extended date which Payee has approved in its sole discretion, (iii) no Default or Event of Default shall have occurred, and (iv) Borrower and Guarantors continue to actively pursue the confirmation of the Plan prior to the extended Maturity Date |
| **Purpose:** | The Debtors shall use the proceeds of the loans made under the DIP Note to (i) pay all fees payable to Payee under the DIP Note, (ii) pay any interest obligations with respect to loans made under the DIP Note, (iii) reimburse any fees and expenses and pay any indemnities owed to the DIP Lenders under the DIP Note and (iv) fund working capital and other lawful general corporate purposes of the Debtor Entities, in each case the payments and fundings shall be in accordance with the Approved Budget; provided, that if Debtor Entities have any proceeds in their possession on the Termination Date, Debtor Entities shall use all such amounts to pay all DIP Obligations without regard to the Approved Budget |
| **Interest:** | Seven percent (7%) per annum, calculated on the basis of a 360-day year and actual days elapsed, and payable in arrears on the Interest Payment Date |
| **Default Interest:** | Nine percent (9%) per annum, calculated on the basis of the number of days in the applicable Fiscal Year |

596353.1 8/4/10

| | |
|---|---|
| **Fees:** | The Debtor Entities will pay on the Termination Date, all reasonable documented costs and expenses incurred by or on behalf of the DIP Lenders, including, but not limited to, reasonable fees, costs, expenses of counsel for the DIP Lenders, arising from or relating to the DIP Note and any other DIP Loan Document, the Interim Order and the Final Order, all liabilities and costs arising from or in connection with the past, present or future operations of the Borrower involving any damage to real or personal property or natural resources or harm or injury alleged to have resulted from any release of Materials of Environmental Concern on, upon or into such property, which are incurred by reason of the DIP Lenders' capacity as provider of the loans under the DIP Note, recipient of the collateral grant under the Applicable Order, or as a result of exercise of its rights and remedies under the DIP Note and under the other DIP Loan Documents, and any Environmental Liabilities incurred in connection with the investigation, removal, cleanup or remediation of any Materials of Environmental Concern present or arising out of the operations of any facility owned or operated by any Debtor Entity.<br><br>The Debtors agree to pay all stamp, document, transfer, recording or filing taxes or fees and similar impositions now or hereafter determined by the DIP Lenders to be payable in connection with the DIP Note or any other DIP Loan Document, and each Debtor Entity agrees to save DIP Lenders harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such taxes, fees or impositions. |
| **Mandatory Prepayments:** | Immediately upon receipt by Borrower of cash or cash equivalent proceeds of any Disposition, insurance or condemnation proceeds, tax refunds, or other amounts not constituting collections of accounts receivable and proceeds of the DIP Note (net of any payment with respect to Prior Liens that require such payment), Borrower shall either prepay the unpaid principal amount of the DIP Note in an amount equal to such proceeds and amounts or use such amounts as cash flow to reduce the budgeted amount for advances under the DIP Note in the next five Business Days, with any excess proceeds and amounts remaining thereafter applied to repay the DIP Note. Following the effectiveness of the Plan, Borrower or any applicable liquidating trust shall disburse all funds from time to time, whether from collections of accounts receivable, or otherwise, in accordance with the Plan. |

11

| | |
|---|---|
| **Priority and Security under DIP Credit Facility:** | Debtors' obligations under the DIP Loan Documents (collectively, the "*DIP Obligations*") shall at all times, and subject only to the Carve-Out:<br><br>(i) pursuant to Bankruptcy Code § § 364(c) and 364(d), constitute administrative expenses of the Debtor Entities in the Chapter 11 Case, with administrative priority and senior secured status. Subject to the Carve-Out Amount and any other amounts expressly provided for in the Interim Order and the Final Order, such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of each of the Debtor Entities' estate, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code;<br><br>(ii) pursuant to Bankruptcy Code § 364(c)(2) and subject only to the Carve-Out, be secured by a perfected first priority lien on all tangible and intangible prepetition and postpetition property of the Debtors, subject only to the Carve-Out and the Prior Liens;<br><br>(iii) pursuant to Bankruptcy Code § 364(c)(3), and subject only to the Carve-Out, valid, binding, continuing, perfected, enforceable and non-avoidable second priority or other junior liens on and security interests in all tangible and intangible prepetition and postpetition assets and property of the Debtors, whether now owned or hereafter acquired, that are subject to Prior Liens;<br><br>(iv) pursuant to Bankruptcy Code § 364(d), and subject only to the Carve-Out, valid, binding, continuing, perfected, enforceable and non-avoidable first priority senior priming liens on and security interests in the all of Prepetition Collateral and the proceeds and products thereof. |

596353.1 8/4/10

| | |
|---|---|
| **Carve-Out** | The term *"Carve-Out"* means: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under § 1930(a) of title 28 of the United States Code or otherwise, and (b) to the extent allowed at any time (provided, however, that such fees and expenses are not subsequently disallowed or disgorged by this court), all unpaid fees and expenses allowed by the Bankruptcy Court of the Debtors' and Committee's professionals and professional firms pursuant to Bankruptcy Code § § 327 or 1103, that were incurred during the Debtors' chapter 11 cases up to a maximum aggregate amount for clauses (a) and (b) not to exceed $1,450,000 in the aggregate and in accordance with the amount budgeted for each such Professional Person in the Budget, less the amount of any retainer or other deposit or security held by any Professional Person as of the Petition Date, *provided* that the Carve-Out shall not include any professional fees and expenses of a chapter 7 trustee or any fees or disbursements arising after the conversion of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code; *provided, further*, that nothing in the Final Order impairs the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates. The Carve-Out shall be free and clear of all liens, claims and encumbrances granted in the Final Order and under the Interim Order and shall be subject only to the allowed claims of the Professionals for such fees and expenses as may be awarded by the Court under Bankruptcy Code § §327 or 328, and shall be free of any claim of creditors of the Debtors or any subsequently appointed trustee. The rights of the Professionals with respect to the Carve-Out shall Survive the occurrence of an Event of Default.

Except as otherwise provided in the DIP Orders, no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtors owing to the Prepetition Agent (on behalf of the Prepetition Lenders) under the Prepetition Loan Documents, or to assert any other claims or causes of action against the Administrative Agent and/or Prepetition Lenders held by the Debtors' estates, *provided, however*, that the Cash Collateral or the Carve-Out may be used for investigation by the Committee in connection therewith, subject to a limitation of $25,000. |

596353.1 8/4/10

| | |
|---|---|
| **Conditions Precedent to Loans on Each Draw Date:** | Customary and required conditions regarding the continued truth and correctness of all representations of the Borrower, the absence of a default, the provision of a valid borrowing request, the continued efficacy of the DIP Orders |
| **Representations and Warranties:** | Customary and required representations and warranties including, e.g., corporate existence, qualification and power, compliance with laws, and representations and warranties regarding the Debtors' chapter 11 cases |
| **Affirmative Covenants:** | Customary and required covenants concerning, e.g., the provision of financial information reasonably requested by the DIP Lenders (including variance reports), the preservation of corporate existence and business operations, cooperation by the Debtors in executing additional documents required by the DIP Lenders in connection with the DIP Loan Documents, and compliance with the Budget |
| **Negative Covenants:** | Customary and required covenants prohibiting, e.g., creation of liens upon or granting security interests in the Debtors' property (or superpriority administrative claims), the incurrence of additional indebtedness, investments by the Borrower, certain transactions between affiliates, changes in corporate structure or existence, creation of contractual obligations, and certain dispositions of property, including asset sales (other than the Proposed Sale) or transfers on account of reclamation claims |
| **Events of Default:** | Customary and required events of default including, e.g., nonpayment, failure to observe covenants under the DIP Note or other DIP Loan Documents, material breaches of representations or warranties, unenforceability of any provision of the DIP Note of DIP Loan Documents, security agreements or mortgages failing to create a valid lien, assets of any Debtor with a fair market value of $100,000 or more are attached, seized, levied upon, and a judgment of over $100,000 against a Debtor. In addition, there are a number of Events of Default relating to the Debtors' Chapter 11 Cases:<br><br>     (i) the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any Debtor Entity in the Chapter 11 Cases: (w) to obtain additional financing under Bankruptcy Code § 364(c) or (d) not otherwise permitted pursuant to this Note; (x) to grant any Lien other than Liens permitted under the DIP Note upon or affecting any Collateral; (y) except as provided in the Interim Order and the Final Order, to use cash collateral of |

596353.1 8/4/10

Payee under Bankruptcy Code § 363(c) without the prior written consent of Payee; or (z) any other action or actions adverse to Payee (determined in its sole reasonable discretion) with respect to its rights and remedies hereunder or its interest in the Collateral;

(ii)  the filing of any plan of reorganization or liquidation other than the Plan;

(iii)  the entry of an order in the Chapter 11 Case confirming a plan or plans of reorganization or liquidation other than the Plan;

(iv)  the entry of an order amending, supplementing, staying, vacating or otherwise modifying the DIP Loan Documents or the Interim Order or the Final Order without the written consent of the Payee;

(v)  the payment of, or application for authority to pay, any pre-petition claim without Payee's prior written consent or pursuant to an order of the Bankruptcy Court after notice and a hearing unless otherwise permitted under this Note;

(vi)  the allowance of any claim or claims under Bankruptcy Code § 506(c) against Payee or any of the Collateral;

(vii)  the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of any Debtor Entity; or the sale (other than pursuant to the APA) without Payee's consent, of all or substantially all of any Debtor Entities' assets either through a sale under Bankruptcy Code § 363, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the DIP Obligations and termination of all obligations of Payee under the Note;

(viii)  the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

(ix)  the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Bankruptcy Code § 362 (x) to allow any creditor to execute

15

upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

(x) the entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations, or avoiding or otherwise nullifying any Lien securing any DIP Obligation, owing under this Note or the other DIP Loan Documents;

(xi) the failure of Maker to perform any of its obligations under the Final Order, Interim Order, Bid Procedures Order or Sale Order or any of the Final Order, Interim Order, Bid Procedures Order or Sale Order after entry by the Bankruptcy Court shall cease to be in full force and effect, shall be reversed, stayed, modified or amended or otherwise shall be subject to a Material Problematic Appeal not stayed, or shall be subject to a stay pending appeal;

(xii) the entry of an order in the Chapter 11 Case granting any other super priority administrative claim or Lien equal or superior to that granted to Payee; or

(xiii) the termination of the Maker's exclusive right to file a plan or plans of reorganization in the Chapter 11 Cases.

(xiv) the failure to satisfy any of the following within the prescribed time periods set forth below:

*(a) On or prior to the 30th day following the Petition Date, the Maker shall have conducted an auction for the assets of the Debtor Entities identified as for sale in the APA pursuant to Bankruptcy Code § 363, and Payee shall be designated the successful bidder;*

*(b) On or prior to the 31st day following the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance substantially the same as the order attached to the APA, approving the consummation of the 363 Sale pursuant to the APA (the "Sale Order");*

*(c) On or prior to the 31st day following the Petition Date, the Debtor Entities shall have consummated the transactions for the 363 Sale pursuant to the APA pursuant to Bankruptcy Code § 363;*

16

*(d) (i) On or prior to the 14th day following the Petition Date, the Maker shall have filed a motion to approve solicitation procedures, a disclosure statement reasonably acceptable to Payee, and a detailed plan of liquidation for Maker and Subsidiaries reasonably acceptable to Payee consistent with the plan term sheet set forth on Exhibit C hereto (the "Plan") and (ii) On or prior to October 1, 2010, there shall be an effective Plan;*

*(e) On or prior to the 14th day following the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to counsel to the Payee, approving the Bid Procedures Motion, which order has not been modified, reversed, stayed or vacated or amended nor shall any Material Problematic Appeal have been timely filed and not stayed, nor shall such order be subject to a stay pending appeal (the "Bid Procedures Order"); and*

*(f) On or prior to the 14th day following the Petition Date, the Bankruptcy Court shall have entered the Final Order.*

(xv) The failure to cooperate with Payee, its affiliates and designees in connection with their enforcement of the Strict Foreclosure Agreement, including without limitation, the delivery of the Specified Equipment (as defined in the Strict Foreclosure Agreement).

| | |
|---|---|
| **Remedies:** | If any Event of Default has occurred and is continuing, the DIP Lenders may, notwithstanding the provisions of Bankruptcy Code § 362, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, suspend or terminate the obligation of the DIP Lenders to make loans under the DIP Note and declare the Termination Date to have occurred, whereupon any disbursements under the DIP Note shall be made or incurred, in DIP Lenders' sole discretion so long as such Default or Event of Default is continuing. If any Event of Default has occurred and is continuing, DIP Lenders may, upon proper notice, request relief from the automatic stay under Bankruptcy Code § 362, with a hearing to be held within five calendar days; *provided, however*; only the occurrence or non-occurrence of such Default or Event of Default be the subject of any such hearing. Subject to the Final Order or any order granting relief from the automatic stay, as applicable, if any Event of Default has occurred and is continuing, DIP Lenders may, (A) declare all or any portion of the DIP Obligations to be forthwith due and payable, all without |

17

| | |
|---|---|
| | presentment, demand, protest or further notice of any kind, all of which are expressly waived by each Debtor Entity, (B) direct the Debtor Entities to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to DIP Lenders pursuant to Bankruptcy Code §§ 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Debtor Entity to assume and assign any lease or executory contract included in the Collateral to DIP Lenders or DIP Lenders' designees in accordance with and subject to Bankruptcy Code § 365), (C) enter onto the premises of the Debtor Entities in connection with an orderly liquidation of the Collateral, or (D) exercise any rights and remedies provided to DIP Lenders under the DIP Loan Documents or at law or equity, including all remedies provided under the UCC or the Bankruptcy Code. Upon the occurrence of an Event of Default and the exercise by DIP Lenders of its rights and remedies under the DIP Note and the other DIP Loan Documents in accordance with the preceding sentence, the Debtor Entities shall assist DIP Lenders in effecting a sale or other disposition of the Collateral upon such terms as are acceptable to DIP Lenders |
| **Indemnification:** | Borrower is required to indemnify and hold harmless DIP Lenders, each of its Affiliates and shareholders, and each such Person's respective partners, members, officers, directors, employees, attorneys, agents and representatives (each, an "*Indemnified Person*"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under the DIP Note and the other DIP Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all Environmental Liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the DIP Loan Documents (collectively, "*Indemnified Liabilities*"); *provided, that* Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that Indemnified Person's gross negligence or willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction. |

596353.1 8/4/10

| | No Indemnified Person shall be responsible or liable to any other party to any DIP Loan Document, any successor, assignee or third party beneficiary of such person or any other person asserting claims derivatively through such party, for indirect, punitive, exemplary or consequential damages which may be alleged as a result of credit having been extended, suspended or terminated under any DIP Loan Document or as a result of any other transaction contemplated hereunder or thereunder. |
|---|---|

## B.    Use of Cash Collateral and Adequate Protection

19.    During the ordinary course of operations, the Debtors generate cash collateral from the use of the Prepetition Collateral (the *"Cash Collateral"*).  The Debtors use Cash Collateral in the normal course of their businesses in order to continue to finance their operations, make essential payments, such as employee payroll, taxes and to purchase goods and services essential to their businesses.  It is imperative that the Debtors obtain authority to use Cash Collateral, in accordance with the Interim Order and the DIP Note, because the use of Cash Collateral is necessary in conjunction with the financing provided by the DIP Note in order to fund the Continuing Business (as defined in the DIP Note).

20.    The Debtors and the DIP Lenders have agreed that the Prepetition Lenders should receive the following as adequate protection of their interests in the Prepetition Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Lenders' interest in the Prepetition Collateral (collectively, the *"Adequate Protection Obligations"*):

| **Stipulations, Waivers and Releases Concerning Prepetition Secured Credit Facility** | Subject to the rights of the Creditors' Committee set forth in paragraph 11 of the Interim Order, the Debtors, for themselves, their estates and all representatives of such estates: |
|---|---|
| | (i) stipulate to the amount, validity and enforceability of the Prepetition Indebtedness; and |
| | (ii) release any claim, counterclaim, cause of action, defenses or setoff rights against the Prepetition Lenders and the Prepetition Agent, whether arising under or in connection with the Prepetition Loan Documents or the transactions contemplated thereunder or the Prepetition Liens, including, |

without limitation, any right to assert any disgorgement or recovery.

The Creditors' Committee, if formed, shall have shall have until three days prior to the scheduled Auction within which to commence an adversary proceeding (collectively, a "*Prepetition Lien/Claim Challenge*") with respect to the validity, priority, extent, perfection, and enforceability of the claims and security interests held by the Prepetition Agent (on behalf of the Prepetition Lenders) and the obligations arising under the Prepetition Loan Documents, or to assert any other claims or causes of action against the Administrative Agent and/or Prepetition Lenders held by the Debtors' estates

**Replacement Liens**

Effective and perfected upon the entry of the Interim Order and without the necessity of the execution by the Debtors of security agreements, financing statements or other agreements, Prepetition Lenders and Prepetition Agent are granted valid and perfected replacement security interests in and liens upon all Prepetition Collateral of the Debtors and the proceeds thereof solely to the extent of diminution in the value of their interest in the Prepetition Collateral (collectively, the "*Adequate Protection Liens*"), (i) the Carve-Out, (ii) the Investigation Period described in the Final DIP Order, (iii) the DIP Facility Liens, and (iv) any Prior Liens to the extent such Prior Liens are valid, perfected and unavoidable and senior to the Administrative Agent's Prepetition Liens

**Administrative Claim**

The Administrative Agent (on behalf of the Prepetition Lenders) is granted in each of the Debtors' chapter 11 cases an allowed administrative claim under Bankruptcy Code § 507(b) with respect to all Adequate Protection Obligations, to the extent that the Adequate Protection Liens do not adequately protect the diminution in the value of the Prepetition Collateral. Such Administrative Claim shall be (i) payable from and have recourse to all prepetition and postpetition property of the Debtors and all products and proceeds thereof; and (ii) subject only to the Carve-Out, the DIP Facility Liens, the DIP Facility Superpriority Claims and any Prior Liens permitted under the Credit Agreement or the Final Order

**§ 506(c) Waiver**

Except for the Carve-Out and upon entry of the Final Order (to the extent approved by this Court), no costs or expenses of administration which already have been, or may hereafter be, incurred in the Debtors' chapter 11 cases or in any subsequently converted case under chapter 7 of the Bankruptcy Code shall be charged or asserted by the Debtors against the Prepetition Lenders, their claims or the Prepetition Collateral, pursuant to

20

Bankruptcy Code § § 105 or 506(c) or otherwise without the prior written consent of the Prepetition Lenders (and no such consent shall be implied from any other action, inaction or acquiescence by the Prepetition Lenders in this proceeding)

**Limitations on Use of Cash Collateral**

The Cash Collateral or the Carve-Out may not be used for the payment or reimbursement of any fees or disbursements of the Committee incurred in connection with the assertion or joinder of in any claim, counter-claim, action, proceeding, application, motion or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief: (a) invalidating, setting aside, avoiding, subordinating, in whole or in part, the Prepetition Indebtedness or any lien and security interest securing the Prepetition Indebtedness; or (b) preventing, hindering or delaying, whether directly or indirectly, the assertion by the Prepetition Lenders or enforcement by the Prepetition Lenders of its liens or realization upon any of the respective Prepetition Collateral; or (c) challenging the postpetition liens or claims seeking an affirmative recovery from the Prepetition Lenders

For the avoidance of doubt, the Debtors shall not have access to any collections and other property of the Debtors, other than collections and other property of Form-Co, Inc. and Accubrace, Inc., and any deposit accounts and lockboxes of such Debtors other than Form-Co, Inc. and Accubrace, Inc. shall be detached from that certain UBP Concentration Account (as such term is defined in the Debtors' Motion for Entry of Order Authorizing the Debtors to Continue to Use Existing Cash Management System, filed as of the Petition Date) and all disbursement accounts such that no funds flow out of such accounts and lockboxes. Debtors shall not change any payment instructions with any of their customers. To the extent any collections are received after the Petition Date with respect to (a) any accounts receivable of any Debtor other than Form-Co, Inc. and Accubrace, Inc. rental collections, Debtors shall immediately segregate such funds and deposit them in the deposit accounts of Debtors other than Form-Co and Accubrace and (b) any dispositions, insurance recoveries or tax refunds, Debtors shall apply such collections in accordance with the DIP Note.

21.     The Debtors believe the foregoing adequate protection package adequately protects the Prepetition Lender on account of the priming of the Prepetition Lender's liens and the Debtors' proposed use of Cash Collateral. In addition, the Prepetition Lender has consented

to the foregoing Adequate Protection Obligations. Therefore, the Debtors respectfully request that the Adequate Protection Obligations be approved.

## C. Highlighted Provisions under Bankruptcy Rule 4001 and Local Rule 4001-2

22. Provisions of the DIP Note and Interim Order required to be highlighted pursuant to Fed. R. Bankr. P. 4001(c)(1)(B)(i)-(xi) and Del. Bankr. L.R. 4001-2(a)(i)(A)-(G), to the extent applicable (collectively, the *"Highlighted Provisions"*), are as follows:

(a) <u>Grant of Priority or a Lien on Property of the Estates.</u> DIP Note §§ 4(c)(ii)-(iii); 6(a)-(b); Interim Order ¶¶ 6; 7(a)-(d).

(b) <u>Adequate Protection or Priority for a Claim that Arose before the Commencement of the Cases.</u> Interim Order ¶¶ 8(a)-(c).

(c) <u>Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose before the Commencement of the Cases.</u> Interim Order ¶¶ G(a)-(b); H(e); 11; 32.

(d) <u>Waiver or Modification of the Automatic Stay.</u> DIP Note §§ 7(viii)(I); Interim Order ¶¶ 17; 28.

(e) <u>Waiver or Modification of Authority to Request Use of Cash Collateral or Request Authority to Obtain Credit.</u> DIP Note §§ 5(f)-(g); 21; 22; Interim Order ¶¶ 13; 15; 27(i); 31.

(f) <u>Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien.</u> DIP Note §§ 4(c)(iii); Interim Order ¶¶ 16; 20.

(g) <u>Release, Waiver or Limitation on any Claim or Cause of Action Belonging to the Estate.</u> DIP Note §§ 20; Interim Order ¶¶ G(c); 11.

(h) <u>Indemnification of Any Entity.</u> DIP Note §§ 11.

(i) <u>Release, Waiver or Limitation on Rights under Section 506(c).</u> DIP Note §§ 6(b)(iii); Interim Order ¶¶ 12.

(j) <u>Liens Granted on Claims Arising Under Chapters 5 or 7.</u> DIP Note §§ 4(c)(iii); Interim Order ¶¶ 4(c)(iii); 7(a) (subject to entry of a Final Order).

(k) <u>Liens on Proceeds of Avoidance Actions.</u> DIP Note §§ 4(c)(iii); Interim Order ¶¶ 4(c)(iii), 7(a) (subject to entry of a Final Order).

596353.1 8/4/10

23.     The Highlighted Provisions were negotiated as material terms to the DIP Credit Facility and are necessary for the Debtors to procure the financing made available under the DIP Note in a sufficient amount and on a timely basis.

**BASIS FOR RELIEF**

24.     Bankruptcy Code § 364(c) provides:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —

> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

> (3)     secured by a junior lien on property of the estate that is subject to a lien.

25.     Courts have articulated a three-part test to determine whether a debtor is authorized to obtain secured financing under Bankruptcy Code § 364(c). Specifically, courts look to whether: (i) the debtor is unable to obtain unsecured credit under Bankruptcy Code § 364(b), i.e., by allowing a lender only an administrative claim; (ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender. *In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hospital*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

26.     If a debtor is unable to obtain credit under the provisions of Bankruptcy Code § 364(c), the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. §

23

364(d). Bankruptcy Code § 364(d)(1), which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A)  the trustee is unable to obtain credit otherwise; and

(B)  there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

27.  Based on current capital markets conditions and the Debtors' financial condition, the Debtors determined that postpetition financing on an unsecured basis or on a junior priority basis to the Prepetition Secured Lender would be unobtainable in amounts necessary to fund the Debtors' operations during the course of these chapter 11 cases. Moreover, because substantially all of the Debtors' assets are subject to the liens of the Prepetition Lenders, the Debtors were unable to obtain financing secured by liens in their unencumbered assets. Nor were the Debtors able to obtain financing secured by junior liens in the Prepetition Collateral. Accordingly, the circumstances of these cases require the Debtors to obtain financing under both Bankruptcy Code § § 364(c) and (d).

28.  The DIP Credit Facility is absolutely essential to the Debtors' ability to conduct their Chapter 11 Cases, and their ability to maximize value by conducting an orderly liquidation of their assets. Without the infusion of additional capital, the Debtors will suffer immediate and irreparable harm, including the cessation of their operations and the orderly wind-down currently in progress. Accordingly, entry of the Interim Order is necessary to preserve the Debtors' estates.

596353.1 8/4/10

29. As set forth more fully above, the Debtors negotiated the DIP Note in good faith with the DIP Lenders. Given the Debtors' current financial circumstances and the lack of unencumbered assets to serve as collateral for a new secured credit facility, the Debtors had no alternative but to pursue funding from the DIP Lenders. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Bankruptcy Code § § 364(c) and (d)); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

30. The proposed DIP Credit Facility provided by the DIP Lenders was quite literally the only financing available to the Debtors. Even so, the terms of the DIP Credit Facility were negotiated by the Debtors and the DIP Lenders in good faith and at arm's length, and are fair and reasonable under the circumstances. For example, the proposed DIP Note and the Interim Order provide that the security interests and administrative expense claims granted to the DIP Lenders and the Prepetition Lender are subject to the Carve-Out. In *In re Ames Dep't Stores*, 115 B.R. at 34, the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. *Id.* at 40. In addition, the DIP Note and Interim Order do *not* provide for an interim 506(c) waiver or grant of liens in chapter 5 avoidance actions, reserving these provisions for consideration on full notice at the final hearing on the Motion.

31. For the foregoing reasons, among others, the terms of the DIP Note are fair, reasonable and adequate, and DIP Lenders should be accorded the benefits of Bankruptcy Code § 364(e) in respect of such agreement.

596353.1 8/4/10

32.	Finally, in accordance with Bankruptcy Code §§ 364(d) and 361, the proposed Interim Order provides the Prepetition Lenders with adequate protection as described in paragraph 16 above.  In light of this adequate protection, the Prepetition Lenders have consented to the priming of its liens in the Prepetition Collateral.

33.	In sum, the DIP Credit Facility should be approved as a valid exercise of the Debtors' business judgment consistent with the letter and the spirit of the Bankruptcy Code. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor-in-possession financing necessary to sustain seasonal business); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

34.	The Debtors further request that the automatic stay provisions of Bankruptcy Code § 362 be vacated and modified to the extent necessary so as to permit the DIP Lenders to exercise all remedies provided for in the DIP Facility Documents upon the occurrence of an Event of Default (as defined in the DIP Note and the proposed Interim Order) all rights and remedies provided for in the DIP Facility Documents; provided, that prior to the exercise of any enforcement or liquidation remedies against the Collateral, the DIP Lenders shall be required to give written notice to the Debtors, its bankruptcy counsel, the Committee's counsel, if any, and the U.S. Trustee with a hearing to be held within five calendar days of receipt of such notice.

596353.1 8/4/10

## A.     Interim Approval of the DIP Note is Appropriate

35.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to Bankruptcy Code § § 363 and 364 may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.

36.     The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors to obtain up to $965,099 under the DIP Credit Facility.  This relief will enable the Debtors to preserve and maximize estate value, conduct Auction, complete the Proposed Sale, consummate a chapter 11 plan of liquidation, and to avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.  It will also provide the Debtors' vendors and suppliers the necessary confidence to continue relationships with the Debtors during their process of liquidation and also will be viewed favorably by the Debtors' employees and customers, and thereby enhance the Debtors' efforts to maximize the value of their assets for the benefit of creditors.

## C.     Final Hearing

37.     The Debtors further respectfully request that the Court schedule the Final Hearing and authorize the Debtors to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon the:  (i) the office of the United States Trustee for the District of Delaware (the *"U.S. Trustee"*); (ii) the entities listed on the Consolidated List of Creditors Holding Largest Unsecured Claims Against Each Debtor filed

pursuant to Bankruptcy Rule 1007(d) (the "*Top 30 List*"); (iii) counsel to the Official Committee of Unsecured Creditors, if and when formed; (iv) counsel to the Prepetition Lender; (v) counsel to the DIP Lenders; (vi) any party who filed a request for notices in these chapter 11 cases pursuant to Bankruptcy Rule 2002 prior to the date set forth in the Interim Order for service of notice of the Final Hearing; and (vii) any known lien holders of the Debtors. The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.[9]

## D.     The Section 506(c) Waiver in the Final Order Should Be Approved

38.     The Court should approve the Debtors' waiver, subject to any of the Final Order, of any right to surcharge the DIP Collateral and the Prepetition Collateral. Such waivers and provisions are standard and customary under financings between sophisticated parties. As one court noted in discussing the later enforceability of such waivers, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)." *In re Molten Metal Technology, Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000). *See also In re Nutri/System of Florida Assocs.*, 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor in possession financing); *In re Telesphere Communications, Inc.*, 179 B.R. 544, 549 (Bank. N.D. Ill. 1994) (approving settlement between

---

[9]     Local Rule 2002-1(b) provides that "[i]n chapter 11 cases, all motions . . . shall be served only upon counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices pursuant to Fed. R. Bankr. P. 2002(i) and all parties whose rights are affected by the motion. If an official unsecured creditors' committee has not been appointed, service shall be made on the twenty (20) largest unsecured creditors in the case in lieu of the committee."

debtor and certain lenders wherein debtor waived certain rights — including 506(c) rights — against the lenders in exchange for valuable consideration).

39.     The waiver of surcharge rights is particularly appropriate where, as here, it is tied to the benefit to be received from the Carve-Out.  Under the DIP Credit Facility, the Debtors agree to waive any rights to charge costs and expenses against the DIP Collateral or the Prepetition Collateral except for the Carve-Out.  In other words, the Debtors have waived the uncertainty of surcharge rights in exchange for the valuable and predictable rights granted to the Debtors' other estate professionals under the Carve-Out.  *See In re Lunan Family Restaurants Ltd. P'ship*, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily benefited by the expenditure].") (citing *In re Flagstaff*, 739 F.2d 73, 77 (2d Cir. 1984) and *New Orleans Public Service Inc. v. Delta Towers, Ltd. (In re Delta Towers)*, 112 B.R. 811, 815 (E.D. La. 1990), *rev'd on other grounds sub nom., In re Delta Towers*, 924 F.2d 74 (5th Cir. 1991).

### NOTICE

40.     Notice of this Motion has been given to (a) the Office of the United States Trustee, (b) counsel to the Agent for the Debtors' prepetition secured lenders, (c) the Debtors' largest thirty (30) unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions, (d) the Office of the United States Attorney for the District of Delaware, and (e) the Internal Revenue Service.  In light of the nature of the relief requested, the Debtors submit that no further notice is required.

### No Prior Request

41.     No prior request for the relief sought herein has been made to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an interim order substantially in the form attached hereto granting the relief requested in the Motion and such other and further relief as is just and proper.

Dated: August 4, 2010

K&L GATES LLP
Harley J. Goldstein
Sven T. Nylen
70 West Madison Street, Suite 3100
Chicago, IL 60602
Telephone: (312) 372-1121
Facsimile: (312) 827-8000

-and-

SAUL EWING LLP

Mark Minuti (DE Bar No. 2659)
Teresa K.D. Currier (DE Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873

-and

MaryJo Bellew (DE Bar No. 4519)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7144
Facsimile: (215) 972-2292

*Proposed Co-Counsel for Debtors
and Debtors in Possession*

596353.1 8/4/10