## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UNIVERSAL BUILDING PRODUCTS, INC., *et al.*,[1] | ) ) ) | Case No. 10-12453 (MFW) |
| | ) | Joint Administration Requested |
| Debtors. | ) | **Related to Docket No. 19** |
| | ) | |

## AMENDED DECLARATION OF GREGORY D. WALLER, CHIEF FINANCIAL OFFICER OF UNIVERSAL BUILDING PRODUCTS, INC., IN SUPPORT OF FIRST DAY MOTIONS

Gregory D. Waller, being duly sworn, deposes and states:

1.    I am the Chief Financial Officer of Universal Building Products, Inc. ("*UBP*") and am an officer of all of the other above-captioned debtors and debtors in possession (collectively, the "*Debtors*") in the above-captioned chapter 11 cases (collectively, the "*Chapter 11 Cases*"). I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records.

2.    On the date hereof (the "*Petition Date*"), UBP and four of five of its direct or indirect subsidiaries filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their remaining businesses and manage their properties as debtors in possession.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Universal Building Products, Inc. (7884); (ii) Accubrace, Inc. (3418); (iii) Don De Cristo Concrete Accessories, Inc. (7547); (iv) Form-Co, Inc. (0079); and (v) Universal Form Clamp, Inc. (3003). The address of the Debtors' corporate headquarters is 15172 Goldenwest Circle, Westminster, California 92683.

3.　　The Debtors are the following entities: (i) UBP; (ii) Accubrace, Inc. ("*Accubrace*"); (iii) Don De Cristo Concrete Accessories, Inc. ("*DDC*"); (iv) Form-Co, Inc. ("*Form-Co*"); and (v) Universal Form Clamp, Inc. ("*UFC*"). In addition, UFC owns one non-domestic entity, Universal Form Clamp of Canada ("*UFC Canada*"). UFC Canada is not a Debtor in these Chapter 11 Cases.

4.　　In order to enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses, the Debtors have requested various types of relief in certain "first day" applications and motions (each a "*First Day Motion*," and collectively, the "*First Day Motions*"). The First Day Motions seek relief aimed at, among other things, maintaining the Debtors' remaining operations and going-concern value, allowing for an orderly liquidation of the Debtors' assets, and bolstering employee morale. All of the First Day Motions are crucial to the Debtors' efforts to maintain the value of their estates for the benefit of their creditors during the course of these Chapter 11 Cases. Furthermore, the Debtors have filed a motion for entry of an order directing joint administration of the Debtors' Chapter 11 Cases, for procedural purposes only.

5.　　I submit this declaration (the "*Declaration*") in support of the First Day Motions. All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by others at the Debtors, upon my review of relevant documents or upon my opinion based on my experience and knowledge of the Debtors' operations, financial condition, and present financial outlook. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

2

## Background

6.      Collectively, the Debtors operated one of the largest privately-owned concrete form and accessory manufacturing businesses in North America, manufacturing and delivering a complete assortment of premium concrete accessories to residential and commercial construction projects. The Debtors' primary manufacturing facilities are located in Bellwood, Illinois and Westminster, California.

7.      UBP is a Delaware corporation and the holding company for each of the other Debtors. The Debtors are the following entities:

**Universal Building Products, Inc.**, a Delaware corporation, serves as the holding company for and corporate headquarters of the other Debtors.

**Don De Cristo Concrete Accessories, Inc.**, a California corporation, manufactures and distributes concrete accessories for the construction industry which are primarily sold through a dealer network.

**Accubrace, Inc.**, a Delaware corporation, manufactures and distributes total bracing systems for tilt-up slab and precast wall construction, soil anchor construction, and heavy shoring construction.

**Form-Co, Inc.**, a Delaware corporation, is a distributor of concrete forms and other construction equipment used in residential and commercial buildings including: single story and multi-story structures, bridges, tunnels, power plants, parking garages, warehouses, industrial projects, and treatment plants.

**Universal Form Clamp, Inc.**, a Delaware corporation, is one of the largest manufacturers and marketers of concrete accessories, forming and shoring products, and concrete related products in the United States. UFC has been

3

serving the industry for over eighty years and has five fully integrated manufacturing plants and six distribution centers.

8.  As of the Petition Date, the Debtors employ approximately 87 employees in the aggregate. Seven employees are covered by various collective bargaining agreements.

9.  The Debtors' financial performance has deteriorated over the last several years, largely due to the downturn in the economy generally and the construction industry in particular. For the fiscal year ending December 31, 2009, the Debtors' net revenue was approximately $80 million, which resulted in a net loss about $28 million. For the fiscal year ending December 31, 2008, the Debtors generated net revenue of approximately $141 million, which resulted in a net loss of about $27 million. In the prior fiscal year, 2007, the UBP group's net revenue was about $146 million, which resulted in net income of approximately $3 million.

### *The Debtors' Corporate History and Equity Structure*

10.  In 2006, Whitney Universal Acquisition, LLC ("Whitney"), a private equity investor, incorporated UBP in order to acquire and bring together industry leaders DDC and UFC. UBP subsequently acquired Form-Co in 2007 and added Accubrace in 2008.

11.  In addition to common stock, UBP has issued two series of preferred stock. Whitney continues to be the largest holder of UBP's preferred stock, holding approximately 88.9% of the Series A Preferred Stock and approximately 93.6% of the Series B Preferred Stock. Jeffrey D. Church, UBP's Chief Executive Officer, owns approximately 99% of UBP's common stock. The List of Equity Security Holders; Corporate Ownership Statement attached to UBP's bankruptcy petition provides a detailed breakdown of the ownership interests in each class of UBP stock.

4

## Credit Agreement and Debt Structure

12.    On April 28, 2006, Debtors Universal Building Products, Inc., Don De Cristo Concrete Accessories, Inc., and Universal Form Clamp, Inc. entered into a Credit Agreement (as amended, supplemented or modified prior to the Petition Date, the *"Prepetition Credit Agreement"* and, together with all other agreements, instruments, and documents relating thereto, as amended, supplemented or modified prior to the Petition Date, the *"Prepetition Loan Documents"*) with the several lenders from time to time party thereto which, as of the Petition Date, consisted solely of UBP Acquisition Corp. (collectively, the *"Prepetition Lenders"*), and OCM FIE L.P., as the successor to the administrative agent for the Prepetition Lenders (in such capacity, the *"Prepetition Agent"*).[2]   The Credit Agreement provides for aggregate borrowings of up to $106 million, consisting of (a) a six-year term loan (the *"Term Loan"*) of $81 million and (b) a five-year revolving credit facility (the *"Revolver"*) of up to $25 million (including letter of credit and swingline subfacilities of $7.5 million and $3 million).  As of the Petition Date, the Debtors owe the Lenders an aggregate principal amount of not less than $40,331,692.45 (together with all accrued and unpaid interest thereon, any cash management obligations owed to the Prepetition Lenders, and any fees and expenses, the *"Prepetition Indebtedness"*).[3]

13.    The Term Loan has a stated maturity date under the Credit Agreement of April 28, 2012 (five years after the date of the Credit Agreement), while the Revolver matures on April 28, 2011 (five years after the date of the Credit Agreement).

---

[2]    The remaining Debtors, Form-Co, Inc. and Accubrace, Inc., were subsequently added as "Subsidiary Borrowers" pursuant to Joinder Agreements dated November 29, 2007 and March 28, 2008, respectively.

[3]    The most the Debtors' ever borrowed under the Credit Agreement was approximately $95 million.  This was reduced through ordinary course payments, a paydown resulting from an insurance payout received in 2007, and a 2009 debt repurchase in the approximate amount of $32 million (discussed above).

5

14.     The Credit Agreement has been amended three times.  The first amendment (the "*First Amendment*") is dated as of March 26, 2009, a time when the Debtors were not in default, but were concerned about possible future problems complying with financial covenants. Pursuant to the First Amendment, among other things, the Debtors were given expanded rights to offer to repurchase portions of the Lenders' debt, and the Lenders were authorized to retain a financial advisor.  Pursuant to the repurchase terms of the First Amendment, the Debtors subsequently repurchased approximately $32 million of the Lenders' debt in two separate transactions, both times at a discount.

15.     The Credit Agreement was amended again (the "*Second Amendment*") on April 13, 2009.  At this point, the Debtors were out of compliance with certain financial covenants under the Credit Agreement.  Pursuant to the Second Amendment, the Lenders waived the existing defaults on a one-time basis and prospectively relaxed certain financial covenants.  In exchange, the Lenders were granted, among other things, a substantial interest rate increase.

16.     The latest amendment to the Credit Agreement (the "*Third Amendment*") occurred on January 29, 2010, again, after the Debtors were unable to meet certain financial covenants. The Third Amendment resulted in the imposition of additional reporting requirements and substantial new lending fees.  A borrowing base concept was also built in, in essence tying availability to assets.  Again, however the Debtors' existing defaults were temporarily waived.

17.     Pursuant to the Prepetition Loan Documents, the Prepetition Indebtedness is secured by valid, binding, enforceable, and perfected first-priority liens and security interests (collectively, the "*Prepetition Liens*") in substantially all of the Debtors' tangible and intangible personal property subject to, without limitation, certain Permitted Liens (as defined in the Prepetition Credit Agreement) (the "*Prepetition Collateral*").

6

## *The Debtors' Lenders and Events Leading to These Chapter 11 Cases*

18.     Beginning in 2007, the Debtors' operations began to be impacted by the deteriorating real estate market.  The construction industry continued to contract through 2008 and the first half of 2009 due to both excessive supply, owing to high inventory levels, and insufficient demand, as credit became increasingly tight.  As discussed above, the Debtors' financial performance significantly deteriorated during this downturn, and the Debtors have experienced difficulties meeting certain financial covenants under the Credit Agreement.

19.     In early 2010, the Debtors, in consultation with Wachovia Bank, N.A. ("*Wachovia*", at that time the administrative agent under the Prepetition Credit Agreement), determined that the Debtors could not sustain long-term viability as a going concern without alternative funding.  Wachovia was unwilling to provide such financing, and the Debtors were unable to otherwise obtain financing.

20.     In light of these circumstances, the Debtors retained Dan Scouler and Scouler & Company ("*Scouler*") as chief restructuring officer.  The Debtors, together with Scouler and Wachovia, (i) conducted a robust marketing process aimed at maximizing the value of the Debtors' assets and (ii) solicited the interest of various potential strategic and financial buyers and entertained offers for purchases of the Debtors' assets and outstanding obligations under the Credit Agreement.

21.     Numerous potential buyers conducted due diligence with respect to a potential transaction and certain potential buyers provided letters of intent with respect to potential transactions.  Based on the offers received, it became apparent to the Debtors that the value of their assets is less than the amount of Prepetition Obligations owed by the Debtors under the Credit Agreement.

596382.1 8/4/10

***Debt Acquisition and the Commencement of the Chapter 11 Cases***

22.     On or about July 19, 2010, while the Debtors were still evaluating potential transactions, affiliates of Oaktree Capital Management, L.P. ("*Oaktree*") acquired 100% of the Debtors' senior secured debt owed under the Credit Facility. The Debtors' senior secured debt is now held by UBP Acquisition Corp., an affiliate of Oaktree.

23.     The Debtors engaged in discussions with UBP Acquisition Corp. regarding various restructuring proposals. Ultimately, those discussions resulted in the following proposal:

(i)     Consent to a strict foreclosure by UBP Acquisition Corp. with respect to certain equipment owned by the Debtors;

(ii)     Cease manufacturing operations and file for protection under chapter 11 of the Bankruptcy Code to conduct an orderly wind-down;

(iii)     Subject to certain terms and conditions, UBP Acquisition Corp. would provide Debtor in Possession ("*DIP*") financing and would authorize the use of cash collateral necessary to allow the Debtors to conduct an auction of their assets in bankruptcy pursuant to section 363 of the Bankruptcy Code and to seek confirmation and consummation of a chapter 11 liquidating plan; and

(iv)     UBP Acquisition Corp. agreed to serve as the stalking horse in a sale process conducted pursuant to section 363 of the Bankruptcy Code and would credit bid approximately $25 million of the outstanding debt under the Credit Agreement and/or DIP Note (defined below).

24.     The Debtors evaluated this transaction in light of prior refinancing and marketing efforts (which again made it apparent that the value of their assets is substantially less than the amount of the outstanding obligations under the Credit Agreement) and their severe liquidity

8

constraints. The Debtors ultimately determined that without the support and cooperation of UBP Acquisition Corp. (including DIP financing and use of cash collateral), a piecemeal liquidation of the Debtors' assets may have been inevitable, and would have resulted in substantially less value than would be achieved via the orderly liquidation facilitated through UBP Acquisition Corp.'s financing and purchase. Accordingly, the Debtors agreed to the restructuring terms proposed by UBP Acquisition Corp.

25. In furtherance of their agreement with UBP Acquisition Corp., on August 3, 2010, the Debtors: (i) executed strict foreclosure documents transferring title and turning over certain of their equipment to UBP Acquisition Corp.; (ii) entered into an asset purchase agreement for the sale of their remaining assets to UBP Acquisition Corp. pursuant to an open sale process conducted pursuant to section 363 of the Bankruptcy Code; and (iii) entered into a Senior Secured Super-Priority Debtor-in-Possession Promissory Note (the "*DIP Note*") pursuant to which UBP Acquisition Corp. will provide financing for the Debtors' Chapter 11 Cases (subject to approval of the Court). In addition, the Debtors also ceased all manufacturing operations. Accordingly, as of the close of business on August 3, 2010, only Debtors Accubrace, Inc. and Form-Co., Inc. continue to operate, and will continue to do so in the Chapter 11 Cases subject to any cash collateral or other financing orders approved by the Court.

26. On the date hereof, each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code with this Court. Each of the Debtors intends to continue operating to the extent of its remaining business operations and managing its properties as a debtor in possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have also filed motions seeking approval of bidding procedures for the sale of their remaining assets and to obtain interim and final approval of debtor in possession financing pursuant to the terms of the

9

DIP Note. The Debtors are already working on a liquidating chapter 11 plan and anticipate filing a plan expeditiously.

**First Day Motions**

27.     I believe that the approval of the Debtors' First Day Motions submitted concurrently herewith is critical and necessary to the success of the Debtors' Chapter 11 Cases. The factual background and support for each of the Debtors' First Day Motions is provided below.[4]

### Motion for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases

28.     In order to optimally and economically administer the Debtors' pending Chapter 11 Cases, such cases should be jointly administered, for procedural purposes only, under the case number assigned to UBP.  Many of the motions, hearings and orders that will arise in the Chapter 11 Cases will jointly affect each and every Debtor.  By jointly administering the Chapter 11 Cases, the Debtors will be able to reduce fees and costs resulting from the administration of the Chapter 11 Cases and ease the onerous administrative burden of having to file multiple and duplicative documents.

29.     Accordingly, I believe that the relief requested in the joint administration motion is in the best interests of the Debtors' estates, their creditors and other parties-in-interest.

### Application for Entry of an Order Authorizing the Employment and Retention of K&L Gates LLP as Attorneys for the Debtors

30.     The Debtors seek to employ and retain K&L Gates LLP ("*K&L Gates*") as their counsel to file and prosecute these Chapter 11 Cases and all related matters, effective as of the

---

[4]     Capitalized terms not defined in this section shall have the same meaning ascribed in the respective First Day Motion.

596382.1 8/4/10

Petition Date. The Debtors seek to retain K&L Gates as their attorneys because K&L Gates has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. In addition, K&L Gates possesses extensive experience and knowledge practicing before bankruptcy courts.

31.    I believe that K&L Gates's rates for its attorneys in these Chapter 11 Cases are comparable to rates charged by equivalent practitioners from peer firms on comparable restructuring matters.

32.    Additionally, K&L Gates has represented the Debtors prior to the Petition Date, and therefore, K&L Gates will be able to quickly respond to any and all issues that may arise during these Chapter 11 Cases. During its prior representations and in preparation for these Chapter 11 Cases, K&L Gates has become familiar with the Debtors' businesses and affairs and many of the potential legal issues that may arise in the context of these Chapter 11 Cases.

33.    I believe that the services provided by K&L Gates do not and will not duplicate the services that are being provided to the Debtors in these Chapter 11 Cases by any other professional, and K&L Gates has ensured the Debtors that it will coordinate with the Debtors' other professionals retained in these Chapter 11 Cases to ensure there is no duplication of services.

34.    Accordingly, I believe that K&L Gates is both well-qualified and uniquely able to represent the Debtors in these Chapter 11 Cases in an efficient and timely manner.

**Application for Entry of an Order Authorizing the Employment and Retention of Saul Ewing LLP as Local Counsel to the Debtors**

35.    The Debtors seek to retain Saul Ewing LLP ("*Saul Ewing*") as their local counsel because of Saul Ewing's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code and

11

because of its experience and knowledge practicing before this Court. Saul Ewing is familiar with the Debtors' operations and is well qualified to represent the Debtors in these Chapter 11 Cases.

36. I believe that the services provided by Saul Ewing do not and will not duplicate the services that are being provided to the Debtors in these Chapter 11 Cases by any other professional, and Saul Ewing has ensured the Debtors that it will coordinate with the Debtors' other professionals retained in these Chapter 11 Cases to ensure there is no duplication of services.

37. Accordingly, I believe that Saul Ewing is both well qualified and uniquely able to represent the Debtors as local counsel in these Chapter 11 Cases.

**Application Pursuant to Fed. R. Bankr. P. 2014(a) for Entry of an Order Under Section 327(a) of the Bankruptcy Code Authorizing and Approving the Employment and Retention of Scouler & Company as Financial Advisors to the Debtors**

38. The Debtors seek to employ and retain Scouler as their financial advisor in these Chapter 11 Cases, upon the terms of their engagement letter.

39. Scouler is well qualified to serve as the Debtors' financial advisor after the commencement of these Chapter 11 Cases. Scouler has considerable experience in assisting troubled companies with analyzing their financial situations and developing and implementing appropriate business plans to carry out restructurings. The services that Scouler will provide to the Debtors are necessary to enable the Debtors to maximize the value of their estates.

40. The Debtors have selected Scouler as their financial advisor because of the firm's experience and knowledge of the Debtors' business and financial affairs. Scouler has rendered financial advisory services to the Debtors since March of 2010. Consequently, Scouler is familiar with the Debtors' business and affairs and has the necessary background to assist the

12

Debtors in dealing effectively with many of the needs and problems of the Debtors that may arise in the context of these Chapter 11 Cases.

41.     I believe the services provided by Scouler do not and will not duplicate the services that are being provided to the Debtors in these Chapter 11 Cases by any other professional, and Scouler has ensured the Debtors that it will coordinate with the Debtors' other professionals retained in these Chapter 11 Cases to ensure there is no duplication of services.

42.     According, I believe that Scouler is both well qualified and uniquely able to provide financial advisory services to the Debtors in these Chapter 11 Cases in an efficient and timely manner.

**Application for Entry of an Order Authorizing and Approving the Employment and Retention of The Garden City Group, Inc. as Notice, Claims and Balloting Agent to the Debtors**

43.     The sheer size of the Debtors' creditor body might make it impracticable for the Office of the Clerk of this Court to (a) serve notice on the large number of creditors and interested parties and (b) administer claims during these Chapter 11 Cases.

44.     Garden City is a firm that specializes in noticing, claims processing, balloting and other administrative tasks in chapter 11 cases. The Debtors chose Garden City based on both its experience and the competitiveness of its fees. The Debtors wish to engage Garden City to send out certain designated notices and to collect and monitor claims and perform certain ballot-related functions with respect to these Chapter 11 Cases.

45.     I believe that the services provided by Garden City do not and will not duplicate the services that are being provided to the Debtors in these Chapter 11 Cases by any other professional and Garden City has ensured the Debtors that it will coordinate with the Debtors' other professionals retained in these Chapter 11 Cases to ensure there is no duplication of services.

13

46. Accordingly, I believe that Garden City is well qualified and uniquely able to provide services to the Debtors as notice, claims and balloting agent in these Chapter 11 Cases in an efficient and timely manner.

### Motion for Entry of an Order Authorizing the Debtors to Employ and Compensate Certain Professionals Utilized in the Ordinary Course of the Debtors' Businesses

47. The Debtors retain the services of various attorneys, accountants and other professionals in the ordinary course of their business operations (each an "*OCP*" and, collectively, the "*OCPs*") to assist them in carrying out their assigned responsibilities.

48. I believe the Debtors cannot continue to operate with sound business practice unless they retain and pay for the services of the OCPs postpetition. The uninterrupted services of the OCPs are vital to the Debtors' continuing operations and their ultimate ability to carry out an orderly wind-down and liquidation of their assets in chapter 11. I further believe that due to the number and geographic diversity of the OCPs the Debtors regularly retain, it would be unwieldy and burdensome to both the Debtors and this Court to request each OCP to apply separately for approval of its employment and compensation. Moreover, if the Debtors' current OCPs are lost, the estates undoubtedly will incur additional and unnecessary expenses because the Debtors will be forced to retain other professionals without an acquired background and expertise with the Debtors' operations.

49. Accordingly, I believe that the relief requested in this Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

### Motion for Entry of an Order Establishing Interim Fee Application and Expense Reimbursement Procedures for Professionals

50. The Debtors have filed applications to retain (i) K&L Gates as their lead bankruptcy counsel, (ii) Saul Ewing as their local counsel, (iii) Scouler as their financial

14

advisors; and (iv) Garden City as their claims and balloting agent. The Debtors anticipate that they may retain other professionals in these Chapter 11 Cases as the need arises. In addition, if an official committee is appointed in these Chapter 11 Cases, such committee may also seek to retain various professionals. The Debtors' professionals will carry out unique functions and will coordinate with one another to avoid unnecessary duplication of services while obtaining maximum advantage from each firm's expertise and knowledge of the Debtors.

51.     Briefly stated, the requested procedures would require the presentation to the Debtors, and certain parties-in-interest, of a detailed statement of services rendered and expenses incurred by each professional for the prior month. If there is no timely objection, the professional would be permitted to be paid 80 percent of the amount of fees incurred for the month, with a 20 percent hold-back, and 100 percent of expenses for the month. These payments would be subject to the Court's subsequent approval as part of the normal interim fee application process. I believe that these procedures will enable all parties to monitor closely the costs of administration of these Chapter 11 Cases and not unduly burden the Debtors.

52.     Accordingly, I believe that the relief requested in this Motion is in the best interests of the Debtors' estates, their creditors and other parties-in-interest.

**Motion for Entry of an Order (A) Authorizing the Debtors to Pay Prepetition (I) Sales, Use, Highway Use, Fuel and Franchise Taxes and (II) Tolls, Fees, Licenses and Other Similar Charges and Assessments and (B) Authorizing Applicable Banks and Other Financial Institutions to Receive, Process, Honor and Pay Checks Presented for Payment Related Thereto**

53.     The Debtors have filed a motion (the "*Tax Motion*") seeking authority to pay, in their sole discretion, certain Taxes and Fees (as defined below) in the ordinary course of business.

54.     In connection with the normal operation of their business, the Debtors, as described more fully below, (a) incur sales and use, highway use, fuel, franchise, and other taxes

15

necessary to operate their businesses (collectively, the *"Taxes"*), and (b) are charged for tolls, fees, licenses, permits, and other similar charges and assessments (collectively, the *"Fees"*) by various taxing, tolling, and licensing authorities (collectively, the *"Taxing Authorities"*). The Taxes and Fees are paid to the various Taxing Authorities on a periodic basis and, depending on the nature and incurrence of a particular Tax or Fee, are remitted monthly, quarterly, or yearly. More specifically, the Taxes and Fees incurred by the Debtors fall into one of the following categories:

### Sales Taxes

55. In the normal course of business, the Debtors are required to collect sales taxes (the *"Sales Taxes"*) from non-exempt purchasers of their products on a per sale basis and periodically remit the Sales Taxes to the applicable Taxing Authorities. Typically, Sales Taxes accrue as products are sold, and such taxes are calculated based on a statutory percentage of the sales price. The process by which the Debtors remit the Sales Taxes varies, depending on the nature of the tax at issue and the Taxing Authority which is to be paid. Sales Taxes are remitted to the relevant Taxing Authorities either on the basis of estimated sales tax collections for the coming period or on the basis of Sales Taxes actually collected from consumers during the prior period, in each case depending on the method required by the relevant Taxing Authority. Similarly, states differ with respect to the frequency of payments. With respect to those jurisdictions that require the Debtors to remit estimated Sales Taxes, the applicable Taxing Authority subsequently reconciles payments to determine any payment deficiency or surplus for the period and the applicable refund or payment is then made.

56. As of the Petition Date, the Debtors estimate that approximately $65,000 in Sales Taxes relating to the prepetition period either already have or will become due and owing to the Taxing Authorities in the ordinary course of business. Payment of the Sales Taxes is critical to

the continued, uninterrupted operations of the remaining operating Debtors. Moreover, I believe that nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, filing liens on the Debtors' assets, preventing the remaining operating Debtors from conducting business in the applicable jurisdictions, and seeking to lift the automatic stay, all of which would disrupt the Debtors' remaining operations and could potentially impose significant costs on the Debtors' estates.

### Use Taxes

57. In addition to the Sales Taxes, the Debtors are sometimes required to pay other use taxes (collectively, the *"Use Taxes"*) in certain limited circumstances. For example, the Debtors can be required to pay Use Taxes when they purchase equipment from vendors who are not always located in the state in which the equipment is to be delivered and the vendor does not collect and remit state sales tax on account of the subject transaction. The Debtors estimate that they owe less than $10,000 in Use Taxes incurred prior to the Petition Date. To the extent the Use Taxes are unpaid, I understand that the Debtors' officers and directors may be subject to lawsuits for such nonpayment, and that the Debtors, in turn, may have to indemnify those officers and directors. I believe that such lawsuits would distract from the Debtors' reorganization efforts and the related costs would far exceed the potential amount of Use Taxes incurred as of the Petition Date.

### Real and Personal Property Taxes

58. The Debtors own one parcel of real property located in Centralia, Illinois (the *"Centralia Property"*) as well as personal property located in various states throughout the country that are subject to state and local property taxes (the *"Real Property Taxes"* and *"Personal Property Taxes,"* respectively, and collectively the *"Property Taxes"*). The Real Property Taxes on the Centralia Property – approximately $64,000 per year – are paid on a semi-

17

annual basis in arrears, such that there is a lag between when the taxes accrue and when they come due. I understand that if unpaid, the Real Property Taxes could create a lien on the Centralia Property. Personal Property Taxes are usually paid on an annual basis, and although the Debtors have been unable to verify the exact amount for Universal Form Clamp, Inc., the Debtors estimate that, as of the Petition Date, approximately $210,000 in Personal Property Taxes has accrued that has not been paid. As with the Real Property Taxes, I understand that certain jurisdictions place a lien for unpaid Personal Property Taxes on the property so taxed. To the extent that liens are placed on properties that exceed the value of the unpaid Property Taxes, I believe that the Debtors' Property Tax obligations could be increased by the accumulation of interest, and the Debtors' operations could generally be disrupted by collections efforts instituted by the applicable Taxing Authorities, including the imposition of tax liens on the Debtors' assets.

### Highway Use and Fuel Taxes

59. By operating tractor-trailer units (collectively, the "*Rigs*") on interstate highways, certain of the Debtors incur fuel use taxes (collectively, the "*Fuel Taxes*"), with the majority of the Fuel Taxes being incurred by Accubrace, Inc. Additionally, in certain states in which the Debtors operate the Rigs, the Debtors – and in particular Accubrace, Inc. – are responsible for payment of highway use taxes on a monthly or quarterly basis (the "*Highway Use Taxes*," and together with the Fuel Taxes, the "*Highway Use and Fuel Taxes*"). The amount of the Highway Use Taxes that the Debtors pay to a respective state Taxing Authority varies based on the mileage and weight of the Rigs which the Debtors operate in the respective state. In the aggregate, the Debtors estimate that they may owe approximately $5,000 with respect to the Highway Use and Fuel Taxes as of the Petition Date, either directly to the applicable Taxing Authorities or to a third-party vendor that coordinates payments for the Debtors.

18

60.     Given that (i) Accubrace will be continuing to conduct business and is responsible for most of the Highway Use and Fuel Taxes and (ii) the amount of the Highway Use and Fuel Taxes is relatively de-minimis, I believe that it is appropriate to pay the Highway Use and Fuel Taxes in the ordinary course of business. I believe that having these amounts paid is critical to Accubrace's continued operations (and the Debtors' revenues generally) given that its ability to operate on highways and fulfill customer requests could be curtailed if the Highway and Fuel Taxes are not paid.

**Franchise Taxes**

61.     The Debtors pay franchise taxes (the "*Franchise Taxes*") to certain Taxing Authorities to operate their businesses in the applicable taxing jurisdiction. States can assess franchise taxes based on a variety of criteria. For example, (a) some states assess a flat Franchise Tax on all businesses, (b) some states assess a Franchise Tax based upon net operating income, and (c) other states assess a Franchise Tax on capital employed in the business. The Debtors incur a substantial amount of the Franchise Taxes by virtue of their operations and/or incorporation in the states of Delaware and California. The Debtors, while they are generally current with respect to the Franchise Taxes, estimate that they may owe approximately $45,000 with respect to the Franchise Taxes incurred prior to the Petition Date.[5] If the Debtors do not pay the Franchise Taxes, I understand that the respective Taxing Authorities may suspend the Debtors' right to do business in the respective states, resulting in the shutdown of the Debtors' operations in the respective jurisdictions.

---

[5]     The Debtors pay approximately $200,000 in Franchise Taxes annually.

596382.1 8/4/10

**Tolls**

62.     In the ordinary course of business, certain of the Debtors, including Accubrace and Form-Co, have drivers who routinely drive Rigs (whether owned by the Debtors or third-party Rigs) on highways which require vehicles to pay tolls (collectively, the *"Tolls"*). Depending upon the Rig and the delivery route, the driver may simply pay a Toll in cash and later be reimbursed from the Debtors' petty cash. With respect to certain routes, however, the Tolls may be registered on a state tolling authority-approved electronic transponder (an *"E-Transponder"*) whereby tolls are assessed and recorded by the E-Transponder as the Rig passes through the tollbooth. In addition to shorter waiting periods at tollbooths, the Debtors pay less for respective tolls where an E-Transponder is used which allows the Debtors to more efficiently and cost-effectively conduct their operations as they minimize labor, fuel, and wear and tear costs. The ability to deliver vehicles on schedule, in turn, results in increased customer goodwill and further business opportunities.

63.     Where E-Transponders are used, the Debtors generally prepay the respective Taxing Authority, with the E-Transponder replenished from a corporate credit card. The Taxing Authorities will then credit such amounts against the incurred Tolls.

64.     I understand that if the Debtors were to default on the payment of the Tolls, the Taxing Authorities could deactivate the Debtors' E-Transponders. I believe that such an action by the Taxing Authorities would impair the Debtors' ability to efficiently deliver rented or purchased goods in such states. The Debtors would be compelled to find alternative routes, if any, through which to conduct their vehicle hauling operations, thereby increasing labor, fuel, and wear and tear costs.

596382.1 8/4/10

### Business License Fees

65.     Many municipal and state governments in which the Debtors operate their businesses require the Debtors to obtain a business license and to pay corresponding business license fees (the "*Business License Fees*"). The criteria requiring a company to obtain a business license and the manner that the Business License Fees are computed vary greatly according to local laws. Some jurisdictions assess Business License Fees based on a flat rate and others upon the number of employees working in the jurisdiction. The Debtors estimate that each entity pays less than $2,000 in Business License Fees annually, and that while the Debtors are generally current on their obligations, some of these amounts could be accrued but unpaid. I understand that in the event that the Debtors fail to pay the Business License Fees, the respective Taxing Authorities may revoke the Debtors' license in the respective state or municipality. I believe that such an action could suspend the Debtors' right to do business in the respective jurisdiction, thereby effectively forcing the Debtors to close their operations in the jurisdiction. I further believe that he amount of revenue that could be lost during a short shutdown far outweighs the amount of the Business License Fees that might be owing as of the Petition Date.

### Registration Fees

66.     The Debtors are required to register and pay annual registration fees (collectively, the "*Registration Fees*") for their corporate vehicles, including the Rigs. With respect to the Rigs, the amount of Registration Fees the Debtors pay varies greatly according to (a) the miles a Rig traveled in each state, (b) the gross weight of each Rig traveling in each state, and (c) the number of Rigs traveling in each state.

67.     I believe that the nonpayment of certain of the Registration Fees could result in a massive disruption of the Debtors' remaining operations. The Debtors' failure to pay the Registration Fees may lead a base state to revoke the registration credentials of the Debtors' Rigs

in such state *as well in all other states* in which the Debtors operate. Since all state laws require an operator of a vehicle to properly obtain registration credentials prior to the operation of such vehicle, without registration credentials, the Debtors would be unable to legally operate the Rigs in effectively all states, potentially resulting in a total cessation of business.

68.    The Registration Fees are paid in advance and the Debtors have timely paid their Registration Fees. Therefore, the Debtors believe that they do not owe any prepetition amounts relating to Registration Fees.

69.    I believe that the Debtors are substantially current with respect to all of the above-described Taxes and Fees, however it is possible that (i) some Taxes and Fees accrued prepetition were not, in fact, paid prepetition or were paid in an amount that was less than the amount actually owed, or (ii) payments sought to be made prepetition were lost or otherwise not received in full by any of the Taxing Authorities. Further, there may be Taxes and Fees incurred prepetition that may become due shortly after the commencement of the Chapter 11 Cases. I believe that the total accrued but unpaid amount of Taxes and Fees is approximately $450,000 – representing a small fraction of the Debtors' total consolidated assets as of the Petition Date.

70.    I believe that the failure to pay the Taxes and Fees could trigger a material adverse impact on the Debtors' operations, including the potential suspension of the Debtors' ability to operate in certain jurisdictions. Moreover, if any of the Taxing Authorities attempt to exercise certain remedies against the Debtors, it would have the devastating effect of distracting the attention of the Debtors' management and professionals away from the important task of the Debtors' successful Chapter 11 Cases.

71.    Accordingly, I believe that the relief requested in the Tax Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest..

**Motion for Entry of an Order Authorizing Debtors to (A) Continue to Use Existing Cash Management System and Bank Accounts, (B) Continue Intercompany Transactions and Provide Administrative Priority Status to Intercompany Claims and (C) Continue to Use Existing Checks and Business Forms**

72.     The Debtors have filed a motion (the *"Cash Management Motion"*) seeking authorization to continue to use their existing cash management system and bank accounts, to continue intercompany transactions and provide administrative expense status to intercompany claims, and to continue to use existing checks and business forms.

73.     The Debtors' Cash Management System consists of thirteen bank accounts (collectively, the *"Bank Accounts"*), each of which is described below and in the flowchart of the Cash Management System attached to the Cash Management Motion as Exhibit B. The Cash Management System enables the Debtors to centrally control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of the Debtors' financing agreements, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balance and presentment information.

74.     As detailed on the flowchart attached as Exhibit B to the Cash Management Motion, the Debtors' cash receipts and disbursements flow as follows:

> **a.**    ***Collection Accounts.*** The Debtors maintain four bank accounts at Comerica Bank for the purpose of receiving payments from customers (the *"Collection Accounts"*), one for each of the Debtors' operating entities.[6]  Customers' payments are received by the Debtors in the form of automatic clearing house (*"ACH"*) receipts, physical checks, or wire transfers. In the case of physical checks, each of the Collection Accounts is tied to a separate lockbox account, and most customers send checks directly to the appropriate lockbox account. These checks are then processed and deposited into the corresponding Collection Account. A few customers do

---

[6]    The operating entities are:   (i)Accubrace; (ii) DDC (iii)Form-Co; and (iv) UFC. (collectively, the *"Operating Subsidiaries"*).

send physical checks to the business office of the Operating Subsidiary they do business with, in which case the Debtors deposit the checks directly into the appropriate Collection Account. All of the Collection Accounts other than the Accubrace Collection Account are subject to account control agreements in favor of Prepetition Agent, on behalf of itself and Prepetition Lenders. While not subject to an account control agreement, the Debtor believes that the Prepetition Agent, on behalf of itself and Prepetition Lenders, has a perfected first priority security interest in all amounts on deposit in the Accubrace Collection Account by virtue of having a perfected first priority security interest in the assets the proceeds of which are the sole deposits into such Accubrace Collection Account. Funds received in the Collection Accounts for the Operating Subsidiaries other than Don De Cristo Concrete Accessories, Inc. and Universal Form Clamp, Inc. (the "*Post-Petition Operating Subsidiaries*") are used to fund payments made from the Controlled Disbursement and Payroll Accounts maintained by the Operating Subsidiaries (discussed below). At the end of each day funds in the Collection Accounts of the Post-Petition Operating Subsidiaries that have not been applied to fund payments from the corresponding Controlled Disbursement or Payroll Accounts are swept into the UBP Concentration Account (discussed below). Conversely, if collections received in one of the Collection Accounts on a given day are insufficient to cover payments that need to be made from the associated Controlled Disbursement and/or Payroll Account(s), the shortfall is funded from the UBP Concentration Account

*b.*     ***Concentration Account.***    Universal Building Products, Inc. maintains a concentration account at Comerica Bank (the "UBP *Concentration Account*"). At the end of each day, all funds from the Collection Accounts of the Post-Petition Operating Subsidiaries that have not been used to fund checks or ACH transfers made from the associated Controlled Disbursement and/or Payroll Accounts are swept into the UBP Concentration Account. In addition to funding any shortfalls in the Collection Accounts of the Post-Petition Operating Subsidiaries (if collections on a given day in the Collection Account for one of the Post-Petition Operating Subsidiaries are insufficient to cover all of the expenses that need to be paid from the corresponding Controlled Disbursement and/or Payroll Accounts as discussed above), the UBP Concentration Account also funds the UBP Controlled Disbursement Account and the UBP Payroll Account (both as defined below). At the end of each day, all amounts in the UBP Concentration Account in excess of $25,000.00 in cleared funds are swept into the Investment Sweep Account (defined below).

c. **_Controlled Disbursement Accounts._** Each of the Debtors maintains a controlled disbursement account at Comerica Bank (collectively, the "*Controlled Disbursement Accounts*"). In the case of the Post-Petition Operating Subsidiaries, the Controlled Disbursement Accounts are generally funded from the corresponding Collection Accounts, but if collections are insufficient or for the other Operating Subsidiaries, any shortfall is funded from the UBP Concentration Account. With respect to the Operating Subsidiaries other than the Post-Petition Operating Subsidiaries, the Controlled Disbursement Accounts are funded directly from the UBP Concentration Account. The Controlled Disbursement Account maintained by Universal Building Products, Inc. (the "UBP *Controlled Disbursement Account*") is funded directly from the UBP Concentration Account.

d. **_Payroll Accounts._** Don De Cristo Concrete Accessories, Inc. and Universal Building Products, Inc. each maintain a payroll account (collectively, the "*Payroll Accounts*") used to fund their respective payroll (the other Debtors fund their payroll directly from their respective Controlled Disbursement Accounts). Both Payroll Accounts are funded directly from the UBP Concentration Account.

e. **_Investment Sweep Account._** Universal Building Products, Inc. maintains an investment sweep account (the "*Investment Sweep Account*") at Comerica Bank. The Investment Sweep Account is essentially a money market account, and every day at the close of business all amounts in the UBP Concentration Account over $25,000.00 in cleared funds are swept into the Investment Sweep Account so that the Debtors can earn interest on their cash. If the balance in the UBP Concentration Account falls below $25,000.00 in cleared funds, funds from the Investment Sweep Account are automatically transferred back to ensure that the UBP Concentration Account always contains at least $25,000.00 in cleared funds.

75. Because Debtors UFC and DDC are no longer operating, the Debtors, in consultation with their senior secured lenders, recently modified their Cash Management System by de-linking the Collection Accounts for UFC and DDC from both the UBP Concentration Account and the associated Controlled Disbursement and Payroll Accounts. As a result, collections into those two Collection Accounts are not swept into the UBP Concentration Account or used to fund operating expenses. Instead, all payments that need to be made from the UFC and DDC Controlled Disbursement or Payroll Accounts are funded directly from the UBP

25

Concentration Account. This structure will enable the Debtors to easily monitor cash flow from their ongoing operations, and the modifications are a condition to the Debtors' senior secured lenders' agreement to allow the Debtors to use cash collateral.

76.     The Debtors have utilized their Cash Management System in its current basic structure for years as a mainstay of their ordinary, usual, and essential business practices. The cash management system is similar in form to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity. Multiple-entity businesses tend to use such systems because of the numerous benefits they provide, including the ability to (a) track, and thus control, all corporate funds through an ability to provide near-continuous status reports on the location and amount of all such funds, (b) ensure cash availability and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. These controls are particularly important here, given the significant amount of cash that flows through the Debtors' integrated Cash Management System.

77.     I believe that shutting down their Cash Management System only to establish a new, nearly-identical system would involve significant and unnecessary effort and cost (related to opening new accounts, revising cash management procedures, and instructing customers to redirect payments) and potentially cause significant disruptions to their businesses. I believe that preserving the "business as usual" atmosphere and avoiding the unnecessary distractions associated with such a process will facilitate the Debtors' reorganization efforts.

78.     Prior to the Petition Date, the Debtors engaged in intercompany transactions both between the Debtors and between the Debtors and their Canadian non-debtor affiliate (collectively, the *"Intercompany Transactions"*) in the ordinary course of their respective

26

businesses as part of their Cash Management System. These continuation of these transfers is necessary to preserve and enhance the value of the Debtors' estates, including the value of the Canadian non-debtor affiliate.

79.     At any given time, there may be balances due and owing from one Debtor to another Debtor and between certain Debtors and the Non-Debtor Affiliates. These balances represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System. The Debtors maintain records of these transfers of cash and can ascertain, trace and account for these Intercompany Transactions. The Debtors, moreover, will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

80.     In the ordinary course of their business, the Debtors use a multitude of checks and other business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.). I do not believe that any creditors or parties-in-interest would be harmed by the continued use of the Debtors' existing check stock or substantially similar new checks.

81.     Because of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, I believe that it is important that the Debtors be permitted to continue to use their business forms without alteration or change. Indeed, I believe that parties doing business with the Debtors will most likely be aware of the Debtors' status as a debtor in possession as a result of the publicized nature of these Chapter 11 Cases.

82.     In the ordinary course of business, various third-parties, such as payroll and benefits administrators and providers, prepare and issue checks on behalf of the Debtors (the "*Check Writing Privileges*"). I believe that if the Check Writing Privileges are interrupted, it

27

could result in a disruption of the Debtors' operations and a significant erosion of the Debtors' employees' morale.

83. Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**Motion for Entry of an Order (A) Authorizing but not Requiring the Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Employee Medical, Insurance and Similar Benefits, (III) Workers' Compensation Obligations, (IV) Vacation and Similar Benefits and (V) Reimbursable Employee Expenses, (B) Authorizing but not Requiring the Debtors to Continue to Make Deductions from Employees' Paychecks and (C) Authorizing and Directing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing**

84. The Debtors currently employ 87 employees who are employed by Debtor entity as follows: (i) UBP employs 5 people (the "*UBP Employees*"); (ii) Form-Co employs 26 people (the "*Form-Co Employees*"); (iii) UFC employs 34 people (the "*UFC Employees*"); (iv) DDC employs 11 people (the "*DDC Employees*"); and (v) Accubrace employs 11 people (the "*Accubrace Employees*").

85. The Debtors seek authority, in their sole discretion, to pay and honor certain prepetition wage and benefit obligations the ("*Pre-Petition Wage and Benefit Obligations*"), as well as maintain the post-petition wage and benefit programs described herein (the "*Post-Petition Wage and Benefit Programs*"). In addition, the Debtors request the right to modify, change, and discontinue any of the Post-Petition Wage and Benefit Programs in the ordinary course of business during these Chapter 11 Cases in their sole discretion without the need for further Court approval. The continued utilization of the Post-Petition Wage and Benefit Programs constitutes the ordinary course of business in the context of the Debtors' orderly chapter 11 wind-down and the costs associated therewith are set forth in the budget associated with the Debtors' DIP financing.

28

86.     The Pre-Petition Wage and Benefit Obligations remain owing as the Petition Date. The Debtors seek to pay these obligations to (1) eliminate hardships to those employees that have recently been terminated or are assisting in the Debtors' wind-down and (2) to avoid any potential personal liability for directors and offices that may arise in connection with wage and other obligations. Further, the amounts described as owing herein are being financed through the Debtors' DIP financing and such amounts have been agreed to in the budget with the Debtors' senior secured lender. Notwithstanding anything stated herein, the Debtors will not pay any employee-related obligations in an amount inconsistent with the budget.

87.     UFC maintained a self-insurance program for purposes of the Former and Remaining Employees health benefits. The UFC Employees can still submit medical claims that were incurred prepetition. The Debtors have budgeted $40,000 per week for these medical claims, and this amount has been approved in connection with the DIP financing. In light of the difficult circumstances created by the Debtors' condition, the Debtors still believe it is appropriate to satisfy these obligations.

88.     Two Former Employees were issued live checks for their final wages that may not yet have cleared the Debtors' accounts. These checks totaled $2,037.36.

89.     Certain of the Debtors have commissions programs for their employees. As of the Petition Date, there were $13,000 in outstanding commissions for employees of Form-Co that need to be paid.

90.     Certain of the Debtors reimburse their employees for reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment. As of the Petition Date, there were $6,189.55 in reimbursable expenses that had been submitted but not yet paid. In addition, there may be reimbursable expenses that have been incurred by Former or

29

Remaining Employees that have not yet been submitted for payment. The reimbursable expenses were all incurred on the Debtors' behalf and with the understanding that they would be reimbursed. Accordingly, to avoid harming individuals who incurred the Reimbursable Expenses, the Debtors request authority, in their sole discretion, to continue reimbursing the Reimbursable Expenses in accordance with prepetition practices and to pay all Reimbursable Expenses that accrued prepetition.

91.     As described in detail below, the Debtors deduct certain amounts from their employees' paychecks for remittance to taxing authorities. As of the Petition Date, Form-Co estimates that it owes approximately $4,119.46 to the taxing authorities that it has withheld from employees' paychecks but not yet remitted.

92.     Accubrace employs approximately seven union employees (the "*Union Employees*") whose employment is governed by active collective bargaining agreements (collectively, the "*CBAs*"). The Debtors are required to make contributions to union pension and benefit programs each month. As of the Petition Date, the Debtors estimate they owe approximately $14,000 on account of unpaid contributions required by the CBAs.

93.     Form-Co, as well as other of the Debtors, maintain a retirement savings plan that meets the requirements of section 401(k) of the Internal Revenue Code. As of the Petition Date, Form-Co estimates that $2,733.50 has been withheld from participants' paychecks and has been forwarded, but has not yet cleared Form-Co's bank account.

94.     UFC provides life insurance, accidental death and dismemberment ("*AD&D*") insurance, and long-term disability insurance to eligible employees. As of the Petition Date, UFC estimates it owes approximately $1,223 on account of these obligations. In addition, UFC offered its employees the option to purchase supplemental insurance through Trustmark

30

that is funded 100% by the employees. As of the Petition Date, UFC estimates that it owes Trustmark approximately $2,684 on account of amounts that have been withheld from the paychecks but not yet forwarded to Trustmark.

95.     The Debtors maintain certain corporate programs designed to prevent their employees from having to seek reimbursement for certain costs associated with their employment. Among these programs is the Fuel Card Program (defined below) which manages the fuel costs for the Debtors' automobiles. As of the Petition Date, the Debtors estimate that they owe approximately $35,000 on account the Fuel Card Program.

96.     The Debtors also provided corporate credit and purchasing cards through American Express. Each Debtor entity had a corporate card that was used to pay regular vendors (the "*Corporate Cards*"). As of the Petition Date, a balance of $120,205.77 was outstanding on the Corporate Cards. In addition, the Debtors had 32 purchasing cards (the "*Purchasing Cards*") that were used to pay for maintenance, repairs, and office supplies. Each Debtor entity was billed on a monthly basis. As of the Petition Date, a balance of $836.03 was outstanding on the Purchasing Cards. The Purchasing Card and Corporate Card programs will not be continued on a going forward basis.

### PostPetition Employee Obligations

*Wage Obligations*

97.     All of the Remaining Employees will continue to be paid in the same manner they were prepetition and in the ordinary course of the Debtors' orderly chapter 11 wind-down.

*Remitting and/or Paying Appropriate Deductions and Withholdings*

98.     The Debtors routinely deduct certain amounts from employees' gross pay, including, without limitation: (a) garnishments, child support, and similar deductions; and (b) other pre-tax and after-tax deductions payable pursuant to the employee benefit plans discussed

31

herein (*e.g.*, contributions relating to health care benefits, union dues, insurance premiums, 401(k) contributions, and flexible spending account contributions (collectively, the "*Deductions*"). The Debtors forward such Deductions to various third-party recipients.

99.    In addition to the Deductions, the Debtors are required by law to withhold amounts related to federal, state and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "*Withheld Amounts*"). The Debtors are also required to pay additional amounts for Social Security, workers' compensation costs for certain states, and federal and state unemployment insurance (collectively, the "*Employer Payroll Taxes*," and together with the Withheld Amounts, the "*Payroll Taxes*").

*Union Contributions*

100.    Accubrace has approximately seven Union Employees whose employment is governed by active collective bargaining agreements (collectively, the "*CBAs*"). All of the Union Employees belong to the International Union of Operating Engineers. The requirements set forth for Union Employees in connection with their hours worked, overtime, vacation, and other benefits vary slightly depending upon the particular CBA.

101.    The Debtors are required to make contributions to union pension and benefits programs each month. These amounts vary by month, but the Debtors average roughly $14,000 per month for union contributions.

*Payment of Reimbursable Expenses*

102.    Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors reimbursed Employees for certain expenses incurred on behalf of the Debtors in the scope of their employment (the "*Reimbursable Expenses*").

596382.1 8/4/10

103. The UBP Employees are entitled to reimbursement of expenses for business travel or in performing work on behalf of the company. UBP Employees are reimbursed for expenses incurred in connection with travel including mileage for use of personal cars, gas/oil, various auto expenses for company cars (including repairs, tire changes, maintenance), transportation (such as taxi or rental cars while traveling), meal expenses, client entertainment expenses, airfare and lodging. In addition to travel expenses, UBP Employees are reimbursed for office supplies, phone and fax expenses (including cell phones), and other miscellaneous expenses. The majority of these expenses are incurred by sales staff and members of senior management; however, any and all employees can incur expenses with the approval of their manager. UBP Employees submit expense reports and their Reimbursable Expenses are paid through the payroll system.

104. Form-Co Employees are entitled to reimbursement for business-related expenses including, but not limited to, business meals and entertainment, supplies, repairs and maintenance as it relates to company vehicles.

105. The UFC Employees are entitled to reimbursement of expenses for business travel or in performing work on behalf of the company. UFC Employees are reimbursed for expenses incurred in connection with travel including mileage for use of personal cars, gas/oil, various auto expenses for company cars (including repairs, tire changes, maintenance), transportation (such as taxi or rental cars while traveling), meal expenses, client entertainment expenses, airfare and lodging. In addition to travel expenses, UFC Employees are reimbursed for office supplies, phone and fax expenses (including cell phones), and other miscellaneous expenses. The majority of these expenses are incurred by sales staff and members of senior management; however, any and all employees can incur expenses with the approval of their manager. UFC Employees submit expense reports and their Reimbursable Expenses are paid through the payroll system.

596382.1 8/4/10

106. The DDC Employees are entitled to reimbursement of expenses for business travel or in performing work on behalf of the company. DDC Employees are reimbursed for expenses incurred in connection with travel including mileage for use of personal cars, gas/oil, various auto expenses for company cars (including repairs, tire changes, maintenance), transportation (such as taxi or rental cars while traveling), meal expenses, client entertainment expenses, airfare and lodging. In addition to travel expenses, DDC Employees are reimbursed for office supplies, phone and fax expenses (including cell phones), and other miscellaneous expenses. The majority of these expenses are incurred by sales staff and members of senior management; however, any and all employees can incur expenses with the approval of their manager. DDC Employees submit expense reports and their Reimbursable Expenses are paid through the payroll system.

107. Accubrace Employees are entitled to reimbursement for business related expenses including, but not limited to, business meals and entertainment, supplies, repairs and maintenance as it relates to company vehicles. Certain Accubrace Employees are also entitled to per diems if they are traveling for work to job sites.

<u>Employee Benefits</u>

108. In the ordinary course of business, the Debtors maintain various employee benefit plans and policies, including, without limitation, health care plans, dental plans, workers' compensation benefits, accidental death and dismemberment insurance, long term disability insurance, paid time off, flexible spending plans, supplemental benefits, and COBRA-mandated benefits (collectively, the "*Employee Benefits*").

*Medical and Dental Plans*

109. UBP offers its employees either an HMO or PPO medical plan through Anthem Blue Cross (the "*UBP Medical Plans*"). All of the employees participate in the UBP Medical

596382.1 8/4/10

Plans, but only some of the individual UBP Employees pay a portion of their health care coverage through a payroll deduction, with the amounts varying by employee. UBP pays the remaining costs and pays for certain employees in full.

110.    UBP offers its Employees dental care through Delta Dental of Illinois (the "*UBP Dental Plan*"). All of the Employees participate in the UBP Dental Plan, but only some of the individual UBP Employees pay a portion of their dental coverage through a payroll deduction, with the amounts varying by employee. UBP pays the remaining costs and pays for certain employees in full.

111.    UBP additionally offers its Employees the ability to contribute up to $5,000 each year (pre-tax) for costs not covered by insurance to flexible spending accounts to pay for eligible out-of-pocket health care costs and expenses (the "*UBP Flexible Spending Plan*"). The UBP Flexible Spending Plan is administered through Discover Benefits at no cost to UBP.

112.    Form-Co offers its Employees two major medical plan options through United Healthcare Insurance. One is a Health Savings Account ("*HSA*") and the other is a more traditional medical plan (collectively, the "*Form-Co Medical Plans*"). The HSA has limits of $2,000 per employee and $4,000 per family annually. Form-Co contributes $25 per pay period to an individual employee's health savings account. Form-Co is reimbursed bi-monthly by employees for their portion of health care coverage through a payroll deduction, with the amounts varying by employee. If the employee wants additional coverage for his or her spouse and/or dependents under the traditional plan, the employee funds that cost at 100%. Total Employee contributions to the Form-Co Medical Plans are approximately $1,500 per pay period. Premiums are paid monthly and in advance around the 15th of each month.

35

113. UFC is self-insured in an amount up to $125,000 per UFC employee (the "*UFC Medical Plan*"). UFC additionally offers its Employees dental care through Delta Dental of Illinois (the "*UFC Dental Plan*").

114. UFC additionally offers its Employees the ability to contribute up to $3,000 each year (pre-tax) for costs not covered by insurance to flexible spending accounts to pay for eligible out-of-pocket health care and costs and expenses (the "*UFC Flexible Spending Plan*"). The UFC Flexible Spending Plan is administered through Discover Benefits at no cost to UFC.

115. DDC offers its Employees either an HMO or PPO medical plan through Anthem Blue Cross (the "*DDC Medical Plans*"). DDC additionally offers its Employees dental care through Dental Health Services SmartSmile program (the "*DDC Dental Plan*," and together with the UBP Dental Plan and UFC Dental Plan, the "*Dental Plans*").

116. DDC additionally offers its Employees the ability to contribute up to $3,000 each year (pre-tax) for costs not covered by insurance to flexible spending accounts to pay for eligible out-of-pocket health care costs and expenses (the "*DDC Flexible Spending Plan*," and together with the UBP Flexible Spending Plan and the UFC Flexible Spending Plan, the "*Flexible Spending Plans*"). The DDC Flexible Spending Plan is administered through Discover Benefits at no cost to DDC.

117. Accubrace offers its *non*-union Employees a PPO medical plan through Anthem Blue Cross (the "*Accubrace Medical Plan*," and together with the UBP Medical Plan, the Form-Co Medical Plan, the UFC Medical Plan, and the DDC Medical Plan, the "*Medical Plans*").

*Paid Time Off*

118. The Debtors provide personal time off to employees to cover holidays, vacation, illness, bereavement, and other obligations such as jury duty (the "*Paid Time Off*"). Except as

36

required by the State of California, paid time off benefits neither carry over into the following year nor can they be exchanged for pay or additional compensation.

119.    UBP Employees earn vacation time based on their continuous service with the company. They are eligible for up to five days during the first year of service, ten days during years two through four, and 15 days for five years or more, based on the attainment of five years of service as of January 1 of that year. For California UBP Employees, they can accrue a maximum of 240 hours at one time. UBP Employees also are entitled to eight paid holidays per year, two paid sick days per year, one paid jury duty day, and 2 days per year for bereavement.

120.    UFC Employees earn vacation time off based on their continuous service with the company, after they have been employed for 30 days. They are eligible for up to five days during the first year of service, ten days during years two through four, 15 days for five years or more, based on the attainment of five years of service as of January 1 of that year. UFC Employees also are entitled to eight paid holidays per year, two paid sick days per year, one paid jury duty day, and 2 days per year for bereavement.

121.    Form-Co Employees are entitled to paid vacation based on their length of service. The Form-Co Salaried Employees are entitled to two weeks vacation per year immediately upon hire. Form-Co Hourly Employees are entitled to vacation after one year of service. If they have been employed between one and three years they are entitled to one week of vacation. After three years of employment, Form-Co Hourly Employees are entitled to two weeks of vacation.

122.    DDC Employees earn vacation time off based on their continuous service with the company. They are eligible for up to five days during the first year of service, ten days during years two through four, 15 days for five years or more, based on the attainment of five years of service as of January 1 of that year. California DDC Employees can accrue a maximum of 240

37

hours at one time. DDC Employees also are entitled to eight paid holidays per year, two paid sick days per year, one paid jury duty day, and 2 days per year for bereavement.

123. Non-Union Accubrace Employees are entitled to paid vacation. Employees generally get two weeks vacation per year, and if they do not use these days they do not carry over. Accubrace estimates that it owes approximately $1,200 on account of accrued vacation time during the prepetition period. This amount, however, is not a current cash payable obligation since the Accubrace Employees only are entitled to be paid for accrued and unused vacation time in the event they are terminated.

*401(k) Plans*

124. UBP, Form-Co, UFC, and DDC maintain a retirement savings plan for the benefit of all eligible Employees that meet the requirement of section 401(k) of the Internal Revenue Code (the "*401(k) Plan*"). The 401(k) Plan is administered through Transamerica and the Debtors currently do not have any costs associated with administering the 401(k) Plan. None of the Debtors offer any matching for 401(k) contributions.

*Workers' Compensation Coverage*

125. The laws of various states in which the Debtors operate require them to maintain workers' compensation policies and programs to provide their Employees with workers' compensation benefits for claims arising from, or related to, their employment with the Debtors. The Debtors maintain their current workers' compensation coverage through two fully insured, third-party insurance program (the "*Workers' Compensation Policies*") provided by National Union Fire Insurance Company of Pittsburgh Pennsylvania in California and provided by AIG Casualty Company in all other states.

126. As set forth in the Debtors' *Motion for Entry of an Order Authorizing the Debtor (A) to Maintain Insurance Coverage (Including Premium Financing Agreements) Currently in*

*Effect and Renew Such Coverage; and (B) to Pay any Prepetition Premiums (Including Premium Financing Agreements) Related to Their Policies to the Extent the Debtors Determine Such Payment is Necessary or Appropriate*, filed contemporaneously herewith, the Debtors' Workers Compensation Policies are paid through their broker, Aon Risk Insurance Services West, Inc. In connection with the Workers' Compensation Policies, the Debtors made a down payment of $170,887.00 in August of 2009 and nine subsequent monthly payments of $54,712.00. The Debtors have paid their Workers' Compensation Policies in full for their current term and will consider renewing these policies or entering into new policies as they are set to expire on August 31, 2010.

## Life, Accident, and Disability Insurance

127. Certain of the Debtors provide life insurance (the *"Life Insurance Coverage"*), accidental death and dismemberment coverage (*"AD&D"*), and long-term disability insurance (the *"Long-Term-Disability Benefits"*) for their Employees.

128. UBP provides life insurance in an amount equal to $25,000 for all UBP Employees through Anthem Blue Cross. UPB additionally provides AD&D coverage for employees through Anthem Blue Cross. UBP also supplies all of its employees with long-term disability benefits through Lincoln Life. UBP additionally offers its employees the option to purchase supplemental life, critical illness, disability, and accident coverage through Trustmark. These programs are 100% funded by the UBP Employees.

129. UFC provides life insurance in an amount equal to $20,000 for all UFC full-time employees through Lincoln Life. UFC additionally provides AD&D coverage for all full-time employees through Lincoln Life. UFC also supplies all of its full-time salaried employees with long-term disability benefits through Lincoln Life. UFC offers its employees the option to

39

purchase supplemental life, critical illness, disability, and accident coverage through Trustmark. These programs are 100% funded by the UFC Employees.

130.   DDC provides life insurance in an amount equal to $25,000 for all DDC Employees through Anthem Blue Cross. DDC additionally provides AD&D coverage for employees through Anthem Blue Cross. DDC also supplies all of its full-time salaried employees with long-term disability benefits through Lincoln Life. DDC also offers its employees the option to purchase supplemental life, critical illness, disability, and accident coverage through Trustmark. These programs are 100% funded by the DDC Employees.

131.   Accubrace currently provides life insurance in an amount equal to $25,000 for its non-union employees through Anthem Blue Cross. Accubrace additionally provides non-union employee with AD&D coverage through Anthem Blue Cross.

*COBRA Benefits*

132.   One former UBP Employee who recently received his final severance payment has elected to receive COBRA coverage for medical insurance, which UBP estimates will cost approximately $1,200 to $1,300 per month. As the Debtors recently terminated a large number of Former Employees, it is anticipated that the COBRA costs are going to increase substantially in the coming months.

*Corporate Programs*

133.   The Debtors also maintain a number of corporate programs (the "*Corporate Programs*") that are designed to prevent the Employees from having to seek reimbursement for certain costs associated with their employment.

596382.1 8/4/10

## Vehicle Program

134. The Debtors lease two vehicles for its corporate executives. The Debtors are currently making monthly payments on only one of these leases in the amount of $2,011.99 per month for the next two months. When the Debtors' leases on these vehicles have expired, these executives have the option to purchase the vehicles for $1. This program is justified in light of the fact that the vehicle costs have been added to the executives' income and they have been taxed on those amounts.

## Fuel Card Program

135. In order to efficiently manage fuel costs for the Debtors' automobiles and employees' personal automobiles, the Debtors maintain an account with Wright Express Fleet Services for fuel purchases (the "*Fuel Card Program*"). Prior to the Petition Date, the Debtors spent between $34,000 and $35,000 on the Fuel Card Program per month. The Debtors had approximately 80 fuel cards associated with their automobiles across the five Debtor entities. Going forward, the Debtors will only be continuing the Fuel Card Program for five employees and the costs associated therewith will be substantially reduced.

## Air Card Program

136. The Debtors provide five of its employees with AirCards (the "*AirCards*") for wireless internet access use through AT&T. The average cost per month for the AirCards is $300. In addition, several Employees have their own AirCards which they seek reimbursement for through the typical reimbursement process.

*Retention Issues*

137. Due to the heightened risk of employee resignations in light of the Debtors deteriorating financial condition, in July 2010, the Debtors executed retention agreements that

41

provided bonuses to two non-insider employees who fulfill critical roles in the administration of the Debtors' financial affairs, financial recording, and cash systems in consideration of their commitment to stay with the Debtors through any restructuring and wind-down.

138.    In light of the necessity to maintain the commitment of the Remaining Employees in connection with the orderly chapter 11 wind-down, the Debtors are considering other retention incentives with respect to their non-insider employees, but are not generally seeking any approval of such proposed programs.

139.    In light of the circumstances surrounding the termination of the Debtors' employees, the Debtors assured the Former and Remaining Employees that the obligations discussed in the wages motion would be satisfied. If the Debtors fail to follow through on such statements, the Remaining Employees will become disheartened by the Debtors' conduct, hindering the Debtors ability to conduct an effective chapter 11 wind-down.

140.    Moreover, the vast majority of the Debtors' Employees rely or relied exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses, and these Former and Remaining Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Court does not authorize the Debtors to honor their various obligations under the insurance programs, the Remaining Employees will not receive health coverage and, thus, may become obligated to pay certain health care claims in cases where the Debtors have not paid the respective insurance providers.

141.    In addition, and as described above, the Debtors' directors and officers could potentially be held personally liable for unpaid wages or other employee obligations and the Debtors thus seek to pay these amounts to avoid any such liability.

42

142. For all of the foregoing reasons, the relief requested in the wages motion will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to wind-down efficiently and effectively without interruption. In the absence of such payments, the Debtors believe that their Employees may seek alternative employment opportunities. Such a development would hinder the Debtors' ability to effectively wind-down their operations and result in a costly distraction at a time when the Debtors need to focus on maximizing the value of the estates. Accordingly, the Debtors must be able to pursue all reasonable measures to retain their Remaining Employees by, among other things, continuing to honor all wage, benefits, and related obligations.

143. Accordingly, I believe that the relief requested in the wages motion is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest.

### Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment of Future Utility Services

144. The Debtors incur expenses for gas, water, waste, electric, telecommunications, and other similar utility services (collectively, the "*Utility Services*") provided by approximately 65 utility providers, and have filed a motion to address adequate assurance issues with respect to providers of the Utility Services (the "*Utility Motion*"). A list of the Utility Providers who rendered services to the Debtors as of the Petition Date is attached as Exhibit A to the Utility Motion. The Debtors' forecasted, postpetition run rate for the Utility Services is approximately $49,000 per month.

145. Uninterrupted utility services are essential for securing the Debtors' various locations and preserving the collateral therein. I believe that any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' property and seriously jeopardize the Debtors' ability to conduct an efficient bidding process to sell substantially all of

43

their assets. It, therefore, is critical that utility services continue uninterrupted during these Chapter 11 Cases.

146. The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of their businesses. The Debtors expect that the funding to be obtained through the use of cash collateral and under proposed postpetition financing will be sufficient to pay postpetition obligations related to their Utility Services, as set forth in the cash collateral and proposed financing budgets. Additionally, the Debtors have already posted deposits with certain of the Utility Providers, thereby obviating the need for any additional adequate assurance measures for those entities.

147. Accordingly, I believe that the relief requested in the Utility Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest.

**Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(C)(2), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E) (I) Authorizing and Approving Debtors' Post-Petition Financing; (II) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral and Affording Adequate Protection; (IV) Modifying Automatic Stay; and (V) Scheduling Final Hearing**

148. As discussed above, the Debtors have filed a motion (the "*DIP Motion*") seeking entry of interim and final orders authorizing them to borrow money from UBP Acquisition Corp. The Debtor's Prepetition Credit Facility and Prepetition Loan Documents are also discussed in detail above.

149. As also noted above, the Debtors are seeking to conduct an efficient auction process to sell substantially all of their assets with the goal of confirming and consummating a liquidating chapter 11 plan. In order to manage and preserve their assets and properties while achieving an orderly liquidation, preserve value by allowing Debtors Accubrace, Inc. and Form-Co., Inc. to continue to operate pending consummation of the Proposed Sale, and fund other

44

costs needed to allow the Debtors to consummate a chapter 11 plan liquidation, the Debtors desperately need liquidity and working capital.

150.    However, the Debtors have no further availability under the Prepetition Credit Agreement and do not have sufficient available sources of working capital to continue to operate their businesses without additional financing.  Simply put, without an immediate infusion of working capital, the Debtors would have no choice but to liquidate their assets immediately in a "free fall" bankruptcy.  This would destroy the Debtors' remaining businesses and harm the Debtors' employees, customers, trade vendors and other creditors.

151.    In light of the Debtors' financial condition and the fact that the Prepetition Lenders were woefully undersecured, the Debtors were unable to obtain additional equity financing or unsecured financing prior to the Petition Date.  The undersecured nature of the Prepetition Indebtedness became particularly apparent when Debtors engaged in a prepetition sale process with the help of their financial advisors, which only resulted in offers that were substantially below the amount owed to the Prepetition Lenders.[7]  It became apparent that the Debtors would not be able to obtain secured financing junior to the liens of the Prepetition Agent.  The Prepetition Agent would not consent to the Debtors obtaining third party financing secured by liens in the Prepetition Collateral senior to, or *pari passu* with, the liens of the

---

[7]    In early 2009, the Debtors, in consultation with Wachovia Bank, N.A. ("*Wachovia*", at that time the administrative agent under the Prepetition Credit Agreement), determined that the Debtors could not sustain long-term viability as a going concern without alternative funding.  Wachovia was unwilling to provide such financing, and the Debtors were unable to otherwise obtain financing.  In light of these circumstances, the Debtors retained Scouler as chief restructuring officer.  The Debtors, together with Scouler and Wachovia, (i) conducted a robust marketing process aimed at maximizing the value of the Debtors' assets and (ii) solicited the interest of various potential strategic and financial buyers and entertained offers for purchases of the Debtors' assets and outstanding obligations under the Credit Agreement.

Prepetition Agent, and the Prepetition Lenders would only agree to provide further financing in the context of a chapter 11 debtor in possession ("*DIP*") facility.

152. Accordingly, the Debtors negotiated in good faith with the Prepetition Agent on the terms of a possible DIP facility and were ultimately able to procure a commitment from the DIP Lenders, on behalf of itself and the Prepetition Lenders, for postpetition financing (the "*DIP Facility*") on the terms and conditions set forth in the DIP Note and Final Order (as such terms are hereinafter defined). The purpose of the DIP Facility is to permit, among other things, (i) the management and preservation of the Debtors' assets and properties, (ii) a sale of certain of those assets (the "*Proposed Sale*") at an auction (the "*Auction*") pursuant to an order entered by the Court approving bid procedures (the "*Bid Procedures*") related thereto, and (iii) the Debtors to confirm and effectuate a chapter 11 plan of liquidation on the terms agreed to by the Prepetition Lenders and Debtors (the "*Plan*").

153. The Debtors, with the assistance of, and in consultation with, their financial advisors, have prepared a budget (as amended from time to time to the extent permitted under the DIP Note (as hereinafter defined), the "*Budget*")[8] that shows the Debtors' projected operating cash expenditures during the period from the Petition Date to October 1, 2010 (as may be extended from time to time, the "*Budget Period*") and estimates the period in which such cash expenditures will either need to be paid or accrue. The Debtors anticipate that their cash on hand as of the Petition Date and receipts from operations will be insufficient to satisfy their operating cash needs during the Budget Period. Accordingly, additional financing is necessary in order to permit the Debtors to conduct their Chapter 11 Cases. Given their financial circumstances, the Debtors believe that the DIP Facility is the only available source of such financing.

---

[8] The Budget is attached as Exhibit 2 to the proposed Interim Order.

154.    The terms of the DIP Facility are reasonable under the circumstances, and the terms and conditions of the DIP Note (as defined below) were: (a) negotiated by the parties in good faith and at arm's length; and (b) instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11, consummate the Proposed Sale in accordance with the Bid Procedures, and to consummate a chapter 11 plan of liquidation. In the absence of such financing, the Debtors will suffer immediate and irreparable harm because they will be forced to wind down their operations and liquidate their assets piecemeal, which will undoubtedly yield less value for the Debtors' estates than sale of the assets through the Proposed Sale.

155.    During the ordinary course of operations, the Debtors generate cash collateral from the use of the Prepetition Collateral (the "*Cash Collateral*"). The Debtors use Cash Collateral in the normal course of their businesses in order to continue to finance their operations, make essential payments, such as employee payroll, taxes and to purchase goods and services essential to their businesses. I believe that it is imperative that the Debtors obtain authority to use Cash Collateral, in accordance with the Interim Order and the DIP Note, because the use of Cash Collateral is necessary in conjunction with the financing provided by the DIP Note in order to fund the Continuing Business (as defined in the DIP Note).

156.    Based on current capital markets conditions and the Debtors' financial condition, the Debtors determined that postpetition financing on an unsecured basis or on a junior priority basis to the Prepetition Secured Lender would be unobtainable in amounts necessary to fund the Debtors' operations during the course of these Chapter 11 Cases.

157.    I believe that the DIP Credit Facility is absolutely essential to the Debtors' ability to conduct their Chapter 11 Cases, and their ability to maximize value by conducting an orderly

596382.1 8/4/10

liquidation of their assets. Without the infusion of additional capital, the Debtors will suffer immediate and irreparable harm, including the cessation of their operations and the orderly wind-down currently in progress. Accordingly, entry of the Interim Order is necessary to preserve the Debtors' estates.

158. The terms of the DIP Credit Facility were negotiated by the Debtors and the DIP Lenders in good faith and at arm's length, and I believe that they are fair and reasonable under the circumstances.

159. Accordingly, I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest.

**Motion for Order (A) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (B) Scheduling Hearing to Consider Sale and Approving the Form and Matter of Notices; (C) Approving Expense Reimbursement Provision and Break-Up Fee; and (D) Granting Related Relief**

**-and-**

**Motion for Order Under Sections 105(a), 363, and 1146(c) of the Bankruptcy Code (A) Authorizing the Sale(s) of Certain or All of the Debtors' Assets, Free and Clear of Liens, Claims, Encumbrances and Interests, (B) Approving Asset Purchase Agreement, and (C) Granting Related Relief**

160. As discussed above, UBP Acquisition Corp. and the Debtors have negotiated an agreement for Purchaser to purchase substantially all of the assets of the Debtors and, from the Petition Date through the closing, provide funding for the Debtors' operations through the DIP Facility. The Debtors believe it is in the best interests of their estates, creditors, customers, and employees to commence a bidding process immediately, as the Debtors have limited funding and resources to try to maximize the value of their assets. Indeed, the DIP Facility is available only for a finite period of time. Additionally, the Debtors considered pursuing alternative restructuring options, but determined that such course of action would not be the best strategy to maximize recoveries for their creditors. The Debtors determined that a sale of their assets is in

48

the best interests of their estates and their creditors, customers, employees, and other stakeholders after a thorough analysis of all of these factors and other considerations.

161.     The Debtors are filing the Sale Motion and Motion for approval of the Bid Procedures in connection with the Auction in an effort to maximize the likelihood of higher and better bids being made for the Debtors' assets. The Debtors believe that the Bid Procedures will permit interested parties reasonable opportunities, consistent with the financial constraints of the Debtors, to evaluate whether to propose a bid for the Debtors' assets that is higher and better than the Agreement entered into by the Debtors and Purchaser.

### Debtors' Motion for Entry of an Order Authorizing Rejection of Unexpired Leases *Nunc Pro Tunc* to August 4, 2010

162.     The Debtors seek entry of an order authorizing the Debtors to reject the following unexpired leases: (i) an unexpired lease of nonresidential real property located at 6904 Park East Boulevard, Tampa Florida (the "*Tampa Premises*") with MiTek Industries, Inc. (the "*Tampa Lease*"); and (ii) an unexpired lease of nonresidential real property located at 2300 Maywood Drive, Bellwood, Illinois (the "*Maywood Premises*") with MLRP 2300 Maywood LLC (the "*Maywood Lease*," and together with the Tampa Lease, the "*Leases*")). Additionally, the Debtors request that the rejections of the Leases be effective as of August 4, 2010.

163.     The Debtors have determined that it is in their best business interest to avoid the accrual of any further obligations under the Leases, if any, as of the rejection date of August 4, 2010. The Debtors are no longer in possession of these premises and are not using them in their operations or for any other purposes. The Debtors fully surrendered possession of the Maywood Premises as of August 3, 2010 by delivering the keys and key FOBs to the landlord's counsel as well as a letter unequivocally abandoning the property and relinquishing possession to the landlord. Additionally, the Debtors had removed all of their property from the Maywood

49

Premises weeks before delivering possession to the landlord as indicated above. The Debtors surrendered possession of the Tampa Premises in late February or early March 2010 by returning the keys to the landlord.

164.    The Leases hold no material economic value to the Debtors or their estates and they are not essential to the conduct of the Debtors' bankruptcy cases. The decision to reject the Leases will eliminate the Debtors' obligations to perform under such agreements and the accrual of any further obligations thereunder, such as administrative rent.

596382.1 8/4/10

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

By: _____

Name: Gregory D. Waller
Chief Executive Officer and President of Universal Building
Products, Inc. and authorized signatory of the Debtors