IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 )  |
| UNIVERSAL BUILDING PRODUCTS, INC., et al.,[1] | ) Case No. 10-12453 (MFW) ) Jointly Administered ) **Hearing Date Requested: August 23, 2010 @12:00 p.m. ET** |
| Debtors. | ) **Obj. Deadline Requested: August 23, 2010 @ 9:00 a.m. ET** ) |

## MOTION OF UBP ACQUISITION CORPORATION FOR ENTRY OF ORDER GRANTING RELIEF FROM (A) AUTOMATIC STAY TO FORECLOSE ON DEBTORS' ASSETS AND (B) ANY STAY PURSUANT TO RULE 4001(A)(3)

UBP Acquisition Corporation (the "Lender") hereby files this motion (the "Motion") on a contingency basis, for entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**, granting relief from (A) the automatic stay pursuant to § 362(d) of title 11 of the United States Code (the "Bankruptcy Code") and (B) any stay pursuant to Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").[2] In support of this Motion, the Lender submits the *Affidavit of Jordon Kruse in Support of the Motion of UBP Acquisition Corporation for Entry of Order Granting Relief from Automatic Stay to Foreclose on Debtors' Assets* (the "Kruse Affidavit"). Also in support of the Motion, the Lender respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Universal Building Products, Inc. (7884); (ii) Accubrace, Inc. (3418); (iii) Don De Cristo Concrete Accessories, Inc. (7547); (iv) Form-Co, Inc. (0079); and (v) Universal Form Clamp, Inc. (3003). The address of the Debtors' corporate headquarters is 15172 Goldenwest Circle, Westminster, California 92683.

[2] Contemporaneously herewith, the Lender filed the Motion for Order Scheduling Expedited Hearing and Shortening Notice Pursuant to Fed. R. Bankr. P. 9006(C) and Del. L.R. 9006-1(E) with Respect to Motion of UBP Acquisition Corporation for Entry of Order Granting Relief from Automatic Stay to Foreclose On Debtors' Assets (the "Scheduling Motion") asking the Court to hear the Motion on an emergency basis at the hearing scheduled for Monday, August 23, 2010. For the avoidance of doubt, the Lender, through this Motion and the Scheduling Motion, requests that the Court conduct a final hearing under §362(e) on August 23, 2010 at 12:00 P.M. (Prevailing Eastern Time).

## PRELIMINARY STATEMENT

From the outset of these chapter 11 cases, as communicated to the Court, the Lender has reluctantly participated in the bankruptcy cases of Universal Building Products, Inc. and its affiliated debtors (collectively, the "Debtors"). The Debtors' business enterprise has struggled since the recent financial downturn in the construction industry, sustaining substantial losses over the past several years. Eventually, the Debtors decided to market its business to potential financial or strategic investors. No investors emerged through that process at a value that would have covered the Debtors' prepetition secured debt. Having been invited to submit an offer, the Lender purchased 100% of the Debtors' senior secured debt at a discount, a market-driven price that reflects the reality of the Debtors' enterprise value. Thereafter, the Lender engaged in arm's length, intensive discussions with the Debtors regarding repayment of the secured debt and, short of that, the optimal means for realizing value. As part of these discussions, the Lender clearly communicated its preference for non-bankruptcy options.

Nevertheless, at the Debtors' insistence, the Lender agreed to support a short chapter 11 process, even providing debtor in possession financing (the "DIP Facility") for an orderly wind-up of the Debtors' affairs. However, understandably, the Lender is not a bottomless reservoir of cash and, as a result, required the Debtors to operate in chapter 11 in accordance with a budget (the "Budget").[3] The Budget, proposed by the Debtors, not the Lender, dictated the bid procedures and liquidation schedule under the DIP Facility and the Asset Purchase Agreement (as hereinafter defined) filed by the Debtors, under which the Lender has agreed to serve as the stalking horse bidder for the Debtors' assets. Now that the Official Committee of Unsecured

---

[3] The Budget is attached as Exhibit 2 to the Interim Order (A) Authorizing and Approving Debtors' Post-Petition Financing; (B) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status; (C) Authorizing Use of Cash Collateral and Affording Adequate Protection; (D) Modifying Automatic Stay; and (E) Scheduling a Final Hearing, entered by this Court on August 10, 2010 (the "Interim DIP Order") [Docket No. 66].

2

Creditors appointed in these cases (the "Committee") has opposed this well-considered process, and created the real prospect of upending the Budget, and hence terminating the DIP Facility, the Lender must move quickly and aggressively to protect its collateral, realize value, and cut its losses. To the extent the Court sustains the Committee's objections and the DIP Facility terminates, the Debtors will have no means for preserving and protecting their estates and the Court must, as a result, lift the automatic stay so the Lender can realize upon its collateral.

Despite the economic realities and clear benefits of the DIP Facility to their constituents, the Committee believes that the proposed Milestones (as hereinafter defined) for the proposed sale are overly aggressive, and has objected to the Debtors' proposed bid procedures and approval of the DIP Facility on a final basis. But without a practical solution to the Debtors' liquidity needs, the Debtors cannot complete a wind down in chapter 11, consummate a plan, and maximize value. While the Lender offered to extend certain of the Milestones, within the existing Budget constraints, the Lender cannot and will not fund a Committee bent on destroying estate value, all in an effort to extract value for a hopelessly out-of-the-money constituency. For that reason, unfortunately, the Lender must now proceed with this Motion and make every effort to realize upon its collateral. Accordingly, the Lender is seeking, on a contingency basis, pending the outcome of the hearing on August 23, 2010, relief from the automatic stay so that it can commence the foreclosure process.[4]

## JURISDICTION

1. The Court has jurisdiction over this motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

---

[4] The Committee has filed several pleadings that effectively reject the carefully calibrated bankruptcy process negotiated by the Debtors and the Lender. The Committee laces its papers with hyperbole and misstatements of facts and law. Suffice it to say, the Lender disagrees with most, if not all, of the Committee's arguments and reserves all rights to present arguments and evidence at a hearing in response to those arguments.

3

2. Venue is proper pursuant to 28 U.S.C. § § 1408 and 1409.

3. The statutory bases for the relief sought herein are Bankruptcy Code § § 361, 362(d)(1), 362(d)(2), 362(e) and 362(g), Bankruptcy Rule 4001(a)(3), and Rule 4001-1 of the Local Rules of Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

4. The Lender is a Delaware corporation. OCM Principal Opportunities Fund IV Delaware, L.P. owns approximately 82.76% of the shares of the Lender, the balance owned by Solus Core Opportunities Master Fund Ltd. (collectively, the "Lender Affiliates"). OCM Principal Opportunities Fund IV Delaware, L.P. is an affiliate of Oaktree Capital Management, L.P. ("Oaktree").

*Debt History*

5. The Lender owns 100% of the senior secured debt of the Debtors under that certain Credit Agreement, dated as of April 28, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among the Debtors, the Lender, as the sole lender, and OCM FIE, L.P., as successor administrative agent on behalf of the Lender (the "Agent"). The Debtors and the Agent also are parties to that certain Security Agreement dated as of April 28, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the "Security Agreement," and together with the Credit Agreement and all other agreements, instruments and documents relating thereto, the "Prepetition Loan Documents"). As of the August 4, 2010, the date the Debtors filed their chapter 11 bankruptcy petitions (the "Petition Date"), the Debtors owed the Lender the principal amount of at least $40,331,692.45 (together with all accrued and unpaid interest thereon and any fees and expenses, the "Prepetition Indebtedness"). The Debtors have no other funded secured debt.

4

6.  Pursuant to the Prepetition Loan Documents, amounts outstanding under the Credit Agreement are secured by valid, binding, enforceable and perfected first-priority liens and security interests (the "Prepetition Liens") in substantially all of the Debtors' tangible and intangible property, subject to Permitted Liens (as such term defined in the Credit Agreement) (collectively, the "Prepetition Collateral").

7.  The Lender acquired its interests in the senior secured debt in late July 2010, pursuant to that certain Assignment Agreement by and among the Lender, as assignee, and certain affiliates of Oaktree, as assignor. Oaktree's affiliates had acquired their position in the Debtors' senior secured obligations from Wachovia Bank, N.A. ("Wachovia"), the previous administrative agent for the lending syndicate under the Credit Agreement, in July 2010, for approximately $23,071,000.

8.  The Debtors' financial performance has deteriorated over the last several years, suffering net losses of $28 million in the 2009 fiscal year and $27 million in the 2008 fiscal year. *See* Declaration of Gregory D. Waller, Chief Financial Officer of Universal Building Products, Inc., in Support of First Day Motions [Docket No. 19] (the "Waller Declaration"), ¶ 9.

9.  The Debtors' deteriorating financial performance has caused the Credit Agreement to be amended three times since March 2009. The latter two amendments, in April, 2009 and January, 2010, were in response to the Debtors' failure to comply with financial covenants under the Credit Agreement. These amendments collectively resulted in increased interest rates and fees, additional reporting requirements and restrictions on future borrowings. *Id.*, ¶¶ 14-16. Leading up to the Petition Date, the Debtors had effectively zero cash on hand, no source of liquidity other than the Credit Agreement, and could not even meet their employee payroll obligations.

5

DOCS_DE:162932.1

*Restructuring Discussions*

10. Prior to the Lender's acquisition of purchasing the secured debt, the Debtors, in consultation with Wachovia, determined that the Debtors could not sustain long-term viability as a going concern without new funding and a liquidity infusion. *Id.*, ¶ 18. As a result, the Debtors retained Scouler & Company ("Scouler") as financial advisor and appointed Dan Scouler as chief restructuring officer to help the Debtors determine their strategic alternatives. The Debtors, together with Scouler and Wachovia, conducted a robust marketing process and solicited offers for the sale of the Debtors' assets from potential strategic and financial buyers. *Id.*, ¶ 20. The marketing process also involved the Debtors' lenders, as it was contemplated that any investment in the Debtors would be facilitated through a purchase of the secured debt.

11. During this process, numerous potential buyers conducted due diligence, and certain potential buyers provided letters of intent. Based on the offers received, the Debtors determined that the value of their assets was less than the total obligations outstanding under the Credit Agreement. *Id.*, ¶ 21. In fact, the highest offer to purchase Wachovia's position in the Debtors' capital structure was proposed by the Lender Affiliates, at approximately 54 cents on the dollar.

12. Needing a solution to its overleveraged balance sheet and lacking the ability to sustain operations beyond the very short term, the Debtors and the Lender engaged in discussions regarding possible alternatives. The parties discussed in-court and out-of-court options, including a consensual foreclosure in satisfaction of all or a portion of the Prepetition Indebtedness, an assignment for the benefit of creditors, and a bankruptcy filing with a 363 auction and sale process. Based on the Debtors' liquidity constraints and projected cash needs to maintain even minimal operations, it was evident that a chapter 11 filing and 363 sale process would require outside financing, whether the Debtors continued to operate post-filing or not.

6
DOCS_DE:162932.1

13. The Lender ultimately arrived at a non-bankruptcy approach as the most expedient and cost effective means to maximize its recovery. Conversely, the Lender did not view a chapter 11 bankruptcy process as an attractive option because the Debtors lacked adequate resources to sustain even a quick chapter 11 process and had determined, with the help of Scouler, that third-party financing was not available. With no other financing available, the Debtors demanded that the Lender provide the financing for a wind down through chapter 11, a 363 auction and sale process, and a plan of liquidation.

14. Recognizing the benefits of a consensual and orderly process, the Lenders ultimately agreed to support the chapter 11 option and provide limited financing for a 363 sale and liquidating plan. With the Debtors out of liquidity and value quickly evaporating, the parties negotiated a global restructuring package that would among other things accomplish the following goals:

- stabilize the Debtors for their transition into chapter 11;
- confirm a liquidating plan and fund a recovery for administrative, priority and general unsecured creditors; and
- implement a 363 sale process, with the Lender as the stalking horse purchaser.

All of this was and is contemplated in a carefully calibrated Budget. The Lender will fund no more than the amount contemplated under the Budget, which the Lender has made abundantly clear to all parties. Moreover, it is not believed that the Debtors have any alternatives.

15. In a matter of days, the Lender and the Debtors negotiated and documented this arrangement in the form of, among other documents, the Senior Secured Super-Priority Debtor-in-Possession Promissory Note dated August 3, 2010 (the "DIP Note"), the Interim DIP Order entered by the Court on August 10, 2010, and that certain Asset Purchase Agreement dated August 3, 2010, under which the Lender serves as the stalking horse purchaser (the "Asset

Purchase Agreement"), filed by the Debtors on the Petition Date as Exhibit A to the Debtors' Motion for Order Under Sections 105(a), 363, and 1146(c) of the Bankruptcy Code (A) Authorizing the Sale(s) of Certain or All of the Debtors' Assets, Free and Clear of Liens, Claims, Encumbrances and Interests, (B) Approving Asset Purchase Agreement, and (C) Granting Related Relief (the "Sale Motion") [Docket No. 15].

*Events of Default Under the Interim DIP Order*

16. The DIP Note provides that the following constitute "Events of Default":

(N) the failure to satisfy any of the following within the prescribed time periods set forth below:

(1) On or prior to the 30th day following the Petition Date, the Maker shall have conducted an auction for the assets of the Debtor Entities identified as for sale in the APA pursuant to Section 363 of the Bankruptcy Code, and Payee shall be designated the successful bidder;

(2) On or prior to the 31st day following the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance substantially the same as the order attached to the APA, approving the consummation of the 363 Sale pursuant to the APA (the "Sale Order");

(3) On or prior to the 31st day following the Petition Date, the Debtor Entities shall have consummated the transactions for the 363 Sale pursuant to the APA pursuant to Section 363 of the Bankruptcy Code;

\*\*\*

(5) On or prior to the 14th day following the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to counsel to the Payee, approving the Bid Procedures Motion,[5] which order has not been modified, reversed, stayed or vacated or amended nor shall any Material Problematic Appeal have been timely filed and not stayed, nor

---

[5] The "Bid Procedures Motion" refers to the Motion for Order (A) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (B) Scheduling Hearing to Consider Sale and Approving the Form and Matter [sic] of Notices; (C) Approving Expense Reimbursement and Break-Up Fee; and (D) Granting Related Relief, filed on the Petition Date [Docket No. 14].

8

shall such order be subject to a stay pending appeal (the "Bid Procedures Order"); and

(6) On or prior to the 14th day following the Petition Date, the Bankruptcy Court shall have entered the Final Order.

DIP Note § 7(a)(viii)(N)(5).[6] Substantially the same "Event of Default" provisions can be found in the Interim DIP Order, *see* Interim DIP Order, ¶ 28(i), and the Asset Purchase Agreement, *see* Asset Purchase Agreement § 8.1(g)-(k) (these Events of Default, collectively, the "Milestones"). In addition, the Interim DIP Order contains an Event of Default that is triggered by: "the failure of the Bankruptcy Court to enter a Final Order, substantially in the form attached as an Exhibit to the DIP Motion, within fourteen (14) days after the Petition Date [such deadline was consensually extended to August 23, 2010 at the interim hearing regarding the DIP Facility]."[7] *See* Interim DIP Order, ¶ 28(i)(i). Absent entry of the Bid Procedures Order and the Final DIP Order, in form and substance acceptable to the Lender by August 23, 2010, the Debtors will default on all of these provisions.

17. The DIP Note provides that, if an Event of Default occurs and is continuing, the Lender may, without notice or hearing, suspend or terminate the Lender's obligation to lend under the DIP Note and declare the "Termination Date" to have occurred. *See* DIP Note, § 7(b). Further, upon an Event of Default, the Lender may, "upon proper notice, request relief from the automatic stay under Section 362 of the Bankruptcy Code, with a hearing to be held within five calendar days; *provided, however*, only the occurrence or non-occurrence of such Default or

---

[6] The Interim DIP Order provided: "Notwithstanding the foregoing, or anything else herein to the contrary, the scheduling of the Final Hearing established herein, and the resulting inability for the Final Order to be entered by August 18, 2010, shall not constitute an Event of Default under this Interim Order, the DIP Note, the DIP Facility Documents, the Asset Purchase Agreement, or any other agreements among the Debtors, the Administrative Agent, the DIP Lenders, and the Prepetition Lenders, so long as the Final Order is entered on or prior to August 23, 2010. The Debtors shall use commercially reasonable efforts to minimize cash expenditures during this interim period." Interim DIP Order at 39.

[7] The Lender agreed to this extension only after the Debtor demonstrated that the additional time would not require expenditures in excess of the Budget.

9

Event of Default shall be the subject of any such hearing." *Id.* Subject to any order granting relief from the automatic stay, the Lender's remedies include the following:

> (A) declare all or any portion of the DIP Obligations to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by each Debtor Entity, (B) direct the Debtor Entities to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to [Lender] ... (C) enter onto the premises of the Debtor Entities in connection with an orderly liquidation of the Collateral, or (D) exercise any rights and remedies provided to [Lender] under the DIP Loan Documents or at law or equity, including all remedies provided under the UCC or the Bankruptcy Code....

DIP Note, § 7(b)(i). The Interim DIP Order contains similar provisions with respect to the Lender's remedies:

> Upon the occurrence of an Event of Default ... the DIP Lenders may, notwithstanding the provisions of Bankruptcy Code § 362, without any application, motion or notice to or order from, the Bankruptcy Court, without prior notice, take any one or more of the following actions: (a) terminate all or any portion of the commitments under the DIP Facility whereupon the DIP Lenders' obligation to make further loans or advances shall terminate; (b) declare all or any portion of the DIP Facility Obligations to be forthwith due and payable whereupon such DIP Facility Obligations shall become due and payable; and/or (c) exercise any rights and remedies provided to the DIP Lenders under the DIP Facility Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and, pursuant to this Interim Order, the automatic stay of Bankruptcy Code § 362 shall be modified and vacated to permit the DIP Lenders to exercise their remedies under the DIP Note and the DIP Facility Documents without further application or motion to, or order from, the Bankruptcy Court; *provided*, that notwithstanding anything to the contrary contained herein, the DIP Lenders shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrower in the Collateral only upon prior written notice to the Debtors, the U.S. Trustee, and the Committee's counsel with a hearing to be held within five (5) calendar days of receipt of such notice; provided, further, only the occurrence or non-occurrence of such Default or Event of Default shall be the subject of any such hearing....

Interim DIP Order at 39-40.

*Occurrence of Event of Default*

18. On August 23, 2010, this Court will hear argument from counsel for the Debtors, counsel for the Committee and possibly counsel for the Lender with respect to the Milestones in the Bid Procedures, the Interim DIP Order and the Asset Purchase Agreement. As described above, the Lender agreed to fund these chapter 11 cases in accordance with the Budget. If the Committee's objections and any extensions to the Milestones lead to expenditures in excess of the Budget, the Lender must immediately exercise its rights and remedies under the DIP Note, Interim DIP Order and, to the extent of the Prepetition Indebtedness, applicable non-bankruptcy law. For the Lender to take any other action would amount to a pointless act of value destruction. The Lender has filed this motion so that it can be heard as soon as possible after the hearing, and only in the event that an Event of Default occurs. For the avoidance of doubt, the Lender is requesting relief from the stay only to the extent required to exercise its remedies under non-bankruptcy law with regard to the Prepetition Indebtedness; with regard to the DIP Facility, the filing of this Motion shall commence the five-day notice period required under DIP Note § 7(b) and Interim DIP Order ¶ 29.

**RELIEF REQUESTED**

19. The Lender respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) immediately modifying the automatic stay pursuant to Bankruptcy Code §§ 362(d)(1) and 362(d)(2) for the purpose of permitting the Lender to foreclose on its collateral, and (b) waiving any stay pursuant to Rule 4001(a)(3).

11

## BASIS FOR RELIEF

20. Bankruptcy Code § 362(d) sets forth the relevant legal standards for lifting the automatic stay. Section 362(d) provides, in relevant part:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if: (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization.

**II. The Court Should Lift the Automatic Stay for Lack of Adequate Protection Pursuant to § 362(d)(1).**

21. Pursuant to § 362(d)(1), this Court must lift the automatic stay for cause if the Lender's interest in the Debtors' property is not adequately protected. *See, e.g., In re Indian Palms Assoc., Ltd.*, 61 F.3d 197, 206-07 (3d Cir. 1995) (stating "the lifting of the stay could be granted under section 362(d)(1) which provides that 'the court shall grant relief from the automatic stay for cause, including the lack of adequate protection of an interest in property of such party in interest.'"). In addition, courts in the Third Circuit have held that a debtor's inability to confirm a plan results in a lack of adequate protection enabling a creditor to lift the automatic stay. *See, e.g., In re Wynnefield Manor Assoc. L.P.*, 163 B.R. 53, 61 (Bankr. E.D. Pa. 1993) (stating "[s]ince no confirmable plan has been proposed and [the secured creditor's] interest in the [p]roperty has continued to erode, its interest in the [p]roperty is not adequately protected . . . and cause for relief, pursuant to 11 U.S.C. 362(d)(1), is proven."); *see also In re Pa. Footwear Corp.*, 204 B.R. 165, 183 (Bankr. E.D. Pa. 1997) (same); *In re Franklin Pembroke Venture II*, 105 B.R. 276, 278 (Bankr. E.D. Pa. 1989) (same). The creditor requesting relief from

12

the stay under Bankruptcy Code 362(d)(1) bears the initial burden of showing "cause" for such relief. *See In re DBSI*, 407 B.R. 159, 166 (Bankr. D. Del. 2009) (stating "[t]he movant bears the initial burden to produce evidence that cause exists to grant relief from the automatic stay; if the movant meets its burden, then the burden shifts to opposing party."); *see also In re Rexene Prods. Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992).

22. In *In re Swedeland Devel. Group, Inc.*, 16 F.3d 552 (3d Cir. 1994), the bankruptcy court initially determined that the debtor had the ability to reorganize because, among other things, the debtor had filed a plan of reorganization, obtained a commitment for post-petition financing, and had not acted in bad faith. Despite having no equity in certain collateral, the bankruptcy court denied a secured creditor's motion for relief from the stay to foreclose on the debtor's assets. *Id.* at 567. After the Third Circuit held that the debtor's plan was not confirmable on appeal, the Third Circuit also granted the secured creditor's motion for relief from the stay to foreclose on its collateral. *Id.* The Third Circuit reasoned that the debtor had no ability to reorganize because its operations were failing, the debtor had lost access to its post-petition financing, further dooming its operations, and the secured creditor's deficiency claim served to block any plan the debtor proposed. *Id.* at 568. The Third Circuit also made clear that the lifting the stay was the only way to protect the creditor's interests, noting that the court would "not hold that a debtor can achieve an effective reorganization by diminishing the value of its pre-petition creditor's lien interest." *Id.*

23. The circumstances of the Debtors' chapter 11 cases are even more dire than in the *Swedeland* case. Due to their utter lack of liquidity, the Debtors were forced to terminate substantially all of their operations and employees to avoid incurring wage and other expenses they had no ability to pay. The Debtors are on the precipice of defaulting under the DIP Facility,

13

DOCS_DE:162932.1

without which the Debtors cannot formulate or confirm a plan without diminishing the value of the Lender's pre-petition lien interest. *Id.* In short, absent relief from the stay, the value of the Lender's security interests will quickly deteriorate while the Debtors' bankruptcy case degenerates into a freefall, with no financing or a strategy for emergence or preserving value for any of their stakeholders. The lack of ability to confirm a plan is compelling evidence that the Lender's security interests are not adequately protected, warranting relief from the stay under § 362(d)(1). *See id.*; *see also Wynnefield Manor*, 163 B.R. at 61.

24. If the DIP Facility terminates, and as a result the Debtors cannot complete their chapter 11 cases, the Debtors' cannot adequately protect the Lender's collateral, which will suffer from rapid diminution in value. While the Bankruptcy Code does not define the term "adequate protection," Bankruptcy Code § 361 provides examples of what might constitute adequate protection, including (a) a cash payment or periodic cash payments, (b) providing additional or replacement liens, and (c) otherwise providing the indubitable equivalent of a creditor's interests other than an administrative expense claim under Bankruptcy Code § 503(b)(1). The Debtors can provide none of the above. The Debtors have no meaningful cash on hand and, as a result, have ceased the bulk of their operations to avoid incurring expenses they have no ability to pay. It is doubtful that the Debtors even have the resources to provide adequate security for the Lender's collateral.

25. Accordingly, the Lender respectfully requests that this Court lift the automatic stay in favor of the Lender, pursuant to Bankruptcy Code § 362(d)(1), to allow the Lender to foreclose on the Debtors' assets in which the Lender has a valid, perfected security interest.

14

DOCS_DE:162932.1

**III.  The Court Should Lift the Automatic Stay Pursuant to Bankruptcy Code § 362(d)(2) Because the Debtors Have (a) No Equity in the Property and (b) No Likelihood of Confirming an Effective Plan of Reorganization.**

26.  Section 362(d)(2) provides that this Court must grant relief from the automatic stay with respect to an act against the Debtors' property when (a) the Debtor has no equity in the property and (b) the property is not necessary for an effective reorganization. *Indian Palms Assoc.*, 61 F.3d at 206-07; *see also In re Ripley*, 412 B.R. 690, 702 (Bankr. D. Del. 2008). The creditor moving for relief from the automatic stay on the basis that debtor has no equity in property bears the burden of proving the value of the property, and the party opposing the motion has the burden of proof on all other issues. *See* 11 U.S.C. § § 362(g)(1) and (2); *see also In re Aardvark, Inc.*, Case No. 96-858, 1997 WL 129346, *5 (D. Del. 1997) (*citing In re 1025 Associates, Inc.*, 106 B.R. 805, 810 (Bankr. D. Del. 1989) for the proposition that "[t]he party requesting relief has the burden of proof as to debtor's equity. § 362(g). On all other issues -- adequate protection and feasibility of reorganization -- debtor must shoulder the burden of proof" (internal citations omitted)).

**(a)  The Debtors Have No Equity in the Property**

27.  The test for determining whether the Debtor has any equity in the property under § 362(d)(2)(A) requires a comparison between the total liens against the property and the property's current value. *See, e.g., Indian Palms Assoc.*, 61 F.3d at 206-07 (citing cases). A debtor has no equity in the property for purposes of § 362(d)(2) when the debts secured by liens on the property exceed the value of the property. *Id.* at 207. In making this comparison, "[a]ll encumbrances are totaled to determine equity whether or not all lienholders have requested relief from the stay." *Nazareth Nat'l Bank & Trust Co. v. Trina-Dee, Inc. (In re Trina-Dee, Inc.)*, 26 B.R. 152, 154 (Bankr. E.D. Pa. 1983), *aff'd*, 731 F.2d 170 (3d Cir. 1984).

28. Here, the Debtors assets are worth significantly less than the Lender's claims based on the Debtors' own marketing efforts and liquidation analysis. The Lender has a valid, perfected senior secured claim in the approximate amount of over $40 million, not including accrued and unpaid interest, and a claim under the Interim DIP Order in the approximate amount of over $1 million, both being secured by liens on substantially all of the Debtors' assets. The Debtors conducted an extensive marketing process for their assets prior to the Petition Date, through which the Debtors solicited offers from numerous strategic and financial investors. The highest offer would have generated proceeds sufficient to satisfy approximately half of the overall secured debt, leaving a deficiency of approximately $18-20 million.

29. In addition, on August 17, 2010, Scouler prepared an updated liquidation analysis. In this analysis, Scouler determined that the Debtors' assets would be worth between approximately $6.8-$13.6 million, with a midpoint valuation of approximately $10.2 million in a liquidation scenario. Even Scouler's most optimistic view of the liquidation value of the Debtors' assets ($13.6 million) leaves the Lender's secured claims undersecured by at least $26 million. Accordingly, the value of the Lender's interests in the Debtors' assets far exceeds those assets' market or liquidation value.

### (b) The Debtors Have No Likelihood of Confirming an Effective Plan of Reorganization

30. Section 362(d)(2)(B) provides that a creditor shall receive relief from the automatic stay when the property is not necessary for a plan of reorganization. According to the U.S. Supreme Court, there "must be a reasonable possibility of a successful reorganization within a reasonable time," and that the property at issue is necessary to that reorganization. *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc's, Ltd. (In re Timbers of Inwood Forest Assoc's, Ltd.)*, 484 U.S. 365, 376 (1988). The lack of any realistic prospect for

16

DOCS_DE:162932.1

effective reorganization mandates relief under Bankruptcy Code § 362(d)(2). *Id.* The Debtors' have the burden of affirmatively demonstrating that reorganization is feasible. *In re Ritz-Carlton of D.C., Inc.*, 98 B.R. 170, 172 (S.D.N.Y. 1989); *In re 8th Street Village Ltd. P'ship*, 94 B.R. 993, 995–96 (N.D. Ill. 1988); *In re Assoc'd Investors Joint Venture*, 91 B.R. 555, 558 (Bankr. C.D. Cal. 1988).

31. Courts have held that an effective reorganization is not possible where: (i) the debtor's business is closed and a substantial amount of money is needed to reopen it, *In re Aries Enterprises, Ltd.*, 3 B.R. 472, 477 (Bankr. D. D.C. 1980); (ii) where the debtor's operation is not profitable, and there is neither evidence of an outside source of funds to finance a plan, nor evidence that the debtor can meet its other obligations, *see, e.g., In re Accent Assoc., Inc.*, 8 B.R. 933, 936 (Bankr. D. Mass. 1981); and (iii) where the debtor has not shown that its proposed plan is confirmable over a creditor's objection, *see, e.g., Swedeland Devel. Group*, 16 F.3d at 568; *see also In re DeLuca*, 194 B.R. 797 (Bankr. E.D. Va. 1996).

32. Here, there is no likelihood of the Debtors reorganizing, and the state of the Debtors' chapter 11 cases mirrors the circumstances when other courts have lifted the stay pursuant to § 362(b)(2)(B). Specifically:

(a) On August 3, 2010, the Debtors terminated substantially all of their employees and shut down all operations except for the Continuing Business to avoid incurring wages and other expenses they could not pay. The Debtors would need to obtain significant financing to reopen the Debtors' business, which other courts have held is sufficient to determine that a debtor lacks any realistic prospect for an effective reorganization. *See Aries Enterprises, Ltd.*, 3 B.R. at 477.

(b) The Debtors have operated at a loss for over two years and, absent the DIP Facility, the Debtors are unable to meet any of their obligations. A successful reorganization would necessitate an infusion of funds, either from business operations or outside sources. As the Lender no longer is willing to finance the Debtors' plan and is unwilling to consent to a priming lien to secure additional debtor-in-possession financing under Bankruptcy Code § 364, additional financing is not available. *Accent Assoc., Inc.*, 8 B.R. at 936.

17

(c) Assuming the Debtors could obtain sufficient financing to fund a chapter 11 plan, it is highly unlikely the Debtors could confirm a plan without support from the Lender, due to the Lender's position as both the senior secured lender and likely holder of the largest unsecured deficiency claim. *Swedeland*, 16 F.3d at 568.

In this and other jurisdictions, courts have lifted the stay when just one of the foregoing circumstances existed. This case fits all three scenarios, strongly suggesting that the Debtors have no realistic prospect for effective reorganization.

33. Courts have also granted motions for relief from the automatic stay under § 362(b)(2)(B) where there is no evidence of the development or sale of the property, no investors, no refinancing available, and no plan filed. *See, e.g. In re Development, Inc.*, 36 B.R. 998, 1005, (Bankr. D. Haw. 1984). In this case, the sole reason the Debtors could formulate their reorganization strategy, including a sale of their assets pursuant to § 363 followed by a chapter 11 plan of liquidation, was the DIP Facility provided by the Lender. Now that the Lender has terminated the DIP Facility due to the occurrence of an Event of Default, the Debtors' circumstances mirror those in *In re Development*: no evidence of the development or sale of the property, no investors, no refinancing available, and no confirmable plan filed. *Id.* at 1005.

## RELIEF FROM THE STAY UNDER BANKRUPTCY RULE 4001(A)(3) IS WARRANTED

34. Bankruptcy Rule 4001(a)(3) provides that "any order granting a motion for relief from the automatic stay made in accordance with Bankruptcy Rule 4001(a)(1) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Courts routinely waive the 14-day period to allow secured creditors to foreclose on their collateral based on the circumstances of the case when entering an order granting the secured creditor relief from the automatic stay. *See, e.g., In re Stoltzfus*, Case No. 09-11904, 2009 WL 2872860, *7 (Bankr. E.D. Pa. Mar. 30, 2009) (stating "the stay provisions in Fed. R. Bankr. P. 4001(a)(3) shall not be applicable given the totality of circumstances surrounding this most recent bankruptcy filing.")

18

*see also In re Atrium Corp.*, Case No. 10-10150, 2010 WL 2822131, *28 (Bankr. D. Del. Mar. 17, 2010); *In re Pick*, Case No. 08-82148, 2008 WL 5392017, at *3 (Bankr. D. Neb. Dec. 18, 2008); *In re El Mariachi, LLC*, Case No. 07-32407, 2008 WL 2756921, at *2 (Bankr. D. Conn. July 13, 2008).

35. Here, the circumstances of the Debtors' cases warrant waiver of the 14-day stay under Bankruptcy Rule 4001(a)(3). As noted above, if the DIP Facility is terminated at the August 23, 2010 hearing, the Debtors will have no ability to reorganize or protect the value of the Lender's collateral. The Lender's collateral will suffer severe diminution in value with each passing day thereafter, increasing the Lender's deficiency claim and reducing the likelihood that any creditors junior to the Lender see any recovery in these cases. Accordingly, waiver of the 14-day stay under Bankruptcy Rule 4001(a)(3) is appropriate under the circumstances of these chapter 11 cases.

## CONCLUSION

36. The Lender respectfully submits that this Court should grant its request for relief under Bankruptcy Code § 362(d) for the following reasons. *First*, the Debtors have no ability to confirm a plan, resulting in a lack of adequate protection. Under § 362(d)(1), the lack of adequate protection is sufficient "cause" to warrant relief from the automatic stay. *Second*, the Debtors have no equity in the property and the property is not necessary for an effective reorganization, warranting relief from the automatic stay under § 362(d)(2).

## NOTICE

37. Notice of this Motion has been given to (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the official committee of unsecured creditors; (c) counsel to the Debtors; and (d) all parties who filed requests for notices pursuant to

Bankruptcy Rule 2002 in the Debtors' chapter 11 cases. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

## NO PRIOR REQUEST

38. No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in the Motion and such other and further relief as is just and proper.

Dated: August 20, 2010

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Bradford J. Sandler (Bar No. 4142)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
Telephone: 302-652-4100
Facsimile: 302-652-4400
Email: ljones@pszjlaw.com
      joneill@pszjlaw.com
      bsandler@pszjlaw.com

and

David L. Eaton *(pro hac vice)*
David A. Agay *(pro hac vice)*
Sarah Hiltz Seewer *(pro hace vice)*
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, Illinois 60654
Telephone: 312-862-2000
Facsimile: 312-862-2200

Co-Counsel for UBP Acquisition Corp.