## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re:

UNIVERSAL BUILDING PRODUCTS, INC.,
*et al.*[1],

               Debtors.

------------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:
:
:

Case No. 10-12453 (MFW)

Chapter 11

(Jointly Administered)

Hearing Date: To be Determined[2]
Objection Deadline: To be Determined

**EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR ENTRY OF AN ORDER (I) APPOINTING A CHAPTER 11
TRUSTEE PURSUANT TO 11 U.S.C. §§ 105(a) AND 1104(a) AND BANKRUPTCY
RULES 2007.1 AND 9014; OR IN THE ALTERNATIVE, (II) TERMINATING THE
DEBTORS' EXCLUSIVITY PERIODS PURSUANT TO 11 U.S.C. §§ 105(a) AND 1121(d)**

The Official Committee of Unsecured Creditors (the "Committee") of the above-

captioned debtors and debtors in possession (the "Debtors") by and through its proposed counsel,

Arent Fox LLP ("Arent Fox") and Elliott Greenleaf, respectfully submits this emergency motion

(the "Motion") for entry of an order (I) appointing a Chapter 11 trustee, pursuant to §§ 105(a)

and 1104(a) of title 11 of the United States Code 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy

Code") and Rules 2007.1 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rule(s)"); or in the alternative, (II) terminating the period during which the Debtors

have the exclusive right to file a Chapter 11 plan (the "Exclusive Filing Period") and similarly

terminating the period during which the Debtors have the exclusive right to solicit acceptances of

such plan (the "Exclusive Solicitation Period" and collectively, the "Exclusivity Periods"),

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification number, if applicable, are: (i) Universal Building Products, Inc. (7884); (ii) Accubrace, Inc. (3418); (iii) Don De Cristo Concrete Accessories, Inc. (7547); (iv) Form-Co., Inc. (0079); and (v) Universal Form Clamp, Inc. (3003).

[2] A motion to shorten time for a hearing and to set an appropriate objection deadline has been filed concurrently with this motion.

pursuant to §§ 105(a) and 1121(d) of the Bankruptcy Code. In support of the Motion, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Committee brings this motion reluctantly, after exhausting all other avenues for cooperation with the Debtors and good faith attempts to try to bring these cases to a resolution. What began from the outset as a difficult working relationship with the Debtors' professionals has degenerated to such an extent that the Committee and the Debtors are at an impasse. The Committee has lost all confidence in the Debtors and their professionals and believes the Debtors have now focused their energies and estate resources on a campaign designed to paralyze and embarrass the Committee for the benefit of insiders and the professionals of the Debtors. The Committee recognizes that the matters described in this motion and the relief sought are extremely serious. But even though these cases were only recently commenced, they are already at a critical stage, and as a result, the Committee believes that it has no other alternative. This Court's intervention is necessary to prevent these cases from spiraling hopelessly out of control, depleting the estates' limited assets and harming unsecured creditors.

2.      What the Committee seeks in this motion is the appointment of an independent fiduciary who will oversee the estates and manage the Debtors' restructuring process, or in the alternative, termination of the Exclusivity Periods so that the Committee can itself propose a liquidation plan – a plan consistent with its agreement with the Debtors and Lender. The Committee does not seek to derail the sale process that is currently underway, but only to ensure that the winding down of Debtors' business and closure of this proceeding are done in the most cost-effective manner and that the liquidation of the remaining assets will be handled impartially,

with due consideration paid to the interests of the key remaining stakeholders in these cases – the unsecured creditors.

3.      It may be that this motion was inevitable from the outset. From virtually the first moment of the Committee's appointment, it has been met with nothing short of dismissiveness, and often outright disdain and contempt, from the Debtors, and more specifically its counsel. Also from the beginning, the Committee's attempts to fulfill its fiduciary obligations to unsecured creditors and to negotiate in good faith with the Debtors have been thwarted by relentless and unfounded attacks on the Committee's members and professionals, their motivations, and their integrity. These attacks, coupled with the short-shrift the Committee has consistently been given, has caused the Committee to lose any confidence it might have once had that the Debtors are interested in maximizing value of these estates and can bring these cases to a close on some reasonable basis that acknowledges the legitimate rights and interests of unsecured creditors. To the contrary, the Debtors seem determined to use any measures available to force their desired plan through to fruition and appear willing to sacrifice both professionalism and the unsecured creditors in the process.

4.      The Debtors' professionals have sought at every turn to minimize and discredit the Committee and its professionals: (i) the Debtors have subjected the Committee's professionals to a barrage of personal insults and unfounded accusations that they were seeking only to "line their own pockets;" (ii) the Debtors have responded to nearly every request of the Committee, no matter the substance, with a reflexive denial and the consistent unsupported refrain that the Committee "was going to blow up the whole deal" (indicating that whatever issue or question it was that the Committee was raising was trivial, a waste of time, and the Debtors felt they should not have to be bothered with even considering it); and (iii) the Debtors have

substantively reneged on key terms that Debtors and the Committee had previously discussed and agreed upon. To make matters worse, Debtors' counsel now seeks to gain leverage in plan negotiations by threatening to depose individual Committee members and by opposing the Committee professionals' retention application.

5. Moreover, the Debtors' professionals have taken it upon themselves to draft and file a proposed plan of liquidation and disclosure statement without the participation or consent of the Committee. These documents provide, *inter alia,* for the disenfranchisement of the unsecured creditors and place control of the post-confirmation liquidating trust in the hands of the Debtors. This is contrary to numerous representations made to the Committee on which the Committee relied in agreeing to support the global resolution announced to this Court on August 26, 2010.

6. The Committee is gravely concerned that the Debtors and its counsel do not appear to be operating in the best interests of creditors (or these estates) and that future good faith attempts to work with the Debtors' professionals will continue to be dismissed out of hand. The Committee thus believes that the immediate appointment of a Chapter 11 trustee, or in the alternative, termination of the Exclusivity Periods, is necessary and will better serve the interests of the estates and their creditors than the Debtors' continued control. Unfortunately, failure to grant the relief requested by the Motion will result in these cases spiraling out of control and a continued depletion of estate assets.

## JURISDICTION AND VENUE

7. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) & (O). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the requested

relief are sections 1104(a) and 105(a) of the Bankruptcy Code, and Bankruptcy Rules 2007.1 and 9014.

## BACKGROUND

### A.    The Sale, DIP Financing, and Global Resolution

8.    On August 4, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

9.    On August 13, 2010, the Office of the United States Trustee appointed the Committee. The Committee elected to engage Arent Fox as its counsel, Elliott Greenleaf as co-counsel, and NHB Advisors as its financial advisor, subject to approval by this Court. Applications to retain the Committee's professionals have been filed and are pending.

10.    On the Petition Date, nine days prior to the formation of the Committee, the Debtors filed motions to approve bid procedures and for approval of a sale of substantially all of the Debtors' assets (the "Sale") to the prepetition and DIP lender (the "Lender")that would close within a mere thirty days of the Petition Date. In addition, the Debtors also filed a motion to approve debtor-in-possession financing to be provided by the Lender (the "DIP Financing").

11.    Immediately upon the appointment of the Committee, in fulfillment of its fiduciary duties and as is customary, the Committee's professionals, including its financial advisors, sought to examine and evaluate the Debtors' financial condition, its pre-petition marketing efforts, the value of the Debtors' assets, and the possibility there would be additional interest in the assets proposed to be sold to the Lender. As the Committee's professionals analyzed the Debtors' proposed DIP Financing and the proposed auction and sale process, they

noted some concerns with certain aspects, and they promptly attempted to negotiate and resolve the issues with the Debtors' professionals.

12.     The Committee's actions, however, were instantly met with hostility from Debtors. Indeed, the Committee's professionals received a sarcastic e-mail criticizing the customary and proper actions of the Committee's professionals and implying that the Committee should not be undertaking its due diligence.[3] Thus, the Debtors signaled from the outset that they did not intend to recognize the Committee as a vital part of the Chapter 11 process and would not support the Committee's exercise of its fiduciary duties.

13.     A resolution of the concerns raised by the Committee could not be obtained before the relevant objection deadline, and so the Committee filed objections to both the approval of the proposed bid procedures and the entry of a final order approving the DIP Financing [Docket Nos. 94 and 95] (collectively, the "Committee's Objections").[4]

14.     Thereafter, the Committee, still desirous of a consensual resolution, tried in good faith to negotiate with the Debtors and the Lender. On the day of the August 23rd hearing,[5] the Committee met with Debtors and the Lender in their first face-to-face meetings with these parties to discuss and negotiate a possible global resolution of these cases that would meet the expedited timetable desired by the Debtors and the Lender for a sale, while enhancing value for unsecured creditors and providing unsecured creditors a voice in the post-confirmation vehicle. The tone of the negotiations degenerated almost immediately when the Debtors' lead counsel entered the room without identifying himself and began subjecting the Committee's professionals to a condescending, cross-examination type questioning, indicating by his demeanor and tone that he

---

[3]  A copy of the e-mail from H. Goldstein to J. Sullivan dated August 20, 2010 is attached hereto as **Exhibit A**.

[4]  To the extent applicable, the Committee's Objections are fully incorporated herein by reference.

[5]  All statements described in this motion are for purposes of establishing the facts underlying the requested relief and are not included to demonstrate liability; thus, Fed. R. Evid. 408 is inapplicable.

ascribed no merit to the Committee's role in the process. While certain key terms were agreed upon and presented jointly to the Lender, further negotiations were upset when Debtors' counsel, without any foundation or reasonable basis, attacked the Committee professionals' motivations and integrity. In a break-out room away from the Lender, Debtors' counsel told the Committee professionals that he refused to flesh out details of certain terms because – to paraphrase – "the only thing keeping the Committee at the negotiating table was the professionals' desire to increase their own fees."

15. Debtors thus vigorously opposed the requests of the Committee to include in the DIP Financing budget a reasonable carve-out for professional fees for the Committee's professionals. And, indeed, no amount would have been provided in the Second Interim DIP Order entered on August 23, 2010, were it not for the Lender's intervention to authorize funds for Committee professionals. Meanwhile, the Debtors insisted that their own professionals, including counsel, financial advisors, restructuring officers and staff, and their management personnel, be retained with full staffing and compensation even though the global resolution being negotiated provided for the immediate wind-down of all business, so that many of these professionals would undoubtedly (and should) become unnecessary.

16. Subsequent to the August 23rd hearing when the concept of the expedited sale and liquidation plan was presented to the Court, the Committee and its professionals pressed forward with negotiations, despite repeated attempts by the Debtors to discredit or sideline the Committee and its professionals. Indeed, the Committee and the Lender agreed on the terms of consensual orders resolving the Committee's Objections and providing a framework for a Chapter 11 plan.

17. As this Court will recall, another impasse was reached at the time of the August 26th hearing over the Debtors' insistence that the Committee agree to support a plan of

liquidation that contained broad releases for the Debtors' directors and officers (the "D&O Releases"), without any consideration or value added to the estates.

18.     The Committee had previously indicated concern about the propriety of these requested releases given that it had yet to complete a meaningful investigation of any pre-petition conduct, and it continued to express these concerns. Nonetheless, after discussions before this Court and in the interest of obtaining a resolution that would benefit unsecured creditors, the Committee (itself, not its individual members in their own individual capacities as creditors, which the Committee has no authority to bind) agreed to support a plan containing the D&O Releases of certain individuals. When Debtors' counsel misrepresented the agreement with the Committee on the record as including both the Committee *and* its individual members, Committee counsel corrected the error. Debtors' counsel has subsequently turned this correction into yet another basis on which to hurl insults and prevent good faith negotiations with the Committee, fallaciously claiming that Committee counsel "went back on his word." Ostensibly on the basis of this unwarranted accusation, Debtors' counsel has now refused to engage in any further oral conferences or negotiations with the Committee.[6] It goes without saying that this seriously hampers the Committee's effectiveness going forward.

**B.      The Debtors' Recent Conduct and Filing of a Chapter 11 Plan**

19.     After reaching an agreement on August 26th, and negotiating consensual orders that were submitted and approved by this Court, the Committee requested that the Debtors provide a draft of the plan of liquidation (the "Proposed Plan") and disclosure statement (the "Disclosure Statement") for its review and comment. When the documents were ultimately provided, only a day before they were due to be filed, the Committee discovered that they did

---

[6]     See additional e-mails from H. Goldstein to J. Sullivan attached hereto as **Exhibit B**.

not, as had been discussed and understood, provide (a) for unsecured creditors to vote to accept or reject the plan, or (b) for the Committee to have a voice in the post-confirmation liquidating trust. Committee counsel voiced an immediate objection, but Debtors' counsel dismissively informed the Committee that there was no such agreement and once again falsely accused Committee counsel of complaining only because they sought to increase their own counsel fees.

20. What is true is that the Committee and its professionals recognized the need for representatives of unsecured creditors to have a voice in the post-confirmation trust as the monetizing of assets by that trust will be the primary source of recovery for unsecured creditors. This was discussed openly with the Debtors' counsel in that very first face-to-face meeting on August 23rd. At that time, Debtor's counsel inquired who the Committee would suggest to control the liquidating trust and how logistically the trust would be run. Counsel asked specifically whether the Committee was proposing that a panel of advisors in addition to a trustee be appointed (to which he indicated the Debtors would be opposed) or a single individual, or some other option. The Committee responded that it was suggesting only that a single individual trustee be selected by the Committee, and Debtors' counsel indicated his assent to that. The current contention of Debtors' counsel that this is a "new" concept never before agreed to is wholly disingenuous. Counsel's conduct in this matter is doing damage to the process and reversing any progress toward a final resolution.

21. The DIP Financing Order had allowed the Debtors until August 31st to file a plan. The Proposed Plan and related documents were provided to the Committee in draft form only on August 30th. Accordingly, the Committee inquired of the Lender whether it would consent to allowing the Debtors additional time to file the required plan so that the Debtors and the Committee could discuss the Committee's concerns and, hopefully, resolve the outstanding

issues. The Lender responded that, in fact, it had already indicated to the Debtors that it was willing to extend the deadline until September 8th so that discussions between the Debtors and the Committee could occur.

22.     Debtors' counsel rebuffed this offer of more time and instead plowed ahead with the filing of their Proposed Plan on August 31st, without even discussing it with the Committee, thereby excluding the Committee from participation in decisions concerning the reorganization. [Docket Nos. 177-180]. The Proposed Plan does not provide for a vote of unsecured creditors notwithstanding that the Debtors filed schedules only this past Friday evening (September 3rd), that a bar date for filing proofs of claim has not been set, and the that U.S. Trustee has not even conducted the meeting of creditors pursuant to § 341.[7]

23.     If the conduct of the Debtors to date were not bad enough, Debtors' counsel are now trying to gain improper leverage over the Committee with respect to their Proposed Plan by a transparent attempt to weaken the Committee and its ability to move forward in any effective way. In this regard, while refusing to conference orally with the Committee any further, Debtors' counsel has suddenly demanded immediate formal depositions of individual Committee members under the guise of targeting Committee counsel with unsupported allegations regarding their retention. As is evident from the disclosures filed by the Committee's professionals, there is no improper conduct, and the Debtors lack any good faith basis on which to attack the Committee's professionals.

## **RELIEF REQUESTED**

24.     The facts of these cases and current posture of these proceedings support the appointment of a Chapter 11 trustee pursuant to § 1104(a) of the Bankruptcy Code. Absent the

---

[7]     The meeting of creditors is scheduled for September 15, 2010. It is unclear why the Debtors have not yet filed a motion requesting the establishment of a bar date.

granting of the Motion, the Committee believes that the estates and unsecured creditors will be irreparably harmed and the cases will spiral out of control. Despite the Committee's numerous attempts to work cooperatively with the Debtors on a restructuring strategy and to establish greater independence and transparency of the Debtors' restructuring process, the Debtors and their advisors are either ignoring or outright refusing to address the Committee's legitimate concerns, and are dismissing altogether the rights of the unsecured creditors. The appointment of a Chapter 11 trustee is thus warranted in these cases. As a result, the Committee now seeks entry of an order (I) appointing a Chapter 11 trustee, pursuant to §§ 105(a) and 1104(a) of the Bankruptcy Code; or in the alternative, (II) terminating the Debtors' Exclusive Filing Period and Exclusive Solicitation Period, pursuant to §§ 105(a) and 1121(d) of the Bankruptcy Code, which would allow the Committee to file a competing plan of reorganization.

## ARGUMENT

## I. THE COURT SHOULD APPOINT A TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)

25. The continued campaign by the Debtors' professionals to eliminate the Committee's vital role in these cases and to discredit the Committee's professionals raises serious concerns and is in contravention of the principles of the Bankruptcy Code. Actions by Debtors' lead counsel have made it impossible for the Committee to work with him. As a result, the Committee lacks confidence in the Debtors' ability to conduct these Chapter 11 cases in accordance with their fiduciary duties, and the Committee and the Debtors are at an impasse in trying to resolve the cases. The Committee believes that the best means of salvaging these cases is the appointment of a Chapter 11 trustee as an independent fiduciary who could guide the cases forward toward a final plan effectively and efficiently without bias or entrenchment.

26.     Under the Bankruptcy Code, appointment of a Chapter 11 trustee is governed by

§ 1104(a), which provides as follows:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court *shall* order the appointment of a trustee –
>
>> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
>>
>> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>>
>> (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interest of creditors and the estate.

11 U.S.C. § 1104(a) (emphasis added).

27.     Section 1104(a)(1) mandates the appointment of a trustee when "cause" to do so is present; a determination that cause exists lies with the Court. *In re North American Communications, Inc.*, 138 B.R. 175, 178 (W.D. Pa. 1992) (citing *Comm. of Dalkon Shield Claimants v. A.H. Robins Co.*, 828 F.2d 239, 242 (4th Cir. 1987)).  The Third Circuit has recognized that the list of causes in the statute is not exclusive and that the language "or similar cause" encompasses a wide range of conduct. *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989); *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1998) (upholding district court's appointment of a trustee where (1) acrimony between debtor and its creditors rose to the level of "cause," and (2) appointment of a trustee was found to be in the best interests of the parties and the debtor's estate).

28. "Acrimony" or a deep seeded conflict between the debtors and their creditors can constitute "cause" under § 1104(a)(1), which the Court of Appeals for the Third Circuit in *Marvel Entertainment* relied upon to uphold the District Court's appointment of a trustee. *Marvel Entm't Group*, 140 F.3d at 475 (citing *In re Colorado-Ute Elec. Assoc., Inc.*, 120 B.R. 164 (Bankr. D. Colo. 1990) (appointing a trustee in interests of parties where serious conflicts among the debtor, its board of directors and creditors made the prospect for gridlock seem more probable than the ability to rehabilitate the debtor)); *see also In re The Bible Speaks*, 74 B.R. 511 (Bankr. D. Mass. 1987) (appointing trustee where friction had developed between the debtor and the creditors committee which threatened to engulf the debtor's estate in costly and legalistic disputes over the entire range of the reorganization process).

### A.  Cause Exists to Appoint a Trustee

29. Based upon the totality of the circumstances, sufficient "cause" for the appointment of a Chapter 11 trustee is present because the Debtors' professionals have failed to cooperate with the Committee, have given little or no consideration to the interests of unsecured creditors, and are managing the affairs of the Debtors to the detriment of these estates and their creditors. Specifically, the Debtors have failed with respect to the following:

(a)  The Debtors' board and management have breached their fiduciary duties and obligations by directing or allowing their counsel to behave in a manner that ignores the interests of unsecured creditors and eviscerates the Committee and its legitimate, statutorily protected role in the process.

(b)  The Debtors' campaign to marginalize the Committee and their counsel's refusal to engage in any future oral conferences with the Committee's professionals has brought negotiations to a stand-still despite the Committee's good faith efforts, and is counter-productive to the prompt resolution of these cases.

(c)  The Debtors' counsel's constant attacks on the integrity of the Committee's professionals as a negotiating and leverage tactic is unprofessional and offensive and has caused the Committee to lose all confidence in the Debtors' ability to move the process forward in good faith.

(d)     The Debtors have failed to conduct their affairs in a manner that is free from any perception of self-dealing by demanding, for the sole benefit of their Board and management, releases from liability in connection with potential claims the estates may have against the Debtors' officers and directors relating to their pre-petition decisions to discontinue the Debtors' operations, to terminate their employees, and to consent to a strict partial foreclosure of the Debtors' assets. Such releases are without consideration, inappropriate, and certainly premature.

(e)     The Debtors and their counsel have reneged on their earlier recognition of the Committee's legitimate concerns regarding the need to provide for an adequate voice for unsecured creditors in the plan process and in the post-confirmation trust that will administer assets for the benefit of unsecured creditors.

(f)     While even the Lender recognized the important role of the Committee by indicating its willingness to extend the deadline for the filing of the plan, Debtors' counsel insisted on cutting the Committee out the process, refused the extension, and went ahead with the filing of the Proposed Plan without so much as entertaining a discussion of the Committee's concerns.

Thus, there is a need for an independent fiduciary to reverse the polarization and deadlock among the parties and build a consensus in order to avoid unnecessary battling and a waste of the estates' limited resources. It is critical that an independent fiduciary be brought in who can work with the Committee and its professionals in a professional and productive way.

30.     Where, as here, the Debtors' conduct and questionable actions have adversely affected the value of their estates and the rights of the true stakeholders, the general presumption against appointing a trustee is inoperative. *See Marvel Entm't Group*, 140 F.3d at 471, 478 (citing *Petit v. New England Mort. Servs.*, 182 B.R. 64, 69 (D. Me. 1995)). Moreover, the presumption is premised on the expectation that current management can be relied upon to carry out the fiduciary responsibilities of a trustee, *Marvel Entm't Group*, 140 F.3d at 474, which is demonstrably not the situation here.

31.     Because the Debtors' professionals have failed to work in a constructive fashion with the Committee and have refused to consider the legitimate interests of the unsecured creditors, the Committee no longer trusts the Debtors to carry out their fiduciary duties to all

creditors of these estates. Indeed, from the time of the Committee's appointment, the Debtors, their management, and their professionals have tried to negate the Committee's statutorily mandated participation in these cases in violation of the Bankruptcy Code and the Debtors' own fiduciary duties. These facts plainly provide ample "cause" warranting the appointment of a Chapter 11 trustee, and accordingly, the Committee respectfully submits that its motion for the appointment of a trustee should be granted.

### B.    Appointment of a Trustee Is in the Interests of Creditors and the Estates

32.    Even if the Court determines that there is insufficient "cause" to appoint a trustee under § 1104(a)(1), § 1104(a)(2) provides a more flexible standard that permits appointment of a trustee when doing so would *serve the interests of the creditors and the estate*. *See Sharon Steel*, 871 F.2d at 1226; *In re L.S. Good & Co.*, 8 B.R. 312, 314-15 (Bankr. N.D. W.Va. 1980) (appointing a trustee was in the interests of creditors and the estate where prospects for a successful rehabilitation were extremely remote, it was presumed that the debtor's assets would be liquidated, and the magnitude of inter-company transactions between the debtor and its affiliates created the possibility that continuation of current management would result in serious potential conflicts of interests).

33.    The appointment of a trustee under § 1104(a)(2) is warranted when the loyalty of the debtor's management is substantially called into question by competing business interests favoring the debtor's management and equity holders, thereby causing its creditors to lose confidence in management abilities to reach a successful reorganization. *See In re Concord Coal Corp.*, 11 B.R. 552, 554 (Bankr. S.D. W.Va. 1981).

34.    The loyalty of the Debtors' board, management, and professionals to these estates and to the unsecured creditors has been placed in serious question by their disrespect for the unsecured creditors' rights and their improper attempts to obtain releases for the sole benefit of

the Debtors' management and certain equity holders, at the expense of unsecured creditors who are the true stakeholders in these Chapter 11 cases. Further, the Debtors' loyalty is called into question by their decision to file the Proposed Plan without any meaningful input from the Committee and in total disregard of the concerns of the Committee.

35.     Prudence dictates the appointment of an independent fiduciary, a Chapter 11 trustee, who will independently run a liquidation or reorganization to truly maximize value in consideration of the interests of all stakeholders in these Chapter 11 cases.

36.     Additionally, appointment of a trustee will be more cost-effective in producing a resolution to these cases, as a trustee will surely be less costly than continuing to maintain the Debtors' current professionals, its restructuring officer and his staff, and various management representatives.

37.     Indeed, there is no downside to the appointment of a trustee here since, as of September 7th, the sale to the Lender will be completed, and the cases will be in final liquidation mode. Involvement of the Debtors will no longer be needed.

38.     Based upon the foregoing, the appointment of a Chapter 11 trustee is in the best interests of these estates and all constituencies.

## II.     THE DEBTORS' EXCLUSIVITY PERIODS SHOULD BE TERMINATED

39.     If a Chapter 11 trustee is not appointed, the Court should terminate the Exclusivity Periods, pursuant to §§ 1121(d) and 105(a) of the Bankruptcy Code, and allow the Committee to file a plan of reorganization or liquidation, consistent with its agreements with the Debtors and Lenders.

40.     Section 1121(d) provides that the Court may terminate the Debtors' Exclusivity Periods "for cause." 11 U.S.C. § 1121(d)(1). This section "grants great latitude to the Bankruptcy Judge in deciding, on a case-specific basis, whether to modify the exclusivity period

on a showing of 'cause.'" *Geriatrics Nursing Home v. First Fidelity Bank, N.A. (In re Geriatrics Nursing Home)*, 187 B.R. 128, 132 (D.N.J. 1995) (citing *In re Kerns*, 111 B.R. 777, 781 (S.D. Ind. 1990); *In re Sharon Steel Corp.*, 78 B. R. 762, 763 (Bankr. W.D. Pa. 1987)).

41.　　"Cause" justifying the termination of a debtor's exclusivity is not defined in the Bankruptcy Code, but courts generally look at the totality of the circumstances and consider a number of competing factors. *See, e.g., In re Adelphia Commc'ns Corp.*, 352 B.R. 578 (Bankr. S.D.N.Y. 2006); *In re Dow Corning Corp.*, 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997). Some of the factors courts consider include the "existence of good faith progress towards reorganization," "whether the debtor has demonstrated reasonable prospects for filing a viable plan," and "whether the debtor has made progress in negotiations with its creditors." *Dow Corning*, 208 B.R. 664-65.

42.　　Courts have noted that "the primary consideration in determining whether to terminate the debtor's exclusivity is whether its termination will move the case forward, and that this 'is a practical call that can override a mere toting up of the factors.'" *Adelphia Commc'ns*, 352 B.R. at 590 (quoting *Dow Corning*, 208 B.R. at 670). The *Adelphia* court went on to note that the "test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case." *Adelphia Commc'ns*, 352 B.R. at 590 (citing *Dow Corning*, 208 B.R. at 670).

43.　　As shown above, the Debtors have not demonstrated good faith nor have they made progress in negotiations with the Committee. To the contrary, they have thwarted progress at every opportunity, and as a result the parties are now at an impasse.

44.　　The Debtors have refused to fully consider the Committee's proposals, disregarded unsecured creditors' interests, and proposed a Chapter 11 plan to the detriment of the

estates and unsecured creditors. Under these circumstances, only the termination of the Exclusivity Periods by the Court will allow the Committee to propose its own plan to be considered by both the Court and all constituencies of the estates, and to allow unsecured creditors to see any reasonable recovery.

45.     The Committee's intent to file a Chapter 11 plan or competing Chapter 11 plan is not a hypothetical or potential alternative plan based on mere speculation or conjecture. *Cf. In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 134 (D.N.J. 1995) (denying a motion to terminate the debtor's exclusivity based on mere "statements made by creditors and parties in interest that they were prepared to offer more favorable plans if the court were to terminate the exclusivity period . . . ."). Rather, it is a definitive proposal that has already been discussed with the Debtors and other parties in interest. In comparison to the Proposed Plan, which completely disregards the legitimate interests of the unsecured creditors while insulating the Debtors' management entirely from any potential liability, the Committee's plan would encompass the parameters that were previously agreed upon by the Debtors, and would be in accordance with the provisions in the interim order approving the Sale and the final order approving the DIP Financing. Further, the Committee's plan would provide for a creditor voice in the confirmation process and would create a post-confirmation vehicle that would be incentivized to monetize the remaining assets for the benefit of unsecured creditors. Perhaps most importantly, the Proposed Plan contains numerous flaws and defects such that it is patently non-confirmable. Terminating exclusivity would allow the Committee to file a plan that is confirmable and supported by creditors.

46.     At a minimum, the Committee's readiness to propose its own plan dictates that creditors should have an opportunity to at least consider it without the threat of confirmation of

the Proposed Plan hanging over their heads. It is an advantageous proposal that the creditors should have a meaningful opportunity to consider, negotiate, and vote on.

47.     Terminating the Exclusivity Periods to allow the Committee or any other party in interest to file a Chapter 11 plan would move these cases forward materially, to a degree that otherwise would not occur, and would avoid the waste of estate assets. If the Exclusivity Periods remain intact, a non-confirmable plan may be put forward and creditors will never have the benefit of reviewing more than one plan proposal and selecting the proposal that provides the greatest value for their claims.

48.     While terminating the Exclusivity Periods at this juncture would "afford[] creditors their right to file the plan; there [would be] no negative effect upon the debtor's co-existing right to file its plan." *In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1005 (Bankr. N.D. Ind. 1990). First, the Proposed Plan is not confirmable, which means that allowing the Debtors to proceed will cause delay and depletion of estate resources. Second, even if the Debtors cure the defects and revise the Proposed Plan so that it is confirmable, allowing creditors to consider competing plans will encourage all plan proponents to make their proposals as attractive to creditors as possible, with the objective of garnering creditor support prior to solicitation. Such material progress will not occur if the Exclusivity Periods are allowed to remain in place and creditors are forced to consider only the plan proposed by the Debtors.

49.     Finally, from a practical standpoint, terminating the Exclusivity Periods will ensure consideration of the interests of unsecured creditors – interests that the Proposed Plan completely disregards. By allowing the Committee to propose a competing plan, more value may be provided to unsecured creditors, or it may cause the Debtors to improve their plan. The earlier the various creditor constituencies are allowed to consider the Committee's proposal as a

viable alternative to the Debtors' Proposed Plan, the better the estates and their creditors will be. Thus, the interests of practicality and justice demand that the Court terminate the Exclusivity Periods so that the Committee may file its own Chapter 11 plan, and the creditors may fully consider the merits of the Committee's proposal in comparison with those of the Debtors' plan and draw their own conclusions as to which proposal provides the highest value and offers the best outcome in these cases.

50.     Accordingly, in the interests of the Debtors' estates and all creditor constituencies, the Committee submits that the Exclusivity Periods must be terminated.

## RESERVATION OF RIGHTS

51.     The Committee reserves its rights to address further the Motion and any other ancillary issues and to respond to any objection of any party, either by further submissions to this Court, at oral argument, or by testimony to be presented at any hearing. Before such hearing, the Committee intends to try to continue working with the Debtors and other parties in interest in an attempt to resolve consensually the problems raised in the Motion and identify potential solutions.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Committee respectfully requests that the Court grant the Motion and enter an Order in the form attached hereto directing (I) the immediate appointment of a Chapter 11 trustee, or in the alternative, (II) the immediate termination of the period during which the Debtors have the exclusive right to file a Chapter 11 plan and termination of the period during which the Debtors have the exclusive right to solicit acceptances of such plan, allowing the Committee to file its own Chapter 11 plan, and granting such further relief as the Court deems just.

Dated: September 6, 2010            ELLIOTT GREENLEAF

Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Shelley A. Kinsella (DE Bar No. 4023)
1105 North Market Street, Suite 1700
Wilmington, Delaware 19801
Telephone: (302) 384-9400
Facsimile: (302) 384-9399
Email: rxza@elliottgreenleaf.com
Email: sak@elliottgreenleaf.com

-and-

Arent Fox LLP
Andrew I. Silfen
James Sullivan
1675 Broadway
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
Email: silfen.andrew@arentfox.com
Email: sullivan.james@arentfox.com

-and-

Arent Fox LLP
Carol Connor Cohen
Caroline Turner English
Jeffrey N. Rothleder

1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: 202-828-3472
Facsimile: 202-857-6395
Email: cohen.carol@arentfox.com
Email: english.caroline@arentfox.com
Email: rothleder.jeffrey@arentfox.com

*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*