# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| UNIVERSAL BUILDING PRODUCTS, INC., et al.,[1] | Case No. 10-12453 (MFW) |
| Debtors. | Jointly Administered |
| | **Related to Docket Nos. 145 and 173** |

## DEBTORS' COMBINED OBJECTION TO APPLICATIONS FOR ORDERS AUTHORIZING EMPLOYMENT AND RETENTION OF ARENT FOX LLP AND ELLIOTT GREENLEAF AS COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS *NUNC PRO TUNC* TO AUGUST 13, 2010

The above-captioned debtors and debtors in possession (collectively, the "*Debtors*") hereby object (the "*Objection*") to the *Application for an Order Authorizing Employment and Retention of Arent Fox LLP as Attorneys for the Official Committee of Unsecured Creditors Nunc Pro Tunc to August 13, 2010* (Docket No. 173) (the "*AF Application*") and the *Application for an Order Authorizing the Employment and Retention of Elliott Greenleaf as Co-Counsel to the Official Committee of Unsecured Creditors Nunc Pro Tunc August 13, 2010* (Docket No. 145) (the "*EG Application*," and together with the AF Application, the "*Committee Counsel Applications*"). In support of the Objection, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1. This Objection stems from what appears to be a *quid pro quo* arrangement orchestrated by Arent Fox LLP ("*AF*") and Elliott Greenleaf ("*EG*," and together with AF, "*Committee Counsel*") to obtain creditor committee engagements by "solicitation" of creditors with whom Committee Counsel has no prior relationship, which implicates: (i) the applicable

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  (i) Universal Building Products, Inc. (7884); (ii) Accubrace, Inc. (3418); (iii) Don De Cristo Concrete Accessories, Inc. (7547); (iv) Form-Co, Inc. (0079); and (v) Universal Form Clamp, Inc. (3003). The address of the Debtors' corporate headquarters is 15172 Goldenwest Circle, Westminster, California 92683.

rules of professional conduct; (ii) the disinterestedness requirement for committee professionals as set forth in title 11 of the United States Code (the "*Bankruptcy Code*"); and (iii) the mandatory disclosure requirements articulated in the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*").

2.      Based on discovery conducted to date, the solicitation arrangement appears to function as follows. Upon the filing of a chapter 11 bankruptcy case in which Chinese creditors are prevalent in the consolidated list of the debtors' thirty-largest creditors (the "*Top 30 List*"), Committee Counsel notifies Dr. Haishan Liu of US-China Assets Management USA, LLC ("*Dr. Liu*") of the case, implicitly and/or explicitly requesting that Dr. Liu contact such creditors in order to: (i) generate their interest in serving on a creditors' committee; and (ii) obtain the proxies of such creditors to elect the committee's professionals.   Committee Counsel then facilitates Dr. Liu's efforts to contact, obtain proxies from, and harvest votes for the election of committee counsel from such creditors by: (i) unearthing contact information for such creditors so that Dr. Liu may effect such communication; (ii) locating "suitable" candidates to hold such proxies at the meeting in which the committee is formed and to cast such votes to elect Committee Counsel as the committee's counsel; (iii) preparing such proxies for Dr. Liu to disseminate; and (iv) working with Dr. Liu to improve such creditors' likelihood of being appointed to the committee by the U.S. Trustee, including by consulting with Dr. Liu as to the amount of such creditors' claims reflected in the forms requesting that such creditor be appointed to the creditors' committee (because a claimant with a larger claim is more likely to be appointed to the Committee by the U.S. Trustee), as well as in concealing from the U.S. Trustee that Committee Counsel and Dr. Liu are the impetus driving the proxy (rather than the creditor itself).

3.     Indeed, by 9:45 a.m. on the Petition Date (as defined *infra*), both Committee

Counsel firms had e-mailed the Debtors' bankruptcy petitions and the Top 30 List to Dr. Liu. In

the e-mail correspondence accompanying the Top 30 List, one of the firms, EG, directed Dr. Liu

to "let me know if you can get some companies to allow for proxies." *See* Discovery Documents

Produced by Dr. Liu, a full set of which is attached hereto as <u>Exhibit A</u>, at [HL 0388].[2]  In its

own e-mail correspondence accompanying the Top 30 List, the other law firm, AF, directed Dr.

Liu to the fact that the Top 30 List contained a "bunch of Asian creditors." *See* [HL 0334].  Dr.

Liu understood this to "very clearly . . . express a clear intention. He want – he hope me to

contact Chinese exporters . . . ." *See* Deposition Transcript of Dr. Haishan Liu, a copy of which

is attached hereto as <u>Exhibit B</u>, at p. 243, lines 12-19.[3]  As discussed in detail *infra*, Committee

Counsel continued to exploit its collusive strategy through the date the creditors' committee was

formed and elected counsel.

4.     None of these efforts were disclosed in declarations or affidavits accompanying

Committee Counsel's retention pleadings.    Rather, in a continuing effort to disguise the

circumstances under which their retention ensued, Committee Counsel concealed the activity

designed to procure proxies (by not only failing to disclose the solicitation scheme, but also by

failing to disclose individual advice given by Committee Counsel to two Chinese creditors in this

case).  Such information was only subsequently revealed (albeit inadequately) after these matters

---

[2]      References to discovery documents produced by Dr. Liu are cited as [HL (page number)], representing the
Bates stamp on the specific documents cited.  All of these documents are attached to this Objection as part of
<u>Exhibit A</u>.

[3]      The citations to the Deposition Transcript herein are not referenced as evidence for trial.  As the Debtors
have subpoenaed Dr. Liu as a witness for the trial on this matter, counsel to the Committee and to Dr. Liu have
informed the Debtors that Dr. Liu will indeed be present to testify at the trial.  Rather, the Deposition Transcript is
cited herein for the purpose of showing what the evidence at trial is expected to be and to frame the issues that form
the basis for the Debtors' Objection herein.  Accordingly, assuming that Dr. Liu testifies at trial on this matter, such
testimony will be used as evidence, and the Deposition Transcript will only be necessary either if Dr. Liu does not
appear at trial, or for impeachment purposes.

came to light as a result of the Debtors' discovery efforts. Although the failure to disclose *any* potentially relevant information requires disqualification of Committee Counsel, the omission was even more grave in this case, as the individual advice given by Committee Counsel to two creditors here was indeed adverse to the unsecured creditor body as a whole in violation of sections 1103(b) (adverse interest standard) and 328(c) (disinterestedness standard) of the Bankruptcy Code.

5. In return for his assistance in procuring a new, lucrative creditors' committee engagement for Committee Counsel, Dr. Liu profits from this *quid pro quo* arrangement in a number of ways. First of all, Dr. Liu is rewarded by being employed in each case by the creditors' committee as a translator "[u]pon the recommendation of Arent Fox," to be paid as an administrative claimant out of the bankruptcy estate. *See Declaration of Andrew I. Silfen Support of Application for an Order Authorizing Employment and Retention of Arent Fox LLP as Attorneys for the Official Committee of Unsecured Creditors Nunc Pro Tunc to August 13, 2010* (Docket No. 173, Exhibit A) (the "*AF Initial Declaration*"), at ¶ 11. Second, upon being notified of the filing of the bankruptcy case by Committee Counsel, Dr. Liu also pursues engagement by Chinese creditors (in their individual capacities) on either a contingency basis from recoveries received by the creditors on their claims, or by receiving a consulting fee. *See* Exhibit B, at p. 14, line 7 through p. 15, line 2. While Dr. Liu states that he does not pursue retention from the bankruptcy estate and from individual creditors in the same bankruptcy cases, *see* Exhibit B, at p. 39, lines 7-12 (when asked if Dr. Liu has been paid by both a creditor and the bankruptcy estate in the same case, he states "I don't recall any case same time happens"), his claim is belied by translations of his e-mails with Chinese creditors. *See, e.g.*, the Certified Translation of Certain of Dr. Liu's E-mails from Mandarin Chinese to English Prepared by Ganlin Translation,

a Certified Member of American Translators Association, a copy of which is attached hereto as Exhibit C, at pp. 29-30 (translating [HL 0164-65]) (Dr. Liu offering to help an individual creditor deal with all kinds of affairs associated with this bankruptcy case while at the same time seeking a proxy for the creditor to serve on the creditors' committee). Third, Dr. Liu is provided with free legal advice for such Chinese creditors by Committee Counsel in the period between the bankruptcy filing and formation of the creditors' committee. *See, e.g.*, [HL 0302] ("getting a proxy is two way traffic"). Fourth, Dr. Liu is provided the opportunity and assistance in fostering a long-term relationship with such Chinese creditors, which he admits is crucial to his future business endeavors. *See, e.g.*, Exhibit B, at p. 254, lines 5-18 (Dr. Liu testified to the importance of long-term relationships for Chinese creditors).[4] Fifth, Committee Counsel provides a recommendation of Dr. Liu to Chinese vendors. *See, e.g.*, Discovery Documents Produced by AF, a full set of which is attached hereto as Exhibit D, at [AF-UBP 0009] ("Before recommending you, I need some one and some groups to commend me to one or more of those prospective committee participants").[5] Moreover, Dr. Liu compensates Committee Counsel directly, as Committee Counsel represents Dr. Liu and his company in other matters. *See AF Initial Declaration*, at ¶ 11 ("Arent Fox represents US-China Assets Management USA, LLC in certain non-bankruptcy matters"); Exhibit B, at p. 115, lines 7-9.

---

[4]     Although Dr. Liu asserts that his endeavors in this regard are undertaken out of the "goodness of his heart," this claim lacks credibility given not only the compensation scheme described above, but also given Dr. Liu's testimony that he is so in fear of personal harm from Chinese creditors that he is afraid to disclose his home address and birth year (lest Chinese creditors become able to locate him). *See* Exhibit B, at p. 63, line 17 through p. 65, line 2.

[5]     References to discovery documents produced by AF are cited as [AF-UBP (page number)], representing the Bates stamp on the specific documents cited. All of these documents are attached to this Objection as part of Exhibit D.

6. The ethics rules limit the extent to which an attorney can contact a non-attorney with whom such attorney does not have an existing relationship "when a significant motive for the lawyers' doing so is the lawyers' pecuniary gain." Rule 7.3 of the Delaware Lawyers' Rules of Professional Conduct; *see also* ABA-AMRPC Rule 7.3 (same); Rule 7.3 of the New York Rules of Professional Conduct. Moreover, it "is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another . . . ." ABN-AMRPC Rule 8.4(a). Accordingly, a lawyer cannot use a non-attorney as an intermediary in order to avoid the restrictions on the lawyers soliciting themselves.

7. In addition to the implications regarding the rules of ethics and the Bankruptcy Code, permitting Committee Counsel to taint the creditor committee formation process (and the concomitant election of professionals) severely compromises the integrity of the committee formation process.

8. Nor is Committee Counsel's solicitation arrangement a new endeavor. Rather, the Debtors' research indicates that for at least the past five years, AF's *modus operandi* has been to utilize non-attorney third parties to solicit and secure creditors' committee engagements. As discussed *infra*, AF previously worked with a financial advisor (Clear Thinking Group) in the same manner as AF has worked with Dr. Liu in the Debtors' cases. Ultimately, AF's "business relationship" with the financial advisor led to solicitation accusations and subsequent fee reductions in two separate cases in the United States Bankruptcy Court for the Southern District of Texas, where the solicitation processes described by the respective debtor's counsels are eerily similar to the events that transpired in these chapter 11 cases between August 4, 2010 (the "*Petition Date*") and August 13, 2010 (the "*Committee Formation Date*"). However, rather than

6

exhibiting remorse for their prior indiscretions, AF simply switched solicitors. That is, after AF's solicitation efforts came to light, the ingenious idea to switch from a financial advisor to Dr. Liu (a translator) was born. The Court should not countenance Committee Counsel's ethical violations, conflicts, and disclosure violations, and should deny the Committee Counsel Applications.

## BACKGROUND

### A.  Committee Counsel's Correspondence With Dr. Liu

9.  At 9:44 a.m. Eastern time on the Petition Date, AF e-mailed a copy of one of the Debtors' chapter 11 petitions (including the list of the Debtors' largest thirty unsecured creditors) to Dr. Liu and indicated in the cover e-mail that there are a "bunch of Asian creditors." [HL 0334]. Dr. Liu replied that same day noting that AF's "tip came in as one of the five early birds this morning . . . [and AF's] intention of teaming up with [EG] is well recognized." [HL 0334]. Dr. Liu's e-mail also stated that "[a]s usual," he would investigate the "representation status" of those Asian creditors. [HL 0334]; *see also* <u>Exhibit B</u>, at p. 255, lines 4-12 (Dr. Liu testified that he knows some law firms better than others, and in this case he knows AF better than EG). That same day, AF also sent an e-mail to Dr. Liu stating that it "spoke with [EG] this morning. [EG] suggested that [AF] let you know that [EG] and [AF] are going to work together on this case. Let [AF] know if you need any assistance." [HL 0391]. Among other things, this correspondence and the use of the phrase "as usual" evidences AF's *modus operandi* to have Dr. Liu "cold-contact" and solicit proxies on Committee Counsel's

behalf, with Committee Counsel already planning with Dr. Liu, prior to committee formation, who would ultimately work on the Debtors' cases.[6]

10.    At 8:59 a.m. on the Petition Date, EG also sent an e-mail to Dr. Liu with a copy of the Debtors' largest 30 unsecured creditors. [HL 0388]. In such e-mail, EG made the following statements:

(a)    "There are several Asian creditors on this list."

(b)    "I am sending this to you first in order to get your support early."

(c)    "I would like to pitch this as lead or co-counsel."

(d)    "Please let me know if you can get some companies to allow for proxies."

(e)    "I will need to speak to them with you and I will need their authority to pick the right people on the proxy."

*Id.* This e-mail is indicative of Committee Counsel's strategy of solicitation for their own benefit, **contains a direct and explicit request for Dr. Liu to gather proxies**, specifically mentions that EG wished to pitch this case, and solicits authority to choose certain people to act as proxy for the Asian creditors.

11.    As stated above, Dr. Liu understood this to "very clearly . . . express a clear intention. He want – he hope me to contact Chinese exporters . . . ." Exhibit B, at p. 243, lines 12-19; *see also* p. 243, lines 14-24 (Dr. Liu understood "pick the right people" to mean Committee Counsel wanted the support of Dr. Liu and the Chinese creditors).

12.    Viewing the AF and EG e-mails together, Committee Counsel's solicitation scheme was transparent from the outset. Dr. Liu would obtain proxies with the assistance of

---

[6]    Dr. Liu implied in his deposition that Committee Counsel's conduct was permissible because a number of other law firms also sent him the Debtors' petitions with the same implication. The "everybody does it" defense is inappropriate, and whether other firms skirt the canons of ethics is irrelevant here. Committee Counsel was successful in using improper solicitation efforts in this case, and thus, the dispute regarding their retention applications is ripe.

Committee Counsel, the proxies' votes would be cast to elect AF and EG as the Committee's legal counsel, and Committee Counsel would reward Dr. Liu in some capacity.

**B.     Dr. Liu's Solicitation of Creditors**

13.     Subsequent to his e-mail correspondence with AF on August 4, 2010, Dr. Liu began reaching out to contact the Asian creditors set forth in the Debtors' Top 30 List. *See, e.g.*, [HL 0330]. For example, on August 8, 2010, Dr. Liu e-mailed creditor Shanghai Hualin to ignite such creditor's interest, and to encourage the creditor to serve on the Committee. [HL 0233-34]. Based on a translation of this e-mail, Dr. Liu: (i) represented that assets and capital recovered by the Committee would solely be distributed to the Debtors' creditors, incorrectly asserting that U.S. legal advisors are not allowed to share in any such recovery; (ii) stated that if the creditor chose to attend the formation meeting of the Committee (the *"Committee Formation Meeting"*), he could arrange for U.S. counsel to accompany such creditor for free; and (iii) mentioned his previous work on the bankruptcy cases of eToys Inc. (where AF served as legal counsel to the creditors' committee) and Proliance (where EG serves as legal counsel to the creditors' committee). *See* Exhibit C, at p. 44 (translating [HL 0199]).

14.     Dr. Liu's "sales pitch" encourages creditors who have no background or knowledge of the United States bankruptcy process to participate by proxy in committee formation meetings by delegating their right to act to Dr. Liu or another nominee. Unbeknownst to the creditors, they are actually pawns in a scheme crafted earlier to solicit their proxies, appoint them to the Committee, and have their votes case in favor of AF and EG as counsel to the Committee.

15.     Moreover, Dr. Liu's encouragement for creditors to serve on the Committee is based on misrepresentations and incorrect statements regarding the Bankruptcy Code.

Specifically, Dr. Liu's solicitation e-mails assert that U.S. legal advisors *are not allowed to share in any recovery*. Had the solicited creditors been properly informed that the Committee's attorneys' fees would be paid from proceeds that may otherwise be paid to creditors, such creditors may have opted not to serve on the Committee (or, alternatively, have opted not to leave the selection of such professionals entirely to the discretion of their previously-unknown proxy holder). While this Court need not determine whether such creditors would have served on the Committee, it is important to note that the creditors' decisions to participate were predicated on incorrect information conveyed by Dr. Liu.

C.     **Dr. Liu's Assistance From Committee Counsel Regarding his Solicitation Efforts**

16.     When he encountered difficulty reaching a certain creditor, Committee Counsel assisted Dr. Liu in locating that creditor. *Id.* In particular, Dr. Liu asked AF to reach out to the Debtors' professionals or the Office of the United States Trustee to obtain the creditor's contact information. *Id.* AF replied that "[n]either the debtor or the US Trustee will assist any lawyer in this regard. It is possible that they may assist you, but they never want to assist lawyers." *Id.* AF then provided Dr. Liu with the contact information for the Debtors' counsel and the U.S. Trustee. [HL 0326]. This correspondence evidences the fact that AF: (i) was aware of Dr. Liu's solicitation; (ii) knew that Dr. Liu had no previous relationship with this Asian creditor; (iii) provided direct assistance to Dr. Liu in his solicitation efforts; and (iv) supported Dr. Liu in proceeding with contacting such parties. *See* Exhibit B, at p. 51, lines 2-5 (Dr. Liu testified that he had no knowledge or contact with Eastern prior to the Debtors' bankruptcy cases); p. 56, lines 15-18 (same); p. 70, lines 4-9 (same); and p. 83, lines 16-21 (same, and also testifying that Dr. Liu had no contact with Shanghai Hualin prior to the Debtors' bankruptcy cases either).

17.  AF also provided Dr. Liu with assistance in locating Asian creditors. *See, e.g.*, [HL 0317—0320] (AF located and provided a mailing address for a Chinese creditor).

18.  Additional correspondence between Dr. Liu and Committee Counsel provides further evidence of the plan to solicit proxies and elect Committee Counsel. On August 8, 2010, Dr. Liu sent an e-mail to AF stating that all of the efforts thus far are "part of the grand cultivation of a support base from Chinese exporters . . . who might recommend you as a pending committee [counsel][7] in the case of Universal Building." *See* Exhibit D, at [AF-UBP 0009]. Dr. Liu continued by stating:

> Before recommending you, I need some one and some groups to commend me to one or more of those prospective committee participants (forget my hours in this regard) . . . . I admire [EG]'s courage when [EG] called upon me the other day loudly saying 'I just want to make sure you are going to support me as a lead or co-counsel on this case . . . .' Clearly he is needed to be 'reeducated.'

*Id.* Among the conclusions that can be drawn from this e-mail are that: (i) Dr. Liu wrote directly to AF stating that he was "cultivating" creditors to vote for AF as counsel; (ii) Committee Counsel directly contacted Dr. Liu reiterating that they expect Dr. Liu's proxy holders to vote in favor of Committee Counsel at the Committee Formation Meeting; (iii) Dr. Liu expected something in return for his soliciting votes for Committee Counsel; (iv) AF understood more clearly than EG that his *quid pro quo* was required; and (v) EG thus needed to be "reeducated."

19.  As Dr. Liu continued to make contact with Asian creditors, he informed AF that it "may monitor when a formation date will be set up for this case . . . ." [HL 0323]. On August 9, 2010 (five days after the Petition Date and four days before the Committee Formation Date), Dr. Liu sent Committee Counsel an e-mail stating "[a]fter the mobilization work of yesterday and

---

[7]    Dr. Liu utilized the word "member" instead of "counsel," but it appears that he was referring to the retention of AF as counsel to the Committee (as AF did not hold a claim against the Debtors and could thus not be a member of the Committee).

this morning, I have secured the representation of No. 10 creditor . . . and the discussion with No. 7 creditor . . . will continue." [HL 0319]. In response, AF sent Dr. Liu an e-mail stating "Excellent[.] That is great[.] Thanks." *Id.*; *see also* <u>Exhibit B</u>, at p. 161, lines 3-14 (when asked how he interpreted this e-mail, Dr. Liu testified "[m]y understanding is – as a law firm also responding, is that saying, you did great work, you did hard work, **you got us a proxy . . .**") (emphasis added). As his solicitation progressed, Dr. Liu provided regular updates to Committee Counsel.

20. While Dr. Liu continued to solicit creditors, Committee Counsel was busy identifying and recruiting third parties to hold proxies to cast votes for the solicited Asian creditors (since Dr. Liu could only hold one proxy himself). Dr. Liu sent an e-mail to Committee Counsel on August 9, 2010 asking for "[a]ny reliable person who might hold a proxy for No. 10." [HL 0316]; *see also* <u>Exhibit B</u>, at p. 166, lines 2-16 (Dr. Liu testified that he asked Committee Counsel to locate a person to serve as proxy "who is knowledgeable [and] who is reliable"); p. 168, lines 6-17 (same). The word "reliable" suggests that Committee Counsel would locate a party to hold the proxy with the understanding that such party's role was to vote in favor of AF and EG for counsel to the Committee at the Committee Formation Meeting. *See* [HL 0315] (AF "will verify the reliability of reps candidates"). Ultimately, EG provided Dr. Liu with the name of a person to serve as proxy holder (Greg Urbanchuk), and as discussed *infra*, even provided the necessary legal documentation to assist with the proxy holder solicitation process.

21. Even though the proxies were to be used to elect counsel for the Committee, Dr. Liu and the other proxy holders never discussed the proposed selection of Committee Counsel with the creditors whose proxies they were voting, thus leaving any vote for legal

counsel to the discretion of the very proxy holders recruited by AF and/or EG. *See* <u>Exhibit B</u> at p. 85, lines 7-13 (proxy holder has discretion to vote for legal counsel of proxy holder's choice); p. 86, lines 9-13 (same); p. 86, lines 2-4 (never mentioned any law firm to the two creditors); p. 313, lines 14-19 (no discussion with creditors of any lawyers). Moreover, at least one of the creditors solicited by Dr. Liu had never been introduced to its proxy holder prior to the proxy being executed. [HL 0294].

22.     Committee Counsel's and Dr. Liu's efforts to gather proxies and dominate the counsel election also drove Committee Counsel's alignment with proposed financial advisors. *See, e.g.*, [HL 0358] (in an August 11, 2010 e-mail between Committee Counsel and Dr. Liu, EG asserted that it is "fine working with whoever, but shouldn't we here [sic] back from [a financial advisor] and see if they have another vote before we commit to any FA?").

**D.     Preparation for Committee Formation Meeting**

23.     As the Committee Formation Meeting approached, Committee Counsel put the finishing touches on the scheme to manipulate the Committee selection process and ensuing vote to select the Committee's professionals.

24.     As alluded to above, Committee Counsel provided Dr. Liu with legal documents, questionnaires [HL 0371], and proxy forms [HL 0313] to assist in the solicitation process. *See generally* [HL 0305—0314]. On August 9, 2010, in an e-mail chain involving Committee Counsel and Dr. Liu, EG made the following statements:

> (a)     "Please put together a draft of a proxy form with the name of the creditor."[8]
>
> (b)     "Ken please forward the form to Dr. Liu."[9]

---

[8]     This statement was directed to a paralegal at EG.

[9]     "Ken" refers to Kenneth L. Dorsney, an attorney at EG.

(c) "To ensure we have no issue with the UST – Dr. Liu should put Greg [Urbanchuk] in contact with the creditor so he can assert he has been in touch with the creditor if asked."

(d) "This is the minimum required to make sure the creditor gets on from our most recent experience."

[HL 0312].

25. In a separate e-mail from that same set of correspondence, EG made the following statements:

(a) "I am sure [AF] is fine with whoever we suggest as it is not easy, nor will it be with this one, to find proxy holders . . . ."

(b) ". . . call in a favor here without the proxy holder trying to get [appointed as] local [counsel]."

(c) "We just referred business over to Greg [Urbanchuk] and he is not trying to get on as the FA – **he knows the rules and will serve us well**" (emphasis added).

(d) "I know of no issue Arent has with Greg [Urbanchuk] and he is a sophisticated guy who is more than able to handle the proxy."

[HL 0311]. Also as part of that e-mail chain, AF sent one e-mail stating that the "UST does not want proxies and does not want to make it easy for proxies . . . [t]hey would rather not permit them at all," [HL 0310], and a second stating that "Greg [Urbanchuk] is good-or any one else that [EG] is comfortable with." [HL 0307].

26. Committee Counsel also sent an e-mail to Dr. Liu stating that the "UST will disqualify any proxy who has not communicated with the creditor. This can be via email, the details of how much time they spend talking together is none of the UST's business. We just need to make sure the proxy holder has the right information." [AF-UBP 0011].

27. As these e-mails demonstrate, Committee Counsel conspired to disguise its scheme from the U.S. Trustee by: (i) using multiple proxy holders to ensure that each creditor was represented by a different proxy holder at the Committee Formation Meeting, which would

disguise the fact that all these creditors were "in the bag" already to vote in favor of Committee Counsel; (ii) strategizing the optimal way to avoid any objections to their scheme; and (iii) attempting to make it appear that the creditors were the real parties in interest at the Committee Formation Meeting, when it was really the professionals tending to their own self-interests in seeking employment.

28.     While Committee Counsel and Dr. Liu appear to understand the ramifications of their action, Dr. Liu shirks it off, justifying his Machiavellian belief that their conduct is no different than anyone else's by specifically identifying lawyers' solicitation of creditors prior to the committee formation meeting, lawyers' use of other professionals to solicit on their behalf, and proxy holders' one-time appearance at the formation meeting – stating that serious problems exist with the process, and complaining that "the UST has to look itself into the mirror that the subsystem of selecting committee professionals itself has many pores in the first place." [HL 0306]; *see also* <u>Exhibit B</u>, at p. 205, line 14 through p. 209, line 15.

### E.     Committee Formation Meeting

29.     On August 13, 2010, the Office of the United States Trustee appointed the five-member Committee, which included Eastern as a member. *See* Docket No. 76.

30.     Dr. Liu, as proxy holder for one of the largest asserted claims, was instrumental in the ultimate selection of legal counsel to the Committee.  This was part of Dr. Liu's and Committee Counsel's strategy prior to the Committee Formation Meeting.  *See, e.g.,* e-mail correspondence dated August 12, 2010, wherein Dr. Liu stated "I'll hold the proxy [of the largest claimholder] to cheer everyone up."  [HL 0269]; *see also* <u>Exhibit B</u>, at p. 232, lines 16-23.

31.     Ultimately, with the support of Dr. Liu at the Committee Formation Meeting, AF was selected as lead counsel to the Committee and EG as co-counsel.

**F.   Undisclosed Legal Advice to Individual Creditors**

32.   Although Committee Counsel provided legal advice to individual creditors regarding their claims during the period between the Petition Date and the Committee Formation Meeting, they never disclosed these relationships to the Bankruptcy Court or other parties in interest until late September, 2010 – only after Dr. Liu produced discovery documents to the Debtors and after the Debtors deposed Dr. Liu on September 17, 2010 wherein Dr. Liu detailed these relationships. *See* <u>Exhibit B</u> at p. 78, line 19 through p. 79, line 15.

33.   In one instance, once Dr. Liu made contact with creditor Eastern, he notified AF that Eastern "has some legal issues with the debtors, and [he] need[ed] to speak to [AF] before 8:00 pm [that] evening, should [AF] consider worthwhile of pursuing this case," and that AF should "[t]reat this as an urgent matter." [HL 0289]. AF replied that it would call Dr. Liu as soon as possible. *Id.* Additionally, AF confirmed to Dr. Liu that it was "definitely interested in pursuing this case," and apologized for not calling Dr. Liu sooner as to Eastern's particular legal issues. [HL 0288]. The next day, Dr. Liu informed Eastern about potential administrative claims that it may hold under section 503(b)(9) of the Bankruptcy Code. [HL 0012]. This legal advice was provided by AF to Dr. Liu with the intent of relaying such information to Eastern. *See* <u>Exhibit B</u>, at p. 217, line 15 through p. 218, line 7 (Dr. Liu stated that AF advised him that goods received by the debtor within 20 days before the bankruptcy filing would be considered 503(b)(9) claims). Ultimately, Dr. Liu obtained Eastern's executed proxy. [HL 0268—0272].

34.   Obviously, since administrative claims are paid from unencumbered assets prior to general unsecured claims, this legal advice was directly adverse to the interests of the body of unsecured creditors as a whole.

35.     In a second instance, in connection with obtaining the executed proxy of creditor Shanghai Hualin, Dr. Liu requested advice from AF as to what could be done "to help" Shanghai Hualin with respect to its individual situation, noting that "getting a proxy is two way traffic." [HL 0302]; *see also* Exhibit B, at p. 214, line 19 through p. 215, line 14 (Shanghai Hualin informed Dr. Liu that if he wanted Shanghai Hualin to participate in the Committee Formation Meeting, it wanted individual help with two containers at the United States port). In response, AF informed Dr. Liu that Shanghai Hualin may be able to assert certain administrative claims and recommended that Shanghai Hualin contact the Debtors as to the postpetition delivery of certain product. *Id.* Dr. Liu then communicated this advice to Shanghai Hualin. Exhibit B, at p. 298, line 5 through p. 299, line 21.

36.     The next day, Dr. Liu received the executed proxy form of Shanghai Hualin that appointed Dr. Liu or Greg Urbanchuk as its proxy at the Committee Formation Meeting. [HL 0300—0301].

37.     As with Eastern, advice regarding Shanghai Hualin's potential administrative claim was directly adverse to the interests of the unsecured creditor body as a whole.

38.     Subsequent to the receipt of Shanghai Hualin's proxy form, Dr. Liu introduced the proxy, Greg Urbanchuk, to Shanghai Hualin for the purpose of facially complying with the requirements of the U.S. Trustee. *See* Exhibit B, at p. 258, line 16 through p. 259, line 21.

39.     At the same time as Dr. Liu represented to Shanghai Hualin that it would be represented at the Committee Formation Meeting, Dr. Liu also represented that he could assist Shanghai Hualin with issues regarding the acceptance of containers that already arrived or will be arriving in the United States and views on payment. *See* Exhibit C at p. 34 (translating [HL 0186]). Dr. Liu was concurrently working for Shanghai Hualin in an individual capacity by

seeking out a buyer for the product it had shipped to the United States. *Id.* at p. 33 (translating [HL 0181]).

40.    Similarly, to increase the likelihood that Eastern would be chosen by the U.S. Trustee as a member of the Committee, analysis was provided to Eastern as to the maximum amount of the claim it could assert in connection with its Committee membership questionnarie. *See* [HL 0099] ("I'm going through your initial documents...to weigh the feasibility of proving [Eastern] as the largest unsecured creditors [sic] with the combination of the cargos shipped before the debtors joint petition date and the unfinished goods unshipped at your warehouse in China").[10]    Additionally, Dr. Liu consulted with AF with respect to the particulars of Eastern's claim. *See* Exhibit B, at p. 216, line 5 through p. 218, line 7.    The inclusion of these additional amounts was indeed material since they resulted in a purported claim that would make Eastern the largest unsecured creditor relative to the Debtors' top thirty creditor list.

**G.    Committee Counsel Retention Applications and Declarations**

**(1)    AF Application and Declarations**

41.    On August 30, 2010, the Committee filed the AF Application.    Attached to the AF Application was the *Declaration of Andrew I. Silfen in Support of Application for an Order Authorizing Employment and Retention of Arent Fox LLP as Attorneys for the Official Committee of Unsecured Creditors Nunc Pro Tunc to August 13, 2010* (as defined above, the "*AF Initial Declaration*").    Among other things, the AF Initial Declaration states that "Dr. Liu was involved with this case from the Petition Date and also served as proxy for Eastern Accessories Corp. [("*Eastern*")]. . ."    *See* AF Initial Declaration at ¶ 11.    The AF Initial Declaration further provides that AF represents or has represented parties in a number of cases in

---

[10]    The Debtors indeed dispute the amount of Eastern's claim based on unshipped "inventory," some of which was produced without the approval of the Debtors.

which Dr. Liu and/or US-China Assets Management USA, LLC act in various capacities, including AF's representation of: (i) the Official Committee of Unsecured Creditors of Jazz Products, LLC (Case No. 09-33687 (RTL)) (D.N.J.); (ii) the Official Committee of Unsecured Creditors of NPPI Holdings, Inc. (Case No. 09-11547 (PJW)) (D. Del.); (iii) the Official Committee of Unsecured Creditors of International Home Fashions, Inc. (Case No. 08-10434 (GRH)) (W.D.N.C.); (iv) the Official Committee of Unsecured Creditors of Sababa Group, Inc. (Case No. 01-10975 (RDD)) (S.D.N.Y.); (v) the Official Committee of Unsecured Creditors of eTOYS DIRECT 1 *et al.* (Case No. 08-13412 (BLS)) (D. Del.); and (vi) various trade creditors in the cases of Shapes/Arch Holdings L.L.C. where US-China Assets Management USC, LLC serves as the U.S. representative of these same trade creditors. *Id.* At the same time as it makes these disclosures, AF represents that "Dr. Liu does not hold or represent any interest adverse to the Committee." *Id.* As discussed herein, however, Dr. Liu has represented, and seeks to continue to represent, creditors on an individual basis on a variety of case issues.

42. AF's declaration, however, does not disclose the e-mail AF sent to Dr. Liu on the Petition Date. Nor does AF's declaration disclose the manner in which Committee Counsel and Dr. Liu manipulated the Committee formation process by circumventing the rules and requirements set forth in the Bankruptcy Code, Bankruptcy Rules, and ABA Model Rules of Professional Conduct (the *"Model Rules"*) for their own personal gain, from Dr. Liu's solicitation and cold-contacting of creditors, to Dr. Liu obtaining proxies in support of AF, to AF providing legal advice to individual creditors prior to the Committee Formation Meeting.

43. On September 3, 2010, the Debtors filed their *Emergency Motion to (A) Compel Discovery in Connection with Application for an Order Authoring Employment and Retention of Arent Fox LLP as Attorneys for the Official Committee of Unsecured Creditors Nunc Pro Tunc*

*to August 13, 2010; and (B) Extend Deadline to Objection Thereto* (Docket No. 198) (the "*Discovery Motion*").

44.     Upon serving discovery requests, the Debtors received Dr. Liu's first document production on September 15, 2010, and the date of September 17, 2010 was agreed to for Dr. Liu's deposition.

45.     On September 13, 2010, six days after the hearing on the Discovery Motion (which disclosed the Debtors' intention to seek discovery from Dr. Liu) and in response thereto, AF filed its *First Supplemental Declaration of James M. Sullivan in Support of Application for an Order Authorizing Employment and Retention of Arent Fox LLP as Attorneys for the Official Committee of Unsecured Creditors Nunc Pro Tunc to August 13, 2010* (Docket No. 237) (the "*AF Supplemental Declaration*").     The AF Supplemental Declaration includes previously undisclosed connections with Dr. Liu, including AF's representation of: (i) the Official Committee of Unsecured Creditors of Designer License Holding Company, LLC, *et al.* (Case No. 09-17661 (JMP)) (S.D.N.Y.); and (ii) creditor Moonart International Inc. in the bankruptcy case of Barcalounger Corporation, *et al.* (Case No. 10-11637 (BLS)) (D. Del.).     *See* AF Supplemental Declaration at ¶ 3.

46.     The Debtors deposed Dr. Liu on September 17, 2010 (and a rough draft of the transcript was provided by the court reporter that same day).  The Debtors and the Committee agreed to extend certain objection deadlines including, among others, the deadline to object to the AF Application.  With the approval of the U.S. Trustee and this Court, the omnibus hearing on this matter was rescheduled for October 7, 2010.  Subsequent to the original objection deadline, and five days after Dr. Liu's deposition, AF filed its *Second Supplemental Declaration of Andrew I. Silfen in Support of Application for an Order Authorizing Employment and*

*Retention of Arent Fox LLP as Attorneys for the Official Committee of Unsecured Creditors Nunc Pro Tunc to August 13, 2010* (Docket No. 259) (the "*AF Second Supplemental Declaration*") – in response to the information previously concealed by AF and then later disclosed by Dr. Liu in his deposition. The AF Second Supplemental Declaration contains the following disclosure:

> During the post-petition period but before formation of the Committee, Arent Fox had contacts with two Chinese creditors through Dr. Haishan Liu of US-China Assets Management USA, LLC: Shanghai Hualian Hardware, Co., Ltd. ("SHH") and Eastern Accessories Corporation ("EAC"). These creditors had inquiries relating to the Debtors. EAC now sits as a member of the Committee; SHH is not a member of the Committee."

*See* AF Second Supplemental Declaration at ¶ 4.

47.     By agreement of the parties, the deadline to object to the AF Application is Thursday, September 30, 2010, at 5:00 p.m. Eastern time.

### (2)     EG Application and Declarations

48.     On August 24, 2010, the Committee filed the EG Application. Attached to the EG Application was the *Affidavit of Rafael X. Zahralddin-Aravena in Support of the Application for an Order Authorizing Employment and Retention of Elliott Greenleaf as Co-Counsel to the Official Committee of Unsecured Creditors Nunc Pro Tunc August 13, 2010* (the "*EG Initial Declaration*"). The EG Initial Declaration does not mention **any** connections to, or relationship with, Dr. Liu or US-China Assets Management USA, LLC.

49.     On September 15, 2010, after the filing of the Discovery Motion and upon the same date that Dr. Liu produced his first set of documents in discovery, EG filed its *Supplemental Affidavit of Rafael X. Zahralddin-Aravena in Support of the Application for an Order Authorizing Employment and Retention of Elliott Greenleaf as Co-Counsel to the Official Committee of Unsecured Creditors Nunc Pro Tunc August 13, 2010* (Docket No. 243) (the "*EG*

*Supplemental Declaration*"). The EG Supplemental Declaration discloses relationships with the following parties that were not previously disclosed: (i) Ernst & Young, Inc.; (ii) Wells Fargo; (iii) Verizon; and (iv) Borough of Darby, Pennsylvania. *See* EG Supplemental Declaration at ¶ 11. More importantly, the EG Supplemental Declaration also discloses multiple connections with Dr. Liu that were not previously disclosed, including EG's representation of: (i) creditor Bloominglands Co. LTD in the bankruptcy case of Meadowcraft, Inc., *et al.* (Case No. 09-10988 (BLS)) (D. Del.); (ii) creditor Globe Express LTD in the bankruptcy case of Barcalounger Corporation, *et al.* (Case No. 10-11637 (BLS)) (D. Del.); (iii) the Official Committee of Unsecured Creditors of NPPI Holdings, Inc. (Case No. 09-11547 (PJW)) (D. Del.); (iv) the Official Committee of Unsecured Creditors of eTOYS DIRECT 1 *et al.* (Case No. 08-13412 (BLS)) (D. Del.); and (v) the Official Committee of Unsecured Creditors of Proliance International, Inc., *et al.* (Case No. 09-12278 (CSS)) (D. Del.). *Id.* at ¶ 11.

50. On September 23, 2010, six days after Dr. Liu's deposition and one day after the AF Second Supplemental Declaration was filed, EG filed its *Second Supplemental Declaration of Rafael X. Zahralddin-Aravena in Support of Application for an Order Authorizing Employment and Retention of Elliott Greenleaf as Attorneys for the Official Committee of Unsecured Creditors Nunc Pro Tunc to August 13, 2010* (Docket No. 261) (the "*EG Second Supplemental Declaration*"). Among other additional disclosures made in the EG Second Supplemental Declaration, EG disclosed the following:

> During the post-petition period but before formation of the Committee, EG had contacts with two Chinese creditors through Dr. Haishan Liu of US-China Assets Management USA, LLC: Shanghai Hualian Hardware, Co., Ltd. ("SHH") and Eastern Accessories Corporation ("EAC"). These creditors had general inquiries relating to the Debtors['] bankruptcy cases and to the formation meeting. SHH had specific inquiries related to the appropriate process to accommodate attendance by a creditor who

was unable to attend in person due to the time and expense burden involved with travel to Delaware. SHH was introduced to Greg Urbanchuk of Asterion Consulting by EG because Asterion was not interested in pursuing the position of financial advisor for the Committee. EG provided a proxy form to Mr. Urbanchuk and SHH, the form of which had been initially discussed in 2008 with Mark Kenney of the United States Trustee prior to another unrelated formation meeting and had been discussed with various other lawyers in the United States Trustees Office during subsequent formation meetings. EG discussed with Dr. Haishan Liu and Mr. Urbanchuk the necessity of the creditor communicating directly with the proxy holder. EG had communicated to Dr. Haishan Liu in an email the necessity of moving quickly if a creditor was to utilize a proxy on account of the short time frame between the petition date and the formation meeting and the logistical difficulties of communicating with a foreign creditor in a different time zone. EG was not involved in any conversations between Mr. Urbanchuk and SHH regarding selection of any professionals for the Committee. EAC now sits as a member of the Committee; SHH is not a member of the Committee.

*See* EG Second Supplemental Declaration at ¶ 4.

51.    While the deadline to object to the EG Application was set for September 7, 2010, and EG filed a Certificate of No Objection relating to the EG Application on September 13, 2010, EG filed both the EG Supplemental Declaration and the EG Second Supplemental Declaration subsequently.    In light of the sequence of these events, the Debtors believe this Objection to EG's Application is timely.[11]

### H.    Status of Discovery and Document Requests

52.    The Debtors' initial requests for the production of documents requested that Dr. Liu produce all written communications (including e-mails) between Dr. Liu and AF during

---

[11]    The Debtors believe the Committee extended the deadline to object to the EG Application along with the AF Application. However, to the extent that such extension was not intended to encompass EG, the subsequent filing of the EG Supplemental Declaration and EG Second Supplemental Declaration addressing connections with Dr. Liu permits the Debtors to lodge this Objection subsequent to the filing of the Certificate of No Objection. The disinterestedness requirement is continuing, resulting in the ongoing jurisdiction of this Court to disqualify persons with a conflict of interest. *See, e.g., In re Amdura*, 121 B.R. 862, 869 (Bankr. D. Colo. 1990); *In re Roberts*, 75 B.R. 402, 407 (D. Utah 1987).

the period before the Committee Formation Date. However, to date, Dr. Liu has only produced

e-mails for the nine-day period between the Petition Date and the Committee Formation Date.

Both the Committee and Dr. Liu have objected to the production of any documents from prior to

the Petition Date, claiming that such e-mails are not relevant to this bankruptcy case.

Meanwhile, their solicitation scheme is hiding in plain sight. Given that the *quid pro quo*

scheme between Committee Counsel and Dr. Liu was crafted prior to the Petition Date and has

existed for many years (as reflected in the litany of cases involving Dr. Liu described in

Committee Counsel's retention declarations), the prepetition correspondence is unquestionably

relevant to demonstrating Committee Counsel's *modus operandi*.

53.     Nevertheless, given the gravity of the evidence produced thus far, the Debtors

have opted not to distract this Court with another motion to compel seeking the production of

these pre-Petition Date e-mails at this time. However, this Court is entitled to draw its own

conclusions from the refusal of the Committee and Dr. Liu to produce more than nine-days of

e-mails.

I.      **Previous Allegations of Solicitation in the United States Bankruptcy Court
        for the Southern District of Texas**

54.     This is not the first time that AF has been involved in solicitation and ethical

disputes. As discussed below, similar accusations arose in both *In re North Bay Hospital, Inc.*,

Case No. 05-32121 (Bankr. S.D. Tex.) and *In re TKO Sports Group USA Limited*, Case No. 05-

48509 (Bankr. S.D. Tex.), reflecting Committee Counsel's *modus operandi*.

        (1)     *In re North Bay Hospital*, **Case No. 05-32121**

55.     In *North Bay*, AF represented the creditors' committee, and the debtor objected to

AF's final fee application asserting, among other things, that: (i) AF's legal fees were more than

two times greater than the debtor's legal fees; (ii) AF unnecessarily had a total of 22

professionals (including seven partners, twelve associates, and three paralegals) bill to the case; and (iii) duplicative work was conducted by AF and the committee's local counsel. *See North Bay* Docket No. 544, dated November 1, 2006, a copy of which is attached hereto as Exhibit E. The debtor subsequently filed a motion to continue the hearing on AF's final fee application wherein it detailed the solicitation accusations against AF. *See North Bay* Docket No. 613, dated December 1, 2006, a copy of which is attached hereto as Exhibit F. To summarize that pleading, the debtor stated that Clear Thinking Group (a financial advisor) contacted a large creditor prior to the committee formation meeting and offered to serve as a proxy to such creditor *at no charge*, even though the financial advisor was based in New York and the case was in Texas.[12] The debtor asserted that the financial advisor then "dominated" the committee formation meeting, and AF was ultimately hired as counsel. One week after the committee was formed, the creditor who was cold-called by the financial advisor decided that he did not want to serve on the committee, which is not surprising in light of the fact that he never attended the formation meeting, likely did not know what serving on the committee would entail, and did not express an initial interest in serving on the committee. Although AF had a business relationship with Clear Thinking Group prior to the committee formation meeting, AF did not disclose this information in its initial affidavit accompanying its retention application.

56.    While multiple pleadings were filed regarding this motion and certain factual issues were disputed, AF ultimately agreed to a stipulation whereby it took a $62,656.70 reduction in its legal fees and expenses in settlement of the matter. *See North Bay* Docket No. 763, dated February 12, 2007, a copy of which is attached hereto as Exhibit G.

---

[12]    While a financial advisor contacting creditors on its own volition does not in-and-of-itself appear to implicate attorney ethics rules, a financial advisor contacting creditors at an attorney's behest or as part of a *quid pro quo* scheme (as was done by Committee Counsel in the Debtors' bankruptcy case) crosses the line.

57.    In *TKO*, AF represented the creditors' committee, and the debtor objected to AF's final fee application asserting, among other things, that: (i) the total legal fees of committee counsel were more than two times greater than the debtor's legal fees; (ii) AF unnecessarily had twelve attorneys and three paralegals bill to the case; (iii) the committee's lawyers billed over 800 hours while the debtor's billed less than 600 hours; (iv) Clear Thinking Group (the same financial advisor involved in the *North Bay* case) was not disclosed as a connection until April 2006 (over four months after AF's initial affidavit was filed) even though it was a client of AF and served as proxy holder for the chair of the creditors' committee; and (v) Clear Thinking Group served as a proxy holder for Chinese creditors with whom it had zero connections. *See TKO* Docket No. 342, dated October 10, 2006, a copy of which is attached hereto as <u>Exhibit H</u>. The debtor filed a supplemental objection to AF's final fee application on April 3, 2007, largely detailing AF's relationship and connections with Clear Thinking Group and attaching a deposition transcript of the financial advisor as an exhibit. The supplemental objection further asserted that the goal of AF's and Clear Thinking Group's relationship was for Clear Thinking Group to solicit the committee for AF, and then be rewarding on the back-end by serving as liquidating trustee (which explains its willingness to provide "free" service as a proxy holder to creditors in a state thousands of miles away from its office). The objection also stated that the financial advisor in question had been paid over $1 million in other cases involving AF.

58.    Multiple responses were filed to the debtor's motions, which were ultimately "unsealed" by the bankruptcy court pursuant to an order dated March 19, 2009. *See TKO* Docket No. 446, a copy of which is attached hereto as <u>Exhibit I</u>. For example, the financial advisor filed a response stating, among other things, that there is no prohibition against him serving as a proxy

holder because he is not an attorney. Although the financial advisor asserted that he voted in favor of another law firm at the formation meeting, the pleadings demonstrate that AF worked on a case with a non-attorney with whom it had a previous business relationship to solicit committee members for the benefit of a law firm, and also failed to disclose this information. *See TKO* Docket No. 412, dated April 5, 2007, a copy of which is attached hereto as <u>Exhibit J</u>. AF also filed responses to the debtor's objections, asserting that Bankruptcy Rule 2014 was not triggered by the financial advisor at the onset of the case, that the financial advisor never fell within any part of the definition of Bankruptcy Rule 2004 (including that he was not a "party in interest" even though he voted as proxy holder at the committee formation meeting and hoped to eventually serve as liquidating trustee), and that AF only revealed its relationship with the financial advisor in the interests of full disclosure. *See TKO* Docket No. 416, dated April 9, 2007, a copy of which is attached hereto as <u>Exhibit K</u>.

59.     After multiple pleadings were filed, the parties reached a settlement. *See TKO* Docket No. 429, dated July 12, 2007, a copy of which is attached hereto as <u>Exhibit L</u>. Based on a review of the stipulation, it appears that AF: (i) agreed to waive approximately $48,000 sought in its fee applications (which settlement would only be effective if payment was made on a certain timetable); plus (ii) agreed not to seek compensation for the approximately six-month period from February 2007 through the remainder of the case (apparently July 2007).

## OBJECTION

60.     Official committees of unsecured creditors are formed for the benefit of a debtor's general unsecured creditors, not to provide an avenue of abuse for law firms and their pawns to take advantage of innocent creditors for their own pecuniary gain. The concern of potential

abuse through proxy solicitation was well articulated in Footnote 8 of *ABC Automotive Products Corp.*:

> Interestingly, as our Court of Appeals noted in *In re Arkansas Company, Inc.*, 798 F.2d 645 (3rd Cir.1986), one of the abuses which the Bankruptcy Reform Act of 1978 was designed to eliminate was "attorney control of bankruptcy cases." *Id.* at 649. Discussing this issue, the Third Circuit stated:
>
> The legislative history makes clear that the 1978 Code was designed to eliminate the abuses and detrimental practices that had been found to prevail. Among such practices was the cronyism of the "bankruptcy ring" and attorney control of bankruptcy cases. In fact, the House Report noted that "[i]n practice ... the bankruptcy system operates more for the benefit of attorneys than for the benefit of creditors." H.R., No. 595, 95th Cong., 2d Sess. 92, reprinted in 1978 U.S.Code Cong. & Ad. News 5787, 5963, 6053.
>
> As detailed in the House Report, the official committee of unsecured creditors whose function was (and still is) to negotiate with the debtor in possession in the formulation of a plan was elected by the unsecured creditors, much as the trustee was elected in a liquidation case. Although the members of the committee are not compensated, the counsel to the creditors committee is paid, and, as described by the Report, "it is a lucrative position." "Thus, the Report continued, 'creditors' attorneys with proxies participate actively in the election of the members of the committee in order that they may be selected as counsel to the committee." *Id.* at 93, 1978 U.S.Code Cong. & Ad. News 6054. As in the case of the election of a trustee in liquidation proceedings, "those operating the system turn it to their own advantage." *Id.* at 92, 1978 U.S.Code Cong. & Ad. News 6053.

*In re ABC Automotive Products Corp.*, 210 B.R. 437, 443 (Bankr. E.D. Pa. 1997) (citing *In re Arkansas Company, Inc.*, 798 F.2d 645, 649-650 (3d Cir. 1986)). As discussed below, Committee Counsel's and Dr. Liu's solicitation approach implicated the ethical rules imposed by the Model Rules, the disinterestedness requirement for committee professionals as set forth in the Bankruptcy Code, and the mandatory disclosure requirements articulated in the Bankruptcy Rules. Accordingly, Committee Counsel should be disqualified from representing the Committee in the Debtors' bankruptcy cases.

**A.     Ethical Issues:  The Court Should Not Countenance Subversion of the Model Rules of Professional Conduct**

61.     This Court should deny the Committee Counsel Applications on account of Committee Counsel's subversion of the applicable rules of professional conduct. *See, e.g., United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. N.J. 1980) (holding that courts have the "inherent authority to supervise the professional conduct of attorneys" appearing before them); *Yardis Corp. v. Levine*, 1991 U.S. Dist. LEXIS 357 (E.D. Pa. Jan. 11, 1991) (same); *United States v. Universal Rehabilitation Servs. (PA)*, 1994 U.S. Dist. LEXIS 10421 (E.D. Pa. July 29, 1994) (holding that the "court has the power and the duty to enforce professional standards").

62.     As set forth in the Delaware Rules, "[a] lawyer shall not by in-person, live telephone or real-time electronic contact solicit professional employment from a prospective client when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain, unless the person contacted: (1) is a lawyer; or (2) has a family, close personal, or prior professional relationship with the lawyer."   Rule 7.3 of the Delaware Lawyers' Rules of Professional Conduct; *see also* Model Rule 7.3 (identical language); Rule 7.3 of the New York Rules of Professional Conduct ("[a] lawyer shall not engage in solicitation by in-person or telephone contact, or by real-time or interactive computer-accessed communication unless the recipient is a close friend, relative, former client or existing client . . .").  The Annotation to Model Rule 7.3 further provides that:

> Lawyers may not use other people to solicit for them, and Rule 7.3 is sometimes invoked along with either Rule 7.2(b) (prohibiting paid recommendations) or Rule 8.4 (prohibiting use of third persons to violate Rules) to prohibit the practice. *See, e.g., In re O'Keefe*, 877 So. 2d 79 (La. 2004) (lawyer disbarred for paying "runners" to find and refer personal injury cases); *Miss. Bar v. Turnage*, 919 So. 2d 36 (Miss. 2005) (lawyer suspended for hiring former insurance salesperson to solicit clients for potential class suit against insurer); Md. Ethics Op. 98-30 (1998) (lawyer may not have bail bondsman pass out bondsman's business cards with

lawyer's contact information printed on back); *see also Cincinnati Bar Ass'n v. Rinderknecht*, 679 N.E.2d 669 (Ohio 1997) (lawyer indefinitely suspended for setting up direct marketing service to solicit accident victims as clients for himself and chiropractor; decided under Ohio Code); *cf. Crook v. State*, No. 08-02-00382-CR, 2005 WL 1539187 (Tex. App. June 30, 2005) (lawyer convicted of felony barratry for hiring chiropractor's assistant to solicit auto accident victims; court invokes Rules 7.3 and 8.4 in analyzing offense).

*See* Annotations to ABA-AMRPC Rule 7.3, a copy of which is attached hereto as <u>Exhibit M</u>. And Model Rule 8.4 states that "[i]t is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, *or do so through the acts of another . . . .*" ABN-AMRPC Rule 8.4(a) (emphasis added).

63.    Commentators also recognize the impropriety of solicitation under certain circumstances by prospective committee professionals. *See, e.g.,* 21-Nov Am. Bankr. Inst. J. 12, *Solicitation of Clients: Are There Any Guidelines?*" A copy of this article is attached hereto as <u>Exhibit N</u>.

64.    Given the facts described in detail above, the ultimate goal of the arrangement between Committee Counsel and Dr. Liu was for Dr. Liu to obtain proxies for Asian creditors, and then vote such proxies in favor of Committee Counsel at the Committee Formation Meeting. *See, e.g.,* [AF-UBP 0009] (in an August 8, 2010 e-mail to AF, Dr. Liu stated "Counsel Schuyler and Rafeal desire me to get certain support from Asian Chinese exporters . . ."). As part of their *quid pro quo* arrangement, the proxies solicited by Dr. Liu would be cast as votes in favor of the law firm in exchange for various consideration.

65.    Accordingly, Committee Counsel violated the Model Rules by utilizing a non-attorney (Dr. Liu) as an intermediary to solicit creditors on behalf of Committee Counsel, as evidenced above, with Committee Counsel's assistance.

**B.    Disinterestedness:  Committee Counsel is Not Disinterested**

66.    Although section 1103(b) of the Bankruptcy Code states that the relevant standard

for employment of committee professionals is that "[a]n attorney or accountant employed to

represent a committee . . . may not, while employed by such committee, represent any other

entity having an adverse interest in connection with the case," section 328(c) of the Bankruptcy

Code still requires that committee professionals be "disinterested" in order to be compensated.

11 U.S.C. § 1103(b).  Section 328 of the Bankruptcy Code provides:

> the court may deny allowance of compensation for services and
> reimbursement of expenses of a professional person employed
> under section 327 or 1103 of this title if, at any time during such
> professional person's employment . . . such person is not a
> disinterested person, or represents or holds an interest adverse to
> the interest of the estate with respect to the matter on which such
> professional person is employed.

11 U.S.C. § 328(c).

67.    Bankruptcy treatises recognize the application of the broader "disinterested"

standard to committee professionals:

> Because section 1103(b) does not require a professional
> representing a committee to be a disinterested person or not to hold
> an interest adverse to the estate, a professional that holds an
> adverse interest or not qualifying as a disinterested person is not
> per se precluded from representing a committee. *However, section
> 328(c) of the Code empowers the court to deny compensation to
> any professional who holds an interest adverse to the estate or who
> is not disinterested.*"

7 COLLIER ON BANKRUPTCY ¶ 1103.04[1] (Alan N. Resnick & Henry J. Somme reds., 16th ed.)

(emphasis added).

68.    Committee Counsel has a long-established relationship with Dr. Liu that will

preclude them from remaining "disinterested" in these bankruptcy cases.  Because of their *quid

pro quo* arrangement, a conflict of loyalties exists, given the solicitation arrangement and other

connections described above. This presents a conflict of interest and a balancing act that flies in the face of Committee Counsel's purported disinterestedness.

69.     As evidenced by the documents produced in the discovery process, Committee Counsel also fails to meet the disinterestedness standard because Committee Counsel provided legal advice to multiple individual creditors, one of which was appointed to the Committee (and one of which was not), prior to the Committee Formation Meeting. Importantly, Committee Counsel's advice to the two individual creditors (Eastern and Shanghai Hualin) was directly adverse to the interests of the body of unsecured creditors as a whole, since administrative claims are paid in full from unencumbered assets prior to unsecured claims, thus reducing the total amount of money to be distributed to the unsecured creditor pool.

70.     Indeed, Committee Counsel could not now take a position adverse to the Asian creditors (or similarly situated administrative claimants), given the individual legal advice they provided. Moreover, Committee Counsel has divided loyalties to the Asian creditors that were solicited in light of the fact that Dr. Liu had cultivated a relationship that may pay him dividends in the future (and even if not, with creditors with whom Dr. Liu has a relationship), since any such adverse position may ultimately upset Dr. Liu, and thereby hinder Committee Counsel's ability to utilize him in future solicitation efforts. Accordingly, Committee Counsel's representation of the Committee, their relationship with Dr. Liu in connection with Committee solicitation efforts, and their advice to individual creditors in connection with this bankruptcy case prevent Committee Counsel from being disinterested.

## C. Disclosure: Committee Counsel Failed to Adequately Disclose

71.     Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*) provides that a professional seeking to be employed pursuant to section 1103 of the Bankruptcy Code must disclose certain relationships:

> The applications shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bank. P. 2014(a).  Under Delaware Bankruptcy Local Rule 2014-1(a), the duty of disclosure is a continuing duty:  "[p]romptly after learning any additional material information relating to such employment (such as potential or actual conflicts of interest), the professional employed or to be employed shall file and serve a supplemental affidavit setting forth the additional information."  Del. Bank. LR 2014-1(a).

72.     Disclosure "goes to the heart of the integrity of the bankruptcy system." *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005) (quoting *In re B.E.S. Concrete Prods., Inc.*, 93 B.R. 228, 236 (Bankr. E.D. Cal. 1988)).  In *Enron*, the court observed that the "purpose of Rule 2014(a) is to provide the court and the United States trustee with information to determine whether the professional's employment is in the best interests of the estate." *Exco Resources, Inc. v. Milbank, Tweed, Hadley & McCloy LLP, et al. (In re Enron Corp.)*, No. 02 Civ. 5638 (BSJ), 2003 WL 223455, at *4 (S.D.N.Y. Feb. 3, 2003).  For that reason, the duty of disclosure is not merely critical, it is sacrosanct. *In re eToys*, 331 B.R. at 189.

73.     Significantly, the professional must disclose all connections; it may not pick and choose which connections to disclose and which to ignore as unimportant or trivial. *In re Jore Corporation*, 298 B.R. 703, 726 (Bankr. D. Mont. 2003).  The reason is simple: "[t]he decision as to what facts may be relevant should not be left up to the professional, 'whose judgment may

be clouded by the benefits of potential employment.'" *In re Fibermark, Inc.*, 2006 WL 723495, at *8 (Bankr. D. Vt. March 11, 2006) (quoting *In re Lee*, 94 B.R. 172, 177 (Bankr. C.D. Cal. 1988)). As noted by the Third Circuit Court of Appeals, the professional may not leave the court or other parties in interest to search the record for such relationships or otherwise to ferret them out. *In re BH & P, Inc.*, 949 F.2d 1300, 1317-18 (3d Cir. 1991).

74.     Thus, even if the professional to be retained believes a potentially-disclosable matter is not "adverse," the law requires full disclosure so that the Court, U.S. Trustee, and parties to the bankruptcy case may thoroughly vet the issues and relationships.

75.     As a result, "[f]ailure to meet the requirements of Rule 2014(a) is enough by itself to disqualify an attorney and deny compensation even if no conflict of interest exists . . . if an attorney does not disclose a conflict arising after employment has been allowed, the court must set aside the employment and disgorge any compensation granted during the period the conflict existed." *In re Tinley Plaza Associates, L.P.*, 142 B.R. 272, 278 (Bankr. N.D. Ill. 1992); *In re Hot Roof, Inc.*, 205 B.R. 1000, 1003-04 (B.A.P. 1st Cir. 1997) (professional who fails to adequately disclose prior representations from the start should expect denial of compensation and disgorgement).

76.     It was only after the Debtors and the U.S. Trustee indicated their intent to object and after discovery was pursued that AF and EG disclosed additional connections with Dr. Liu for the first time, even though such connections were known by Committee Counsel well before the filing of the Committee Counsel Applications. *See* AF Supplemental Declaration at ¶ 3 and EG Supplemental Declaration at ¶ 11. And it was not until the week *after* the September 17, 2010 deposition of Dr. Liu (almost two months after the Petition Date) that Committee Counsel disclosed its discussions with, and representations of, certain of the Debtors' creditors during the

period between the Petition Date and Committee Formation Date, undoubtedly as a result of the Debtors' discovery. *See* AF Second Supplemental Declaration at ¶ 4 and EG Second Supplemental Declaration at ¶ 4.

77.     Reactionary supplemental declarations, after proposed professionals' disclosures have been discovered by other parties, do not provide an end-around to the disclosure requirements set forth in the Bankruptcy Code. The disclosure process is meant to be full, frank, and timely; it is not designed to be used as a self-defense mechanism in defense of a retention objection. Committee Counsel was aware of all of its connections well before the Committee Counsel Applications were filed, yet consciously chose to avoid disclosing such relationships since they reflect the solicitation scheme perpetuated by Committee Counsel.

78.     Accordingly, in and of itself, Committee Counsel's concealment and tardy disclosure of potentially disqualifying relationships warrants denial of the Committee Counsel Applications.

WHEREFORE, the Debtors respectfully request that this Court enter an order denying the Committee Counsel Applications, and for such other and further relief as is just and proper.

Dated: September 30, 2010

SAUL EWING LLP

Mark Minuti (DE Bar No. 2659)
Teresa K.D. Currier (DE Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19899
Telephone: (302) 421-6840
Facsimile: (302) 421-6813

-and-

K&L GATES LLP
Harley J. Goldstein
70 West Madison Street, Suite 3100
Chicago, Illinois 60602
Telephone: (312) 372-1121
Facsimile: (312) 827-8000

*Co-Counsel for the Debtors and Debtors in Possession*