**Exhibit B**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 ) Case No. 10-12453 (MFW) |
| UNIVERSAL BUILDING PRODUCTS, INC., et al., | ) Jointly Administered ) |

DEPOSITION OF DR. HAISHAN LIU
New York, New York
Friday, September 17, 2010

Reported by:
LYNN VAN DEN HENDE
RPR, CSR, RMR, CRR, CLR
JOB NO: 19953

**2**

<pre>
                    September 17, 2010
                    9:42 a.m.


        Deposition of DR. HAISHAN LIU, held at
   the offices of K&L Gates LLP, 599 Lexington
   Avenue, New York, New York, pursuant to
   Subpoena, before Lynn Van Den Hende, a
   Registered Professional Reporter, Certified
   Shorthand Reporter, Registered Merit
   Reporter, Certified Realtime Reporter,
   Certified LiveNote Reporter and Notary
   Public within and for the State of New York.
</pre>

**3**

A P P E A R A N C E S:
FOR THE DEBTORS:
   K&L GATES, LLP
   BY: HARLEY J. GOLDSTEIN, ESQ.
   BY: DAWN L. JOHNSON, ESQ.
   70 West Madison Street
   Chicago, Illinois 60602-4207
   312-372-1121
   harley.goldstein@klgates.com
   dawn.johnson@klgates.com


FOR WITNESS, DR. HAISHAN LIU:

   RAVERT, PLLC
   BY: GARY O. RAVERT, ESQ.
   116 West 23rd Street, 5th Fl.
   New York, New York 10011
   646-961-4770
   gravert@ravertpllc.com

FOR COMMITTEE OF UNSECURED CREDITORS:

   ARENT FOX, LLP
   BY: CAROLINE TURNER ENGLISH, ESQ.
   1050 Connecticut Avenue, NW
   Washington, DC 20036-5339
   202-857-6000
   english.caroline@arentfox.com


FOR CREDITORS COMMITTEE:

   ELLIOTT GREENLEAF, PC
   BY: NEIL R. LAPINSKI, ESQ.
   1105 Market Street, Suite 1700,
   P.O. Box 2327
   Wilmington, Delaware 19801
   302-384-9400
   nrl@elliottgreenleaf.com

**4**

H. LIU

A P P E A R A N C E S:
FOR U.S. DEPARTMENT OF JUSTICE:
(Telephonically present.)

   U.S. DEPARTMENT OF JUSTICE
   OFFICE OF THE U.S. TRUSTEE
   BY: RICHARD SCHEPACARTER, ESQ.
   844 King Street, Suite 2207
   Wilmington, Delaware 19801
   302-573-6540
   richard.schepacarter@usdoj.gov

**5**

H. LIU

DR. HAISHAN LIU,

   called as a witness, having been duly

   sworn by a Notary Public, was examined

   and testified as follows:

EXAMINATION

BY MR. GOLDSTEIN:

   Q.  Dr. Liu, my name is Harley Goldstein,
as you know.

      Thanks for coming. I appreciate the
time you've made for this.

      I guess as a preliminary matter I'd
like to ask you if you've ever been deposed
before?

   A.  Yes.

   Q.  So you are familiar with the process
and that you should answer with yes or no, rather
than shaking your head or nodding or using
"uh-huh" or a similar sound?

   A.  I remember once. So I am not familiar
with deposition. Usually I depose the other
side.

   Q.  Understood. Then please just be savvy
to the fact that the court reporter has to record
everything you say. So that shaking of your head

H. LIU

1  
2  or nodding or a sound like "uh-huh" won't be  
3  recorded well.  
4  So I would ask that you answer  
5  questions with a yes or no or whatever other  
6  answer is requested.  
7  A.  Yes.  
8  Q.  Thank you.  
9  And if you don't understand a question  
10  that I ask, I ask you to tell me right away.  
11  If you don't tell me, then I'm going  
12  to work with the assumption that you do  
13  understand the question.  
14  A.  Yes.  
15  Q.  And I'll try and talk as slowly as I  
16  can.  
17  A.  Thank you.  
18  Q.  All right. And let the record reflect  
19  that the deposition of Dr. Liu is being taken  
20  pursuant to a subpoena previously served at a  
21  time that was agreed on mutually.  
22  Dr. Liu, I'm just going to start with  
23  some background, so that I can understand your  
24  education and your work experience.  
25  If you could just start by telling me  

H. LIU

1  
2  what your education consists of?  
3  A.  I graduate in Shanghai University,  
4  formerly called Fudan, F-u-d-a-n, University  
5  branch.  
6  I -- after graduate in 1983 I went to  
7  East China University of Politics & Law and  
8  become a lecturer.  
9  Q.  I'm sorry, what was that?  
10  A.  East China University of Politics &  
11  Law in Shanghai. I was a lecturer until 1987.  
12  Then I come here to pursue my Ph.D.  
13  degree at New School University on Fifth Avenue.  
14  And I took some courses at NYU Law  
15  School.  
16  Q.  And which degrees did those result in?  
17  A.  In Shanghai it was Bachelor in Law.  
18  At New School I earned Ph.D.  
19  Q.  What was the subject matter of the  
20  Ph.D. at the New School?  
21  A.  I come here with -- with two  
22  objective. One is urban study, meaning China  
23  will transform from royal society to urban  
24  society.  
25  And the second part, I wanted to learn  

H. LIU

1  
2  how America legal system works; so law by law and  
3  not law by one person.  
4  Q.  With regard to your Shanghai  
5  education, what profession does the Bachelor in  
6  Law permit you to practice?  
7  A.  I don't practice law in China. I was  
8  a lecturer.  
9  And at the time actually as a study,  
10  specialty, first is politics; second is  
11  sociology.  
12  However, in China, the government gave  
13  the degree. They gave you whichever degree they  
14  want to.  
15  So we -- as a first generation, after  
16  revolution, we are first generation of college  
17  graduates after revolution. So they give us  
18  Bachelor in Law degree.  
19  Q.  What degree is required in China in  
20  order to practice law?  
21  A.  These days you have to do -- finish  
22  four years and pass by exam and get one year  
23  practice.  
24  Q.  And you are not licensed to practice  
25  law?  

H. LIU

1  
2  A.  I come before that new law. I come  
3  here in 1987.  
4  At that time China probably has no law  
5  firm, no private law firm yet, back then, before  
6  1987.  
7  Q.  I understand.  
8  Does China only have one type of  
9  lawyer, or is it like the British system where  
10  you have barristers and solicitors and different  
11  degrees of lawyers?  
12  A.  I'm not quite familiar with the  
13  information you're asking for these days because  
14  I come here pretty long ago.  
15  Q.  What about as of 1987, when you came  
16  here?  
17  A.  There's no such kind of division.  
18  China has their own laws.  
19  When I was there, constitution is the  
20  mother law, is everything, and that law  
21  everything; even the divorce, marriage included  
22  in constitution.  
23  Nowadays I know there are hundreds of  
24  branches of law.  
25  Q.  So in 1987 who was eligible to be a  

DAVID FELDMAN WORLDWIDE, INC.  
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

H. LIU

lawyer or an advocate in China?

   A.  Government that dictates you.

   Q.  **People appointed by the government?**

   A.  And even the people without law degree.

   Q.  **So you were permitted to teach law, but not practice law?**

   A.  At that time there's no -- no lawyer, private lawyer, in China.

   And as a teacher you're not allowed to practice law in the first place, back then.

   These days, yes.

   Q.  **I understand. Sounds like it's come a long way.**

   A.  That's correct. China getting closer to U.S. system.

   Q.  **Why don't we go through your professional experience, what your first job was, and from there your other jobs?**

   A.  I graduate in 1987 -- oh, no, 1991. After 1987, four years; so, yes, 1991.

   And I established my own company. I didn't looking for job.

   Q.  **In 1987?**

H. LIU

   A.  1991.

   Q.  **1991. Sorry.**

   And what company was that?

   A.  H&H Business Express, Inc.

   That's photographic distribution company, photo supply.

   Q.  **And what year did you do that until?**

   A.  Still today.

   Q.  **Still today?**

   A.  Yeah. That's my main business. And I'm authorized Fuji distributor.

   Q.  **Repeat that last line. I'm sorry.**

   A.  I'm authorized Fuji distributor in this country.

   Q.  **What other employment or companies do you have?**

   A.  No, I am not employed by any other company. I always on my own and learn capitalism.

   Q.  **What is U.S. China Assets Management USA, LLC?**

   A.  That's company -- is a business consultation, helping Chinese exporters to collect unpaid bills by U.S. importers and

H. LIU

providing -- you know, as business expense I amassed in the past more than 20 years -- accumulated business experiences to educate Chinese exporters how to prevent the debt from occurring.

   We call it safe export education.

   Q.  **And what is your role with U.S. China Assets Management?**

   A.  I'm a managing director.

   Q.  **Does U.S. China Assets Management have other employees?**

   A.  My wife is owner. No employee, no other employees.

   Q.  **And no officers or directors other than you or your wife?**

   A.  We have -- when we establish, we have a third party. And third party resigned.

   Q.  **A what? I'm sorry?**

   A.  When we established the company, we have a third party as partner, third person as a partner. That partner was resigned.

   Q.  **And you started the U.S. China Assets Management company?**

   A.  Yes.

H. LIU

   Q.  **When did you start it?**

   A.  To my best knowledge, should be 2005.

   Q.  **And when you started the company, what was your intent of the type of business that the company would partake in?**

   A.  I intended to help Chinese exporters to protect their rights and I -- because I heard a lot of Chinese exporters ship a lot of things to United States.

   If U.S. importer, they don't want to pay them, they have it difficult to collect.

   Because they're telling me -- they told me U.S. lawyers charge by hour rate. After they lost the goods already, they don't want to pay additional fees to lawyer hour rate.

   And I'm thinking if somebody, some organization can help them with contingent basis service, they may get some help; meaning lawyers do the work first, after get a successful recovery, they have some percentage.

   Q.  **Because the Chinese vendors don't want to throw good money after bad, in essence?**

   A.  Thank you for that explanation.

   Q.  **I'm asking you.**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

**H. LIU**

1   A.  Yes.
2   Q.  And from 2005 until today you have
3   been with this company, with U.S. China Assets
4   Management?
5   A.  Yes.
6   Q.  You said that U.S. China Assets
7   Management is paid on a contingency from creditor
8   recoveries essentially, right?
9   A.  Yes.
10  Q.  What other sources of revenue does
11  U.S. China Assets Management have?
12  A.  Translation for certain committee
13  cases, translation service for certain committee
14  cases in the bankruptcy proceedings.
15  Q.  And are the only --
16  A.  Also, if I help Chinese exporters U.S.
17  representative basis, if there's a successful
18  recovery, we have percentage on a contingent
19  basis.
20  Q.  And those are the only sources of
21  revenue?
22      It's not possible that Chinese
23  creditors sometimes pay you a flat fee, for
24  example, or a consulting fee?

**H. LIU**

1   A.  Consulting fee, yes.
2       If they are waiting to --
3   separately -- with other cases, if they wants me
4   to advise them how to import things, no
5   dedication happens, just a normal export process.
6       And if they ask me to give them
7   business advice, how to make safe export, and
8   they ask me to help them, yes, sometimes they
9   will give me a small -- very small fee.
10      (Liu Exhibit 1, Business card of Dr.
11  Haishan Liu, marked for identification.)
12  Q.  We're going to pass around what's
13  marked as Liu Exhibit 1.
14      I'm new to this. I apologize.
15  MR. SCHEPACARTER: Harley, it's
16  Richard Schepacarter. Can you identify what
17  Exhibit 1 is.
18  MR. GOLDSTEIN: Yes, I'll get into
19  that in a second, Rich.
20  MR. SCHEPACARTER: All right, cool.
21  Thanks.
22  MR. RAVERT: Just let the record
23  reflect that there's a pen mark on this to
24  change the address, that this address is --

**H. LIU**

1   THE WITNESS: Is current.
2   MR. RAVERT: -- is the current
3   address.
4       And what does that say?
5   THE WITNESS: 33-63 55th Street.
6   MR. RAVERT: Okay.
7   THE WITNESS: Woodside, New York, NY,
8   11372.
9   MR. RAVERT: And without the pen mark
10  what does it say?
11  THE WITNESS: Before is 33-65 55th
12  Street.
13  MR. RAVERT: And that's incorrect?
14  THE WITNESS: When established, I have
15  two address.
16      And right now, with economy going
17  down, I only have one space. That's why. I
18  want to save the money, so I change that.
19  BY MR. GOLDSTEIN:
20  Q.  Thank you.
21      Mr. Liu, the exhibit that I've just
22  shown you that's labeled Liu 1 is the business
23  card of yours that you handed to me recently,
24  correct?

**H. LIU**

1   A.  Yes.
2   MR. GOLDSTEIN: Did you get that,
3   Rich?
4   MR. SCHEPACARTER: Yeah, I understand
5   what that is. I don't even know if I have
6   it, but I can get it. That's not a problem.
7   MR. GOLDSTEIN: Yes, we can send you a
8   copy.
9   MR. SCHEPACARTER: I think I'm
10  generally familiar with it.
11  BY MR. GOLDSTEIN:
12  Q.  Dr. Liu, is this the only business
13  card that you use?
14  A.  For this company, yes.
15  Q.  So your other business card would only
16  be for the H&H Business Express Company?
17  A.  That's correct.
18  Q.  The business card, after listing your
19  name, lists the term "initiator," is that
20  correct?
21  A.  Yes.
22  Q.  Can you explain to me what an
23  "initiator" is?
24  A.  Means founder.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

H. LIU

2 Q. I'm sorry?
3 A. Founder.
4 Q. The founder of the company?
5 A. Yeah. Like starter.
6 Q. I understand.
7 Other than these two companies, have
8 you had a relationship with any other company
9 subsequent to 1987 where you derived some form of
10 revenue from?
11 A. Can you rephrase your question a
12 little bit simple and straight.
13 Q. Has any other company paid you since
14 1987?
15 A. Yes.
16 Q. In an employee capacity?
17 A. No.
18 Q. In what capacity?
19 A. Like a set -- I will give example,
20 debtor collection case.
21 If we have a successful rate -- since
22 I'm not lawyer myself, I refer the case to
23 different law firms.
24 If that law firm willing to accept the
25 case on contingency, and then if successful, and

H. LIU

2 then I have income from that recoveries.
3 Q. I understand. Have you had any other
4 form of affiliation with any other company, other
5 than these two companies?
6 A. No.
7 Q. Dr. Liu, I take it you are familiar
8 with the law firm Arent Fox?
9 A. Yes.
10 Q. When did you first meet them?
11 A. Likely in 2008, 2-0-0-8.
12 Q. And who did you meet there?
13 A. I think first person I met is Schuyler
14 Carroll.
15 S-c-h-u-y-l-e-r. Last name, always
16 difficult because he -- C-a-r-r-o-l-l.
17 MS. ENGLISH: Yes, that's right,
18 C-a-r-r-o-l-l.
19 THE WITNESS: And I think -- yeah, I
20 think I first met him, yeah.
21 BY MR. GOLDSTEIN:
22 Q. And how did you meet him?
23 A. Probably I went to Delaware. And he
24 saw me, and he asked me -- then asked me, like
25 many other law firms, asked me, will you visit my

H. LIU

2 law firm. Possibly we met that way.
3 Q. And what did you say?
4 A. I'm always courtesy. Yeah, I say, if
5 I have time; yes, if I have time.
6 Q. And when was the next time after that
7 that you spoke with him?
8 A. I do not recall.
9 Q. About how many times have you spoken
10 with him or met with him?
11 A. Many times.
12 Q. "Many" as in hundreds?
13 A. I cannot be that accurate. I don't
14 count the times. Since we working on same cases,
15 we speak often.
16 Q. Often?
17 A. Yeah.
18 Q. Often.
19 Who else at Arent Fox have you met?
20 A. Lawyers who either working on the
21 committee cases.
22 Q. Just lawyers.
23 A. Okay.
24 At my best. Maybe I omit somebody,
25 okay. I don't know. They have about 300. I

H. LIU

2 only have small group lawyer on bankruptcy I may
3 know.
4 I'm thinking Sullivan James; George
5 Angelich.
6 MS. ENGLISH: George Angelich,
7 A-n-g-e-l-i-c-h.
8 THE WITNESS: Let me see, lawyers over
9 there.
10 Arnold, Arnold.
11 MS. ENGLISH: Ronni?
12 THE WITNESS: Ronni.
13 MS. ENGLISH: R-o-n-n-i, Arnold.
14 THE WITNESS: She was on one of those
15 case, yeah.
16 Other lawyers, maybe assistants to
17 them. Those are key lawyers working on
18 the -- like cases. They have many assistant
19 lawyers.
20 I heard his name. I saw the e-mail.
21 Maybe I met in person; maybe, you know, I
22 never met.
23 BY MR. GOLDSTEIN:
24 Q. But these four lawyers are your
25 primary contacts at Arent Fox?

6 (Pages 18 to 21)

H. LIU

A. Yes.

Q. And those four lawyers are lawyers that you speak with frequently?

A. Only on cases. If we have cases, we speak.

Q. I understand.

Have you ever spoken to or met an attorney by the name of Andrew Silfen.

A. This lawyer name on one of the case; I do not remember which case.

Speak to him? I don't recall.

Q. What other law firms do you have relationships with?

A. I have connection with -- contacts with other law firms because they ask me to -- to -- I ask them to do the collection cases.

Lowenstein Sandler, and Pachulski. Help me.

Q. P-a-c-h-u-l-s-k-i, I believe.

A. It's UBP acquisition counsel; counsel for UBP Acquisition, Inc. in this case.

Vectrix -- let me see the lawyer name. His name called Richard Beck, B-e-c-k, on Vectrix case, V-e-c-t-r-i-x. On Vectrix cases he's the

H. LIU

lead counsel.

I have -- with Jaffe Law in Chicago. I think it's J-a-f-f-e.

MR. RAVERT: Jaffee Law.

THE WITNESS: I have to think.

(Pause in the record.)

THE WITNESS: Recently we have a new case that was filed.

I have -- the contact is called the Neil Wolf, for Lane Punch case, L-a-n-e P-u-n-c-h, bankruptcy case.

Committee just formed.

His law firm I think is called Butler -- Butler Rubin; yeah, I guess that's the name. We just started.

Also Hodgson. Let me try to spell to you, H-o-d-g-e-s-o-n, Russ. Hodgson Russ, R-u-s-s.

The counsel is Debbie Piazza P-i-a -- like famous musician, whatever. P-i-a-z-z-a probably, probably. Check with them. It's a law firm also in New York.

And maybe I have some -- one or two, you know, or three I've -- if you want me --

H. LIU

let me continue to think, I can give you, if you want.

BY MR. GOLDSTEIN:

Q. If you know them off the top of your head, yes.

A. We have a law firm went to China with me in 2007, has -- we held the first U.S. China debt collection and bankruptcy conference.

And I think a few other law firm went with me.

I think one of them called Nerville Paterson, N-e-r-v-i-l-l-e, P-a-t-e-r-s-o-n, Nerville Paterson.

And I have a solo lawyer, because we need some law firms to help small case.

It's called Martin Chow, Martin Chow. Probably called Martin Chow Law Firm. I don't know exactly right now. M-a-r-t-i-n; last name is C-h-o-w.

I have another -- let me see.

I have Metro Group lawyer with me also. Yeah, called the Metro Group. It's specializing in U.S. Customs, marine litigations, like the coast, ships.

H. LIU

Q. One firm I didn't hear you mention is Elliott Greenleaf.

Do you have --

A. Yeah, that's why -- yes, that's in Delaware. And that's another law firm.

Thank you for reminding me. I didn't say the Delaware. Okay, thank you.

Delaware I think I know Elliott Greenleaf.

And I also know Fred Rosner. I don't know what's the law firm. Fred, F-r-e-d; Rosner, probably is R-o-s-n-e-r.

Probably called the Rosner Law Firm LLP, whatever, all right.

And some law firm approach me at information meeting. I may have the business card, but I don't remember exactly the name.

Q. I understand. I'm primarily looking for law firms that --

A. Like I mentioned before, in Delaware, so when I met today, I say look familiar.

So lawyer approach me. And I usually remember name if they are in constant contact, as you know, which is normal.

H. LIU

Q. Which attorneys are you familiar with at Elliott Greenleaf?

A. The -- the person -- I contact the most is called -- always difficult to pronunciation.

Rafael, R-a-f-a-e-l, Zahralddin. I don't know how to spell correctly.

MS. ENGLISH: Z-a-h-r-a-l-d-d-i-n.

MR. LAPINSKI: Correct.

THE WITNESS: My pronunciation is fine?

MR. LAPINSKI: Very good.

THE WITNESS: Oh, thank you.

MR. LAPINSKI: Better than mine.

BY MR. GOLDSTEIN:

Q. And are there other attorneys that you work with at Elliott Greenleaf?

A. You know, see some e-mail address and first time met, you know.

Q. How about Kenneth Dorsney? Did I get that right?

MR. LAPINSKI: D-o-r-s-n-e-y, Dorsney?

BY MR. GOLDSTEIN:

Q. Yes.

H. LIU

A. I don't remember exact. Probably he introduce me -- when I went to his law firm he introduced me all the colleagues to me.

The other person I don't contact. Maybe I see the e-mail. I don't recall, no.

Q. I understand.

A. Thank you for that understanding.

Q. Have you met the NHB firm that's the financial advisor in the Universal case?

A. Yes.

Q. And when did you meet them?

A. I heard the name a lot. I'm thinking I haven't worked on other cases as a financial advisor.

I think this is the first -- the two cases I work with him this year on it.

Let me think which two cases.

One of this is this case, UBP. Universal Building Products, abbreviation for, UBP, UBP.

And another case possibly is Barcalounger, B-a-r-c-a-l-o-u-n-g-e-r, Barcalounger.

And its lead counsel is Lowenstein

H. LIU

Sandler. That's a law firm.

And possibly is a financial advisor because I'm not a translator on that case. I think so.

And then this case, UBP case, he is a financial advisor retained by the committee.

Q. But you wouldn't consider yourself to know NHB well?

A. I don't consider very well.

Q. Of the law firms you listed to me, which of those law firms have you either looked at obtaining creditor committee representations or actually been involved in creditor committee representations with?

MR. RAVERT: Objection. Confusing. Would you mind restating that? I had trouble following that question.

A. I'm trying to say the same thing.

Q. I apologize. Let me split that into two questions.

Of the law firms that you listed for me, which ones of those law firms have you been involved with committee engagements in?

A. If you want me give you this year, I

H. LIU

can give you this year exactly.

If it was back a few years, I may, you know -- don't recall so exactly.

Q. Let's start with this year.

A. This year.

On the committee obviously in this case is Arent Fox.

And Barcalounger is Lowenstein.

Let me see.

In Lane Punch is Neil Wolf.

Q. Which firm, I'm sorry?

A. I think it's Butler Rubin. Probably R-u-b-i-n.

MR. LAPINSKI: Rubin, R-u-b-i-n, I believe.

THE WITNESS: Then Jaffe law firm in the Innatech case, I-n-n-a-t-e-c-h, one word.

How many cases -- this year I have six cases -- sitting on the six committees.

And how many cases -- how many committee I already give to you so far?

MR. RAVERT: I think it was four.

THE WITNESS: So then Ronson Aviation,

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

H. LIU

1           H. LIU
2    R-o-n-s-o-n, Aviation case. That's
3    Lowenstein.
4        Then last one, six, is Designer
5    License. And that's Arent Fox.
6        So it's six right now? Okay. Thank
7    you.
8    BY MR. GOLDSTEIN:
9    **Q.  And I take it you also have**
10   **relationships in those cases just with the Delaware**
11  **counsel, for example, Elliott Greenleaf?**
12    A.  In some case we do have local counsel
13  if it was filed in Delaware, because I was --
14  heard very often by Trustee Richard saying if the
15  case is filed in Delaware, will be different from
16  filed in other states.
17       Delaware law requires you have a local
18  counsel, for whatever reason.
19    **Q.  Of the firms you just named, which of**
20  **those firms were you involved with in committee**
21  **engagements prior to the committee being**
22  **appointed?**
23    A.  Can you rephrase that question a
24  little bit simple, straightforward.
25    **Q.  Can you read that back.**

H. LIU

1           H. LIU
2    A.  Can you rephrase it.
3    **Q.  She's going to read it back to you.**
4    (Record read.)
5    **Q.  So to clarify --**
6    A.  Can you explain what "engagement"
7  means.
8    **Q.  The time period I'm looking for in**
9  **each case is from when the bankruptcy case filed**
10  **until the committee was appointed.**
11       **So you said you worked with all of**
12  **these firms on committee engagements.**
13       **Which of these firms did you work with**
14  **in the time period between filing and committee**
15  **appointment, as opposed to after a committee**
16  **appointment?**
17    A.  If -- if I understand -- correct me if
18  I understand wrong, because I was a teacher
19  before. When I asked the students -- if you get
20  a good answer from students, you expect, you have
21  to make the question very clear, simple,
22  straightforward.
23       If I understand correctly, you mean
24  did I have some contacts with the law firm prior
25  to formation meeting?

H. LIU

1           H. LIU
2    **Q.  Correct.**
3    A.  I'd say, yes.
4    **Q.  Which ones, which law firms?**
5    A.  I think all of them.
6       I think each of them we -- because --
7  usually I'm only person most time in the
8  Delaware -- you know, the formation meeting room
9  non-American. So a lot of law firm approach me.
10    **Q.  If I change that to say instead of the**
11  **relevant time period being prior to committee**
12  **formation, if I changed it to the day of**
13  **formation, which of those law firms would you**
14  **have worked with prior to the day of the**
15  **formation meeting?**
16    A.  If I still understand question, you're
17  still asking the time where contact occurred
18  before the formation meeting?
19    **Q.  Before the day of the formation**
20  **meeting. So the bankruptcy --**
21    A.  Some law firm -- some law firm -- I
22  should say, yes.
23    **Q.  All of them or just some of them?**
24    A.  I should say most of them.
25    **Q.  Most of them?**

H. LIU

1           H. LIU
2    A.  Yeah.
3    **Q.  Which ones haven't you?**
4    A.  I think in this year --
5    (Pause in the record.)
6    A.  -- six case, if you remind me, if you
7  possible, can you help me write down here six
8  cases? Let me see.
9    **Q.  Arent Fox.**
10    A.  Thank you.
11    **Q.  Lowenstein.**
12    A.  Thank you.
13    **Q.  Butler Rubin.**
14    A.  Thank you.
15    **Q.  The Jaffe law firm.**
16    A.  Thank you.
17    **Q.  You said Lowenstein again?**
18    A.  Yes.
19    **Q.  And Arent Fox again.**
20    A.  Then all of them contact me before the
21  formation meeting.
22    **Q.  So there isn't a single committee case**
23  **you're involved with this year where you hadn't**
24  **discussed the bankruptcy case with them prior to**
25  **the day of the formation meeting?**

9 (Pages 30 to 33)

H. LIU

MR. RAVERT: Objection. I don't think that's what he said.

A. Yeah. I said that all law firm contacted me before the formation meeting this year in these six committee cases, and of which three I was confirmed translator, committee translator.

Three either not or pending.

Q. In the cases where you weren't confirmed as a translator, what was the reason for that?

A. The fundamental reason is Chinese exporters, once they were selected by the U.S. Trustee to join in committee, they failed -- they told, they expressed, they had -- they have a difficult understanding of fast American English, because Americans speak very fast.

And particularly -- especially they don't understand -- lack of knowledge of U.S. bankruptcy law and bankruptcy proceedings.

They are afraid, and to participate without perform their fiduciary duties.

Q. It sounded like you answered why you were retained as a translator in those cases.

H. LIU

I think my question was why weren't you retained a translator in some of the cases?

A. If I understand your question correctly, in some case I was a translator and some case not.

And you're asking why not other cases?

Q. Correct.

A. Okay.

I don't know how committee decide, because once they decide, they informed me.

If not, basically I'm thinking fundamental reason is there's -- probably the case is too lean, and there's financially --

Q. So you mean you think it was unlikely that there would be money to pay you in those cases?

MR. LAPINSKI: Objection, to the extent it calls for speculation.

THE WITNESS: This question is not correct. I don't know how the committee made a decision, because I was not -- when the decision made, it's not -- it's not I made the decision who retains me.

The committee make decision to retain

H. LIU

me.

BY MR. GOLDSTEIN:

Q. Just so I understand, what did you mean by the word "lean" when you said it?

A. I guess -- you asked me the reason why they don't retain me. I guess they may -- they may -- you know, financially is not available there which allow --

Q. "Financially," did you say? I'm sorry?

A. Financial resources is lean maybe. That's one reason.

Second reason, committee just don't want to retain a translator. I don't know.

Q. Were you hopeful in all six of those cases that you would be retained as a translator?

A. You speak my mind. And if committee give me a call, and also I have time, I'm busy person, if I have time, and -- I will help with the Chinese creditors.

Q. Which of those cases that you mentioned were you retained as a translator on?

A. Three cases -- three case confirmed this year.

H. LIU

One is UBP, this case. Second is Innatech. And the third is Designer License.

Q. And how --

A. In case I omit something, can you repeat the six case again?

Q. UBP, Barcalounger?

A. Yeah, Barcalounger.

Q. Lane Punch?

A. Pending.

Q. Innatech?

A. Yes.

Q. Ronson Aviation?

A. Pending.

Q. And Designer License?

A. Yes.

Q. And in those cases that you were retained as translator, how were you paid?

A. I tell you make me cry.

Today -- what day is today? September 17, I received zero.

Why? This year many cases poverty is an administrative insolvent.

Q. So by "administrative insolvent" do you mean that you're paid from the bankruptcy

**H. LIU**

estate?

    A.   They will not pay me because there's
no money to pay me if the bankruptcy estate
becomes administratively insolvent.

    Q.  If you were to be paid, from what
source of funds would it come?

    A.   According to -- counsel told me they
should have come from bankruptcy assets.

    Q.  Bankruptcy assets?

    A.   Yeah.

    Q.  I understand.

    Are you also paid directly by
creditors in the cases that you're involved in?

    A.   Can you explain -- we have two
situation, all right.

    One, is debtor collection case. One
is a committee case.

    Debtor collection case is on fully
contingency basis.

    Bankruptcy case is paid by bankruptcy
estate if they have the money available for
translation fees.

    Can you say the question again.

    Q.  Let's move on to the next question. I

**H. LIU**

don't want to confuse you.

    A.   Thank you for that.

    If you say money, I will be very sad.
Unfortunately this year it's not good year for
me, obviously.

    Q.  Has there ever been a case where
you've both been paid by a creditor directly and
by the bankruptcy estate?

    A.   I hope so. To my best knowledge, both
happened same time? I don't recall any case same
time happens.

    I get the fee from creditors -- from
the translating service. Meanwhile you get the
direct paid by creditors.

    Because most case still pending, I
haven't received any funds, like -- like these
six cases.

    Q.  Which two cases were those?

    A.   What do you mean the two cases?

    MR. RAVERT: Objection. I'm not sure
what you're talking about.

    Q.  Did you say that you were hoping to be
paid both from a creditor and from the bankruptcy
estate in two cases?

**H. LIU**

    A.   No, I said I hope I can get both of
them, like two situations you mentioned.

    Q.  But it's never happened before?

    A.   As of today -- I could only tell you
right now. I don't recall exactly. But I can
tell you likely will be under pending, because a
lot of cases dragging on very long. And
bankruptcy usually get paid after the case
concluded fully. And usually get two or three
years.

    So I'm -- 2009, 2007, most cases still
hanging there I think. So I don't recall
exactly. But if any, it's very -- it's not like
substantial.

    Those cases -- if a case is dragging
on, two or three cases, you should know has
expense. Those cases you're expending from
income from avoidance action, or those kind of
things, happens, but it rarely occurs. It rarely
occurs.

    Q.  I apologize. I think I confused you.

    A.   Uh-huh.

    Q.  Rather than talking about cases where
you've actually received a payment already from

**H. LIU**

both a creditor or a bankruptcy estate, I want to
talk about cases where you're entitled to a
payment from both.

    So even though the case isn't over
yet, are there cases in which you have an
agreement with a creditor to be paid on a
contingency where you're also being paid by the
bankruptcy estate?

    A.   I should say, yes.

    Q.  Which cases are those?

    A.   I don't recall exactly.

    Expecting, for example, Proliance,
P-r-o-l-i-a-n-c-e, I was on the committee, yes.

    It's auto parts supplier in the United
States filed bankruptcy.

    And I was a translator on that case.

    And even if I recommend to American
lawyer to sign, he afraid. He asked me to sign
and -- agreement, file the proof of claim,
promising, you know, if there's any recoveries,
they will pay me a percentage.

    But so far no distribution in that
case.

    Q.  Let's talk about UBP for a little bit,

11 (Pages 38 to 41)

H. LIU

since that's probably fresh in your mind.

A. Go ahead.

Q. Which creditors did you have contact with prior to the formation meeting?

A. There are four Chinese -- appears Chinese company name on the petition list filed by the debtors.

I contact the three, which EAC, Eastern Accessories Corporation, which is the largest of the four -- or of the three.

Second is Shanghai Hualin, H-u-a-l-i-a-n.

The third is a Hebei, I forget -- Hebei -- do you have a petition list, anybody?

Third is a Hebei -- I only remember Hebei, H-e-b-e-i. It's probably some kind of hardware some corporation.

Q. I'm sorry, H-e --

A. H-e-b-e-i.

Q. H-e-b-e-i.

A. Is the name of a province in China.

The third, because he told me he bought insurance, so he didn't want to join.

Once he bought export insurance, he

H. LIU

can get paid from the insurance company.

So you -- in this case there's two.

The fourth I didn't contact. Why? Because it's a very small -- very -- I think it ranked number 25.

So I didn't contact because he's -- it's relatively small.

Q. You said you didn't contact him, but I think before you said that you had some contact with him?

A. Three, I explained three, contact three.

There's four on the list. I contacted three, which I gave the name there, right?

Q. So you never had any contact with number 25?

A. With the last one -- the last one, can you check the name, if you have, so to make clear; next time we don't mention this company. Petition list.

Q. Are you referring to -- I'm going to spell it, Q-i-n-g-d-a-o.

A. It's possible I can take a look after you spell.

H. LIU

I think when you say that -- let me take a look.

Q. Let the record reflect that I'm showing the witness the consolidated list of creditors holding 30 largest unsecured claims that were filed in this case.

For reference, it probably appears in a number of places in the document production, but here it's Bates stamped HL 0218 through HL 0223.

(Document review.)

A. Okay, now, I saw the last name, it refresh me. I met him. I didn't call him preformation meeting.

Q. Who are you referring to, I'm sorry?

A. When I saw last name, the creditor's name, the Wang, W-a-n-g, yeah, last name.

Q. And which company is that?

A. That's Qingdao, Q-i-n-g-d-a-o, Construction, Forging, F-o-r-g-i-n-g, Inc.

That reminds me, I'm -- I didn't spoke him prior to formation meeting.

I did meet him at formation meeting. Somebody introduce him, because the trustee

H. LIU

trying to ask him to write -- fill out the questionnaire and had it difficult. So the lady next to the -- Richard asked me to help.

So I come to help explain what is questionnaire means, what is each line.

Yes, I met him at the formation meeting.

Q. I understand.

A. Thank you.

Q. All right.

A. And after the formation meeting he also contact -- trying to contact me, ask me for more help.

Q. But the only three creditors that you had any contact with prior to the formation meeting were EAC, Shanghai Hualin -- did I pronounce that right?

A. I have to see name. Hebei, first name is Hebei. Give me the petition again. Number 7. Let me see.

(Document review.)

A. We got the first, Eastern Accessories Corporation, which is a committee member in this case. Oh, we got here --

12 (Pages 42 to 45)

**46**

H. LIU

Shanghai Hualin Hardware Corporation Limited. It's the last, Hebei, H-e-b-e-i, Longda, L-o-n-g-d-a, Trade Corporation Limited.

Hebei bought the export insurance they told me. They don't have interest in participating in the committee activity.

So I had contacts with EAC, and Shanghai Hualin.

Q. Thank you.

A. Thank you.

Q. Let's walk through each of those three.

How did you first come into the acquaintance of Eastern Accessories?

A. Very good question. Thank you for bringing up this question.

When I -- some law firms sent me some petition files; if I remember correctly, is on August 4, 2010, which is a petition date of this case.

I saw -- when I went to work, I saw the few e-mails there, pointing, as I say, in same case. So my habit is, open it, see what's inside.

**47**

H. LIU

So I see it's a case. There's -- appears to be Chinese name creditor on it. However, there's no phone number, to each of -- no phone number to the EAC, no fax number to EAC, no e-mail address to EAC.

So I cannot contact them in the first place.

According to my experience, if a case -- in a case on a petition list, if there's no phone number, no fax number, no e-mail address, usually it's a difficult case.

Based on my experience, because I'm -- my experience with other cases also prove -- indicates the debtors withhold -- withhold some information for other -- others to contact them, which means they will hide something; it is not cooperating in other cases.

So I use my experience to judge this case.

I say, well, we have nothing here. And he -- he is the largest of the four Chinese creditor.

And I try to locate that company.

The first one I called is called the

**48**

H. LIU

debtors counsel office.

I think I called Mark Munich?

Q. Minuti.

A. Minuti. Thank you.

Q. M-i-n-u-t-i.

A. It's -- he's a local counsel.

Q. Correct.

A. Assistant to Mark, I think named called Rybin. She's R-y-b-i-n. I didn't ask the last name. She said, we don't have it.

I said, could you please help me find it, at least a fax number or some e-mail address; I can inform Chinese creditor the bankruptcy case occurred. And they are entitled to participate U.S. bankruptcy committee activities.

Probably wait one day or two. I didn't get response.

Then I personally called U.S. Trustee office. If they have a recording, must have record there.

And I remember they told me, we don't have also, sorry.

I said, why?

He said, what we have is given by

**49**

H. LIU

debtors. If a debtor said no, we don't have it.

I said could you help me to get from debtor, because I call debtor, I didn't get a response.

They say, try to reach them again. Come back.

So I called debtors again.

And after probably day or two, I got a fax number from Rybin.

Then from the fax number I did a research, because I know how to do Chinese phone number, how fax number works in China.

So I found the company, a new address in China, because original address listed on petition is in Hong Kong, in Hong Kong.

And I -- I called some Hong Kong -- you know, the creditors in other case.

I said, could you help me find the address, if it's correct.

So they helped me to verify this. Come back, say, address is correct, but there's no such a company, EAC, in that building. They move out some time ago. They don't know where to go.

13 (Pages 46 to 49)

## 50

H. LIU

1        That's why I goes back to counsel,
2 other debtor's counsel and goes back to the U.S.
3 Trustee's office.
4        And after I got the fax number from
5 Rybin at the debtor's counsel office, I searched.
6 I find their address in China. And I tried their
7 phone number.
8        And I tell them, are you -- is it
9 Eastern Accessories Corporation.
10        They say, yes.
11        And then I said, do you have address
12 before in Hong Kong.
13        Yes.
14        I say, are you aware of a bankruptcy
15 case? One of your importer maybe filed a
16 bankruptcy a few days ago.
17        He said which one.
18        I said EAC.
19        He said UBP.
20        So I matched. They say, yes. So it
21 matched. So that's how we initial contact with
22 EAC.
23        If you want to know more, let me know,
24 because I don't --

## 51

H. LIU

1     Q. And you didn't have a prior
2 relationship with EAC before --
3     A. Oh, no knowledge. No contact, no
4 knowledge.
5     Q. Did Arent Fox send you the information
6 on the bankruptcy case when it filed?
7     A. If you mean the petition list, yes,
8 along with -- I said, along with a few other law
9 firms.
10     Q. Did Elliott Greenleaf send you the
11 petition also, or information?
12     A. I give you all the -- all the
13 documents.
14     I believe so. If not Elliott, maybe
15 one of his associates. I should have say, yes.
16     Q. And we'll get to the documents.
17     A. Yes. I should say, yes.
18     Q. What's your understanding of why Arent
19 Fox sent you the information on the case?
20     A. It's -- law firms send me -- different
21 law firms send me petition, you know list,
22 meaning, if I understand it correctly, they have
23 interest in pursuing this case.
24     Q. What interest are you aware of?

## 52

H. LIU

1     A. I believe, one, they want help me
2 understand the case, the nature of the case.
3     Another angle, of course, they have
4 intention to bid committee counsel.
5     Q. So they send you the case in order to
6 help themselves get a committee representation,
7 to your knowledge?
8     MS. ENGLISH: Objection. Misstates
9 the testimony.
10     Q. If you could still answer.
11     Unless you don't understand the
12 question. Then I can have her read it back.
13     A. You say question again. You can
14 rephrase your question.
15     Q. Can you read it back, please.
16     (Record read.)
17     A. I cannot speak for -- on their behalf.
18     My understanding is whoever send me
19 petition list, they express their interest in
20 this case. That what I understand.
21     Because in United States obviously you
22 have hundreds, thousands of law firms.
23     Why Goldstein didn't send me in this
24 case, because he's a conflict or have no

## 53

H. LIU

1 interest.
2     So my understanding is whoever sending
3 me the list expressed certain interest in this
4 case.
5     Q. And just to be clear, for the record,
6 I've never sent you a bankruptcy petition in a
7 case, right?
8     A. I think I -- e-mail, no.
9     I think I met you in Delaware, whether
10 you come to me seeking some -- you know, talk to
11 me, as all lawyer doing, which I will make --
12 which I make a suggestion to the U.S. Trustee
13 Office, if allows me, because I trying to make
14 suggestion all the time; is in the room,
15 information room, lawyers and the creditors stay
16 together. They don't separate.
17     And so make lawyer very easy to
18 approach the creditors, asking for their --
19 supporting their interest.
20     Q. Understood.
21     MS. ENGLISH: Sorry, I didn't mean to
22 interrupt. Are you finished with your
23 answer?
24     MR. RAVERT: Are you finished with

14 (Pages 50 to 53)

H. LIU

1  your answer?
2  THE WITNESS: Yeah.
3  MS. ENGLISH: I was just going to ask
4  if we could take a break to use the
5  restroom.
6  MR. GOLDSTEIN: Oh, absolutely.
7  THE WITNESS: Yeah, it's one hour.
8  BY MR. GOLDSTEIN:
9  Q. Are you finished with your answer?
10  A. Yes, yes.
11  Q. Okay.
12  (Recess taken from 10:54 a.m. to 11:09
13  a.m.)
14  BY MR. GOLDSTEIN:
15  Q. You're still sworn in, Mr. Liu.
16  You're still sworn in under oath.
17  A. Thank you, yes.
18  Q. Before we took the break I think we
19  were talking about Arent Fox. And I assume you
20  remember the questions.
21  I just want to make sure that what you
22  told me about Arent Fox was essentially the same
23  as Elliott Greenleaf.
24  So then if you were referring to Arent

H. LIU

1  Fox, your reasons for making calls to creditors
2  were the same with regard to Elliott Greenleaf?
3  MR. RAVERT: Objection.
4  MR. LAPINSKI: Objection.
5  MS. ENGLISH: Objection.
6  MR. RAVERT: If you wouldn't mind
7  restating it just to simplify it, so that we
8  all understand it.
9  MR. GOLDSTEIN: Can you read back the
10  last question we had before.
11  (Record read.)
12  MS. ENGLISH: I don't know what the
13  question pending to Dr. Liu is, if you
14  wouldn't mind starting with that.
15  MR. GOLDSTEIN: Okay.
16  BY MR. GOLDSTEIN:
17  Q. Did you say that Elliott Greenleaf
18  also sent you information on the bankruptcy case
19  prior to the formation meeting?
20  A. Yes.
21  Q. And what's your understanding of why
22  Elliott Greenleaf sent you that information?
23  A. As I said it before, whoever send me
24  petition list, I view them have certain interest

H. LIU

1  in pursuing this case.
2  Q. And how would them sending you the
3  information on the case help them with their
4  interest?
5  MR. LAPINSKI: Objection to form.
6  A. I cannot speak their mind.
7  Q. I'm sorry. I got lost there.
8  MR. LAPINSKI: I just objected to
9  form, if you want the basis.
10  MR. GOLDSTEIN: Can you read back the
11  question.
12  (Record read.)
13  A. My understanding is like this.
14  If a law firm, or few law firms, send
15  me petition list after the case filed, normally
16  means they expressed a clear intention to pursue
17  this case.
18  And I'm a creditor rights advocate.
19  My focus and intention, from my side,
20  is to mobilize more Chinese creditors to
21  participate the formation meeting on one side,
22  and on the other side I mobilize more law firms
23  to participate the formation meeting, to have
24  competition atmosphere at the formation meeting.

H. LIU

1  Because I had one experience, only I
2  have one law firm at one case.
3  Then no matter you like or dislike,
4  you have no choice at a formation meeting.
5  So from -- I always tend to mobilize
6  people, including Chinese exporters, creditors,
7  and a law firm as counsel appears to participate
8  at formation meeting.
9  Q. So your understanding is that Elliott
10  Greenleaf and Arent Fox expected you to mobilize
11  creditors to be on a Creditors Committee?
12  MR. LAPINSKI: Objection to form.
13  MS. ENGLISH: Objection, misstates the
14  testimony.
15  A. They didn't -- they have interest. I
16  cannot speak their mind, their -- their -- their
17  state of mind.
18  Q. Can you read that back.
19  (Record read.)
20  A. That's my answer, yeah, that's
21  correct.
22  Q. What was your understanding of their
23  expectation?
24  MR. RAVERT: Objection.

15 (Pages 54 to 57)

H. LIU

1       MR. LAPINSKI: Objection, form.
2       MR. RAVERT: Objection, asked and
3 answered.
4       You can answer.
5       THE WITNESS: Okay. I repeated a
6 couple times now, and I will say it one more
7 time, my understanding is if a law firm has
8 no interest in pursuing a case, normally
9 they will not send me petition file to alert
10 me or tip me for that information -- I'm
11 sorry, alerts me there's a case, reminds me
12 there's a case occurring.
13       So if a law firm send me the petition
14 list, they expressed their interest in
15 pursuing this case. That's my
16 understanding.
17       And I welcome their -- you know, the
18 competition.
19       That's my understanding of their
20 intention send me that petition list and --
21       Okay. Go ahead. If you have a
22 question, go ahead.
23 BY MR. GOLDSTEIN:
24     Q. But you understand that the law firm

H. LIU

1 has an interest in the folks you contact being on
2 a committee?
3       MR. RAVERT: Objection.
4       MR. LAPINSKI: Objection to form.
5       MS. ENGLISH: Objection.
6       THE WITNESS: Can I answer?
7       MR. RAVERT: You can answer.
8       THE WITNESS: I do this --
9       MR. RAVERT: If you understand the
10 question.
11       THE WITNESS: I do mobilization
12 Chinese exporters, creditors in this case on
13 a voluntarily basis.
14 BY MR. GOLDSTEIN:
15     Q. I'm sorry?
16     A. Voluntarily basis.
17       And in the letter I sent to them I
18 state very clear, there's no fee for you to
19 participate the petition -- the committee
20 meeting.
21     Q. So were you telling me you do this out
22 of the goodness of your heart for altruistic
23 reasons?
24     A. For both countries.

H. LIU

1       My belief is, after I study in both
2 countries, I'm thinking the relationship between
3 United States and China is so fundamental
4 important for the world, for the global stability
5 and, you know, the global economy.
6       So market economy is basis, and where
7 emphasize fairness and fair competition.
8       And the relationship between Chinese
9 exporters, which is businessmen on one side, U.S.
10 importer as businessmen on the other side, is a
11 foundation of trust, a mutual trust, for both
12 countries, to have long way to go.
13       And if the U.S. importers, for
14 whatever reason, refuse to pay the Chinese
15 exporters, I feel it's not fair.
16       And there's no system -- or lack of
17 sufficient system to help Chinese exporters
18 continue the basis.
19       I tried law firm after law firm.
20 Every -- most of law firm wants, pay me our rate.
21 I will do it, no matter case big or small.
22       So I feel let me help, since I have
23 some business experience, some education in both
24 countries.

H. LIU

1       And a Ph.D. education, I tell you,
2 these days no longer sufficient.
3       The world changes so fast. I always
4 catching reading -- for that I have to read
5 Gilbert, bankruptcy law, this textbook, magazine
6 so thick.
7       If I don't get involved in this
8 business, I don't need to read this magazine size
9 such kind of thick textbook in United States,
10 yeah.
11     Q. Are you familiar with what a
12 not-for-profit company is?
13     A. Nonprofit?
14     Q. Yes.
15       MR. RAVERT: Objection.
16       Did you say "not-for-profit" or
17 "nonprofit"?
18       Because I think you said
19 "not-for-profit," and I think he responded
20 "nonprofit."
21 BY MR. GOLDSTEIN:
22     Q. Either would be fine.
23     A. I heard "nonprofit."
24       I never practice myself.

16 (Pages 58 to 61)

H. LIU

1
2    Q.  So that U.S. China Asset Management is
3  neither a nonprofit or a not-for-profit company?
4    A.  Yes, it's for profit.
5    Q.  For profit?
6    A.  For business.
7    Q.  And the calls you make are in your
8  capacity as initiator of U.S. China Asset
9  Management?
10     MR. RAVERT:  Objection.
11     MR. GOLDSTEIN:  Is there a ground for
12  that?
13     MR. RAVERT:  Yes.
14     He testified that "initiator" meant
15  founder of the company.
16     THE WITNESS:  Starter.
17     MR. RAVERT:  And I don't want a
18  suggestion that "initiator" means something
19  other than what he previously testified to.
20     MR. GOLDSTEIN:  Understood.  Let me
21  rephrase the question.
22  BY MR. GOLDSTEIN:
23    Q.  So your contact with the Chinese
24  vendors is in your capacity as an officer,
25  director or employee of U.S. China Asset

H. LIU

1
2  Management?
3    A.  So far, from my U.S. Chinese company,
4  I'm the only person contact Chinese vendors.
5     Because it's -- basically, as I said
6  to you, as indicated before, less financial gains
7  from the cases I participated, but is meaningful
8  for both countries.
9     So I contact Chinese.  And I trying to
10  find a system, a mechanism, on a continual basis
11  to get more law firm involved in to help Chinese
12  exporters.
13     So initially also means a start.
14  Nobody willing to do.  Also let me initially
15  this -- start, found this business, to see if we
16  are successful or not.
17    Q.  I'm not going to ask you your home
18  address.
19     But I am going to ask you if you have
20  a preference as to whether or not you'd like to
21  give your home address on the record?
22    A.  I -- I prefer not.
23     Why? I can tell you my reason.
24    Q.  Please do.
25    A.  My -- U.S. China Assets is debtor

H. LIU

1
2  collection and bankruptcy cases.  So the -- we
3  deal with many U.S. debtors.
4     And many of them are not the --
5  according to my standard understanding of them,
6  they are not decent.
7     And so when we win the judgment
8  against them, and basically they will either have
9  to close the door if they don't want to pay or
10  they will pay money to pay the bills.
11     So I know some debtors trying to go
12  after me, trying to find where I live, especially
13  in New York.
14     We do have some Chinese debtors also,
15  Chinese company here as importer.  They import
16  things from China and don't want to pay.
17     And, you know, since I'm Chinese too
18  originally, all right, from China; so they
19  have -- trying to find where I live.
20     So if -- for the safety reason, if not
21  critical to the concerns, to the focal point you
22  are trying to reach, I prefer give you business
23  address.
24     You can always reach me.  I stay at
25  the business address since 1991, so long enough

H. LIU

1
2  for you to tell you I'm reliable.
3     MR. RAVERT:  Okay.  I need to make a
4  statement for the record though, since we
5  discussed this prior to this -- the
6  beginning of this deposition.
7     I just need to clarify that he's using
8  the term "debtor" -- and you're free to
9  clarify this with him -- but in the broadest
10  sense.
11     He's made some comments about debtors
12  not being decent.  And it is my
13  understanding that he means "debtors" in the
14  broader sense, those who owe money, not
15  debtors in bankruptcy.
16     THE WITNESS:  Yeah, that's correct.
17     MR. RAVERT:  So I welcome you to bring
18  that out.
19     But I don't want the record to be
20  giving the impression that he's making
21  comments about debtors in bankruptcy somehow
22  not being decent; that he's making a
23  generalized statement.
24  BY MR. GOLDSTEIN:
25    Q.  And your counsel's statement

### Page 66

H. LIU

2 accurately reflects what you meant?
3     A.  Yes.
4     And giving another reason, I once
5 participated the -- I believe, because many years
6 ago, one project funded by the federal government
7 to -- started how Chinese minority business in
8 New York affected, victimized by Chinese mafia,
9 or other mafias.
10     I was one interviewed due to my
11 bilingual language.
12     So I do know that mafia exist in
13 Chinese community, all right.
14     Q.  And it's not my intent here to do
15 anything that's going to put you in danger.
16     A.  I hope you will let me last longer so
17 I can help more Chinese exporter victims.
18     Thank you for your understanding.
19     Q.  So if I understand correctly, your
20 contacting of Chinese creditors, for the reasons
21 you said, carries certain risks with it?
22     A.  Yes.
23     When you are helping creditor side,
24 you expecting challenge from the other side.
25     That's normal understanding, of you

### Page 67

H. LIU

2 get into helping one side getting money from the
3 other side who don't want to pay.
4     So there is a risk. Some people will
5 try to revenge, especially from debtor's side.
6     Q.  Do you know very many people that are
7 willing to take on risks like that to do
8 something out of the goodness of their heart?
9     A.  I tell you, they don't -- also broken
10 my heart also. When I started this business, I
11 trying to reach my Chinese community, my
12 colleagues who graduate same school, taught at
13 the same university.
14     Asked them to mobilize them to form a
15 debtor collection on contingent basis. One of
16 the reasons they're signing, besides the
17 financial reason, say, we want our rate.
18     And besides that reason, they're also
19 citing if you're an exporter involved with
20 Chinese, as U.S. importers are Chinese, they say,
21 well, we are here every day. They may go back to
22 us.
23     So they're -- they are not willing to
24 actively participate -- at least -- actively
25 participating in the U.S. debt -- China debtor

### Page 68

H. LIU

2 collection business on contingent basis.
3     We only have one Chinese, American
4 Chinese lawyer; actually, Martin Chow, who I
5 mentioned before.
6     He went to China with us with a
7 delegation. And he born here. He's American,
8 although he speaks some Chinese. So he said, I'm
9 not afraid of.
10     So that make difference.
11     Q.  Why do you think either Lowenstein
12 Sandler or Arent Fox or Greenfield --
13     MR. LAPINSKI: Greenleaf.
14     Q.  Greenleaf. I apologize.
15     Why do you think either of those three
16 firms contact you rather than contacting
17 creditors?
18     MS. ENGLISH: Objection.
19     MR. RAVERT: Objection.
20     MR. LAPINSKI: Objection.
21     MR. RAVERT: Objection, calls for
22 speculation.
23     THE WITNESS: I cannot speak their
24 minds.
25     MS. ENGLISH: I think you want to

### Page 69

H. LIU

2 clarify that.
3 BY MR. GOLDSTEIN:
4     Q.  What's your understanding?
5     A.  My understanding, as I said, more than
6 three times, if remember correctly know my
7 understanding is these three law firms, just like
8 other law firms, when they send me the
9 information of the petition file, it seemed to me
10 they clearly expressed interest in pursuing this
11 case.
12     And in return, I always welcome them
13 to participate in the competition at the
14 formation meeting.
15     Q.  And I apologize if I'm asking you the
16 same question. I just want to be sure I
17 understand.
18     A.  Fine. If you satisfy my question, I
19 will be glad. I just happy you find the facts.
20     If other firm gave me same time, I
21 cannot hide that fact. I gave you facts.
22     Q.  And when you say that one of those law
23 firms has an interest in pursuing the case, you
24 mean to be retained as counsel to the creditors
25 committee?

18 (Pages 66 to 69)

## Page 70

H. LIU

2  MR. LAPINSKI: Object to form.
3  THE WITNESS: If I understand
4  correctly, and as I said it before, if law
5  firm or other law firm send me the petition
6  file within the period of the -- between
7  petition date and the formation date, it
8  clearly express their interest to bidding
9  for committee counsel.
10  If it was after the formation date they
11  send me, then it would be strange, not
12  common sense.
13  So my understanding is, yes, they do
14  have interest to pursuing, to become the
15  lead counsel, or local counsel, if in
16  Delaware, if the case occurs in Delaware.
17  BY MR. GOLDSTEIN:
18  Q.  Why did you contact EAC with regard to
19  the UBP case?
20  MS. ENGLISH: Objection. Asked and
21  answered.
22  MR. GOLDSTEIN: I think we talked
23  about creditors generally. I don't think --
24  MR. LAPINSKI: Same objection.
25  THE WITNESS: EAC is the largest

## Page 71

H. LIU

2  creditor in this case.
3  And, according to my understanding,
4  the U.S. Trustee Office pick up as
5  creditors, one, based upon the dollar
6  amount. The high dollar amount likely to be
7  selected.
8  Two, U.S. Trustee -- it seemed to me
9  right now it's very fair, at least with
10  Delaware.
11  If there's Chinese creditors showed up
12  for geographic balance and for consideration
13  on the foreign vendors, they can too select
14  one or two or more, you know, on committee,
15  as committee members.
16  BY MR. GOLDSTEIN:
17  Q.  Was your initial contact with EAC
18  verbal or in writing?
19  And by "writing" I mean --
20  A.  First day was verbal. I made a phone
21  call.
22  I said before I made a phone call,
23  verify the name of the company and whether you
24  have a former Hong Kong address, because on
25  petition list, list as a Hong Kong address.

## Page 72

H. LIU

2  And after I searched, did a lot of
3  search, what I found is a Chinese address in
4  China.
5  So it's two different areas.
6  And first thing, for me to make sure
7  we got the right creditor.
8  So I did the verification very
9  carefully. After they say that yes, yes, yes,
10  then I feel I got the creditor right, matching
11  this one.
12  Q.  And after you determined that it was,
13  as you called it, the right creditor, what was
14  the conversation with them?
15  A.  Oh, basically I informed --
16  MR. RAVERT: Objection. Asked and
17  answered.
18  You can answer.
19  THE WITNESS: Okay. Thank you.
20  I'm not familiar with the lawyer
21  things. I'm not used to it.
22  MR. RAVERT: I'm sorry.
23  THE WITNESS: So thank you. Sorry for
24  my waiting.
25  BY MR. GOLDSTEIN:

## Page 73

H. LIU

2  Q.  Not at all.
3  A.  And after that, if address correct,
4  usually who answer phone is front desk, like any
5  other company.
6  And I say if it's right, can I speak
7  to your manager, whoever in charge U.S. export.
8  So they refer -- transfer to the -- I
9  think transfer to Jessica Guo.
10  "Jessica" is American name,
11  J-e-s-s-i-c-a. The last name is Chinese, G-u-o.
12  And she said that she's assistant to
13  general -- the president, the boss.
14  In China usually the president is
15  called "boss."
16  And I think another girl also
17  transfer, pick the phone, say the same thing.
18  I forgot his name, but they both say
19  that, Mr. Dong, D-o-n-g, is our boss.
20  And the first name, he say himself, is
21  David Dong.
22  I don't know why the Chinese has got a
23  first name English and a last name in Chinese.
24  Q.  Did you convince him to be on the
25  creditors committee?

19 (Pages 70 to 73)

H. LIU

A. I --

MR. RAVERT: Objection.

THE WITNESS: Can I answer? Okay.

I can -- look, your company name was listed as number four, if I remember correctly.

I don't have the petition file in front of me. I say, you're listed as number four on the list, the largest 30 creditor list.

If you waiting to participate committee activities, my experience, you have higher chance, opportunity, to be selected as committee members.

BY MR. GOLDSTEIN:

Q. Was there a discussion with regard to providing a proxy to vote at the formation meeting?

A. In the beginning we -- first conversation probably not involved -- first conversation -- my habit is first conversation inform them, do you have an e-mail address for me to e-mail you the petition list, if I have a question for them too.

H. LIU

I don't forward a proxy in the first place because I don't know whether they're willing to participate.

So I give them these two.

Usually give them the petition file and the questionnaire, if I have questionnaire available. Usually questionnaire will be few days later available.

I -- in this case, because I delayed few days for looking for correct address of EAC. So when I found the EAC correct creditor, by that time I believe I had the questionnaire ready.

And then I e-mailed them, together with my cover letter, informed them the case number, where it happened, what's your dollar amount listed by debtors; and also reminds them if you consider that that amount is not correct, you are entitled to file proof of claim.

And the U.S. court eventually will review and verify your claims.

If everything is right, they will be, you know, allowed.

Then usually I will ask in the cover letter or tell them the petition committee is not

H. LIU

difficult.

And you only need to fill out the questionnaire if you come -- if you don't come -- if you come in person, if you come in person.

In you don't want to come to United States in person, then you -- you need to find somebody representing you. And then you need a proxy letter.

And, third, usually I inform them the committee is organized by U.S. Trustee Office, will be approved by U.S. court. And fee will be -- there's no fee to participating.

And the committee has rights to select -- to appoint a lead counsel or co-counsel.

And those -- the fees for committee counsel will be paid by bankruptcy estate.

And the committee counsel will provide legal counseling, check and verify debtors' business records and also check the creditors' claims.

Then U.S. counsel or committee counsel also will make sure there's no debtors' assets in probably transferred or disappeared illegally.

H. LIU

And I emphasize, usually at the end of my cover letter, saying, this is sole opportunity for you as a creditor, get it together; have to be from three to seven creditors, get it together, to form a committee called Official and Secured Creditors Committee.

Please don't give up easily.

If you have any questions, concerns regards that, please call me. No charge.

And if you like, I also will help you arrange consultation by professional banks of lawyers, if you ask.

Then writing my name.

And also I tell them, if you want to understand who I am and the nature of the business, please type in, "U.S. China debt collection," in Chinese, or my name, "Haishan Liu," in Chinese, to find the -- my background information, what we did for Chinese exporters.

Q. You mentioned that you offered to arrange consultation on legal issues for the creditors.

Did you mean that you were going to arrange consultation for the creditors committee

H. LIU

1 or for those creditors individually?
2      A.   That's -- we talking preformation
3 period of time.
4      Of course it's for individual
5 creditors.
6      Because I'm -- I'm not lawyer.  And I
7 don't know if it's appropriate, even though I got
8 a high education.  But I was very careful.
9      When things reached to legal area,
10 I'll rather let a lawyer say it, U.S. lawyer say
11 it.  And instead I said to them, even though I
12 know -- aware of them, all right.
13      So that's why if the committee asking
14 or if the individual creditors before the
15 formation meeting, asking specific legal
16 question, I will prefer to get them to U.S.
17 lawyer to counsel them.
18      Q.   So did either Arent Fox or Elliott
19 Greenleaf answer any questions for those
20 creditors in your individual capacities, as
21 opposed to for in your committee capacity?
22      A.   In this case?
23      Q.   Yes.
24      A.   Yes, along with other law firms.

H. LIU

1      My habit is whoever send me the
2 e-mail, I will send the same question I have to
3 the law firm who send me petition file.
4      Why?  Very simple.
5      My intention is if you send me the
6 petition file, meaning you have interest in
7 pursuing this case, in order to get the best law
8 firm to represent the creditors, I want to see
9 how they respond to questions creditors raised or
10 I raised.
11      So I send the question to Arent Fox,
12 to Elliott Greenleaf, and also to Lowenstein,
13 to -- on that day four or five give to me, and to
14 Hodgson Russ and also to Rosner, Fred Rosner.
15      Q.   Just to save some time, my concern is
16 with Elliott Greenleaf and Arent Fox.
17      A.   I'm just saying what I did, because
18 you want effects.  I want to give you complete
19 effects, so you have general judgment --
20      Q.   I appreciate that.
21      A.   -- of what things happened behind
22 the -- you know, behind what you see here.
23      Q.   Which individual creditors did Arent
24 Fox or Elliott Greenleaf give you on behalf of

H. LIU

1 individual creditors?
2      And the period -- just to clarify, the
3 period I'm asking for is only the preformation,
4 precommittee formation period.
5      MR. RAVERT:  Objection.
6      Could you just restate that, because
7 it sounded like you circled back on that a
8 little bit.
9 BY MR. GOLDSTEIN:
10      Q.   Yes.  I apologize.
11      To clarify, the period I'm asking
12 about is only between the bankruptcy filing date
13 and the committee appointment.
14      Which creditors did either Arent Fox
15 or Elliott Greenleaf give you advice regarding
16 for individual creditors in this case?
17      MR. LAPINSKI:  Object to form.
18      MS. ENGLISH:  Objection.
19      And as long as we're objecting, I'm
20 sorry to say this in between a question and
21 answer, but can we just stipulate that one
22 objection is good for all the parties on
23 this side of the table, so we don't keep
24 talking over each other?

H. LIU

1      MS. JOHNSON:  Yes, that's fine.
2      MR. GOLDSTEIN:  My litigator says,
3 yes, that's fine.
4      MR. LAPINSKI:  We should have said
5 that earlier.
6      MS. ENGLISH:  I apologize, we should
7 have said that.
8      (Discussion off the record.)
9      MR. RAVERT:  If you don't mind, just
10 read it back.
11      (Record read.)
12      THE WITNESS:  Both two creditors, two
13 creditors, meaning EAC and Shanghai Hualin.
14      Because I mentioned, there were four
15 Chinese creditors on this list.
16      The last one was too small; the last
17 creditor on the list I didn't contact.  It
18 was too small; I didn't contact.  I didn't
19 contact.
20 BY MR. GOLDSTEIN:
21      Q.   You're referring to Wang Qingdao?
22      A.   Wang.
23      And he's the father.  I met his son at
24 the formation meeting.  Because he -- his English

H. LIU

1  not that good. The committee -- the U.S. Trustee
2  pulled me over -- asked me to help him fill out
3  the questionnaire.
4
5  So this why I remember.
6  So the last one, Wang, didn't contact
7  before the formation meeting.
8  The third, the Qingdao -- the Hebei
9  Longda bought insurance. I didn't contact.
10  I didn't -- I contacted, but didn't
11  follow up, because they bought insurance.
12  They say, we got paid. We don't need
13  to participate the formation meeting. Our
14  collection work.
15  The remaining two, EAC and Shanghai
16  Hualin, and both law firms did give advice to me;
17  not direct to them, but to me, in the beginning.
18  Q.  I'm going to apologize if I asked this
19  already, and just stop me if I did. I just want
20  to make sure I get it in.
21  MS. ENGLISH: Objection.
22  MR. GOLDSTEIN: Dawn, what do I do?
23  MS. JOHNSON: Ask your question.
24  BY MR. GOLDSTEIN:
25  Q.  Did any of the creditors you contacted

H. LIU

1
2  provide you with a proxy to vote at the formation
3  meeting?
4  A.  Actually both provided proxy to me.
5  One first, Shanghai Hualin first,
6  because I got his phone number earlier. I got
7  him.
8  And then EAC later.
9  Yes, both said, Dr. Liu, I feel
10  comfortable with you. Could you represent us
11  because we're in China. It's too far and time
12  too urgent, too short.
13  So both gave me the proxy, yes.
14  Q.  All right. Not to skip around, and I
15  apologize.
16  But did you say that you had no
17  relationship with EAC before the filing of the
18  bankruptcy?
19  A.  I had no relationship. I don't know
20  them. No conversation at all with EAC and
21  Shanghai Hualin.
22  Q.  Thank you. And I apologize again if I
23  asked that.
24  A.  No, fine, fine. Whatever you want to
25  know the truth, I let you know.

H. LIU

1
2  Q.  With regard to EAC and Shanghai
3  Hualin, what did the proxies that they gave you
4  permit to you do?
5  A.  Basically we have two paragraph on the
6  proxy.
7  The first paragraph saying --
8  basically saying, I -- we, the company name,
9  which is Chinese creditor, either EAC or Shanghai
10  Hualin, we are interested in this case. We want
11  to participate in the committee formation
12  meeting, all right.
13  Those are the first -- roughly the
14  general idea.
15  The second paragraph telling --
16  usually list -- chose a U.S. Trustee office.
17  The second part say, since we're in
18  China and, you know, we feel inconvenient and --
19  to participate in person and we're here, we
20  authorize Dr. Liu, or somebody else designated by
21  Dr. Liu, to present -- to represent us to
22  participate in the committee formation meeting,
23  and including, you know, selecting the -- the
24  committee professionals, yes.
25  Q.  So just to make sure I understand

H. LIU

1
2  that, so the proxies that both of these two firms
3  provided you --
4  A.  Same. Is the same style, same
5  content; except the name is different, probably
6  different.
7  Q.  -- gave you or a designee of you the
8  right to take -- to cast any votes in the
9  committee formation meeting --
10  A.  Yes.
11  Q.  -- including with regard to retention
12  of all committee professionals?
13  A.  Yes.
14  Q.  Did you have any discussions with
15  either of those creditors with regard to which
16  professionals you'd vote for while holding their
17  proxies?
18  A.  No.
19  My thing is -- my habit is -- also I
20  was a teacher before. I always tend to speak
21  later.
22  And before the -- all the law firm
23  getting in the formation meeting, before they
24  speak out, usually I don't make the minds. I
25  want to listen to them, what it says.

22  (Pages 82 to 85)

## Page 86

H. LIU

And I never mentioned any law firm,
including Arent Fox, Lowenstein, to these two
Chinese companies, I'm going to vote for this.

I only tell them, the law firm we're
going to recommend is a whole -- want to help
Chinese creditors in this -- in this bankruptcy
cases or debtor collection cases.

Q. So the decision on behalf of these two
creditors as to which professionals to vote for
as committee professionals was entirely within
your discretion?

A. Yes. If I have both of them.
But U.S. Trustee usually don't allow
one person holds two proxies.

Q. But only one of the two got on a
committee?

A. Yeah, yeah.

Q. And that --

A. Which is EAC, get on the committee.

Q. EAC.

A. I vote -- I can vote on their behalf
to choose which professionals finally I intend
to -- prefer to choose.

Q. And I'm not going to ask you who you

## Page 87

H. LIU

voted for, but you had the right to cast that
vote in your discretion?

A. Yes, according to the proxy letters.

Q. Do you personally sit on the UBP
creditors committee?

A. Yes, I'm translator.

Q. Do you personally sit on the committee
as a member rather than as a translator or
professional?

A. In this case translator only.

Q. Did you ever sit as a member?

I mean, you've told me you've casted a
proxy.

A. In other case, yes.

Q. So can you explain how you don't sit
any longer on a committee? Did you resign?

What caused you to cast a proxy and
then no longer be on a committee?

A. Are you talking about this case or
generally other cases?

Q. Just UBP.

A. UBP?

UBP, after I retained as a -- as a
translator. And so when EAC asked me who will

## Page 88

H. LIU

help them to file the proof of claim debtor
collection litigation in bankruptcy case and get
the money back from debtors, conduct litigations,
I said, look, I'm not a lawyer. Right now I'm a
translator. If you want somebody help, you have
two way. One, find a lawyer on an hour basis.
Two, find a lawyer who willing to take your case
on contingencies.

And they respond, yeah, we want a
contingent basis. We don't want to pay.

Okay. So I refer this to another law
firm.

Q. So you sat as proxy for the formation
meeting, but then you never -- you've never had
the power to cast a vote or taken an opportunity
to cast a vote for EAC subsequent to the
formation meeting?

MR. RAVERT: Objection. It's a little
confusing.

Do you understand the question?

A. The question is very confused.

Before the formation meeting I have
right to cast a vote, at the formation meeting to
select committee professionals.

## Page 89

H. LIU

Q. But then --

A. After that -- before that and after
that I have not signed any agreement, business
agreement, with the EAC.

I refer the case to American law firm.

If you want to know, I can tell you.
It's called Nerville Paterson, and George
Thompson, the lawyer.

They signed -- according to my
knowledge, later on they just signed it directly.

Q. So your sole role --

A. In this case.

Q. -- in this case, subsequent to the
formation meeting, is as a translator?

A. That's correct.

Q. Do you have an agreement with EAS for
EAS to pay you in any fashion?

A. Never discussed.

MR. RAVERT: Objection. It's EAC.

Q. EAC, I'm sorry.

A. No problem.

EAC, Eastern Accessories Corporation.

Q. Yes. You have no agreement to pay
them on a contingency or otherwise?

23 (Pages 86 to 89)

H. LIU

1 
2     A.   No agreement.
3          I can tell you, they will not pay you.
4 I hope all this is over you become a debtor
5 collection lawyer on a contingent basis. I will
6 put you in Chinese paper if you can.
7     Q.   I think I'm going to pass on that.
8     A.   Because I have less lawyer. I have
9 more case -- I'll tell you the truth. I have
10 more cases. I don't have enough lawyer waiting
11 to work on contingent basis.
12         Chinese lawyer willing too. But they
13 have no parlance here. So not effective.
14     Q.   Something tells me if they won't pay
15 you, they sure as hell won't pay me.
16     A.   You don't need to -- you don't need to
17 commit to them.
18         You can review the case first. Only
19 if you feel -- only if you feel there's element.
20 You think -- based on your experience, you think
21 you can get some recovery. You can take only
22 debtor case.
23         MS. ENGLISH: Objection. Is there a
24 question pending?
25         MR. GOLDSTEIN: No. Just trying to

H. LIU

1 
2 keep this jovial.
3         MS. ENGLISH: Do you want to take a
4 break?
5         MR. GOLDSTEIN: I'm just trying to
6 decide if I have questions before we go
7 through the actual documents.
8         If you want, we can take a couple
9 minutes break.
10        (Discussion off the record.)
11        MR. GOLDSTEIN: If we can take a five
12 minute break.
13        (Recess taken from 11:57 a.m. to 12:46
14 p.m.)
15 BY MR. GOLDSTEIN:
16    Q.   Dr. Liu, I just have a couple of more
17 minor questions, and then we're going to get into
18 the documents.
19    A.   Fine.
20    Q.   Do you have an Internet Web site for
21 any of your companies?
22    A.   I have -- I'm building a Web site.
23 We're just doing one.
24        It's called safeexport.net.
25    Q.   Safeexport.net?

H. LIU

1 
2     A.   And right now it's only a front cover.
3 The contents is being -- building right now.
4         Because after three years in the
5 United States crisis, I see so many unfortunate
6 things happening.
7         And I think the best way for Chinese
8 exporters to prevent those debt occurring is get
9 a debt prevention education.
10    Q.   And is that live, or are you still
11 working on it?
12    A.   Still working on it.
13        And you see the -- the covers;
14 everything else under construction. I hope will
15 be up for review soon, but not now.
16        And I have a test -- test one inside,
17 I sent to some lawyer to review also.
18        And besides that, I think -- I don't
19 have one built by myself.
20        Some students in law school few years
21 ago, when I started, they build the simple
22 version in China.
23        And it requires codes into it. I
24 think don't -- no longer affected.
25        Most things, I tell them if you key

H. LIU

1 
2 in, "U.S. China debt collection," in Chinese or
3 my name, "Haishan Liu," in Chinese, you find all
4 the information about me, what is it I did, what
5 book I wrote, published in China, and --
6    Q.   Say that again. I'm sorry. I missed
7 that.
8    A.   If you key in, "U.S. China debt
9 collection," in Chinese or, "Haishan Liu," in
10 Chinese, in any Chinese search engine, the
11 creditors in China can find who I am.
12        And even they can find what book I
13 wrote, published in China in the past, and what I
14 did for Chinese creditors.
15        Because this thing -- like I said, I
16 appreciate you mentioned this question, is rare
17 in the United States and rare in China, because
18 most people has a -- say, why do this.
19        So we did a case. And Chinese
20 newspaper interested. They asked me what I did.
21        So I used that opportunity as way to
22 educate other Chinese, tell them, look, some --
23 at least some U.S. law firm help you.
24        Not -- don't say all lawyer bad in the
25 world. You know the lawyer don't have good

24  (Pages 90 to 93)

H. LIU

1 reputation.
2
3     **Q.  Really?**
4     A.  Generally speaking.  I'm not saying
5 everybody.
6         I can tell you is a real story.
7         When I -- back -- you will ask me if
8 you have this background, why don't go to the law
9 firms or those kind of things.
10        At the NY Law School, when I took the
11 legal sociology of law with a law professor, he
12 asked me, what are you doing here after
13 graduation.
14        I said, well I'm preferably going back
15 to China, where the early generation come here.
16        But I needed to make some money.  And
17 China was very low pay at the time.  All right,
18 only about less than $100 minimum be in that time
19 equal $10 whole months.  Because at that time I
20 U.S. dollar equal 10 U.S. dollars.
21        So I said, I have to make some money
22 here.
23        Then he said if you make money, the
24 best income you make is lawyers.  But he said,
25 warn you, discourage me from into the law

H. LIU

1
2 profession.
3         He said, if you want to become lawyer,
4 you can make a lot of money.  However, I'm
5 warning you, the lawyer was listed number one
6 most hated occupation on the list.
7     **Q.  I can't imagine why.**
8     A.  I said, why?
9         He said, lawyer make a simple thing
10 into complex and charge by hours.
11        From there I say I don't want complain
12 by people.  Because I'm first generation of
13 intellectuals come here to this country.
14        If they allow me to have green card,
15 never into the business.  I love to write.  But I
16 have to make survival.
17    **Q.  But it has nothing do with them making
18 you sit down for depositions all day.**
19    A.  I hope he knows -- you understand me,
20 after this formation, I hope you have Chinese
21 down the road.  You have a lot of cases.  You can
22 educate Chinese.  I will welcome all of you to
23 participate, all right.
24        (Discussion off the record.)
25        THE WITNESS:  You have debtor

H. LIU

1
2 collection case in New York right away
3 tomorrow or other states on continued basis.
4         I cannot pay you hour rate because I
5 don't have income myself.
6 BY MR. GOLDSTEIN:
7     **Q.  So noted.**
8     A.  Go ahead.
9     **Q.  When Chinese creditors performed the
10 searches on the Internet that you mentioned, do
11 you know what Web sites those materials would
12 show up on?**
13    A.  Then I tell you.  I don't know -- I
14 didn't pay anybody.
15        But if you searching co-workers, I'm
16 always coming on the top, at least first three
17 pages, on every single Chinese search engine.
18        I don't know why.  I don't have
19 control.
20        Most likely my reason is nobody else
21 willing to do that, especially people in here.
22        Because you know as professionals or
23 lawyers has both language, English, has business;
24 you're sitting in Flushing, you file divorce
25 paper, $500, immediately.

H. LIU

1
2         You file -- you help fill out the
3 title transfer, $600.  Immigration is $1000, plus
4 red envelope, if successful.
5         So seldom are people willing to get
6 into this business.
7         But that's why if you search -- ask
8 any associate.  You have two office in China.
9 Anybody search, any kind of search engine.
10    **Q.  What are the popular search engines in
11 China?**
12    A.  You have a Bidu, B-i-d-u, is number
13 one, like Google in China -- or in United States.
14        And Sohu, number two, S-o-h-u,
15 probably like a Yahoo in here.
16        Number three -- once you search one,
17 they have -- on side have other major search
18 portals.
19    **Q.  I think that's adequate.**
20    A.  And in Google also you can search
21 there.
22        And they have Chinese version also, or
23 they're not limited due to the public case.
24    **Q.  Do you own or lease any domain names,
25 other than the one you said you were developing?**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

H. LIU

2    A.  So far I have just said
3  safeexport.net.
4      I have H&H Web site called
5  photodepotusa.com, p-h-o-t-o-d-e-p-o-t, USA.com.
6      That's all photograph material,
7  nothing to do with U.S. China Assets business.
8    **Q.  Have you ever heard of a firm called**
9  **Clear Thinking?**
10    A.  I heard of it.
11    **Q.  Have you ever met anybody there?**
12    A.  I think I -- famous from their group
13  is a Joe -- Joe Meyer?
14    **Q.  Is he still there?**
15    A.  I have no idea.
16    He disappeared for a while.  I don't
17  know what's the reason.
18      Before -- I think I worked on one case
19  with him many years -- first -- Global Home
20  Products.
21    **Q.  Where was that pending?**
22    A.  No, the case is over 2007.  It's
23  reorganized case.
24    **Q.  Global Home Products?**
25    A.  Yeah, called GHP.

H. LIU

2    **Q.  Do you know what district it was**
3  **pending in?**
4    A.  In New York.
5    **Q.  In the Southern District of New York?**
6    A.  Yeah, 2007 it's finished.
7    In my memory it was a French buyer.
8    **Q.  And you were involved in that case?**
9    A.  As translator.
10    **Q.  As translator?**
11    A.  In the first case in United States.
12    **Q.  Have you ever had any issues brought**
13  **by either a U.S. Trustee, a party or a bankruptcy**
14  **judge with regard to your attention as a**
15  **translator?**
16    A.  No.
17    I can give you more information.
18  Because when -- when -- I always ask lawyers,
19  because I'm not acquainted with the law section,
20  practical details.
21    I ask them -- and actually at the
22  formation meeting UBP, I saw Brad, Brad Sandler.
23  B-r-a-d, the first name.  And last
24  name, Sandler, I think is S-a-n-d-l-e-r.
25    I remember clearly because he sitting

H. LIU

2  in the back row.  And he, you know, say, hello,
3  Doctor.
4    I say why this time I didn't see you
5  sending me petition, you know, the file.
6    Usually he also the person, one of the
7  three law firms, several law firms.
8    Say, this time I don't need.
9    I said, why.
10    He said, I'm retained as counsel for
11  UBP acquisition.  He said, yes.
12    I said, oh, you're Mr. Money Guy
13  today.
14    I say, why you here.
15    He said, I sitting here just to
16  listen.
17    **Q.  Okay.**
18    A.  He said -- I ask him very specific
19  question.
20    I said, if I'm sitting on the -- after
21  the formation formed and I heard some comments
22  regarding committee counsel, as a -- as a --
23  regarding committee translator, is this legal?
24    He said, absolutely.
25    I said, then --

H. LIU

2    **Q.  Who said that, I'm sorry?**
3    A.  Brad Sandler, said as counsel for UBP
4  acquisition case in this.
5    Then I also ask him, I say, what if
6  after the formation meeting if some Chinese
7  creditor asks me to help them file a proof of
8  claim, and if I decide to take it, and after
9  certain while if they have some recoveries, would
10  it still be legal?
11    He said, absolutely, certainly.
12    I said, what if somebody challenged
13  that?  Would you become my defense counsel?
14    He said, certainly.
15    And I tell the truth.
16    After this case occurs, you brought
17  this, and I called him.
18    I said -- e-mailed him also.
19    I said, now somebody want to depose
20  me, which has happened.  Could you become my
21  defense counsel.
22    I remember what he said to me,
23  everything is legal.
24    He said, oh, this case I cannot.
25    I said, why.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

H. LIU

He said, conflict of interest.

This one information.

The second information, I have a case in Innatech, bankruptcy case, which I was retained committee.

I never met the lawyer from -- from their law firm. They just were referred by who; I don't know.

They're saying I represent one Chinese. And the other Chinese obviously has difficult to understand bankruptcy proceeding.

So I say, interested.

And then they said -- he said, Dr. Liu, we don't have a committee translator. This is the first time I heard.

He said, I need to take a cautious step. I have to ask U.S. Trustee Office.

I said, fine. I can wait for your response from Trustee Office.

Then they have -- committee has votes whether to retain me. The committee vote is unanimous.

Then I see the e-mail, the forwarded e-mail to the U.S. Trustee Office. And there

H. LIU

also with lawyers' retention, whatever.

They tell them, here we have this scenario. We have one Chinese creditor on the committee. He not understand all committee's thinking necessary to.

And as of today I never see any objections from their state, although I didn't get one penny yet. If any, I can honestly tell you, only maybe couple thousand dollars, because the case is liquidating case.

Then what I can give you, I filed -- you know, participated a translator last year. I got paid.

I haven't heard or received any objection to my fee operation.

I don't do fee operation myself. The law firm did for me.

Q. What --

A. Oh, then I tell nothing, the new case, pending case. After this case, Ronson Aviation, the U.S. Trustee there is a female called Fran Steels.

F-r-a-n. Last name is Steels, S-t-e-e-l-s, if I remember correctly.

H. LIU

So she asked me, "Doctor, how are you, and which creditor you hold."

They interview everybody because not many creditors on their case; so able to interview everybody.

And I say, yes, I hold.

She said, who sit on the committee.

I said, this gentleman who signs the questionnaire will sit on the committee.

And then she said, then what do you do.

I said, well after that usually I will let the creditor -- direct the creditor formation meeting and a future conference. That is how understand American system.

If the committee needs a translator, they will call me, or letting me know.

She said, if I remember correctly, she said, okay.

And I was selected as -- as this -- that one -- the other translator was selected as a committee member.

I don't hear any objections.

Q. You were talking about retaining

**H. LIU**

**counsel for this deposition.**

**Why did you make the decision to hire separate counsel?**

A. This case?

MS. ENGLISH: Objection.

MR. RAVERT: Objection.

THE WITNESS: I can answer?

MR. GOLDSTEIN: Objection on what grounds?

MR. RAVERT: I'll object only to the extent that you shouldn't disclose obviously any communications that we had or that you had with any other lawyer in connection with this retention.

THE WITNESS: Okay.

MR. GOLDSTEIN: Other than committee counsel, since committee counsel wasn't representing him.

If you had discussions with committee counsel, I think that's okay, right?

Unless the committee is alleging that they also represented Mr. Liu individually?

MS. ENGLISH: Certainly communications we had with Dr. Liu with respect to the

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

H. LIU

1  committee business and the committee's
2  response to the debtor's motion to compel
3  discovery from the committee and to seek
4  discovery from the committee would all be
5  protected and privileged communications.
6      MR. RAVERT: Did you follow what she
7  just said?
8      THE WITNESS: Go ahead.
9      MS. ENGLISH: Any discussions that Dr.
10  Liu might have had with me or anyone else at
11  Arent Fox with respect to his own personal
12  interest in seeking to become a client and
13  seeking representation, to the extent he
14  sought, I don't think those communications
15  would be -- would be privileged.
16      I'll state on the record we didn't
17  provide him with advice in that regard.
18      He provided -- he obtained his own
19  counsel.
20      MR. RAVERT: Okay. So before he
21  answers, I just wanted to make sure that you
22  heard what she said?
23      THE WITNESS: Uh-huh, uh-huh.
24      MR. RAVERT: And that you understand

H. LIU

1  that intracommittee communications regarding
2  the retention, regarding the objection, the
3  motion to compel, those are the
4  communications that would be privileged.
5      Did you understand that?
6      MR. GOLDSTEIN: You know, I can make
7  this easier by splitting it up into two
8  questions.
9      MR. RAVERT: Sure. Okay.
10  BY MR. GOLDSTEIN:
11      Q.  For the first question let's put aside
12  any communications you had with attorneys.
13      MR. SCHEPACARTER: Can somebody
14  clarify what that last representation was.
15      I don't know if it was Gary or
16  somebody, but there was some representation
17  of what the communications were.
18      MR. GOLDSTEIN: I think that was
19  Caroline.
20      MR. RAVERT: Right, that was Caroline
21  initially.
22      And then I just really wanted to make
23  sure that Dr. Liu heard what she said and
24  understood the component that applied.

H. LIU

1  BY MR. GOLDSTEIN:
2      Q.  I'm just going to make it easier by
3  splitting it up into two questions.
4      First, let's forget about any
5  discussions you had with attorneys.
6      A.  Okay.
7      Q.  Separate and apart from any
8  discussions you had with attorneys, why did you
9  decide to hire separate counsel?
10      And if this was based on discussions
11  with attorneys, then just say it was based on
12  discussions with attorneys.
13      MR. LAPINSKI: Object to form.
14      Only because I -- explanation?
15      MR. GOLDSTEIN: Yes.
16      MR. LAPINSKI: You keep saying,
17  "separate counsel."
18      I'm not sure --
19      MR. GOLDSTEIN: Let's start with any
20  counsel, because I'm going to split this up.
21      THE WITNESS: When I first heard this
22  from the committee conference call, I said
23  I'm willing to take any deposition by any
24  party.

H. LIU

1      Second, I also said, this committee
2  issue, I'm not sure I will be represented by
3  committee counsel or by somebody else.
4      Some lawyer called me and --
5      MS. ENGLISH: Let me stop, only
6  because I don't know what you're going to
7  say.
8      And I want to make sure we understand
9  that you are protecting any committee
10  privileges, because obviously there would
11  have been committee discussions with the
12  lawyers about responding to your discovery
13  request.
14      THE WITNESS: I said to the --
15      MS. ENGLISH: But I think the question
16  posed was in your own mind why you decided
17  to hire counsel.
18      And so I don't think the question
19  calls for you to discuss any communications
20  you had with any lawyer.
21      THE WITNESS: Uh-huh, uh-huh.
22  BY MR. GOLDSTEIN:
23      Q.  Correct. For this part of the
24  question.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

## 110

H. LIU

2     A.  Okay.

3        I decided -- since sounds like

4 seriously, because in the beginning is asking

5 emergency motion, then denied. I sort of think

6 is over.

7        Then they said, it's not over yet.

8 There will something coming up.

9        Then I said, well, I'm not familiar

10 with U.S. procedures as deposition. So for my

11 best interest --

12     **Q.  Without telling me the substance of**

13 **any conversation, did you discuss with anybody at**

14 **Arent Fox whether they could represent you in**

15 **this deposition?**

16     A.  Yes.

17     **Q.  How did you ultimately find Gary?**

18     A.  He referred to me.

19        I trying to reach a few lawyers to see

20 if they are available. And Gary is one of them.

21     **Q.  What were your discussions with Arent**

22 **Fox in the context of representing you**

23 **individually?**

24     **So I'm specifically not asking you for**

25 **any discussions in the context of Arent Fox**

## 111

H. LIU

2 **representing the committee.**

3     A.  Basically just, as I said, it's --

4 it's committee -- they are committee counsel.

5 They are also being investigation. And for my

6 interest I should also have then my own lawyers.

7     **Q.  Did Arent Fox or Elliott Greenleaf**

8 **inform you that the committee's interests and**

9 **your interests were aligned in this, or did they**

10 **take another approach?**

11     A.  Can you rephrase -- rephrase the

12 question again.

13     **Q.  Could you read that back.**

14     **(Record read.)**

15     MR. RAVERT: Do you understand the

16 approach?

17     A.  The first part I think that I

18 understand. And then what's the last end of

19 couple words --

20     (Record read.)

21     THE WITNESS: What do you mean,

22 "another approach"? Can you explain that?

23 I'll answer first portion.

24     Then tell me what "another approach"

25 means.

## 112

H. LIU

2     This is -- at formation meeting I

3 heard, you know, this regarding the concerns

4 and issues raised by the debtor's side about

5 proper retention of Arent Fox as

6 professionals and also about Dr. Liu's

7 retention.

8     And obviously by their statement both

9 committee interests and my individual

10 interests were covered.

11     In answer to your -- this first part

12 of question is, yes.

13 BY MR. GOLDSTEIN:

14     **Q.  I think we still need to address the**

15 **second part of that question.**

16     **(Record read.)**

17     A.  Can you explain what "approach" mean

18 by you, so I can answer straightforward.

19     **Q.  Yes. Can you read back the first**

20 **question.**

21     **(Record read.)**

22     **Q.  Or did Arent Fox or Elliott Greenleaf**

23 **tell you that the committee's interest and your**

24 **interests personally might be divergent?**

25     A.  Divergent --

## 113

H. LIU

2     **Q.  Different?**

3     A.  Yeah, diversing from different action.

4 No.

5     **Q.  No, they didn't say anything about**

6 **that or, they told you they weren't**

7 **divergent?**

8     A.  To my best recollection, nobody from

9 Arent Fox or from Elliott Greenleaf told me such

10 kind of things.

11     **Q.  How many committee meetings have there**

12 **been so far?**

13     A.  I don't recall exactly, but not many.

14     In the beginning few days we have. So

15 I should say less than ten times so far.

16     **Q.  When was the last one?**

17     A.  Before you -- right after you filed

18 emergency motion.

19     I don't remember exact date.

20     **Q.  The emergency discovery motion?**

21     A.  Yeah, discovery. And the court

22 denied. So committee had a conference saying

23 inform the committee --

24     MS. ENGLISH: Objection. Please don't

25 reveal the substance of any committee

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

H. LIU

2 meetings.

3 A. Okay.

4 Q. That was not my intent asking him.

5 Who's paying your counsel's fees?

6 A. Myself.

7 And unfortunately I had a zero income

8 from three, you know, committee translation I'm

9 saying now. And although I have some residue

10 income from last year, some case have some --

11 obviously look like have recoveries.

12 But I pay myself.

13 Q. And you're paying on an hourly basis?

14 A. Could I answer?

15 Yes. Unfortunately.

16 MR. RAVERT: Thanks.

17 Q. How did you meet Gary?

18 A. Gary referred by law firm. Then I --

19 if he want --

20 MR. RAVERT: Don't go into discussions

21 about specifically what we did together.

22 A. Okay, okay. He just --

23 Q. Who introduced you and when?

24 A. Yeah, he -- it's Sullivan James.

25 But I'm thinking Gary is at -- for me

H. LIU

2 is affordable rate, reasonable rate.

3 I cannot pay your rate. I don't know

4 how much, but I see all the lawyers got 500, 600

5 up. And Gary is very minimal.

6 Q. Half of the New York rates.

7 Have you retained Arent Fox to do work

8 for you individually or for your companies?

9 A. Oh, yes, on debt collection case.

10 Q. What is the general type of work that

11 you have retained them for?

12 A. What type -- can you repeat.

13 Q. What's the general type of work? I

14 don't need specifics.

15 A. Basically we just gave a few cases

16 like to other law firms.

17 Usually I have many cases. I still

18 have many cases sitting on the table and

19 processed. So I give them a few cases.

20 Each law firm has a right to choose

21 whatever case they want to take.

22 Then if the case interest, take on a

23 contingent basis. Then they will call me back

24 and say, Doctor, this case look like have some

25 hope.

H. LIU

2 And then we sign agreement, engagement

3 letter.

4 Q. So these are collection cases for

5 vendors that you in turn represent?

6 A. Yes -- yeah, I'm representative for

7 Chinese exporters.

8 Q. So Arent Fox hasn't done any work

9 directly for you; it's only for vendors that

10 you --

11 A. For me, because vendors ask me to

12 become U.S. representative, because they don't

13 know the U.S. lawyers, afraid to work with

14 lawyer.

15 I'm sorry, you have to do a lot of

16 good work to win the trust from Chinese

17 exporters.

18 Some they're thinking, my record, I

19 don't charge people for -- for the hour rate. So

20 they're looking for me.

21 And then I -- like I said, I gave the

22 cases to law firm. They chose.

23 Only they agreed to contingency, and

24 then we sign agreement. And it's me and Arent

25 Fox.

H. LIU

2 Unless, unless some Chinese exporters,

3 if they're thinking they're waiting to sign with

4 a lawyer directly, fine with me.

5 MS. ENGLISH: If I could just

6 interject just for the sake of clarity, I

7 believe the cases Dr. Liu is referring to

8 are the cases in which U.S. China Asset

9 Management as a company is a client of Arent

10 Fox.

11 Those matters were disclosed in Mr.

12 Silfen's disclosure declaration.

13 I just wanted to tie that in so we're

14 clear.

15 MR. GOLDSTEIN: Understood.

16 MR. RAVERT: By the way, to clarify

17 further, you're saying in your individual

18 capacity.

19 And maybe we should be clear whether

20 you mean individual or company, as opposed

21 to the vendor or whoever the entity is.

22 MR. GOLDSTEIN: Individual or any of

23 his companies versus vendors that are his

24 clients.

25 MR. RAVERT: Okay.

H. LIU

2 THE WITNESS: All the present case is
3 on U.S. China Assets Management, LLC, under
4 that name.
5 BY MR. GOLDSTEIN:
6 **Q. And with regard to Elliott Greenleaf,**
7 **do they do any work for you?**
8 A. So far, no.
9 **Q. When I say "you," again, you or your**
10 **companies.**
11 A. Or your company, okay.
12 So far, no collection case.
13 But we testing preference claim,
14 trying to find a way how to solve the preference
15 claim issue, because --
16 **Q. In which your creditors are**
17 **defendants?**
18 A. Right. First they are creditors.
19 Then they're -- after the case over,
20 they hand us a ticket saying, you have to pay
21 back 90 days.
22 Chinese got fully puzzled. What
23 happened? They didn't pay me back, owe me money,
24 and wants me the money back to them? No way.
25 **Q. We call that the Robin Hood Theory,**

H. LIU

2 **steal from the rich, give to the poor.**
3 A. I tell them, look, if you're don't
4 responding, then your future business may be
5 affected.
6 And it's better way to responding,
7 explain what happened, how they owe you; then try
8 to reach a settlement without go through the
9 litigation.
10 I try to practice -- open their front
11 and help -- because the Chinese creditors say,
12 let the U.S. bankruptcy estate get us a judgment.
13 Our Chinese court not honor the U.S. judgment.
14 So we waste time for both ends and
15 create mistrust between two countries.
16 So I trying to find a way to set out
17 some preference claims, and way all party could
18 agree upon without going through the court
19 litigation.
20 Because same thing, I cannot find a
21 lawyer willing to work on contingency. So I
22 trying to do the negotiation.
23 So we -- the EG, abbreviation for
24 Elliott Greenleaf, I call EG.
25 EG said they are willing to try the

H. LIU

1 case, one case. That's recently.
2 **Q. Have any of those preference claims**
3 **been in cases where you are involved with a**
4 **committee, whether as a translator or otherwise?**
5 A. I think that one case called IEIG
6 International. It's a big case. It's the
7 largest American shopping cart suppliers.
8 **Q. In Delaware also?**
9 A. I have to check the case, because a
10 couple years ago. You check. You can search it.
11 I notice about last week or 10 days
12 ago I see the notice that all the creditors,
13 whoever had 90 days payment prior to petition
14 date got a notice.
15 And one of Chinese on their committee
16 list, formerly committee list, and I forward to
17 him. I say, look, this is a case; you better pay
18 attention to it.
19 So far he didn't call me back.
20 **Q. Okay. And just as I asked you, if any**
21 **of the cases you were involved in the preferences**
22 **on were on cases you were also involved on behalf**
23 **of creditors' committees, were any of the cases**
24 **that you were involved with preferences on, were**

H. LIU

2 **you also involved for a liquidating trust, as**
3 **opposed to a committee?**
4 MR. RAVERT: Do you understand the
5 question?
6 THE WITNESS: "Liquidating trust," can
7 you explain that?
8 Because I'm not involved any cases
9 liquidating trust. So you have to explain
10 it to me.
11 MR. GOLDSTEIN: You want to explain it
12 to him as his counsel? I'm happy to if you
13 don't want to.
14 MS. ENGLISH: Well doesn't that answer
15 your question?
16 THE WITNESS: The preference usually
17 comes long after the case is over.
18 MR. GOLDSTEIN: He's never been
19 involved in a liquidating trust?
20 MS. ENGLISH: Well you might want to
21 ask him to repeat his answer.
22 THE WITNESS: No. The answer is, no.
23 BY MR. GOLDSTEIN:
24 **Q. My understanding is that a number of**
25 **the committee cases you've been involved in,**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

H. LIU

after confirmation of a plan or upon a structure
dismissal, a liquidating trust has been formed
for benefit of creditors.

   A.  I've heard of those kind of things.

   Q.  So my question is for any of these
cases you were involved with regard to helping to
defend preferences, were those involving
liquidating trusts where you were involved?

   A.  No.

   Q.  Are you aware of any objections or
issues that Arent Fox has had with any of its
retention applications on cases?

   Are you aware of any party that
objected, anybody that's expressed an issue, or
whether it be to the U.S. Trustee, a creditor or
a judge?

   MR. RAVERT:  Do you understand the
question?

   THE WITNESS:  The question look like
very broad, all right.

   So it's -- if I understand correctly,
in any occasion, any U.S. creditors, any
creditors, or U.S. Trustee raise
objection --

H. LIU

BY MR. GOLDSTEIN:

   Q.  Or judge.

   A.  -- to Arent Fox.  Yes.

   Q.  Which ones are you aware of?

   A.  I'll give you an example.

   In Barcalounger case.

   Q.  Say that again.  I'm sorry.

   A.  In Barcalounger case I vote against
Arent Fox to favor Lowenstein.

   If you want to know why, I can tell
you.

   Q.  Sure.

   A.  Okay.  In that case look like
liquidation sale.

   In my understanding with these two
firms, which Arent Fox also is the bidder, one of
the bidder of committee counsel.

   And I feel their case need more
conservative approach to the debtor.  Arent Fox
did well on the problematic things and soft
approach.

   So although both are good team --
reliable team at least, seem to me, because any
firm can survive more than three years, which

H. LIU

American says is average on American business
life.  So I'm thinking they survive more than
three years.

   And I had with them on few cases.  I
feel both law firms fine, but in their particular
case Lowenstein is more fit to that particular
case.

   I voted against Arent Fox instead
of -- in favor of --

   Q.  So who had the objection to their
retention in that case?

   A.  I don't recall.

   It must have more than two creditors.
I don't remember specific name.

   Because, as you know, the committee
vote is a majority rules, majority rules.  You
must have got -- in that case I believe we have a
five creditors.

   So he must have got approval from more
than three.

   Q.  So were they -- when you are answering
my question with regard to objections, do you
mean objections at the formation meeting, or do
you mean objections that are filed with the

H. LIU

bankruptcy court after the formation meeting?

   A.  No, it is a formation meeting, in the
process of selecting the counsels.

   Q.  Okay.  I apologize.  I was unclear.

   The time period I was really looking
for was after the committee had chose counsel.

   Are you aware of any objections not
from the committee --

   A.  Oh, not from the committee.

   Q.  -- but from other parties to Arent
Fox's retention?

   A.  Nobody -- except this case?

   Q.  Yes.

   A.  Nobody brought that issue or that news
to me.  Otherwise would raise my awareness.  I
will look into it if somebody mention to me.

   Q.  I understand.  All right.

   One last question before we go on to
the documents.  And I do not -- do not mean to be
accusatory by this.  I just have to ask.

   There were a number of documents that
Arent Fox produced that you didn't produce, a
number of e-mails that were responsive to the
discovery requests.

H. LIU

Was there a reason that you didn't produce those?

    A.  After I got a notice sometime last week, the time is very precious, and you're asking almost like everything, I paid it close attention.

    I went through all the e-mails in my computers. You know, these days basically is on computers. Seldom you got.

    So I went this. I printed out everything, every single piece related to this case. Then I gave to my counsel.

    My counsel for some reason wants the number on each of the page, which I cannot produce automatically --

    MR. RAVERT: Dr. Liu, I'm just going to instruct you not to go too far in discussing specifically what I may have instructed you to do, okay.

    Try to answer the question in terms -- he's -- if I may restate the question.

    MR. GOLDSTEIN: Please.

    MR. RAVERT: He was asking if you can explain why those e-mails that were produced

H. LIU

last night that Arent Fox produced that were omitted from your original production, why they were not part of your original production.

    I just want you to hold off from saying anything I told you to do.

BY MR. GOLDSTEIN:

    Q.  And, again, I'm not trying to be accusatory.

    A.  To my best knowledge, I provided.

    Maybe they go through printing and maybe some page maybe stuck there.

    But as far as the -- I learned late afternoon. And when immediately go back to the original, we find there.

    And so that's -- that's no intention to -- and the few pages referred to is very -- almost like nothing to do with this case, if you can see it.

    Q.  Is there a chance that you may have missed some others by any chance?

    A.  To my best knowledge, not.

    Q.  You understand you have a continuing obligation to produce documents if you discover

H. LIU

them, right?

    A.  If you want, yes.

    Q.  Will you double-check and make sure there were no others omitted?

    (Request for production.)

    MR. RAVERT: Absolutely. It will be a triple check, because we double checked yesterday when we saw those misses.

    But, yes, we will.

    MR. GOLDSTEIN: Thanks Gary.

    With that I'm going to move on to the documents then.

    THE WITNESS: Everyone had lunch yet?

    MS. JOHNSON: Do you want to go off the record?

    (Luncheon recess taken from 1:27 p.m. to 1:43 p.m.)

BY MR. GOLDSTEIN:

    Q.  So the way procedurally I think I'd like to handle this is I'm going to start with the document production regarding communications between Dr. Liu and Arent Fox.

    And then we'll go on to the other ones from there.

H. LIU

    And since they're in reverse chronological order in the way they were produced and Bates stamped, I'm going to go backwards basically.

    MR. RAVERT: Okay.

    MR. GOLDSTEIN: And Dawn is going to help me out with exhibit tabs and what not.

    MS. JOHNSON: Yes. You just say the Bates number.

    MR. GOLDSTEIN: I'm going to start with HL 0334.

    MS. ENGLISH: So with the attachment?

    MR. GOLDSTEIN: Yes.

    And, just for the record, I understand -- Gary, correct me if I'm wrong -- with documents with multiple exhibits where the exhibits were substantially similar, i.e. bankruptcy petitions for debtors other than the primary debtor, then a number of the redundant exhibits, or closely redundant exhibits, were left out?

    MR. RAVERT: That's correct.

    And if you want them, obviously we can

H. LIU

1  provide them.
2
3      But it would be the petitions. That's
4  my understanding.
5      THE WITNESS: Petition and packing
6  list invoice?
7      MR. RAVERT: Right.
8      There are other e-mails also that had
9  multiple attachments, always the same
10  forwarded. It was exactly the same things.
11      MR. GOLDSTEIN: Understood.
12      THE WITNESS: And the reason would
13  there is wants me to help them clarify the
14  claim debtor amount.
15      MR. GOLDSTEIN: I'm not trying to make
16  you recreate unnecessary paper. I'm trying
17  to make everybody's life easy here.
18      THE WITNESS: All right.
19  BY MR. GOLDSTEIN:
20      Q.  So HL 0334 through HL 0351.
21      And if we do have a request for more
22  pages, then we'll let you know.
23      **(Liu Exhibit 2, E-mail with**
24  **attachment, Bates HL 0334 through HL 0351,**
25  **marked for identification.)**

H. LIU

1
2      MS. JOHNSON: Which will be marked as
3  Liu Exhibit 2.
4      (Document review.)
5  BY MR. GOLDSTEIN:
6      Q.  **With regard to all of the documents,**
7  **when I hand them to you, I'm going to ask you to**
8  **look at it, and I'm going to ask you if you**
9  **recognize it.**
10      A.  Yes.
11      Q.  **Does it accurately reflect e-mail**
12  **correspondence from the parties listed in the**
13  **e-mail on or about the dates reflected in the**
14  **document?**
15      A.  Yes, first day of petition date.
16      Q.  **And why don't you just walk me through**
17  **it from -- as I understand it, the earlier**
18  **e-mails are at the bottom, and then they proceed**
19  **to the top, if I'm not mistaken.**
20      A.  On August 4, as I stated earlier, on
21  that day I received several e-mails.
22      This is one of the e-mails attached
23  with debtor's bankruptcy petition files, from
24  Sullivan James to Dr. Haishan Liu, August the
25  4th, 9:44 a.m.

H. LIU

1
2      Q.  **Was anybody carbon copied on that?**
3      A.  I saw the name -- let me see, yeah, cc
4  Schuyler Carroll.
5      Q.  **And what were the contents of the**
6  **e-mail?**
7      A.  Content of the e-mail from Sullivan
8  James saying, "A bunch of Asian creditors."
9      Nothing more.
10      Q.  **And what was attached to that e-mail?**
11      A.  Debtor's bankruptcy petition file.
12      Q.  **So when he said, "A bunch of Asian**
13  **creditors," he was referring to a bunch of Asian**
14  **creditors in the bankruptcy case in which he**
15  **attached a petition?**
16      MS. ENGLISH: Objection.
17      Calls for speculation as to what
18  Mr. Sullivan meant.
19  BY MR. GOLDSTEIN:
20      Q.  **Did you understand the e-mail, "A**
21  **bunch of Asian creditors," to be referencing the**
22  **bankruptcy case for which the petition was**
23  **attached to your e-mail?**
24      A.  If I read this, what I understand is
25  they're saying in attached bankruptcy filed

H. LIU

1
2  petition there are some Asian creditors, is what
3  the sentence means.
4      Q.  **So you understood that he was sending**
5  **you this because he wanted you to contact the**
6  **creditors?**
7      MR. LAPINSKI: Objection.
8      MS. ENGLISH: Objection.
9      MR. LAPINSKI: Asked and answered.
10      THE WITNESS: I cannot speak their
11  minds.
12      As I said it before, I received
13  several e-mail from other law firm on that
14  day. I mentioned law firm before.
15      And my usually way to deal with it is
16  open the attachment to see whether they
17  refer to the same case or different case.
18      Because this is different -- there's
19  no case number attached.
20      So one see that UBP in this case.
21  Then after look at this, also sometime named
22  called different. You never saw form or
23  something. They have a different name,
24  right, in this case, because they have
25  associate affiliated debtor companies.

34  (Pages 130 to 133)

H. LIU

1 After I sure all this e-mail on the
2 particular day all refer to the same case, I
3 know this case is real.
4 BY MR. GOLDSTEIN:
5 Q. Are you aware of any other purpose,
6 other than that Mr. Sullivan wanted you to
7 contact creditors that he might have?
8 MR. LAPINSKI: Objection.
9 THE WITNESS: I repeat, as I said many
10 times, whenever I see e-mail like this, it
11 clear to me the law firm sent me this have
12 intention to -- interest in this case, to
13 pursuing in case.
14 That's my understanding.
15 BY MR. GOLDSTEIN:
16 Q. And it's your understanding that if
17 you were to contact creditors, that would
18 facilitate the law firm in obtaining the
19 engagement?
20 MR. RAVERT: Objection to form.
21 MS. ENGLISH: Objection.
22 THE WITNESS: I cannot speak their
23 minds.
24 BY MR. GOLDSTEIN:

H. LIU

1 Q. Well I asked you for your
2 understanding.
3 A. I can't answer them as their
4 questions.
5 My understanding, I said it before, in
6 this process, whoever sent to me, law firm, they
7 indicates their interest to me, saying they want
8 pursue this case.
9 Q. But you are not aware of any other
10 interests that they may have?
11 A. At that moment, no.
12 And that's my e-mail responding to
13 them.
14 Q. Can you read that back. I'm sorry.
15 (Record read.)
16 A. Yeah, at that moment, no, yeah.
17 Q. And at that point prior to the number
18 of attorneys that you said sent you this
19 petition, you weren't involved in the case?
20 MR. LAPINSKI: I'm sorry?
21 A. What's the question again?
22 Q. Can you read that back.
23 (Record read.)
24 A. No, no knowledge of this case. I even

H. LIU

1 never heard of UBP before.
2 You want to continue this top side,
3 from the bottom to the top?
4 Q. I'll get to the next question. Sorry.
5 I'm juggling my matzo ball soup.
6 A. Oh, okay.
7 Q. Moving up to the top of the page, and
8 we're still talking about HL 0334, could you tell
9 me what the e-mail is referenced at the top of
10 that page?
11 A. This e-mail -- my e-mail responding to
12 Sullivan's e-mail we just mentioned a couple
13 minutes ago.
14 My response is, yes, I received your
15 e-mail.
16 But meanwhile I informed them you are,
17 "one of five early birds this morning," meaning I
18 received several e-mails this morning.
19 And counsel's intention for teaming
20 up -- you want me to read it, right?
21 Q. Yes, yes. Let's read that second
22 sentence.
23 A. Oh, you want to read it.
24 "Counsel Schuyler's intention of

H. LIU

1 teaming up with Rafael is well recognized."
2 Q. And what did that mean exactly?
3 A. That means, as I said, I also received
4 e-mail from other law firm. One of law firm is
5 from Elliott.
6 Q. Elliott?
7 A. Elliott Greenleaf, and also from
8 Schuyler.
9 I mentioned Arent Fox had two lawyers
10 sending me the e-mail on that date.
11 One is Sullivan James. One from
12 Schuyler Carroll on that particular day. I
13 mentioned earlier.
14 Q. Well how did you know at this stage
15 when you wrote this e-mail that counsel Schuyler
16 of Arent Fox intended to team up with Rafael from
17 Elliott Greenleaf?
18 A. Because in one of the e-mail, one of
19 them mentioned they want to co-pitch on this
20 case. If you go through the e-mail, it must be
21 there.
22 They expressed their interest to team
23 up as local counsel or as lead counsel, whatever
24 they do at the moment.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585