H. LIU

1    My response to them, "As usual, at
2  this probing stage," which means the case just
3  started, we don't know yet, "let's find out what
4  those Asian creditors are going to respond and
5  their representation status in the USA prior to
6  the petition."
7    That's it, period.
8    Q.   All right. I'm going to turn your
9  attention to the next exhibit, which is Bates
10  stamped HL 0332 and HL 0333.
11    MS. JOHNSON:  Which will be marked Liu
12    Exhibit 3.
13    (Liu Exhibit 3, E-mail, Bates stamped
14    HL 0332 and HL 0333, marked for
15    identification.)
16    MS. JOHNSON:  Dr. Liu, you can just
17    put that one right there. That's fine.
18  BY MR. GOLDSTEIN:
19    Q.   And, Dr. Liu, I'm not going to ask you
20  to go through all of the redundant e-mails,
21  because I know there were a number of ones that
22  we already discussed appended to the bottom of
23  each of these.
24    A.   Uh-huh, uh-huh.

H. LIU

1    Q.   So I'm just going to start with HL
2  00332, the top e-mail.
3    Why don't you tell me what that is?
4    A.   That e-mail, it's August the 5th.
5    It's the next day after I received the
6  petition file from U.S. China Assets, which mean
7  from me, to Schuyler Carroll, cc to Sullivan
8  James.
9    You want me to read it?
10    Q.   Please.
11    A.   Okay.
12    "Counsel: Last night, after a
13  strenuous search and the tip from my client in
14  Hong Kong, I found the telephone number
15  associated with No. 4 creditor (named below) and
16  spoke to Ms. Wong who is working at the same room
17  number of the business address listed on the
18  petition schedule (copied below), and she give me
19  her e-mail address and Web site. Obviously they
20  are two different companies and Eastern
21  Accessories Corporation may have moved out. I
22  also noticed other creditors have a fax number on
23  that petition schedule, but No. 4 creditor has no
24  fax number, no phone number and no e-mail

H. LIU

1    address.  Could you get them or of them from the
2  debtors attorney, financial advisors or the U.S.
3  Trustees Office?"
4    Q.   And who did you address this e-mail
5  to?
6    A.   This particular e-mail, I stated
7  before, is from me to Schuyler Carroll, cc to
8  Sullivan James.
9    Q.   On August 5 of 2010?
10    A.   Yes. I answered before.
11    Q.   I apologize.
12    A.   No problem.
13    Q.   So the brunt of this e-mail is that
14  you asked for their assistance in finding the
15  contact information for the creditors so that you
16  could reach out to them?
17    A.   Yes. At the same time I said earlier
18  I sent the same request to other law firms who
19  sent me the petition file.
20    If you need that e-mail, I can give to
21  you. Because my habit is I want to see how
22  deeply they are understanding the case and their
23  real interest in this case.
24    And also, as I said before, I did call

H. LIU

1    your debtor's counsel. I did call U.S. Trustee's
2  office for the relevant missing phone number, fax
3  number and e-mail address.
4    Q.   The next pages I'm going to call your
5  attention to are Bates stamped HL 0330 and HL
6  0331.
7    MR. RAVERT:  Harley, to the extent
8  Dr. Liu volunteers documents, obviously
9  those documents will be provided only after
10  he and I have a chance to consult about it.
11    MR. GOLDSTEIN:  I'm confused.
12    MR. RAVERT:  He said -- and if you
13  want those e-mails, I'll provide them to
14  you.
15    But we haven't had a chance to discuss
16  those e-mails. I haven't had a chance to
17  review them.
18    MR. GOLDSTEIN:  Understood.
19    MR. RAVERT:  He's trying to be
20  cooperative.
21    THE WITNESS:  No, because the purpose
22  is you're trying to find out facts. And I
23  willing to cooperate.
24    MR. GOLDSTEIN:  I assumed that.

36  (Pages 138 to 141)

H. LIU

1
2      MS. JOHNSON: And this will be marked
3   Liu Exhibit 4.
4       (Liu Exhibit 4, E-mail, Bates stamped
5   HL 0330 and HL 0331, marked for
6   identification.)
7       **Q.   Does this also accurately represent**
8   **the correspondence, the e-mail correspondence**
9   **from the time?**
10      **(Document review.)**
11      MS. ENGLISH: I'm going to object,
12  because I'm not sure -- does it accurately
13  represent the e-mail correspondence or it is
14  e-mail correspondence you're asking about
15  right now?
16      MR. GOLDSTEIN: Accurately reflect.
17      THE WITNESS: Yes.
18  BY MR. GOLDSTEIN:
19      **Q.   And, again, without making you recite**
20  **the redundant e-mails at the bottom, let's just**
21  **move closer up to the top, to the second e-mail**
22  **here, which appears to be from Mr. Carroll to**
23  **you, with a current copy to Sullivan James, is**
24  **that correct?**
25      A.   Yes, the e-mail is from me to Schuyler

H. LIU

1
2   Carroll, and cc to Sullivan James.
3       **Q.   I think it appears from the e-mail**
4   **that it's from Mr. Carroll to you.**
5       **Am I missing something?  I'm looking**
6   **at the second e-mail down.**
7       A.   At the bottom.
8       **Q.   Yes -- not the bottom --**
9       A.   Oh, the middle.
10      Yeah, I see it.  That's from Carroll
11  Schuyler to U.S. China, cc Sullivan James, yes.
12      **Q.   And could you read that.**
13      A.   "Neither the debtor or the U.S.
14  Trustee will assist any lawyer in this regard.
15  It is possible that they may assist you, but they
16  never want to assist lawyers."
17      MS. ENGLISH: Give us just one second.
18      MR. GOLDSTEIN: Could we go off the
19  record for just one second.
20      (Discussion off the record.)
21      MS. JOHNSON: The parties have agreed
22  to stipulate, and Dr. Liu has agreed to
23  stipulate, to the authenticity of certain
24  documents that have been produced in this
25  case.

H. LIU

1
2   Specifically those will include
3   documents Bates labeled HL 0005 through HL
4   0394 and AF-UBP 0001 through AF-UBP 0025.
5       And that those contents accurately
6   represent his communications at or about the
7   times reflected in the e-mails.
8       MR. GOLDSTEIN: And moving on to HL
9   0327.
10      MS. JOHNSON: Which will be marked as
11  Liu Exhibit 5.
12      (Liu Exhibit 5, E-mail, Bates HL 0327,
13  marked for identification.)
14  BY MR. GOLDSTEIN:
15      **Q.   At the top of the e-mail it states,**
16  **"James - can you get Dr. Liu the info?" correct?**
17      A.   Yes.
18      **Q.   What "info" were you referring to?**
19      A.   I believe I asking in the last --
20  previous e-mail here, just put aside as evidence,
21  mentioned -- can I get it back one minute?  Okay.
22      MS. JOHNSON: I'm sorry, if we can
23  keep the record clear too, Dr. Liu has gone
24  back to Exhibit 4.
25      THE WITNESS: On Exhibit 4 they said,

H. LIU

1
2   "Neither the debtor or the U.S. Trustee will
3   assist any lawyer in this regard.  It's
4   possible they may assist you, but they never
5   want to assist lawyers."
6       Then I responded to that e-mail
7   saying, give me the contact info of both the
8   debtor and the U.S. Trustee, period.
9   BY MR. GOLDSTEIN:
10      **Q.   And for what purpose was that?**
11      A.   Purpose to find -- get a phone number
12  of the debtor and the U.S. Trustee.
13      **Q.   Thank you.**
14      **Moving on to HL 0326.**
15      A.   No, responding to you -- you asked me
16  what is Exhibit 5.
17      Exhibit 5 is just a response to this,
18  Schuyler to this.  Because I wanted phone number.
19      And his response to me is, "I am in a
20  meeting right now.  James - can you get Dr. Liu
21  the info," meaning both the contact information
22  of both debtor and the U.S. Trustee.
23      **Q.   For the purpose of locating --**
24      A.   For the purpose of locating the number
25  four, the number four creditor, which is largest

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

H. LIU

1 Chinese creditor EAC, has no fax number, no phone
2 number and no e-mail address.
3     **Q. Let's move on to HL 0326.**
4     MS. JOHNSON: Which will be marked as
5 Liu Exhibit 6.
6     (Liu Exhibit 6, E-mail, Bates HL 0326,
7 marked for identification.)
8     MR. RAVERT: You said 326?
9     MR. LAPINSKI: 326?
10 BY MR. GOLDSTEIN:
11     **Q. All right. And I'm referring to the**
12 **e-mail at the bottom of the page.**
13     A. Yeah, go ahead. What's the question?
14     **Q. I'm referring to the e-mail at the**
15 **bottom of the page sent at 9:17 a.m. on August 5.**
16 **Could you explain to me the brunt of**
17 **that?**
18     MS. ENGLISH: Objection. Asked and
19 answered. You just went through this on the
20 other e-mail. Exhibit 3, you asked him all
21 about that, the same thing.
22     MR. GOLDSTEIN: Oh, I apologize.
23     MS. ENGLISH: Just trying to get you
24 to sundown, buddy.

H. LIU

1 BY MR. GOLDSTEIN:
2     **Q. Next I'm going to direct your**
3 **attention to HL 0323 through 0324.**
4     MS. JOHNSON: Which we'll mark as Liu
5 Exhibit 7.
6     (Liu Exhibit 7, E-mail, Bates HL 0323
7 through 0324, marked for identification.)
8 BY MR. GOLDSTEIN:
9     **Q. Can you explain to me the brunt of the**
10 **e-mail?**
11     A. I have not received it yet.
12     **Q. I apologize.**
13     A. Okay.
14     (Document review.)
15     **Q. Could you explain to me the brunt of**
16 **that first e-mail at the top of the page on HL**
17 **0323?**
18     MR. LAPINSKI: Objection. "Brunt"?
19     MR. GOLDSTEIN: Summary.
20     MS. ENGLISH: Same objection.
21     MR. GOLDSTEIN: You want me to have
22 him read it?
23     THE WITNESS: You want me also --
24     MR. RAVERT: No, did you understand

H. LIU

1 the question? He said, "the brunt."
2     THE WITNESS: Oh.
3 BY MR. GOLDSTEIN:
4     **Q. Why did you send the e-mail at the top**
5 **of HL 0323?**
6     A. The first paragraph, right? The first
7 e-mail on the top?
8     **Q. The first e-mail, right.**
9     A. Since on the previous e-mail said --
10 Schuyler said the debtors or the U.S. Trustee
11 will not assist lawyers, but counselors will
12 assist the creditors or as nonlawyer persons.
13     So I -- this is a e-mail follow that
14 e-mail. That's what I said, from me to Schuyler,
15 to Rafael at Elliott Greenleaf.
16     "Counsels: I call the U.S. Trustee's
17 office and was told that since the information at
18 the U.S. Trustee's Office was provided by the
19 debtor's attorney, I should talk to the debtor's
20 attorney. When I asked what if the debtor's
21 attorney declines to my request for more
22 information regarding Chinese creditors, the
23 answers was well, the debtor's attorney shouldn't
24 do that to you because information is public. I

H. LIU

1 pushed one inch further saying what if he does,
2 then come back to me -- to us, meaning back to
3 the U.S. Trustee's office."
4     That's first paragraph.
5     You want me to go further? The second
6 paragraph in the same e-mail?
7     MR. RAVERT: Just wait till he
8 answers.
9     **Q. No, I think that's adequate.**
10     A. Okay.
11     **Q. For what purpose were you keeping**
12 **Arent Fox apprised of your contacts with the**
13 **creditors?**
14     MR. RAVERT: Objection. That assumes
15 facts in evidence.
16     A. I cannot speak of their minds.
17     As I said, I sent the same request to
18 several other law firm who sending me their
19 petition file.
20     Answer from them basically the same.
21 They're saying you talk to U.S. Trustee better,
22 all debtors -- something like this, the phone
23 number --
24     **Q. What do you mean, "You talk to the**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

H. LIU

1  U.S. Trustee better"?
2
3      A.   Because I'm not lawyer myself,
4  according to their opinion. I don't know their
5  law, I tell you.
6          They said -- because first I said I'm
7  getting the information from them. I believe
8  U.S. Trustee has more important things to do than
9  just providing the phone number for me for
10 individual creditors. I don't want to bother
11 them or call them until I have nowhere to turn
12 to.
13         Actually I did. I first called the
14 debtor's attorney to get information.
15         And I wait -- you see the date. I
16 wait one day, whatever, to get a response, for
17 either fax number or phone number or e-mail
18 address, which allows me to inform the Chinese
19 creditors.
20         I didn't get it on time, when the
21 formation date is fast approaching.
22         So I called lawyer. I said, do you
23 have those things, information for contacting
24 them.
25         They said it's better for me to talk

H. LIU

1
2  as a nonlawyer. They didn't say that, but my
3  understanding that, my understanding that.
4      So I call the debtors, instead of
5  first call the U.S. Trustee office.
6      Only I didn't get the response on time
7  from the debtor counsel. Then I reach the U.S.
8  Trustee office.
9      Then response I said before.
10     Q.   Why did the debtor's counsel tell you
11 it was better -- I'm sorry, not the debtor's
12 counsel, why did committee counsel tell you that
13 it was better?
14         MR. LAPINSKI: Objection.
15         MS. ENGLISH: Objection.
16         THE WITNESS: I cannot speak their
17 minds.
18         MS. ENGLISH: There's no committee
19 counsel at this time either.
20 BY MR. GOLDSTEIN:
21     Q.   Why did counsel who was interested in
22 becoming committee counsel tell you it was better
23 for you to speak to the U.S. Trustee?
24         MR. LAPINSKI: Objection, calls for
25 speculation.

H. LIU

1
2          MS. ENGLISH: Objection.
3          MR. RAVERT: Objection.
4  BY MR. GOLDSTEIN:
5      Q.   What is your impression?
6      A.   My impression from reading is it's
7  better for me to talk to the Trustee Office or to
8  debtor's office because I'm not a lawyer. I'm
9  not pitching the committee counsel myself.
10         That's what I think is the language --
11 what I'm understanding from their communication.
12     Q.   It didn't occur to you that that might
13 be hiding something from the U.S. Trustee?
14         MS. ENGLISH: Objection.
15     A.   I have no idea what they said or did.
16     Q.   All right. I'm going to turn your
17 attention to document Bates stamped HL 0321.
18         MS. JOHNSON: Which we'll mark as Liu
19 Exhibit 8.
20         (Liu Exhibit 8, E-mail, Bates HL 0321,
21 marked for identification.)
22 BY MR. GOLDSTEIN:
23     Q.   What were you trying to convey in
24 sending this e-mail?
25     A.   This e-mail dated August 9 from me to

H. LIU

1
2  Schuyler, cc to Sullivan and Rafael.
3      "Counsels: After the mobilization
4  work of yesterday and this morning, I have
5  secured the representation of No. 10 creditor,
6  Shanghai Hualin Hardware, and the discussion with
7  No. 7 creditor, Hebei Longda Trade Company will
8  continue.
9      "As to the following No. 4 creditor,
10 no response has come from the debtor's attorney
11 side, but I got the contact information of the
12 newly hired CRO in this case. Let me know when
13 is convenient for you to have conference to
14 address the reps matter, Eastern Accessories
15 Corporation, Suite 801, Tower 1, Gateway 25,
16 Canton Road, TST, Hong Kong."
17     Q.   And why were you telling Arent Fox
18 this as well as Elliott Greenleaf?
19     A.   Since they sent me the interest, the
20 letter, at the first day, as one of the several
21 other law firms.
22         And I informed them at this moment, as
23 of August 9 at least, I have one creditors agree
24 to let me represent this company as a proxy
25 holder and -- meaning I have one proxy holder.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

H. LIU

2     Q.   Meaning that you would be able to cast
3 your vote for the committee's professionals?
4     A.   That's -- say that again.
5     Q.   Meaning that you would be able to cast
6 your vote as proxy for the committee's
7 professionals?
8     A.   Yes.
9     Q.   All right. Just so I can confirm --
10     A.   But make sure -- I have to say that
11 the date April 9 means preformation meeting.
12     It's a time even you got proxy holder
13 in hand, doesn't necessarily mean you will be
14 selected.
15     Q.   I understand.
16     A.   But at least I make sure the counsels
17 should prepare their continuing -- petition for
18 they're really interested. That's my purpose.
19     Q.   And I just want to make sure there's
20 no language barrier here and that we have
21 ascribed the same meanings to all of the words
22 here. Your English is impeccable, but I just
23 want to make sure we're on the same page.
24     A.   I'm always learning. English never be
25 enough for me.

H. LIU

2     Q.   So I just want to make sure that my
3 understanding jives with yours.
4     And it says here, "After the
5 mobilization work of yesterday."
6     By that you meant something to the
7 tune of that you invested hard work in making
8 this happen, right?
9     A.   Yeah, because I believe --
10     MR. RAVERT: Objection.
11     What do you mean by, "this happen"?
12     I just want to make sure that he's
13 answering your question.
14     MR. GOLDSTEIN: The second half of the
15 sentence, the second clause of the sentence
16 says, "I have secured the representation of
17 No. 10 creditor."
18     That's to what I'm referring.
19     THE WITNESS: The petition date was on
20 August the 5th.
21     This e-mail occurred August the 9th,
22 meaning you have four days in between.
23     And for any person who doesn't know
24 the creditors before the petition date, and
25 from first call to get the proxy, it's not

H. LIU

2 easy work. You take time. You have to
3 inform them. They have to believe the case
4 really happens.
5     Then they were starting research me
6 from their side, make sure they talk to a
7 person is real.
8 BY MR. GOLDSTEIN:
9     Q.   But I just want to focus on
10 mobilization --
11     A.   Mobilization, as I said before --
12     Q.   Hard work?
13     A.   No, means basically I have to educate
14 them, educate Chinese.
15     After bankruptcy occurs you have a
16 right to pursue your interest by participating
17 committee formation meeting.
18     Because individually you don't want to
19 pay hour rate to U.S. attorneys, this committee
20 is a way for you to get information, get a legal
21 counsel in, get to know the case progress, and
22 mobilize them to participate formation meeting.
23     Q.   Which requires significant effort on
24 your part, is what you're trying to convey?
25     A.   Thank you. If I understand, yes.

H. LIU

2     Q.   And then the second clause says, "I
3 have secured the representation."
4     So by saying, "I have secured the
5 representation," you're evidencing a victory in
6 gaining the representation?
7     MR. RAVERT: Objection.
8     It's a mischaracterization. Those are
9 your words.
10     Q.   I just want to understand what he
11 meant by, "I have secured the representation."
12     I want to make sure there's no
13 language barrier here.
14     A.   Once I sent -- meaning the creditor of
15 Shanghai Hualin, either verbally or in writing,
16 agreed to let me hold the -- represent them to
17 attend the formation meeting because they don't
18 want to come in person.
19     Q.   Thank you.
20     So you were successful in obtaining
21 the representation?
22     A.   Thank you.
23     Q.   I'm now referring to the Bates stamp
24 HL 0320.
25     MS. JOHNSON: Which we'll mark as Liu

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

H. LIU

1  Exhibit 9.
2     (Liu Exhibit 9, E-mail, Bates HL 0320,
3  marked for identification.)
4  BY MR. GOLDSTEIN:
5     Q.  Can you just briefly explain what you
6  were trying to convey in that e-mail?
7        MS. ENGLISH:  I'm going to object, to
8  the extent you are asking him on each of
9  these documents to convey what he meant by
10  the e-mail, which seems to just elicit a
11  response, "I meant what I said," and he
12  reads the e-mail.
13     I think it may be more productive if
14  you have a question about what he said in
15  the e-mail, to ask him that, as opposed to
16  asking him what he meant to convey, when
17  he's just going to keep answering that he
18  meant to convey what he said and then read
19  the e-mail.
20        MR. GOLDSTEIN:  Well I appreciate your
21  concern.  And I want to get out of here just
22  as much as you do.
23     But I think this is different than
24  your ordinary circumstance because I think

H. LIU

1  there is at least somewhat of a language
2  barrier.  And I just want to make sure that
3  we're all on the same page as to what these
4  meant.
5        MS. ENGLISH:  Sure.  But rereading the
6  e-mail doesn't get you past his language
7  barrier.
8     So why don't you just ask him
9  specifically if you have words that you're
10  concerned about or phrases that you're not
11  sure they convey the meaning you would
12  ascribe to them, then, why don't you ask him about
13  those, instead of asking him to read the
14  e-mail.
15        MR. GOLDSTEIN:  It's a pretty short
16  e-mail.
17     The way of doing that is for me to
18  read the e-mail.  It's going to take up just
19  as much time.
20  BY MR. GOLDSTEIN:
21     Q.  I mean, you could just tell me in a
22  couple words what you meant by this.
23     A.  The e-mail is responding to -- I think
24  Ms. Wong in relation with finding where is No. 4

H. LIU

1  creditor.
2     As I stated earlier in one of the --
3  one of my answers to your questions said it is
4  the same address as this did on the largest
5  secured creditors.  It's a Hong Kong address.
6  It's a Hong Kong address another company occupied
7  as a space, which is Ms. Wong's company.
8     And are asking to her -- are asking
9  her whether they can help me to find out where is
10  Eastern Accessories Corp.
11     So here she respond, "Please advise
12  which jurisdiction of the reference company you
13  are referring to."
14     I'm not quite understanding at the
15  time what is jurisdiction of the reference
16  company you are referring to.  So I trying to get
17  a device from counsel on the top, which he mean
18  Schuyler Carroll, cc Sullivan James.
19     Q.  All right.  Turning to HL 0319.
20        MS. JOHNSON:  Which we'll mark as Liu
21  Exhibit 10.
22     (Liu Exhibit 10, E-mail, Bates HL
23  0319, marked for identification.)
24     Q.  We've already discussed the e-mail at

H. LIU

1  the bottom of this.
2     So I only want to call your attention
3  to the e-mail at the top of this, in which
4  Schuyler Carroll responds to an e-mail to you,
5  carbon copying Sullivan James and Elliott
6  Greenleaf, stating, "Excellent.  That is great.
7  Thanks.
8     What is your understanding of what
9  they were referring to?
10     A.  My understanding is -- as a law firm
11  also responding, is that saying, you did great
12  work, you did hard work, you got us a proxy, gave
13  me encouragement, because courtesy words.
14     Q.  Thank you.
15     Next I'm going to turn your attention
16  to HL 0317 and HL 0318.
17        MS. JOHNSON:  Which we'll mark as Liu
18  Exhibit 11.
19     (Liu Exhibit 11, E-mail, Bates HL 0317
20  to HL 0318, marked for identification.)
21     Q.  And I'm only going to call your
22  attention to the top e-mail on HL 0317, in which
23  Sullivan James carbon copying Schuyler sends you
24  an e-mail providing an address.

41  (Pages 158 to 161)

H. LIU

1  
2      And my question is whose address is he
3  providing you?
4      MR. RAVERT: If you know.
5      Q. If you know.
6      (Document review.)
7      A. I don't know this address.
8      From the e-mail look like Sullivan
9  provide address which doesn't match the address
10 on the largest 30 creditors list.
11     When they file bankruptcy, they always
12 have top 10 or top 20 or top 30 creditors list.
13     Q. All right. And just to call your
14 attention to the first two lines of the e-mail,
15 which states in the second line, "I noticed the
16 following Chinese address for the creditor on the
17 Internet though so perhaps that is what she
18 means."
19     That indicates to you that this is in
20 fact one of the creditors of the debtors,
21 correct?
22     MS. ENGLISH: Objection.
23     THE WITNESS: Can I answer?
24     MR. RAVERT: Yeah, if you understand
25 the question.

H. LIU

1  
2      THE WITNESS: My understanding is this
3  address doesn't match address on the largest
4  30 creditors.
5      So I don't take this seriously.
6  BY MR. GOLDSTEIN:
7      Q. Are you aware of any reason why James
8  Sullivan would be sending you this in this
9  context, particularly giving the "regarding" line
10 in the subject here, other than this is a
11 creditor of the debtors?
12     A. I cannot speak his mind.
13     However, I didn't send the request --
14     Q. Can you read the question back,
15 please, because I believe it said, "Are you
16 aware."
17     (Record read.)
18     A. My understanding is I sent the same
19 request to other law firms, to the -- call the
20 debtor's office -- call the debtor counsel
21 office, called U.S. Trustee.
22     I didn't get it.
23     So here look like he trying to give me
24 address, ask -- asked me or inquire me whether
25 this address is correct address.

H. LIU

1  
2      Q. A creditor of UBP?
3      A. Yeah, referring No. 4 creditors.
4      Right now all the e-mail -- few --
5  since now is regarding No. 4 creditors.
6      Q. Thank you.
7      Turning to HL 0316.
8      MS. JOHNSON: Which we'll mark as Liu
9  Exhibit 12.
10     (Liu Exhibit 12, E-mail, Bates HL
11 0316, marked for identification.)
12     Q. This appears to be an e-mail from you
13 to Schuyler, carbon copying James Sullivan and
14 Elliott Greenleaf, inquiring whether there's a
15 reliable person who might hold a proxy for number
16 10.
17     Why were you asking this question?
18     A. By that time I believe the number four
19 phone number, address, and e-mail address, I got
20 it.
21     And according to my experience, one
22 person only could hold one proxy holder. And the
23 number four has a higher dollar amount than
24 number ten.
25     So under the situation I cannot hold

H. LIU

1  
2  two proxies at one time, I trying to find
3  somebody else willing to help Chinese creditor to
4  attend the formation meeting.
5      Q. So just to be crystal clear, at the
6  time and date this e-mail was sent, on August 9
7  of 2010 at 4:31 p.m. eastern time, you were
8  intimately aware that Arent Fox and Elliott
9  Greenleaf were seeking a position as committee
10 counsel?
11     MR. LAPINSKI: Objection to form.
12     MR. RAVERT: Objection.
13     THE WITNESS: I can answer?
14     MR. RAVERT: Yes, you can answer.
15     THE WITNESS: I say many times, Arent
16 Fox is one of the few other law firms
17 expressed interest in pursuing this case.
18 BY MR. GOLDSTEIN:
19     Q. And Elliott Greenleaf?
20     A. And Elliott Greenleaf.
21     Q. So the answer to my question is, yes,
22 then?
23     She can read back the question then,
24 if you didn't --
25     A. Yes.

42  (Pages 162 to 165)

H. LIU

2  Q.  So by this e-mail you were asking
3  Arent Fox and Elliott Greenleaf to choose a
4  proxy?
5  MR. RAVERT: Objection.
6  A.  I asked them to recommend if they know
7  somebody who is knowledgeable who is reliable,
8  meaning not from the street, not somebody who has
9  no idea what a proxy means.
10  As I also stated before, since it's
11  free service and it's hard for me to find a
12  person who has voluntarily -- willing to
13  voluntarily help the Chinese creditors, then a
14  person also understand the proxy holder and
15  bankrupt proceeding.
16  So I asked professionals to recommend.
17  Q.  So when you asked them for a reliable
18  person, and I stress the word "reliable," then
19  you were, in essence, asking them for somebody
20  that they were able to judge whether they were
21  reliable, meaning that they know them well?
22  MR. RAVERT: Objection.
23  A.  I stated before the reliable, to me in
24  my mind, is somebody not from the street,
25  somebody who should have knowledge about the

H. LIU

2  formation meeting or about the -- you know, the
3  proxy holders.
4  Q.  Is there a way that you're aware that
5  they could be able to determine whether they're
6  reliable without them knowing the person?
7  A.  You ask me do I know there's a way if
8  I'm able to find out there's a system or some
9  organization to find such kind of person?
10  Q.  Well let's ask a couple of other
11  questions.
12  A.  Because I don't realize there's such
13  kind of system.
14  Q.  Is there a book that lists reliable
15  proxies?
16  A.  There is a --
17  Q.  Is there a book?
18  Can you go to Barnes & Noble and can
19  you buy a book that says these are reliable
20  proxies, that you're aware of?
21  A.  No.
22  Q.  So the way you would find a "reliable
23  person" would be to ask for a recommendation of
24  counsel?
25  A.  At this stage I believe from my

H. LIU

2  experience is a lawyer who has special knowledge
3  about what is reliable person.
4  So they recommend somebody -- at least
5  one for me to know who referred to me.
6  For example, if Arent Fox refer to me
7  or EG, which is -- which said many times Elliott
8  Greenleaf, recommend.
9  So at least I know somebody I can
10  trace him back to if something goes wrong.
11  Q.  So in order -- in your understanding,
12  in order to form an opinion as to their
13  reliability, Arent Fox or Elliott Greenleaf would
14  have to know the person that would serve the
15  proxy well?
16  A.  Yes.  Otherwise -- otherwise they
17  probably would not recommend to me.
18  Q.  And if Arent Fox and/or Elliott
19  Greenleaf were recommending this person as proxy,
20  wouldn't you expect that that proxy would be cast
21  for the firms that recommended him?
22  MR. RAVERT: Objection.
23  A.  I cannot speak their mind.
24  However, basically in the past if
25  somebody recommend to me, be by Arent Fox or be

H. LIU

2  by EG or be by some other law firms, they usually
3  let that person speak to Chinese creditors, which
4  in this case Shanghai Hualin.
5  I will explain to them, since I may
6  have -- since I will represent -- since I may
7  represent number four creditors, which he has
8  higher dollar amount than you, and as a U.S.
9  bankruptcy proceeding formation meeting one
10  person is allowed to hold one proxy holder,
11  meaning I can hold for you.
12  However, if you continue, wants to
13  participate the formation meeting, and if you
14  don't have friends or your company rep other than
15  me, I could recommend somebody to you.  I explain
16  to them.
17  Only they agreed and signed on the
18  proxy, that would be effective.
19  Q.  But that proxy has the right to vote
20  for professionals for the committee, assuming
21  that the creditor makes it to the committee?
22  A.  Yes, according to the proxy.
23  Q.  Have you ever seen a situation where a
24  law firm has recommended somebody to sit as a
25  reliable proxy and that proxy didn't ultimately

43  (Pages 166 to 169)

H. LIU

1               **H. LIU**
2 vote for that law firm?
3     A. I cannot speak for them. And sometime
4 I even --
5     **Q. Are you aware?**
6     A. I'm aware -- the proxy holder --
7 somebody recommend to me.
8     He cast a vote to -- can you say the
9 question again, rephrase the -- express the
10 question again.
11     **Q. He cast a vote for counsel other than**
12 **counsel that recommended him to you?**
13     MR. RAVERT: Do you understand the
14 question?
15     A. Nobody tell me which counsel they are
16 going to vote.
17     **Q. So you're not aware of any**
18 **situation --**
19     A. Yes.
20     **Q. -- of that type?**
21     A. Yeah.
22     **Q. Thank you.**
23     A. Yes, to make that clear to you.
24     **Q. I'm going to direct your attention now**
25 **to HL 0315.**

1               **H. LIU**
2     MS. JOHNSON: And which we'll mark as
3 Liu Exhibit 13.
4     (Liu Exhibit 13, E-mail, Bates HL
5 0315, marked for identification.)
6     **Q. And this appears to be an e-mail from**
7 **you to Elliott Greenleaf and Arent Fox?**
8     **(Document review.)**
9     MS. ENGLISH: I'm sorry, just so that
10 the record is clear, it appears to me to be
11 an e-mail just to Elliott Greenleaf that's
12 copying some attorneys at Arent Fox.
13     MR. GOLDSTEIN: Apologies. That's
14 correct.
15 BY MR. GOLDSTEIN:
16     **Q. And this reiterates that an Arent Fox**
17 **attorney will verify the reliability of the reps,**
18 **which presumably is short for representatives**
19 **candidates?**
20     A. To my best knowledge, I think as a --
21 as a -- the proxy holder recommend in this regard
22 was posed by EG, Elliott Greenleaf.
23     Since I -- when the name pops up, I
24 believe is Greg Urbanchuk, somebody, last name.
25     And I say I don't know this person,

1               H. LIU
2 which mean by this one do you know this person.
3     And I also said Chinese creditor will
4 be afraid talking to someone who have no idea of
5 who that person is.
6     So before I explain to Chinese
7 creditor, I used my caution to make sure at least
8 Arent Fox knows this person. Whether they know
9 or not, I make sure.
10     The reason is Arent Fox stay in
11 business longer than I get into this business.
12 Arent Fox may have more knowledge about EG and
13 their attorneys.
14     **Q. All right. I'm going to call your**
15 **attention to — somebody correct me if I'm wrong,**
16 **that these aren't one unit together with**
17 **exhibits, but it's HL 0311 through HL 0313.**
18     MS. JOHNSON: Which we'll mark as Liu
19 Exhibit 14.
20     (Liu Exhibit 14, E-mail, Bates HL 0311
21 through HL 0313, marked for identification.)
22 BY MR. GOLDSTEIN:
23     **Q. I'm going to start with page 312.**
24     MR. RAVERT: Could you just give him
25 one second.

1               H. LIU
2     You're going to confirm that there are
3 three pieces that go together, two pages
4 like this, and that this is an attachment to
5 that.
6     THE WITNESS: Okay.
7     (Document review.)
8 BY MR. GOLDSTEIN:
9     **Q. Before we get to that exhibit just one**
10 **general question, with regard to the UBP**
11 **bankruptcies, did you ask any other law firms to**
12 **help you find the proxies?**
13     MR. RAVERT: Excuse me, what's the
14 question?
15     Did you ask my other law firms to help
16 you find --
17 BY MR. GOLDSTEIN:
18     **Q. Other than Arent Fox or Elliott**
19 **Greenleaf.**
20     A. No.
21     MR. SCHEPACARTER: I hate to
22 interrupt, but somebody has got their
23 Blackberry next to the phone. And I frankly
24 missed that whole last question and answer.
25     (Record read.)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

H. LIU

1   A.   No, because --
2   **Q.   Let's move on to the next question.**
3   A.   Because -- let me explain to it,
4   because somebody interrupt.
5       Because there's only one proxy --
6   **Q.   I don't think there's a pending**
7   **question.  If you guys want to bring this back**
8   **up --**
9       MS. ENGLISH: I think he's finishing
10  his answer.  He felt he was interrupted, I
11  thought is what he said.
12      MR. SCHEPACARTER: Yes, I think he
13  should be allowed to finish that answer.
14  BY MR. GOLDSTEIN:
15  **Q.   Can you start over.**
16  A.   Because want understanding the facts,
17  find the facts.
18      The facts best way to find is know
19  whole general background, why it happened, why
20  don't give to somebody else.
21      So you don't have one anchor.  You
22  judge later on, okay.  I said what I did.
23  **Q.   I'm sorry. I'm just on a time**
24  **deadline.  I don't mean to rush you.**

H. LIU

1   A.   Because only one proxy holder.  And
2   this case happened in Delaware.  So EG was easy
3   in Delaware.
4   **Q.   EG?**
5   A.   Is Elliott Greenleaf.
6   **Q.   Elliott Greenleaf?**
7   A.   Was located in Delaware.
8       I have to consider the cost effective
9   because it's a free for to hold the proxy holder.
10  You cannot ask somebody in Hawaii to fly to this,
11  all right.
12      So if -- even from New York cost a few
13  hundred dollars to have a ticket trains, all
14  right, train ticket.
15      I call -- also because only one proxy
16  holder.  If you go to other law firm, they are
17  not in New York most likely.  And they will pay
18  for it.
19      So I gave to the -- I chose to --
20  **Q.   I'm glad you finished answering the**
21  **question, because it sounds like that you were**
22  **predisposed at this point to Elliott Greenleaf**
23  **and Arent Fox.**
24      MS. ENGLISH: Objection.  Is that a

H. LIU

1   question?
2       MR. GOLDSTEIN: No.
3   BY MR. GOLDSTEIN:
4   **Q.   Again turning attention to HL 0312,**
5   **Exhibit 14, which appears to be an e-mail from**
6   **Arent Fox to Kenneth Dorsney.**
7       **Who is Kenneth Dorsney, first of all,**
8   **for the record?**
9       MR. RAVERT: He hasn't found the
10  e-mail that you're on yet.
11      You're looking at the one towards the
12  bottom of the page?
13      MR. GOLDSTEIN: I was starting at the
14  top on 312.
15      MR. LAPINSKI: 312?
16      (Document review.)
17      THE WITNESS: This is from Rafael
18  Zahralddin to Kenneth Dorsney.
19  BY MR. GOLDSTEIN:
20  **Q.   And who is he?**
21  A.   Cc -- I have no idea.  Probably
22  somebody -- is Rafael's colleagues or somebody
23  Rafael knows.
24  **Q.   And it has carbon copies to you and to**

H. LIU

1   Schuyler at James Sullivan and then to Jessi
2   Adkins.
3       **Do you know who Jessi Adkins is?**
4   A.   No, at this moment I don't know who's
5   Jessi.
6       Since he's a firm of Rafael, I tend to
7   believe Jessi is somebody Rafael knows about.
8   **Q.   I'll going to call your attention to**
9   **about the middle of that e-mail with the sentence**
10  **that starts, "To ensure we have no issue with the**
11  **U.S. Trustee."**
12  A.   What is your question?
13  **Q.   My question is why would you have an**
14  **issue with the U.S. Trustee?**
15      MS. ENGLISH: Objection.
16      Are you asking him what the author of
17  this e-mail meant?
18  **Q.   Do you understand what the issue with**
19  **the U.S. Trustee would have been?**
20  A.   I don't know exactly what it means.
21      I could think he wants proper
22  procedures, proper procedures to which U.S.
23  Trustee Office will not raise a question.
24      That's what I understanding from this

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

H. LIU

1 sentence.
2
3    **Q. Are you aware that the U.S. Trustee**
4 **frowns upon the process being operated for the**
5 **benefit of professionals rather than --**
6    MR. RAVERT: Objection.
7    MR. LAPINSKI: Objection.
8    THE WITNESS: I cannot speak on behalf
9 of U.S. Trustee Office.
10 BY MR. GOLDSTEIN:
11    **Q. I'm asking if you understand it or**
12 **not.**
13    **If you don't understand it, the answer**
14 **is probably, no, right?**
15    MR. RAVERT: The question assumes the
16 truth of the statement that you're making.
17 And you're asking him if he understands
18 that.
19    THE WITNESS: My experience --
20    MR. GOLDSTEIN: I didn't even get to
21 finish the question.
22    THE WITNESS: My experience is --
23    MS. ENGLISH: Is there a question
24 pending?
25    MR. RAVERT: Let him ask the question.

H. LIU

1
2    MR. GOLDSTEIN: Why don't you read
3 back the first half of the question that I
4 got through. And I apologize. Let me
5 finish the question.
6    (Record read.)
7    MR. RAVERT: It's his turn to ask a
8 question. I'm sorry, she was just reading
9 back from the record.
10    MR. GOLDSTEIN: I'll rephrase it.
11 BY MR. GOLDSTEIN:
12    **Q. Have you been informed that the U.S.**
13 **Trustee would have an issue with either a**
14 **professional or a proxy appearing to be the true**
15 **party interested as opposed to a creditor itself?**
16    MS. ENGLISH: Objection.
17    MR. RAVERT: Objection.
18    It could even call for a legal
19 conclusion.
20    Do you understand the question?
21    THE WITNESS: Yeah, can you put the
22 question shorter.
23    MR. GOLDSTEIN: Can you reread it
24 again.
25    THE WITNESS: Because shorter is

H. LIU

1
2 better.
3    If you shorter, I answer more
4 straightforward. Because longer, I have to
5 think about what you truly means, that cause
6 both misunderstanding, possible
7 misunderstanding.
8    I don't want to mislead you. The
9 purpose here, I don't want mislead you. I
10 want you on right track.
11 BY MR. GOLDSTEIN:
12    **Q. I appreciate that.**
13    A. Thank you.
14    (Record read.)
15    MR. RAVERT: Objection, confusing.
16    MS. ENGLISH: Objection.
17    MR. RAVERT: Don't answer. Just give
18 him a second. I hear you talking. I'm not
19 sure whether you're going to rephrase it.
20    MR. GOLDSTEIN: I don't think that's a
21 complicated question.
22    MR. RAVERT: Okay. If you can answer
23 it, go ahead.
24    THE WITNESS: Let me explain your
25 question, all right.

H. LIU

1
2    If you ask me whether U.S. Trustee --
3 BY MR. GOLDSTEIN:
4    **Q. Why don't you just explain your**
5 **understanding of that sentence?**
6    A. Ask me --
7    **Q. Let me draw your attention to the**
8 **sentence.**
9    A. Can you be a little shorter and
10 straightforward.
11    **Q. Let me draw your attention to the**
12 **sentence that says, "To ensure we have no issue**
13 **with the U.S. Trustee," through the end of the**
14 **sentence where it says, "if asked."**
15    **Can you tell me what your**
16 **understanding of that sentence is?**
17    MS. ENGLISH: Objection, asked and
18 answered.
19    MR. LAPINSKI: Objection.
20    MS. ENGLISH: He said, "To ensure
21 proper procedures."
22    She read it back for a second time
23 already.
24 BY MR. GOLDSTEIN:
25    **Q. Could you explain what you mean by,**

46 (Pages 178 to 181)

H. LIU

1  "to ensure proper procedures"?
3     A.   That's my understanding his language.
4     It's not my job to ensure the
5  procedure is properly executed. It's the U.S.
6  Trustee job, will evaluate when somebody present
7  at a formation meeting.
8     I could tell you my experience. Maybe
9  help your understanding.
10    Q.   What proper procedures are you
11 referring to?
12    A.   Okay. Then I can tell you my
13 experience.
14    I cannot tell how U.S. Trustee Office
15 exercise the evaluation on the proper procedure.
16    My experience is when you -- not a
17 direct -- direct exporters or creditors
18 themselves, and you are the proxy holder showing
19 at formation meeting, proxy holder at a formation
20 meeting, U.S. Trustee Office, especially in
21 Delaware, will interview and ask you how do you
22 get this case.
23    You explain either by knowing him or
24 by contacting him or referred by somebody else.
25 You explain to the Trustee Office.

H. LIU

2     Then usually Trustee Office will ask
3  you who will sitting on the committee, if this
4  creditor will be selected on the committee.
5     Then I will answer this person who
6  sign the questionnaire and the proxy will sit on,
7  or I will sit on for them.
8     Then U.S. Trustee basically trying to
9  verify whether you know the company, so asking a
10 few questions, when the business started, this
11 creditor -- when this creditor started business
12 with his debtor, what are products sold to the
13 debtors, what is total amount of claims, same
14 question, all related question, to assure the
15 person who holds the proxy for the creditor has
16 basic knowledge or some kind of relationship with
17 the creditor.
18    So that's my experience. Then I see
19 U.S. Trustees going through that way.
20    But I don't know there is a proper
21 procedure U.S. Trustee practice. I cannot speak
22 on them, but just my personal experience.
23    Q.   So this was, in essence, an attempt to
24 disguise something from the U.S. Trustee?
25    MS. ENGLISH: Objection.

H. LIU

2     MR. RAVERT: Objection.
3     THE WITNESS: I cannot speak of your
4  mind. I cannot speak your speculation.
5     But you're free to do so.
6  BY MR. GOLDSTEIN:
7     Q.   So it's your understanding that this
8  was an attempt to disguise something from the
9  U.S. Trustee?
10    MS. ENGLISH: Objection.
11    MR. RAVERT: Objection.
12    THE WITNESS: I cannot speak your
13 mind.
14 BY MR. GOLDSTEIN:
15    Q.   I asked you if it was your
16 understanding.
17    MS. ENGLISH: The witness has given
18 you his answer and this lengthy explanation
19 several times, and he never said anything
20 close to what you are now trying to put in
21 his mouth.
22    THE WITNESS: And I don't understand
23 what's your true meaning --
24    MR. GOLDSTEIN: It's belied by the
25 e-mail.

H. LIU

2     THE WITNESS: -- by asking this.
3  Thank you.
4     MR. GOLDSTEIN: Rich, I think we're
5  going to let you take up that question later
6  when you get to yours.
7     All right. Moving on to HL 0311.
8  It's part of the same exhibit I believe.
9     MS. ENGLISH: Same exhibit?
10    MR. GOLDSTEIN: You know, in my view
11 of you three screaming in unison does not
12 mask the intent of this e-mail anymore.
13    MS. ENGLISH: Screaming? I'm sorry?
14 I don't believe anyone was --
15    MR. LAPINSKI: For the record, no one
16 was screaming, number one.
17    Number two, repeating the same loaded
18 leading question can be arguably --
19 argumentative. Forgive me. And at some
20 point it becomes harassing. And we are
21 forced to voice our objections.
22    We didn't state the basis because we
23 weren't asked, for the most part. But we're
24 happy to give it.
25    MR. GOLDSTEIN: We're at two separate

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

H. LIU

1　ends here. There's harassment on the one
2　side and evasion on the other.
3　　　MS. ENGLISH: No one has directed the
4　witness not to answer any of your questions.
5　BY MR. GOLDSTEIN:
6　　Q.　All right. The HL 0311 that I'm
7　referring to appears to be an e-mail from Elliott
8　Greenleaf to you, Dr. Liu, with carbon copies to
9　other Elliott Greenleaf attorneys, as well as
10　Arent Fox.
11　　A.　Yes.
12　　　(Document review.)
13　　Q.　All right. Let's just go through the
14　paragraphs, starting with the paragraph that
15　says, "I'm sure Schuyler is fine."
16　　　What's your understanding of what that
17　paragraph means?
18　　　(Document review.)
19　　A.　As I said before in my answer to
20　previous questions, I said EG referred to
21　somebody called Greg Urbanchuk.
22　　Q.　Are we looking at the same thing? I'm
23　sorry. (Indicating.)
24　　　MR. RAVERT: The second paragraph down

H. LIU

1　is the one he's looking at.
2　　Q.　"I'm sure Schuyler is fine" -- can you
3　repeat that.
4　　A.　"I'm sure Schuyler is fine with
5　whoever we suggest as it is not easy, nor will it
6　be with this one, to find proxy holders as think
7　this will attract a lot of people."
8　　　And my understanding is -- in my
9　answer to previous question, I said the Greg
10　Urbanchuk posed by EG, and I want my caution --
11　　Q.　And when you say "EG," you mean
12　Elliott Greenleaf?
13　　A.　That's correct.
14　　　Can we put inside in the future when
15　say "EG," means Elliott Greenleaf.
16　　Q.　Yes.
17　　A.　Because I don't want to drag all
18　professional here, because say many times.
19　　Q.　I understand. I understand.
20　　A.　Like UBP for Universal Building
21　Products. You know, that's building parts, all
22　right.
23　　　And I want to exercise extra caution
24　make sure Arent Fox or Schuyler, other lawyers

H. LIU

1　knows a Greg Urbanchuk, this person.
2　　Q.　Who's the "Greg" that this is
3　referring to?
4　　A.　Greg here -- to me? I don't know Greg
5　Urbanchuk when the person first time brought to
6　me.
7　　　That's why I asked Arent Fox to help
8　me see whether this person he has knowledge
9　about.
10　　Q.　And Greg was the proposed proxy --
11　　A.　Holder for Shanghai Hualin, the
12　smaller creditors.
13　　Q.　I understand.
14　　A.　Because I'm going to hold the largest
15　Chinese creditor proxy holder.
16　　Q.　What's your understanding of why it
17　was difficult to find a proxy?
18　　　MR. RAVERT: Objection, asked and
19　answered.
20　　　MR. LAPINSKI: Objection, asked and
21　answered.
22　　　THE WITNESS: Because the service for
23　holding proxy is basically free.
24　　　And for cost effective in this

H. LIU

1　particular case I tend to thinking somebody
2　within Delaware.
3　BY MR. GOLDSTEIN:
4　　Q.　Moving on to the next sentence, where
5　it talks about finding somebody and calling in a
6　favor, what do you mean by that -- or sorry, what
7　do you think Elliott Greenleaf meant by that?
8　　　MR. RAVERT: Objection. Calls for
9　speculation.
10　BY MR. GOLDSTEIN:
11　　Q.　What is your understanding of what
12　Elliott Greenleaf meant by that?
13　　　You guys are going to teach me to be a
14　litigator the hard way, aren't you? I hope I
15　don't have to do a deposition for another 17
16　years.
17　　　(Document review.)
18　　A.　No matter what it says, in my mind my
19　understanding this case is -- in this situation
20　is somebody referred to me, and I'm not familiar
21　with that person, I want make sure that person
22　being recognized by certain party, somebody else,
23　and that person from local in Delaware.
24　　　Honest -- I tell you honestly I'm

48　(Pages 186 to 189)

H. LIU

1 quite not familiar with real meaning.
2 But my intention is very clear. I
3 want a third party to make sure knows Greg
4 Urbanchuk, just for caution.
5 **Q. The word I'm focusing on here is**
6 **"favor."**
7 **Could you explain your understanding**
8 **of what the word "favor" is?**
9 A. I cannot speak of other people's mind.
10 **Q. You do not have an understanding of**
11 **what he meant by "favor"?**
12 **Because that doesn't sound credible.**
13 MS. ENGLISH: Objection.
14 You want him to define the word
15 "favor" for you in someone else's e-mail?
16 MR. GOLDSTEIN: I want him to describe
17 his understanding of the word "favor."
18 BY MR. GOLDSTEIN:
19 **Q. Do you not know what the word "favor"**
20 **means?**
21 MS. ENGLISH: Argumentative.
22 BY MR. GOLDSTEIN:
23 **Q. It seems to be what you're saying.**
24 A. You want me to answer?

H. LIU

1 Out of this context, in general,
2 "favor" is you like something.
3 **Q. I'm not sure I understood that. I'm**
4 **sorry.**
5 A. If it's a favor this Pepsi over the
6 Sprite, means that you like Pepsi more than
7 Sprite.
8 MR. RAVERT: You favor it.
9 **Q. Are you aware of any other definitions**
10 **of the word "favor" other than in that context?**
11 A. You're teaching me. I love to learn
12 from people, have different meanings out of
13 general context.
14 **Q. Going on to the next sentence, in**
15 **which Elliott Greenleaf appears to say that he**
16 **just referred business to Greg and that Greg**
17 **isn't trying to obtain a financial advisor**
18 **engagement here, it then states, "He knows the**
19 **rules and will serve us well."**
20 **What is your understanding of what**
21 **Elliott Greenleaf meant when he said, "He knows**
22 **the rules and will serve us well."**
23 A. Again, I cannot speak what Rafael
24 truly meaning by saying that.

H. LIU

1 My understanding is still same. He
2 refer Greg to me. I don't care what his formal
3 position. I just don't know that person.
4 I don't know what's arrangement
5 between Greg and EG, because had no knowledge
6 before this e-mail who Greg is, before the Greg
7 name first referred to me.
8 For that very reason I asked Arent
9 Fox, said do you know this person.
10 **Q. And if your answer to this is no,**
11 **that's perfectly fine.**
12 **But do you know what "rules" he's**
13 **referring to?**
14 A. If Arent Fox back to me saying this
15 person has knowledge of the rules, knows about
16 the rules of the bankruptcy proceedings or proxy
17 holding, I tend to think that's a fair
18 assessment.
19 **Q. And when read in conjunction with the**
20 **next few words, that "They will serve us well,"**
21 **does that change your understanding of the word**
22 **"rules"?**
23 A. This not changed my mind. My mind is
24 very fixed and firm. No matter what he says, I

H. LIU

1 want to find who he is, somebody knows about him.
2 I'm just not taking EG's words without
3 going extra background checking before I even let
4 them talk to Chinese creditors.
5 **Q. When EG uses the word "us," is it your**
6 **understanding that -- who is it your**
7 **understanding that EG is referring to?**
8 A. I cannot explain for -- for Rafael.
9 He explains. He may means his law firms.
10 **Q. Thank you.**
11 **Going on to the next paragraph where**
12 **it says, "I know of no issue Arent has with**
13 **Greg," what is your understanding of why that's**
14 **relevant?**
15 A. Even he said that, I still --
16 MR. RAVERT: Objection, by the way.
17 It presumes that he believes it to be
18 relevant at all.
19 So he can explain it, to the best that
20 he can.
21 THE WITNESS: Like I said it before,
22 even he said that, I still want Arent Fox to
23 let me know whether he knows that person or
24 not.

49 (Pages 190 to 193)

## 194

H. LIU

1    BY MR. GOLDSTEIN:
2       Q.   And I don't mean to be snippety with
3    you here. I have a cold and my head is ringing.
4       MS. ENGLISH:  Do you want to take a
5    break?
6       MR. GOLDSTEIN:  No, I'm in a rush.
7       MS. ENGLISH:  It might be a good time
8    anyways.
9       MR. GOLDSTEIN:  If you all want to
10   take a break, let's take a very short break.
11   I'm short on time.
12      MS. ENGLISH:  I could use 2 minutes to
13   hit the ladies room.
14      MR. GOLDSTEIN:  Let's take a break.
15      (Recess taken from 3:13 p.m. to 3:29
16   p.m.)
17      MR. SCHEPACARTER:  We are back on the
18   record.
19      Since this deposition is taking so
20   long and we may need more information, I'm
21   going to reserve my right to either subpoena
22   Dr. Liu or call Dr. Liu or do something with
23   respect to Dr. Liu on my own deposition.
24      So I'm not sure I'm doing it, but I'm

## 195

H. LIU

1    reserving the right.
2       MR. RAVERT:  That's fine.
3    Obviously we would reserve our rights.
4       MR. GOLDSTEIN:  If you want to do this
5    in another way, I can go back in the hall
6    with Dawn and give her the rest of my
7    comments to all of the questions. And you
8    can just wait 10 minutes. I'll give her
9    those, and we can finish our batch
10   altogether.
11      MR. SCHEPACARTER:  I'd rather you guys
12   just finish up whatever you've got. And
13   then let me do what I've got. And then call
14   it a day.
15      MR. GOLDSTEIN:  All right. Let's do
16   that.
17      MR. SCHEPACARTER:  I'm reserving my
18   rights to call him again, but, you know.
19      MS. ENGLISH:  And I don't know if we
20   were on the record for the first part.
21      I think it's a fair summary to say the
22   debtor's counsel requested that they be able
23   to switch out lawyers, switch from
24   Mr. Goldstein to Ms. Johnson and then back

## 196

H. LIU

1    to Mr. Goldstein later.
2       The committee voiced an objection as
3    to switching lawyers for a single party in a
4    deposition.
5       But we are now reaching an agreement
6    to allow you all to do so if Ms. Johnson
7    will finish the questioning.
8       MR. GOLDSTEIN:  That's right.
9       And just so the record is complete,
10   the reason that I'm doing that is because,
11   number one, I have a ringing headache right
12   now and really can't focus and, number two,
13   I have to remove my bags from the hotel by a
14   deadline.
15      So it's a mechanical issue, not a
16   strategic one.
17      MR. SCHEPACARTER:  That's fine.
18      (Recess taken from 3:32 p.m. to 3:59
19   p.m.)
20      MS. ENGLISH:  I just want to make a
21   quick statement, if I may.
22      What's the time?
23      MR. LAPINSKI:  3:59.
24      MS. ENGLISH:  Okay. It is now 4:00

## 197

H. LIU

1    o'clock. We have been going for over six
2    hours in this deposition today.
3       And, as we all know, the rules permit
4    only a seven hour deposition.
5       The committee -- assuming it is okay
6    with Dr. Liu and his counsel, the committee
7    is fine with waiving the seven hour
8    limitation for some limited period of time,
9    in order to allow us to get finished today.
10      That said, you know, in light of that,
11   we certainly will object to any attempts to
12   bring Dr. Liu back or suspend the deposition
13   and hold it open and bring him back for
14   another day. We will object to that.
15      I just wanted to put that on the
16   record.
17      MR. SCHEPACARTER:  That's fine.
18      And on the behalf of the United States
19   Trustee we reserve the right to either
20   notice up our own deposition or bring him
21   back, most likely probably notice him up.
22      But either way, we reserve the right
23   to do that.
24      And I understand your reservation of a

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

H. LIU

1 right to object.
2 MS. JOHNSON: Okay. I turn your
3 attention -- and, Gary, if you can help me
4 with exhibit numbers too.
5 MR. RAVERT: Yes.
6 EXAMINATION
7 BY MS. JOHNSON:
8 Q. If I can have you turn your attention
9 to HL 307 through 309.
10 And specifically if you could look at
11 the second page of that document.
12 MR. RAVERT: Are you going to mark it?
13 MR. LAPINSKI: 15, Liu 15.
14 MS. JOHNSON: You know, I can give you
15 a stapler too.
16 (Liu Exhibit 15, E-mail, Bates HL 307
17 to 309, marked for identification.)
18 BY MS. JOHNSON:
19 Q. If you could look at the bottom of the
20 second page of that document, there's an e-mail
21 from Kenneth Dorsney.
22 It says, "Greg Urbanchuk of Asterion
23 will hold that proxy."
24 What proxy are they referring to?

H. LIU

1 MS. ENGLISH: Objection. Asked and
2 answered.
3 MR. RAVERT: First of all, I do not
4 see the e-mail that you're -- you're talking
5 about the very last page or the second?
6 MS. JOHNSON: No, the second page.
7 MR. RAVERT: The bottom of the second
8 page.
9 Oh, there it is right there. From
10 Kenneth Dorsney.
11 And repeat the question, please.
12 BY MS. JOHNSON:
13 Q. There's an e-mail from Kenneth
14 Dorsney. It says, "Greg Urbanchuk of Asterion
15 will hold the proxy."
16 What proxy is this e-mail referring
17 to?
18 A. Yes, this proxy refers to Shanghai
19 Hualin Hardware. It's a smaller customer -- a
20 smaller creditor compared to EAC.
21 Q. Now did anyone from Elliott Greenleaf
22 contact Shanghai directly to suggest Greg
23 Urbanchuk?
24 A. My understanding is after the person

H. LIU

1 Greg name pops up, I asked for Arent Fox to help
2 me identify that person.
3 After I got the feedback from
4 Counselor Schuyler. And it now appears to me
5 they know that person.
6 And then we arranged a conference call
7 with Chinese vendor, Shanghai Hualin Hardware.
8 That's the first time Greg had an
9 opportunity to speak to Chinese creditor
10 directly.
11 Q. Now was that conference call before or
12 after Kenneth Dorsney sent this e-mail saying
13 Greg will hold that proxy?
14 A. Logically it should be before the
15 conference, because I see the e-mail -- on this
16 e-mail August 9, 2010, from Schuyler to EG, cc to
17 EG, and my name on it -- let me see --
18 Yeah, to me also.
19 Saying Greg is good or anyone else
20 that Raf is comfortable with.
21 So my understanding is Schuyler has
22 some knowledge of that person, it seemed to me.
23 So then I said, okay, if you want,
24 that next step is -- is -- have a conference call

H. LIU

1 with Chinese creditor Shanghai Hualin Hardware
2 directly.
3 And we introduced Greg to them, to the
4 Chinese creditor.
5 I explained why we need a third party
6 and that because I, you know, have -- similar at
7 the time I have largest creditor, Chinese
8 creditor, EAC. So I cannot hold two proxy
9 holders at the same time.
10 And if they still wants participate
11 the committee formation activities, if they have
12 their own person, own friends, associates in
13 United States that can refer to, they are free to
14 do so.
15 If not, here's gentleman Greg, and
16 other law firm also assure me that knows him.
17 And he will -- Greg will hold proxy holder for
18 your company.
19 You think about whether you agree or
20 not. If you agree, change his name on the proxy
21 and sign it, put your stamp on it, and get it
22 back to Greg.
23 But in China stamp look like a more
24 serious than individual signature. In United

H. LIU

1  States signature is enough.
2  
3  Q. When you say, "change the name on the
4  proxy," what are you referring to?
5  A. Originally, as I you said before if
6  you listen carefully, the e-mail -- the proxy
7  first was my name on it.
8  That's before we find EAC, located
9  EAC. Remember we said a few time ago, because
10 EAC was no name, no phone number, no address, no
11 e-mail.
12 After few days, probably around August
13 9, and finally we find, located -- located that
14 company, EAC.
15 And Shanghai Hualin gave me the proxy
16 earlier than EAC.
17 Q. Okay. So you had already sent a proxy
18 to Shanghai Hualin before you located EAC?
19 A. Yes, correct.
20 The proxy blank from my company. I
21 sent him proxy holder blank after they agreed to
22 sign the questionnaire, express willing to
23 participate in the future activities.
24 And then we send the proxy holder -- a
25 proxy letter to Shanghai Hualin Hardware to

H. LIU

1  execute.
2  
3  Q. Where you did get the proxy letter
4  from?
5  A. I had a version myself in the
6  computers. And I believe when I presented the
7  proxy, I first faxed questionnaire and a proxy to
8  the U.S. Trustee Office one day before the
9  formation meeting date, to EAC.
10 We didn't fax -- I didn't fax with my
11 name on it to -- on the Shanghai Hualin Hardware
12 proxy.
13 Q. That was the one with Greg's name on
14 it?
15 A. That's Greg's name. And Greg faxed to
16 it.
17 Q. Okay. So now just to clarify, on this
18 Exhibit 15 you said this very top e-mail on the
19 first page, HL 307, "Greg is good - or anyone
20 else that Raf is comfortable with."
21 After that was the call with --
22 A. Yeah, uh-huh.
23 Q. So at the point in time when this
24 e-mail on the second page goes through, no one
25 from Elliott Greenleaf has spoken to Shanghai

H. LIU

1  
2  Hualian?
3  MR. RAVERT: Objection.
4  Could you try to be specific, because
5  I see three e-mails on the second page.
6  Are you talking about the bottom one?
7  MS. JOHNSON: I am. The one that we
8  were discussing previously.
9  MS. ENGLISH: 1:57 p.m.?
10 MS. JOHNSON: Yes.
11 MR. RAVERT: Would you mind repeating
12 the question.
13 MS. JOHNSON: Can you read it back.
14 (Record read.)
15 THE WITNESS: I don't recall exact
16 time and minute.
17 But definitely before Shanghai Hualin
18 agreed to let Greg hold their proxy and the
19 conference call had occurred before this
20 executed proxy, agreed to change the name
21 from me to Greg.
22 BY MS. JOHNSON:
23 Q. Okay. But -- let me go back to the
24 first page.
25 After you received this e-mail, "Greg

H. LIU

1  is good or anyone else that Raf is comfortable
2  with," after that --
3  A. Yeah.
4  Q. -- was the conference call where Greg
5  was introduced to Shanghai Hualin, is that
6  correct?
7  A. Yes.
8  Q. Next I'd like you to look at HL 306.
9  And we would mark that 16.
10 (Liu Exhibit 16, E-mail, Bates HL 306,
11 marked for identification.)
12 Q. Liu Exhibit 16.
13 And I'd like to direct your attention
14 to the last sentence there. It says, "Meanwhile
15 the UST has to look itself into the mirror that
16 the subsystem of selecting committee
17 professionals itself has many pores in the first
18 place."
19 Can you complain to me what you mean
20 by that?
21 A. Okay, if you allow me to explain that.
22 And when I say "many pores in the
23 systems," because from my experience bankruptcy
24 law itself provides opportunity for U.S.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

H. LIU

1
2 creditors and foreign creditors to seek their
3 credit rights.
4         And you need a system to practice that
5 law, to put the law into practice.
6         And that system right now, supervising
7 system, is U.S. Trustees --
8         And there's only -- on one particular
9 bankruptcy case there only will be -- one law
10 firm will be eventually selected, appointed as --
11 as committee counsel.
12         However, normal situation will be more
13 than one law firms showed up at a formation
14 meeting, at a formation meeting. And they're all
15 competing for that one position.
16         And one flaws I see in the system
17 is -- because I heard and I saw many lawyers
18 approaching to us, to the creditors and asking
19 for support.
20         Because the time is so short they
21 don't use courtesy over there. They just direct
22 in asking, do you want support us. Doctor, can
23 you support us. Somebody will say, we are the
24 best. All right?
25         So they give lawyers opportunity to

H. LIU

1
2 solicited creditors to vote for them in a very
3 short period of time.
4         And I believe if U.S. Trustee could
5 separate lawyers from creditors before the
6 formation meeting, if as a condition, if
7 permissible, that will be effective step to
8 prevent the counsels from approaching creditors
9 to exert their last minute effort to solicit
10 creditors to vote for them.
11         That's the first pore. Means holes.
12 They have some holes, some leaks.
13         And second one, I feel I don't know
14 why U.S. Trustee not stopping, not preventing the
15 financial advisors promoting for law firms.
16         Because it says lawyer cannot contact
17 the creditors.
18         But it has no law prohibiting
19 financial advisor from to contact the creditors.
20         And as happens, as we see very often,
21 the financial advisor promote for certain law
22 firms.
23         And, third, I see many proxy holders
24 that only showed up once at the formation
25 meeting. And after formation meeting over, those

H. LIU

1
2 proxy holders disappeared, never showed up again.
3         And those proxy holders normally is
4 the lawyers' financial advisors.
5         So I'm thinking to allow the committee
6 to choose best law firm to be appointed for us
7 committee on a particular day, less lawyer, less
8 financial advisor holding proxy holder will be
9 better for the creditors in general.
10         And that's my personal observation.
11 And maybe it's not right, maybe a lack of knowing
12 other things on other side. Just my personal
13 proposals.
14         And same thing here, if you don't
15 mind, I keep saying few words.
16         For example, how do you know Harley
17 Goldstein. When I saw his -- you know, him
18 today, I said met him somewhere.
19         He said, yes, I'm on the Delaware
20 case. Same thing. He approached me, introduced.
21 And he showed words, very simple, whatever I
22 attach and the body language or words, the
23 intention is clear. He's trying to get voters,
24 like the creditors, you know, to support them.
25         And it's kind of short meeting.

H. LIU

1
2 Usually language is very blunt. And make -- make
3 me very uncomfortable. I can tell you the truth.
4         Because especially showed up more than
5 once. People look like in the face; they
6 approach me.
7         And I hope U.S. Trustee is somehow
8 down the road, if United States economy turns
9 better, have a second room to separate.
10     Q.  So those are problems with the system
11 that you see?
12     A.  That's what it means. U.S. Trustee
13 itself could look into things, can improve the
14 condition, make -- make creditors a little more
15 comfortable.
16         That's my personal observation.
17     Q.  Can I direct your attention to HL 032.
18         MR. RAVERT: 302?
19         MS. JOHNSON: 302, yes, sorry.
20         MR. LAPINSKI: It's Liu 17?
21     Q.  Yes.
22         (Liu Exhibit 17, E-mail, Bates HL 032,
23         marked for identification.)
24     Q.  And when you get that, if you could
25 look at the top e-mail on that page.

53  (Pages 206 to 209)

H. LIU

1  (Document review.)
2  
3      A.  Before you go to this question, I want
4  to mention again, this situation where creditors,
5  lawyers mingling together at a formation meeting
6  room, it's not only in Delaware court, Trustee
7  Office, formation meeting room.
8      Also in New York, in New Jersey.  So
9  the phenomenon is universal.  So the system
10 itself.
11     Q.  If you could take a look at the top
12 e-mail on Exhibit 17 from -- and is that Schuyler
13 Carroll, is that right?
14     MR. RAVERT:  Yes.
15     A.  Yes.
16     Q.  To you.
17     This says, "This creditor will be
18 entitled to a claim for the extra $50,000 and
19 should be able to assert an admin claim for it as
20 well."
21     Do you see that?
22     A.  Yes.
23     Q.  And that's in reference to a specific
24 creditor in the UBP bankruptcy, is that correct?
25     A.  I believe that's to the Shanghai

H. LIU

1  Hualin.
2      Q.  And just Shanghai Hualin, correct?
3      A.  Yes.
4      And I don't know where he get exact
5  amount.  Probably he use rougher estimation.
6      What happened is the Shanghai Hualin
7  at the petition date they had two containers on
8  the sea to the United States, either will arrive
9  at a U.S. port or arrive shortly.
10     So we -- we are asking whether this --
11 those two containers was about $50,000 will be
12 treated as an administrative claims.
13     So it seemed to me that Schuyler
14 answer the question, say, yes, you can treat it
15 as an administrative claim.
16     Q.  If you look down further on your
17 e-mail to EG and Arent Fox attorneys, it says, "I
18 heard the debtors want to return them to China,
19 but the creditor insists the goods were made for
20 the debtors and there would be no use and/or
21 costly for returning them back to China."
22     What type of help in this regard, what
23 type of help were you looking for?
24     A.  I posed this question at a formation

H. LIU

1  meeting.
2      After U.S. Trustee presides over the
3  formation meeting, after the debtor's counsel
4  spoke.  I raise my hand.  I stand up.  I stood
5  up.
6      I ask there's two containers.  It is
7  at Customs now or is approaching U.S. Customs.
8      Could you help to resolve that two
9  containers, retrieve from the court -- or
10 retrieve from the port and pay the creditors.
11     And my real question is your
12 counsel -- the debtor's counsel answered, we will
13 look into it, and get back to me, which never get
14 back to me.
15     And I called Schuyler --
16     MR. RAVERT:  Schuyler?
17     THE WITNESS:  Schooler.
18     MR. RAVERT:  Oh, Schooler.
19     THE WITNESS:  Dan Schooler office --
20 BY MS. JOHNSON:
21     Q.  I don't mean to interrupt, but what
22 I'm really interested in, this is before the
23 formation meeting.
24     If you look at this e-mail, it's dated

H. LIU

1  August 10, okay.
2      A.  Oh, okay, uh-huh.
3      Q.  Okay.  So I'm really asking for what
4  type of help were they looking for?
5      A.  Looking for who --
6      Q.  In terms of these two containers, what
7  did they want to happen?
8      A.  The Chinese creditor wants who in
9  United States can help with them ask debtor to
10 buy those two containers.
11     Q.  So they want the sale to go through?
12     A.  Go through, yes, exactly.
13     Q.  And that would add to the amount of
14 that particular company's claim then in the
15 bankruptcy?
16     MR. RAVERT:  Objection.
17     MS. ENGLISH:  Objection.
18     THE WITNESS:  At the time we didn't
19 discuss what's exact claim amount.
20     But these two container, I ask them
21 what is the value.  They probably estimated
22 at about $50,000.
23 BY MS. JOHNSON:
24     Q.  And you specifically then asked

54 (Pages 210 to 213)

H. LIU

1  Schuyler about how to handle this issue for
2  Shanghai Hualin?
3
4      MS. ENGLISH: Objection.
5      The e-mail is to two attorneys at
6  Elliott Greenleaf, with a cc to Schuyler and
7  others.
8      MR. LAPINSKI: Objection.
9  BY MS. JOHNSON:
10     Q.   Then let me say this.
11     You were asking the attorneys on this
12  e-mail to give you advice with respect to
13  Shanghai Hualin, is that correct?
14     A.   Yes.
15     Q.   And Schuyler responded with the advice
16  that's up at the top of this e-mail on page HL
17  302, correct?
18     A.   Yes, it appears, yes.
19     Q.   Now also down at the bottom of this
20  page you have a note that says, "Now you may
21  understand getting a proxy is a two way traffic."
22     What does that mean?
23     A.   That means very simple.  You educate
24  Chinese that United States is a fair, the
25  bankruptcy law is fair to everybody.

H. LIU

1      They gave me a challenge back.  Said,
2  look, I have two containers in port.  Could you
3  guys help me get the containers sold through the
4  debtor.
5      And you can see, you want us to
6  participate in U.S. formation meeting bankruptcy
7  courses, would you, U.S. side, can you help us
8  solve the real problem here.
9      Q.   So they're asking you for help in
10  return?
11     A.   Help in return, exactly.
12     And also a free service, at least on
13  container basis.
14     Do you want to know what is the
15  follow-up to containers?
16     MR. RAVERT: Just wait for a question.
17     Q.   If I could direct your attention to HL
18  290, which would be Exhibit 18.
19     (Liu Exhibit 18, E-mail, Bates, HL
20  290, marked for identification.)
21     Q.   And if you could take a look at that
22  e-mail, it says, "However, this creditor has some
23  legal issues with the debtors, and I need to
24  speak to you before 8:00 p.m. this evening."

H. LIU

1      And that's you writing to Schuyler
2  Carroll, is that correct?
3      A.   That's correct.
4      Q.   And what was the legal issue with this
5  creditor?
6      A.   This creditor has three problems with
7  debtor.
8      First, for whatever the goods already
9  slipped to debtor and received by the debtor as
10  of the petition date unpaid.
11     The debtor listed as about $416,000,
12  around there, slightly over 400,000.
13     This creditor number four told me that
14  claim much larger than that amount listed by the
15  debtors on the largest 30 creditors list.
16     One, which is a second part, second
17  part, is they have some goods arrived at the U.S.
18  and Canada.
19     They're not sure whether they're
20  pickup or not picked up by the debtor as of
21  petition date.
22     Third, the problem is they have
23  approximately over $1.5 million goods already
24  produced in China, but not shipped out to the

H. LIU

1  U.S. debtor yet, as of -- as of petition date.
2      So they had three problems.  They ask
3  what to do.  So I trying to get some kind of
4  advice from counsels, because I see the date
5  August 11 and the formation meeting is 13th, and
6  plus a time difference.
7      So the matter seemed to me is urgent.
8  That's what that means.
9      Q.   So did Schuyler or someone else from
10  Arent Fox call you back on this?
11     A.   I don't recall exactly what time they
12  call me back.  I -- assuming I thought somebody
13  reach me back on this matter.
14     Q.   And you spoke to them about these
15  particular issues for Eastern Accessories?
16     A.   Yes, I explained to the situation.
17     Q.   And did they give you any advice on
18  how to handle that?
19     A.   I don't exactly remember exact words,
20  if we should e-mail one way.
21     But basically advise for -- if the
22  goods received by the debtor waiting 20 days,
23  within 20 days, prior to bankruptcy petition
24  date, they would consider as 503B9.

H. LIU

1                 H. LIU
2     As to the goods already produced in
3 China, not shipped yet, they probably will go
4 through different procedure.
5     **Q.  And who gave you that advice?**
6     A.  Either Schuyler Carroll or Sullivan
7 James.
8     **Q.  If I could direct your attention to HL**
9 **288, which will be the Exhibit 19.**
10          (Liu Exhibit 19, E-mail, Bates HL 288,
11 **marked for identification.)**
12     **Q.  And if you could look at the top of**
13 **the page, there's an e-mail from Schuyler Carol**
14 **to you and others that says, "We are definitely**
15 **interested in pursuing this case."**
16        What is your understanding of what
17 **they meant by, "pursuing this case"?**
18     A.  As I said before, any law firm that
19 sent the e-mail of petition file usually is a law
20 firm or those law firm have interest or had
21 interest in pursuing to be elected as committee
22 counsel.
23     **Q.  So that's what you understood this**
24 **statement to mean, that they were interested in**
25 **being selected as committee counsel?**

H. LIU

1                 H. LIU
2     A.  As other law firms.
3     **Q.  Is that correct?**
4     A.  Yeah.
5     Arent Fox is no different from any
6 other law firms.
7     **Q.  Yeah.  And I'm just asking, that's**
8 **what you understood it to mean.**
9     A.  Now also I asked the same question to
10 other law firms.
11    **Q.  Move to strike.  No pending question.**
12    A.  Okay.
13    **Q.  If you could look at HL 280, which**
14 **would be Liu Exhibit 20.**
15     MR. RAVERT:  I'm sorry, what number
16 was that?
17    **Q.  HL 280.**
18     (Liu Exhibit 20, E-mail, Bates HL 280,
19 **marked for identification.)**
20    **Q.  There are a couple of e-mails here,**
21 **"Good to be advised.  Maybe massage + messages**
22 **work to him."**
23     **What are you talking about?**
24    A.  Can you refer to the e-mail prior to
25 this?  Then you understand it perfectly.  See the

H. LIU

1                 H. LIU
2 minutes.  You have a time.
3     **Q.  Yes.**
4     A.  So see any e-mail August 11 at 9:05
5 p.m.  Some e-mail before this, one e-mail before
6 this minute.
7     **Q.  If you could show him HL 281.**
8     **We don't need to mark that as an**
9 **exhibit, but that might help him.  I mean that I**
10 **think is the e-mail right before.**
11    A.  You want me to express other way?  I
12 remember what this e-mail means.
13    **Q.  Oh, yeah, if you can tell me what it**
14 **means, yeah.  Then please do.**
15    A.  Okay, okay.
16     Remember I first contacted Schuyler
17 for asking office, that office to help Chinese
18 Shanghai Hualin to help solve the two containers
19 at the port.
20     And the Schuyler office assigned the
21 one person.  He didn't answer to me, my question
22 e-mails.  And I called again.
23     Then one time I believe a lady claim
24 is his daughter answer the phone.
25     Say, my father is not here.  Could I

H. LIU

1                 H. LIU
2 help you.
3     I ask her, you are -- who's your
4 father.
5     Then say, Dan Schooler.
6     And I say what's your position there.
7     She said, I'm the manager --
8 administrator supervising the operation.
9     I say, okay, that person should talk.
10    So I explain the situation to them.
11    And she said, let me help you find the
12 person who might able to help you allocate those
13 two containers.
14    **Q.  Allocate?**
15     MR. RAVERT:  Locate.
16    A.  Locate, locate.  I'm sorry.
17     Locate those two containers, were they
18 at the port or they already picked up.
19     I waited probably a day or two.  And
20 they didn't call me back -- they didn't e-mail me
21 back saying -- they did call me back -- or they
22 e-mail back saying those two container located.
23     That's only for stock purpose, not for
24 purchase, not for purchase, only for stock
25 purpose.

56  (Pages 218 to 221)

H. LIU

1        
2     The Chinese creditor saying that one
3  of these containers are urgent matters. They
4  have e-mails showing the debtor wants those two
5  containers. They have users.
6     And I'm trying to reach Dan Schooler
7  again, trying to say, the debtor wants it. Why
8  now he's tell me only for stock purposes. They
9  told the Chinese they had a buyer. They had a
10  buyer before the goods shipped out of China.
11     Now that the goods arrived, you not
12  tell me the goods only for stock purpose.
13     And there's no budget. They called in
14  DIP financing to buy their goods, meaning nobody
15  can help.
16     So I trying to reach Schooler, Dan
17  Schooler. And he didn't respond.
18     And I wrote an e-mail to Schuyler.
19  Two e-mails against Schuyler, do you know Dan
20  Schooler.
21     And he said Schooler is not a very
22  helpful person and don't expect the response from
23  him.
24     So after I got the information, I said
25  well maybe this person, somebody have to give him

H. LIU

1   
2  message, say if you too -- work too hard, you
3  should start doing some massage, relax yourself,
4  helping others.
5     Because you are CRO on this case and
6  not responding, your creditors' request and are
7  pleading for help.
8     **Q.  Now --**
9     A.  So that's what it mean this here.
10     And then Schuyler mention back saying,
11  you know, this is a joke.
12     And then he said I have not found
13  anything yet.
14     MR. RAVERT: He said this is a joke.
15     A.  I have not found anything yet that it
16  does, but maybe you can find a successful
17  combination.
18     So it's a humor.
19     **Q.  Now just to clarify, when you were**
20  **trying to get ahold of Dan Schooler, was it that**
21  **you were trying to get payment for those two**
22  **containers?**
23     A.  That's Chinese creditors wants; wants
24  debtor to retrieve the containers from the U.S.
25  Custom.

H. LIU

1   
2  Why? Because when they stay there you
3  have a demurrage fee cost, d-e-m-u-r-r-a-g-e,
4  which means overstocking charges. It is a U.S.
5  port. After certain days.
6     So the goods only $50,000. If nobody
7  goes there, takes this thing seriously and the
8  days passed and the demurrage fee adds up, and
9  will eat the value of these containers.
10     And then the Chinese creditor
11  basically will not get money back, loss back.
12     So we trying to find a way to urge the
13  debtors to help to get these two containers out
14  of the U.S. Custom.
15     **Q.  Okay. And so just to get them out of**
16  **Customs, not --**
17     A.  And pay back too. Of course. Of
18  course they wants -- they wants the money back
19  from the -- after the debtor will -- would take
20  out those containers.
21     **Q.  All right if I could have you look at**
22  **HL 273, which would be Liu Exhibit 21.**
23     **(Liu Exhibit 21, E-mail, Bates HL 273**
24  **to HL 274, marked for identification.)**
25     **(Document review.)**

H. LIU

1   
2     **Q.  And actually I'm going to make that HL**
3  **273 and HL 274 for that exhibit.**
4     Now if you could look at it.
5     MR. RAVERT: Just give me one second.
6     (Pause in the record.)
7  BY MS. JOHNSON:
8     **Q.  Now on the first page of this exhibit,**
9  **HL 273 it talks about a dollar amount for the**
10  **proxy claim. And it says, "Now matches the same**
11  **figure on the questionnaire."**
12     **What was the issue there?**
13     A.  Original name, most likely in my
14  memory, the first time the figure put that amount
15  on proxy is different number.
16     And we asked them back, say, you give
17  me two different numbers, different -- some
18  different numbers. Which number is exactly your
19  total claim?
20     And then Shanghai Hualin double
21  checked. And then they put the number which they
22  believe is the correct number, which is
23  351,107.06.
24     And then I said, now the dollar amount
25  on their summary sheet -- they have a summary

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

H. LIU

1  sheet. There's a balance summary sheet owed by
2  the debtors. Now matches the dollar amount on
3  the proxy.
4      Q.  And the proxy you are referring to is
5  the second page of this exhibit, correct?
6      A.  Yes.  As a smaller creditor, yes.
7      Q.  Now on this proxy, HL 274, it's got
8  both names here.
9      "Does hereby appoint and authorize its
10  U.S. rep Dr. Haishan Liu or advisor Greg
11  Urbanchuk, to act on the creditors behalf."
12      Is this the proxy that was filed with
13  the U.S. Trustee?
14      A.  I don't believe so.
15      Because after this one they have
16  another one, a final one.  Because seem like -- I
17  said, look, after -- this is already after the
18  conference call.
19      I said, I cannot represent you because
20  I already -- I have -- I may have -- I might have
21  the proxy for EAC.
22      I told this customer, Shanghai
23  Hualian, because in China -- I informed the
24  Shanghai Hualian Hardware Company I might have --

H. LIU

1  represent EAC, the largest creditor in this case.
2  So I cannot hold your proxy.
3      So you take me and my name out, give
4  to -- to give to Greg Urbanchuk as -- after the
5  conference, which Shanghai Hualian agreed to let
6  Greg Urbanchuk hold the proxy for this company.
7      This is not a final version, to my
8  knowledge.
9      Q.  So now prior to the committee
10  formation at some point in time after the filing
11  both Shanghai Hualian and EAC had authorized you
12  to serve as their proxy?
13      A.  Shanghai Hualian gave me the proxy
14  first and EAC later.
15      The reason is Shanghai Hualian at
16  least I have -- I contacted first.  They have
17  some fax number.  EAC has no contact information.
18      Q.  That's okay.  And you've explained
19  that, definitely.
20      And so did you choose which of the two
21  you were going to serve as the representative
22  for?
23      A.  Yes.
24      Q.  And did you choose EAC because they

H. LIU

1  had a higher dollar value claim?
2      A.  That's correct.
3      Q.  Now on this first page of Exhibit 21,
4  HL 273, there's a note from you here that says
5  "Hope Greg as the proxy holder will pass them to
6  the UST."
7      What does that mean?
8      A.  This means after -- if the proxy
9  letter, everything is accurate, Greg should pass,
10  which is a fax, or deliver to U.S. -- the U.S.
11  Trustee Office.
12      Q.  The proxy statement?
13      A.  Yeah.  And the questionnaire also.
14      Q.  And was there any reason you thought
15  he might not do that as a proxy holder?
16      A.  I didn't follow that.
17      I assuming if Greg had that
18  questionnaire is accurate, since EG and our folks
19  knows him, saying he's a reliable person, meaning
20  he's a person not from the street, he's a person
21  who has knowledge of proxy, you know, treatment
22  and familiar with bankruptcy proceeding, the
23  other person should know this questionnaire and
24  proxy should be passed to -- fall to Trustee

H. LIU

1  Office on time.
2      That's what that means.
3      Q.  If I could have you look at HL 269,
4  which will be Liu Exhibit 22.
5      MR. RAVERT:  Just the one page?
6      MS. JOHNSON:  Yes.
7      (Liu Exhibit 22, E-mail, Bates HL 269,
8  marked for identification.)
9      Q.  And if I could direct your attention
10  to the first sentence, this is you e-mailing
11  counsel at Arent Fox, correct?
12      A.  Yes.
13      Q.  And it says:
14      "Dear Counsels:  I have been working
15  through the evening and night with No. 4
16  creditors Eastern Accessories Corporation, hence
17  I have been rewarded with its signed proxy and
18  questionnaire."
19      What type of work were you doing
20  through the evening and night?
21      A.  Okay.  That's interesting question.
22      Although I located this company with
23  the correct address, correct company, correct
24  creditor; however, the owner of the company was

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

H. LIU

1  in France at the time. And due to time
2  difference, I have to wait for him, he able to
3  respond.
4      And August 10 is the formation date.
5  So I sitting there to wait for him to get it
6  executed, the questionnaire and the proxy.
7      Because sales manager at the company
8  don't want to sign it. They wanted the owner to
9  sign, because large claims.
10     This mean I'm working through the
11 evening and night in this U.S. time.
12     And finally the No. 4 creditor
13 executed the questionnaire and proxy, which mean
14 I got rewarded for my hard work, to get him
15 signed.
16     Q.   And by "rewarded," you mean they gave
17 you the proxy?
18     A.   That's correct.
19     Q.   Which meant that you would get to go
20 to the committee formation meeting?
21     A.   Yes.
22     Q.   And you said you were waiting for the
23 owner.
24     Did you initially ask the sales

H. LIU

1  manager to sign the proxy?
2      A.   I -- also I explained to them, if you
3  can get an e-mail authorization from your owner,
4  you could act on your behalf -- on his behalf.
5      And he said for such kind of big issue
6  the boss said only he can -- he could sign. I
7  don't want sign.
8      And after I get this, because of late
9  date, before I sleep, I sent the same
10 information, if you wanted the e-mail, to five
11 law firms, who give me the petition file on
12 August the 4th.
13     I say I got this -- got this proxy
14 now. And I welcome you to go to the committee
15 formation meeting. And hopefully you will give
16 your best pitch and win the majority rule -- win
17 the majority vote and become the best law firm on
18 that date.
19     Something like that I give to five law
20 firms. You only see one of the e-mail here.
21     Q.   Now when you're saying -- in this
22 e-mail you're saying that you view your
23 participation in the committee formation meeting
24 as a reward; is that accurate?

H. LIU

1      A.   I cannot -- that's your understanding.
2      My understanding is I think from the
3  day one these creditor appear on the largest 30
4  creditor list, no name, no address, no phone
5  number.
6      For me to go through that to finally
7  locate the customer in China. And then you have
8  to speak to front desk, to the sales manager and
9  eventually spoke to the owner, that's a lot of
10 work.
11     When somebody finally sign for that,
12 meaning they recognize my work, they give me the
13 voted confidence on me, I view that my reward for
14 my hard work.
15     Q.   And this e-mail also says, "I'll hold
16 the proxy to cheer everyone up."
17     What does that mean?
18     A.   Yeah, which mean I hold -- I hold --
19 now I have a proxy holder. You're sending me a
20 petition date. You have interest trying to bid
21 for a committee counsel. Now you can go there to
22 pitch, all of you.
23     Q.   Well --
24     A.   Five law firms sent to me. And I sent

H. LIU

1  back to the five law firm on that night before I
2  sleep, because date is so short.
3      And there's -- four of the law firm I
4  sent to did show up, except Hodgson Russ.
5      She sent an e-mail back saying, I have
6  time conflict.
7      Q.   So you saw your appointment as -- or,
8  I'm sorry, strike that.
9      So you saw your position as a proxy as
10 being beneficial to the law firms in being able
11 to show up to bid?
12     A.   That's your --
13     MR. RAVERT: Objection.
14     A.   That's your understanding. And I
15 cannot -- I cannot speak your mind.
16     My understanding, I said before, it
17 only show when the -- when you work to assist --
18 trying to become creditors' rights advocate, you
19 need the other side to recognize you will be
20 their advocate.
21     The first step in bankruptcy case is
22 get the proxy holder a U.S. rep in order to help
23 them. To get that authorization or recognition,
24 that's hard work.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

H. LIU

1
2       And by signing the questionnaire or
3  proxy, that's a vote -- a confidence vote on you.
4       Then I call that -- call it reward.
5       This is free.  You can see my e-mail
6  to them, cover letter, absolutely.
7       When I represent this company or other
8  company, go to Delaware, go to New Jersey, to any
9  formation meeting, my service is free.
10      Q.   But if you represent them in debt
11  collection, then it's not free?
12      A.   In this case we didn't sign this
13  because I was selected as creditor -- as a
14  committee translator.
15      So this EAC was referred to the third
16  party law firm, which, as I said before, is
17  Nerville Paterson law firm.
18      This way you can see the separation.
19      Q.   Well do you refer all of your debt
20  collection cases to attorneys?
21      A.   This is bankruptcy case, not a debt
22  collection case.
23      UBP is bankruptcy case.
24      Q.   Okay.
25      A.   Debtor collection usually one on one.

H. LIU

1  One --
2
3      Q.   So not in the context of bankruptcy?
4      A.   Yeah, this is a bankruptcy case.
5      Q.   Okay.
6      A.   It's one debtor versus many creditors.
7      Debtor collection, usually one on one;
8  one Chinese exporter versus one U.S. importer.
9      Q.   And going back to this e-mail, Exhibit
10  22, "I strongly suggest Counsel Schuyler may
11  co-pitch with his colleagues."
12      Why are you strongly suggesting that?
13      A.   Good question.
14      I participated many creditor meetings,
15  whether I be selected or not selected, all right.
16      I understand -- I'm the person
17  understand who will be the best person, best
18  lawyer.
19      You know, we have five fingers.  Every
20  single finger is a variable.  But you look at a
21  reality, something -- some finger longer than
22  others.
23      In my view, Schuyler is a leader of
24  Arent Fox.  I wanted the best lawyer from that
25  law firm to represent -- to represent Arent Fox.

H. LIU

1
2      By same token, I urged Lowenstein to
3  send Ken Rosen to represent Lowenstein,
4  R-o-s-e-n.
5      Because Ken Rosen is their leader or
6  director of bankruptcy group.
7      Because best lawyer showed up, they
8  make a best performance.  And as the creditors
9  will see, will have compare, they could choose
10  the best law firm on their particular date for
11  particular case.
12      Q.   When you said, "I'll hold the proxy to
13  cheer everyone up," was it your understanding
14  that these firms that you had been communicating
15  with would not be pitching unless you were on the
16  committee?
17      MR. RAVERT:  Objection.  Confusing.
18      THE WITNESS:  You want me to answer?
19      MR. RAVERT:  You can answer if you
20  understand it.
21      THE WITNESS:  If I understand your
22  question correctly, is -- my answer is, no
23  matter I'm on the committee or not on the
24  committee, no matter whether I had the proxy
25  holder on not, Arent Fox or Lowenstein will

H. LIU

1
2  go there to participating, because the
3  petition filed to me showing -- meaning that
4  they were prepared for that pitch.
5      Whether they really wants to go, I
6  cannot speak for them.  I cannot decide them
7  whether they want to go.
8      From my end I want more law firm show
9  up at formation meeting.
10      Why?  You have a performance.  We have
11  more interviews.  We can hear more proposals
12  and more suggestions, more strategics how to
13  handle this case.
14      It's beneficial, in my personal eyes,
15  beneficial to creditors, especially to the
16  first-time creditors on the committee.
17      MS. JOHNSON:  All right.  I'm going to
18  skip to this packet HL 352, just to give
19  counsel a heads up, the later stuff.  But
20  give me one second.
21      (Pause in the record.)
22      MR. RAVERT:  Oh, you did not give that
23  to me.  I don't see that in my pile here.
24      MS. JOHNSON:  At the very back.
25      MR. RAVERT:  Mine ends at 310.

## Page 238

H. LIU

2  MS. JOHNSON: Oh, you're right, sorry.
3  Just so you have a general idea of
4  where in the documents we'll be.
5  And if I can have you pull out HL 388
6  and 89, which will be Liu Exhibit 23.
7  (Liu Exhibit 23, E-mail, Bates HL 388
8  to 389, marked for identification.)
9  Q.  If you can read that first e-mail on
10  the first page of this exhibit, which is dated on
11  August 4, petition date.
12  And it says, "Dr. Liu, there are
13  several Asian creditors on this list."
14  Do you see that?
15  A.  Yes.
16  Q.  Is that referring to the UBP petition?
17  A.  Yes, that's one of the several law
18  firm e-mails.
19  Q.  And is this the first communication
20  you received from EG on the UBP bankruptcy case?
21  A.  Yes.
22  MR. RAVERT: I'm sorry, this is
23  Exhibit 23, right?
24  MS. JOHNSON: Yes.
25  MR. RAVERT: I'm sorry. I thought I

## Page 239

H. LIU

2  was missing the exhibit. That's fine.
3  BY MS. JOHNSON:
4  Q.  Now it says, "I am sending this to you
5  first in order to get your support early."
6  What did you understand that to mean?
7  A.  For me it's very clear.
8  He has intention to pitch this case,
9  as other law firms.
10  Q.  And he says, "I would like to pitch
11  this as lead or co-counsel - no more local"?
12  A.  And he's -- he has ambition to become
13  lead counsel on the big case. He said that on
14  several occasions.
15  And you can see the result. We didn't
16  listen to them. Committee didn't listen to him.
17  And committee choose whoever the best
18  on that day to lead this case.
19  Q.  Now when he says, "to get your support
20  early," is he referring to support for --
21  A.  Lead counsel.
22  Q.  Okay.
23  A.  From his end.
24  Q.  Gotcha.
25  And it also says, "Please let me know

## Page 240

H. LIU

2  if you can get some companies to allow for
3  proxies."
4  Do you see that?
5  A.  Yes.
6  Q.  And is that referring to companies on
7  the creditor list for the UBP petition?
8  A.  Yes, if I understand correctly.
9  Q.  And he's asking you to see if you can
10  get proxies?
11  MR. LAPINSKI: Object to form.
12  A.  Whether he's -- whether he says that
13  or not, from my end I will approach Chinese
14  creditors.
15  I only advocate the creditors from
16  China whenever the U.S. bankruptcy filed.
17  I don't call the bankruptcy case where
18  no Chinese creditors, meaning I don't approach
19  U.S. creditors on this end.
20  Q.  So you only look for -- you only look
21  to represent Chinese companies, not U.S.
22  companies?
23  A.  Yes, from China.
24  Q.  Okay.  To serve as a proxy for Chinese
25  companies?

## Page 241

H. LIU

2  A.  Yeah.
3  I think of it as a need to find
4  somebody or get somebody to help them.
5  I hopefully -- either U.S. Government
6  or U.S. Trustee creative enough to create some
7  kind of organization to help those creditors, not
8  me.
9  You can see I worked overnight for
10  free. And I have a second day my day business to
11  take care of.
12  It's not easy job. That's why I paid
13  extra efforts to do the first step.
14  Q.  Now he also says -- and this is
15  Rafael, that, "I will need to speak to them with
16  you and I will need their authority to pick the
17  right people here on the proxy."
18  What did you understand that to mean?
19  A.  He can -- from my understanding is
20  that he wants -- he express his interest and
21  desire to ask me whether I can get some supports
22  from Chinese vendors.
23  Q.  But what is he talking about, "picking
24  the right people here"?
25  MR. LAPINSKI: Objection to form.

61 (Pages 238 to 241)

242

H. LIU

2 MS. ENGLISH: Objection.
3 Q. On the proxy.
4 What did you understand him to mean by
5 that statement?
6 A. I think the question, let Rafael speak
7 for himself is better. If you let him speak to
8 that.
9 Q. Well you received this e-mail,
10 correct?
11 A. Yes.
12 Q. And you read it when you received it?
13 A. Yeah.
14 Q. And when you read that last sentence,
15 what did you understand it to mean?
16 A. I tell you why.
17 When you receive several e-mail from
18 different law firms, you know you cannot satisfy
19 everybody, every single terms.
20 You just ignore. You don't responding
21 to them. There's no need to responding to every
22 single lawyer on every single request.
23 I do what I think I believe is right
24 or reasonable for each case.
25 So in this case you can find the

243

H. LIU

2 foreign e-mail. I don't responding anything to
3 all this request for an e-mail. Is a lead
4 counsel. You see any e-mail follow up?
5 I very courtesy. I say, every law
6 firm should prepare, should do the best, best
7 prepare for the pitch and get a majority of
8 votes.
9 Q. I'm just asking what you understood
10 this sentence to mean.
11 A. I explained what I thought is right.
12 Q. Well not necessarily what you would
13 do.
14 I'm just asking, when you read this
15 e-mail, what did you understand that to mean?
16 A. Understand -- I said very clearly he
17 express a clear intention.
18 He want -- he hope me to contact
19 Chinese exporters, one understanding.
20 Second, he wants me to support him,
21 all right. That's -- that's his intention.
22 For me, it's different -- different
23 choice.
24 I cannot control what he says.
25 Q. Well let me ask it to you this way.

244

H. LIU

2 Did you have an understanding -- the
3 phrase I don't understand is, "to pick the right
4 people here."
5 Did you have an understanding of what
6 he's referring to, "pick the right people" for
7 what?
8 MR. LAPINSKI: Objection as to --
9 A. I didn't pay clear attention to this.
10 I feel no need to pay attention from my end.
11 Whatever he says, you ask him.
12 Q. So you don't know what he meant by
13 that?
14 A. I don't know what he meant, yes.
15 That's good answer.
16 Q. And can you look at HL 383, which I
17 will mark as Liu Exhibit 24.
18 (Liu Exhibit 24, E-mail, Bates HL 383,
19 marked for identification.)
20 Q. And if you could look at the e-mail at
21 the top of the page, just for reference, I think
22 there's an e-mail below that that was talking
23 about the U.S. Trustee.
24 This is the one with the pores in the
25 system that we already discussed.

245

H. LIU

2 But then on the top there's an e-mail
3 from Rafael to you, is that correct?
4 A. Yes.
5 Q. And it says, "Call me - good news on
6 the preferences."
7 What is that referring to?
8 MR. RAVERT: We're going to object.
9 MR. LAPINSKI: Objection.
10 Finish your question.
11 MS. JOHNSON: I did.
12 MR. RAVERT: I'm going to object.
13 There's a representation of Elliott
14 Greenleaf and Dr. Liu's company.
15 I am instructing you to -- not to
16 communicate any further communications
17 regarding that representation.
18 You can explain the fact that there's
19 a representation that concerns it.
20 But you cannot talk about any advice
21 that that firm gave you or anything you told
22 it.
23 THE WITNESS: Basically good news on
24 the preferences is after he explained to
25 me --

62 (Pages 242 to 245)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

**246**

1    H. LIU
2    MS. ENGLISH: No.
3    THE WITNESS: Yes, that's enough. He
4    explained to me.
5        I understand, we -- I said before, we
6    trying to find a way to help U.S. court,
7    U.S. -- U.S. bankruptcy estate to deal with
8    preference claims against the Chinese
9    vendors.
10       So we signed a -- we retained EG as
11   counsel on one preference case.
12   BY MS. JOHNSON:
13       Q.   Okay.  Let me stop you right there.
14   Is this preferences that you're
15   referring to unrelated to the UBP case?
16       A.   Yes.
17       Q.   That's all I need.
18       A.   Thank you.
19       MR. LAPINSKI:  Thanks, Dawn.
20       Q.   If I could have you take a look at HL
21   381, which I will mark as Exhibit 25.
22       (Liu Exhibit 25, E-mail, Bates, HL
23       381, marked for identification.)
24       Q.   And if you look at the top there's an
25   e-mail from Rafael to you.

**247**

1    H. LIU
2    It says, "Tomorrow is fine as well,
3    just wanted to share good news."
4        MR. RAVERT:  Yes, I'm going to object.
5    To the extent that it --
6        THE WITNESS:  Yes, that's conference.
7    He got some --
8        MR. LAPINSKI:  No.  Object.  You don't
9    have to answer.  It's privileged.
10       (Instruction Not to Answer.)
11   BY MS. JOHNSON:
12       Q.   Does this refer to --
13       A.   -- I never sleep so --
14       (Discussion off the record.)
15   BY MS. JOHNSON:
16       Q.   The good news that's referred to in
17   this e-mail, is that on a matter unrelated to the
18   UBP bankruptcy?
19       A.   Thank very much.  Unrelated.
20       Q.   Yes.  That's correct?
21       A.   That's correct.
22       MS. JOHNSON:  Okay.  Let's go to the
23   Arent Fox set.  And you do not have these
24   for exhibit set.
25       MR. RAVERT:  Okay.

**248**

1    H. LIU
2        MS. JOHNSON:  And you might just want
3    to keep those on top because I'll be using
4    those first.
5        MR. LAPINSKI:  These?
6        MS. JOHNSON:  The Arent Fox ones,
7    yeah.  That's what I wanted to go through
8    now.
9        MR. RAVERT:  We're not going back to
10   these?
11       (Discussion off the record.)
12       MS. JOHNSON:  Can we go off the record
13   for just a minute.
14       (Recess taken from 5:13 p.m. to 5:17
15   p.m.)
16   BY MS. JOHNSON:
17       Q.   Let's take a look at AF-UBP 1 which
18   I'll mark as Liu Exhibit 26.
19       (Liu Exhibit 26, E-mail, Bates AF-UBP
20       1, marked for identification.)
21       Q.   This is an e-mail from Schuyler
22   Carroll to you on August 4, which is the petition
23   date, that is correct?
24       A.   Yes.
25       Q.   And it says, "I spoke with Rafael this

**249**

1    H. LIU
2    morning.  He suggested that I let you know that
3    he and I are going to work together on this
4    case."
5        What do you understand him to mean by
6    that?
7        A.   My understanding is these two law firm
8    want to work together to pitch this case.  They
9    have interest to work together to pitch this
10   case.
11       Q.   Now does that mean that they were
12   going to work together if appointed as well?
13       A.   I cannot speak on their -- their mind.
14   It's their decision.
15       Q.   You have no idea?
16       A.   Just for me the e-mail shows clearly
17   these two law firm express interest.  They want
18   working together to bid the -- to bid on this
19   case.
20       Q.   Okay.  For representation on the
21   creditors committee, correct?
22       A.   For the bankruptcy case, yes.
23       Q.   If you could turn to AF-UBP 9.  And
24   I'll mark that as Exhibit 27.
25       (Liu Exhibit 27, E-mail, Bates AF-UBP

63  (Pages 246 to 249)

H. LIU

9, marked for identification.)

Q. This is an e-mail from you to Sullivan James, and Schuyler Carroll is copied, is that correct.

A. It's e-mail from me to Sullivan James, and cc Schuyler Carroll.

Q. The first couple sentences here, they say, "All of the efforts is a part of the grand cultivation of a support base from Chinese exporters side. That support base is an invaluable asset, when utilized. For an ongoing example, Counsel Schuyler and Rafael desire me to get a certain support from Asian Chinese exporters who might recommend you as a pending committee member in the case of Universal Building."

Do you see that?

A. Yes.

Q. Now what do you mean there when you say, "who might recommend you as a pending committee member in the case of Universal Building"?

A. Probably some mistake here in words.

Let me see. Let me read the whole

---

H. LIU

e-mail.

(Document review.)

A. Basically "you" should be "me," because a lawyer can never be a committee member itself.

So here "you" should be typing error for "me," okay.

That those Chinese exporter might look at me as a pending committee member in the case of Universal Building.

It's easy asking, but is not -- it is no cinch, which is not easy job.

Q. Now when you say, "Before recommending you, I need someone and some groups to commend me to one or more of these prospective committee participants."

Do you see that?

A. Yeah, recommending me to possible future pending committee member in this regard.

Q. And when you say, "future committee member," what do you mean?

A. Means easy -- this case or other bankruptcy cases.

Because case like this, if I'm not

---

H. LIU

retained as a committee translator, then I may -- I might have a choice to become their rep, to help them file claims.

In this way if I'm not choose as committee translator, I can help them sitting on the committee, as a possibility, which is as use the word "might".

You see, you can also see, I challenged Rafael's desire for becoming leading counsel. I asked on which baseline could he make such kind of claim.

He wants become lead or co-counsel on this case.

Q. What was your issue with him becoming lead or co-counsel?

A. Because he claim the first day -- remember the previous e-mail, on the first day just asked? He wants become a lead counsel or co-counsel on this case.

So that e-mail showing I disagree with him.

Q. And that's because you haven't seen that he has done anything meaningful for Chinese exporters?

---

H. LIU

MR. RAVERT: Objection.

Q. What did you mean by that last statement?

A. When somebody asking for lead counsel, and from the very beginning, before I see the performance, the preparation for the case, pitch performance, it's not right for any lawyer to make a claim, an assertion he could have become lead counsel.

The lead counsel only could be decide at a formation meeting, after majority votes.

That I'm saying here, on which basis line he can make such claim, I could be a lead counsel, which I showing I disagree with him.

That's what I'm saying. Clearly he needs -- needed -- he's needed to be reeducated.

Q. Now earlier in this e-mail, towards the beginning, you're saying -- you're talking about cultivating a support base from Chinese exporters and that support base is an invaluable asset.

What do you mean by that?

A. Well when you help, actually help Chinese exporters to do debtor collection,

---

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

H. LIU

that's -- that relationship is invaluable assets.

In the United States maybe capital
money counts. In China relationship counts.

So when you establish relationship
with Chinese exporters, they could become
invaluable asset, meaning if next time if they
have some problem, if they call, they will not
ask, who is your Dr. Liu. They know you, all
right.

Q. And so by that you're talking about,
you know, an ongoing relationship in the future?

A. Right, that's correct.

That's invaluable. And you have two
branches in China. You know how difficult
establishing relationship.

And once you establish, how valuable
to your firm in China.

Q. Sorry, going back to this last
sentence again.

When you're talking about Rafael, it
says, "He hasn't done any meaningful or voluntary
work for Chinese exporters."

What are you talking about, "voluntary
work"?

H. LIU

A. Where?

Q. In the second to last sentence.

A. Okay. To my knowledge, between Arent
Fox and -- I know -- let's put it this way.

I know some law firm better than other
firms. In this case I know Arent Fox better than
EG.

And I view law firms who waiting to
help Chinese exporters will establish their
credit, establish their willingness to help
foreign vendors.

Q. And how do they --

A. Meaning before this date -- before
this date, August 8, EG had not did any
collection work for Chinese maybe, with -- or
some education, because my safe exporter
education is a -- is voluntary education work,
so --

Q. And by "education," are you talking
about educating them in terms of the bankruptcy
or collection procedures?

A. And a safe export.

Because my Web site name is
safeexport.net.

H. LIU

Q. If I could direct your attention to
AF-UBP 11, which I will mark as Exhibit 28.

(Liu Exhibit 28, E-mail, Bates AF-UBP
11, marked for identification.)

Q. If you could take a look at that.

And I'd like to start with your
e-mail, the second e-mail to -- do you know who
that was sent to?

A. This from Rafael Zahralddin to my
company, and cc to everybody else.

Q. But if you look at the second half of
the text, there's an e-mail on August 9, 2010 at
2:34 p.m. from you.

Do you know who you sent that to?

A. We mentioned -- discussed this before.

After we got proxy letter from
Shanghai Hualian Hardware, I sent away for the
extra caution. I want to have a conference call
with that creditor.

Q. I'm going to get to that.

But my first question is do you know
who you sent this e-mail to?

And let me ask you this.

Is it safe to assume that you sent

H. LIU

this e-mail to the people who are then listed in
the "From, To, and CC" lines up above?

MR. RAVERT: I'm going to object to
that.

There's just not enough on this
document to possibly tell who it was sent
to. I don't know why it's configured this
way.

MS. JOHNSON: And that's why I'm
asking if he knows.

THE WITNESS: If you want to safe say,
sent to two law firms, put it this way.

One law firm to return to --
responding to EG and another is Arent Fox.

BY MS. JOHNSON:

Q. Okay. And you say, "I don't plan to
overwork on a conference call with the Chinese
creditor who might get afraid of being talking to
someone they have no idea."

What are you referring to?

A. Remember we short time ago the Greg
Urbanchuk was first posed by EG that wants
contact Chinese right away.

I said, wait a minute. We -- I need

65 (Pages 254 to 257)

H. LIU

1  to verify this person through Arent Fox.
2  Arent Fox had a big law firm, had
3  more -- I'm assuming they have more connection,
4  more knowledge.
5  **Q.  So this e-mail is just putting the**
6  **breaks on getting a call right away --**
7  A.  Right.
8  **Q.  -- so that you can confirm the**
9  **representation?**
10  A.  That's correct.  That's showing my
11  cautious.
12  **Q.  And then if you look at -- there's an**
13  **e-mail up above from Rafael to you with several**
14  **people copied.**
15  **And it says, "The UST will disqualify**
16  **any proxy who has in the communicated with the**
17  **creditor.  This can be via e-mail, the details of**
18  **how much time they spend talking together is none**
19  **of the UST's business."**
20  **What did you understand that to mean?**
21  **And let me stop that.**
22  **Do you know what prompted this e-mail**
23  **in the first place?**
24  A.  After they heard the Shanghai Hualian
25

H. LIU

1  Hardware waiting to change my name to a third
2  party, and then there's need to link, connects
3  the U.S. person who -- the person in U.S. who
4  willing to hold proxy for this company and the
5  original -- the creditor.  In this case it's
6  Shanghai Hualian.  They need a dialogue.
7  And this is -- I'm not a lawyer.  I
8  don't specific rules how U.S. Trustee Office
9  treat this details.
10  But without such conference, even
11  myself will not introduce -- will not allow any
12  person who holds the Chinese -- hold the proxy
13  for Chinese exporter and Chinese exporter had no
14  idea which other person is.
15  We must let the Chinese exporter talk
16  to the person in U.S. and who willing or who
17  wants to hold a proxy for them, get them to
18  understand, get them agreed, get them signed.
19  Then if they are both signed and it
20  has company seal, then they can go ahead.
21  **Q.  Were you on the call when Greg spoke**
22  **to Shanghai Hualian?**
23  A.  Yeah.  I'm interpreter.
24  **Q.  How long was that call?**
25

H. LIU

1  A.  I don't recall exactly minutes.
2  Should be 15 minutes or longer.
3  Should say maybe half hour.  I cannot
4  give you accurate minutes, but -- it's not 3
5  minute call, because we have to understand the
6  name, who is on the phone, identify each person.
7  And they say hello each other.
8  And then each person express themself,
9  who they are, what is their function.  And then
10  they explain why they need to do that.
11  So all in all, assuming should be a
12  half hour around, but I don't -- I cannot
13  guarantee the minutes exactly.
14  **Q.  Was that the only time Greg spoke to**
15  **Shanghai Hualian, to your knowledge?**
16  A.  Yes, to my knowledge, before this
17  signed, the proxy holder, that's first time.
18  After signing, whether they contact or
19  not, I have no idea.
20  I didn't follow up, because after sign
21  it's relationship between Shanghai Hualian and
22  Greg.
23  **Q.  And you arranged that conference call,**
24  **I take it?**
25

H. LIU

1  A.  Yeah, because language issue.
2  **Q.  And because they -- you had introduced**
3  **yourself to Shanghai Hualian?**
4  A.  Yeah.  At the time Shanghai Hualian
5  already knows me.
6  **Q.  Right.  And they didn't know the**
7  **attorneys or Greg at that point in time?**
8  A.  Yeah, yes.
9  **Q.  If I could have you look at AF-UBP 12.**
10  **And I'll mark that as 29, Liu Exhibit 29.**
11  (Liu Exhibit 29, E-mail, Bates AF-UBP
12  12, marked for identification.)
13  **Q.  And if you could just look at the**
14  **first sentence on the top e-mail.**
15  **It's from Rafael to you.  And it says,**
16  **"Like I said, if you think it will make the**
17  **creditor uncomfortable, then e-mail may be the**
18  **best way."**
19  **What is he referring to when he says**
20  **"it"?**
21  MR. LAPINSKI:  Objection.  Same.
22  THE WITNESS:  I understand -- my
23  understanding is for a conference call you
24  have to arrange multiple parties.  Then it
25

H. LIU

1 will be definitely more difficult than an
2 e-mail.
3 But it seemed to me conference call
4 will be better than e-mail.
5 Why? Because the other side can hear
6 the voice. In the future they can recognize
7 the voice.
8 But Rafael look like suggesting if
9 Chinese creditor cannot speak, not
10 comfortable. I don't know what he means.
11 Maybe he probably means the language
12 barrier, whatever. He said e-mail could do.
13 But myself, in -- just in conference,
14 better the people speak each other.
15 Then they can exchange e-mail that
16 after that.
17 BY MS. JOHNSON:
18 Q. And just to clarify too, I think you
19 said during the conference call you served as
20 interpreter, is that correct?
21 A. Yeah, on that call, yes.
22 Q. All right. And so part of the time
23 was spent with Greg or the attorneys talking, you
24 would interpret and then -- in Chinese, I take

H. LIU

1 it?
2 A. If U.S. attorney speak first or -- and
3 then usually we ask Chinese, do you understand
4 what he says.
5 If they say, yes, I understand, I
6 don't do translation.
7 If they say, I'm not sure what they
8 said, then I do translation.
9 Q. So it wasn't all the time; it was as
10 needed, your translation?
11 A. For this customer only one time.
12 So I cannot evaluate. But say, hello,
13 definitely don't need to be translated.
14 When I get into nihao, next time I say
15 nihao, they only ask me what nihao means.
16 N-i-h-a-o, means hello.
17 Q. If I could have you take a look at
18 AF-UBP 15 through 18, which we'll mark as Liu
19 Exhibit 30.
20 (Liu Exhibit 30, E-mail, Bates AF-UBP
21 15 through 18, marked for identification.)
22 Q. And if you could look at 17.
23 MR. RAVERT: So it's going to be 15
24 through 18?

H. LIU

1 MS. JOHNSON: Yes.
2 I need 5 minutes.
3 (Recess taken from 5:42 p.m. to 5:51
4 p.m.)
5 BY MS. JOHNSON:
6 Q. If I can have you look really quickly
7 at AF-UBP 20, which we will mark as Liu Exhibit
8 31.
9 (Liu Exhibit 31, E-mail, Bates AF-UBP
10 20, marked for identification.)
11 Q. And my first question for you -- and
12 let's look at the top e-mail there.
13 It says, "I just received a message
14 from John Bambach."
15 Do you know who that is?
16 A. It's a financial advisor from Focus.
17 It's a financial advisory firm.
18 Q. And it says, "He indicates that the
19 creditor will now be supporting him, is this
20 accurate - I could not understand his message in
21 full."
22 Now Rafael is asking you this,
23 correct?
24 A. My understanding correctly is John

H. LIU

1 Bambach -- it seems John Bambach call or contact
2 Rafael and tell Rafael the creditor I'm assuming
3 is me to supporting him.
4 And Rafael say that could not
5 understand his message in full.
6 Q. Do you know what Rafael -- who Rafael
7 is referring to when he says "the creditor," what
8 company?
9 A. See the date, 11. And then possibly
10 that means the No. 4 creditor. See the date on
11 the top?
12 Q. Yeah, okay. So Rafael's message means
13 the No. 4 creditor is going to be supporting John
14 Bambach as financial advisor?
15 Can you tell me what this means?
16 A. (Shaking head.)
17 Q. Let the record reflect he was shaking
18 his head no.
19 MR. LAPINSKI: Objection to form.
20 THE WITNESS: You have to ask either
21 John Bambach or Rafael when they say --
22 instead of using name, Dr. Liu, No. 4
23 creditor, EAC or Shanghai Hualian, what
24 exactly they mean, "the creditor" here.

H. LIU

BY MS. JOHNSON:

Q.   So you don't know what that second sentence means?

A.   My understanding basically they -- both -- both person seeking -- looking for some kind of -- express their interest -- if they send e-mail to me, because I'm recipient, right -- yes, recipient.

John Bambach is a financial advisor. That's another group of problem for the -- for their pitching their FAs. They have interest in seeking financial advisor position.

And, as I indicated before, there is no law prohibiting them from contact creditors. So this system to fix it, the U.S. system Trustee Office or U.S. Bankruptcy Court to deal with it.

It seems to me they're -- both person thinking I could support them. That's what it means, sending the e-mail to me. That's my understanding.

You cannot verify with them exactly which creditors that means.

Q.   Do you know who Ted Gavin is?

H. LIU

A.   Ted Gavin is a former NHEB. He's another financial advisor.

I not familiar with Myron Bloom. But I know Executive Sounding Board, because he is -- his company was sitting on the Design License as a financial advisor.

So I know that -- but on that one is not this person.

So I don't know Myron Bloom. But it said Myron Bloom, Executive Sounding Board.

I know ESBA. Simple. That I know. It's another financial advisor.

Q.   Now this e-mail to you, do you know what Rafael was talking about when he was asking to hear -- "shouldn't we hear back from Ted Gavin or Myron Bloom at Executive Sounding Board and see if they have another vote before we commit to any FA?"

What was it -- strike that.

What is your understanding of what that meant?

A.   My understanding of that, first, that several -- this seem to me more than one financial advisor firm seeking financial advisor

H. LIU

position for this committee.

For me the best way is don't answer, ignore. Because you cannot -- as I said, you cannot satisfy everybody on every single details.

Basically encourage them, go to the formation meeting, prepare your petition, let the committee choose, whoever is the best on that particular day for a particular case.

Q.   Do you know what he was referring to when he said, "if they have another vote"?

Another vote for what? Do you know what he meant?

A.   Where is the vote -- "and see if they have another vote before we commit to any --"

You have to ask them. I cannot speak on their behalf.

Q.   And you didn't have any understanding of what he was referring to?

A.   Generally speaking, they're seeking some kind of support -- they desire to seeking some kind of support from me.

But I cannot speak of whether their mind for definition, which creditor, which -- and the votes they're talking about. That's between

H. LIU

them.

Q.   So in general somebody supportive who would be on the committee?

MR. RAVERT: Objection. I don't understand that question.

THE WITNESS: Let me tell very simple. Like law firm, there's several -- more than one financial advisor firm send an e-mail, say the same thing as law firm says, here's the case, meaning they have interest also, seeking their position as committee financial advisors. That's that interest.

BY MS. JOHNSON:

Q.   Well is it your understanding that they were looking to choose a financial advisor based on whether that financial advisor had additional votes?

MR. LAPINSKI: Objection. Asked and answered as to what his understanding of the votes meant.

THE WITNESS: In my memory, okay, to my best knowledge, about three financial firms send the e-mail regarding petition NHB, which is Ted Gavin and BDO -- I don't

H. LIU

1  remember exact name -- BDO financial
2  advisor, he also participated in the
3  petition at the committee meeting.
4      One, two -- and John Bambach of Focus.
5      And three -- all three company showed
6  up, showed up this time again at the
7  formation meeting.
8  BY MS. JOHNSON:
9      Q.  But they're talking about votes here
10  before the formation meeting, correct, because
11  it's August 11?
12      A.  Yes, they're talking about it.
13      I don't know which votes they're
14  talking about.  I don't know.  I have no
15  commitment with them.
16      I just send the e-mail to they, say,
17  welcome you, go to the formation meeting, have
18  your petition -- have your pitch, let the
19  committee choose.
20      I didn't responding to Myron Bloom
21  because he didn't send to me -- send me a
22  petition file.  So I sent three, to my best
23  knowledge.
24      I tell the truth.  It's not pleasant

H. LIU

1  for me to receive so many e-mails from different
2  law firms.
3      If there's a firewall I can put, stop
4  here lawyer, stop here financial advisor, if you
5  have somebody invent, I would be very
6  appreciative.
7      Q.  I've got a couple more documents that
8  I'm going to go back to in the initial
9  production.
10      First one will be HL 106.
11      MR. GOLDSTEIN:  Can we just go off the
12  record for a second.  I've got to leave.
13      (Discussion off the record.)
14      MS. JOHNSON:  HL 106 to HL 108.
15      MR. RAVERT:  We're marking that as 32,
16  now.
17      (Liu Exhibit 32, E-mail, Bates HL 106
18  to 108, marked for identification.)
19      Q.  And, Dr. Liu --
20      MR. RAVERT:  One second, please.
21  BY MS. JOHNSON:
22      Q.  If you could just take a look at that
23  first e-mail on the first page, it says -- and
24  this is from Easta Sale -- is that what we have

H. LIU

1  been referring to as EAC?
2      A.  That's correct.  Jessica is assistant
3  to the boss.
4      Q.  And this e-mail from EAC to you says,
5  "Hello, Dr. Liu, we hereby authorize you to be
6  our lawyer to help us to get back our money from
7  bankruptcy court."
8      Do you see that?
9      A.  Yes.
10      Q.  Were you representing to them that you
11  were a lawyer?
12      A.  Let me put it this way.
13      First I'm not a lawyer, explain to
14  them.  You can see all my response is "doctor"
15  only.
16      And in China it's different from here.
17  They can authorize anybody to be their lawyer.
18  You can authorize the wife to be his -- husband
19  wife the husband lawyer, go to the court.
20      So they have expression, "I authorize
21  you as a lawyer."  They use their Chinese culture
22  or their expression to talk to me.
23      Second, they hope, they hope I'm the
24  lawyer, so because I don't charge them.  I

H. LIU

1  working on a contingent basis.
2      So they don't want me to refer to any
3  other lawyers.  You got it?  That's what they
4  wants.
5      But that's their -- you cannot stop
6  people whatever they says.
7      But the reality is I'm not lawyer.  I
8  have to refer to somebody else who is lawyer to
9  handle their case.
10      In this case I refer him to Nerville
11  Paterson to help him file the claim and dealing
12  with other things.
13      Q.  Let's go to HL 99 through 100.  I'll
14  mark that as Liu Exhibit 33.
15      (Liu Exhibit 33, E-mail, Bates HL 99
16  to 100, marked for identification.)
17      Q.  And if you could take a look at the
18  first page there, there is an e-mail sort of a
19  quarter of the way down, dated 8/12/2010 from
20  you.
21      Do you see that?
22      A.  Uh-huh, uh-huh.
23      Q.  Yeah, if could you say yes or no,
24  instead of uh-huh, or uh-huh.  It's difficult for

H. LIU

1  her to tell what you're saying.
2     It says:
3     "Dear President David Dong: Thank you
4  for your confidence in our U.S.- China Bankruptcy
5  and Collection Team to represent you to guide and
6  to seek your optimal interests in this difficult
7  bankruptcy case, and I assure that with the
8  veteran attorneys who have rich experiences in
9  many other same and/or similar bankruptcy cases,
10 we together will give a good fight."
11    Who are you referring to as, "the
12 veteran attorneys"?
13    A.  Here date is 8/12, is preformation
14 meeting.  So it is a time we have several law
15 firms in the past, prior to formation date, help
16 the Chinese to either do debt collection or they
17 participated in bankruptcy cases.
18    My standard is to retain a law firm is,
19 one, the law firm should be more than ten years
20 in debt collection or in bankruptcy cases.
21    So by that age is basically called
22 veteran, senior.  And I almost don't use any
23 young lawyer because the Chinese export bill
24 unpaid is a big deal, big stake for Chinese

H. LIU

1  exporters.
2     So I prefer to retain or seeking help
3  from the veteran lawyers, U.S. lawyers.  So that
4  we're talking about veteran lawyers, veteran
5  attorneys.
6     And I view whoever helped in the past,
7  we feel that's a team -- one of -- part of our
8  team for helping Chinese.
9     Q.  Okay.  On that point you say, "our
10 U.S. China Bankruptcy and Collection Team"?
11    A.  Yes.
12    Q.  Who all does that refer to?
13    A.  I said it before, whoever helped
14 participated in the past prior to this formation
15 meeting, either in bankruptcy case or in debtor
16 collection activity, that's we view as a
17 teamwork.
18    Q.  And who were the people that
19 participated?
20    A.  Oh, that will go back to the morning
21 session.  I told you here who went to China with
22 us, with joined the first -- joined the U.S.
23 China Debtor Collection Bankruptcy Conference,
24 and also some law firm follow that, joined the --

H. LIU

1  take the case, helping the Chinese vendors.
2     Those different law firms together I
3  view as a team.
4     Q.  So what you're including in your team
5  is firms that you've worked with in the past?
6     A.  That's correct.
7     Q.  Okay.  Then if I could have you look
8  at HL 16 through 18?
9     MS. ENGLISH:  34?
10    Q.  Yes, Liu Exhibit 34.
11    (Liu Exhibit 34, Bates HL 16 through
12 18, marked for identification.)
13    Q.  And if you look at the top e-mail on
14 the first page, it's to you.
15    Who is it from?
16    A.  From EAC.
17    Hanyanggd is a different e-mail used
18 by the president of EAC, David Dong.
19    This e-mail is from David Dong to me
20 and cc to EAC other employees, other staffs.
21    Q.  And it says, "we hereby authorize you
22 to try to be the chairman, not me."
23    Had you guys discussed -- had you
24 discussed with EAC trying to become chairman of

H. LIU

1  the creditors committee; is that what this is
2  referring to?
3     A.  Yes.
4     Q.  And what did you discuss?
5     A.  Basically we informed the creditors --
6  these creditors, after I learned his claim from
7  $400,000 something jumped to $2.1 million.
8     And I look at the -- at the
9  petition -- largest 30 creditors list, if was
10 2.1 million true.  And he -- basically it will be
11 viewed as the highest claims on that list.
12    And according to my observation and my
13 experience, the committee usually tend to
14 choose -- choose the -- the committee member
15 who's appointed by the U.S. Trustee who also has
16 the largest claim.
17    Well, you know, most time there will
18 be first recommended as a -- as a chairman or
19 co-chairman, unless he give up or he -- somebody
20 else has more experience than him.
21    Usually in my experience Chinese
22 company will be co-chair for the simple reason,
23 one, language; two, time.
24    Because the lawyer wants -- wants

H. LIU

somebody as a committee chair on U.S. soil if
they need emergency signature.

So eventually the David Dong finally
agreed to -- he finally be selected as a co-chair
on this committee.

I told him, you want me do everything
for you, authorize lawyer, authorize chairman, I
cannot do for you. Sorry for that. I tell him I
cannot do for you, okay.

They wants me to become chairman --
once I say you possibly could be selected by
other members as committee chair.

Then they come back to me, you become
chairman.

I said, no. You yourself should
acting as committee chair or co-chair, if the
committee selected you.

So I educating them, inform them their
rights.

Q.   And I take it the chairman position is
a lot more work?

A.   According to my understanding
chairman -- yes, is more work than other members
because it has some like administrative duties,

H. LIU

sign some paper.

Other than that, every committee
member has equal rights to vote. One member, one
vote, no matter you chairman or not chairman.
One member, one vote. That's equal.

That's my understanding.

MS. JOHNSON: Rich.

MR. SCHEPACARTER: Still here.

MS. JOHNSON: I'm turning it over to
you.

(Discussion off the record.)

EXAMINATION

BY MR. SCHEPACARTER:

Q.   I just want to cover a couple things.

I don't know how you have the
documents like in front of Dr. Liu, but can you
turn back to -- I think it was marked as Liu 27.

It should be an e-mail dated August 8,
2010. Sullivan James from U.S. China Asset.

MR. RAVERT: This is the redacted
e-mail?

MR. SCHEPACARTER: It's the redacted
one.  Is that the one?

MR. RAVERT: Yes.

H. LIU

MR. SCHEPACARTER: All right, cool.

THE WITNESS: We talked about it a few
minutes ago?

MR. SCHEPACARTER: Yes, yes.

I just want to turn back to that, I
just had a couple questions there.

BY MR. SCHEPACARTER:

Q.   Dr. Liu, with respect to this one
e-mail -- and maybe you could help me, just
explain it for me a little bit, you're
explaining, and I think you are, about the
Chinese exporter side and the support base being
an invaluable asset, correct?

A.   Yes.

Q.   And then you go on to say, "Counselor
Schuyler and Rafael desire me to get a certain
support from Asian Chinese exporters."

What did you mean by the "support from
the Asian Chinese exporters"?

A.   When you talk to Chinese exporters,
when you express interest or desire to have them
join in U.S. committee formation meeting in the
future, you know, work, possible, you basically
looking for support from them.

H. LIU

Because without support -- they're
like give you proxy, give you documents, their
export documents -- you cannot go to next stage.

Q.   And what's the next stage?

A.   Next stage is -- first stage you get
their information, as I did, their rights.

Then next step, after the
understanding, the participating U.S. committee
is free, no charge for them.

They could get a legal counseling
through the committee counsel and can unite and
get some recoveries through the committee
counsel. And they are working together.

Then if I understand, then coming back
to me, either Dr. Liu, we have time, we want to
go there in person or, Dr. Liu, we want to
participate, but I don't have time. We don't
want to go there. Time too limit.

Then they will ask me was I willing to
help them to go to the meeting.

And then based on this case, I agreed
to them if they don't want to come here -- on my
cover letter I give them two choices which, I
expressed this morning.

H. LIU

Either they come themself. Or if they don't want to come, they are waiting to have a representative United States, I willing to help them. And also absolutely free of charge.

And then if they agree, they will say, Dr. Liu, we want to authorize you to hold the proxy for us.

Q. How do they know about the proxy system, I'll just call it?

A. Basically I explain to them when the formation meeting held in Delaware, you have -- if a big case like this case, normally will have more than ten law firm be there.

And creditors who faxed, delivered, signed questionnaire, proxy, if they don't come themself on time before the formation meeting, then U.S. Trustee will call the name.

If it was more than seven members who creditors signed the proxy or signed the questionnaire, then U.S. Trustee will have interview and decide is there three or five or seven to form a committee.

They always ask me why three, five, seven, not four, six.

H. LIU

I tell them, it's democracy system. And if sometime if they need a vote and it happen to be two, two, two -- two versus two -- the number five can make decision, three versus two or four versus three or two versus one.

Now then they understand why three, five, seven.

I tell them in order for me to represent you, you have to give me export documents showing you are real exporter creditor in this case.

And I have to have a basic understanding of what your relationship with the debtor. That's why we got so many packing list, shipping bills and invoices.

And when I feel I have a name on the top with debtor and have a correct name as creditor and have dollar amount of date before the formation -- before the petition date, usually I consider that's a real creditor.

Otherwise waste everybody's time.

Then if they assign me, authorize me as a process holder, in this case EAC, I will fax that signed, executed questionnaire and proxy to

H. LIU

your office.

And I have a habit that after fax, after 15 minutes or half hour, I will make a phone call to your office, make sure you do receive.

Because I'm coming from New York. I don't want next day come to the office saying, Dr. Liu we didn't receive you. Time is over.

So I prevent. I have a habit to call you.

Q. Now also in that one e-mail -- we're still on number 27.

A. Yes.

Q. You indicate that you admire Rafael's courage when he loudly stated that he wanted to be -- he wanted basically that you're going to support him as lead or co-counsel in the case.

And then you say, "on which baseline could he make such a claim."

When you say "baseline," what did you mean by that?

A. Which means I work on ground --

MR. RAVERT: Objection, asked and answered.

H. LIU

MR. SCHEPACARTER: I don't think it was asked and answered in that context.

MR. RAVERT: That's fine.

THE WITNESS: I mean, on which grounds he could claim his --

BY MR. SCHEPACARTER:

Q. On which what?

A. On what kind grounds --

Q. Okay.

A. -- he had -- he could make such a claim, I will become a lead counsel or co-counsel on this committee.

And I said clearly, although I admired his courage and also mentioning he's needed to be reeducated; meaning somebody have to tell -- remind him it's not -- in my eyes not a proper way to talk to me directly.

Q. When you say not a proper way to talk to you directly, I'm not sure what you mean by that.

A. Meaning that all the lawyer trying to talk to me seeking all the support, especially use very explicit language.

Most lawyer also use the vague

H. LIU

1 language. But they are intending to clear, they
2 have expressed their interest in seeking my
3 support for them.
4     And what I do is I encourage all of
5 them to go to the -- to prepare the petition --
6 pitching speech, to compete, and the members of
7 committee to choose whose the best on that
8 particular day.
9     Q.   Okay.  Now in this case you're either
10 acting as or you're seeking to be acting as the
11 interpreter, correct?
12     MR. RAVERT:  Objection.
13     Do you mean at this point in time?
14     MR. SCHEPACARTER:  Right.  As of
15 August 8th.
16     THE WITNESS:  As of August 8th --
17     MR. SCHEPACARTER:  Sorry.  As of now,
18 today, August 17th, whatever time, 6:30 --
19     MR. RAVERT:  September.
20     THE WITNESS:  Right now -- on the
21 e-mail is August 8, which is a preformation
22 meeting.
23 BY MR. SCHEPACARTER:
24     Q.   Right.

H. LIU

1     A.   And which day you ask me?
2     MR. RAVERT:  Richard, I think --
3 BY MR. SCHEPACARTER:
4     Q.   Let me ask the question again, maybe I
5 wasn't clear.  And I apologize for that.
6     A.   I appreciate it.
7     Q.   In the application for Arent Fox it
8 also indicates that you, Dr. Liu, are going to be
9 acting as the interpreter for the Chinese
10 creditor.
11     There's one on the committee, correct?
12     A.   Yes.
13     Q.   If you weren't acting as the Chinese
14 interpreter in this case, would you otherwise be
15 acting on behalf of one or more of the Chinese
16 creditors in this case?
17     A.   If they asked me to help them, yes.
18     Q.   But if you're acting as the
19 interpreter, would you still intend to assist
20 them in either filing a proof of claim or helping
21 them with their claim in any way?
22     A.   I asked several lawyers actually.  And
23 their answer is not the same.  Most of them say
24 it's legal.

H. LIU

1     MR. RAVERT:  Okay.  I'm going to
2 object.
3     Whatever you do, do not discuss any
4 discussions you and I have had or anyone
5 else with whom you have sought counsel on
6 this matter.
7     MR. SCHEPACARTER:  Right.  And I
8 didn't ask him to disclose any.
9     I just asked him that simple question,
10 which was if he's going to not act as an
11 interpreter, would he otherwise be assisting
12 the Chinese creditors in this case.
13     MR. RAVERT:  That's fine.
14     MR. LAPINSKI:  So we could all agree
15 that the witness's response is not a waiver
16 of any of his attorney-client privilege?
17     MR. SCHEPACARTER:  Right.
18     MR. LAPINSKI:  Thank you.
19     MR. SCHEPACARTER:  I didn't ask him
20 any attorney-client information.
21     MR. LAPINSKI:  Thanks, Rich.
22     MR. SCHEPACARTER:  Nor am I seeking
23 any.
24 BY MR. SCHEPACARTER:

H. LIU

1     Q.   So if you could either answer that
2 question or --
3     MR. RAVERT:  Richard, could you have
4 the question restated, please.
5     MR. SCHEPACARTER:  Could the court
6 reporter just read it back to him.  I
7 thought it was pretty clear.
8     MS. ENGLISH:  I think we just forgot
9 it, Rich.  I'm sorry.
10 BY MR. SCHEPACARTER:
11     Q.   It's real easy.
12     And, Dr. Liu, I'm hoping that the
13 phone is working, because I can't sort of hear
14 what you guys are hearing.
15     But my question was simple, very
16 simple.
17     If you weren't to be acting as an
18 interpreter in this case, or frankly any case, if
19 you weren't going to be the interpreter, would
20 you otherwise be acting as either the collection
21 agent or another type of person assisting the
22 Chinese creditors with either the processing of
23 their claim, the filing of a proof of claim, or
24 otherwise seeking to help them with their

H. LIU

1  collection efforts?
2      MS. ENGLISH: Oh, I'm going to object
3  asked and answered, because that's the
4  question he did answer when he said, "If
5  they asked me to, yes."
6      MR. SCHEPACARTER: Okay. That's fine.
7      MS. ENGLISH: I thought you were on to
8  a different something, sorry.
9      MR. SCHEPACARTER: No, maybe it was
10  just the 200 miles I guess between Delaware
11  and --
12      MS. ENGLISH: Yeah, sorry, it's not
13  ideal.
14  BY MR. SCHEPACARTER:
15      Q.  You mentioned that there was
16  five early birds. And I think we established
17  that two of the early birds were Arent Fox and
18  EG, so to speak.
19      Can you tell me who the other three
20  early birds were?
21      A.  I gave all the names in the early
22  morning session.
23      The other three is, if I remember
24  correctly, Lowenstein Sandler.

H. LIU

1
2      Q.  Right.
3      A.  And Rafael, which is EG.
4      Q.  Yeah, we have that one.
5      A.  Which is No. 4.
6      Q.  Right.
7      A.  And then the last one is Hodgson Russ,
8  which is the counsel called Debra Piazza or
9  Debbie Piazza.
10      Q.  Okay. I only have four then.
11      I have Arent Fox, Lowenstein Sandler,
12  Elliott Greenleaf, and Hodgson Russ.
13      What's the fifth one?
14      MR. RAVERT: Richard, I remember, Fred
15  Rosner I believe was the other one.
16      THE WITNESS: Yeah, Fred Rosner,
17  Delaware.
18  BY MR. SCHEPACARTER:
19      Q.  Fred Rosner, right.
20      Let me go back. I'm skipping around a
21  little bit.
22      Only because Dawn did such a great job
23  getting through some of these documents, I don't
24  have to cover it so much.
25      If you can turn back to document

H. LIU

1  number -- I think it's 34.
2      MR. RAVERT: Document number or
3  exhibit?
4      MR. SCHEPACARTER: HL 16 through 18.
5      MR. RAVERT: So that's the very last
6  one we did, 30.
7      MR. SCHEPACARTER: Should be the last
8  one we did.
9      MS. ENGLISH: Yes, got it.
10  BY MR. SCHEPACARTER:
11      Q.  16 through 18, there's a whole
12  recitation of the case. It almost looks like the
13  first day affidavit.
14      Do you know who prepared that?
15      A.  To my best knowledge, it should have
16  come from Rafael Zahralddin at EG.
17      Q.  Okay. All right. We're going to skip
18  around again. And I'm actually going to make a
19  request for some official documents.
20      HL 269.
21      MS. ENGLISH: Say again.
22      MR. SCHEPACARTER: HL 269.
23      MR. RAVERT: 2269 --
24      MR. SCHEPACARTER: Not 2269. Just

H. LIU

1  269.
2      MR. RAVERT: 269. This was not
3  previously made an exhibit.
4      MS. ENGLISH: It's 22.
5      MR. SCHEPACARTER: It's 22. I'll go
6  by either the 22 or the Bates stamp. It
7  doesn't matter to me.
8      MR. RAVERT: If it's an exhibit, we
9  should just go by the exhibit.
10      MR. SCHEPACARTER: I did last time and
11  you guys yelled at me.
12      MS. ENGLISH: We reserve the right
13  to --
14  BY MR. SCHEPACARTER:
15      Q.  Hold a proxy to cheer everybody up.
16      Now I think -- Dr. Liu, I think you
17  said you sent this e-mail. You didn't just send
18  it to Arent Fox; you sent it to other law firms
19  as well, correct?
20      A.  Five law firm you just mentioned.
21      I remember clearly before I went to
22  sleep, even at 3:22 early morning in United
23  States, I still didn't send the e-mail out to
24  these five law firm who give me -- who forward me

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

H. LIU

the petition file on August the 4th.

Q. Right.

A. Because formation meeting, if I remember correctly now, is August 13. And I got this proxy very late, because owner of this No. 4 creditors EAC was in France.

And I mentioned at the formation meeting.

Q. Yes, okay. We don't have to rehash that.

A. Yeah.

Q. But my question is, and this is pretty much almost like a document request, what I'd like to have is a copy of the other four e-mails that were sent to the other four law firms.

(Request for production.)

THE WITNESS: Definitely.

BY MR. SCHEPACARTER:

Q. What's that?

A. Definitely, gladly. Certainly.

Q. Okay, okay.

MR. RAVERT: Richard we'll take a look for those, and we'll get back to you.

MR. SCHEPACARTER: It should be just

H. LIU

one e-mail to each of them. So it would be four e-mails.

THE WITNESS: I separate e-mail, yeah.

BY MR. SCHEPACARTER:

Q. Without disclosing any privileged information or the like, and I don't know that you would, do you still currently have a relationship with Shanghai Hualin?

A. Yes.

Q. And is that through you or through the U.S. China Asset Management?

A. Through the company.

In this bankruptcy case I never go any case through my individual. It's company.

Q. Okay. Understood.

And what's the nature of that relationship?

A. Relationship basically they wants somebody file the proof of claim, because they sold the two containers by themself, they said. They sent me an e-mail.

And when I asked them who to, they didn't say. They say they were sold.

And as of today, no penny paid to me,

H. LIU

no penny, all right.

And then they wants to file the remaining claims. And I refer to Nerville Paterson, and the lawyer called George Thompson, to help them to file.

And they filed I think because there's deadline for 45 day recommendation. I believe he filed on time.

Q. All right. I can understand you, Mr. Liu.

A. Thank you for understanding.

Q. Actually, believe it or not, you come through very clear. And I don't think there's any language barrier whatsoever.

Let me ask you this question.

Now you said with Shanghai Hualin you're still doing some work for them.

Is that the same case for EAC?

A. No.

EAC I don't -- they -- EAC just contact Nerville Paterson directly.

And I sent the instruction to -- I sent instruction of Shanghai Hualin to Paterson also. And Nerville Paterson sent their retainer

H. LIU

agreement to both the companies.

And EAC signed because he could make trip to -- he signed directly. And Shanghai Hualin had doubt on certain agreement, asked me to help them to execute the agreement.

Q. Right.

A. And I did on their behalf. I said, don't worry about it. George Thompson will not working on your case on fully, fully continual basis, will not charge you by hour rate.

So that's help him -- help Shanghai Hualin connect with Nerville Paterson law firm.

Q. Okay. Understood.

Now turn back a little bit to HL 17. It's HL 302.

MR. RAVERT: Exhibit 17?

MR. SCHEPACARTER: Yes. Let me know when you're there.

You guys there?

MR. RAVERT: Are you ready?

He's just reviewing that e-mail. Oh, you're ready.

BY MR. SCHEPACARTER:

Q. Let me know when you're there.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

H. LIU

1 A. Go ahead go ahead. I got 17.
2 Q. Okay. Are you finished looking at it?
3 A. Fine. Go ahead.
4 Q. Okay. At the top of that e-mail
5 there's the -- or at the top of that page there's
6 an e-mail from Schuyler Carroll to you, it looks
7 like two lawyers from Elliott Greenleaf -- or
8 three lawyers from Elliott Greenleaf and two from
9 Arent Fox.
10 And it's an e-mail that says, "This
11 creditor will be entitled to a claim for the
12 extra $50,000 and should be able to assert an
13 admin claim for it as well."
14 And then it goes on to say, "at the
15 outset though, I would recommend contacting the
16 debtor to see if they will accept delivery of the
17 goods in transit and if so, make clear to them
18 that they only will be released upon COD
19 payment."
20 Now that e-mail that you got from
21 Mr. Carroll, what did you do with that
22 information?
23 A. Upon the advice on this -- in this
24 e-mail I contacted the -- the debtor's counsel.

H. LIU

1 As I stated before -- I think we talked about
2 this same e-mail before today.
3 I contacted the counsel and -- and
4 even I -- I -- they forward to Dan Schooler.
5 Q. Right.
6 A. And Dan Schooler was not there. His
7 daughter answer phone.
8 And wait for day maybe. They didn't
9 answer. Then I -- I called her back.
10 Then they stated they locate
11 something, who first thing have to locate where
12 were those two containers, either at a port,
13 still at a port, or already picked up by the
14 debtors.
15 Q. Okay. Now did you relay that
16 information also to Shanghai Hualin?
17 A. Oh, definitely.
18 I tell them -- in my memory, I should
19 have forwarded the original response to Shanghai
20 Hualin.
21 I said, look, they tell me those
22 goods -- those two containers bought only for
23 stock, not for the purchase. And I remember you
24 said the debtor wants the goods. They had a

H. LIU

1 buyer before they had placed the order to you.
2 Could you explain to me why is different standing
3 here.
4 Q. Right.
5 A. The Chinese creditor insisted that the
6 debtor had made such kind of commitment.
7 Then I go back -- I have all e-mail to
8 the debtor's counsel or Dan Schooler.
9 I say, look, Chinese creditor told me
10 you -- the debtor had a promise to take these two
11 containers.
12 Now it's already here. Why you say is
13 only for stock purpose.
14 Please please -- I think I remember
15 used a couple "please" -- help get these two
16 container retrieved.
17 And it's not a big amount fortunately.
18 It's only $50,000 amount, please help them to
19 give Chinese creditor a little bit comfort.
20 I used some begging words in that
21 e-mail to debtor's counsel or debtor's CRO, chief
22 restructuring officer.
23 Q. Right. Now with respect to Shanghai
24 Hualin, when you relayed that information to

H. LIU

1 them, did they believe that you were -- you were
2 their lawyer, or was that legal advice they were
3 getting from somewhere else?
4 MR. RAVERT: Objection. That calls
5 for speculation as to what they were
6 thinking.
7 THE WITNESS: In my conversation with
8 all Chinese creditors, I always tell them,
9 I'm no lawyer. I'm a doctor. I'm a
10 business consultant.
11 If they can't find -- in my cover
12 letter I said, here you could looking to --
13 for your own familiar lawyer to represent
14 you in United States.
15 If you don't, and if you need my help,
16 talk to me.
17 I always give them first choice. Let
18 them choose their own familiar lawyers.
19 BY MR. SCHEPACARTER:
20 Q. I understand.
21 Again, I'm going to jump around a
22 little bit. Can we turn to HL 59. It should be
23 in the first set of exhibits.
24 MR. RAVERT: Is this an exhibit or a

H. LIU

1 new document?
2     MR. SCHEPACARTER:  It should be a new
3 one.  Exhibit 35, right?
4     MS. ENGLISH:  35?  Wait, wait.
5     MR. RAVERT:  I have them here, it's
6 HL -- which number, 35?
7     MR. SCHEPACARTER:  No, it's HL 59,
8 0059.
9     MR. RAVERT:  We're just going to
10 continue with the numbering?
11     MR. SCHEPACARTER:  I think it's 35.
12     MS. JOHNSON:  I have that it would be
13 number 35.
14     MR. RAVERT:  Okay.  Richard, it
15 appears that that is an attachment to an
16 e-mail right before it, document number 58.
17     We could ask Dr. Liu to confirm, but
18 that's the way it appears to me.
19     Do you want to see both?
20     MR. SCHEPACARTER:  I'm not going to
21 ask questions about both, but if you want to
22 treat it as 50 and 59 being the complete
23 document, I have no problem with that.  I
24 have no problem with that at all.  But I'm

H. LIU

1 going to ask about 59.
2     (Discussion off the record.)
3     (Liu Exhibit 35, Proxy, Bates HL 0058
4 to HL 0059, marked for identification.)
5 BY MR. SCHEPACARTER:
6     Q.  35, Dr. Liu, just take a look at that
7 real quick, and let me know when you're finished.
8     A.  It's ready.
9     Q.  Is that the proxy that was actually
10 submitted to our office?
11     A.  That's Greg Urbanchuk.
12     Q.  Right.
13     A.  Is only name on that.
14     And you should ask Greg whether he
15 faxed or delivered to your office with that copy.
16     Q.  Let me ask you this.  Do you know who
17 prepared that specific proxy?
18     A.  I believe the original format from EG,
19 Elliott Greenleaf.
20     Q.  They prepared that?
21     MR. RAVERT:  Richard, just to be
22 clear, are you asking who prepared the
23 document template or this final form of the
24 document?

H. LIU

1 BY MR. SCHEPACARTER:
2     Q.  Let me ask both.
3     Who prepared the template, if you
4 know, of this --
5     MR. RAVERT:  Do you understand what
6 he's talking about, templates?
7     THE WITNESS:  Original format?
8     MR. RAVERT:  Well let's say who
9 prepared this let's say with blanks in it?
10     THE WITNESS:  It's from same law firm,
11 EG.
12     One of the e-mail from EG says this
13 type of proxy form will be acceptable to
14 U.S. Trustees, if I remember correctly.
15 BY MR. SCHEPACARTER:
16     Q.  Okay.  And did they also prepare the
17 final version of this document?
18     A.  Yes.
19     I think they just change the name from
20 me initially to Greg, because I cannot hold the
21 two proxy at the same time.
22     I think nothing else changed.
23     Q.  All right.  And what's your
24 understanding of why you cannot hold two proxies

H. LIU

1 at one time?
2     MR. RAVERT:  Objection, to the extent
3 that calls for a legal conclusion.
4 BY MR. SCHEPACARTER:
5     Q.  Well he's the one that stated why he
6 couldn't hold two proxies.  I want to know why.
7     A.  I should get a consultation from you.
8 I could -- maybe I can get a consultation from
9 you in the future.
10     At that moment I heard from lawyers
11 saying U.S. Trustee will not allow one person who
12 holds two proxy holders -- two proxies for two --
13 two creditors in the same case.
14     Q.  Do you remember who told you that?
15     A.  I believe -- I don't recall who, but
16 at least more than one law firms lawyers.  It's
17 not from myself.
18     I should have consulted you directly.
19 But when I get there, you're always busy.
20     Q.  No comment.
21     This might even be actually my last
22 question.
23     I told you I was going to be half.
24     On that document, the proxy, number

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

H. LIU

1  59, which is now marked as 35, it says that Greg
2  Urbanchuk is the U.S. Rep advisor.
3      Do you know why that says he's the
4  U.S. Rep Advisor?
5      A.  I believe, to my knowledge, if I
6  understand correctly with this what in here, it's
7  probably missing something here, the comma.
8      Basically it said Greg could have
9  become U.S. Rep for the Shanghai Hualin, and Greg
10  is advisor in United States.
11  Q.  Do you know if he's the United States
12  rep or advisor for Shanghai Hualin?
13  MR. RAVERT:  Objection.
14  THE WITNESS:  Could you rephrase your
15  question, if I can hear more clearly.
16  BY MR. SCHEPACARTER:
17  Q.  Okay.  Do you know if Mr. Urbanchuk is
18  the United States representative or advisor for
19  Shanghai Hualin?
20  MR. RAVERT:  Objection.
21  Q.  He can answer.
22  A.  I -- I -- I believe after the Shanghai
23  Hualin executed this proxy, meaning Shanghai
24  Hualin authorized Greg Urbanchuk as Shanghai

H. LIU

1  Hualin's U.S. rep.
2  Q.  Okay.
3  A.  In holding proxy only.
4  Q.  Oh, in holding proxy only, okay.
5  A.  Yeah.
6      And before I forgot, could I ask you a
7  question?
8  Q.  I don't know.  I'm not being deposed.
9  A.  No, no, no, not deposed.
10      You mentioned one proxy -- one person
11  cannot hold two proxy.
12      So at this time -- I take it at this
13  time, educating me, whether one person can hold
14  two proxy?
15      In the future I don't have talk to
16  other people.
17  MS. ENGLISH:  Dr. Liu, with all due
18  respect, may I ask that we complete the
19  deposition first.
20      And then if you have questions for
21  Mr. Schepacarter while you've got him on the
22  line, maybe you could do that when the
23  deposition is finished.
24  MR. SCHEPACARTER:  Yeah, actually we

H. LIU

1  can do that --
2      Probably if you want to, you can
3  submit a letter.
4  THE WITNESS:  Okay.  Thank you.
5  MR. SCHEPACARTER:  We'll talk about
6  that a little later.
7      All right.  At this point I don't have
8  any further questions.
9      As I said before, I'm going to reserve
10  the right to either call Dr. Liu, you know,
11  as a witness or as a deponent if I get more
12  information and need for information, and
13  maybe to ask more questions as we continue
14  discovery.
15  MR. RAVERT:  Okay.  Obviously we also
16  reserve our rights to object in proper
17  circumstances.
18  MR. SCHEPACARTER:  Absolutely.
19  MS. ENGLISH:  I have just a few
20  questions.  And then we can all get out of
21  here.
22  MR. SCHEPACARTER:  You less than 10
23  minutes.
24  MS. ENGLISH:  That's fine.  I can do

H. LIU

1  it.
2  EXAMINATION
3  BY MS. ENGLISH:
4  Q.  Dr. Liu, my name is Caroline English.
5  I'm from the law firm of Arent Fox.  And I
6  represent the committee in this case.
7      You and I have never met before today,
8  is that correct?
9  A.  Yes.
10  Q.  And I just wanted to ask you, did you
11  do anything to prepare for your deposition today?
12  MR. RAVERT:  Objection.
13      Do not discuss in any kind of detail
14  what you and I may have discussed.
15  A.  Can you rephrase the question again.
16  Q.  Did you do anything to prepare for
17  your deposition today?
18  A.  To come here, since I got the notice,
19  at least in my mind I have to prepare for this
20  deposition, yes.  The answer is, yes.
21  Q.  And did you meet with your lawyer to
22  prepare for the deposition today?
23  A.  Yes.
24  Q.  When was that meeting?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

**H. LIU**

1  A.  I don't recall exact day, but on very
2  short notice should be three, four days ago,
3  because I believe I got notice for deposition
4  last Thursday or Friday, and then probably see
5  him Monday or Tuesday, because a weekend issue.
6  Q.  And was it just one meeting you had
7  with your lawyer or several meetings?
8  A.  More than once.
9  Q.  And at any of those meetings you had
10  with your lawyer to prepare for your deposition
11  was anyone from Arent Fox present?
12  A.  No.
13  Q.  Did you have any conversations with
14  any lawyers from Arent Fox about your testimony
15  today?
16  A.  No.  After the -- I got my counsel,
17  no.
18  Q.  And did you have -- at the meetings
19  you had with your lawyer to prepare for today
20  were any lawyers from Elliott Greenleaf present
21  at those meetings?
22  A.  I got the one phone call --
23  Q.  No, I'm asking at the meetings you had
24  with your lawyer were any lawyers from Elliott

**H. LIU**

1  Greenleaf present at those meetings?
2  A.  No.
3  Q.  No.  And did you discuss with any
4  lawyers from Elliott Greenleaf how you would
5  testify today?
6  A.  No.
7  Q.  Thank you.
8  I want to ask you about -- returning
9  to the UBP case and the formation of the
10  committee -- and I don't want to ask you anything
11  that may have occurred in the committee meetings
12  once the committee was appointed.
13  But I do want to ask you, when you
14  decided which law firm you would vote for once
15  the committee was appointed, not which law firm
16  you voted for, but when you made your decision,
17  which law firm you would support?
18  A.  My personal decision was made at the
19  last rounds of the committee selection.
20  We -- in my memory, if memory correct,
21  we have more than ten law firms present, showed
22  up at the formation meeting on August 13.
23  And we interviewed five or six either
24  coming a team, two, or coming one law firm

**H. LIU**

1  single, pitching for committee counsel.
2  And after first round, the committee
3  narrowed down to the two law firm, which is
4  Lowenstein Sandler and Arent Fox.
5  Then after the second round pitching,
6  and their performance, then committee close the
7  door, compare both of them, and then committee
8  had a final vote.
9  And at the time usually -- I said I
10  have habit.  I was a teacher before.  I usually
11  tend to vote later or last.
12  And it's -- clearly to me it's a
13  majority vote.  And it is a formation meeting --
14  it is at last round.
15  Nobody verbally objecting.  And
16  although people had liked both of them, a
17  difficult choice --
18  Q.  I'm going to interrupt you, because my
19  question doesn't call for information about what
20  happened in the committee meeting, but just when
21  you made your decision.
22  If I understood what you were saying
23  correctly, it was after all of the pitches had
24  been made by the law firms?

**H. LIU**

1  A.  Last round.
2  Q.  Last round, okay.
3  When you contacted the three Chinese
4  creditors that you testified about earlier today,
5  at any time when you were calling them to talk
6  about this case, did you tell them they should
7  support Arent Fox as committee counsel?
8  A.  To my best knowledge, in any e-mail,
9  in any verbal conversation with Chinese creditor,
10  I have to correct you, not three, only two,
11  because the third one bought insurance.
12  Q.  I'm sorry.  Right.
13  A.  So they have no interest.
14  So there's no mentioning any law firm,
15  including Arent Fox.
16  Q.  And would that also include Elliott
17  Greenleaf?
18  A.  Yes.
19  Q.  I just have one other thing I wanted
20  to follow up on.
21  When Ms. Johnson was questioning you
22  and you were testifying to some of the problems
23  you saw with the committee formation process and
24  you were testifying about lawyers who might be

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

H. LIU

1  approaching yourself or creditors on the day of
2  the formation meetings, do you recall that
3  testimony?
4      A.  Yes.
5      Q.  And when you were testifying earlier,
6  you mentioned that Mr. Harley Goldstein, who was
7  in this room earlier today was one of the lawyers
8  who approached you at a formation day, is that
9  correct?
10         MS. JOHNSON:  Objection,
11     mischaracterizes the testimony.
12         Go ahead.
13  BY MS. ENGLISH:
14     Q.  That's why I'm asking.
15         Is that correct?
16     A.  Not in UBP case.
17         Is back to the case I hold a proxy in
18  Delaware.
19     Q.  And what case was that, sir?
20     A.  And I need to ask Richard to help me
21  because when -- each case, they have two sheets,
22  if I remember correctly.
23         One sheet is a creditors' sheet,
24  whoever showed up holds the proxy or

H. LIU

1  questionnaire.
2         Another sheet is professional, lawyers
3  and financial advisors.
4         And we both recognized at the
5  formation meeting in the one case.  The case
6  should be bigger case.
7     Q.  Do you not recall what that case was
8  where you met Mr. Goldstein at the formation?
9     A.  At this moment it's hard for me to
10  recall exactly.
11         But since we both recognized we met at
12  this year at a formation meeting, with help from
13  Trustee Richard we could find the case name, with
14  my name and --
15     Q.  Do you remember the year?
16     A.  Probably last year.
17     Q.  Last year?
18     A.  Probably, yeah.
19     Q.  And is my recollection clear --
20     A.  Within three years, because I only
21  join in 2008, 2009 and 2010.
22         And 2007 I only did one case, GHP.  So
23  three years.
24     Q.  So is my understanding of your

H. LIU

1  testimony correct that Mr. Goldstein approached
2  you before the formation meeting?
3     A.  Yes, like many other law firm in that
4  room.
5         MS. ENGLISH:  Okay.  I have nothing
6     further.
7         MS. JOHNSON:  I'm sorry, I have some.
8         Do you have any questions?
9         MR. LAPINSKI:  Well, no.  The
10     committee is only represented by counsel.
11         MS. JOHNSON:  Oh, right, yes.  Sorry.
12  EXAMINATION
13  BY MS. JOHNSON:
14     Q.  I have a follow-up on that.
15     A.  Go ahead.
16     Q.  You were just asked about your first
17  meeting with Harley Goldstein.
18         Can you explain what was discussed the
19  very first time you ever met Harley Goldstein.
20     A.  That's only time I met Harley
21  Goldstein in person at a debtor formation
22  meeting.
23         The reason for me to remember him is
24  usually is big case, the law firm -- many law

H. LIU

1  firm will send senior lawyers to pitch big cases.
2  Small cases they can be young lawyers.
3         I remember -- why so deeply I
4  remember?  Because he introduced himself,
5  approaching me.  And he had somebody else with
6  him, saying he's great rising star, very good in
7  bankruptcy, although he's young.  And he won how
8  many awards, whatever, and did some case.
9  Introduced me in a very short time.
10         And I say -- I admire him.  I say you
11  are very young here.  Everybody is older than
12  you.  So just why I given deep impression.
13         Many lawyers approach me.  Most
14  lawyers I may forgot, if they are not in New
15  York, I'm living in New York.
16         So that's why I remember him.
17     Q.  And, I'm sorry, correct me if I'm
18  wrong, you said that was at the committee
19  formation meeting, correct?
20     A.  That's correct.  One of the case, one
21  of the bankruptcy case, should be a big case.
22         MS. ENGLISH:  Just for the record, it
23     is now 7:00 o'clock.  This deposition has
24     been going for more than nine hours.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

H. LIU

1
2 The committee will object to any party
3 who wishes to hold this deposition open or
4 redepose Dr. Liu for any other day.
5 MR. SCHEPACARTER: We've all reserved
6 our rights to do so.
7 MS. JOHNSON: Same. We'll reserve any
8 rights.
9 Are we done?
10 MS. ENGLISH: We're done.
11 Thank you all.
12 MR. RAVERT: Thanks, Richard.
13 (Discussion off the record.)
14 MR. RAVERT: So obviously, I think
15 everyone would agree, we need to read this
16 transcript.
17 THE COURT REPORTER: Mr. Schepacarter,
18 did you want it for Monday?
19 MR. SCHEPACARTER: Send it to me for
20 Monday. If I can get, you know, the usual
21 transcript. Can you send a minuscript?
22 (Time noted: 7:04 p.m.)

A C K N O W L E D G E M E N T

STATE OF NEW YORK )
                   :ss
COUNTY OF NEW YORK )

I, DR. HAISHAN LIU, hereby certify,
I have read the transcript of my testimony
taken under oath in my deposition of September 17,
2010; that the transcript is a true, complete
and correct record of what was asked, answered
and said during this deposition, and that the
answers on the record as given by me are true
and correct.

_____
DR. HAISHAN LIU

Sworn and subscribed to before me
this _____ day of _____ 2010.

_____
NOTARY PUBLIC

C E R T I F I C A T E

STATE OF NEW YORK )
                   :ss
COUNTY OF NEW YORK )

I, LYNN VAN DEN HENDE, a Certified
Shorthand Reporter and Notary Public, within and
for the State of New York, do hereby certify:
That DR. HAISHAN LIU, the witness
whose deposition is hereinbefore set forth, was
duly sworn by me and that such deposition is a
true record of the testimony given by such
witness.
I further certify that I am not
related to any of the parties to this action by
blood or marriage and that I am in no way
interested in the outcome of this matter.
In witness, whereof, I have hereunto
set my hand this _____ day of _____, 2010.

_____
LYNN VAN DEN HENDE, RPR-CSR-RMR-CRR-CLR

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| DR. HAISHAN LIU | MR. GOLDSTEIN | 5 |
| | MS. JOHNSON | 198 |
| | MR. SCHEPACARTER | 279 |
| | MS. ENGLISH | 309 |
| | MS. JOHNSON | 316 |

EXHIBITS

| LIU | | PAGE |
|---|---|---|
| Exhibit 1 | Business card of Dr. Haishan Liu. | 15 |
| Exhibit 2 | E-mail with attachment, Bates HL 0334 through HL 0351. | 130 |
| Exhibit 3 | E-mail, Bates stamped HL 0332 and HL 0333. | 138 |
| Exhibit 4 | E-mail, Bates stamped HL 0330 and HL 0331. | 142 |
| Exhibit 5 | E-mail, Bates HL 0327. | 144 |
| Exhibit 6 | E-mail, Bates HL 0326. | 146 |
| Exhibit 7 | E-mail, Bates HL 0323 through 0324. | 147 |
| Exhibit 8 | E-mail, Bates HL 0321. | 152 |
| Exhibit 9 | E-mail, Bates HL 0320. | 158 |
| Exhibit 10 | E-mail, Bates HL 0319. | 160 |
| Exhibit 11 | E-mail, Bates HL 0317 to HL 0318. | 161 |
| Exhibit 12 | E-mail, Bates HL 0316. | 164 |

81 (Pages 318 to 321)

INDEX
EXHIBITS

| LIU | | PAGE |
|---|---|---|
| Exhibit 13 | E-mail, Bates HL 0315. | 171 |
| Exhibit 14 | E-mail, Bates HL 0311 through HL 0313. | 172 |
| Exhibit 15 | E-mail, Bates HL 307 to 309. | 198 |
| Exhibit 16 | E-mail, Bates HL 306. | 205 |
| Exhibit 17 | E-mail, Bates HL 032. | 209 |
| Exhibit 18 | E-mail, Bates, HL 290. | 215 |
| Exhibit 19 | E-mail, Bates HL 288. | 218 |
| Exhibit 20 | E-mail, Bates HL 280. | 219 |
| Exhibit 21 | E-mail, Bates HL 273 to HL 274. | 224 |
| Exhibit 22 | E-mail, Bates HL 269. | 229 |
| Exhibit 23 | E-mail, Bates HL 388 to 389. | 238 |
| Exhibit 24 | E-mail, Bates HL 383. | 244 |
| Exhibit 25 | E-mail, Bates, HL 381. | 246 |
| Exhibit 26 | E-mail, Bates AF-UBP 1. | 248 |
| Exhibit 27 | E-mail, Bates AF-UBP 9. | 249 |
| Exhibit 28 | E-mail, Bates AF-UBP 11. | 256 |
| Exhibit 29 | E-mail, Bates AF-UBP 12. | 261 |
| Exhibit 30 | E-mail, Bates AF-UBP 15 through 18. | 263 |
| Exhibit 31 | E-mail, Bates AF-UBP 20. | 264 |

INDEX
EXHIBITS

| LIU | | PAGE |
|---|---|---|
| Exhibit 32 | E-mail, Bates HL 106 to 108. | 271 |
| Exhibit 33 | E-mail, Bates HL 99 to 100. | 273 |
| Exhibit 34 | Bates HL 16 through 18. | 276 |
| Exhibit 35 | Proxy, Bates HL 0058 to HL 0059. | 303 |

REQUESTS FOR PRODUCTION | | PAGE |
| E-mails not produced. | 128 |
| Copy of the other four e-mails that were sent to the other four law firms. | 294 |

INSTRUCTIONS NOT TO ANSWER | PAGE |
| Instruction Not to Answer. | 247 |

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. In you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

E R R A T A

I wish to make the following changes, for the following reasons:

PAGE LINE

___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____

_____
WITNESS' SIGNATURE          DATE

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

**A**

abbreviation
27:20 119:23
able 104:5 154:2
154:5 166:20
167:5,8 195:23
210:19 221:12
230:3 233:11
298:13
absolutely 54:7
100:24 101:11
128:7 234:6
282:5 308:19
accept 18:24
298:17
acceptable
304:14
Accessories
42:10 45:23
46:15 50:10
89:23 139:22
153:14 160:11
217:16 229:17
accumulated
12:4
accurate 20:13
228:10 231:25
260:5 264:21
324:16
accurately 66:2
131:11 142:7
142:12,16
144:5
accusatory
125:21 127:10
acquaintance
46:15
acquainted
99:19
acquisition
22:21,22
100:11 101:4
act 226:12 231:5
288:11
acting 278:17
286:11,11
287:10,14,16
287:19 289:18

289:21
action 40:19
317:11
actively 67:24,24
activities 48:16
74:13 201:12
202:23
activity 46:7
275:17
actual 91:7
add 213:14
additional 13:16
269:18
address 15:25,25
16:4,16 26:19
47:6,12 48:13
49:14,15,20,22
50:7,12 63:18
63:21 64:23,25
71:24,25 72:3
73:3 74:23
75:11 112:14
139:18,20
140:2,5 141:4
146:3 150:18
153:14 160:5,6
160:7 161:25
162:2,7,9,9,16
163:3,3,24,25
163:25 164:19
164:19 202:10
229:24 232:5
adds 224:8
adequate 97:19
149:10
Adkins 177:3,4
admin 210:19
298:14
Administered
1:5
administrative
37:23,24
211:13,16
278:25
administrative...
38:5
administrator
221:8

admire 284:15
317:11
admired 285:14
advice 15:8
80:16 82:16
106:18 214:12
214:15 217:5
217:18 218:5
245:20 298:24
301:3
advise 15:5
160:12 217:22
advised 219:21
advisor 27:10,15
28:3,7 191:18
207:19,21
208:8 226:11
264:17 265:15
266:10,13
267:3,7,13,25
267:25 269:9
269:16,17
270:3 271:5
306:3,5,11,13
306:19
advisors 140:3
207:15 208:4
269:13 315:4
advisory 264:18
advocate 10:2
56:19 233:19
233:21 240:15
affidavit 292:14
affiliated 133:25
affiliation 19:4
affordable 115:2
afraid 34:22
41:19 68:9
116:13 172:4
257:19
afternoon
127:15
AF-UBP 144:4,4
248:17,19
249:23,25
256:3,4 261:10
261:12 263:19
263:21 264:8

264:10 322:18
322:19,20,21
322:22,24
age 274:22
agent 289:22
ago 9:14 49:24
50:17 66:6
92:21 120:11
120:13 136:14
202:9 257:22
280:4 310:3
agree 119:18
153:23 201:20
201:21 282:6
288:15 318:15
agreed 6:21
116:23 143:21
143:22 157:16
169:17 202:21
204:18,20
227:6 259:19
278:5 281:22
agreement 41:7
41:20 89:4,5
89:17,24 90:2
116:2,24 196:6
297:2,5,6
ahead 42:3
58:22,23 96:8
106:9 146:14
180:23 259:21
298:2,2,4
314:13 316:16
ahold 223:20
al 1:6
alert 58:10
alerts 58:12
aligned 111:9
alleging 105:22
allocate 221:12
221:14
allow 36:9 86:14
95:14 196:7
197:10 205:22
208:5 240:2
259:12 305:12
allowed 10:11
75:23 169:10

174:14
allows 53:14
150:18
altogether
195:11
altruistic 59:23
amassed 12:3
ambition 239:12
America 8:2
American 34:17
41:18 68:3,7
73:10 89:6
104:16 120:8
124:2,2
Americans
34:18
amount 71:6,6
75:17,18
130:14 164:23
169:8 183:13
211:6 213:14
213:20 216:15
225:9,14,24
226:3 283:19
300:18,19
anchor 174:22
Andrew 22:9
and/or 168:18
211:21 274:10
Angelich 21:5,6
angle 52:4
answer 5:17 6:4
6:6 31:20
52:11 53:24
54:2,10 57:21
58:5 59:7,8
72:18 73:4
74:4 78:20
80:22 105:8
111:23 112:11
112:18 114:14
121:14,21,22
126:21 135:4
149:21 162:23
165:13,14,21
173:24 174:11
174:14 178:13
180:3,17,22

183:5 184:18
186:5,20
187:10 190:25
192:11 211:15
220:21,24
236:18,19,22
244:15 247:9
247:10 268:3
287:24 289:2
290:5 299:8,10
306:22 309:21
323:13,14
**answered** 34:24
58:4 70:21
72:17 133:9
140:11 146:20
181:18 188:20
188:22 199:3
212:13 269:20
284:25 285:3
290:4 319:12
**answering**
124:22 155:13
158:18 175:21
**answers** 106:22
148:24 149:9
160:4 319:14
**anybody** 42:15
96:14 97:9
98:11 110:13
122:15 132:2
272:18
**anymore** 185:12
**anyways** 194:9
**apart** 108:8
**Apologies**
171:13
**apologize** 15:15
28:20 40:22
68:14 69:15
80:11 81:7
82:18 83:15,22
125:5 140:12
146:23 147:13
179:4 287:6
**appear** 232:4
**appearing**
179:14

**appears** 42:6
44:8 47:3 57:8
142:22 143:3
164:12 171:6
171:10 176:6
186:8 191:16
200:5 214:18
302:16,19
**appended**
138:23
**application**
287:8
**applications**
122:13
**applied** 107:25
**appoint** 76:15
226:10
**appointed** 10:4
30:22 31:10
206:10 208:6
249:12 277:16
311:13,16
**appointment**
31:15,16 80:14
233:8
**appreciate** 5:10
79:21 93:16
158:21 180:12
287:7
**appreciative**
271:7
**apprised** 149:13
**approach** 25:16
25:23 32:9
53:19 111:10
111:16,22,24
112:17 123:20
123:22 209:6
240:13,18
317:14
**approached**
208:20 314:9
316:2
**approaching**
150:21 206:18
207:8 212:8
314:2 317:6
**appropriate**

78:8 324:5
**approval** 124:20
**approved** 76:12
**approximately**
216:24
**April** 154:11
**area** 78:10
**areas** 72:5
**Arent** 3:16 19:8
20:19 21:25
29:8 30:5 33:9
33:19 51:6,19
54:20,23,25
57:11 68:12
78:19 79:12,17
79:24 80:15
86:3 106:12
110:14,21,25
111:7 112:5,22
113:9 115:7
116:8,24 117:9
122:12 123:4
123:10,17,20
124:9 125:11
125:23 127:2
128:23 137:10
137:17 149:13
153:17 165:8
165:15 166:3
168:6,13,18,25
171:7,12,16
172:8,10,12
173:18 175:24
176:7 186:11
187:25 188:8
192:9,15
193:13,23
200:2 211:18
217:11 219:5
229:12 235:24
235:25 236:25
247:23 248:6
255:4,7 257:15
258:2,3 287:8
290:18 291:11
293:19 298:10
309:6 310:12
310:15 312:5

313:8,16
**arguably** 185:18
**argumentative**
185:19 190:22
**Arnold** 21:10,10
21:13
**arrange** 77:12
77:22,25
261:25
**arranged** 200:7
260:24
**arrangement**
192:5
**arrive** 211:9,10
**arrived** 216:18
222:11
**ascribe** 159:13
**ascribed** 154:21
**Asian** 132:8,12
132:13,21
133:2 138:5
238:13 250:14
280:18,20
**aside** 107:12
144:20
**asked** 19:24,24
19:25 31:19
36:6 41:19
45:4 58:3
67:14 70:20
72:16 82:3,18
83:23 87:25
93:20 94:12
104:2 120:21
133:9 135:2
140:15 145:15
146:19,21
148:21 163:24
166:6,16,17
181:14,17
184:15 185:23
188:8,19,21
192:9 199:2
200:2 213:25
219:9 225:16
252:11,19
269:19 284:24
285:3 287:18

287:23 288:10
290:4,6 295:23
297:5 316:17
319:12
**asking** 9:13
13:25 32:17
35:7 53:19
69:15 78:14,16
80:4,12 110:4
110:24 114:4
126:6,24
142:14 144:19
158:9,17
159:14 160:9,9
164:17 166:2
166:19 177:17
178:11,17
183:9 185:2
206:18,22
211:11 213:4
214:11 215:10
219:7 220:17
240:9 243:9,14
251:12 253:5
257:11 264:23
267:15 303:23
310:24 314:15
**asks** 101:7
**assert** 210:19
298:13
**assertion** 253:9
**assessment**
192:19
**asset** 62:2,8,25
117:8 250:12
253:22 254:7
279:20 280:14
295:12
**assets** 11:21 12:9
12:11,23 14:4
14:7,12 38:9
38:10 63:25
76:24 98:7
118:3 139:7
254:2
**assign** 283:23
**assigned** 220:20
**assist** 143:14,15

143:16 145:3,4
145:5 148:12
148:13 233:18
287:20
**assistance**
140:15
**assistant** 21:18
48:9 73:12
272:3
**assistants** 21:16
**assisting** 288:12
289:22
**associate** 97:8
133:25
**associated**
139:16
**associates** 51:16
201:13
**assume** 54:20
256:25
**assumed** 141:25
**assumes** 149:15
178:15
**assuming** 169:20
197:6 217:13
228:18 258:4
260:12 265:3
**assumption** 6:12
**assure** 183:14
201:17 274:8
**Asterion** 198:23
199:15
**atmosphere**
56:25
**attach** 208:22
**attached** 131:22
132:10,15,23
132:25 133:19
324:11
**attachment**
129:13 130:24
133:16 173:4
302:16 321:11
**attachments**
130:9
**attempt** 183:23
184:8
**attempts** 197:12

**attend** 157:17
165:4
**attention** 99:14
120:19 126:7
138:10 141:6
147:4 152:17
161:3,16,23
162:14 170:24
172:15 176:5
177:9 181:7,11
198:4,9 205:14
209:17 215:18
218:8 229:10
244:9,10 256:2
**attorney** 22:9
140:3 148:20
148:21,22,24
150:14 153:10
171:17 263:3
324:13
**attorneys** 26:2
26:17 107:13
108:6,9,12,13
135:19 156:19
171:12 172:13
186:10 211:18
214:5,11
234:20 261:8
262:24 274:9
274:13 275:6
**attorney-client**
288:17,21
**attract** 187:8
**August** 46:20
131:20,24
139:5 140:10
146:16 152:25
153:23 155:20
155:21 165:6
200:17 202:12
213:2 217:6
220:4 230:5
231:13 238:11
248:22 255:15
256:13 270:12
279:19 286:16
286:17,19,22
294:2,5 311:23

**authenticity**
143:23
**author** 177:17
**authority** 241:16
**authorization**
231:4 233:24
**authorize** 84:20
226:10 272:6
272:18,19,21
276:22 278:8,8
282:7 283:23
**authorized**
11:12,14
227:12 306:25
**auto** 41:15
**automatically**
126:16
**available** 36:8
38:22 75:8,9
110:20
**Avenue** 2:10
3:17 7:13
**average** 124:2
**Aviation** 29:25
30:2 37:13
103:21
**avoidance** 40:19
**awards** 317:9
**aware** 50:15
51:25 78:13
122:11,14
123:5 125:8
134:6 135:10
163:7,16 165:8
167:4,20 170:5
170:6,17 178:3
191:10
**awareness**
125:16
**A-n-g-e-l-i-c-h**
21:7
**a.m** 2:6 54:13,14
91:13 131:25
146:16

———————
**B**
**Bachelor** 7:17
8:5,18

**back** 9:5 10:12
29:3 30:25
31:3 49:7,22
50:2,3 52:13
52:16 55:10
56:11 57:19
67:21 80:8
81:11 88:4
94:7,14 100:2
111:13 112:19
115:23 118:21
118:23,24
120:20 127:15
135:15,23
144:21,24
149:3,3 163:14
165:23 168:10
174:8 179:3,9
181:22 192:15
194:18 195:6
195:25 197:13
197:14,22
201:23 204:13
204:23 211:22
212:14,15
215:2 217:10
217:13,14
221:20,21,21
221:22 223:10
224:11,11,17
224:18 225:16
233:2,6 235:9
237:24 248:9
254:19 267:16
271:9 272:7
275:21 278:14
279:18 280:6
281:15 289:7
291:20,25
294:24 297:15
299:10 300:8
314:18
**background**
6:23 77:19
94:8 174:20
193:4
**backwards**
129:4

**bad** 13:23 93:24
**bags** 196:14
**balance** 71:12
226:2
**ball** 136:6
**Bambach**
264:15 265:2,2
265:15,22
266:10 270:5
**bankrupt**
166:15
**bankruptcies**
173:11
**bankruptcy** 1:2
14:15 21:2
23:12 24:9
31:9 32:20
33:24 34:21,21
37:25 38:4,9
38:10,21,21
39:9,24 40:9
41:2,9,16
48:14,16 50:15
50:17 51:7
53:7 55:19
61:6 64:21
65:15,21 76:18
80:13 83:18
86:7 88:3
99:13 102:5,12
119:12 125:2
129:19 131:23
132:11,14,22
132:25 156:15
162:11 169:9
192:17 205:24
206:9 210:24
213:16 214:25
215:7 217:24
228:23 233:22
234:21,23
235:3,4 236:6
238:20 240:16
240:17 246:7
247:18 249:22
251:24 255:21
266:17 272:8
274:5,8,10,18

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

274:21 275:11
275:16,24
295:14 317:8
317:22
**banks** 77:12
**Barcalounger**
27:23,24 29:9
37:7,8 123:7,9
**Barnes** 167:18
**barrier** 154:20
157:13 159:3,8
262:13 296:15
**barristers** 9:10
**base** 250:10,11
253:20,21
280:13
**based** 47:13 71:5
90:20 108:11
108:12 269:17
281:22
**baseline** 252:11
284:19,21
**basic** 183:16
283:13
**basically** 35:12
63:5 64:8
72:15 84:5,8
111:3 115:15
126:9 129:5
149:21 156:13
168:24 183:8
188:24 217:22
224:11 245:23
251:4 266:5
268:6 274:22
277:6,11
280:24 282:11
284:17 295:19
306:9
**basis** 13:18
14:18,20 38:20
56:10 59:14,17
60:7,19 63:10
67:15 68:2
88:7,11 90:5
90:11 96:3
114:13 115:23
185:22 215:14

253:13 273:2
297:11
**batch** 195:10
**Bates** 44:10
129:4,10
130:24 138:10
138:14 141:6
142:4 144:3,12
146:7 147:7
152:17,20
157:23 158:3
160:23 161:20
164:10 171:4
172:20 198:17
205:11 209:22
215:20 218:10
219:18 224:23
229:8 238:7
244:18 246:22
248:19 249:25
256:4 261:12
263:21 264:10
271:18 273:16
276:12 293:7
303:4 321:11
321:12,14,15
321:16,17,19
321:20,21,22
321:23 322:4,5
322:7,8,9,10
322:11,12,13
322:14,15,16
322:17,18,19
322:20,21,22
322:24 323:4,5
323:6,7
**BDO** 269:25
270:2
**Beck** 22:24
**becoming**
151:22 252:10
252:15
**begging** 300:21
**beginning** 65:6
74:20 82:17
110:4 113:14
253:6,19
**behalf** 52:18

79:25 86:9,22
120:23 178:8
197:19 226:12
231:5,5 268:17
287:16 297:8
**belied** 184:24
**belief** 60:2
**believe** 22:20
29:16 51:15
52:2 66:5
75:13 117:7
124:18 144:19
150:7 155:9
156:3 163:15
164:18 167:25
171:24 177:8
185:8,14 203:6
207:4 210:25
220:23 225:22
226:15 242:23
291:15 296:8
296:13 301:2
303:19 305:16
306:6,23 310:4
**believes** 193:18
**beneficial**
233:11 237:14
237:15
**benefit** 122:4
178:5
**best** 13:3 20:24
39:10 79:8
92:7 94:24
110:11 113:8
127:11,23
171:20 174:19
193:20 206:24
208:6 231:17
231:18 235:17
235:17,24
236:7,8,10
239:17 243:6,6
261:19 268:3,8
269:23 270:23
286:8 292:16
313:9
**better** 26:15
119:6 120:18

149:22 150:2
150:25 151:11
151:13,22
152:7 180:2
208:9 209:9
242:7 255:6,7
262:5,15
**bid** 52:5 232:21
233:12 249:18
249:18
**bidder** 123:17
123:18
**bidding** 70:8
**Bidu** 97:12
**big** 60:22 120:7
231:6 239:13
258:3 274:25
274:25 282:13
300:18 316:25
317:2,22
**bigger** 315:7
**bilingual** 66:11
**bill** 274:24
**bills** 11:25 64:10
283:16
**birds** 136:18
290:17,18,21
**bit** 18:12 30:24
41:25 80:9
280:11 291:21
297:15 300:20
301:23
**Blackberry**
173:23
**blank** 202:20,21
**blanks** 304:10
**blood** 320:18
**Bloom** 267:4,10
267:11,17
270:21
**blunt** 209:2
**Board** 267:5,11
267:17
**body** 208:22
**book** 93:5,12
167:14,17,19
**born** 68:7
**boss** 73:13,15,19

231:7 272:4
**bother** 150:10
**bottom** 131:18
136:4 138:23
142:20 143:7,8
146:13,16
161:2 176:13
198:20 199:8
204:6 214:19
**bought** 42:24,25
46:5 82:9,11
299:23 313:12
**Box** 3:23
**Brad** 99:22,22
101:3
**branch** 7:5
**branches** 9:24
254:15
**break** 54:5,19
91:4,9,12
194:6,11,11,15
**breaks** 258:7
**briefly** 158:6
**bring** 65:17
174:8 197:13
197:14,21
**bringing** 46:17
**British** 9:9
**broad** 122:21
**broader** 65:14
**broadest** 65:9
**broken** 67:9
**brought** 99:12
101:16 125:15
188:6
**brunt** 140:14
146:17 147:10
147:16,19
148:2
**buddy** 146:25
**budget** 222:13
**build** 92:21
**building** 1:5
27:20 49:23
91:22 92:3
187:21,22
250:17,23
251:11

**built** 92:19
**bunch** 132:8,12
  132:13,21
**business** 11:5,11
  11:23 12:2,4
  13:5 15:8,11
  16:23 17:13,16
  17:17,19 25:17
  60:24 61:9
  62:6 63:15
  64:22,25 66:7
  67:10 68:2
  76:21 77:17
  89:4 95:15
  96:23 97:6
  98:7 106:2
  119:4 124:2
  139:18 172:11
  172:11 183:10
  183:11 191:17
  241:10 258:20
  301:11 321:9
**businessmen**
  60:10,11
**busy** 36:19
  305:20
**Butler** 23:15,15
  29:13 33:13
**buy** 167:19
  213:11 222:14
**buyer** 99:7 222:9
  222:10 300:2
**B-a-r-c-a-l-o-u...**
  27:23
**B-e-c-k** 22:24
**B-i-d-u** 97:12
**B-r-a-d** 99:23

**C**

**C** 3:2 4:2 319:2
  320:2,2
**call** 12:7 36:19
  44:14 49:4
  71:21,22 77:10
  104:18 108:23
  115:23 118:25
  119:24 120:20
  140:25 141:2,5

148:17 150:11
151:4,5 155:25
161:3,22
162:13 163:19
163:20 172:14
175:16 177:9
179:18 194:23
195:14,19
200:7,12,25
203:21 204:19
205:5 217:11
217:13 221:20
221:21 226:19
234:4,4 240:17
245:5 254:8
256:19 257:18
258:7 259:22
259:25 260:6
260:24 261:24
262:4,20,22
265:2 282:10
282:18 284:5
284:10 308:11
310:23 312:20
**called** 5:3 7:4
  22:24 23:10,14
  24:12,17,18,23
  25:14 26:5
  47:25,25 48:3
  48:10,19 49:8
  49:17 72:13
  73:15 77:6
  89:8 91:24
  98:4,8,25
  101:17 103:22
  109:5 120:6
  133:22 150:13
  150:22 163:21
  186:22 212:16
  220:22 222:13
  274:22 291:8
  296:5 299:10
**calling** 189:6
  313:6
**calls** 35:19 55:2
  62:7 68:21
  109:20 132:17
  151:24 189:9

301:5 305:4
**Canada** 216:19
**candidates**
  171:19
**Canton** 153:16
**capacities** 78:21
**capacity** 18:16
  18:18 62:8,24
  78:22 117:18
**capital** 254:3
**capitalism** 11:20
**carbon** 132:2
  161:6,24
  164:13 176:25
  186:9
**card** 15:11 16:24
  17:14,16,19
  25:18 95:14
  321:9
**care** 192:3
  241:11
**careful** 78:9
**carefully** 72:9
  202:6 324:3
**Carol** 218:13
**Caroline** 3:16
  107:20,21
  309:5
**carries** 66:21
**Carroll** 19:14
  132:4 137:13
  139:8 140:8
  142:22 143:2,4
  143:10 160:19
  161:5 210:13
  216:3 218:6
  248:22 250:4,7
  298:7,22
**cart** 120:8
**case** 1:5 18:20
  18:22,25 21:15
  22:10,11,22,25
  23:9,11,12
  24:16 27:10,19
  27:22 28:4,6,6
  29:8,18 30:2
  30:12,15 31:9
  31:9 33:6,22

33:24 35:5,6
35:14 36:24
37:2,5,6 38:17
38:18,19,21
39:7,11,16
40:9,16 41:5
41:17,24 43:3
44:7 45:25
46:21,24 47:2
47:10,10,12,20
48:14 49:18
50:16 51:7,20
51:24 52:3,3,6
52:21,25 53:5
53:8 55:19
56:2,4,16,18
57:3 58:9,12
58:13,16 59:13
60:22 69:11,23
70:16,19 71:2
75:10,15 78:23
79:8 80:17
84:10 87:11,15
87:20 88:3,8
89:6,13,14
90:9,18,22
93:19 96:2
97:23 98:18,22
98:23 99:8,11
101:4,16,24
102:4,5 103:11
103:11,20,21
103:21 104:5
105:5 114:10
115:9,21,22,24
118:2,12,19
120:2,2,6,7,10
120:18 121:17
123:7,9,14,19
124:7,8,12,18
125:13 126:13
127:19 132:14
132:22 133:17
133:17,19,20
133:24 134:3,4
134:13,14
135:9,20,25
137:21 138:3

140:23,24
143:25 153:12
156:3,21
165:17 169:4
175:3 182:22
189:2,20 206:9
208:20 218:15
218:17 223:5
227:2 233:22
234:12,21,22
234:23 235:4
236:11 237:13
238:20 239:8
239:13,18
240:17 242:24
242:25 246:11
246:15 249:4,8
249:10,19,22
250:16,22
251:10,23,25
252:14,20
253:7 255:7
259:6 268:9
269:11 273:10
273:11 274:8
275:16 276:2
281:22 282:13
282:13 283:12
283:24 284:18
286:10 287:15
287:17 288:13
289:19,19
292:13 295:14
295:15 296:19
297:10 305:14
309:7 311:10
313:7 314:17
314:18,20,22
315:6,6,7,8,14
315:23 316:25
317:9,21,22,22
**cases** 14:14,15
  15:4 20:14,21
  21:18 22:5,5
  22:17,25 27:14
  27:17,18 29:20
  29:21,22 30:10
  33:8 34:6,10

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

34:25 35:3,7
35:17 36:17,22
36:24 37:17,22
38:14 39:18,19
39:20,25 40:8
40:12,16,17,18
40:24 41:3,6
41:11 47:14,18
63:7 64:2 86:8
86:8 87:21
90:10 95:21
115:15,17,18
115:19 116:4
116:22 117:7,8
120:4,22,23,24
121:8,25 122:7
122:13 124:5
234:20 251:24
274:10,18,21
317:2,3
cast 85:8 87:2,18
88:16,17,24
154:2,5 168:20
170:8,11
casted 87:13
catching 61:5
cause 180:5
caused 87:18
caution 172:7
187:11,24
190:5 256:19
cautious 102:17
258:12
cc 132:3 139:8
140:8 143:2,11
153:2 160:19
176:22 200:17
214:6 250:7
256:11 257:3
276:21
certain 14:13,14
53:4 55:25
66:21 101:9
143:23 189:23
207:21 224:5
250:14 280:17
297:5
certainly 101:11

101:14 105:24
197:12 294:21
Certified 2:12
2:14,15 320:8
certify 319:8
320:10,16
chair 278:2,13
278:17
chairman
276:23,25
277:19 278:8
278:11,15,21
278:24 279:5,5
challenge 66:24
215:2
challenged
101:12 252:10
chance 74:14
127:21,22
141:11,16,17
change 15:25
16:19 32:10
192:22 201:21
202:3 204:20
259:2 304:20
325:9,11,13,15
325:17,19
changed 32:12
192:24 304:23
changes 61:4
324:9 325:5
Chapter 1:4
charge 13:14
73:7 77:10
95:10 116:19
272:25 281:10
282:5 297:11
charges 224:4
check 23:22
43:19 76:20,21
120:10,11
128:8
checked 128:8
225:21
checking 193:4
cheer 232:17
236:13 293:16
Chicago 3:6 23:3

chief 300:22
China 7:7,10,22
8:7,12,19 9:4,8
9:18 10:2,10
10:16 11:21
12:8,11,23
14:4,7,12 24:7
24:8 42:22
49:13,15 50:7
60:4 62:2,8,25
63:25 64:16,18
67:25 68:6
72:4 73:14
77:17 83:11
84:18 92:22
92:5,5,8,11,13
93:17 94:15,17
97:8,11,13
98:7 117:8
118:3 139:7
143:11 201:24
211:19,22
216:25 218:3
222:10 226:24
232:8 240:16
240:23 254:4
254:15,18
272:17 274:5
275:11,22,24
279:20 295:12
Chinese 11:24
12:5 13:7,9,22
14:17,23 34:13
36:21 42:6,7
47:3,22 48:14
49:12 56:21
57:7 59:13
60:9,15,18
62:23 63:3,4,9
63:11 64:14,15
64:17 66:7,8
66:13,17,20
67:11,20,20
68:3,4,8 71:11
72:3 73:11,22
73:23 77:18,19
77:20 81:16
84:9 86:4,7

90:6,12 92:7
93:2,3,9,10,10
93:14,19,22
95:20,22 96:9
96:17 97:22
101:6 102:11
102:11 103:4
116:7,16 117:2
118:22 119:11
119:13 120:16
146:2 148:23
150:18 156:14
162:16 165:3
166:13 169:3
172:3,6 188:16
193:5 200:8,10
201:2,5,8
213:9 214:24
220:17 222:2,9
223:23 224:10
235:8 240:13
240:18,21,24
241:22 243:19
246:8 250:10
250:14 251:9
252:24 253:20
253:25 254:6
254:23 255:10
255:16 257:18
257:24 259:13
259:14,14,16
262:10,25
263:4 272:22
274:17,24,25
275:9 276:2
277:22 280:13
280:18,20,21
287:10,14,16
288:13 289:23
300:6,10,20
301:9 313:4,10
choice 57:5
243:23 252:3
301:18 312:18
choices 281:24
choose 86:23,24
115:20 166:3
208:6 227:21

227:25 236:9
239:17 252:5
268:8 269:16
270:20 277:15
277:15 286:8
301:19
chose 84:16
116:22 125:7
175:20
Chow 24:17,17
24:18 68:4
chronological
129:3
cinch 251:13
circled 80:8
circumstance
158:25
circumstances
308:18
citing 67:19
claim 41:20
75:19 88:2
101:8 118:13
118:15 130:14
210:18,19
211:16 213:15
213:20 216:15
220:23 225:10
225:19 228:2
252:12,17
253:9,14
273:12 277:7
277:17 284:20
285:6,12
287:21,22
289:24,24
295:20 298:12
298:14
claims 44:6
75:21 76:22
119:17 120:3
183:13 211:13
230:10 246:8
252:4 277:12
296:4
clarify 31:5 65:7
65:9 69:2 80:3
80:12 107:15

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

117:16 130:13
203:17 223:19
262:19
**clarity** 117:6
**clause** 155:15
157:2
**clear** 31:21
43:20 53:6
56:17 59:19
98:9 117:14,19
134:12 144:23
165:5 170:23
171:10 190:3
208:23 239:7
243:17 244:9
286:2 287:6
289:8 296:14
298:18 303:23
315:20
**clearly** 69:10
70:8 99:25
243:16 249:16
253:16 285:14
293:22 306:16
312:13
**client** 106:13
117:9 139:14
**clients** 117:24
**close** 64:9 126:6
184:20 312:7
**closely** 129:22
**closer** 10:16
142:21
**CLR** 1:16
**coast** 24:25
**COD** 298:19
**codes** 92:23
**cold** 194:4
**colleagues** 27:4
67:12 176:23
235:11
**collect** 11:25
13:12
**collection** 18:20
22:17 24:9
38:17,19 64:2
67:15 68:2
77:18 82:14

86:8 88:3 90:5
93:2,9 96:2
115:9 116:4
118:12 234:11
234:20,22,25
235:7 253:25
255:16,22
274:6,17,21
275:11,17,24
289:21 290:2
**college** 8:16
**combination**
223:17
**come** 7:12,21 9:2
9:2,14 10:14
38:7,9 45:5
46:14 49:7,22
53:11 76:4,4,5
76:5,6 94:15
95:13 149:3
153:10 157:18
278:14 281:23
282:2,3,16
284:8 292:17
296:13 309:19
**comes** 121:17
**comfort** 300:20
**comfortable**
83:10 200:21
203:20 205:2
209:15 262:11
**coming** 5:10
96:16 110:8
281:15 284:7
311:25,25
**comma** 306:8
**commend**
251:15
**comment** 305:21
**comments** 65:11
65:21 100:21
195:8
**commit** 90:17
267:18 268:15
**commitment**
270:16 300:7
**committee** 3:15
3:20 14:13,14

20:21 23:13
28:7,13,14,24
29:7,23 30:20
30:21 31:10,12
31:14,15 32:11
33:22 34:6,7
34:15 35:10,21
35:25 36:14,18
38:18 41:14
45:24 46:7
48:16 52:5,7
57:12 59:3,20
69:25 70:9
71:14,15 73:25
74:13,15 75:25
76:11,14,17,19
76:23 77:6,7
77:25 78:14,22
80:14 82:2
84:11,22,24
85:9,12 86:11
86:17,20 87:6
87:8,17,19
88:25 100:22
100:23 102:6
102:15,21,22
103:5 104:8,10
104:17,23
105:17,18,20
105:22 106:2,4
106:5 108:23
109:2,4,10,12
111:2,4,4
112:9 113:11
113:22,23,25
114:8 120:5,16
120:17 121:3
121:25 123:18
124:16 125:7,9
125:10 151:12
151:18,22
152:9 156:17
156:19 165:9
169:20,21
183:3,4 196:3
197:6,7 201:12
205:17 206:11
208:5,7 218:21

218:25 227:10
230:21 231:15
231:24 232:22
234:14 236:16
236:23,24
237:16 239:16
239:17 249:21
250:16,22
251:5,10,16,20
251:21 252:2,6
252:7 268:2,8
269:4,12 270:4
270:20 277:2
277:14,15
278:2,6,13,17
278:18 279:3
280:23 281:9
281:12,13
282:23 285:13
286:8 287:12
309:7 311:11
311:12,13,16
311:20 312:2,3
312:7,8,21
313:8,24
316:11 317:19
318:2
**committees**
29:21 120:24
**committee's**
103:5 106:2
111:8 112:23
154:3,6
**common** 70:12
**communicate**
245:16
**communicated**
258:17
**communicating**
236:14
**communication**
152:11 238:19
**communicatio...**
105:13,24
106:6,15 107:2
107:5,13,18
109:20 128:22
144:6 245:16

**community**
66:13 67:11
**companies** 11:16
18:7 19:5 86:4
91:21 115:8
117:23 118:10
133:25 139:21
240:2,6,21,22
240:25 297:2
**company** 10:23
11:4,7,19,23
12:20,24 13:4
13:6 14:4
17:15,17 18:4
18:8,13 19:4
42:7 43:2,20
44:19 47:24
49:14,23 61:13
62:3,15 63:3
64:15 71:23
73:5 74:5 84:8
117:9,20
118:11 153:7
153:24 160:7,8
160:13,17
169:14 183:9
201:19 202:14
202:20 226:25
227:7 229:23
229:24,25
230:8 234:7,8
245:14 256:11
259:5,21 265:9
267:6 270:6
277:23 295:13
295:15
**company's**
213:15
**compare** 236:9
312:8
**compared**
199:21
**compel** 106:3
107:4
**compete** 286:7
**competing**
206:15
**competition**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585