**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UNIVERSAL BUILDING PRODUCTS, INC., et al.,[1] | ) | Case No. 10-12453 (MFW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

**REDLINE COMPARING SEPTEMBER 30, 2010**
**PROPOSED DISCLOSURE STATEMENT TO**
**AUGUST 31, 2010 PROPOSED DISCLOSURE STATEMENT**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Universal Building Products, Inc. (7884); (ii) Accubrace, Inc. (3418); (iii) Don De Cristo Concrete Accessories, Inc. (7547); (iv) Form-Co, Inc. (0079); and (v) Universal Form Clamp, Inc. (3003). The address of the Debtors' corporate headquarters is 15172 Goldenwest Circle, Westminster, California 92683.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UNIVERSAL BUILDING PRODUCTS, INC., et al.,[1] | ) | Case No. 10-12453 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |

**DISCLOSURE STATEMENT FOR THE FIRST MODIFIED JOINT LIQUIDATING PLAN OF
UNIVERSAL BUILDING PRODUCTS, INC. AND CERTAIN OF ITS SUBSIDIARIES
PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**IMPORTANT DATES**

- Date by which Ballots must be received: **[TO COME]**
- Date by which objections to Confirmation of the Plan must be filed and served: **[TO COME]**
- Hearing on Confirmation of the Plan: **[TO COME]**

---

## DISCLAIMER

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY
COURT HAS APPROVED THIS DISCLOSURE STATEMENT. THIS DISCLOSURE
STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN
APPROVED BY THE COURT**

| | |
|---|---|
| K&L Gates LLP | Saul Ewing LLP |
| Harley J. Goldstein | Mark Minuti |
| Sven T. Nylen | Teresa K.D. Currier |
| 70 West Madison Street, Suite 3100 | 222 Delaware Avenue, Suite 1200 |
| Chicago, Illinois 60602 | P.O. Box 1266 |
| Telephone: (312) 372-1121 | Wilmington, DE 19899 |
| Facsimile: (312) 827-8000 | Telephone: (302) 421-6800 |
| | Facsimile: (302) 421-6813 |

Co-Counsel for the Debtors and Debtors in Possession

~~August 31,~~ September 30, 2010

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Universal Building Products, Inc. (7884); (ii) Accubrace, Inc. (3418); (iii) Don De Cristo Concrete Accessories, Inc. (7547); (iv) Form-Co, Inc. (0079); and (v) Universal Form Clamp, Inc. (3003). The address of the Debtors' corporate headquarters is 15172 Goldenwest Circle, Westminster, California 92683.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE FIRST MODIFIED JOINT LIQUIDATING PLAN OF UNIVERSAL BUILDING PRODUCTS, INC. AND CERTAIN OF ITS SUBSIDIARIES PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (AS AMENDED FROM TIME TO TIME, THE *"PLAN"*), A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A, AS WELL AS CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE FINANCIAL INFORMATION SUMMARIES AND OTHER DOCUMENTS ATTACHED HERETO OR INCORPORATED BY REFERENCE HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER BUT RATHER SHOULD BE CONSTRUED AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

THE DEBTORS MAKE THE STATEMENTS AND PROVIDE THE FINANCIAL INFORMATION CONTAINED HEREIN AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE HEREOF UNLESS SO SPECIFIED. EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE THEREFORE SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. ANY PERSONS DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO PARTY IS AUTHORIZED TO PROVIDE TO ANY OTHER PARTY ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE CONTENTS OF THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT, EXCEPT WHERE SPECIFICALLY NOTED, HAS NOT BEEN AUDITED.

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF ALL OF THEIR CREDITORS AND REPRESENTS THE BEST POSSIBLE OUTCOME FOR THEIR CREDITORS. THE DEBTORS THEREFORE RECOMMEND THAT ALL HOLDERS OF CLAIMS SUBMIT BALLOTS TO ACCEPT THE PLAN. WHEN EVALUATING THE PLAN, PLEASE SEE ARTICLE VIII OF THIS DISCLOSURE STATEMENT FOR A DISCUSSION OF DIFFERENT "RISK FACTORS" WHICH SHOULD BE CONSIDERED IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................... 1
        A.      PLAN OVERVIEW/ EXECUTIVE SUMMARY................................................... 1
                1.      Solicitation .................................................................................... 2
                2.      Purpose of the Liquidating Plan ................................................... 2
                3.      Substantive Consolidation for Plan Purposes Only ....................... 2
                4.      Establishment of the Liquidating Trust ........................................ 2
                5.      Summary of Projected Distributions to Creditors ........................ 2
                6.      Voting and Confirmation................................................................. 4̶5
                7.      Liquidation Analysis ...................................................................... 5̶6
                8.      Risk Factors .................................................................................... 6
                9.      Injunction ...................................................................................... 6̶7
        B.      RECOMMENDATION .............................................................................. 6̶7
        C.      DISCLAIMER ............................................................................................ 7

II.     GENERAL INFORMATION ............................................................................... 7̶8
        A.      DESCRIPTION OF THE DEBTORS' BUSINESSES.............................. 7̶8
        B.      THE DEBTORS' CORPORATE HISTORY AND EQUITY STRUCTURE............................. 8̶9
        C.      CREDIT AGREEMENT AND DEBT STRUCTURE ................................ 8̶9
        D.      EVENTS LEADING TO THE CHAPTER 11 CASES ............................. 9̶10
        E.      DEBT ACQUISITION AND THE COMMENCEMENT OF THE CHAPTER
                11 CASES.................................................................................................... 10
        F.      PLANNED SALE OF THE DEBTORS' ASSETS ............................... 1̶0̶11
                1.      UBPA Asset Purchase Agreement .............................................. 1̶0̶11
                2.      Public Auction For The Sale Of The Debtors' Assets ............... 1̶2̶13

III.    THE CHAPTER 11 CASES .............................................................................. 1̶2̶13
        A.      DEBTOR IN POSSESSION FINANCING.......................................... 1̶2̶13
        B.      RESOLUTION OF DISPUTES REGARDING THE SALE AND DIP
                FINANCING .............................................................................................. 13
                1.      Resolution of Disputes ................................................................. 13
                2.      Interim Sale to UBPA .................................................................. 14
        C.      SUMMARY OF OTHER SIGNIFICANT MOTIONS ........................... 1̶4̶15
                1.      Applications for Retention of Debtors' Professionals .............. 1̶4̶15
                2.      Motion for Joint Administration of the Chapter 11 Cases ......... 1̶4̶15
                3.      Motion to Pay Employee Wages and Associated Benefits......... 1̶4̶15
                4.      Utilities Procedures Motion......................................................... 15
                5.      Motion Authorizing Rejection of Unexpired Leases .................. 15
                6.      Motion to Employ Ordinary Course Professionals ................... 1̶5̶16
                7.      Schedules and Statement of Financial Affairs............................ 1̶5̶16
                8.      Taxes .......................................................................................... 1̶5̶16
                9.      Claims Bar Date ......................................................................... 1̶5̶16
                10.     Cash Management .................................................................... 16

IV.     SUMMARY OF THE LIQUIDATING PLAN OF REORGANIZATION ........................... 1̶6̶17
        A.      OVERVIEW OF CHAPTER 11................................................................ 1̶6̶17
        B.      GENERALLY ............................................................................................ 1̶7̶18
                1.      Liquidating Plan of Reorganization............................................ 1̶7̶18
                2.      The Liquidating Trust................................................................. 1̶7̶18
        C.      CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
                INTERESTS.............................................................................................. 1̶7̶18
                1.      Schedule of Treatment of Claims and Equity Interests ............. 1̶8̶19
                2.      Treatment of Unclassified Claims .............................................. 1̶8̶19
                3.      Classification and Treatment of Classified Claims ................... 1̶9̶20

D.     MEANS FOR IMPLEMENTATION OF THE PLAN ............................................ 2022
    1.     Funding ~~From DIP Facility~~ ........................................... 21of the Pla
    2.     ~~Establishment~~Funding of the Liquidating Trust ...................... 2122
    3.     Transfer of Liquidating Trust Assets to the Liquidating Trust ............. 22
    4.     The Liquidating Trust ....................................................... 22
    5.     Final Administration of Liquidating Trust ................................ 25
    6.     Corporate Action .................................................... 2126
    4.7.     Preservation of ~~Causes of Action; Settlement of Causes of Action~~ ............ 21Rights
    5.8.     Cancellation of Notes, Instruments, Debentures and Equity Securities ........ 2227
    6.9.     Dissolution of Committee(s) ........................................ 2227
    7.     ~~Insurance Preservation~~ ................................................ 23
    8.10.     Accounting ......................................................... 2327
E.     TREATMENT OF DISPUTED CLAIMS ................................................. 2327
    1.     Objections to Claims; Prosecution of Disputed Claims ................... 2327
    2.     Estimation of Claims .................................................. 2328
    3.     Payments and Distributions on Disputed Claims ......................... 2328
F.     DISTRIBUTIONS ................................................................ 2428
    1.     Means of Cash Payment ................................................ 2428
    2.     Delivery of Distributions .............................................. 2428
    3.     Undeliverable Distributions ............................................ 2428
    4.     Withholding and Reporting Requirements ............................... 2429
    5.     Time Bar to Cash Payments ........................................... 2529
    6.     Distributions after Effective Date ...................................... 2529
    7.     Interest ............................................................... 2529
    8.     Fractional Dollars; De Minimis Distributions .......................... 2530
    9.     Setoffs .............................................................. 2530
    10.     ~~Settlement of Claims and Controversies~~ ............................. 25
G.     EXECUTORY CONTRACTS ....................................................... 2630
    1.     Rejection of Executory Contracts and Unexpired Leases ................. 2630
    2.     Rejection Damages Claim ............................................. 2630
H.     ~~LIQUIDATING TRUST AND LIQUIDATING TRUSTEE~~ ....................... 26
    1.     ~~Generally~~ .......................................................... 26
    2.     ~~Purpose of the Liquidating Trust~~ ..................................... 26
    3.     ~~Termination of Liquidating Trust~~ .................................... 26
    4.     ~~Termination of Liquidating Trustee~~ .................................. 27
    5.     ~~Compensation of Liquidating Trustee~~ ................................ 27
    6.     ~~Exculpation; Indemnification~~ ........................................ 27
H.     INSURANCE POLICIES .......................................................... 30
I.     CONDITIONS PRECEDENT TO PLAN CONFIRMATION AND
    CONSUMMATION ............................................................... 2731
    1.     Acceptance or Rejection of the Plan .................................... 2731
    2.     Conditions Precedent to Confirmation .................................. 2731
    3.     Conditions Precedent to Effective Date of the Plan ...................... 2832
    4.     Waiver of Conditions Precedent ....................................... 2832
    5.     The Confirmation Order ............................................... 2832
J.     EFFECT OF PLAN CONFIRMATION ................................................ 2832
    1.     No Discharge of Claims and Termination of Interests ................... 2832
    2.     Termination of Subordination Rights and Settlement of Related Claims ....... 2932
    3.     Injunction ........................................................... 2933
    4.     Terms of Existing Injunctions and Stays ................................ 2933
    5.     Exculpation ......................................................... 2933
    6.     Releases by the Debtors ............................................... 3034
    7.     Mutual Releases by Holders of Claims and Interests .................... 3134
K.     MISCELLANEOUS PROVISIONS .................................................. 3135
    1.     Settlement of Claims and Controversies ................................ 35
    2.     Payment of Statutory Fees ............................................. 3135

|  |  | 3. | Exemption from Securities Laws | 35 |
|  |  | 2.4. | Section 1146 Exemption | 3135 |
|  |  | 5. | Books and Records | 36 |
|  |  | 6. | Privileges as to Certain Causes of Action | 36 |
|  |  | 7. | Employee Agreements | 36 |
|  |  | 8. | Unclaimed Property | 36 |
|  |  | 3.9. | Business Day | 3236 |
|  |  | 4.10. | Severability | 3237 |
|  |  | 5.11. | Conflicts | 3237 |
|  |  | 12. | Evidence | 37 |
|  |  | 6.13. | Further Assurances | 3237 |
|  |  | 7.14. | Notices | 3237 |
|  |  | 8.15. | Filing of Additional Documents | 3338 |
|  |  | 9.16. | Successors and Assigns | 3338 |
|  |  | 17. | Governing Law | 38 |
|  |  | 10.18. | Closing of Cases | 3338 |
|  |  | 11.19. | Section Headings | 3338 |
|  | L. | RETENTION OF JURISDICTION | | 3338 |
|  | M. | MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN | | 3439 |
|  |  | 1. | Modification of the Plan | 3439 |
|  |  | 2. | Revocation, Withdrawal, or Non-Consummation | 3540 |

| V. | ACCEPTANCE OR REJECTION OF THE PLAN | | 3540 |
|  | A. | CLASSES ENTITLED TO VOTE | 3540 |
|  | B. | ACCEPTANCE BY IMPAIRED CLASSES | 3540 |
|  | C. | PRESUMED ACCEPTANCE OF THE PLAN | 3540 |
|  | D. | PRESUMED REJECTION OF THE PLAN | 3540 |

| VI. | PROCEDURES FOR VOTING ON THE PLAN | | 3540 |
|  | A. | VOTING DEADLINE | 3641 |
|  | B. | VOTING RECORD DATE | 3641 |
|  | C. | VOTING INSTRUCTIONS | 3641 |
|  | D. | THE CONFIRMATION HEARING | 3742 |

| VII. | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN | | 3843 |
|  | A. | GENERALLY | 3843 |
|  | B. | FEASIBILITY | 3943 |
|  | C. | "BEST INTERESTS" TEST | 3944 |
|  | D. | ACCEPTANCE BY IMPAIRED CLASS | 40CLASSE |
|  | E. | NON-CONSENSUAL CONFIRMATION | 4045 |
|  |  | 1. | Secured Claims | 4145 |
|  |  | 2. | Unsecured Claims | 4145 |
|  |  | 3. | Equity Interests | 4145 |

| VIII. | PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING AND CONSUMMATING THE PLAN | | 4146 |
|  | A. | FINANCIAL INFORMATION; DISCLAIMER | 4146 |
|  | B. | CERTAIN BANKRUPTCY CONSIDERATIONS | 4246 |
|  |  | 1. | Classification Risk | 4246 |
|  |  | 2. | The Debtors May be Unable to Expeditiously Transfer the Assets | 4246 |
|  |  | 3. | The Debtors May Not be Able to Secure Confirmation of the Plan | 4246 |
|  |  | 4. | The Confirmation and Consummation of the Plan Are Also Subject to Certain Conditions as Described Herein | 4247 |
|  |  | 5. | The Debtors May Object to the Amount or Classification of a Claim | 4247 |
|  |  | 6. | Nonconsensual Confirmation | 4347 |
|  |  | 7. | Delays of Confirmation and/or the Effective Date | 4347 |

|  | C. | PENDING LITIGATION | 43 47 |
|  | D. | LIQUIDATION UNDER CHAPTER 7 | 43 47 |

| IX. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES | 44 48 |
|  | A. | CONSEQUENCES TO DEBTORS | 44 49 |
|  | B. | FEDERAL INCOME TAX TREATMENT OF LIQUIDATING TRUST | 45 49 |
|  |  | 1. | Classification of Liquidating Trust | 45 49 |
|  |  | 2. | Tax Reporting | 45 49 |
|  |  | 3. | Claim Reserve for Disputed Claims | 45 50 |
|  | C. | CONSEQUENCES TO HOLDERS OF CLAIMS | 45 50 |
|  |  | 1. | Holders of Allowed Claims | 45 50 |
|  |  | 2. | Distributions in Discharge of Accrued but Unpaid Interest | 46 50 |
|  |  | 3. | Character of Gain or Loss; Tax Basis; Holding Period | 46 50 |
|  | D. | CONSEQUENCES TO HOLDERS OF EQUITY INTERESTS | 46 51 |
|  | E. | WITHHOLDING | 46 51 |

| X. | RECOMMENDATION | 48 52 |

## EXHIBITS

Exhibit A  -  Debtors' First Modified Joint Liquidating Plan of Reorganization
Exhibit B  -  Hypothetical Liquidation Analysis

# I.

## INTRODUCTION

On August 4, 2010, Universal Building Products, Inc., Accubrace, Inc., Don De Cristo Concrete Accessories, Inc., Form-Co, Inc., and Universal Form Clamp, Inc. (collectively, the *"Debtors"*) each filed a petition under chapter 11 of title 11 of the United States Code (as amended, the *"Bankruptcy Code"*) in the United States Bankruptcy Court for the District of Delaware (the *"Bankruptcy Court"*).

The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Chapter 11 of the Bankruptcy Code allows a debtor to sponsor a plan of reorganization that proposes how to dispose of a debtor's assets and treat claims (*i.e.*, debts) against, and interests in, such a debtor. A chapter 11 plan typically may provide for a debtor in possession to reorganize by continuing to operate, to liquidate by selling assets of the estate or to implement a combination of both. The Plan is a liquidating plan.

The Bankruptcy Code requires that the party proposing a chapter 11 plan prepare and file with the Bankruptcy Court a document called a "disclosure statement." **THIS DOCUMENT IS THE DISCLOSURE STATEMENT (THE *"DISCLOSURE STATEMENT"*) FOR THE PLAN. THE DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED HEREIN BY REFERENCE.**

*Please note that any terms not specifically defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan and any conflict arising therefrom shall be governed by the Plan.*

This Disclosure Statement summarizes the Plan's content and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan. The Disclosure Statement also discusses the events leading to the Debtors' filing of their chapter 11 cases (the *"Chapter 11 Cases"*), describes certain events anticipated to occur in the Debtors' Chapter 11 Cases, and, finally, summarizes and analyzes the Plan. The Disclosure Statement also describes certain potential Federal income tax consequences for Holders of Claims and Equity Interests, voting procedures and the confirmation process.

*The Bankruptcy Code requires a disclosure statement to contain "adequate information" concerning the Plan. In other words, a disclosure statement must contain sufficient information to enable parties who are affected by the Plan to vote intelligently for or against the Plan or object to the Plan, as the case may be. The Bankruptcy Court has reviewed this Disclosure Statement, and has determined that it contains adequate information and may be sent to you to solicit your vote on the Plan.*

All Holders of Claims (as defined in the Plan) should carefully review both the Disclosure Statement and the Plan before voting to accept or reject the Plan. Indeed, Holders of Claims should not rely solely on the Disclosure Statement but should also read the Plan. Moreover, the Plan provisions will govern if there are any inconsistencies between the Plan and the Disclosure Statement.

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS \_\_\_\_\_ \_\_.M. (PREVAILING WILMINGTON, DELAWARE TIME) ON _____, 2010, UNLESS THE COURT OR THE DEBTORS EXTEND THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED BY THE DEBTORS, IN WHICH CASE THE VOTING DEADLINE FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED.**

---

## A. PLAN OVERVIEW/ EXECUTIVE SUMMARY

THE FOLLOWING SUMMARIZES CERTAIN KEY INFORMATION CONTAINED ELSEWHERE IN THIS DISCLOSURE STATEMENT. REFERENCE IS MADE TO, AND THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO, THE MORE DETAILED

INFORMATION CONTAINED ELSEWHERE IN THIS DISCLOSURE STATEMENT AND IN THE PLAN. THE PLAN WILL CONTROL IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS SUMMARY AND THE PLAN. FOR A MORE DETAILED SUMMARY OF THE PLAN, PLEASE SEE ARTICLE IV OF THIS DISCLOSURE STATEMENT.

## 1.    Solicitation

Solicitation materials, including this Disclosure Statement and a Ballot to be used for voting on the Plan, are being distributed to all known Holders of Claims entitled to vote on the Plan. The only ~~Class~~Classes of Claims entitled to vote on the Plan ~~is  Class 1~~are Classes 1 and 4.  The purpose of this solicitation, among other things, is to obtain the requisite number of acceptances of the Plan under the Bankruptcy Code from the Classes of Claims entitled to vote (the statutory requirements for Confirmation of the Plan are described in Article IV.I herein - "Conditions Precedent to Plan Confirmation and Consummation" and Article V herein).  Assuming the requisite acceptances are obtained, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing commencing on [_____, 2010].

## 2.    Purpose of the Liquidating Plan

The Plan provides for the orderly liquidation of substantially all of the Debtors' assets and the distribution of proceeds.

## 3.    Substantive Consolidation ~~for Plan Purposes Only~~

Subject to the occurrence of the Effective Date, the Debtors and their Estates will be deemed substantively consolidated for ~~the  following~~voting and distribution purposes ~~under  the  Plan:    (a)  no Distributions~~only.  No distributions will be made under the Plan on account of ~~the  Intercompany  Claims;  (b)  any guarantees of certain Debtors of obligations of other Debtors will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any Debtor with another Debtor will be deemed to be one obligation of the deemed consolidated Debtors; and (c) each and every Claim against a Debtor will be deemed asserted against the consolidated Estates of all of the Debtors, will be deemed one Claim against and obligation of the deemed consolidated Debtors and their Estates and will be treated in the same Class regardless of the Debtor~~Intercompany Claims.  The assets and liabilities of the Debtors shall be pooled and all Claims shall be satisfied from the assets of a single consolidated estate.  Any Claims against one or more of the Debtors (including Claims based upon a guaranty, indemnity, co-signature, surety or otherwise, of Claims against another Debtor) shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to distributions under the Plan only with respect to such single Claim.

## 4.    Establishment of the Liquidating Trust

~~On or prior to the Effective Date, the Debtors shall consummate the Sale pursuant to the Sale Motion filed by the Debtors on the Petition Date.  On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Debtors shall assign and transfer to the Liquidating Trust all of their right, title, and interest in and to all of~~

On the Effective Date or immediately prior thereto, a Liquidating Trust shall be created and vested with certain property and the Liquidating Trust shall reduce to Cash or otherwise liquidate the Liquidating Trust Assets, ~~notwithstanding  any  prohibition  of  assignability  under  applicable  non-bankruptcy  law,~~ and distribute such liquidated assets in accordance with and subject to the terms and provisions of the Plan.

## 5.    Summary of Projected Distributions to Creditors

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtors.  The following chart summarizes the treatment of Allowed Claims and Equity Interests under the Plan. This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the

classification and treatment of Claims and Equity Interests. Moreover, the column entitled, "Projected Recovery," is merely the Debtors' good faith estimate at the present time based on available information of the total amount of Allowed Claims in the Debtors' Chapter 11 Cases. These estimates should not be deemed to be an admission, binding or otherwise, as to the amount of total Allowed Claims. The Debtors reserve the right to change their estimates and object to any Claim, unless previously Allowed by Final Order or otherwise.

| Class | Description | Treatment | Projected Recovery |
|---|---|---|---|
| Unclassified | Administrative Claims | Non-Professional Fee Administrative Claims. Each Allowed Administrative Claim shall be, at the Liquidating Trustee's election, either (i) paid by the Debtors, at their election, (i) in full, in Cash, in such amounts as such Administrative Claim is Allowed by the Bankruptcy Court upon the later of the Effective Date or the date upon which such Administrative Claim is Allowed, or (ii) satisfied upon such other terms as may be agreed upon between the Holder of such Administrative Claim and the applicable DebtorLiquidating Trustee. Any application for the payment of any Administrative Claims on account of any fees or reimbursement of expenses of any Professional, shall be Filed with the Bankruptcy Court no later than fifteenthirty (1530) days after the ConfirmationEffective Date.<br><br>Professional Fee Claims. Unless otherwise expressly provided in the Plan, a Professional Fee Claim will be Allowed only if: (i) on or before forty-five (45) days after the Effective Date (the "Professional Fee Bar Date"), the entity holding such Professional Fee Claim files with the Court a final fee application and serves the application on counsel to the Debtors, counsel to the Committee and the U.S. Trustee; and (ii) the Court enters an order allowing the Claim.<br><br>In accordance with section 1129(a)(9) of the Bankruptcy Code, the DIP Lender has agreed that the DIP FacilityAny party in interest may file an objection to such application within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes. Entities holding Professional Fee Claims that do not timely file and serve a fee application will be forever barred from asserting such Professional Fee Claim shall receive the treatment afforded in Article III.B.1 of the Plan notwithstanding its super priority Administrative Claim status.against the Debtors, the Estates, the Liquidating Trust, or their respective property. | 100% |
| Unclassified | DIP Facility Claim | In full and final satisfaction, settlement, release and discharge of and in exchange for release of the DIP Facility Claim, in accordance with section 1129(a)(9) of the Bankruptcy Code, the DIP Lender has agreed that the DIP Facility Claim shall receive the treatment afforded in Article | |

| Class | Description | Treatment | Projected Recovery |
|-------|-------------|-----------|--------------------|
| | | III.B.1 of the Plan. | |
| Unclassified | Priority Tax Claims | On, or as soon as reasonably practicable after, the latest of the Effective Date or the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim or (ii) such other treatment as to which the ~~Debtors~~Liquidating Trustee and such Holder have agreed upon in writing. | 100% |
| 1 | Senior Creditor Claims | *Impaired.* Holders of Allowed Senior Creditor Claims shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Senior Creditor Claims, the Senior Creditor Series ~~A~~of the Liquidating Trust ~~Interests~~ as provided for in the Liquidating Trust Agreement. | 6.4 to 8.5% (after reducing Claim on account of credit bid) |
| 2 | Other Secured Claims | *Unimpaired.* On, or as soon as reasonably practicable after, the later of the Effective Date or the date such Claim becomes an Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive (i) the property securing such Allowed Other Secured Claim, or (ii) such other treatment as to which the Debtors or the Liquidating Trustee and such Holder have agreed upon in writing. | 100% |
| 3 | Other Priority Claims | *Unimpaired.* On, or as soon as reasonably practicable after, the later of the Effective Date or the date such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, (i) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (ii) such other treatment as to which the Debtors or the Liquidating Trustee and such Holder have agreed upon in writing. | 100% |
| 4 | Unsecured Claims | *Impaired.* Holders of Allowed Unsecured Claims in Class 4 shall receive ~~pro rata Distributions~~a Pro Rata share of the Unsecured Creditor Series ~~B Trust Interests, as provided in~~of the Liquidating Trust ~~Agreement.~~ On the Effective Date, or as soon thereafter as is practicable, the Liquidating Trustee shall make a distribution of the Unsecured Creditor Series of the Liquidating Trust to each | 0 to 3% |

| Class | Description | Treatment | Projected Recovery |
|-------|-------------|-----------|--------------------|
| | | Holder of an Allowed Class 4 Claim in an amount equal to such Holder's Pro Rata share of the balance in the Transferred Property transferred to the Liquidating Trust remaining after creation of the Disputed Claim Reserve.<br><br>~~Although Class 4 Unsecured Claims are impaired, yet potentially receiving Distributions under the Plan, such Distributions are gifted from the Debtors' senior secured creditors and such funds do not constitute property of the Estates~~In the event of entry of a Final Order determining a Disputed Claim to be an Allowed Claim, the Liquidating Trustee, in his sole discretion, may make an interim distribution to the Holder of such Allowed Claim from the Disputed Claim Reserve to such Holder. ~~Therefore, Class 4 is not entitled to vote to accept or reject the Plan.~~The Holders of Class 4 Allowed Claims shall thereafter receive their Pro Rata share of any subsequent distributions from the Liquidating Trust. | |
| 5 | Intercompany Claims | ***Impaired.*** On the Effective Date, all Intercompany Claims shall be deemed waived and cancelled and Holders of Intercompany Claims shall not receive any ~~Distribution~~distribution on account of such Intercompany Claim under the Plan. Class 5 is impaired. Because Holders of Intercompany Claims will receive no distributions under the Plan, Class 5 will be deemed to have voted to reject the Plan. | 0% |
| 6 | Equity Interests | ***Impaired.*** On the Effective Date, all Equity Interests shall be cancelled and the Holders of Equity Interests shall not receive or retain any ~~Distribution~~distribution or property on account of such Equity Interests. Class 6 is impaired. Because Holders of Equity Interests will receive no distribution under the Plan, Class 6 will be deemed to have voted to reject the Plan. | 0% |

*The distributions projected in the table above represent only a range of possible recoveries that the Debtors believe are reasonable based upon all information reasonably available to them as of the date hereof. See Article VIII for a detailed discussion of the many factors which may impact upon the distributions that will ultimately be available to creditors.*

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BIND ALL CLAIM AND EQUITY INTEREST HOLDERS.

### 6.    Voting and Confirmation

Each Holder of a Claim in ~~Class~~Classes 1 and 4 will be entitled to vote either to accept or reject the Plan. ~~Class~~Classes 1 and 4 shall have accepted the Plan if: (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in each such Class have voted to accept the Plan and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in each such Class have voted to accept the Plan. Classes 2 and 3 are Unimpaired under the Plan and are deemed to accept the Plan. Classes ~~4, 5,~~5 and 6 are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan. Assuming the requisite acceptances are obtained, the Debtors intend to seek confirmation of the Plan at a hearing (the "*Confirmation Hearing*") scheduled to commence on [_____, 2010, at : ___.m. (prevailing Wilmington, Delaware time)], before the Bankruptcy Court. **Notwithstanding the foregoing, provided that at least one Impaired Class accepts the Plan, the Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to the Impaired Classes presumed to reject the Plan, and reserve the right to do so with respect to any other rejecting Class or to modify the Plan in accordance with Article XIII of the Plan.**

Article VI of this Disclosure Statement specifies the deadlines, procedures and instructions for voting to accept or reject the Plan and the applicable standards for tabulating Ballots. The Bankruptcy Court has established [_____, 2010] (the "*Voting Record Date*"), as the date for determining which Holders of Claims are eligible to vote on the Plan. Ballots will be mailed to all registered Holders of Claims as of the Voting Record Date who are entitled to vote to accept or reject the Plan. An appropriate return envelope will be included with your Ballot, if necessary.

**TO BE COUNTED, YOUR BALLOT INDICATING AN ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY ~~THE~~ THE DEBTORS' ATTORNEYS BY NO LATER THAN _____ __.M. (PREVAILING WILMINGTON, DELAWARE TIME) ON _____, 2010 (THE "*VOTING DEADLINE*") UNLESS THE COURT OR THE DEBTORS EXTEND THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED BY THE DEBTORS, IN WHICH CASE THE VOTING DEADLINE FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED.**

**THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL OF THEIR CREDITORS AS A WHOLE. THE DEBTORS THEREFORE RECOMMEND THAT ALL HOLDERS OF CLAIMS SUBMIT BALLOTS TO ACCEPT THE PLAN.**

Objections to confirmation of the Plan must be filed and served on or before [____.m.   prevailing **Wilmington, Delaware time on _____, 2010]. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### 7.    Liquidation Analysis

The Debtors believe that the Plan will produce a greater recovery for Holders of Claims than would be achieved in a chapter 7 liquidation because, among other things, the administrative costs and delays incurred in connection with a chapter 7 case would likely diminish the distributions to such Holders, and the projected liquidation of the Debtors would not produce any recovery for Holders of Unsecured Claims. The Debtors' financial advisors have prepared a hypothetical liquidation analysis on behalf of the Debtors to assist Holders of Claims to reach their determination as to whether to accept or reject the Plan. This Hypothetical Liquidation Analysis, attached hereto as Exhibit B, estimates the proceeds to be realized if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code. ~~The Hypothetical Liquidation Analysis is based upon projected assets and liabilities as of June 30, 2010, and incorporates estimates and assumptions developed by the Debtors, which are subject to potentially material changes with respect to economic and business conditions, as well as uncertainty not within the Debtors' control.~~

## 8. Risk Factors

There are a variety of factors that each Holder of a Claim should consider prior to voting to accept or reject the Plan. Some of these factors, which are described in more detail in Article VIII of this Disclosure Statement, are as follows and may impact the recoveries under the Plan:

- The financial information disclosed in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and Disclosure Statement.

- Article IX of this Disclosure Statement describes certain significant federal tax consequences of the transactions that are described herein and in the Plan that affect the Debtors and others. Such consequences may include: (1) the recognition of taxable gain or loss to the Debtors; (2) the reduction of net operating loss carryforward by the Debtors; and (3) the recognition of taxable income by the Holders of Claims. Holders of Claims are urged to consult with their own tax advisors regarding the federal, state, local and other tax consequences of the Plan.

- Although the Debtors believe that the Plan complies with all applicable standards of the Bankruptcy Code, the Debtors can provide no assurance that the Plan will comply with section 1129 of the Bankruptcy Code or that the Bankruptcy Court will confirm the Plan.

- The Debtors may be required to request Confirmation of the Plan without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code.

- Any delays of either Confirmation or the Effective Date of the Plan could result in, among other things, increased Claims of Professionals.

- Delays in closing the Sale or otherwise transfer the Debtors' assets to the Purchaser may result in increased administrative costs.

## 9. Injunction

**Except as otherwise expressly provided in the Plan, all Entities that have held, hold, or may hold Claims against or Equity Interests in the Debtors are permanently enjoined, from and after the Effective Date, from taking any of the following actions against any of the Debtors, their Estates, the ~~Committee or its members solely in their capacities as members of the Committee and not in any other capacity,~~ the Liquidating Trust, the Liquidating Trustee, the ~~Prepetition Lenders~~Administrative Agent, UBP Acquisition Corp. and any of its affiliates, successors or assigns, including but not limited to Oaktree Capital Management, L.P., Solus Capital Partners, LLC and Dayton Superior Corporation, the Prepetition Lenders and the DIP Lender, or any of their property on account of any Claims or causes of action arising from events prior to the Effective Date: — including, without limitation, (i) commencing or continuing in any manner any action or other proceeding of any kind; (ii) enforcing, attaching, collecting, or recovering by any manner or in any place or means any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind; and (iv) asserting any defense or right of setoff, subrogation, or recoupment of any kind against any obligation, debt, or liability due to the Debtors.**

## B. RECOMMENDATION

The Debtors believe that the Plan provides the best and most feasible recovery for Holders of Allowed Claims against the Debtors and that accepting the Plan is in the best interests of the Holders of Allowed Claims against the Debtors. The Debtors therefore recommend that you vote to accept the Plan.

## C. DISCLAIMER

In formulating the Plan, the Debtors relied on financial data derived from their books and records. The Debtors therefore represent that everything stated in the Disclosure Statement is true to the best of their knowledge. The Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable and therefore does not recommend whether you should accept or reject the Plan.

The discussion in the Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses, distribution projections, and other information are estimates only, and the timing and amount of actual distributions to Holders of Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT IS, OR SHALL BE DEEMED TO BE, AN ADMISSION OR STATEMENT AGAINST INTEREST BY THE DEBTORS FOR PURPOSES OF ANY PENDING OR FUTURE LITIGATION MATTER OR PROCEEDING.**

**ALTHOUGH THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTORS, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF. THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS SHALL HAVE NO LIABILITY FOR THE INFORMATION IN THE DISCLOSURE STATEMENT.**

## II.

## GENERAL INFORMATION

## A. DESCRIPTION OF THE DEBTORS' BUSINESSES

Collectively, the Debtors operated one of the largest privately-owned concrete form and accessory manufacturing businesses in North America, manufacturing and delivering a complete assortment of premium concrete accessories to residential and commercial construction projects. The Debtors' primary manufacturing facilities are located in Bellwood, Illinois and Westminster, California.

Universal Building Products, Inc. is a Delaware corporation and the holding company for each of the other Debtors. The Debtors are the following entities:

- *Universal Building Products, Inc.*, a Delaware corporation ("*UBP*"), serves as the holding company for and corporate headquarters of the other Debtors.

- *Don De Cristo Concrete Accessories, Inc.*, a California corporation ("*DDC*"), manufactures and distributes concrete accessories for the construction industry which are primarily sold through a dealer network.

- *Accubrace, Inc.*, a Delaware corporation ("*Accubrace*"), manufactures and distributes total bracing systems for tilt-up slab and precast wall construction, soil anchor construction, and heavy shoring construction.

- *Form-Co, Inc.*, a Delaware corporation ("*Form-Co*"), is a distributor of concrete forms and other construction equipment used in residential and commercial buildings including: single story and multi-story structures, bridges, tunnels, power plants, parking garages, warehouses, industrial projects, and treatment plants.

- *Universal Form Clamp, Inc.*, a Delaware corporation ("*UFC*"), is one of the largest manufacturers and marketers of concrete accessories, forming and shoring products, and concrete related products in the United States. UFC has been serving the industry for over eighty years and has five fully integrated manufacturing plants and six distribution centers. UFC has one wholly-owned non-debtor subsidiary, Universal Form Clamp of Canada, Inc. ("*UFC Canada*"). UFC Canada is indebted to Universal Form Clamp, Inc. pursuant to, without limitation, a Secured Revolving Promissory Note in the original principal amount of $4 million (the "*Canadian Payable*"). UFC Canada has ceased operations and is in the process of winding-up its affairs.

As of the Petition Date, the Debtors employ approximately 87 employees in the aggregate. Seven employees are covered by various collective bargaining agreements.

## B.    THE DEBTORS' CORPORATE HISTORY AND EQUITY STRUCTURE

In 2006, Whitney Universal Acquisition, LLC ("*Whitney*"), a private equity investor, incorporated UBP in order to acquire and bring together industry leaders DDC and UFC. UBP subsequently acquired Form-Co in 2007 and added Accubrace in 2008.

In addition to common stock, UBP has issued two series of preferred stock. Whitney continues to be the largest holder of UBP's preferred stock, holding approximately 88.9% of the Series A Preferred Stock and approximately 93.6% of the Series B Preferred Stock. Jeffrey D. Church, UBP's Chief Executive Officer, owns approximately 99% of UBP's common stock. The List of Equity Security Holders; Corporate Ownership Statement attached to UBP's bankruptcy petition provides a detailed breakdown of the ownership interests in each class of UBP stock.

## C.    CREDIT AGREEMENT AND DEBT STRUCTURE

On April 28, 2006, Debtors Universal Building Products, Inc., Don De Cristo Concrete Accessories, Inc., and Universal Form Clamp, Inc. entered into the Credit Agreement with the Prepetition Lenders and the Administrative Agent.[1] The Credit Agreement provides for aggregate borrowings of up to $106 million, consisting of (a) a six-year term loan (the "*Term Loan*") of $81 million and (b) a five-year revolving credit facility (the "*Revolver*") of up to $25 million (including letter of credit and swingline subfacilities of $7.5 million and $3 million). As of the Petition Date, the Debtors owed the Prepetition Lenders an aggregate principal amount of not less than $40,331,692.45 (together with all accrued and unpaid interest thereon, any cash management obligations owed to the Prepetition Lenders, and any fees and expenses, the "*Prepetition Indebtedness*").[2]

---

[1]    The remaining Debtors, Form-Co, Inc. and Accubrace, Inc., were subsequently added as "Subsidiary Borrowers" pursuant to Joinder Agreements dated November 29, 2007 and March 28, 2008, respectively.

[2]    The most the Debtors' ever borrowed under the Credit Agreement was approximately $95 million. This was reduced through ordinary course payments, a paydown resulting from an insurance payout received in 2007, and a 2009 debt repurchase in the approximate amount of $32 million (discussed above).

The Term Loan has a stated maturity date under the Credit Agreement of April 28, 2012 (six years after the date of the Credit Agreement), while the Revolver matures on April 28, 2011 (five years after the date of the Credit Agreement).

The Credit Agreement has been amended three times. The first amendment (the *"First Amendment"*) is dated as of March 26, 2009, a time when the Debtors were not in default, but were concerned about possible future problems complying with financial covenants. Pursuant to the First Amendment, among other things, the Debtors were given expanded rights to offer to repurchase portions of the Lenders' debt, and the Lenders were authorized to retain a financial advisor. Pursuant to the repurchase terms of the First Amendment, the Debtors subsequently repurchased approximately $32 million of the Lenders' debt in two separate transactions, both times at a discount.

The Credit Agreement was amended again (the *"Second Amendment"*) on April 13, 2009. At this point, the Debtors were out of compliance with certain financial covenants under the Credit Agreement. Pursuant to the Second Amendment, the Lenders waived the existing defaults on a one-time basis and prospectively relaxed certain financial covenants. In exchange, the Lenders were granted, among other things, a substantial interest rate increase.

The latest amendment to the Credit Agreement (the *"Third Amendment"*) occurred on January 29, 2010, again, after the Debtors were unable to meet certain financial covenants. The Third Amendment resulted in the imposition of additional reporting requirements and substantial new lending fees. A borrowing base concept was also built in, in essence tying availability to assets. Again, however the Debtors' existing defaults were temporarily waived.

Pursuant to the Prepetition Loan Documents, the Prepetition Indebtedness is secured by valid, binding, enforceable, and perfected first-priority liens and security interests in substantially all of the Debtors' tangible and intangible personal property.

### D.     EVENTS LEADING TO THE CHAPTER 11 CASES

Beginning in 2007, the Debtors' operations began to be impacted by the deteriorating real estate market. The construction industry continued to contract through 2008 and the first half of 2009 due to both excessive supply, owing to high inventory levels, and insufficient demand, as credit became increasingly tight. As discussed above, the Debtors' financial performance significantly deteriorated during this downturn, and the Debtors have experienced difficulties meeting certain financial covenants under the Credit Agreement.

In early 2010, the Debtors, in consultation with Wachovia Bank, N.A. (*"Wachovia,"* at that time the administrative agent under the Prepetition Credit Agreement), determined that the Debtors could not sustain long-term viability as a going concern without alternative funding. Wachovia was unwilling to provide such financing, and the Debtors were unable to otherwise obtain financing.

In light of these circumstances, the Debtors retained Dan Scouler and Scouler & Company (*"Scouler"*) as chief restructuring officer. The Debtors, together with Scouler and Wachovia, (i) conducted a robust marketing process aimed at maximizing the value of the Debtors' assets and (ii) solicited the interest of various potential strategic and financial buyers and entertained offers for purchases of the Debtors' assets and outstanding obligations under the Credit Agreement.

Numerous potential buyers conducted due diligence with respect to a potential transaction and certain potential buyers provided letters of intent with respect to potential transactions. Based on the offers received, it became apparent to the Debtors that the value of their assets is less than the amount of Prepetition Obligations owed by the Debtors under the Credit Agreement.

### E.     DEBT ACQUISITION AND THE COMMENCEMENT OF THE CHAPTER 11 CASES

On or about July 19, 2010, in connection with the Debtors' marketing efforts, affiliates of Oaktree Capital Management, L.P. (*"Oaktree"*) acquired 100% of the Debtors' senior secured debt owed to the Prepetition Lenders

under the Credit Agreement. Thus, all of the Debtors' obligations under the Credit Agreement are now owed to UBP Acquisition Corp. ("*UBPA*"), an affiliate of Oaktree.

The Debtors engaged in discussions with UBPA regarding various restructuring proposals. Ultimately, those discussions resulted in the following proposal:

- Consent to a strict foreclosure by UBPA with respect to certain equipment owned by the Debtors;

- Cease manufacturing operations and file for protection under chapter 11 of the Bankruptcy Code to conduct an orderly wind-down;

- Subject to certain terms and conditions, UBPA would provide Debtor in Possession ("*DIP*") financing and would authorize the use of cash collateral necessary to allow the Debtors to conduct an auction of their assets in bankruptcy pursuant to section 363 of the Bankruptcy Code and to seek confirmation and consummation of a chapter 11 liquidating plan; and

- UBPA agreed to serve as the stalking horse in a sale process conducted pursuant to section 363 of the Bankruptcy Code and would credit bid approximately $25 million of the outstanding debt under the Credit Agreement and/or DIP Note (defined below).

The Debtors evaluated this transaction in light of prior refinancing and marketing efforts (which again made it apparent that the value of their assets is substantially less than the amount of the outstanding obligations under the Credit Agreement) and their severe liquidity constraints. The Debtors ultimately determined that without the support and cooperation of UBPA (including DIP financing and use of cash collateral), a piecemeal liquidation of the Debtors' assets may have been inevitable, and would have resulted in substantially less value than would be achieved via the orderly liquidation facilitated through UBPA's financing and purchase. Accordingly, the Debtors agreed to the restructuring terms proposed by UBPA.

In furtherance of their agreement with UBPA, on August 3, 2010, the Debtors: (i) executed strict foreclosure documents transferring title and turning over certain of their equipment to UBPA; (ii) entered into an asset purchase agreement (the "*UBPA Asset Purchase Agreement*") for the sale of their remaining assets (the "*UBP Assets*") to UBPA pursuant to an open sale process conducted pursuant to section 363 of the Bankruptcy Code; and (iii) entered into a Senior Secured Super-Priority Debtor-in-Possession Promissory Note (the "*DIP Note*") pursuant to which UBPA will provide financing for the Debtors' Chapter 11 Cases (subject to approval of the Court). In addition, the Debtors also ceased all manufacturing operations. Accordingly, as of the close of business on August 3, 2010, only Debtors Accubrace, Inc. and Form-Co., Inc. continued to operate, and have continued to do so in the Chapter 11 Cases. On August 4, 2010, the Debtors commenced the Chapter 11 Cases by filing petition for relief under chapter 11 of the Bankruptcy Code with the Court.

## F.    PLANNED SALE OF THE DEBTORS' ASSETS

### 1.    UBPA Asset Purchase Agreement

As noted above, prior to the Petition Date the Debtors entered into the UBPA Asset Purchase Agreement. Pursuant to the UBPA Asset Purchase Agreement, the UBP Assets are to be sold and transferred to UBPA pursuant to section 363 of the Bankruptcy Code, free and clear of all liens, claims, encumbrances and other interests.

The following briefly summarizes certain provisions of the UBPA Asset Purchase Agreement and is qualified entirely by reference to the UBPA Asset Purchase Agreement:

| Acquired Assets | All right, title, and interest in and to all of the Debtors' assets of any kind other than the Excluded Assets |
| --- | --- |

| | |
|---|---|
| | (described below). |
| **Excluded Assets** | The Excluded Assets include all of the Debtors' assets and properties that are being retained by the Debtors and are not being sold or transferred to UBP Acquisition and consisting of (i) any equity interests held by any Debtor in any Person (including any other Debtor or any subsidiary thereof) and (ii) all land and real estate owned by the Debtors. |
| **Assumed Liabilities** | None. |
| **Retained Liabilities** | UBPA is not assuming any of the Debtors' liabilities. |
| **Purchase Price** | $25,000,000 in the form of a credit bid, under section 363(k) of the Bankruptcy Code, on account of the obligations owed to UBPA under the Credit Agreement and/or DIP Note |
| **Representations and Warranties** | The representations and warranties are customary representations and warranties for a transaction of this type, including, without limitation, representations and warranties regarding: the authority to enter into the sale transaction, the agreement to abide by all laws with respect to the sale, the capability of satisfying the conditions contained in section 365 of the Bankruptcy Code with respect to assumed contracts, and a general disclaimer regarding representations and warranties not specifically enumerated. |
| **Covenants** | The covenants are customary covenants for a transaction of this type, including, without limitation, covenants regarding: the best efforts of the parties, notices and consents, and access to information. |
| **Events of Default** | The events of default are customary events of default for a transaction of this type. |
| **Indemnification** | The Debtors, jointly and severally, agree to indemnify and hold UBPA and each of its Affiliates and each of their respective officers, directors, managers, equity holders, partners, employees, agents and representatives and any Person claiming by or through any of them harmless with respect to the Excluded Assets and Excluded Liabilities, including any loss, damage, Liability, cost or expense (including legal fees and expenses and court costs) arising out of or in connection with, or otherwise relating to, the Excluded Assets and the Excluded Liabilities. |
| **Expense Reimbursement** | If the UBPA Asset Purchase Agreement is terminated prior to the Closing for any reason other than validly by the Debtors pursuant to Section 8.1(c) of the UBPA Asset Purchase Agreement, the Debtors shall, concurrently with any such termination by the Debtors, |

| | and no later than two (2) Business Days following any such termination by UBPA, immediately pay to UBPA in cash, by wire transfer of immediately available funds to an account designated in writing by UBPA, an amount equal to the costs of out-of-pocket expenses incurred by UBPA in connection with its business, legal and accounting due diligence and the preparation and negotiation of this Agreement up to a maximum of eight hundred and fifty thousand dollars ($850,000) (the *"Expense Reimbursement"*). |
|---|---|
| **Break-Up-Fee** | In addition to any Expense Reimbursement, upon the first to occur of (i) the date any Debtor consummates a sale of any of the Acquired Assets to an entity other than UBPA or (ii) the date any Debtor consummates a plan under the Bankruptcy Code without first selling the UBP Assets to UBPA, the Debtors shall immediately pay to UBPA in cash, by wire transfer of immediately available funds to an account designated in writing by UBPA, a breakup fee in an amount equal to four hundred thousand dollars ($400,000) (the *"Breakup Fee"*); *provided, however,* that the Breakup Fee shall not be payable to UBPA if the Agreement is validly terminated by the Debtors pursuant to Section 8.1(c) of the UBPA Asset Purchase Agreement. |

### 2. Public Auction For The Sale Of The Debtors' Assets

On the Petition Date, the Debtors sought to establish procedures (the *"Bidding Procedures"*) for a competitive process to effectuate the Sale of the UBP Assets by filing a *Motion for Order (A) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (B) Scheduling Hearing to Consider Sale and Approving the Form and Manner of Notices; (C) Approving Expense Reimbursement Provision and Break-Up Fee; and (D) Granting Related Relief* (the *"Bidding Procedures Motion"*). The Bidding Procedures Motion is discussed further herein in connection with a discussion regarding the resolution of certain disputes regarding the sale process and the DIP financing among the Debtors, UBPA, and the official committee of unsecured creditors appointed in these cases (the *"Committee"*).

### III.

### THE CHAPTER 11 CASES

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors were stayed under section 362 of the Bankruptcy Code. The Debtors have continued to conduct their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### A. DEBTOR IN POSSESSION FINANCING

On August 3, 2010, Debtor Universal Building Products, Inc. and UBPA entered into the $6,002,673 DIP Note. The purpose of the DIP Note is to provide the Debtors with sufficient liquidity to operate during the Chapter 11 Cases and financial protection while the Debtors (i) close the Sale and (ii) consummate and effectuate the Plan. The DIP Note provides UBPA with a first priority lien in all of the Debtors' assets. The remaining Debtors are Guarantors of Universal Building Products, Inc.'s obligations to UBPA under the DIP Note.

The DIP financing was approved on an interim basis by the Bankruptcy Court on August 5, 2010. The DIP financing was approved on a final basis on August 27, 2010 as discussed further below. The Debtors are currently working with UBPA on a proposed extension of the DIP financing for purposes of facilitating the administration of the Estates and the implementation of the Plan pending the Effective Date.

## B.    RESOLUTION OF DISPUTES REGARDING THE SALE AND DIP FINANCING

### 1.    Resolution of Disputes

Prior to the August 23, 2010 hearing on the Bidding Procedures Motion and final consideration of the DIP financing, the Committee filed (i) objections to both the Bidding Procedures Motion and the DIP based on various grounds, and (ii) a motion to limit UBPA's ability to credit bid.

Prior to the August 23, 2010, the Committee, the Debtors, and UBPA engaged in preliminary settlement discussions focusing on the resolution of these disputes and an efficient exit strategy for the Chapter 11 Cases. The settlement discussions were based on the facts that (i) the Debtors had previously conducted an extensive sale process; (ii) it is highly doubtful that any party would be willing to pay more for the Debtors' assets than had been offered by UBPA; and (iii) it is highly doubtful that the Debtors could obtain affirmative funding to administer these Chapter 11 Cases other than UBPA's DIP. Hence, maximum recoveries for creditors would be achieved through quickly transferring the Debtors' assets so that administrative costs (*i.e.*, wages, rents, etc.) were minimized and allowing portions of the DIP Note commitment to go towards creditor claims as opposed to administrative expenses. In light of those discussions, the parties requested a continuance of the hearing.

At a hearing on August 26, 2010, the parties agreed to a resolution of the disputes on the following terms:

- The Debtors would transfer substantially all of their assets to UBPA under the UBPA Asset Purchase Agreement on an "interim basis" subject to receipt of other offers (discussed further below). This would allow UBPA to begin taking possession of the assets and allowing the Debtors to expedite the wind-down of their affairs.

- The Bidding Procedures Motion would be granted substantially in the form as presented so that a sale and auction process could be conducted in the event a qualified bidder presented a competing offer for the assets.

- The DIP financing was approved, but (i) UBPA agreed that its liens would not attach to any (a) Avoidance Actions or (b) other Causes of Action not transferred to UBPA or asserted against UBPA (but not including any Acquired Assets under the Asset Purchase Agreement, the "*Excluded Property*)the "*Transferred Causes of Action*"), and (ii) additional professional fee amounts were allocated to the Committee's professionals.

- The full amount of the DIP commitment, less amounts previously funded, would fund a liquidating chapter 11 plan (collectively, with the Transferred Causes of Action and the Avoidance Action, the "*Transferred Property*").

- The Debtors, the Committee, and UBPA shall support a liquidating chapter 11 plan that (i) embodies the terms of the DIP financing; (ii) provides for a waiver of UBPA's Claim as to the ExcludedTransferred Property; and (iii) provides broad releases to (a) Jeff Church (the Debtors' CEO and a member of the Debtors' board of directors); (b) Kerry Shiba (a member of the Debtors' board of directors); (c) Greg Waller (the Debtors' CFO); and (d) Dan Scouler (the Debtors' CRO), Scouler & Company, and its professionals (a through d collectively, the "*Debtor Releasees*").

On August 27, 2010, the Bankruptcy Court entered orders approving the DIP, the Bidding Procedures Motion, and the "interim" sale, which reflected these terms.

2. ~~Interim~~ Sale to UBPA

In connection with the resolution of certain disputes discussed above, the Debtors, UBPA, and the Committee agreed that (a) the Debtors would seek entry of an interim sale order (the "*Interim Sale Order*") approving a sale of assets to UBPA on an emergency basis; (b) UBPA would immediately begin to take possession of the Acquired Assets to enable the Debtors to realize certain administrative savings and limit borrowings under the DIP Note, which savings would inure to the benefit of the Debtors' estates; (c) an auction would be held in the event that the Debtors receive one or more other qualified bids (as set forth in the Bidding Procedures Motion) on or before the bid deadline of September 1, 2010 at 12:00 p.m. prevailing Eastern Time; (d) if the Debtors receive no additional qualified bids before the bid deadline, or in the event that an auction occurs and UBPA is the winning bidder, the Debtors shall submit a Final Order under certification of counsel, which Final Order shall be identical in all material respects to the Interim Sale Order, and the Committee consents without objection to entry of such a Final Order; and (e) in the event an auction occurs and UBPA is not the winning bidder, (i) conveyance of the Acquired Assets to UBPA shall be rescinded and all right, title and interest in the Acquired Assets will be deemed re-vested in the Debtors, (ii) all Liens, Claims and Interests in the Acquired Assets shall attached to the Acquired Assets to the same extent as prior to entry of the Interim Order; and (iv) the winning bidder shall (1) reimburse UBPA for all costs and expenses incurred by UBPA in transferring or storing Acquired Assets pursuant to the Interim Sale Order; and (2) pay all costs of transferring the Acquired Assets from UBPA to the winning bidder.

The Bankruptcy Court entered the Interim Sale Order on August 27, 2010. ~~As of the filing~~ After no competing offers were submitted, the Bankruptcy Court entered a Final Order on September 7, 2010. As of the date of this Disclosure Statement, ~~no other offers for the assets have been submitted~~ the Debtors have transferred possession of substantially all of the Acquired Assets to UBPA. Additionally, the Debtors have rejected substantially all of their real and personal property leases pursuant to motions filed with the Bankruptcy Court.

C.     SUMMARY OF OTHER SIGNIFICANT MOTIONS

The following summarizes other significant motions that the Debtors filed on the Petition Date. You may view each of these motions, and other filed documents, by (i) accessing the Bankruptcy Court's website at http://www.deb.uscourts.gov/ or (ii) making a written request to the Debtors' notice, claims and balloting agent, The Garden City Group, Inc., P.O. Box 9656 Dublin, OH 43017-4956, 1 (800) 327-3664.

1.     Applications for Retention of Debtors' Professionals

The Debtors filed applications for the retention of certain professionals to represent and assist the Debtors in connection with the Chapter 11 Cases. These professionals include, among others: (a) K&L Gates LLP, as co-counsel to the Debtors, (b) Saul Ewing LLP, as co-counsel to the Debtors, (c) Scouler & Company, as Chief Restructuring Officer for the Debtors, and (d) The Garden City Group, Inc., as notice, claims and balloting agent to the Debtors. The Debtors also filed a separate motion seeking to establish procedures for the interim compensation of professionals.

2.     Motion for Joint Administration of the Chapter 11 Cases

The Debtors filed a motion seeking to consolidate the Debtors' Chapter 11 Cases for administrative purposes only. The Debtors' Chapter 11 Cases are currently administered under a single case name and number: *In re Universal Building Products, Inc. et al.*, Case No. 10-12453, for administrative purposes only.

3.     Motion to Pay Employee Wages and Associated Benefits

The Debtors believe that their employees are a valuable asset and that any delay in paying prepetition or postpetition compensation or benefits to their employees would destroy their relationship with employees and irreparably harm employee morale at a time when the dedication, confidence and cooperation of their

employees is most critical. The Debtors filed a motion requesting that the Bankruptcy Court authorize the Debtors, in their sole discretion, to pay all compensation and benefits to their employees for obligations payable as of the Petition Date, as well as obligations that come due after the Petition Date.

### 4. Utilities Procedures Motion

The Debtors believe that uninterrupted utility services are essential to ongoing operations. The Debtors sought authority to implement procedures to prevent utilities from discontinuing, altering or refusing service and to provide a systematic procedure for determining adequate assurances.

### 5. Motion Authorizing Rejection of Unexpired Leases

The Debtors have determined that it is in their best business interest to avoid the accrual of any further obligations under several leases, and thus filed a motion seeking to reject these leases effective August 4, 2010. The Debtors are no longer in possession of these premises and are not using them in their operations or for any other purposes. The unexpired leases at issue are: (i) an unexpired lease of nonresidential real property located at 6904 Park East Boulevard, Tampa Florida with MiTek Industries, Inc; and (ii) an unexpired lease of nonresidential real property located at 2300 Maywood Drive, Bellwood, Illinois with MLRP 2300 Maywood LLC

### 6. Motion to Employ Ordinary Course Professionals

The Debtors retain the services of various professionals in the ordinary course of their business operations. The Debtors filed a motion requesting permission to continue to employ such professionals postpetition without the necessity of filing formal applications for employment and compensation by each professional.

### 7. Schedules and Statement of Financial Affairs

The Debtors are filing their schedules of claims, assets, liabilities, executory contracts and other information (the "*Schedules*") and a Statement of Financial Affairs (the "*SOFAs*") to provide creditors and other interested parties with material information to enable each creditor to evaluate its proposed treatment under the Plan. Interested parties may review the Schedules and the SOFAs (i) by accessing the Bankruptcy Court's website at http://www.deb.uscourts.gov/, (ii) making a written request to the Debtors' notice, claims and balloting agent, The Garden City Group, Inc., P.O. Box 9656 Dublin, OH 43017-4956, 1 (800) 327-3664, or (iii) at the office of the Clerk of the Bankruptcy Court for the Western District of Delaware, Wilmington Division.

### 8. Taxes

In connection with the normal operation of their businesses, the Debtors (a) incur sales and use, highway use, fuel, franchise, and other taxes necessary to operate their businesses (collectively, the "*Taxes*"), and (b) are charged for tolls, fees, licenses, permits, and other similar charges and assessments (collectively, the "*Fees*") by various taxing, tolling, and licensing authorities (collectively, the "*Taxing Authorities*"). The Debtors believe that the failure to pay the Taxes and Fees could trigger a materially adverse impact on the Debtors' operations, including the potential suspension of the Debtors' ability to operate in certain jurisdictions. Moreover, if any of the Taxing Authorities attempt to exercise certain remedies against the Debtors, it would have the devastating effect of distracting the attention of the Debtors' management and professionals away from the important tasks associated with ensuring that the Chapter 11 Cases are successful. Accordingly, the Debtors filed a motion requesting authority to pay, in their discretion, all Taxes and Fees owing to the Taxing Authorities.

### 9. Claims Bar Date

~~In order to efficiently proceed towards confirmation of the Plan within the timeframe allowed by the DIP Note, and to effectuate the Plan when and if confirmed, the Debtors believe it is essential to ascertain, as soon as possible, the full nature, extent and scope of all claims asserted against the Debtors and their respective estates in order to determine the feasibility of the Plan and to facilitate the establishment of appropriate reserves under the Plan. Substantially contemporaneously with the filing of the Plan the Debtors are filing a motion seeking~~

to establishThe Debtors filed a motion seeking the establishment of dates by which proofs of Claims must be submitted. The Bankruptcy Court has set _____, 2010 as the bar date for all non-governmental persons or entities to file prepetition Claims, and _____, 2010 as the bar date for all governmental units to file prepetition Claims in these Chapter 11 Cases. The motion further requests that anyAny person or entity that is required to file a proof of claim in these Chapter 11 Cases but fails to do so in a timely manner shall be forever barred, estopped and enjoined from (a) asserting any Claim against the Debtors that such person or entity has that (i) is in an amount that exceeds the amount, if any, that may be set forth in the Schedules or (ii) is of a different nature or in a different classification than what may be set forth in the Schedules (in either case any such Claim referred to as an "*Unscheduled Claim*") and (b) voting upon, or receiving distributions under, the Plan in respect of an Unscheduled Claim.

### 10. Cash Management

To avoid delays in paying debts incurred postpetition and to ensure as smooth a transition into chapter 11 as possible, the Debtors filed a motion seeking authority to maintain their existing cash management system, business forms, and bank accounts, and, if necessary, to open new accounts and close existing accounts in the normal course of business operations, without further application to the Bankruptcy Court.

### IV.

### SUMMARY OF THE LIQUIDATING PLAN OF REORGANIZATION

### A. OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. It authorizes a debtor to reorganize its business for the benefit of itself, its creditors and its interest holders. Another chapter 11 goal is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that comprises all of a debtor's legal and equitable interests as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The principal objective of a chapter 11 case is to consummate a chapter 11 plan. The chapter 11 plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a chapter 11 plan by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity holder in the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable right of the Holders of Claims or Equity Interests in classes are to remain unaltered by the reorganization to be effectuated by the plan. Such Classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the Holders of Claims or Equity Interests in such Classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such Classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the Plan. Any Classes that are receiving a distribution of property of the Estates under the Plan but are not "unimpaired" will be solicited to vote to accept or reject the Plan. Although Holders of Class 4 General Unsecured Claims may receive a Distribution under the Plan, such Distributions are solely as result of UBPA's funding of the full commitment under the DIP Note and such Distributions are, thus, "gifts" from UBPA and not property of the Debtors' Estates.

**THE REMAINDER OF THIS SECTION SUMMARIZES THE STRUCTURE AND MEANS FOR IMPLEMENTING THE PLAN AND HOW THE PLAN CLASSIFIES AND TREATS CLAIMS AND**

EQUITY INTERESTS, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD REFER TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN ITSELF AND THE DOCUMENTS THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, THE DEBTORS' ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES–IN–INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL GOVERN.

HOLDERS OF CLAIMS OR EQUITY INTERESTS AND OTHER INTERESTED PARTIES ARE THEREFORE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

B.    GENERALLY

1.    Liquidating Plan of Reorganization

The Plan is a liquidating chapter 11 plan of reorganization that provides for the orderly liquidation of all of the Debtors' assets, the determination of all Claims and the distribution of the proceeds of the assets to creditors. On or prior to the Effective Date, the Debtors shall consummate the Sale. On the Effective Date, ~~and in accordance with and pursuant to the terms of the Plan,~~ the Debtors shall ~~assign and~~ transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust ~~all of their right, title, and interest in and to all of,~~ for and on behalf of the beneficiaries of the Liquidating Trust, with no reversionary interest in the Debtors, the Liquidating Trust Assets~~, notwithstanding any prohibition of assignability under applicable non bankruptcy law~~.

2.    The Liquidating Trust

The Liquidating Trust shall be established for the primary purpose of liquidating its assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. The Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan. The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the beneficiaries treated as grantors and owners of the trust. As of the Effective Date, the Liquidating Trust shall be responsible for (i) the winding up of the Debtors' Estates, (ii) liquidating or otherwise reducing to Cash the Transferred Property or the Preserved Collateral, as applicable and in accordance with the Liquidating Trust Agreement, (iii) filing, prosecuting and settling Causes of Action, Avoidance Actions, Transferred Causes of Action (iv) making distributions to Holders of Allowed Claims, (v) overseeing the continued liquidation to Cash of all other Liquidating Trust Assets, and (vi) settling, resolving and objecting to Claims.

C.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only

to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified, but the treatment for such unclassified claims are set forth in Article II of the Plan and Article IV.C.2 herein.

The Debtors believe that the Plan has classified all Claims and Equity Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Equity Interest may challenge the classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.

As set forth in Article III.A.2 of the Plan, subjectSubject to the occurrence of the Effective Date, the Debtors and their Estates will be deemed substantively consolidated for the followingvoting and distribution purposes under the Plan: (a) no Distributionsonly. No distributions will be made under the Plan on account of the Intercompany Claims; (b) any and all guarantees of certain Debtors of obligations of other Debtors will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any Debtor with another Debtor will be deemed to be one obligation of the deemed consolidated Debtors; and (c) each and every Claim against a Debtor will be deemed asserted against the consolidated Estates of all of the Debtors, will be deemed one Claim against and obligation of the deemed consolidated Debtors and their Estates and will be treated in the same Class regardless of the DebtorIntercompany Claims. The assets and liabilities of the Debtors shall be pooled and all Claims shall be satisfied from the assets of a single consolidated estate. Any Claims against one or more of the Debtors (including Claims based upon a guaranty, indemnity, co-signature, surety or otherwise, of Claims against another Debtor) shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to distributions under the Plan only with respect to such single Claim.

The classification of Claims and Equity Interests and the nature of Distributions to members of each Class are summarized below. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims and Equity Interests reflects an appropriate resolution of their Claims and Equity Interests, taking into account the differing nature and priority (including applicable contractual subordination) of Claims and Equity Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Equity Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court. The "cramdown" provisions of section 1129(b) of the Bankruptcy Code, for example, permit confirmation of a chapter 11 plan in certain circumstances even if the Plan has not been accepted by all Impaired Classes of Claims and Equity Interests. The Debtors will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, because of the deemed rejection of Classes 4, 5,5 and 6. Although the Debtors believe that the Plan could be confirmed under section 1129(b) even if the Plan has not been accepted by all of the Impaired Classes, there can be no assurance that the requirements of such section would be satisfied.

1.    **Schedule of Treatment of Claims and Equity Interests**

| Class | Title | Status | Entitled to Vote |
|-------|-------|--------|------------------|
| 1 | Senior Creditor Claims | Impaired | Yes |
| 2 | Other Secured Claims | Unimpaired | No |
| 3 | Other Priority Claims | Unimpaired | No |
| 4 | Unsecured Claims | Impaired | NoYes |
| 5 | Intercompany Claims | Impaired | No |
| 6 | Equity Interests | Impaired | No |

2.    **Treatment of Unclassified Claims**

• Administrative Claims

Non-Professional Fee Administrative Claims. Each Allowed Administrative Claim shall be, at the ~~Debtors'~~Liquidating Trustee's election, either (i) paid by the Debtors in full, in Cash, in such amounts as such Administrative Claim is Allowed by the Bankruptcy Court upon the later of the Effective Date or the date upon which such Administrative Claim is Allowed or (ii) satisfied upon such other terms as may be agreed upon between the Holder of such Administrative Claim and the ~~applicable Debtor~~Liquidating Trustee. Any application for the payment of any Administrative Claims on account of any fees or reimbursement of expenses of any Professional, shall be Filed with the Bankruptcy Court no later than ~~fifteen~~thirty (~~15~~30) days after the Effective Date.

(b)     Professional Fee Claims. Unless otherwise expressly provided in the Plan, a Professional Fee Claim will be Allowed only if: (i) on or before forty-five (45) days after the Effective Date (the "Professional Fee Bar Date"), the entity holding such Professional Fee Claim files with the Court a final fee application and serves the application on counsel to the Debtors, counsel to the Committee and the U.S. Trustee; and (ii) the Court enters an order allowing the Claim.

Any party in interest may file an objection to such application within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes. Entities holding Professional Fee Claims that do not timely file and serve a fee application will be forever barred from asserting such Professional Fee Claim against the Debtors, the Estates, the Liquidating Trust, or their respective property.

- DIP Facility Claims

Notwithstanding anything to the contrary herein, in full and final satisfaction, settlement, release and discharge of and in exchange for release of the DIP Facility Claim, in accordance with section 1129(a)(9) of the Bankruptcy Code, the DIP Lender has agreed that the DIP Facility Claim shall receive the treatment afforded in Article III.B.1 of the Plan.

- Priority Tax Claims

On, or as soon as reasonably practicable after, the latest of the Effective Date or the date such Priority Tax Claims becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim or (ii) such other treatment as to which the Debtors and such Holder have agreed upon in writing.

3.     **Classification and Treatment of Classified Claims**

- Class 1 – Senior Creditor Claims

  - Classification: Class 1 consists of all Senior Creditor Claims.

  - ~~Treatment:~~ Holders of Allowed Senior Creditor Claims shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Senior Creditor Claims, the Senior Creditor Series A~~of~~ the Liquidating Trust ~~Interests~~ as provided for in the Liquidating Trust Agreement. ~~"Series A Trust Interests" means the interests in the Liquidating Trust to be issued in accordance with this Plan and the Liquidating Trust Agreement and on account of which holders of such interests will receive distributions of the Debtors' assets (or the proceeds thereof) other than the Excluded Property.~~

  - Voting: Class 1 is impaired. Holders of Senior Creditor Claims in Class 1 are entitled to vote to accept or reject the Plan.

- Class 2 – Other Secured Claims

- Classification: Class 2 consists of all Other Secured Claims.

- Treatment: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such Claim becomes an Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive (i) the property securing such Allowed Other Secured Claim, or (ii) such other treatment as to which the Debtors or the Liquidating Trustee and such Holder have agreed upon in writing, upon consultation with the Prepetition Lenders and the DIP Lender.

- Voting: Class 2 is unimpaired. Holders of Other Secured Claims in Class 2 are deemed to accept the Plan and are therefore not entitled to vote to accept or reject the Plan.

- Class 3 – Other Priority Claims

  - Classification: Class 3 consists of all Other Priority Claims.

  - Treatment: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, (i) Cash equal to the unpaid portion of such Allowed Other Priority Claim, or (ii) such other treatment as to which the Debtors or the Liquidating Trustee and such Holder have agreed upon in writing upon consultation with the Prepetition Lenders and the DIP Lender.

  - Voting: Class 3 is unimpaired. Holders of Other Priority Claims in Class 3 are deemed to accept the Plan and are not therefore entitled to vote to accept or reject the Plan.

- Class 4 – Unsecured Claims

  - Classification: Class 4 consists of all Unsecured Claims.

  - Treatment: Holders of Allowed Unsecured Claims in Class 4 shall receive pro rata Distributions of the Series B Trust Interests, as provided in a Pro Rata share of the Unsecured Creditor Series of the Liquidating Trust Agreement. "Series B Trust Interests" means the interests in. On the Effective Date, or as soon thereafter as is practicable, the Liquidating Trustee shall make a distribution of the Unsecured Creditor Series of the Liquidating Trust to be issued in accordance with this Plan and the Liquidating Trust Agreement and on account of which holders of such interests will receive distributions of the Excluded Property (or the proceeds thereof)each Holder of an Allowed Class 4 Claim in an amount equal to such Holder's Pro Rata share of the balance in the Transferred Property transferred to the Liquidating Trust remaining after creation of the Disputed Claim Reserve.

- In the event of entry of a Final Order determining a Disputed Claim to be an Allowed Claim, the Liquidating Trustee, in his sole discretion, may make an interim distribution to the Holder of such Allowed Claim from the Disputed Claim Reserve to such Holder. The Holders of Class 4 Allowed Claims shall thereafter receive their Pro Rata share of any subsequent distributions from the Liquidating Trust.

- Voting: Class 4 is impaired. Holders of Allowed Unsecured Claims in Class 4 are ~~not entitled to vote to reject the Plan. Although Class 4 Unsecured Claims are impaired while potentially receiving Distributions under the Plan, such Distributions are gifted from the Holders of Senior Creditor Claims and such funds do not constitute property of the Estates. Therefore, Class 4 is not~~ entitled to vote to accept or reject the Plan.

- Class 5 – Intercompany Claims

  - Classification: Class 5 consists of all Intercompany Claims.

  - Treatment: On the Effective Date, all Intercompany Claims shall be deemed waived and cancelled and Holders of Intercompany Claims shall not receive any ~~Distribution~~distribution on account of such Intercompany Claim under the Plan.

  - Voting: Class 5 is impaired. Because Holders of Intercompany Claims will receive no ~~Distributions~~distributions under the Plan, Class 5 will be deemed to have voted to reject the Plan.

- Class 6 – Equity Interests

  - Classification: Class 6 consists of all Equity Interests.

  - Treatment: On the Effective Date, all Equity Interests shall be cancelled and the Holders of Equity Interests shall not receive or retain any ~~Distribution~~distribution or property on account of such Equity Interests.

  - Voting: Class 6 is impaired. Because Holders of Equity Interests will receive no ~~Distribution~~distribution under the Plan, Class 6 will be deemed to have voted to reject the Plan.

## D.     MEANS FOR IMPLEMENTATION OF THE PLAN

### 1.     Funding ~~From DIP Facility~~of the Plan Fund Into the Liquidating Trust

On or prior to the Effective Date, the DIP Lender shall fund to the ~~Debtors or the~~ Liquidating Trust from the DIP Facility the entire amount of credit provided for under the DIP Facility, less amounts previously funded to the Debtors ~~in accordance with the DIP Order.~~ In addition, on or prior to the Effective Date, the Debtors shall fund to the Liquidating Trust any amounts that have been previously funded pursuant to the DIP Facility and that have not been spent or disbursed by the Debtors; provided, however, that the ~~DIP Lender shall not be obligated to fund any amount in excess of the Budget.~~Debtors' and DIP Lenders' funding of these amounts into the Liquidating Trust shall be expressly conditioned on the Debtors having remitted to the DIP Lenders and/or Prepetition Lenders (as applicable) any cash collateral other than amounts funded pursuant to the DIP Facility that were not disbursed or expected to be disbursed in accordance with the Budget. The estimated amount of the Plan Fund as of the projected Effective Date shall be set forth in the Plan Supplement.