# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re:                      :

UNIVERSAL BUILDING PRODUCTS,    :
INC., *et al.*,[1]

            Debtors.         :

------------------------------------------------------- x

Case No. 10-12453 (MFW)

Chapter 11

(Jointly Administered)

Hearing Date: October 7, 2010
Objection Deadline: September 30, 2010
Reply Deadline: October 5, 2010 at noon

Re: Docket No. 173

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' REPLY TO THE DEBTORS' AND THE UNITED STATES TRUSTEE'S OBJECTIONS TO THE APPLICATION TO RETAIN ARENT FOX LLP AS COUNSEL TO THE COMMITTEE

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors in possession (the "Debtors"), by and through its proposed counsel, Arent Fox LLP and Elliott Greenleaf, respectfully submits this reply (the "Reply") to the Debtors' Combined Objection to Applications for Orders Authorizing Employment and Retention of Arent Fox LLP and Elliott Greenleaf as Counsel for the Official Committee of Unsecured Creditors *Nunc Pro Tunc* to August 13, 2010 (Docket No. 268) (the "Debtors' Objection") and The United States Trustee's Supplemental Statement in Support of Her Objection to the Application to Employ/Retain Arent Fox LLP as Counsel to the Official Committee of Unsecured Creditors (Docket No. 272) (the "UST Objection") (collectively, the "Objections"). This Reply is directed only to the application to retain Arent Fox (the "Retention

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification number, if applicable, are: (i) Universal Building Products, Inc. (7884); (ii) Accubrace, Inc. (3418); (iii) Don De Cristo Concrete Accessories, Inc. (7547); (iv) Form-Co., Inc. (0079); and (v) Universal Form Clamp, Inc. (3003).

Application"); a separate reply paper is being submitted with respect to the application to retain Elliott Greenleaf.[2] In this Reply, the Committee states as follows:

## PRELIMINARY STATEMENT

To say that the Committee and its proposed counsel are outraged by the inflammatory, misleading, factually inaccurate, and legally irrelevant arguments made by the Debtors in response to the application to retain Arent Fox would be the understatement of the century. Arent Fox is pegged by the Debtors' rhetoric as some kind of racketeering criminal enterprise based on nothing more than hypothetical suppositions and conspiracy theories not grounded in fact or reason. Indeed, the Debtors in particular take such liberties as to misstate and misconstrue documents and testimony, jump to reckless and defamatory conclusions, and, even more offensively, suggest damning inferences from email communications while blatantly ignoring the author's own contrary explanation in sworn deposition testimony. Absolutely *nothing* that Arent Fox did in the course of pursuing retention in this case was improper or unethical. And contrary to the UST Objection, Arent Fox made full and complete disclosures on a timely basis. The Objections are simply meritless.

From a factual perspective, the Objections are devoted largely to the activities of Dr. Liu. Dr. Liu is a Chinese businessman and creditors' rights advocate for Chinese exporters who do business with U.S. importers. Dr. Liu has made it his business to provide Chinese exporters who face debt collection issues in the U.S. with education and advice based on his knowledge and experience, to encourage Chinese participation in the American legal system, including both as creditors in bankruptcy cases and as plaintiffs in direct debt collection litigation (as Dr. Liu views this as important not only to the individual creditor, but to Chinese-American economic

---

[2] In the Debtors' Objection, they lump together both Arent Fox and Elliott Greenleaf and conversations and email correspondence involving only one firm was frequently inaccurately attributed to both. The resulting misleading implication is that there was twice as much activity as actually existed.

relations generally), and to assist his clients, when requested and when necessary, in interviewing and securing appropriate U.S. legal counsel to handle their legal and debt collection needs. Arent Fox is merely one of 12 law firms that Dr. Liu has selected and worked with over the years in his efforts to assist his Chinese creditor clients.

The Debtors argue that Dr. Liu is, in effect, a paid "runner" for Arent Fox, *i.e.,* that he is an instrument of Arent Fox used to solicit clients for Arent Fox. But this is belied by the fact that Dr. Liu works with so many different law firms and is plainly not beholden to Arent Fox or any other firm. It is also argued that Dr. Liu has a *"quid pro quo"* arrangement with Arent Fox, but that too is belied by the fact that Arent Fox does not pay or compensate him in any way for selecting Arent Fox as counsel for his clients. Arent Fox has never directed or instructed or even expected Dr. Liu to locate and bring any clients to it. While Arent Fox has known Dr. Liu now for a number of years, it has never expected anything more than to be fairly evaluated and considered along with other firms to provide services when Dr. Liu, in the course of his business, is in a position of recommending or selecting counsel. To say that there is a scheme whereby Arent Fox and Dr. Liu engage in the ritualized unethical solicitation of a client base for Arent Fox is ludicrous and contrary to the evidence.

From a legal perspective, there is absolutely nothing improper about Arent Fox's relationship with Dr. Liu. And, more to the point, there is absolutely nothing about Arent Fox's relationship with Dr. Liu that disqualifies it to be retained by the Committee under the Bankruptcy Code. The Objections are, as a result, notably devoid of relevant legal arguments. What is required for retention of a committee professional is that the proposed professional not represent any other entity having an adverse interest – a legal standard that the Debtors' Objection seem only to brush by on its way to accusations of an overarching "modus operandi"

for ethical violations.  Arent Fox does not represent any entity that is adverse to the Committee; nor does Dr. Liu's business and his occasional selection of Arent Fox represent any adverse interest to the Committee.  Moreover, all of the connections Arent Fox has shared with Dr. Liu have been fully disclosed – and well before the objection date and hearing on the retention application.  (In fact, Arent Fox's disclosures go beyond what is required, and are more thorough and complete than the disclosures typically filed by other firms.)  The Debtors' Objection was filed for no other purpose than to create scandal and tarnish Arent Fox's reputation, and to create leverage in the plan process.  Arent Fox looks forward to the evidentiary hearing in this matter where it will present substantial evidence that the Objections are baseless.[3]

## FACTUAL BACKGROUND[4]

### Dr. Liu's Business

Dr. Liu first met Arent Fox counsel in the very same manner he first met the counsel for the Debtors in this case – on the day of a committee formation meeting in a bankruptcy case, where he was representing one of his Chinese creditor clients who was applying for a seat on the creditors committee.  In each instance, the Arent Fox counsel and the Debtors' counsel were present to "pitch" to represent the creditors committee and so they introduced themselves to Dr. Liu, as many other counsel have done.  Ex. B at 19:7 – 20:2; 25:16-25; 53:10-20; 208:16-24; 316:21 – 317:17.

---

[3] Arent Fox is also evaluating whether the insidious allegations lodged against it in the Debtors' Objection and the widespread publicity of those allegations should be subject to sanctions or some other remedial proceeding against either the Debtors or their counsel, K&L Gates.

[4] The Debtors attached to their Objection the complete set of documents produced as a result of their discovery efforts (Exs. A & D) and a complete copy of the transcript of the deposition of Dr. Liu (Ex. B).  The errata sheet for the deposition transcript was omitted from the Debtors' filing, but included in the deposition excerpts filed by the United States Trustee with her Objection.  So as not to burden the Court with duplicate voluminous filings, the Committee will refer to these lettered exhibits filed by the opposing parties.  Exhibits newly filed with the Committee's reply brief will be numbered (as opposed to lettered) to differentiate them.

Dr. Liu often appears at committee formation meetings on behalf of Chinese creditors that he represents – this is part of his business. He is a self-described "creditor[s'] rights advocate." Ex. B at 56:19; 233:17-21. As such, his clients are Chinese exporters who have trouble with U.S. importers and need assistance with matters of debt collection and the like. He views his business and the services he provides as valuable not only to Chinese creditors but also to the global economy and Chinese-American relations:

```
2               My belief is, after I study in both
3       countries, I'm thinking the relationship between
4       United States and China is so fundamental
5       important for the world, for the global stability
6       and, you know, the global economy.
7               So market economy is basis, and where
8       emphasize fairness and fair competition.
9               And the relationship between Chinese
10      exporters, which is businessmen on one side, U.S.
11      importer as businessmen on the other side, is a
12      foundation of trust, a mutual trust, for both
13      countries, to have long way to go.
14              And if the U.S. importers, for
15      whatever reason, refuse to pay the Chinese
16      exporters, I feel it's not fair.
17              And there's no system -- or lack of
18      sufficient system to help Chinese exporters
19      continue the basis.
 *  *  *
23              So I feel let me help, since I have
```

```
24      some business experience, some education in both

25      countries.
```

Ex. B at 60:2-25.

Dr. Liu also testified that it is not about the money for him – he often does not get paid

for this work – he views it to be of such importance, that he often provides services "on a

voluntar[y] basis." Ex. B at 59:12-21; 63:6-12. He is even developing a website at

"safeexport.net" "[b]ecause after three years in the United States crisis, I see so many

unfortunate things happening. And I think the best way for Chinese exporters to prevent those

debt occurring is get a debt prevention education." Ex. B at 91:20 – 92:9.[5]

When debtors file bankruptcy petitions, Dr. Liu seeks to help the Chinese creditors of the

debtors by making sure they are properly notified and aware of the process, educating them as to

certain options they may have, encouraging them to travel to the U.S. to personally participate in

the process, offering to act as their representative U.S. proxy when they cannot attend in person,

and securing appropriate legal counsel for them when the need arises. Ex. B at 74:17 – 77:20;

Ex. B at 156:12-22.

Dr. Liu has never been beholden to any one lawyer or law firm. He testified that, over

the last few years, he has consulted and worked with 12 different law firms who have provided

legal services to his company and to his Chinese creditor clients. Ex. B at 22:13 – 25:15. Arent

Fox is just one of these law firms. Also in his testimony, he gave an example of one case in

which he specifically voted against Arent Fox in favor of another law firm (Lowenstein Sandler)

---

[5] Demonstrating his dedication even more vividly, Dr. Liu testified that he was uncomfortable providing his home address on the record because he deals with "many U.S. debtors. And many of them are not the - - according to my standard understanding of them, they are not decent. . . . So I know some debtors trying to go after me, trying to find where I live, especially in New York." Ex. B at 64:3-13. Astonishingly, Debtors' misrepresent this testimony entirely. They insultingly claim that Dr. Liu's assertion that his endeavors are undertaken out of the "goodness of his heart" lacks credibility "given Dr. Liu's testimony that he is so in fear of personal harm from *Chinese* creditors that he is afraid to disclose his home address and birth year (lest *Chinese* creditors become able to locate him)." Debtors' Objection at 5, n. 4 (emphasis added).

because he thought the latter's proposed strategy was a more conservative approach that was a better fit for the case. Ex. B at 123:6 – 124:10.

In the last year, Dr. Liu has been involved with six bankruptcy cases – either in the capacity as a proxy or representative of a Chinese creditor or as a translator for a committee having one or more Chinese creditors as a member. Of these six cases, Arent Fox was counsel to the committee in two cases, Lowenstein Sandler was also counsel to the committee in two cases, Butler Rubin was counsel to the committee in one case, and the Jaffe law firm was counsel to the committee in one case. Ex. B at 28:22 – 30:7. Dr. Liu testified that, on each of these six cases with four different law firms, he had some contact with the law firms prior to the day of committee formation. Ex. B at 31:23 – 33:20.

Dr. Liu purposefully interacts with many law firms prior to the day of committee formation – indeed with any law firm that he believes may be interested in becoming committee counsel. He willingly accepts emails from them forwarding copies of the bankruptcy petition, and then will typically correspond with them about general issues in the case or even more specific issues pertinent to the Chinese creditors. Ex. A at HL0395-98, HL0408, HL0413-14, HL0416-22. He usually has parallel communications with several law firms as he evaluates and investigates the situation and also looks forward to determining who he thinks will be the best advocate for the needs of his clients. Ex. B at 79:2-15 (noting that his habit is to email questions to several law firms "in order to get the best law firm to represent the creditors, I want to see how they respond to questions creditors raised or I raised."); 140:22-24 ("my habit is I want to see how deeply they are understanding the case and their real interest in this case"); Ex. A at HL0419. He even emails multiple firms encouraging them to pitch at the formation meeting

because he believes more competition among law firms will lead to better representation for the

creditors:

```
15              If a law firm, or a few law firms, send
16      me petition list after the case filed, normally
17      means they expressed a clear intention to pursue
18      this case.
19              And I'm a creditor rights advocate.
20              My focus and intention, from my side,
21      is to mobilize more Chinese creditors to
22      participate the formation meeting on one side,
23      and on the other side I mobilize more law firms
24      to participate the formation meeting, to have
25      competition atmosphere at the formation meeting.
 2              Because I had one experience, only I
 3      have one law firm at one case.
 4              Then no matter you like or dislike,
 5      you have no choice at a formation meeting.
 6              So from -- I always tend to mobilize
 7      people, including Chinese exporters, creditors,
 8      and a law firm as counsel appears to participate
 9      at formation meeting.
```

Ex. B at 56:15 – 57:9; *see also* 58:14-19 ("So if a law firm send me the petition list, they

expressed their interest in pursuing this case. That's my understanding. And I welcome their –

you know, the competition."); 69:12-14 ("I always welcome [the law firms] to participate in the

competition at the formation meeting."); 237:9-16 ("From my end I want more law firms show

up at formation meeting. Why? You have a performance. We have more interviews. We can

hear more proposals and more suggestions, more strategics [sic] how to handle this case...."); 286:5-9 ("And what I do is I encourage all of them to go to the – to prepare the [] pitching speech, to compete, and the members of committee to choose whose the best on that particular day.").

As Dr. Liu works with the creditors he contacts to offer his services, he does not discuss with them particular law firms or, if they are seeking to become a member of the creditors' committee, which law firm should be selected as committee counsel. Ex. B at 95:19-25.

## Dr. Liu's Involvement with UBP Creditors

Five law firms that have worked with Dr. Liu in the past – including Arent Fox – sent Dr. Liu the UBP petition the same day it was filed. Ex. B at 51:6-10; 136:17-19; Ex. A at HL0334, HL0416-22. After reviewing the list of creditors appended to the petition, Dr. Liu noticed that the largest Chinese creditor was listed without any contact information whatsoever. Ex. B at 46:14 – 47:8. He testified that this concerned him because it could indicate that the Debtors were withholding information. Ex. B at 47:9-18. Dr. Liu then emailed all five firms to ask if they had any leads on how to find contact information for the creditors. Ex. A at HL0332, HL0386, HL0405-06, HL0409-10; Ex. B at 140:14-20. Based on responses he received from Arent Fox and the other firms, he then contacted both the Debtors' counsel and the UST in an attempt to locate the contact information he needed. Ex. A at HL0323-24; Ex. B at 47:24 – 50:8; 140:25 – 141:4; 145:6-22; 149:18 – 151:8. Eventually, he received the contact information he needed to locate the creditor in China from Debtors' counsel. Ex. B at 50:5-11.

During this time period, in an email to an Arent Fox attorney in the context of another case in which Arent Fox was representing a Chinese creditor for whom Dr. Liu was serving as the U.S. representative, Dr. Liu referred to his cultivation of a support base among Chinese

exporters. Ex. 27 to Ex. B. Noting that such a support base can be valuable, Dr. Liu cited these cases as an example, stating that Arent Fox and Elliott Greenleaf wished him to get support from a Chinese exporter "who might recommend you as a pending committee member in the case of Universal Building." *Id.*[6] In his deposition, Dr. Liu explained that the "recommend you" was a typo – it should have read "recommend *me.*" He further explained that he was suggesting that "those Chinese exporter might look at me as a pending committee member in the case of Universal Building. It's an easy asking, but is not – it is no cinch." Ex. B at 251:9-13.

Dr. Liu consulted, wholly on his own initiative, with three Chinese creditors of the Debtors. Ex. B at 42:9-20. One informed him that, as they had insurance, they were not in need of Dr. Liu's services. Ex. B at 42:23 – 43:2. The other two, through their discussions with Dr. Liu, determined that they would like to participate in the committee formation process through the use of a proxy holder to represent them, who could be in Delaware for the formation meeting. Accordingly, Dr. Liu arranged that he would hold the proxy for the largest creditor and that another person would hold the proxy for the other creditor. Ex. A at HL0099-100. He was able to locate an individual willing to hold the second proxy through a referral from Elliott Greenleaf, which he asked because they were local in Delaware and he was looking for someone who would both be reliable and willing to appear free of charge. Ex. A at HL0367-68; Ex. B at 166:23 – 168:10 (needed someone reliable and free); 175:2-19 (needed someone in Delaware to avoid travel costs). Furthermore, Dr. Liu checked with the law firms to make sure the proxy forms were in order and "to ensure proper procedures" for proxy-holding consistent with UST requirements. Ex. B at 177:9-24; 182:4 – 183:22. In the end, he announced via email to all five

---

[6] As one of several examples of the duplicity of Debtors' counsel, they quote this sentence in Debtors' Objection, but change the sentence to read "who might recommend you as a pending committee *counsel* in the case of Universal Building," suggesting in a footnote that this must have been what he meant. What they fail to advise the Court, however, is that Dr. Liu himself testified under oath as to what he meant – which was *not* what the Debtors' re-write suggests. Ex. B at 250:20 – 251:8.

law firms with which he was regularly corresponding the news that he had obtained the proxies and, as he now knew he would be present on behalf of his constituents, he encouraged each of the firms to come to the formation meeting and give their best presentation. Ex. A at HL0397-99; Ex. B at 230:17 – 231:21; 232:19 – 232:7; 235:9 – 236:11; 293:17 – 294:2.[7]

In the interim, on behalf of these same two creditors, Dr. Liu also asked questions of Arent Fox and the other law firms with which he was corresponding about the UBP filing. Ex. B at 78:19 – 79:15; 219:9-10. These were simple run-of-the-mill type questions that get asked of bankruptcy practitioners, both in the abstract and specifically, every day – questions like, "we shipped two containers to the debtors before they filed their bankruptcy petition, and now they are stuck in customs – what can we do?" *See* Ex. B at 216:5 – 217:7. Arent Fox attorneys provided quick and simple responses to Dr. Liu on these types of questions. For example, in a two-sentence email, they noted that the creditor would have a claim in the bankruptcy case, and suggested the creditor talk with the Debtors directly. Ex. A at HL0302; Ex. B at 210:17 – 211:16. As Dr. Liu testified, these questions were informal attempts to gauge the various law firm's level of interest in the case and the level of assistance they might be able to provide. No party – not Arent Fox, nor Dr. Liu, nor the creditor to whom the message was relayed – believed this to be "attorney-client advice," or believed that an attorney-client relationship was created by such a one-off answer to a question. In fact, in the experience of the chair of Arent Fox's Bankruptcy and Financial Restructuring Group, creditors and other Parties-in-Interest will often ask any bankruptcy professional they come into contact with for "off the cuff" advice regarding creditor rights in bankruptcy. Silfen Decl., ¶ 23. In his view, providing the questioner with a

---

[7] The Debtors' Objection cites in **bold type** a statement from Dr. Liu's testimony where he is discussing Arent Fox's congratulatory response to his announcement that he received a proxy, and Dr. Liu testifies that it means "you did great work you did hard work, you got **us** a proxy, gave me encouragement...." Ex. B at 161:12-14. **However, the Debtors failed to check the errata sheet before citing this statement.** The correct testimony was: "you got **yours** [meaning, "yourself" to Dr. Liu's manner of speaking] a proxy."

simple answer that delineates only what the Bankruptcy Code provides on its face and suggesting they contact someone in a position to help them (including the debtors) does not rise to the level of being legal advice, does not create any attorney-client relationship, and is simply the cordial thing to do. *Id.*

As further evidence that no attorney-client relationship (and no *quid pro quo*) existed, Dr. Liu subsequently referred both of these creditors to another law firm for representation in connection with the UBP case. Ex. B at 273:11-13; 295:6 – 297:13.

At his own testimony, at no time did Dr. Liu discuss with either of the Chinese creditors of UBP which counsel to support; at no time did Dr. Liu tell them they should select Arent Fox as their counsel; and at no time did Dr. Liu even mention Arent Fox to his clients. Ex. B at 85:14 – 86:13; 313:4-16.

### The Committee's Formation and Selection of Arent Fox

On August 13, 2010, the UST held an organizational meeting and selected five creditors to serve on the Committee. Declaration of H. Eugene Laster ("Laster Declaration"), ¶ 2. Dr. Liu appeared as a proxy for Chinese creditor EAC, and EAC – as one of the largest of the Debtors' creditors – was selected to be a member of the Committee. The UST also selected Millenium Metals, Jade-Sterling Steel Co., Inc., King Steel Corporation, and Raytrans Distributing Services, Inc. None of the other creditors had ever had any prior dealings with Arent Fox – or had, for that matter, even heard of Arent Fox before that day.

More than 10 law firms appeared to make a pitch to be committee counsel. Ex. B at 311:21-23. After the Committee was selected, it interviewed several of the law firms (some of which teamed up, at the Committee's request) who wished to serve as counsel for the Committee. The Committee heard presentations, and received and reviewed materials, from

seven law firms. Laster Declaration, ¶ 3. These firms included Arent Fox LLP (with Elliott Greenleaf), Lowenstein Sandler PC, McDonald Hopkins LLC, Freeborn & Peters LLP (with Morris James), Cross & Simon, LLC, Ashby & Geddes, P.A., and Rosner Law Group. *Id.*

After considering the presentations and written materials of the seven law firms, the Committee narrowed the field to the two firms it thought best suited to the engagement – Arent Fox (teamed with Elliott Greenleaf) and Lowenstein Sandler – and interviewed each of these two firms again. Laster Declaration, ¶4. After the second round of interviews, the Committee closed the door, had a confidential discussion, and held a final vote to select Arent Fox. Ex. B at 312:6-9. Dr. Liu testified definitively that he did not decide which firm to vote for until after all the presentations had been made and the field had been narrowed to the two firms in the final round. Ex. B at 312:23 – 313:2. After the second round of interviews, the Committee selected Arent Fox and Elliott Greenleaf to serve as its counsel. Laster Declaration, ¶ 4.

After counsel for the Committee was selected, the Committee chose financial advisors. Laster Declaration, ¶ 5. The Committee then discussed the hiring of a translator, in view of the fact that one of its members did not speak English, and other Chinese-based businesses were also creditors of the Debtors. *Id.* Upon the recommendation of Arent Fox, and based on Dr. Liu's previous experience working with several law firms, including Arent Fox, in bankruptcy matters, the Committee decided to hire Dr. Liu as a translator. *Id.*

Subsequent to the Committee's formation, and given that a large Chinese creditor was a member of the Committee, the Committee elected to appoint Dr. Liu as an obvious choice to provide Chinese-English translation services for the Committee.

On September 28th, after a lengthy discussion, the Committee reaffirmed its engagement of Arent Fox and Elliott Greenleaf, and its continued desire for the Court to approve such retention. Laster Declaration, ¶ 7.

## **Arent Fox's Disclosures**

Arent Fox aims to provide full disclosures under Sections 504 and 1103(a) of the Bankruptcy Code, Rules 2014 and 5002 of the Bankruptcy Rules, and Rule 2014–1 of the Local Bankruptcy Rules. Declaration of Andrew I. Silfen ("Silfen Declaration"), ¶ 4.[8] To do so, Arent Fox has established certain procedures and protocols, described below. *Id.*

In connection with preparing a retention application and accompanying declaration in support, the Arent Fox partner responsible for the case (the "Partner-in-Charge"), typically with the assistance of an assigned associate, submits the names of parties-in-interest in each case (the "Parties-in-Interest") for review in a computerized conflict database system maintained by Arent Fox. Silfen Declaration, ¶ 5. The list of the Parties-in-Interest is formulated by Arent Fox from the initial papers filed by a debtor and members of the official committee of unsecured creditors. *Id.* Arent Fox maintains and systematically updates its conflict check system in the regular course of its business, and it is the regular practice of the firm to make and maintain these records. *Id.* The conflict check system maintained by Arent Fox is designed to include every matter on which the firm is now or has been engaged, the entity for which the firm is now or has been engaged, and in each instance, the identity of related parties and adverse parties as well as the attorney in the firm that is knowledgeable about the matter. *Id.* It is the policy of Arent Fox

---

[8] Silfen is chair of the Bankruptcy and Financial Restructuring Group at Arent Fox. Silfen Declaration, ¶ 1. He is licensed to practice law and a member in good standing of the bar for the State of New York, the United States District Courts for the Southern and Eastern Districts of New York, the State of New Jersey, and the United States District Court, District of New Jersey. Silfen Declaration, ¶ 2. He serves on the Board of Directors of AIRA (the Association of Insolvency & Restructuring Advisors) and is a trustee of the executive committee of the board of trustees of the New York Institute of Credit. *Id.* He has lectured and spoken on retention issues and ethics and professional conduct for bankruptcy attorneys. *Id.*

that no new matter may be accepted or opened within the firm without completing and submitting to those charged with maintaining the conflict check system the information necessary to check each such matter for conflicts, including the identity of the prospective client, as well as related and adverse parties. *Id.* Accordingly, the database is regularly updated for every new matter undertaken by Arent Fox. *Id.*

The Parties-in-Interest which Arent Fox typically submits to its conflict database for an unsecured creditors committee engagement (and indeed the Parties-in-Interest submitted in this case) include:

(a)     The debtor (including former names and aliases) and related entities/parties;

(b)     The debtor's professionals;

(c)     The debtor's secured creditors;

(d)     The debtor's secured lenders;

(e)     The twenty (or in this case, thirty) largest unsecured creditors of the debtor on a consolidated basis; and

(f)     Members of the Creditors Committee.

Silfen Declaration, ¶ 6.

A list of all Parties-in-Interest submitted to the conflict check system is then attached to the declaration filed with the retention application. Silfen Declaration, ¶ 7.

Search results for all Parties-in-Interest submitted to the conflict check system are reviewed by the Partner-in-Charge and included in the declaration (the "Retention Declaration") filed with the retention application. Silfen Declaration, ¶ 8. The conflicts or connections directly relevant to the case are included in the body of the Retention Declaration, along with a detailed explanation of the conflict or connection. *Id.* The conflicts or connections regarding wholly

unrelated matters are listed in an exhibit to the Retention Declaration, along with a brief description of the conflict or connection. *Id.*

As a standard, Arent Fox discloses that it appears in cases, proceedings, and transactions involving a substantial number of different attorneys, accountants, financial consultants, and investment bankers, some of whom now, or may in the future, represent creditors or Parties-in-Interest in these cases. Silfen Declaration, ¶ 9. The understanding is that neither the Court nor the U.S. Trustee is assisted in their duty to review disclosures by disclosures identifying every detail of any possible connection between an individual at Arent Fox and any entity which is or might be involved in the case (for example, disclosing every employee with a bank account at the DIP lender bank). *Id.* Arent Fox recognizes the importance of full disclosure, and understands it has a duty to allow the Court to determine whether a contact is relevant and needs to be disclosed or not, rather than make that decision itself. *Id.* However, Arent Fox also understands that neither the Court nor the U.S. Trustee has the time or resources to investigate vast disclosures so far removed from the case as to be completely irrelevant. *Id.* Certainly, some common sense applies. Arent Fox strives to provide the fullest disclosures without wandering too far afield into the absurd. *Id.*

As a standard, Arent Fox discloses its connection with the United States Trustee and the attorneys for the District in which the case is pending, which appear in every bankruptcy matter in which Arent Fox appears. Silfen Declaration, ¶ 10. Aside from this, Arent Fox has no known connection requiring disclosure with the U.S. Trustee or any of its attorneys. *Id.*

Many attorneys in Arent Fox's bankruptcy group clerked for bankruptcy judges. Silfen Declaration, ¶ 11. When appearing before any of these judges, Arent Fox discloses the connection. *Id.*

Despite it not being the general practice of the bankruptcy bar, Arent Fox routinely discloses connections with proxy holders, agents, or other representatives who sit on the creditors committee or act for a member of the committee. Silfen Declaration, ¶ 12. In these situations, the Partner-in-Charge typically knows who the proxy holders are, and either (a) in the case of a proxy holder known to have held proxies in previous Arent Fox committee engagements, corresponds with the other partners in the bankruptcy group to determine which matters Arent Fox has worked on with the proxy holder and discloses the same, or (b) in the case of a proxy holder not known to have any previous contact with Arent Fox, submits the name of the proxy holder to the conflict check system, and makes disclosures accordingly. *Id.*

In general, under Arent Fox's procedures and protocols, it is required that the Partner-in-Charge take all necessary steps to obtain the names of all "connection" parties involved in the proceeding, run a complete conflict check, review the conflict check, resolve any issues or concerns, and prepare the necessary disclosures and connection declaration. Silfen Declaration, ¶ 13. If any of these steps are handled by an associate or other firm attorney, the Partner-in-Charge must review, check, and approve the process and disclosures. *Id.*

Once completed, the materials with supporting detail are submitted to the chair of the Bankruptcy and Restructuring Group for review, revision, and vetting. Silfen Declaration, ¶ 14. The chair makes revisions where necessary and provides these revisions to the Partner-in-Charge and (when applicable) the associate. *Id.* These revisions can range from typographical and grammatical corrections to wholesale substantive rewrites. *Id.* Many times the chair has meetings or discussions with the Partner-in-Charge or assigned associate to discuss the completeness and adequacy of the disclosures. *Id.*

After the Partner-in-Charge or associate enters the revisions, and the Partner-in-Charge finalizes the documents, they are again provided to the chair for a final review, and if necessary, additional revision. Silfen Declaration, ¶15. This is so that the chair can ensure that all disclosures are proper. *Id.* At this stage, the chair confirms with the Partner-in-Charge that he or she is entirely confident that the documents and the disclosures therein satisfy the requirements of the Bankruptcy Code and Rules. *Id.* If not, we work together to address any remaining issues. If so, I review the documents a final time and ask the Partner-in-Charge if he or she believes the declaration is complete and complies with the Rules and Code before executing and filing it. *Id.*

In its retention application and the accompanying declaration in support (the "Initial Retention Documents"), Arent Fox's Partner-in-Charge for this case, James Sullivan, acted in accordance with the procedures outlined above, and the Initial Retention Documents were filed. Silfen Declaration, ¶ 16.

Of relevance to the issues currently before the Court, Arent Fox disclosed (a) the Committee's intent to engage Dr. Liu as translator, (b) that Dr. Liu was a proxy for a creditor who became a committee member in these cases, (c) that Arent Fox has represented Dr. Liu's company in the past, and (d) that Dr. Liu was involved in previous cases in which Arent Fox was engaged in some capacity. Silfen Declaration, ¶ 17. These disclosures included two cases in which Arent Fox represents or represented a creditors committee and Dr. Liu served as translator, three cases in which Arent Fox represents or represented a creditors committee and Dr. Liu served on the committee as proxy for one or more committee members, and one case in which Arent Fox represents or represented certain creditors who use Dr. Liu as their U.S. representative. *Id.*

In addition, the Initial Retention Documents disclosed that K&L Gates LLP is counsel to a party to whom Arent Fox is currently adverse in an unrelated matter, and that Scouler & Co. is currently adverse to Arent Fox in an unrelated matter. Silfen Declaration, ¶18.

Finally, the Initial Retention Documents indicated that Arent Fox ran the names of creditors Shanghai Hualian Hardware Co., Ltd. ("SHH") and Eastern Accessories Corporation ("EAC") through its conflict check system, and the search turned up no conflicts, as SHH and EAC were not then nor were they ever previously involved with Arent Fox as a client or an adverse party. Silfen Declaration, ¶ 19.

In its first supplemental disclosure [Docket No. 237], Arent Fox disclosed two matters previously overlooked and unintentionally left out of the Initial Retention Documents. Silfen Declaration, ¶ 20. In one matter, Arent Fox represents a creditors committee and Dr. Liu serves as translator. *Id.* In the other matter, Arent Fox represents a creditor for whom Dr. Liu serves as U.S. representative. *Id.*

In its second supplemental disclosure [Docket No. 259], Arent Fox disclosed contacts it had with SHH and EAC before the formation of the Committee. Silfen Declaration, ¶ 21. Arent Fox did not and does not believe that these contacts are connections within the meaning of the Bankruptcy Code and Rules, and therefore, believes these required no more disclosure than already provided in the Initial Retention Documents. *Id.* However, after a conversation with counsel to the U.S. Trustee in which counsel indicated their belief that these contacts needed to be disclosed, Arent Fox filed its second supplemental declaration. *Id.*

Finally, in its third supplemental disclosure [Docket No. 265], Arent Fox expounded on its disclosures regarding K&L Gates LLP and Scouler & Co., indicating that Arent Fox, by virtue of its previous representation of a creditors committee, is a creditor of a liquidating trust for

which Dan Scouler is trustee (a disclosure never provided by Scouler & Co.), and that Arent Fox represented a committee in a case where K&L Gates LLP represented the debtor. Silfen Declaration, ¶ 22.

## Dr. Liu's Other Engagements

Over the past few years, Dr. Liu has participated in seventeen bankruptcy cases and has served as a translator for the creditors committee in ten of those cases. *See* Exhibit A ("Chart Detailing Dr. Liu's Participation in Bankruptcy Cases") to Declaration of Jeffrey N. Rothleder ("Rothleder Declaration"). In the cases in which Dr. Liu served as a translator, three law firms made no disclosure regarding the retention of Dr. Liu or translation services. *Id.* Arent Fox was selected as counsel in three of the Dr. Liu translator cases, and in six of the seventeen total bankruptcy cases. *Id.* All of the other cases involved other law firms. *Id.* Based on a review of the retention applications in all of the cases identified on the Chart, Arent Fox provides the most detailed disclosures regarding the firm's connections to Dr. Liu. Rothleder Declaration, ¶ 6.

## Arent Fox's Other Engagements

Arent Fox has served or is currently serving as counsel to the creditors committee in 69 bankruptcy cases nationwide. *See* Exhibit B to Rothleder Declaration. Of those cases, Arent Fox works with approximately 22 different financial advisory firms and 22 different law firms serving as co-counsel or local counsel. *Id.* Dr. Liu participates or has participated in only six of these cases. *Id.*

## ARGUMENT

**A.    Arent Fox Satisfies the Standard for Retention.**

The retention of committee counsel is governed by 11 U.S.C. § 1103(a), which provides:

> [A] committee appointed under section 1102 of this title with the court's approval
> . . . may select and authorize the employment of such committee of one or more
> attorneys . . . to represent or perform services for such committee.

The only statutory limitation on a committee's right to select counsel of its choice is Section 1103(b), which provides that an attorney employed to represent a committee "may not, while employed by the committee, represent any other entity having an adverse interest in connection with the case." 11 U.S.C. § 1103(b). Moreover, "[r]epresentation of one or more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest." *Id.* Thus, a firm is not disqualified from representing a committee as a result of any representation that predates its employment by the committee, nor is it automatically disqualified if it represents an individual creditor or committee member in addition to the committee. *See In re Enron Corp.*, 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003) (Section 1103(b) is not violated if counsel represented an entity with an adverse interest in a matter that predates proposed committee representation); *In re Nat'l Century Fin. Enters., Inc.*, 298 B.R. 112, 117 (Bankr. S.D. Ohio 2003) (UST's objection to retention of counsel for committee overruled; neither prior representation of debtor nor continued representation of individual committee members were disqualifying conflicts).

The standard under Section 1103(b) for retention of committee counsel is different from the standard for the retention of debtors' counsel under Section 327(a). *See Halbert v. Yousif*, 225 B.R. 336, 346 n. 17 (E.D. Mich. 1998). As this Court noted in *In re eToys, Inc.*, :

> Committee counsel, retained under section 1103, need only show it does not
> represent an interest adverse to the estate; in fact, committee counsel is
> specifically authorized to represent a creditor in the case so long as its interests
> are not adverse to the committee's. 11 U.S.C. § 1103(b). In contrast, debtor's
> counsel, retained under section 327, must establish that it is disinterested, which is
> a higher standard. 11 U.S.C. § 101(14)(E).

331 B.R. 176, 192 n.5 (Bankr. D. Del. 2005); *see also United States v. Schilling (In re Big Rivers Elec. Corp.)*, 355 F.3d 415, 439 (6th Cir. 2004) (same); *In re Firstmark Corp.*, 132 F.3d 1179, 1183 (7th Cir. 1997) (same); *United Steelworkers of Am. v. Lampl (In re Mesta Mach. Co.)*, 67 B.R. 151, 157 (W.D. Pa. 1986) (same). The sole standard, as the statute clearly reflects, is that the professional not represent any other entity having an adverse interest in connection with the case.

The Laster Declaration describes how Arent Fox was selected by the Committee, through a competitive process, to serve as its counsel in these cases. And the Silfen Declaration describes, in detail, how Arent Fox determined that it did not represent any other entity having an adverse interest in connection with the case. Together, these declarations demonstrate affirmatively that Arent Fox satisfies the Section 1103(a) and (b) standard for retention, and that the Committee's selection of Arent Fox as its counsel should be approved.

**B.     The UST Objection Lacks Merit.**

In objecting to Arent Fox's retention by the Committee, the UST does not argue that the standard set forth in Section 1103(a) and (b) is not satisfied; rather, she argues that the Retention Application should be denied because, in her view, Arent Fox failed to make "full and proper disclosure of its connections with creditors in these cases" on a *timely* basis. UST Objection at ¶ 49. Specifically, the UST complains that Arent Fox did not disclose connections with two of the unsecured creditors in these cases, with which it communicated prior to the formation of the Committee. The UST Objection should be overruled based on both the facts and the law.

As an initial matter, even if the UST were right that Arent Fox failed to make a timely disclosure – and she is not – that failure would not be a legitimate basis for denying the Retention Application. The UST does not cite a single case to the contrary – because there is

none. The standard for retention established by Section 1103 simply does not incorporate a disclosure obligation.

This is not to say, of course, that no disclosure obligation exists. Under Fed. R. Bankr. P. 2014(a), the application of a professional seeking to be employed pursuant to Section 1103 "shall state . . . to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." The application is to be accompanied by a verified statement setting forth these facts. *Id.* And a local rule of this Court makes the disclosure obligation a continuing one, requiring that a professional employed "or to be employed" file and serve a supplemental affidavit "[p]romptly after learning any additional material information relating to such employment." Del. Bankr. LR 2014-1(a). Thus, disclosures are clearly required, and here, they were just as clearly made.

Pursuant to the rules, the Retention Application, filed on August 30, 2010, was accompanied by a declaration of Andrew I. Silfen, chair of Arent Fox's bankruptcy practice. Mr. Silfen's declaration, spanning 12 pages (including 4 pages of exhibits), disclosed the firm's process for checking conflicts, the names of the parties-in-interest submitted to the firm's conflict check system, and the firm's relationships with parties-in-interest in unrelated matters. Thereafter, the firm discovered two additional connections that had been overlooked in preparing the initial declaration, and a supplemental declaration was filed and served on September 13, 2010, disclosing these additional connections.

Shortly thereafter, in the course of the discovery relating to the Retention Application, Mr. Silfen learned that, during the period prior to the formation of the Committee, lawyers at Arent Fox had had communications with two Chinese creditors through Dr. Liu, each of whom

had inquiries concerning the Debtors. During a telephone conversation with counsel for the UST, on September 22, counsel opined that these communications constituted a connection that should have been disclosed. Arent Fox did not agree, but nevertheless filed and served a second supplemental declaration, that very same day, to disclose the communications. And on September 29, after further deliberation, Arent Fox determined to expand on its disclosure regarding its connection with Scouler & Co., one of the Debtors' professionals. Accordingly, Arent Fox filed a third supplemental declaration.

As the UST recognizes, the purpose behind Rule 2014(a) is to ensure that all facts relevant to a party's professional qualifications are before the Court, so that the Court can determine whether the connections disqualify the applicant or if further inquiry into the matter is required. UST Objection at ¶ 47. That purpose is fully achieved where, as here, a disclosure is made before the date on which the Court is required to determine whether to approve the applicant's retention. Indeed, the disclosure at issue was also made well in advance of the deadline for objections to the Retention Application.

Significantly (and in contrast to the Debtors, as discussed below), the UST does not allege that any of Arent Fox's disclosures reveal a conflict of interest. Nor does she allege – again in contrast to the Debtors – that Arent Fox is subject to, but not in compliance with, the disinterestedness standard applicable to debtors' counsel under Section 327. Her objection relates solely to the alleged lack of disclosure, as to which she is demonstrably incorrect.

The UST argues that disclosures must be spontaneous and voluntary, and implies that Arent Fox's disclosure of the pre-formation communications with two creditors – which arguably did not require disclosure at all – somehow do not count because they were made subsequent to the initial disclosures. If this were the law, however, there would be no purpose in

Local Rule 2014-1(a), which imposes a continuing disclosure obligation. Instead disclosure would be a jeopardy exercise allowing one and only one disclosure and requiring that it be perfect. The Local Rule obviously recognizes that additional information may come to the attention of a professional after the initial disclosures are made, and requires that the newly-discovered information be disclosed at that time. The very existence of this rule belies the notion that all disclosures must necessarily be made at the outset as a condition to a professional's retention. The common sense rule and practice is that so long as disclosures are made at a time when the other parties and the Court can review and consider them in determining the propriety of a professional's retention, they have been made timely. Indeed, as the Court stated in *In re Fibermark, Inc.*, 2006 WL 723495, at *10 (Bankr. D. Vt. 2006:

> This Court will weigh an applicant's obligation to disclose connections with other professionals and parties in interest in the case – where such connections are not attorney-client relationships, pecuniary relationships, or adversarial relationships – against the burden that this obligation will impose, on a case by case basis. It will continue to rely on the U.S. Trustee and other parties in interest to move for additional disclosure when those parties have reason to believe that the additional level of disclosure is warranted . . .

Here, Arent Fox did not wait for the UST to move for additional disclosures; it promptly filed and served additional disclosures the very same day the UST raised the matter. No more was required.

In short, there is no merit to the UST's contention that Arent Fox made untimely disclosure of its communications, prior to the formation of the Committee, with two of the Debtors' creditors. The disclosure was made, and it was timely. But even if it were otherwise, there would also be no basis for denying the Retention Application; a failure to make a timely disclosure is simply not a basis for denying retention. The UST Objection should, therefore, be overruled.

## C.    The Debtors' Objection Also Lacks Merit.

In their effort to weaken and intimidate the Committee by eviscerating its chosen counsel,

Debtors unleash a fury of reckless, defamatory, and even devious allegations and accusations

that are grounded in neither reason nor fact.  Their tactics begin with lumping together Arent Fox

and Elliott Greenleaf as "Committee Counsel" and then indiscriminately using this term in

describing actions or conduct allegedly engaged in by one or the other of the two firms, in an

effort to make it appear that all such alleged actions or conduct involved both, or in an effort to

make innocent communications appear nefarious.[9]

Despite the dozens of pages of scurrilous rhetoric and irrelevant innuendo, Debtors make

only three contentions in support of their objection to the Retention Application.  They contend

(1) that the Court should not countenance "subversion" of the Model Rules of Professional

Conduct, (2) that Arent Fox is not disinterested, and (3) that Arent Fox failed to disclose

adequately.  None of these contentions have merit.  The ethics argument, which is the most

outrageous, is based on nothing more than haughty speculation that is contradicted entirely by

sworn and uncontroverted testimony.  The "disinterestedness" argument teeters on a

misunderstanding of the law, as well as a misrepresentation of the facts.  And the disclosure

argument, just like that in the UST Objection, similarly finds no support in either law or fact.

For all of the reasons set forth below, the Debtors' Objection must be overruled.

---

[9] One glaring example appears at page 3 of Debtors' Objection, where they quote the email by which Arent Fox forwarded the petition to Dr. Liu, saying a "bunch of Asian creditors,"  The very next sentence reads "Dr. Liu understood this to 'very clearly . . . express a clear intention.  He want – no he hope me to contact Chinese exporters . . . .'" (citing page 243 of Dr. Liu's deposition transcript).  The clear import of this juxtaposition is that Dr. Liu was testifying about the Arent Fox email.  In fact, a review of Dr. Liu's transcript (or ¶¶ 10-11, where Dr. Liu's testimony is repeated yet again) makes it clear that he was testifying about an *entirely different email* from Elliott Greenleaf.

### 1. Arent Fox Has Not Violated Any Ethics Rules.

Debtors contend that Arent Fox violated applicable ethics rules by "utilizing a non-attorney (Dr. Liu) as an intermediary to solicit creditors" on behalf of Arent Fox, with Arent Fox's assistance. Debtors' Objection at ¶ 65. This defamatory allegation is not only baseless, it is also fully controverted by Dr. Liu's sworn testimony.[10]

Dr. Liu testified, without contradiction, that it is his business to advocate for Chinese exporters who do business with U.S. importers, particularly with respect to debt collection issues; that he encourages Chinese participation in the American legal system (including both as creditors in bankruptcy cases and as plaintiffs in direct debt collection litigation); and that he assists his clients in interviewing and securing appropriate U.S. legal counsel to handle their legal and debt collection needs. In this context, he has worked with a full dozen law firms over the past few years in his efforts to assist his Chinese clients, one of which is Arent Fox.

Dr. Liu further testified, again without contradiction, that he received one of the petitions in these cases, including the list of the Debtors' largest 30 creditors, not just from Arent Fox, but from 5 law firms on the day the cases were filed. Of course, as revealed by Arent Fox's initial disclosures, the firm had a prior relationship with Dr. Liu, and accordingly, there was nothing

---

[10] Preliminarily, it is unclear whether there can *ever* be solicitation prior to the formation of a committee; at least some commentators believe that there is no client to be solicited until the committee is formed. *See, e.g.*, Michael P. Richman, *Chasing Committees: The Ethics of Entertainment Solicitation*, 22-8 ABIJ 18, n.1 (2003) ("There is no 'client' until the committee is chosen."). Moreover, because committee members are often sophisticated business entities, a rule restricting attorney solicitations may not withstand First Amendment scrutiny. *See Edenfeld v. Fane*, 507 U.S. 761, 774 (1993) (striking down a Florida statute that prohibited a CPA from soliciting to provide accounting services as violative of the First Amendment, and noting a distinction between clients that are "sophisticated and experienced business executives who understand well the services," as opposed to "an unsophisticated, injured or distressed lay person" such as the individual involved in *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) (the case that upheld an Ohio ban on in-person lawyer solicitation)). Here, however, because there was no prohibited solicitation in any event, the Court need not address these controversial legal issues.

inappropriate about this communication from Arent Fox. Dr. Liu testified that he believed the law firms who sent him the petition to be interested in vying for counsel to the creditors committee in these cases. Yet again, there is nothing improper about seeking to be retained as committee counsel – indeed, the UST invites and organizes this process. Thereafter, Dr. Liu set out to contact several of the creditors on the list, but not on behalf of Arent Fox or any other law firm that sent him the petition – rather, he contacts creditors solely in furtherance of his own business. In fact, in his efforts to track down creditors, he relied primarily on the UST and Debtors' counsel, and it was ultimately Debtors' counsel who provided him with the necessary contact information. Despite the Debtors' insinuations, Dr. Liu *never* testified that he had any arrangement with Arent Fox, or that he was directed by Arent Fox to solicit creditors, or that he was beholden to Arent Fox in any way. To the contrary, Dr. Liu testified that in his conversations with those creditors he focused his energy on educating them as to the American process and their options, and never even mentioned the name of a single law firm that might be available to assist them.[11]

### 2. Arent Fox's Retention Is Not Barred by the Disinterestedness Standard.

As this Court recognized in *eToys*, 331 B.R. at 192 n.5, the disinterestedness standard is inapplicable to the retention of committee counsel. Debtors' Objection on this ground may, therefore, be overruled on this basis alone. Debtors' Objection on this ground is also fatally flawed, because no facts exist to show that Arent Fox is *not* disinterested.

Debtors' assertion to the contrary is premised on an imagined *quid pro quo* arrangement that they allege somehow gives rise to a conflict of loyalties, and on communications that took place prior to the formation of the Committee, which Debtors speciously assert were adverse to

---

[11] Significantly, the UST, who is expressly charged with the duty to monitor retention applications, and whose counsel participated fully in the discovery conducted in this case, has not objected on this basis.

the interests of the body of unsecured creditors as a whole. Neither allegation withstands scrutiny.

There are no facts demonstrating any kind of *quid pro quo* relationship between Dr. Liu and Arent Fox; the record evidence, in fact, demonstrates otherwise. Debtors assert that Dr. Liu assists Arent Fox in procuring a lucrative creditors' committee engagement, and in return, profits from the arrangement in a number of ways. But this simply is not what the testimony shows. Dr. Liu does not operate his business to "assist" or "benefit" Arent Fox in any way. He is a creditors' rights advocate and makes it abundantly clear that his sole motivation is to further his business assisting Chinese exporters in their relationships with U.S. importers. Moreover, he consistently strives to involve several law firms in his efforts under the theory that more competition among lawyers – both in terms of substantive and strategic ideas and in terms of billing rates – is better for his clients. He never makes up his mind what law firm to support until he has heard all the proposals and evaluated what each firm has to offer in a given case. Even here, Dr. Liu decided to support Arent Fox only in the last and final round of interviews when only two firms remained.

Debtors speculate as to several sources of alleged compensation flowing to Dr. Liu as part of the *quid pro quo* arrangement. They suggest, for example, that his employment as a translator is part of the deal. But the facts show that while Dr. Liu is sometimes retained as a translator by committees for which Arent Fox is serving as counsel, there are numerous other occasions when he is not. Likewise, the facts show that Dr. Liu is also regularly retained as a translator by committees for which other firms are serving as counsel. Quite simply, as a speaker of Mandarin Chinese experienced in U.S. bankruptcy proceedings and familiar with law firms and other relevant professional service providers, Dr. Liu provides a unique and valuable service

to committees with Chinese members; his retention under these circumstances in no way warrants the scurrilous inference Debtors seek to draw. At bottom, Dr. Liu's employment as a translator is not dictated by and could not be guaranteed by Arent Fox – it is the committees who make the determination whether and which types of professionals to employ.

Similarly, Debtors falsely allege that Dr. Liu profits from the Chinese creditors he represents, despite his sworn testimony that he does *not* pursue paid retention from any creditor in a case in which he is retained as a translator, and his further detailed testimony about how he assisted EAC in acquiring its own legal counsel to assist it in filing claims in these cases, precisely because he could not serve as its representative while also serving as the Committee's translator. Debtors' next assertion – that Dr. Liu profits by being provided "free legal advice" for his Chinese creditors – is illogical on its face, as is their final allegation that Dr. Liu profits because Arent Fox – which has to make use of a translator because its bankruptcy lawyers do not speak Chinese – somehow recommends him to Chinese creditors. None of these accusations is supported by a single fact, and all of them are contradicted by Dr. Liu's testimony. Quite simply, no *quid pro quo* arrangement exists.

The facts demonstrate unequivocally that Dr. Liu has relationships with numerous law firms – he is in no way tied exclusively to Arent Fox – and that Arent Fox, which handles many committee cases, likewise has relationships with numerous other professionals, and is in no way tied exclusively to Dr. Liu. In fact, when Debtors' arguments regarding Dr. Liu are shorn of their garish perversity, there is nothing left, and certainly, their "facts" are entirely insufficient to establish that Arent Fox is not disinterested.

There is likewise no basis for the assertion that the pre-formation communications between Arent Fox and two of the Debtors' creditors cause Arent Fox to have an interest adverse

to the creditors as a whole. As an initial matter, the questions posed by these two creditors (that they had a shipment on its way to the Debtors and did not know what to do about it) is the kind of question all kinds of bankruptcy professionals – accountants and financial advisors, as well as lawyers – receive with the filing of virtually every new bankruptcy case. And the wholly innocuous response (that they would have a claim in the bankruptcy, but should contact the Debtors to ask if they would accept the shipment) surely does not require a law degree.

The adverse interest test in Section 1103(b) is clear – a professional has a disqualifying interest *if and only if* he represents another entity having an adverse interest in connection with the case *while employed by the committee*. These communications, which took place prior to the Committee's formation, plainly do not run afoul of this test. Moreover, since the statute itself expressly provides that "[r]epresentation of one or more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest," 11 U.S.C. § 1103(b), there is also no basis for Debtors' assertion that the interest of these creditors was adverse. Indeed, one of them – EAC – was subsequently selected to serve on the Committee. Consequently, there clearly is no basis here on which to deny Arent Fox's retention due to a lack of disinterestedness.[12]

### 3. Arent Fox Has Made Full and Timely Disclosure.

Like the UST, Debtors contend that Arent Fox failed to make timely disclosures. And for all of the same reasons discussed above that the UST's Objection must be overruled, the Debtors' Objection on this ground must also fail. Arent Fox made full and complete disclosure of all of the matters about which both the UST and the Debtors complain, and it did so on a timely basis.

---

[12] Here again, the UST has not objected on this basis, giving rise to the reasonable inference that the UST agrees that the facts do not support a lack of disinterestedness.

# CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court enter an Order granting the Committee's application to retain Arent Fox as Committee counsel and such other and further relief as this Court deems just and appropriate.

Dated: Wilmington, Delaware
October 5, 2010

Proposed Counsel for the Official Committee of Unsecured Creditors of Universal Building Products, Inc., *et al.*

By: _____
Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Shelley A. Kinsella (DE Bar No. 4023)
ELLIOTT GREENLEAF
1105 N. Market Street, Suite 1700
P.O. Box 2327
Wilmington, DE 19899
Tel: (302) 384-9400
Fax: (302) 656-3714

- and -

Andrew I. Silfen
ARENT FOX LLP
1675 Broadway
New York, NY 10019
Tel: (212) 484-3900
Fax: (212) 484-3990

- and -

Carol Connor Cohen
Caroline Turner English
Jeffrey N. Rothleder
ARENT FOX LLP
1050 Connecticut Avenue NW
Washington, DC 20036
Tel: (202) 857-6000
Fax: (202) 857-639