## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                    )    Chapter 11
                                          )
UNIVERSAL BUILDING PRODUCTS,              )    Case No. 10-12453 (MFW)
                                          )
               Debtor.                    )    Jointly Administered
_____         )

### MEMORANDUM OPINION[1]

Before the Court are the Applications of the Official
Unsecured Creditors' Committee (the "Committee") to retain Arent
Fox LLP ("AF") and Elliot Greenleaf & Siedzikowski, P.C. ("EG")
as counsel (collectively the "Committee Retention Applications").
The Committee Retention Applications are opposed by the United
States Trustee (the "UST") and the Debtors.  For the reasons set
forth below, the Committee Retention Applications will be denied.

I.    GENERAL CASE BACKGROUND

On August 4, 2010, Universal Building Products, Inc., and
several of its affiliates (collectively, the "Debtors") filed
voluntary petitions for relief under chapter 11 of the Bankruptcy
Code.  At the same time the Debtors filed a motion to approve a
sale of substantially all of their assets to their pre-petition
lenders (the "Lenders") and a motion for approval of DIP

_____

[1]  This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052, which is made applicable to contested
matters by Federal Rule of Bankruptcy Procedure 9014.

financing to allow for the sale process to continue with a projected sale hearing date in early September. At the first day hearing held on August 5, 2010, the Court set a hearing for August 23, 2010, to consider the Debtors' request for bid procedures related to the sale motion.

On August 13, 2010, the UST held an organizational meeting to determine whether there was sufficient creditor interest to form a Committee. At that time a Committee was formed and it selected AF and EG as counsel. The Committee Retention Applications were filed on August 24 and 30, 2010.

In the interim, on August 19, 2010, the Committee filed preliminary objections to the motions for approval of the sale procedures and the final DIP financing. The Committee also filed an emergency motion seeking to prohibit the Lenders from credit bidding at the proposed sale. At the August 23 hearing on the DIP financing and sale procedures motions, a global settlement among the Debtors, the Committee and the Lenders was announced pursuant to which the sale to the Lenders would proceed, with a sale hearing scheduled for September 7, 2010. (Tr. 8/23/10 at 5-6.)[2] In exchange, the Lenders would allow any excess funds from

---

[2] References to the record are as follows: "Tr. [date] at" refers to the transcript of the hearing held on the referenced date; "Liu Dep." refers to the transcript of the deposition of Dr. Haishan Liu held on September 17, 2010; "Ex. L-[#]" refers to the Liu deposition exhibits; "Ex. [letter]" and "Ex. [#]" refer to the exhibits of the Committee and the Debtors, respectively, admitted into evidence at the October 7, 2010, hearing.

the DIP budget and the avoidance actions to be transferred to a liquidating trust for the benefit of the unsecured creditors pursuant to an agreed plan of reorganization. (Id.) After additional notice and hearing, the Court approved the proposed procedure and ultimately the sale was approved on September 7, 2010.

On September 3, 2010, the Debtors filed an emergency motion to compel discovery related to the Committee Retention Applications. The Debtors sought discovery, inter alia, of the relationship between proposed counsel for the Committee and Dr. Haishan Liu whom the Committee had retained as a translator.[3] The Court did not grant the Debtors' motion to expedite the hearing on the emergency motion but noted at the sale hearing held on September 7, 2010, that the motion appeared to be premature because no discovery had even been served. (Tr. 9/7/10 at 8.)

In the interim, the global settlement apparently fell apart. When the Committee filed an objection to the Debtors' emergency motion to compel discovery on September 6, 2010, it also filed an emergency motion for the appointment of a chapter 11 trustee and to terminate the Debtors' exclusivity contending that the Debtors

_____

[3] No separate application was filed with respect to Dr. Liu's retention. Rather, in the application to retain AF, the Committee sought approval of Dr. Liu's retention and payment of his fees subject to section 503(b)(3)(F). (See proposed form of order attached to AF retention application.)

3

had filed a plan and disclosure statement on August 31, 2010, which did not comply with the parties' agreement. On September 30, 2010, the Committee filed an objection to the Debtors' disclosure statement. Most recently, on October 27, 2010, the Committee filed an emergency motion to convert these cases to chapter 7, inter alia, because the Lenders have now taken the position that the Debtors are in default of the DIP financing budget and Order and the Lenders, therefore, are under no obligation to fund a plan of liquidation.

On September 16 and 30, 2010, the UST filed an objection and supplemental objection to the Committee Retention Applications contending that counsel's disclosures under Rule 2014 were incomplete. On September 30, 2010, the Debtors filed an omnibus objection to the Committee Retention Applications contending that proposed counsel had (1) violated the applicable Codes of Professional Conduct by having Dr. Liu solicit creditors to serve on the Committee and give him their proxy so that he could vote for counsel in exchange for being retained as a translator by the Committee and (2) violated the applicable provisions of the Bankruptcy Code and Rules by failing to disclose adequately their relationship with Dr. Liu.

A hearing was held on October 7, 2010, to consider the Committee Retention Applications and objections. After hearing

evidence, the Court took the matter under advisement.[4]  The

parties filed post-trial briefs on October 21, 2010.  The matter

is now ripe for decision.


II.  FACTUAL BACKGROUND RELEVANT TO RETENTION MOTIONS

As a result of the evidence presented, including the

deposition of Dr. Liu and testimony of representatives of the

respective firms proposed to be retained by the Committee, the

Court finds that the following occurred between the filing of the

Debtors' petition on August 4, 2010, and the Committee formation

meeting on August 13, 2010.

On the day the Debtors filed their bankruptcy petitions,

attorneys at both AF and EG faxed copies of the petitions and the

list of the thirty largest creditors to Dr. Liu.[5]  (Liu Dep. at

_____

[4]  At the hearing on the Committee Retention Applications in
this case, the Debtors moved into evidence pleadings filed in
bankruptcy cases in Texas in which it was alleged that AF had a
financial advisor, with which it had a relationship, solicit
creditors for proxies to serve on the creditors' committee for
the purpose of supporting AF as counsel to the committee.  The
Committee filed a motion to strike the Debtors' references in
their pleadings to those unrelated cases and opposed the
admission of those pleadings into evidence in this case on
numerous grounds.  The Court took that issue under advisement as
well.  (Tr. 10/7/10 at 105-08.)  Because the Court finds that it
is not necessary to consider those pleadings to sustain the
Debtors' objection, the Court finds it unnecessary to consider
whether those pleadings are admissible.

[5]  EG sent additional information about its analysis of the
case to Dr. Liu and to several other clients and contacts known
to have relationships with foreign entities.  (Tr. 10/7/10 at 68-
69, 96.)

51-52; Exs. L-2, L-23.)  Dr. Liu testified that he received the same information from three other law firms that same day.  (Id.) Dr. Liu's main business is as an authorized distributor for Fujifilm, but he also consults with Asian creditors who may have a collection problem in the United States.  (Id. at 11-12.)  Each of the firms who sent the information to Dr. Liu had a prior relationship with him, representing him or his Asian clients in collection or preference cases.  (Id. at 115-20; Tr. 10/7/10 at 69.)  Several had worked with him in cases where they served as Committee counsel while he acted as a translator or a representative of an Asian creditor.  (Liu Dep. at 115-20.)

Dr. Liu understood that counsel were sending him the information because they were interested in making a pitch for the Committee representation in this case.  (Liu Dep. at 50-51, 58, 70, 134.)  AF emailed Dr. Liu "[w]e are definitely interested in pursuing this case."  (Ex. L-19; Tr. 10/7/10 at 45-46.)  The attorney at EG emailed "I am sending this to you first in order to get your support early.  I would like to pitch this as lead or co-counsel - no more local."  (Ex. L-23.)

At the time of the bankruptcy filing, neither AF nor EG had any prior relationship with any of the Asian creditors.  (Tr. 10/7/10 at 39-40, 84-85.)  Nor did AF or EG have any knowledge that Dr. Liu had a relationship with any of those creditors. (Id. at 40, 85-87.)  In fact, Dr. Liu did not represent any of

the creditors on the creditor list at the time it was sent to
him.  (Liu Dep. at 46-51, 83, 155.)

In response to the information sent to him by AF and EG on
August 4, 2010, Dr. Liu responded by email "As usual, at this
probing stage, let's find out what those Asian creditors are
going to respond and their representation status in the USA prior
to the petition."  (Ex. L-2.)  Dr. Liu further noted that AF and
EG "desire me to get a certain support from Asian Chinese
exporters who might recommend [Dr. Liu] as a pending committee
member in the case. . . .  Before recommending you, I need some
one and some groups to commend me to one or more of those
prospective committee participants."  (Ex. L-27.)  Dr. Liu noted
that "the grand cultivation of a support base from Chinese
exporters" was "an invaluable asset."  (Id.)

Notwithstanding having no relationship with the Asian
creditors on the list, Dr. Liu made extensive efforts to contact
them to educate them about the intricacies of the United States
Bankruptcy Code and to see if they would give him a proxy to
represent them at the Committee formation meeting.  (Id. at 42-
43, 46-51, 71-72, 74-78, 83-85.)  Throughout this process, Dr.
Liu sent almost daily emails to AF and EG reporting on his
efforts to locate creditors on the list and get their proxies.
(Ex. L-3, L-7, L-8, L-9, L-18; Tr. 10/7/10 at 89-90.)  The AF
partner involved in this process emailed Dr. Liu "Let me know if

you need any assistance." (Ex. A at HL-391.) In fact, AF did assist Dr. Liu in his efforts to find contact information for the creditors.[6]

While seeking to persuade the creditors to give him their proxies, Dr. Liu asked AF and EG for legal advice regarding the creditors noting that "getting a proxy is a two way traffic." (Liu Dep. at 78-81, 210-18; Ex. L-17, L-18.) The questions related specifically to how the creditors could improve their chances of getting paid for product in transit. (Liu dep. at 213, 216-18; Tr. 10/7/10 at 50-51.) AF advised Dr. Liu that the creditors could claim administrative status for that product under section 503(b)(9). (Liu Dep. at 213, 216-18; Ex. L-17.)

Ultimately, Dr. Liu was "rewarded" for his efforts when two of the creditors, Eastern Accessories Corporation ("EAC") and Shanghai Hualin Hardware ("SHH"), agreed to give him their proxies. (Liu Dep. at 83, 227-28; Exs. L-8, L-22.) When Dr. Liu reported that he had secured the representation of SHH, AF responded "Excellent. That is great. Thanks." (Ex. L-10.) Dr. Liu reported to AF and EG that "I'll hold the proxy [for the

---

[6] Dr. Liu asked AF to contact the Debtors' counsel or the UST to obtain contact information for the fourth largest creditor, but AF advised him that neither would give an attorney that information. Instead, AF recommended that Liu call them directly and gave him their phone numbers. (Tr. 10/7/10 at 41-42; Ex. L-4, L-5, L-6.) In addition, an attorney at AF forwarded to Dr. Liu an address for one of the creditors that he had obtained through an internet search. (Ex. L-11.)

larger creditor, EAC] to cheer everyone up.  I strongly suggest
[AF] may co-pitch with his colleagues."  (Ex. L-22.)

Because he felt that the UST would not allow him to act as a
proxy for both creditors, Dr. Liu decided to act as proxy only
for the larger creditor, EAC, because he felt it was more likely
to get on the Committee.  (Id. at 74, 86, 227-28.)  Dr. Liu asked
AF and EG to get him a "reliable" person to hold the proxy for
SHH.  (Liu Dep. at 164-65; Ex. L-12.)  EG responded that it could
"call in a favor" and recommended a person to whom EG had
recently referred business and noted that the person was not
interested in making a pitch for business from the Committee (as
a financial advisor) and that he "knows the rules and will serve
us well."  (Tr. 10/7/10 at 90, 93-94; Ex. L -14.)  AF was aware
of the recommendation and approved it.  (Liu Dep. at 171-72; Exs.
L-13 & L-15; Tr. 10/7/10 at 44.)  EG also sent Dr. Liu a form of
proxy that it said complied with the UST's requirements.  (Exs.
L-30, L-35; Tr. 10/7/10 at 79, 92.)

EG advised Dr. Liu that the UST would ask the proxy holder
questions about how it was obtained and would disqualify the
holder if he had not actually communicated with the creditor
before the committee formation meeting.  (Exs. L-14, L-28.)  This
comported with Dr. Liu's experience.  (Liu Dep. at 182.)  As a
result, a conference call was arranged among SHH, Dr. Liu, AF,
EG, and the proxy holder to discuss whether the creditor wished

to give its proxy.  (Liu Dep. at 200-03; Tr. 10/7/10 at 45, 78, 90-91.)

The proxies that Dr. Liu obtained included the right to vote on the creditors' behalf for counsel for the Committee.  (Liu Dep. at 84-85; Ex. L-14.)  Dr. Liu did not discuss with the creditors which professionals he would support; the proxies gave him the discretion to decide.  (Id. at 86, 313.)

At the Committee formation meeting, EAC (whose proxy Dr. Liu held) was chosen by the UST to serve on the Committee.  (Tr. 10/7/10 at 79.)  After it was formed, the Committee interviewed attorneys and financial advisors.  Ten law firms, including AF and EG, gave presentations seeking to be retained as counsel for the Committee.  (Id. at 80; Liu Dep. at 311-12.)  Liu told the other Committee members that he had had dealings in other cases with AF and EG and the other law firm that was a finalist.  (Tr. 10/7/10 at 11.)  However, Dr. Liu did not advise the other members of the Committee of the email and other communications he had had with AF and EG leading to the formation meeting.  (Id. at 16.)  AF and EG were ultimately chosen as counsel by unanimous vote.  (Id. at 15-16.)

Thereafter, on AF's recommendation, the Committee decided to hire Dr. Liu as a translator so that EAC could participate in Committee meetings.  (Id. at 14.)  Dr. Liu advised EAC that, in light of his retention as a translator, he could no longer act as

its representative on the Committee and referred it to another attorney he knew.  (Liu Dep. at 87-88.)  However, no one advised the Co-Chair of the Committee that Dr. Liu was no longer acting as EAC's representative on the Committee.  (Tr. 10/7/10 at 14-16.)

On August 30, 2010, the Committee filed the Committee Retention Applications.  In its retention application, AF filed a declaration disclosing that (1) at AF's recommendation, Dr. Liu had been selected by the Committee to serve as a translator for the Committee and (2) AF had been involved in many cases where Dr. Liu served as a translator for the creditors' committee or acted as a representative of a creditor on the committee.  (Ex. D at ¶ 11.)  The declaration also disclosed that Dr. Liu had held a proxy for a creditor in that case.  (Id.)  On September 13, 2010, AF filed a Supplemental Declaration identifying two additional cases in which it was involved where Dr. Liu was the committee translator or a creditor representative, one of which had happened very recently.  (Tr. 10/7/10 at 37; Ex. E.)  On September 22, 2010, AF filed a Second Supplemental Declaration advising that it had "contacts" with EAC and SHH through Dr. Liu and that those creditors had "inquiries relating to the Debtors." (Tr. 10/7/10 at 38; Ex. F.)  There was no revelation, however, as

to the content of those communications.[7]

Attached to its retention application, EG's original Affidavit did not reveal any connection with Dr. Liu, EAC or SHH. (Ex. O; Tr. 10/7/10 at 97-98.)  In a Supplemental Affidavit filed on September 15, 2010, EG revealed it had been involved in a number of cases in which Dr. Liu was involved as a translator or creditor representative.  (Ex. P.)  In a Second Supplemental Affidavit, filed on September 23, 2010, EG revealed that it had had contacts with Dr. Liu and EAC and SHH prior to the formation meeting, including providing a proxy and introducing a proxy holder for SHH.  (Ex. 52.)

At the hearing, the Committee offered a declaration which contained a chart of all seventeen bankruptcy cases in which Liu had been involved.  (Exs. J & K.)  AF had been counsel to the Committee in six of those cases, Lowenstein Sandler had been counsel in five, and six different firms had been counsel in the other six cases.  (Tr. 10/7/10 at 16-19; Ex. K.)  A second chart detailed the seventy bankruptcy cases in which AF had been counsel to the committee since 2003.  (Ex. M.)  Dr. Liu was involved in only six of them.  (Id.)  If one considers only the cases since June 4, 2008, when Dr. Liu apparently first became involved in bankruptcy matters with AF, however, there are

_____

[7] On September 29, 2010, AF filed a Third Supplemental Declaration regarding an unrelated connection with the Debtors' CRO.  (Ex. G; Tr. 10/7/10 at 38.)

twenty-seven cases in which AF served as committee counsel including three in which Liu served as translator for the committee and three in which Liu acted as a representative of committee members.  (Exs. K, M.)


III.  <u>JURISDICTION</u>

The Court has jurisdiction over this matter which is a core proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A) & (O).


IV.  <u>DISCUSSION</u>

A.  <u>Standing</u>

As a preliminary matter, EG asserts that the Debtors have no standing to object to the Committee Retention Applications because they have no interest in whom the Committee chooses to represent them.  Specifically, EG argues that to have standing to be heard on the issue presented in this case the Debtors must show that resolution of the issue will diminish the Debtors' property, increase their burdens, or impair their rights.  <u>See, e.g.</u>, <u>In re ANC Rental Corp.</u>, 2003 U.S. App. LEXIS 2159, at *7 (3d Cir. Dec. 13, 2002); <u>Newspaper & Mail Deliverers' Union</u>, 1991 U.S. Dist. LEXIS 16337 (S.D.N.Y. Nov. 12, 1991).

The Court rejects this argument.  Section 1109 expressly grants the Debtors the right to appear and be heard on any issue in their cases.  11 U.S.C. § 1109.  In addition, any attorney

with knowledge of a violation of applicable rules of professional conduct by another may be obligated to report that violation.[8] Therefore, the Court finds that the Debtors do have standing to object to the Committee Retention Applications.

B.   Violation of Rules of Professional Conduct

The Debtors contend that the Committee Retention Applications should be denied because proposed Committee counsel violated the applicable rules governing attorney conduct. Specifically, the Debtors cite Rule 7.3 of Delaware's Rules of Professional Responsibility which provides:

> A lawyer shall not by in-person, live telephone or real-time electronic contact solicit professional employment from a prospective client when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain, unless the person contacted: (1) is a lawyer; or (2) has a family, close personal, or prior professional relationship with the lawyer.

Del. Lawyers' R. of Prof. Cond. 7.3.  This rule is identical to Rule 7.3 of the Model Rules of Professional Conduct.  Rule 7.3 of the New York Rules of Professional Conduct is similar: "[a] lawyer shall not engage in solicitation by in-person or telephone contact, or by real-time or interactive computer-accessed communication unless the recipient is a close friend, relative,

---

[8]  Rule 8.3 Reporting Professional Misconduct provides that: (a) A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority.

former client or existing client. . . ."

The comments to Rule 7.3 make it clear that a lawyer is also prohibited from using another as an intermediary to solicit prospective clients.  The Annotations to Model Rule 7.3 provide:

> Lawyers may not use other people to solicit for them, and Rule 7.3 is sometimes invoked along with either Rule 7.2(b) (prohibiting paid recommendations) or Rule 8.4 (prohibiting use of third parties to violate Rules) to prohibit the practice.  See, e.g., In re O'Keefe, 877 So. 2d 79 (La. 2004) (lawyer disbarred for paying "runners" to find and refer personal injury cases); Miss. Bar v. Turnage, 919 So. 2d 36 (Miss. 2005) (lawyer suspended for hiring former insurance salesperson to solicit clients for potential class suit against insurer); Md. Ethics Op. 98-30 (1988) (lawyer may not have bail bondsman pass out bondsman's business cards with lawyer's contact information printed on back); see also Cincinnati Bar Ass'n v. Rinderknecht, 679 N.E.2d 669 (Ohio 1997) (lawyer indefinitely suspended for setting up direct marketing service to solicit accident victims as clients for himself and chiropractor; decided under Ohio Code); cf. Crook v. State, No. 08-020003820CR, 2005 WL 1539187 (Tex. App. June 30, 2005) (lawyer convicted of felony barratry for hiring chiropractor's assistant to solicit auto accident victims; court invokes Rules 7.3 and 8.4 in analyzing offense).

Annotations to ABA-AMRPC Rule 7.3.  See also Thomas E. Ray, Solicitation of Clients: Are There Any Guidelines?, 21 NOV Am. Bankr. Inst. J. 12 (2002) (suggesting that direct solicitation by phone or in person of creditors on the debtor's schedules by counsel hoping to be retained as counsel to the committee was unethical).

AF and EG argue that the Rule cannot be constitutionally applied to them to prohibit their activities in this case.  They

argue that, because committee members are often sophisticated business entities, restricting attorney solicitations to them runs afoul of the First Amendment.  See, e.g., Edenfeld v. Fane, 507 U.S. 761, 774-75 (1993) (striking Florida statute which prohibited CPAs from directly soliciting accounting clients and noting that business clients are different from the "unsophisticated, injured or distressed lay person" often targeted by attorney's solicitations).  See also Samuel L. Bufford, Attorney Solicitation of Legal Work in Business Settings, County Bar Update, Vol. 26, No. 4 (April 2006) (arguing that California's disciplinary rule prohibiting direct solicitation of prospective unrelated clients by attorneys in the business context is unconstitutional).

The Court disagrees.  The issue in this case is not the propriety of written "advertising" issued by AF and EG.  In fact, the Court finds nothing wrong with AF and EG sending the list of creditors to their clients and contacts with whom they have a professional relationship.  Nor does the Court object to EG's sending its "analysis" of the Debtors' case to those same entities.  See generally Michael P. Richman, Chasing Committees: the Ethics of Entertainment Solicitation, 22 OCT Am. Bankr. Inst. J. 18 (2003) (noting that written solicitation of prospective clients - giving counsel's qualifications - is permissible but that entertainment solicitation - wining and dining prospective

committee members before the formation meeting - was unethical).

What the Court finds improper in this case is that once AF and EG learned that Dr. Liu did not represent any creditor on the list, they actively encouraged and assisted him in his efforts to solicit creditors to get their proxies to attend the formation meeting and vote for counsel. The Supreme Court has expressly held that state bar associations may prohibit direct oral communications with prospective clients by an attorney or by someone on his behalf. Ohralik v. Ohio Stat Bar Ass'n, 436 U.S. 447, 464-66 (1978) (upholding states' right to prohibit direct solicitation by attorneys given states' compelling interest in preventing abuses and significant potential for harm to prospective clients by attorneys "trained in the art of persuasion"). That precedent has not been changed in the business context. Further, the Court finds it particularly unwise to change it in the context of this case. In this case the prospective clients who were solicited were foreign creditors unfamiliar with our bankruptcy laws and particularly with the system of forming creditors' committees. They are no less vulnerable to direct solicitation by someone on behalf of an attorney than an individual.[9]

---

[9] In fact, Dr. Liu himself (a sophisticated businessman who is familiar with our bankruptcy laws and procedures) said he felt uncomfortable when attorneys sent him emails and approached him at formation meetings asking for his support. (Liu Dep. at 205-09, 271.) Dr. Liu also complained that many proxy holders only

Further, the practice at issue here has been a matter of criticism under the Act and the Bankruptcy Code was enacted to change some of those practices (or at least to shed some light on them by requiring disclosures).  See, e.g., H.R. No. 595, 95th Cong., 2d Sess. 93, reprinted in 1978 U.S. Code Cong. & Ad. News 6054 (criticizing the practice of "creditors' attorneys with proxies participat[ing] actively in the election of the members of the committee in order that they may be selected as counsel to the committee" which "is a lucrative position."). Cf. In re ABC Auto. Prods. Corp., 210 B.R. 437, 443 (Bankr. E.D. Pa. 1997) (criticizing committee counsel for using members' proxies to conduct committee business without any input from committee members).

AF and EG argue further, however, that their activity did not violate any ethical rule.  At the hearing on the instant motion, the partner at AF leading the engagement testified that he never asked Dr. Liu to solicit clients for AF or creditors to serve on a creditors' committee "on behalf of AF."  (Tr. 10/7/10 at 23.)  He explained the language in his emails thanking Dr. Liu for his efforts and asking if he needed any assistance as simple

---

showed up at the formation meeting (ostensibly to vote for professionals) and then never participated in the case again. (Id. at 208.)  Ironically, that is exactly what Dr. Liu himself did; he directly solicited EAC and SHH for their support with the intention of only representing them at the formation meeting and not thereafter.

common courtesy.  (<u>Id.</u> at 27-28.)  He further denied having any discussion with EG regarding what they expected Dr. Liu to do for them, other than to allow them to demonstrate that they were the best firm for the Committee to hire.  (<u>Id.</u> at 28-29.)  The partner in charge of the EG engagement also denied that he asked Dr. Liu to solicit any clients on its behalf and also stated that he was just hoping for a recommendation and "a fair shot to go in and present our case as to why we should be Committee counsel." (<u>Id.</u> at 72, 81-82.)  EG also denied offering Dr. Liu or the proxy chosen for SHH anything of value for voting for them.  (<u>Id.</u> at 82.)  Both firms vehemently denied asking Dr. Liu to solicit creditors for them.

The Court finds that the evidence proves otherwise and finds that, in fact, AF, EG and Dr. Liu were acting in concert to cold-call creditors that Dr. Liu did not represent for the purpose of being retained by them to attend the Committee formation meeting and to cast a proxy in favor of AF and EG for counsel.  This is demonstrated by the following facts: (1) as a result of the communications between Dr. Liu, AF and EG, it was clear to counsel that Dr. Liu did not represent any of the creditors at the time he first endeavored to contact them; (2) Dr. Liu kept AF and EG apprised (on at least a daily basis) of his efforts to locate and obtain proxies from the creditors and noted that he would act "as usual" in doing so; (3) Dr. Liu asked for

assistance in locating the creditors and AF provided advice and some assistance; (4) Dr. Liu expressly stated that he understood that counsel wanted him to get "support" from the creditors and that they were interested in serving as Committee counsel; (5) to persuade the creditors to provide proxies, Dr. Liu asked for (and AF provided) legal advice relevant to those creditors' rights as part of the "two way traffic;" (6) Dr. Liu asked for a nominee to serve as a proxy for one of the creditors and EG made a recommendation (approved by AF) of someone who "will serve us well;" (7) when Dr. Liu got EAC's proxy he said he would serve as the proxy which would "cheer everyone up" and that AF and EG should definitely make a pitch for the Committee now; (8) both AF and EG were on the conference call with one of the creditors, SHH, to discuss the case and persuade it to execute a proxy; (9) Dr. Liu did vote the EAC proxy in favor of AF and EG at the committee formation meeting; and (10) AF immediately recommended that the Committee retain Dr. Liu as a translator.

AF and EG note, however, that they were not the only attorneys seeking Dr. Liu's assistance or asking him to vote any proxies he held for them as counsel. Rather than excusing the behavior of AF or EG, however, it simply evidences that others may not be complying with the rules either.[10]  The Court is only

---

[10]  In fact, Dr. Liu testified that counsel for the Debtors had approached him at an organizational meeting of creditors in another case ostensibly to get his support when he made a pitch.

able to address the issue before it: the conduct of AF and EG. The Court would caution other counsel who observe violations of the Rules of Professional Responsibility or Model Rules of Professional Conduct in other cases to bring it to the Court's attention for proper action.  See Rule 8.3 of the Model Rules of Professional Conduct.  See generally Thomas E. Ray, Solicitation of Clients: Are There Any Guidelines?, 21 NOV Am. Bankr. Inst. J. 12 (2002) (noting that attorneys who are aware of ethical violations are obligated by Model Rule 8.3(a) to report such violations).

Therefore, the Court concludes that there are sufficient facts to suggest that AF and EG did violate Rule 7.3 and Rule 8.4 of the Model Rules of Professional Conduct and of Delaware's Rules of Professional Responsibility.  The Court finds this conduct sufficient reason to disqualify AF and EG from serving as counsel to the Committee in this case.  See, e.g., In re Vanderbilt Assocs., Ltd., 117 B.R. 678, 680 (D. Utah 1990) (noting that ethical rules apply to question of whether an attorney can be employed pursuant to § 327 of the Bankruptcy Code); Berger McGill, Inc. v. Capozzoli (In re Berger McGill, Inc.), 242 B.R. 413, 423 (Bankr. S.D. Ohio 1999) (disqualifying law firm from representing debtor in action against creditor/former client where creditor had previously consulted

(Liu Dep. at 314.)

and provided confidential information to counsel about the
subject of the law suit); <u>In re Soulisak</u>, 227 B.R. 77, 80 (Bankr.
E.D. Va. 1998) ("Attorneys who practice before a bankruptcy court
must not only concern themselves with the obligations set forth
in the Bankruptcy Code and the Federal Rules of Bankruptcy
Procedure, but also with the application of state ethical
rules."); <u>In re RKC Dev. Corp.</u>, 205 B.R. 869, 873 (Bankr. S.D.
Ohio 1997) (concluding that appointment under § 327 should be
refused where retention is at variance with ethical and
disciplinary rules); <u>In re Sauer</u>, 191 B.R. 402, 407 (Bankr. D.
Neb. 1995) (disqualifying counsel for failure to observe
applicable state ethics code).

### C. Failure to be Disinterested

The Debtors also contend that AF's Retention Application
should be denied because AF is not disinterested. While section
1103(b) of the Bankruptcy Code provides only that Committee
counsel may not represent an entity with an interest adverse to
the Committee,[11] the Debtors contend that section 328 imposes the
additional requirement that Committee counsel be disinterested.[12]

---

[11] "An attorney . . . employed to represent a committee . .
. may not, while employed by such committee, represent any other
entity having an adverse interest in connection with the case."
11 U.S.C. § 1103(b).

[12] Section 328(c) provides that the Court may disallow
counsel fees "if, at any time during such professional person's
employment . . . such person is not a disinterested person, or
represents or holds an interest adverse to the interest of the

In this case, the Debtors contend that AF is not disinterested because it provided legal advice to several creditors that they could assert administrative claims for goods in transit, which is contrary to the interests of the general unsecured creditors represented by the Committee.

At the hearing the AF partner admitted that he responded to Dr. Liu's email regarding the question of what creditors' rights were with respect to in-transit goods. (Tr. 10/7/10 at 29.) He denied, however, that he was providing legal advice to the creditors, stating that Dr. Liu often asked counsel who were interested in pitching for Committee representation "hypothetical" questions to see who was the most knowledgeable. (Id. at 29.) Further, he noted that he gave the "advice" to Dr. Liu not to the creditors and that there was no attorney/client relationship ever established between AF and the creditors. (Id. at 31.) He stated that it was no different from the hundreds of questions he gets from acquaintances at cocktail parties and in the hall. (Id. at 31, 53.)

The Court disagrees. The emails were far from hypothetical cocktail party conversation; they expressly referenced the names of the creditors and amounts of their claims in the "re" lines and in the text. (Tr. 10/7/10 at 53-58; Ex. L-17, L-18.)

_____

estate with respect to the matter on which such professional person is employed." 11 U.S.C. § 328(c).

Further, the legal advice was given in the context of AF's effort to win Dr. Liu's support for its pitch to become Committee counsel. Even if AF did provide legal advice to the creditors (through Dr. Liu), however, the Court concludes that AF is not disqualified from serving as Committee counsel on the basis that it is not disinterested.

The Court disagrees with the Debtors' argument that committee counsel generally cannot be retained if they are not disinterested. Section 1103 specifically provides only that committee counsel shall not hold or represent an interest adverse to the committee. That section expressly states that the representation of a creditor in the case (which would make the attorney not disinterested[13]) is not a per se disqualifying factor as suggested by the Debtors.[14] See, e.g., In re Firstmark Corp., 132 F.3d 1179, 1182-83 (7th Cir. 1997) (finding no disqualification where counsel for committee represented former president of the debtor - who was a possible creditor and avoidance action defendant - in matters unrelated to the debtor); In re Nat'l Century Fin. Enters., Inc., 298 B.R. 112, 118 (Bankr. S.D. Ohio 2003) (finding firm not disqualified from representing

---

[13] Disinterested is defined in the Code to include "a creditor" or anyone with "an interest materially adverse to the interest of the estate." 11 U.S.C. § 101(14).

[14] Cf. 11 U.S.C. § 327(c) (counsel is not per se disqualified from representing the trustee simply because of its prior representation of a creditor).

committee although it concurrently represented two members of the committee).

The fact that committee counsel also represents an individual creditor has been found to be at most a potential conflict.

> Congress implicitly determined that the inherent tension between a committee and one of its creditors, standing alone, was immaterial and any conflict too theoretical to warrant being classified as an adverse interest. That is, merely the remote potential for dispute, strife, discord, or difference between a committee and one of its creditors does not give rise to any conflict of interest or appearance of impropriety that would bar an attorney from representing both parties.

In re Nat'l Liquidators, 182 B.R. 186, 192-93 (S.D. Ohio 1995) (concluding that only when "evidence suggest[s] the existence of possible challenges to a creditor's claim, the existence of a possible recovery action against the creditor, or the existence of any possible dispute between a committee and one of its constituents or members" would counsel be disqualified under § 1103).

A potential conflict alone does not mandate disqualification of counsel for the Committee. See, e.g., In re First Jersey Secs., Inc., 180 F.3d 504, 509 (3d Cir. 1999) (stating that the Bankruptcy Code "mandates disqualification when there is an actual conflict, allows for it when there is a potential conflict, and precludes it based solely on an appearance of a conflict.").

Furthermore, the time to evaluate whether AF is disqualified, because it represents an interest adverse to the Committee, is at the time of retention. Prior representations, even if adverse to the interests of the committee or unsecured creditors, do not disqualify committee counsel. See, e.g., In re Enron Corp., No. 02 Civ. 5638 (BSJ), 2003 WL 223455, *6-7 (S.D.N.Y. Feb. 3, 2003) (finding committee counsel did not hold an adverse interest because it had previously represented debtor-related entities and stating that the "argument under § 1103 fails because [counsel's] alleged adverse interests . . . predated [counsel's] representation of the committee"); In re Diva Jewelry Design, Inc., 367 B.R. 463, 473-74 (Bankr. S.D.N.Y. 2007) (finding that discussions that proposed trustee's counsel had with creditors regarding their possible consignment claims prior to retention by trustee did not disqualify counsel from employment); Nat'l Century Fin., 298 B.R. at 118 (finding firm not disqualified from representing committee although it had previously represented the debtor in a discreet matter that ended before bankruptcy).

Therefore, even if AF "represented" EAC and SHH as a result of the legal advice given to Dr. Liu on their behalf, that is insufficient to disqualify it per se. Further, the Court finds that there is no evidence that AF actually entered into an attorney/client relationship with either EAC or SHH or that that

legal representation continued to the time of AF's retention by the Committee.

D.   <u>Failure to Disclose</u>

The Debtors (and the UST) argue, however, that the Committee Retention Applications should be denied because proposed counsel failed to disclose adequately their connections with Dr. Liu and with EAC and SHH in their original retention applications.  Rule 2014(a) requires that

> The application [of any professional person seeking retention by the debtor or committee] shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014(a).  Delaware Local Rule 2014-1(a) also requires that additional disclosures be made "[p]romptly after learning any additional material information relating to such employment (such as potential or actual conflicts)."

"Defective disclosure is not a minor matter.  It goes to the heart of the integrity of the bankruptcy system. . . ."  <u>In re B.E.S. Concrete Prods., Inc.</u>, 93 B.R. 228, 236-38 (Bankr. E.D. Cal. 1988) (disqualifying special counsel who failed to disclose that it represented co-defendants in litigation it was handling for debtor).  The professional must disclose all contacts, not pick and choose which to disclose and which to ignore or leave the court to search the record for such relationships.  <u>In re</u>

BH&P, Inc., 949 F.2d 1300, 1317-18 (3d Cir. 1991) (finding failure to disclose potential conflict which counsel had discussed with UST was inadvertent but violative of Rule 2014 nonetheless); In re Jore Corp., 298 B.R. 703, 732 (Bankr. D. Mont. 2003) (disqualifying counsel for debtor for failure to disclose that conflicts waiver obtained from DIP lender prohibited debtor's counsel from undertaking litigation adverse to it); In re Granite Partners, L.P., 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998) (noting that "professional's duty to disclose is self-policing . . . . [and court] should not have to 'rummage through files or conduct independent factfinding investigations' to determine if the professional is disqualified") (quoting In re Rusty Jones, Inc., 134 B.R. 321, 345 (Bankr. N.D. Ill. 1991)).

Failure to disclose connections itself is enough to warrant disqualification of counsel from employment. See, e.g., In re Crivello, 134 F.3d 831, 839 (7th Cir. 1998) (stating that "a bankruptcy court should punish a willful failure to disclose connections under Fed. R. Bankr. P. 2014 as severely as an attempt to put forth a fraud on the court."); Rome v. Braunstein, 19 F.3d 54, 59 (1st Cir. 1994) (warning that "[a]bsent the spontaneous, timely and complete disclosure required by section 327(a) and Fed. R. Bankr. P. 2014(a), court-appointed counsel proceed at their own risk.") (emphasis in original); In re Filene's Basement, Inc., 239 B.R. 845 (Bankr. D. Mass. 1999)

(disqualifying counsel because of false 2014 disclosures alone without deciding whether counsel was disinterested); In re Tinley Plaza Assocs., L.P., 142 B.R. 272, 280 (Bankr. N.D. Ill. 1992) (firm disqualified from representing debtor where original retention application failed to disclose that "of counsel" to firm was president of investment banking firm providing services for debtor).  But see In re Leslie Fay Cos., Inc., 175 B.R. 525, 539 (Bankr. S.D.N.Y. 1994) (finding that failure of counsel to disclose potential conflicts did not warrant disqualification but did warrant sanction requiring counsel to pay the substantial fees incurred in having an examiner investigate its potential conflicts).

In this case the Court finds that the evidence supports disqualification of both AF and EG from representing the Committee.  Although AF at least disclosed that it had a prior relationship with Dr. Liu, having served as committee counsel in cases where he represented a creditor or acted as a translator to the committee, the Court finds that disclosure deficient.  AF argues that complete disclosures were ultimately made, before the hearing on consideration of the Committee Retention Applications. The Court agrees with the UST, however, that the subsequent disclosures by AF and EG (filed only after concerns about them were expressed by the Debtors and the UST and after discovery revealed what had occurred) were not enough to cure the original

deficiencies.[15] AF (and EG) should have fully disclosed at the
outset their efforts in support of Dr. Liu's attempt to obtain
proxies from creditors to attend the Committee formation meeting.
Further, while it was not a disqualifying factor, the fact that
AF had provided legal advice to two creditors on their right to
seek administrative claims is a fact that should have been
revealed to the Committee and to the Court.  Because AF and EG
did not make sufficient disclosures in their original retention
applications, the Debtors and the UST were obligated to engage in
discovery to garner the facts and bring them to the Court's
attention.  The failure to provide complete and accurate
disclosure at the outset warrants denial of the Committee
Retention Applications.[16]

    F.   <u>Further Recommendations</u>

The Court hopes that by requiring disclosure of the practice
of using others to solicit proxies to act at a committee

---

[15] Although AF did disclose it had communications regarding
two of the creditors, it did not provide details about those
communications or provide any details about other communications
it had with Dr. Liu in an effort to obtain creditor proxies.

[16] The Court finds that this disclosure requirement applies
to all professionals under Rule 2014.  Although a financial
advisor and others are not bound by the same Rules of
Professional Responsibility that attorneys are, the Court
concludes that, because solicitation efforts go to the integrity
of the process, all professionals should disclose any direct
calls they made (or others made on their behalf) to creditors
(who were not their respective clients) in an effort to be
employed in a bankruptcy case.

formation meeting will go a long way to discourage that improper practice.  The Court would also urge the UST to consider implementing procedures to reduce the likelihood of undue influence on the decision of a committee to hire professionals. Specifically, the Court recommends that the UST adopt the suggestion by Dr. Liu that the creditors be kept in a separate room from prospective professionals (who do not represent a client eligible to serve on the Committee) before the committee formation meeting.  Further, the UST might consider amending the questionnaire it sends to prospective committee members to include questions regarding whether they were solicited by anyone in connection with the case.

V.    <u>CONCLUSION</u>

  For the reasons set forth above, the Court will deny the Committee Retention Applications.

  An appropriate order is attached.


Dated: November 4, 2010    BY THE COURT:

              Mary F. Walrath
              United States Bankruptcy Judge