## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UNIVERSAL BUILDING PRODUCTS, INC., et al.,[1] | ) | Case No. 10-12453 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |

**DISCLOSURE STATEMENT FOR THE ~~FIRST~~THIRD MODIFIED JOINT LIQUIDATING PLAN OF UNIVERSAL BUILDING PRODUCTS, INC. AND CERTAIN OF ITS SUBSIDIARIES PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**IMPORTANT DATES**

- ~~Date by which~~ Ballots must be received: ~~**[TO COME]**~~ by **March 4, 2011, at 5:00 p.m. (all times prevailing Wilmington, Delaware time)**
- ~~Date by which objections~~Objections to Confirmation of the Plan must be filed and served: ~~**[TO COME]**~~ by **March 4, 2011, at 4:00 p.m.**
- Hearing on Confirmation of the Plan: ~~**[TO COME]**~~ to be held on **March 8, 2011, at 11:30 a.m.**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS SUPPORTS THE PLAN AND RECOMMENDS THAT YOU VOTE IN FAVOR OF THE PLAN[2]**

---

## DISCLAIMER

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT**

K&L Gates LLP
Harley J. Goldstein
Sven T. Nylen
70 West Madison Street, Suite 3100
Chicago, Illinois 60602
Telephone: (312) 372-1121
Facsimile: (312) 827-8000

Saul Ewing LLP
Mark Minuti
Teresa K.D. Currier
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Facsimile: (302) 421-6813

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Universal Building Products, Inc. (7884); (ii) Accubrace, Inc. (3418); (iii) Don De Cristo Concrete Accessories, Inc. (7547); (iv) Form-Co, Inc. (0079); and (v) Universal Form Clamp, Inc. (3003). The address of the Debtors' corporate headquarters is 15172 Goldenwest Circle, Westminster, California 92683.

[2] The Official Committee of Unsecured Creditors is appointed under the Bankruptcy Code to act as a fiduciary representative of unsecured creditors in a chapter 11 bankruptcy case.

Co-Counsel for the Debtors and Debtors in Possession

~~September 30, 2010~~January 31, 2011

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE ~~FIRST~~THIRD MODIFIED JOINT LIQUIDATING PLAN OF UNIVERSAL BUILDING PRODUCTS, INC. AND CERTAIN OF ITS SUBSIDIARIES PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (AS AMENDED FROM TIME TO TIME, THE "*PLAN*"), A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>, AS WELL AS CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE FINANCIAL INFORMATION SUMMARIES AND OTHER DOCUMENTS ATTACHED HERETO OR INCORPORATED BY REFERENCE HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER BUT RATHER SHOULD BE CONSTRUED AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

THE DEBTORS MAKE THE STATEMENTS AND PROVIDE THE FINANCIAL INFORMATION CONTAINED HEREIN AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT REVIEW AT THE TIME OF SUCH REVIEW THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE HEREOF UNLESS SO SPECIFIED. EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE THEREFORE SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. ANY PERSONS DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO PARTY IS AUTHORIZED TO PROVIDE TO ANY OTHER PARTY ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE CONTENTS OF THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT, EXCEPT WHERE SPECIFICALLY NOTED, HAS NOT BEEN AUDITED.

THE DEBTORS <u>AND THE CREDITORS' COMMITTEE</u> BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF ALL OF THEIR CREDITORS AND REPRESENTS THE BEST POSSIBLE OUTCOME FOR THEIR CREDITORS. THE DEBTORS THEREFORE RECOMMEND THAT ALL HOLDERS OF CLAIMS SUBMIT BALLOTS TO ACCEPT THE PLAN. WHEN EVALUATING THE PLAN, PLEASE SEE ARTICLE VIII OF THIS DISCLOSURE STATEMENT FOR A DISCUSSION OF DIFFERENT "RISK FACTORS" WHICH SHOULD BE CONSIDERED IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................................. 1
      A.    PLAN OVERVIEW/ EXECUTIVE SUMMARY .................................................... ~~1~~2
            1.    Solicitation ................................................................................................ 2
            2.    Purpose of the Liquidating Plan ............................................................... 2
            3.    Significant Disputes .................................................................................. 2
            4.    Substantive Consolidation ~~for Plan Purposes Only~~ .............................. 2
            ~~4.~~5.    Establishment of the Liquidating Trust ................................................... ~~2~~3
            ~~5.~~6.    Summary of Projected Distributions to Creditors .................................... ~~2~~3
            ~~6.~~7.    Voting and Confirmation ........................................................................... ~~5~~7
            ~~7.    Liquidation~~8.    ............................................................. Distribution Analysis
            ~~8.~~9.    Risk Factors .............................................................................................. ~~6~~8
            ~~9.~~10.   Injunction ................................................................................................. ~~7~~8
      B.    RECOMMENDATION ............................................................................................ ~~7~~8
      C.    DISCLAIMER ......................................................................................................... ~~7~~9

II.   GENERAL INFORMATION .............................................................................................. ~~8~~9
      A.    DESCRIPTION OF THE DEBTORS' BUSINESSES ............................................. ~~8~~9
      B.    THE DEBTORS' CORPORATE HISTORY AND EQUITY STRUCTURE ........... ~~9~~10
      C.    CREDIT AGREEMENT AND DEBT STRUCTURE .............................................. ~~9~~10
      D.    EVENTS LEADING TO THE CHAPTER 11 CASES ............................................ ~~10~~11
      E.    DEBT ACQUISITION AND THE COMMENCEMENT OF THE CHAPTER
            11 CASES ................................................................................................................ ~~10~~12
      F.    PLANNED SALE OF THE DEBTORS' ASSETS .................................................. ~~11~~12
            1.    UBPA Asset Purchase Agreement ............................................................ ~~11~~12
            2.    Public Auction For The Sale Of The Debtors' Assets ............................. ~~13~~14

III.  THE CHAPTER 11 CASES ............................................................................................... ~~13~~14
      A.    DEBTOR IN POSSESSION FINANCING ............................................................. ~~13~~14
      B.    ~~RESOLUTION OF~~ DISPUTES REGARDING THE SALE AND DIP
            FINANCING ............................................................................................................ ~~13~~14
            1.    Resolution of Certain Disputes ................................................................. ~~13~~15
            2.    ~~Interim~~ Sale to UBPA ............................................................................... ~~14~~16
            3.    Current Status of the DIP Financing ........................................................ 16
            4.    UBPA's Asserted Administrative Expense Claim .................................... 17
      C.    SUMMARY OF OTHER SIGNIFICANT MOTIONS ........................................... ~~15~~17
            1.    Applications for Retention of Debtors' Professionals .............................. ~~15~~17
            2.    Motion for Joint Administration of the Chapter 11 Cases ....................... ~~15~~18
            3.    Motion to Pay Employee Wages and Associated Benefits ...................... ~~15~~18
            4.    Utilities Procedures Motion ...................................................................... ~~15~~18
            5.    Motion Authorizing Rejection of Unexpired Leases ................................ ~~15~~18
            6.    Motion to Employ Ordinary Course Professionals ................................... ~~16~~18
            7.    Schedules and Statement of Financial Affairs ......................................... ~~16~~18
            8.    Taxes ......................................................................................................... ~~16~~18
            9.    Claims Bar Date ........................................................................................ ~~16~~19
            10.   Cash Management ...................................................................................... ~~16~~19
            11.   Creditors' Committee Formation; Previous Disputes with the Debtors ......... 19

IV.   SUMMARY OF THE LIQUIDATING PLAN OF REORGANIZATION ........................... ~~17~~19
      A.    OVERVIEW OF CHAPTER 11 ............................................................................... ~~17~~19
      B.    GENERALLY ......................................................................................................... ~~18~~20
            1.    Liquidating Plan of Reorganization ......................................................... ~~18~~20
            2.    The Liquidating Trust ............................................................................... ~~18~~21

C.       CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
INTERESTS ........................................................................................... ~~18~~21

     1.    Schedule of Treatment of Claims and Equity Interests ......................... ~~19~~23
     2.    Treatment of Unclassified Claims ...................................................... ~~19~~23
     3.    Classification and Treatment of Classified Claims ............................. ~~20~~24

D.       MEANS FOR IMPLEMENTATION OF THE PLAN ..................................... ~~22~~26
     1.    Funding of the Plan Fund Into the Liquidating Trust .......................... ~~22~~26
     2.    Funding of the Liquidating Trust ....................................................... ~~22~~26
     3.    Transfer of Liquidating Trust Assets to the Liquidating Trust ............ ~~22~~26
     4.    The Liquidating Trust ....................................................................... ~~22~~26
     5.    Final Administration of Liquidating Trust ......................................... ~~25~~29
     6.    Corporate Action .............................................................................. ~~26~~29
     7.    Preservation of Rights ....................................................................... ~~26~~30
     8.    Cancellation of Notes, Instruments, Debentures and Equity Securities ..... ~~27~~31
     9.    Dissolution of Committee(s) .............................................................. ~~27~~31
    10.    Accounting ...................................................................................... ~~27~~31

E.       TREATMENT OF DISPUTED CLAIMS ...................................................... ~~27~~31
     1.    Objections to Claims; Prosecution of Disputed Claims ...................... ~~27~~31
     2.    Estimation of Claims ........................................................................ ~~28~~32
     3.    Payments and Distributions on Disputed Claims ................................ ~~28~~32

F.       DISTRIBUTIONS ..................................................................................... ~~28~~32
     1.    Means of Cash Payment .................................................................... ~~28~~32
     2.    Delivery of Distributions .................................................................. ~~28~~32
     3.    Undeliverable Distributions .............................................................. ~~28~~32
     4.    Withholding and Reporting Requirements .......................................... ~~29~~33
     5.    Time Bar to Cash Payments .............................................................. ~~29~~33
     6.    Distributions after Effective Date ...................................................... ~~29~~33
     7.    Interest ............................................................................................ ~~29~~33
     8.    Fractional Dollars; De Minimis Distributions .................................... ~~30~~33
     9.    Setoffs ............................................................................................. ~~30~~34

G.       EXECUTORY CONTRACTS ..................................................................... ~~30~~34
     1.    Rejection of Executory Contracts and Unexpired Leases .................... ~~30~~34
     2.    Rejection Damages Claim .................................................................. ~~30~~34

H.       INSURANCE POLICIES ........................................................................... ~~30~~34
I.       CONDITIONS PRECEDENT TO PLAN CONFIRMATION AND
CONSUMMATION ................................................................................. ~~31~~34

     1.    Acceptance or Rejection of the Plan ................................................... ~~31~~35
     2.    Conditions Precedent to Confirmation ............................................... ~~31~~35
     3.    Conditions Precedent to Effective Date of the Plan ............................ ~~32~~35
     4.    Waiver of Conditions Precedent ........................................................ ~~32~~36
     5.    The Confirmation Order .................................................................... ~~32~~36

J.       EFFECT OF PLAN CONFIRMATION ....................................................... ~~32~~36
     1.    No Discharge of Claims and Termination of Interests ........................ ~~32~~36
     2.    Termination of Subordination Rights and Settlement of Related Claims..... ~~32~~36
     3.    Injunction ........................................................................................ ~~33~~36
     4.    Terms of Existing Injunctions and Stays ........................................... ~~33~~37
     5.    Exculpation ..................................................................................... ~~33~~37
     6.    Releases by the Debtors .................................................................... ~~34~~38
     7.    Mutual Releases by Holders of Claims and Interests .......................... ~~34~~39

K.       MISCELLANEOUS PROVISIONS ............................................................. ~~35~~39
     1.    Settlement of Claims and Controversies ............................................ ~~35~~39
     2.    Payment of Statutory Fees ................................................................ ~~35~~40
     3.    Exemption from Securities Laws ....................................................... ~~35~~40
     4.    Section 1146 Exemption ................................................................... ~~35~~40
     5.    Books and Records ........................................................................... ~~36~~40
     6.    Privileges as to Certain Causes of Action .......................................... ~~36~~41

7.     Employee Agreements ................................................................. ~~36~~41

8.     Unclaimed Property ..................................................................... ~~36~~41

9.     Business Day ............................................................................... ~~36~~41

10.    Severability ................................................................................ ~~37~~41

11.    Conflicts .................................................................................... ~~37~~41

12.    Evidence .................................................................................... ~~37~~41

13.    Further Assurances ..................................................................... ~~37~~42

14.    Notices....................................................................................... ~~37~~42

15.    Filing of Additional Documents ................................................ ~~38~~42

16.    Successors and Assigns .............................................................. ~~38~~42

17.    Governing Law ........................................................................... ~~38~~43

18.    Closing of Cases ........................................................................ ~~38~~43

19.    Section Headings ....................................................................... ~~38~~43

L.        RETENTION OF JURISDICTION ...................................................... ~~38~~43

M.      MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ...... ~~39~~44

1.     Modification of the Plan ............................................................. ~~39~~44

2.     Revocation, Withdrawal, or Non-Consummation ........................ ~~40~~44

V.       ACCEPTANCE OR REJECTION OF THE PLAN .................................... ~~40~~45

A.        CLASSES ENTITLED TO VOTE ........................................................ ~~40~~45

B.        ACCEPTANCE BY IMPAIRED CLASSES ........................................... ~~40~~45

C.        PRESUMED ACCEPTANCE OF THE PLAN ......................................... ~~40~~45

D.        PRESUMED REJECTION OF THE PLAN ............................................ ~~40~~45

VI.      PROCEDURES FOR VOTING ON THE PLAN ....................................... ~~40~~45

A.        VOTING DEADLINE ...................................................................... ~~41~~45

B.        VOTING RECORD DATE ................................................................ ~~41~~45

C.        VOTING INSTRUCTIONS ................................................................ ~~41~~46

D.        THE CONFIRMATION HEARING ..................................................... ~~42~~46

VII.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ...... ~~43~~47

A.        GENERALLY ................................................................................ ~~43~~47

B.        FEASIBILITY ............................................................................... ~~43~~48

C.        "BEST INTERESTS" TEST ............................................................. ~~44~~48

D.        ACCEPTANCE BY IMPAIRED CLASSES ........................................... ~~45~~49

E.        NON-CONSENSUAL CONFIRMATION ............................................... ~~45~~49

1.     Secured Claims ........................................................................... ~~45~~49

2.     Unsecured Claims ....................................................................... ~~45~~50

3.     Equity Interests .......................................................................... ~~45~~50

VIII.    50

PLAN-RELATED RISK FACTORS AND 50

ALTERNATIVES TO CONFIRMING AND CONSUMMATING THE PLAN .................. ~~46~~50

A.        FINANCIAL INFORMATION; DISCLAIMER ...................................... ~~46~~50

B.        CERTAIN BANKRUPTCY CONSIDERATIONS .................................... ~~46~~50

1.     Classification Risk...................................................................... ~~46~~50

2.     ~~The Debtors May be Unable to Expeditiously Transfer the Assets~~ .... ~~46~~

~~3.~~     The Debtors May Not be Able to Secure Confirmation of the Plan........... ~~46~~50

~~4.~~3.     The Confirmation and Consummation of the Plan Are Also Subject to Certain Conditions as Described Herein. ....................................... ~~47~~51

~~5.~~4.     The Debtors May Object to the Amount or Classification of a Claim. ...... ~~47~~51

~~6.~~5.     Nonconsensual Confirmation ...................................................... ~~47~~51

~~7.~~6.     Delays of Confirmation and/or the Effective Date ......................... ~~47~~51

C.        PENDING LITIGATION .................................................................. ~~47~~52

      D.      LIQUIDATION UNDER CHAPTER 7 ................................................................. ~~47~~52

IX.      CERTAIN FEDERAL INCOME TAX CONSEQUENCES ............................................ ~~48~~52
      A.      CONSEQUENCES TO DEBTORS ....................................................................... ~~49~~53
      B.      FEDERAL INCOME TAX TREATMENT OF LIQUIDATING TRUST ................... ~~49~~53
            1.      Classification of Liquidating Trust ................................................ ~~49~~53
            2.      Tax Reporting ................................................................................ ~~49~~54
            3.      Claim Reserve for Disputed Claims .............................................. ~~50~~54
      C.      CONSEQUENCES TO HOLDERS OF CLAIMS ................................................ ~~50~~54
            1.      Holders of Allowed Claims ........................................................... ~~50~~54
            2.      Distributions in Discharge of Accrued but Unpaid Interest ......... ~~50~~54
            3.      Character of Gain or Loss; Tax Basis; Holding Period ................ ~~50~~55
      D.      CONSEQUENCES TO HOLDERS OF EQUITY INTERESTS ............................ ~~51~~55
      E.      WITHHOLDING .............................................................................................. ~~51~~55

X.      RECOMMENDATION .......................................................................................... ~~52~~56

**EXHIBITS**

Exhibit A   -   Debtors' ~~First~~<u>Third</u> Modified Joint Liquidating Plan of Reorganization

Exhibit B   -   ~~Hypothetical Liquidation~~<u>Distribution</u> Analysis

# I.

## INTRODUCTION

On August 4, 2010, Universal Building Products, Inc., Accubrace, Inc., Don De Cristo Concrete Accessories, Inc., Form-Co, Inc., and Universal Form Clamp, Inc. (collectively, the "*Debtors*") each filed a petition under chapter 11 of title 11 of the United States Code (as amended, the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*").

~~The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.~~

Chapter 11 of the Bankruptcy Code allows a debtor to sponsor a plan of reorganization that proposes how to dispose of a debtor's assets and treat claims (*i.e.*, debts) against, and interests in, such a debtor. A chapter 11 plan typically may provide for a debtor in possession to reorganize by continuing to operate, to liquidate by selling assets of the estate or to implement a combination of both. The Plan is a liquidating plan.

As discussed further herein, the Debtors' senior secured creditor has asserted that it will not vote in favor of the Plan and, therefore, the Plan is unconfirmable. The Debtors, on the other hand, believe that the secured creditor is bound to support the Plan under prior agreement, and, even were this not the case, that its vote may not be necessary if the Debtors abandon the senior secured creditors' remaining collateral. Without the funding to be provided by the secured creditor, however, the Plan cannot be effectuated.

**The Official Committee of Unsecured Creditors (the "*Committee*") appointed in these cases supports the Plan and recommends that creditors vote to accept the Plan.**

The Bankruptcy Code requires that the party proposing a chapter 11 plan prepare and file with the Bankruptcy Court a document called a "disclosure statement." **THIS DOCUMENT IS THE DISCLOSURE STATEMENT (THE "*DISCLOSURE STATEMENT*") FOR THE PLAN. THE DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED HEREIN BY REFERENCE.**

*Please note that any terms not specifically defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan and any conflict arising therefrom shall be governed by the Plan.*

This Disclosure Statement summarizes the Plan's content and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan. The Disclosure Statement also discusses the events leading to the Debtors' filing of their chapter 11 cases (the "*Chapter 11 Cases*"), describes certain events anticipated to occur in the Debtors' Chapter 11 Cases, and, finally, summarizes and analyzes the Plan. The Disclosure Statement also describes certain potential Federal income tax consequences for Holders of Claims and Equity Interests, voting procedures and the confirmation process.

*The Bankruptcy Code requires a disclosure statement to contain "adequate information" concerning the Plan. In other words, a disclosure statement must contain sufficient information to enable parties who are affected by the Plan to vote intelligently for or against the Plan or object to the Plan, as the case may be. The Bankruptcy Court has reviewed this Disclosure Statement, and has determined that it contains adequate information and may be sent to you to solicit your vote on the Plan.*

All Holders of Claims (as defined in the Plan) should carefully review both the Disclosure Statement and the Plan before voting to accept or reject the Plan. Indeed, Holders of Claims should not rely solely on the Disclosure Statement but should also read the Plan. Moreover, the Plan provisions will govern if there are any inconsistencies between the Plan and the Disclosure Statement.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS ~~_____~~ 5:00 P.M. (PREVAILING WILMINGTON, DELAWARE TIME) ON ~~_____, 2010.~~MARCH 4, 2011, UNLESS THE COURT OR THE DEBTORS, UPON THE CONSENT OF THE COMMITTEE, EXTEND THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED BY THE DEBTORS, IN WHICH CASE THE VOTING DEADLINE FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED.

A.      PLAN OVERVIEW/ EXECUTIVE SUMMARY

THE FOLLOWING SUMMARIZES CERTAIN KEY INFORMATION CONTAINED ELSEWHERE IN THIS DISCLOSURE STATEMENT. REFERENCE IS MADE TO, AND THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO, THE MORE DETAILED INFORMATION CONTAINED ELSEWHERE IN THIS DISCLOSURE STATEMENT AND IN THE PLAN. THE PLAN WILL CONTROL IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS SUMMARY AND THE PLAN. FOR A MORE DETAILED SUMMARY OF THE PLAN, PLEASE SEE ARTICLE IV OF THIS DISCLOSURE STATEMENT.

1.      Solicitation

Solicitation materials, including this Disclosure Statement and a Ballot to be used for voting on the Plan, are being distributed to all known Holders of Claims entitled to vote on the Plan. The only Classes of Claims entitled to vote on the Plan are Classes ~~1~~1, 2, 3, and 4.¹ The purpose of this solicitation, among other things, is to obtain the requisite number of acceptances of the Plan under the Bankruptcy Code from the Classes of Claims entitled to vote (the statutory requirements for Confirmation of the Plan are described in Article IV.I herein - "Conditions Precedent to Plan Confirmation and Consummation" and Article V herein). Assuming the requisite acceptances are obtained, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing commencing on [~~_____, 2010~~]March 8, 2011 at 11:30 a.m.

2.      Purpose of the Liquidating Plan

The Plan provides for the orderly liquidation of substantially all of the Debtors' assets and the distribution of proceeds.

3.      Significant Disputes

The Debtors' senior secured creditor asserts that it will not vote in favor of the Plan and, therefore, the Plan is not confirmable. The Debtors, on the other hand, believe that the secured creditor is bound to support the Plan under prior agreement, and, in any event, its vote may not be necessary if the Debtors abandon the senior secured creditors' remaining collateral. Without the funding to be provided by the secured creditor, however, the Plan cannot be effectuated.

4.      ~~3.~~Substantive Consolidation

Subject to the occurrence of the Effective Date, the Debtors and their Estates will be deemed substantively consolidated for voting and distribution purposes only. No distributions will be made under the Plan on account of Intercompany Claims. The assets and liabilities of the Debtors shall be pooled and all Claims shall be satisfied from the assets of a single consolidated estate. Any Claims against one or more of the Debtors (including

---

¹      The Debtors are reserving the right to argue at the Confirmation Hearing that any vote of the Holders of Senior Creditor Claims shall only count if the Debtors have not previously abandoned the Preserved Collateral because such Holders waived the DIP Lender Deficiency Claim and the Prepetition Lender Deficiency Claim under prior agreements and, thus, the abandonment of the Preserved Collateral will eliminate such Holders' Secured Claims, leaving such Holders without any Claims against the Debtors or their Estates. UBPA opposes this conclusion and is reserving all rights in connection therewith.

Claims based upon a guaranty, indemnity, co-signature, surety or otherwise, of Claims against another Debtor) shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to distributions under the Plan only with respect to such single Claim.

### 5. ~~4.~~ Establishment of the Liquidating Trust

On the Effective Date or immediately prior thereto, a Liquidating Trust shall be created and vested with certain property and the Liquidating Trust shall reduce to Cash or otherwise liquidate the Liquidating Trust Assets and distribute such liquidated assets in accordance with and subject to the terms and provisions of the Plan. The property that will be transferred to the Liquidating Trust is described in Section III.B herein.

### 6. ~~5.~~ Summary of Projected Distributions to Creditors

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtors. The following chart summarizes the treatment of Allowed Claims and Equity Interests under the Plan. This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests. Moreover, the column entitled, "Projected Recovery," is merely the Debtors' good faith estimate ~~at~~as of the ~~present time~~date hereof based on available information of the total amount of Allowed Claims in the Debtors' Chapter 11 Cases. These estimates should not be deemed to be an admission, binding or otherwise, as to the amount of total Allowed Claims. The Debtors reserve the right to change their estimates and object to any Claim, unless previously Allowed by Final Order or otherwise.

| Class | Description | Treatment | Projected Recovery |
|---|---|---|---|
| Unclassified | Administrative Claims | **Non-Professional Fee Administrative Claims.** Each Allowed Administrative Claim shall be, at the Liquidating Trustee's election, either (i) paid by the Debtors in full, in Cash from the Transferred Property (or the proceeds thereof), in such amounts as such Administrative Claim is Allowed by the Bankruptcy Court upon the later of the Effective Date or the date upon which such Administrative Claim is Allowed or (ii) satisfied upon such other terms as may be agreed upon between the Holder of such Administrative Claim and the Liquidating Trustee. Any application for the payment of any Administrative Claims on account of any fees or reimbursement of expenses of any(other than Professional, Fee Claims) shall be Filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date.<br><br>**Professional Fee Claims.** Unless otherwise expressly provided in the Plan, a Professional Fee Claim will be Allowed only if: (i) on or before forty-five (45) days after the Effective Date (the "*Professional Fee Bar Date*"), the entity holding such Professional Fee Claim files with the Court a final fee application and serves the application on counsel to the Debtors, counsel to the Committee, counsel to the Liquidating Trustee, and the U.S. Trustee; and (ii) the Court enters an order allowing the Claim.<br><br>The Liquidating Trust shall pay any Allowed Professional Fee Claims within three (3) Business Days of entry of the respective Final Order allowing such Professional Fee Claim. Any party in interest may file an objection to such application within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes. Entities holding Professional Fee Claims that do not timely file and serve a fee application by the Professional Fee Bar Date will be forever barred from asserting such Professional Fee Claim against the Debtors, the Estates, the Liquidating Trust, or their respective property. Notwithstanding any releases provided in this Plan, all Professional Fee Claims shall be subject to potential objections at the hearing on the respective Professional Fee Claim in accordance herewith on grounds that a Professional Fee Claim is not allowable under section 330 of the Bankruptcy Code. | 100% |

| Class | Description | Treatment | Projected Recovery |
|---|---|---|---|
| Unclassified | DIP Facility Claim | In full and final satisfaction, settlement, release and discharge of and in exchange for release of the DIP Facility Claim, in accordance with section 1129(a)(9) of the Bankruptcy Code, the DIP Lender has agreed that the DIP Facility Claim shall receive the treatment afforded in Article III.B.1 of the Plan. | |
| Unclassified | Priority Tax Claims | On, or as soon as reasonably practicable after, the latest of the Effective Date or the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (i) Cash from the Transferred Property (or the proceeds thereof) equal to the unpaid portion of such Allowed Priority Tax Claim or (ii) such other treatment as to which the Liquidating Trustee and such Holder have agreed upon in writing. | 100% |
| 1 | Senior Creditor Claims | ***Impaired***.  Holders of Allowed Senior Creditor Claims shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Senior Creditor Claims, ~~the Senior Creditor Series~~distributions of the Preserved Collateral (or the proceeds thereof) from the Liquidating Trust~~ as provided for in the Liquidating Trust Agreement~~.<br><br>The total amount owing to UBPA is approximately $21 million, after deduction of its credit bid under the sale of substantially all of the Debtors' assets. | ~~6.4 to 8.5% (after reducing Claim on account of credit bid)~~Unknown[2] |
| 2 | Other Secured Claims | ~~*Unimpaired*~~***Impaired***.  On, or as soon as reasonably practicable after, the later of the Effective Date or the date such Claim becomes an Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive (i) the property securing such Allowed Other Secured Claim, or (ii) such other treatment as to which the Debtors or the Liquidating Trustee and such Holder have agreed upon in writing. | 100% |

---

[2]    UBPA's prepetition secured claim was approximately $40 million, and its potential postpetition claim based on full funding of its DIP financing obligations is approximately $6 million.  After reducing the total claim amount by its $25 million credit bid for substantially all of the Debtors' assets, UBPA holds a secured claim of approximately $21 million, secured by the Debtors' real property in Centralia, Illinois and their equity interest in a Canadian affiliate.  The Debtors believe that the equity in the Canadian entity is worthless.  The Centralia real property was purchased in 2003 for approximately $950,000.  The Debtors, however, express no opinion as to the amount of net proceeds that may be recovered from a sale of the Centralia property under the current economic circumstances, and such an estimation is not feasible absent the marketing of the property.  Any purchase price ultimately achieved will result in net proceeds only after payment of, among other things, appropriate brokerage and marketing expenses, closing costs, and real estate taxes or other valid secured claims against the property.

| Class | Description | Treatment | Projected Recovery |
|---|---|---|---|
| 3 | Other Priority Claims | ~~Unimpaired~~**Impaired**. On, or as soon as reasonably practicable after, the later of the Effective Date or the date such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, (i) Cash from the Transferred Property (or the proceeds thereof) equal to the unpaid portion of such Allowed Other Priority Claim or (ii) such other treatment as to which the Debtors or the Liquidating Trustee and such Holder have agreed upon in writing. | 100% |
| 4 | Unsecured Claims | **Impaired**. Holders of Allowed Unsecured Claims in Class 4 shall receive a Pro Rata share of the ~~Unsecured Creditor Series of the Liquidating Trust. On the Effective Date, or as soon thereafter as is practicable, the Liquidating Trustee shall make a distribution of the Unsecured Creditor Series of the Liquidating Trust to each Holder of an Allowed Class 4 Claim in an amount equal to such Holder's Pro Rata share of the balance in the Transferred Property transferred to the Liquidating Trust remaining after creation of the Disputed Claim Reserve.~~<br><br>~~In the event of entry of a Final Order determining a Disputed Claim to be an~~Transferred Property (or the proceeds thereof) remaining after payment of Allowed ~~Claim, the Liquidating Trustee, in his sole discretion, may make an interim distribution to the Holder of such Allowed Claim from the Disputed Claim Reserve to such Holder. The Holders of Class 4 Allowed Claims shall thereafter receive their Pro Rata share of any subsequent distributions from the Liquidating Trust.~~Administrative Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims. | ~~0 to 3%~~See Distribution Analysis attached hereto as Exhibit B |
| 5 | Intercompany Claims | **Impaired**. On the Effective Date, all Intercompany Claims shall be deemed waived and cancelled and Holders of Intercompany Claims shall not receive any distribution on account of such Intercompany Claim under the Plan. Class 5 is impaired. Because Holders of Intercompany Claims will receive no distributions under the Plan, Class 5 will be deemed to have voted to reject the Plan. | 0% |
| 6 | Equity Interests | **Impaired**. On the Effective Date, all Equity Interests shall be cancelled and the Holders of Equity Interests shall not receive or retain any | 0% |

| Class | Description | Treatment | Projected Recovery |
|-------|-------------|-----------|--------------------|
| | | distribution or property on account of such Equity Interests. Class 6 is impaired. Because Holders of Equity Interests will receive no distribution under the Plan, Class 6 will be deemed to have voted to reject the Plan. | |

*The distributions projected in the table above represent only a range of possible recoveries that the Debtors believe are reasonable based upon all information reasonably available to them as of the date hereof. See Article VIII for a detailed discussion of the many factors which may impact upon the distributions that will ultimately be available to creditors. A Distribution Analysis is attached hereto as Exhibit B.*

**THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BIND ALL CLAIM AND EQUITY INTEREST HOLDERS, EXCEPT TO THE EXTENT A CREDITOR HOLDING A CLASS 2, 3, OR 4 CLAIM ELECTS TO OPT-OUT OF THE RELEASES PROVIDED IN ARTICLE X OF THE PLAN.**

**7. 6. Voting and Confirmation**

Each Holder of a Claim in Classes ~~1~~ 1, 2, 3, and 4 will be entitled to vote either to accept or reject the Plan. Classes ~~1~~ 1, 2, 3, and 4 shall have accepted the Plan if: (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in each such Class have voted to accept the Plan and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in each such Class have voted ~~to accept the Plan. Classes 2 and 3 are Unimpaired under the Plan and are deemed~~ to accept the Plan. Classes 5 and 6 are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan. Assuming the requisite acceptances are obtained, the Debtors intend to seek confirmation of the Plan at a hearing (the "*Confirmation Hearing*") scheduled to commence on ~~[_____, 2010]~~ **March 8, 2011, at 11:~~_____~~30 a.m. (prevailing Wilmington, Delaware time)],** before the Bankruptcy Court. **Notwithstanding the foregoing, provided that at least one Impaired Class accepts the Plan, the Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to the Impaired Classes presumed to reject the Plan, and reserve the right to do so with respect to any other rejecting Class or to modify the Plan in accordance with Article XIII of the Plan.**

When voting, Holders of Class 2, 3, or 4 Claims are entitled to opt-out of the Releases of Non-Debtor parties by making such an election on the Class 4 Ballot included with this Disclosure Statement. Creditors should refer to Section IV.J.7 herein for a further discussion of the "opt-out" election.

Article VI of this Disclosure Statement specifies the deadlines, procedures and instructions for voting to accept or reject the Plan and the applicable standards for tabulating Ballots. The Bankruptcy Court has established ~~[_____, 2010]~~ **February 1, 2011** (the "*Voting Record Date*"), as the date for determining which Holders of Claims are eligible to vote on the Plan. Ballots will be mailed to all registered Holders of Claims as of the Voting Record Date who are entitled to vote to accept or reject the Plan. An appropriate return envelope will be included with your Ballot, if necessary.

**TO BE COUNTED, YOUR BALLOT INDICATING AN ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE ~~DEBTORS' ATTORNEYS~~ GARDEN CITY GROUP BY NO LATER THAN ~~_____ __~~ 5:00 P.M. (PREVAILING WILMINGTON, DELAWARE TIME) ON ~~_____, 2010~~ MARCH 4, 2011 (THE "*VOTING DEADLINE*") UNLESS THE COURT OR THE DEBTORS, UPON THE CONSENT OF THE COMMITTEE, EXTEND THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED BY THE DEBTORS, IN WHICH CASE THE VOTING DEADLINE FOR**

SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED.

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL OF THEIR CREDITORS AS A WHOLE. THE DEBTORS THEREFORE RECOMMEND THAT ALL HOLDERS OF CLAIMS SUBMIT BALLOTS TO ACCEPT THE PLAN.

Objections to confirmation of the Plan must be filed and served on or before [  4:00 p.m. prevailing Wilmington, Delaware time on _____, 2010] March 4, 2011. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### 8.   7. Liquidation Distribution Analysis

The Debtors believe that the Plan will produce a greater recovery for Holders of Claims than would be achieved in a chapter 7 liquidation because, among other things, the administrative costs and delays incurred in connection with a chapter 7 case would likely diminish the distributions to such Holders, and the projected liquidation of the Debtors would not produce any recovery for Holders of Unsecured Claims. The Debtors' financial advisors have prepared a hypothetical liquidation analysis on behalf of the Debtors to assist Holders of Claims to reach their determination as to whether to accept or reject the Plan. This Hypothetical Liquidation Analysis, as discussed further herein, the Plan contemplates additional funding of approximately $1.8 million from UBPA that is necessary for purposes of satisfying estimated Administrative Claims and Priority Claims, and allowing for a potential recovery for Unsecured Claims. UBPA has taken the position that it is not obligated to vote in favor of the Plan or to provide any further funding to the Debtors or their Estates. The Debtors, however, believe that prior rulings of the Bankruptcy Court indicate that UBPA is bound to support the Plan, and, in any event, UBPA's vote may be unnecessary if the Debtors abandon UBPA's remaining collateral. The Plan is not confirmable, however, without the additional funding from UBPA. A Distribution Analysis is attached hereto as Exhibit B. estimates the proceeds to be realized if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

### 9.   8. Risk Factors

There are a variety of factors that each Holder of a Claim should consider prior to voting to accept or reject the Plan. Some of these factors, which are described in more detail in Article VIII of this Disclosure Statement, are as follows and may impact the recoveries under the Plan:

- The financial information disclosed in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and Disclosure Statement. The Distribution Analysis attached hereto as Exhibit B is qualified by the assumptions and limitations attached thereto.

- Article IX of this Disclosure Statement describes certain significant federal tax consequences of the transactions that are described herein and in the Plan that affect the Debtors and others. Such consequences may include: (1) the recognition of taxable gain or loss to the Debtors; (2) the reduction of net operating loss carryforward by the Debtors; and (3) the recognition of taxable income by the Holders of Claims. Holders of Claims are urged to consult with their own tax advisors regarding the federal, state, local and other tax consequences of the Plan.

- Although the Debtors believe that the Plan complies with all applicable standards of the Bankruptcy Code, the Debtors can provide no assurance that the Plan will comply with section 1129 of the Bankruptcy Code or that the Bankruptcy Court will confirm the Plan.

- The Debtors may be required to request Confirmation of the Plan without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code.

- Any delays of either Confirmation or the Effective Date of the Plan could result in, among other things, increased Claims of Professionals.

- ~~Delays in closing the Sale or otherwise transfer the Debtors' assets to the Purchaser may result in increased administrative costs.~~

**10.** ~~9.~~ **Injunction**

Except as otherwise expressly provided in the Plan, all Entities that have held, hold, or may hold Claims against or Equity Interests in the Debtors are permanently enjoined, from and after the Effective Date, from taking any of the following actions against any of the Debtors, their Estates, the Committee or its members solely in their capacities as members of the Committee and not in any other capacity, the Liquidating Trust, the Liquidating Trustee, the Administrative Agent, UBP Acquisition Corp. and any of its affiliates, successors or assigns, including but not limited to Oaktree Capital Management, L.P., Solus Capital Partners, LLC and Dayton Superior Corporation, the Prepetition Lenders and the DIP Lender, or any of their property on account of any Claims or causes of action arising from events prior to the Effective Date including, without limitation, (i) commencing or continuing in any manner any action or other proceeding of any kind; (ii) enforcing, attaching, collecting, or recovering by any manner or in any place or means any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind; and (iv) asserting any defense or right of setoff, subrogation, or recoupment of any kind against any obligation, debt, or liability due to the Debtors.

**B. RECOMMENDATION**

The Debtors believe that the Plan provides the best and most feasible recovery for Holders of Allowed Claims against the Debtors and that accepting the Plan is in the best interests of the Holders of Allowed Claims against the Debtors. The Debtors therefore recommend that you vote to accept the Plan.

**THE COMMITTEE ALSO RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.**

**C. DISCLAIMER**

In formulating the Plan, the Debtors relied on financial data derived from ~~their books and records~~the best information available to the Debtors as of the date hereof. The Debtors therefore represent that everything stated in the Disclosure Statement is true to the best of their knowledge. The Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable and therefore does not recommend whether you should accept or reject the Plan.

The discussion in the Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The ~~liquidation analyses,~~ distribution projections~~,~~ and other information are estimates only, and the timing and amount of actual distributions to Holders of Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT IS, OR SHALL BE DEEMED TO BE, AN ADMISSION OR STATEMENT AGAINST INTEREST BY THE DEBTORS FOR PURPOSES OF ANY PENDING OR FUTURE LITIGATION MATTER OR PROCEEDING.

ALTHOUGH THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTORS, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF. THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS SHALL HAVE NO LIABILITY FOR THE INFORMATION IN THE DISCLOSURE STATEMENT.

II.

GENERAL INFORMATION

A.    DESCRIPTION OF THE DEBTORS' BUSINESSES

Collectively, the Debtors operated one of the largest privately-owned concrete form and accessory manufacturing businesses in North America, manufacturing and delivering a complete assortment of premium concrete accessories to residential and commercial construction projects. The Debtors' primary manufacturing facilities ~~are~~were located in Bellwood, Illinois and Westminster, California.

Universal Building Products, Inc. is a Delaware corporation and the holding company for each of the other Debtors. The Debtors are the following entities:

- *Universal Building Products, Inc*., a Delaware corporation ("*UBP*"), serves as the holding company for and corporate headquarters of the other Debtors.

- *Don De Cristo Concrete Accessories, Inc*., a California corporation ("*DDC*"), ~~manufactures~~manufactured and ~~distributes~~distributed concrete accessories for the construction industry which ~~are~~were primarily sold through a dealer network.

- *Accubrace, Inc*., a Delaware corporation ("*Accubrace*"), ~~manufactures~~manufactured and ~~distributes~~distributed total bracing systems for tilt-up slab and precast wall construction, soil anchor construction, and heavy shoring construction.

- *Form-Co, Inc*., a Delaware corporation ("*Form-Co*"), ~~is~~was a distributor of concrete forms and other construction equipment used in residential and commercial buildings including: single story and multi-story structures, bridges, tunnels, power plants, parking garages, warehouses, industrial projects, and treatment plants.

- *Universal Form Clamp, Inc*., a Delaware corporation ("*UFC*"), ~~is~~was one of the largest manufacturers and marketers of concrete accessories, forming and shoring products, and concrete related products in the United States. UFC ~~has been  serving~~served the industry for over eighty years and ~~has~~had five fully integrated manufacturing plants and six distribution centers. UFC has one wholly-owned non-debtor subsidiary, Universal Form Clamp of Canada, Inc. ("*UFC Canada*"). UFC Canada is indebted to Universal Form Clamp, Inc. pursuant to, without limitation, a Secured Revolving Promissory Note in the

original principal amount of $4 million (the "*Canadian Payable*"). UFC Canada has ceased operations and is in the process of winding-up its affairs.

As of the Petition Date, the Debtors ~~employ~~employed approximately 87 employees in the aggregate. Seven employees ~~are~~were covered by various collective bargaining agreements.

## B.    THE DEBTORS' CORPORATE HISTORY AND EQUITY STRUCTURE

In 2006, Whitney Universal Acquisition, LLC ("*Whitney*"), a private equity investor, incorporated UBP in order to acquire and bring together industry leaders DDC and UFC. UBP subsequently acquired Form-Co in 2007 and added Accubrace in 2008.

In addition to common stock, UBP has issued two series of preferred stock. Whitney continues to be the largest holder of UBP's preferred stock, holding approximately 88.9% of the Series A Preferred Stock and approximately 93.6% of the Series B Preferred Stock. Jeffrey D. Church, UBP's Chief Executive Officer, owns approximately 99% of UBP's common stock. The List of Equity Security Holders; Corporate Ownership Statement attached to UBP's bankruptcy petition provides a detailed breakdown of the ownership interests in each class of UBP stock.

Currently, the Debtors' board of directors consists of Jeffrey Church and Kerry Shiba (an independent director who was appointed in June 2010). On or about July 19, 2010, Peter Gudwin, Robert Chartener, and Mike Stone resigned from the board.

## C.    CREDIT AGREEMENT AND DEBT STRUCTURE

On April 28, 2006, Debtors Universal Building Products, Inc., Don De Cristo Concrete Accessories, Inc., and Universal Form Clamp, Inc. entered into the Credit Agreement with the Prepetition Lenders and the Administrative Agent.[3] The Credit Agreement ~~provides~~provided for aggregate borrowings of up to $106 million, consisting of (a) a six-year term loan (the "*Term Loan*") of $81 million and (b) a five-year revolving credit facility (the "*Revolver*") of up to $25 million (including letter of credit and swingline subfacilities of $7.5 million and $3 million). As of the Petition Date, the Debtors owed the Prepetition Lenders an aggregate principal amount of not less than $40,331,692.45 (together with all accrued and unpaid interest thereon, any cash management obligations owed to the Prepetition Lenders, and any fees and expenses, the "*Prepetition Indebtedness*").[4]

The Term Loan has a stated maturity date under the Credit Agreement of April 28, 2012 (six years after the date of the Credit Agreement), while the Revolver matures on April 28, 2011 (five years after the date of the Credit Agreement).

The Credit Agreement has been amended three times. The first amendment (the "*First Amendment*") is dated as of March 26, 2009, a time when the Debtors were not in default, but were concerned about possible future problems complying with financial covenants. Pursuant to the First Amendment, among other things, the Debtors were given expanded rights to offer to repurchase portions of the Lenders' debt, and the Lenders were authorized to retain a financial advisor. Pursuant to the repurchase terms of the First Amendment, the Debtors subsequently repurchased approximately $32 million of the Lenders' debt in two separate transactions, both times at a discount.

The Credit Agreement was amended again (the "*Second Amendment*") on April 13, 2009. At this point, the Debtors were out of compliance with certain financial covenants under the Credit Agreement. Pursuant to the Second Amendment, the Lenders waived the existing defaults on a one-time basis and prospectively relaxed certain financial covenants. In exchange, the Lenders were granted, among other things, a substantial interest rate increase.

---

[3]    The remaining Debtors, Form-Co, Inc. and Accubrace, Inc., were subsequently added as "Subsidiary Borrowers" pursuant to Joinder Agreements dated November 29, 2007 and March 28, 2008, respectively.

[4]    The most the Debtors' ever borrowed under the Credit Agreement was approximately $95 million. This was reduced through ordinary course payments, a paydown resulting from an insurance payout received in 2007, and a 2009 debt repurchase in the approximate amount of $32 million (discussed above).

The latest amendment to the Credit Agreement (the "*Third Amendment*") occurred on January 29, 2010, again, after the Debtors were unable to meet certain financial covenants. The Third Amendment resulted in the imposition of additional reporting requirements and substantial new lending fees. A borrowing base concept was also built in, in essence tying availability to assets. Again, however the Debtors' existing defaults were temporarily waived.

Pursuant to the Prepetition Loan Documents, the Prepetition Indebtedness is secured by valid, binding, enforceable, and perfected first-priority liens and security interests in substantially all of the Debtors' tangible and intangible personal property.

### D.    EVENTS LEADING TO THE CHAPTER 11 CASES

Beginning in 2007, the Debtors' operations began to be impacted by the deteriorating real estate market. The construction industry continued to contract through 2008 and the first half of 2009 due to both excessive supply, owing to high inventory levels, and insufficient demand, as credit became increasingly tight. As discussed above, the Debtors' financial performance significantly deteriorated during this downturn, and the Debtors have experienced difficulties meeting certain financial covenants under the Credit Agreement.

In early 2010, the Debtors, in consultation with Wachovia Bank, N.A. ("*Wachovia*," at that time the administrative agent under the Prepetition Credit Agreement), determined that the Debtors could not sustain long-term viability as a going concern without alternative funding. Wachovia was unwilling to provide such financing, and the Debtors were unable to otherwise obtain financing.

In light of these circumstances, the Debtors retained Dan Scouler and Scouler & Company ("*Scouler*") as chief restructuring officer. The Debtors, together with Scouler and Wachovia, (i) conducted a robust marketing process aimed at maximizing the value of the Debtors' assets and (ii) solicited the interest of various potential strategic and financial buyers and entertained offers for purchases of the Debtors' assets and outstanding obligations under the Credit Agreement.

Numerous potential buyers conducted due diligence with respect to a potential transaction and certain potential buyers provided letters of intent with respect to potential transactions. Based on the offers received, it became apparent to the Debtors that the value of their assets is less than the amount of Prepetition Obligations owed by the Debtors under the Credit Agreement.

### E.    DEBT ACQUISITION AND THE COMMENCEMENT OF THE CHAPTER 11 CASES

On or about July 19, 2010, in connection with the Debtors' marketing efforts, affiliates of Oaktree Capital Management, L.P. ("*Oaktree*") acquired 100% of the Debtors' senior secured debt owed to the Prepetition Lenders under the Credit Agreement. Thus, all of the Debtors' obligations under the Credit Agreement are now owed to UBP Acquisition Corp. ("*UBPA*"), an affiliate of Oaktree.

The Debtors engaged in discussions with UBPA regarding various restructuring proposals. Ultimately, those discussions resulted in the following proposal:

- Consent to a strict foreclosure by UBPA with respect to certain equipment owned by the Debtors;

- Cease manufacturing operations and file for protection under chapter 11 of the Bankruptcy Code to conduct an orderly wind-down;

- Subject to certain terms and conditions, UBPA would provide Debtor in Possession ("*DIP*") financing and would authorize the use of cash collateral necessary to allow the Debtors to conduct an auction of their assets in bankruptcy pursuant to section 363 of the Bankruptcy Code and to seek confirmation and consummation of a chapter 11 liquidating plan; and

- UBPA agreed to serve as the stalking horse in a sale process conducted pursuant to section 363 of the Bankruptcy Code and would credit bid approximately $25 million of the outstanding debt under the Credit Agreement and/or DIP Note (defined below).

The Debtors evaluated this transaction in light of prior refinancing and marketing efforts (which again made it apparent that the value of their assets is substantially less than the amount of the outstanding obligations under the Credit Agreement) and their severe liquidity constraints. The Debtors ultimately determined that without the support and cooperation of UBPA (including DIP financing and use of cash collateral), a piecemeal liquidation of the Debtors' assets may have been inevitable, and would have resulted in substantially less value than would be achieved via the orderly liquidation facilitated through UBPA's financing and purchase. Accordingly, the Debtors agreed to the restructuring terms proposed by UBPA.

In furtherance of their agreement with UBPA, on August 3, 2010, the Debtors: (i) executed strict foreclosure documents transferring title and turning over certain of their equipment to UBPA; (ii) entered into an asset purchase agreement (the "*UBPA Asset Purchase Agreement*") for the sale of their remaining assets (the "*UBP Assets*") to UBPA pursuant to an open sale process conducted pursuant to section 363 of the Bankruptcy Code; and (iii) entered into a Senior Secured Super-Priority Debtor-in-Possession Promissory Note (the "*DIP Note*") pursuant to which UBPA ~~will~~agreed to provide financing for the Debtors' Chapter 11 Cases ~~(subject to approval of the Court)~~. In addition, the Debtors also ceased all manufacturing operations and terminated substantially all of their employees immediately on August 3, 2010. Accordingly, as of the close of business on August 3, 2010, only Debtors Accubrace, Inc. and Form-Co., Inc. continued to operate, ~~and have continued to do so in the Chapter 11 Cases~~but those companies are no longer operating as UBPA has acquired the assets of those companies. On August 4, 2010, the Debtors commenced the Chapter 11 Cases by filing petition for relief under chapter 11 of the Bankruptcy Code with the Court.

F.    **PLANNED SALE OF THE DEBTORS' ASSETS**

1.    **UBPA Asset Purchase Agreement**

As noted above, prior to the Petition Date the Debtors entered into the UBPA Asset Purchase Agreement. Pursuant to the UBPA Asset Purchase Agreement, the UBP Assets ~~are to be~~were sold and transferred to UBPA pursuant to section 363 of the Bankruptcy Code, free and clear of all liens, claims, encumbrances and other interests.

The following briefly summarizes certain provisions of the UBPA Asset Purchase Agreement and is qualified entirely by reference to the UBPA Asset Purchase Agreement:

| | |
|---|---|
| **Acquired Assets** | All right, title, and interest in and to all of the Debtors' assets of any kind other than the Excluded Assets (described below). |
| **Excluded Assets** | The Excluded Assets include all of the Debtors' assets and properties that are being retained by the Debtors and are not being sold or transferred to UBP Acquisition and consisting of (i) any equity interests held by any Debtor in any Person (including any other Debtor or any subsidiary thereof) and (ii) all land and real estate owned by the Debtors. |
| **Assumed Liabilities** | None. |
| **Retained Liabilities** | UBPA ~~is~~did not ~~assuming~~assume any of the Debtors' liabilities. |

| | |
|---|---|
| **Purchase Price** | $25,000,000 in the form of a credit bid, under section 363(k) of the Bankruptcy Code, on account of the obligations owed to UBPA under the Credit Agreement and/or DIP Note |
| **Representations and Warranties** | The representations and warranties are customary representations and warranties for a transaction of this type, including, without limitation, representations and warranties regarding: the authority to enter into the sale transaction, the agreement to abide by all laws with respect to the sale, the capability of satisfying the conditions contained in section 365 of the Bankruptcy Code with respect to assumed contracts, and a general disclaimer regarding representations and warranties not specifically enumerated. |
| **Covenants** | The covenants are customary covenants for a transaction of this type, including, without limitation, covenants regarding: the best efforts of the parties, notices and consents, and access to information. |
| **Events of Default** | The events of default are customary events of default for a transaction of this type. |
| **Indemnification** | The Debtors, jointly and severally, agree to indemnify and hold UBPA and each of its Affiliates and each of their respective officers, directors, managers, equity holders, partners, employees, agents and representatives and any Person claiming by or through any of them harmless with respect to the Excluded Assets and Excluded Liabilities, including any loss, damage, Liability, cost or expense (including legal fees and expenses and court costs) arising out of or in connection with, or otherwise relating to, the Excluded Assets and the Excluded Liabilities. |
| ~~**Expense Reimbursement**~~ | ~~If the UBPA Asset Purchase Agreement is terminated prior to the Closing for any reason other than validly by the Debtors pursuant to Section 8.1(e) of the UBPA Asset Purchase Agreement, the Debtors shall, concurrently with any such termination by the Debtors, and no later than two (2) Business Days following any such termination by UBPA, immediately pay to UBPA in cash, by wire transfer of immediately available funds to an account designated in writing by UBPA, an amount equal to the costs of out-of-pocket expenses incurred by UBPA in connection with its business, legal and accounting due diligence and the preparation and negotiation of this Agreement up to a maximum of eight hundred and fifty thousand dollars ($850,000) (the "Expense Reimbursement").~~ |
| ~~**Break Up Fee**~~ | ~~In addition to any Expense Reimbursement, upon the first to occur of (i) the date any Debtor consummates a sale of any of the Acquired Assets to an entity other than UBPA or (ii) the date any Debtor consummates a plan~~ |

under the Bankruptcy Code without first selling the UBP Assets to UBPA, the Debtors shall immediately pay to UBPA in cash, by wire transfer of immediately available funds to an account designated in writing by UBPA, a breakup fee in an amount equal to four hundred thousand dollars ($400,000) (the *"Breakup Fee"*); *provided, however,* that the Breakup Fee shall not be payable to UBPA if the Agreement is validly terminated by the Debtors pursuant to Section 8.1(c) of the UBPA Asset Purchase Agreement.

As discussed below, the terms of the Asset Purchase Agreement should be interpreted in accordance with the terms of the Interim and Final Sale Orders.

**2.      Public Auction For The Sale Of The Debtors' Assets**

On the Petition Date, the Debtors sought to establish procedures (the "*Bidding Procedures*") for a competitive process to effectuate the Sale of the UBP Assets by filing a *Motion for Order (A) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (B) Scheduling Hearing to Consider Sale and Approving the Form and Manner of Notices; (C) Approving Expense Reimbursement Provision and Break-Up Fee; and (D) Granting Related Relief* (the "*Bidding Procedures Motion*").  The Bidding Procedures Motion isas well as the motion to approve the Asset Purchase Agreement are discussed further herein in connection with a discussion regarding the resolution of certain disputes regarding the sale process and the DIP financing among the Debtors, UBPA, and the official committee of unsecured creditors appointed in these cases (the "Committee").

**III.**

**THE CHAPTER 11 CASES**

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On the Petition Date, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors were stayed under section 362 of the Bankruptcy Code.  The Debtors have continued to conduct their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**A.      DEBTOR IN POSSESSION FINANCING**

On August 3, 2010, Debtor Universal Building Products, Inc. and UBPA entered into the $6,002,673 DIP Note.  The purpose of the DIP Note iswas to provide the Debtors with sufficient liquidity to operate during the Chapter 11 Cases and financial protection while the Debtors (i) close the Sale and (ii) consummate and effectuate the Plan.  The DIP Note providesprovided UBPA with a first priority lien in all of the Debtors' assets.  The remaining Debtors are Guarantors of Universal Building Products, Inc.'s obligations to UBPA under the DIP Note.

The DIP financing was approved on an interim basis by the Bankruptcy Court on August 5, 2010.  The DIP financing was approved on a final basis on August 27, 2010 as discussed further below.  The Debtors are currently working with UBPA on a proposed extension ofAs further discussed herein, although UBPA called a default under the DIP financing for purposes of facilitating the administration of the Estates and the implementation of the Plan pending the Effective Dateand terminated funding, the Bankruptcy Court nevertheless ruled that such defaults do not relieve UBPA of its obligation to support the Plan consistent with the August 26, 2010 settlement discussed below.  UBPA has taken the position that it has no obligation to provide further funding to the Debtors or their bankruptcy estates or to vote to accept the Plan.  The Debtors, however, believe this position is inconsistent with the rulings and findings of the Bankruptcy Court.

B. ~~RESOLUTION OF~~ DISPUTES REGARDING THE SALE AND DIP FINANCING

1. Resolution of <u>Certain</u> Disputes

Prior to the August 23, ~~2010~~<u>2010,</u> hearing on the Bidding Procedures Motion and final consideration of the DIP financing, the Committee filed (i) objections to both the Bidding Procedures Motion and the DIP based on various grounds, and (ii) a motion to limit UBPA's ability to credit bid.

Prior to the August 23, 2010, the Committee, the Debtors, and UBPA engaged in preliminary settlement discussions focusing on the resolution of these disputes and an efficient exit strategy for the Chapter 11 Cases. The settlement discussions were based on the facts that (i) the Debtors had previously conducted an extensive sale process; (ii) it ~~is~~<u>was</u> highly doubtful that any party would be willing to pay more for the Debtors' assets than had been offered by UBPA; and (iii) it ~~is~~<u>was</u> highly doubtful that the Debtors could obtain affirmative funding to administer these Chapter 11 Cases other than UBPA's DIP. Hence, <u>the Debtors believed that</u> maximum recoveries for creditors would be achieved through quickly transferring the Debtors' assets so that administrative costs (*i.e.*, wages, rents, etc.) were minimized and allowing portions of the DIP Note commitment to go towards creditor claims as opposed to administrative expenses. In light of those discussions, the parties requested a continuance of the hearing.

At a hearing on August 26, 2010, the parties agreed to a resolution of the disputes on the following terms:

- The Debtors would transfer substantially all of their assets to UBPA under the UBPA Asset Purchase Agreement on an "interim basis" subject to receipt of other offers (discussed further below). This would allow UBPA to begin taking possession of the assets and allowing the Debtors to expedite the wind-down of their affairs.

- The Bidding Procedures Motion would be granted substantially in the form as presented so that a sale and auction process could be conducted in the event a qualified bidder presented a competing offer for the assets.

- The DIP financing was approved, but (i) UBPA agreed that its liens would not attach to any (a) Avoidance Actions or (b) other Causes of Action not transferred to UBPA or asserted against UBPA (the "*Transferred Causes of Action*"),<u>[5]</u> and (ii) additional professional fee amounts were allocated to the Committee's professionals <u>in the Budget</u>.

- The full amount of the DIP commitment, less amounts previously funded, would fund a liquidating chapter 11 plan (collectively, with the Transferred Causes of Action and the Avoidance Action, the "*Transferred Property*").

- The Debtors, the Committee, and UBPA shall support a liquidating chapter 11 plan that (i) embodies the terms of the DIP financing <u>orders and the orders related to the bidding procedures and the sale</u>; (ii) provides for a waiver of UBPA's Claim as to the Transferred Property; and (iii) provides broad releases

---

[5] <u>In particular, the Final DIP Order provides that the DIP liens do not attach to "(i) any and all avoidance actions or other claims or causes of action under Chapter 5 of the Bankruptcy Code and products and proceeds thereof or (ii) other claims or causes of action, in each case of (i) and (ii), not related to or asserted against (y) UBPA or any affiliate, successor or assign thereof, including, without limitation, Dayton Superior Corporation, and each of their respective current and former members, officers, directors, managed funds, investment advisors, attorneys, employees, partners, affiliates, shareholders, financial advisors and representatives (each of the foregoing solely in their capacity as such), or (z) any assets acquired by UBPA from the Debtors prior to or after the Petition Date, including, without limitation, infringement actions relating to intellectual property acquired by UBPA (as hereinafter defined) or UBPA and products and proceeds thereof; or (iii) the difference of: (A) the funds borrowed or available to be borrowed under the DIP Facility up to the Maximum Amount (as hereinafter defined) less (B) any amounts borrowed under the DIP Facility and spent.</u>

to (a) Jeff Church (the Debtors' CEO and a member of the Debtors' board of directors); (b) Kerry Shiba (a member of the Debtors' board of directors); (c) Greg Waller (the Debtors' CFO); and (d) Dan Scouler (the Debtors' CRO), Scouler & Company, and its professionals (a through d collectively, the "*Debtor Releasees*") assuming the Plan complies with the settlement terms.

On August 27, 2010, the Bankruptcy Court entered orders approving the DIP (the "Final DIP Order"), the Bidding Procedures Motion, and the "interim" sale, which reflected these terms.

As part of this settlement, the Plan provides releases of the Debtor Releasees. The Debtors' Estates and individual creditors may have claims or causes of action against the Debtor Releasees (although the Debtors do not believe any such causes of action exist); however, the existence of such claims and causes of action have not been fully investigated. As a result, creditors holding Class 2, 3, or 4 Claims may elect to "opt-out" of the releases of their potential individual claims against the Debtor Releasees, and such creditors may pursue their individual claims against the Debtor Releasees.

## 2. Sale to UBPA

In connection with the resolution of certain disputes discussed above, the Debtors, UBPA, and the Committee agreed that (a) the Debtors would seek entry of an interim sale order (the "*Interim Sale Order*") approving a sale of assets to UBPA on an emergency basis; (b) UBPA would immediately begin to take possession of the Acquired Assets to enable the Debtors to realize certain administrative savings and limit borrowings under the DIP Note, which savings would inure to the benefit of the Debtors' estates; (c) an auction would be held in the event that the Debtors receive one or more other qualified bids (as set forth in the Bidding Procedures Motion) on or before the bid deadline of September 1, 2010 at 12:00 p.m. prevailing Eastern Time; (d) if the Debtors receive no additional qualified bids before the bid deadline, or in the event that an auction occurs and UBPA is the winning bidder, the Debtors shall submit a Final Order under certification of counsel, which Final Order shall be identical in all material respects to the Interim Sale Order, and the Committee consents without objection to entry of such a Final Order; and (e) in the event an auction occurs and UBPA is not the winning bidder, (i) conveyance of the Acquired Assets to UBPA shall be rescinded and all right, title and interest in the Acquired Assets will be deemed re-vested in the Debtors, (ii) all Liens, Claims and Interests in the Acquired Assets shall attached to the Acquired Assets to the same extent as prior to entry of the Interim Order; and (iv) the winning bidder shall (1) reimburse UBPA for all costs and expenses incurred by UBPA in transferring or storing Acquired Assets pursuant to the Interim Sale Order; and (2) pay all costs of transferring the Acquired Assets from UBPA to the winning bidder.

The Bankruptcy Court entered the Interim Sale Order on August 27, ~~2010~~ 2010 and the Sale was considered closed subject to the terms of the Interim Sale Order. After no competing offers were submitted, the Bankruptcy Court entered a Final Order on September 7, 2010. As of the date of this Disclosure Statement, the Debtors have transferred possession of substantially all of the Acquired Assets to UBPA. Additionally, the Debtors have rejected substantially all of their real and personal property leases pursuant to motions filed with the Bankruptcy Court. The rejections of the real property leases will result in unsecured and potentially administrative claims against the Estates.

## 3. Current Status of the DIP Financing

The original budget under the DIP financing expired on October 1, 2010, and a chapter 11 plan had not been effectuated by that date. As a result of these events, a default has been called by UBPA under the DIP and UBPA has declared the DIP to be terminated.

UBPA then asserted that it currently does not support the Plan and that the Plan may not be confirmable without (i) UBPA waiving the default under the DIP and (ii) UBPA's support of the Plan.

On November 1, 2010, the Debtors filed a motion to compel UBPA to honor its commitment to provide funding and to be deemed as accepting the Plan (the "*Motion to Compel*"). The Debtors asserted that UBPA cannot terminate its obligation to fund and support the Plan (as was agreed upon in connection with the settlement

reached on August 26, 2010) based on technical timing defaults which do not prejudice UBPA and which cause a forfeiture to the bankruptcy estates, while UBPA benefited from the sale of the Debtors' assets.

In connection with the hearing on the Motion to Compel on November 5, 2010, the Bankruptcy Court concluded:

- The essence of the August 26, 2010 settlement was that UBPA would support a plan, and the essence of the DIP has been met.

- The Debtors' defaults under the DIP do not affect the August 26, 2010 settlement or eliminate UBPA's "obligation to support a plan" consistent with the provisions of the settlement.

- The Plan is consistent with the August 26, 2010 settlement.

- The DIP's deadlines as to a plan were not material to the August 26, 2010 settlement.

On November 23, 2010, the Bankruptcy Court entered an order providing that UBPA's obligation to support a plan consistent with the August 26, 2010 settlement continues notwithstanding the existing defaults under the DIP financing arrangements.

In light of the Bankruptcy Court's conclusions, the Debtors believe that UBPA is bound to support the Plan, and the Plan is confirmable. UBPA continues to assert that it has no obligation to provide further funding to the Debtors or their bankruptcy estates or to vote to accept the Plan, but the Debtors believe that position is inconsistent with the Bankruptcy Court's conclusions made on November 5, 2010.

**4.      UBPA's Asserted Administrative Expense Claim**

On November 19, 2010, UBPA filed the *Application of UBP Acquisition Corp. for Payment of Administrative Expenses* (the "*UBPA Asserted Administrative Claim*") which seeks the allowance of a $565,757 administrative expense claim on account of amounts UBPA asserts that it incurred in connection with the Debtors' exit of their various locations. UBPA amended the UBPA Asserted Administrative Claim on January 27, 2011, to an increased amount of $674,964. UBPA has reserved its right to increase the amount sought in connection with the UBPA Asserted Administrative Claim, and it may supplement its request to include additional amounts to which it believes it may be entitled under the Final DIP Order.

The Debtors believe that the UBPA Asserted Administrative Claim is an attempt by UBPA to circumvent the August 26, 2010 settlement, and the Debtors or the Liquidating Trust shall object to the UBPA Asserted Administrative Claim because, among other things, it is inconsistent with the agreements between UBPA and the Debtors.

The Debtors are confident that the UBPA Asserted Administrative Claim will be disallowed. Nevertheless, if the UBPA Asserted Administrative Claim is ultimately allowed, potential distributions to creditors as set forth in the Distribution Analysis attached hereto as Exhibit B would be decreased accordingly.

**C.      SUMMARY OF OTHER SIGNIFICANT MOTIONS**

The following summarizes other significant motions that the Debtors filed on the Petition Date. You may view each of these motions, and other filed documents, by (i) accessing the Bankruptcy Court's website at http://www.deb.uscourts.gov/ or (ii) making a written request to the Debtors' notice, claims and balloting agent, The Garden City Group, Inc., P.O. Box 9656 Dublin, OH 43017-4956, 1 (800) 327-3664.

**1.      Applications for Retention of Debtors' Professionals**

The Debtors filed applications for the retention of certain professionals to represent and assist the Debtors in connection with the Chapter 11 Cases. These professionals include, among others: (a) K&L Gates LLP, as co-counsel to the Debtors, (b) Saul Ewing LLP, as co-counsel to the Debtors, (c) Scouler & Company, as Chief Restructuring Officer for the Debtors, and (d) The Garden City Group, Inc., as notice, claims and balloting agent to the Debtors. The Debtors also filed a separate motion seeking to establish procedures for the interim compensation of professionals.

### 2. Motion for Joint Administration of the Chapter 11 Cases

The Debtors filed a motion seeking to consolidate the Debtors' Chapter 11 Cases for administrative purposes only. The Debtors' Chapter 11 Cases are currently administered under a single case name and number: *In re Universal Building Products, Inc. et al.*, Case No. 10-12453, for administrative purposes only.

### 3. Motion to Pay Employee Wages and Associated Benefits

The Debtors believe that their employees ~~are~~were a valuable asset and that any delay in paying prepetition or postpetition compensation or benefits to their employees would destroy their relationship with employees and irreparably harm employee morale at a time when the dedication, confidence and cooperation of their employees is most critical. The Debtors filed a motion requesting that the Bankruptcy Court authorize the Debtors, in their sole discretion, to pay all compensation and benefits to their employees for obligations payable as of the Petition Date, as well as obligations that come due after the Petition Date.

### 4. Utilities Procedures Motion

The Debtors believe that uninterrupted utility services ~~are~~were essential to ongoing operations. The Debtors sought authority to implement procedures to prevent utilities from discontinuing, altering or refusing service and to provide a systematic procedure for determining adequate assurances.

### 5. Motion Authorizing Rejection of Unexpired Leases

The Debtors ~~have~~ determined that it ~~is~~was in their best business interest to avoid the accrual of any further obligations under several leases, and thus filed a motion seeking to reject these leases effective August 4, 2010. The Debtors ~~are~~were no longer in possession of these premises and ~~are~~were not using them in their operations or for any other purpose as of the Petition Date. The unexpired leases at issue are: (i) an unexpired lease of nonresidential real property located at 6904 Park East Boulevard, Tampa Florida with MiTek Industries, Inc; and (ii) an unexpired lease of nonresidential real property located at 2300 Maywood Drive, Bellwood, Illinois with MLRP 2300 Maywood LLC

### 6. Motion to Employ Ordinary Course Professionals

The Debtors ~~retain~~retained the services of various professionals in the ordinary course of their business operations. The Debtors filed a motion requesting permission to continue to employ such professionals postpetition without the necessity of filing formal applications for employment and compensation by each professional.

### 7. Schedules and Statement of Financial Affairs

The Debtors ~~are filing~~filed their schedules of claims, assets, liabilities, executory contracts and other information (the "*Schedules*") and a Statement of Financial Affairs (the "*SOFAs*") to provide creditors and other interested parties with material information to enable each creditor to evaluate its proposed treatment under the Plan. Interested parties may review the Schedules and the SOFAs (i) by accessing the Bankruptcy Court's website at http://www.deb.uscourts.gov/, (ii) making a written request to the Debtors' notice, claims and balloting agent, The Garden City Group, Inc., P.O. Box 9656 Dublin, OH 43017-4956, 1 (800) 327-3664, or (iii) at the office of the Clerk of the Bankruptcy Court for the Western District of Delaware, Wilmington Division.

### 8. Taxes

In connection with the normal operation of their businesses, the Debtors (a) incur sales and use, highway use, fuel, franchise, and other taxes necessary to operate their businesses (collectively, the "*Taxes*"), and (b) are charged for tolls, fees, licenses, permits, and other similar charges and assessments (collectively, the "*Fees*") by various taxing, tolling, and licensing authorities (collectively, the "*Taxing Authorities*"). The Debtors ~~believe~~believed that the failure to pay the Taxes and Fees could trigger a materially adverse impact on the Debtors' operations, including the potential suspension of the Debtors' ability to operate in certain jurisdictions. Moreover, if any of the Taxing Authorities attempt to exercise certain remedies against the Debtors, it would have had the devastating effect of distracting the attention of the Debtors' management and professionals away from the important tasks associated with ensuring that the Chapter 11 Cases are successful. Accordingly, the Debtors filed a motion requesting authority to pay, in their discretion, all Taxes and Fees owing to the Taxing Authorities.

### 9. Claims Bar Date

The Debtors filed a motion seeking the establishment of dates by which proofs of Claims must be submitted. The Bankruptcy Court ~~has~~ set ~~_____,~~October 29, 2010 as the bar date for all non-governmental persons or entities to file prepetition Claims, and ~~_____, 2010~~January 31, 2011 as the bar date for all governmental units to file prepetition Claims in these Chapter 11 Cases. Any person or entity that is required to file a proof of claim in these Chapter 11 Cases but fails to do so in a timely manner shall be forever barred, estopped and enjoined from (a) asserting any Claim against the Debtors that such person or entity has that (i) is in an amount that exceeds the amount, if any, that may be set forth in the Schedules or (ii) is of a different nature or in a different classification than what may be set forth in the Schedules (in either case any such Claim referred to as an "*Unscheduled Claim*") and (b) voting upon, or receiving distributions under, the Plan in respect of an Unscheduled Claim.

### 10. Cash Management

To avoid delays in paying debts incurred postpetition and to ensure as smooth a transition into chapter 11 as possible, the Debtors filed a motion seeking authority to maintain their existing cash management system, business forms, and bank accounts, and, if necessary, to open new accounts and close existing accounts in the normal course of business operations, without further application to the Bankruptcy Court.

### 11. Creditors' Committee Formation; Previous Disputes with the Debtors

The Committee was formed on August 13, 2010, consisting of the following members: (i) Raytrans Distribution Services, Inc.; (ii) King Steel Corporation; (iii) Eastern Accessories Corp; (iv) Millennium Metals, LLC; and (v) Jade-Sterling Steel Co., Inc.

The Committee originally sought to retain Arent Fox, LLP as its lead counsel and Elliott Greenleaf as its local counsel. The Debtors objected to the retention of these firms based upon certain provisions of the Bankruptcy Code and the Rules of Professional Responsibility.

The Committee subsequently filed motions to (i) displace the Debtors management and appoint a chapter 11 trustee, and (ii) convert the Chapter 11 Cases to cases under chapter 7, both of which were opposed by the Debtors.

Ultimately, the Debtors prevailed on their objection to the retention of Arent Fox, LLP and Elliott Greenleaf. The Committee then retained Benesch, Friedlander, Coplan & Aronoff LLP as its counsel.

The Committee subsequently withdrew its previously filings regarding the retention dispute and its chapter 11 trustee and conversion motions without prejudice.

IV.

**SUMMARY OF THE LIQUIDATING PLAN OF REORGANIZATION**

**A.      OVERVIEW OF CHAPTER 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  It authorizes a debtor to reorganize its business for the benefit of itself, its creditors and its interest holders.  Another chapter 11 goal is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that comprises all of a debtor's legal and equitable interests as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The principal objective of a chapter 11 case is to consummate a chapter 11 plan.  The chapter 11 plan sets forth the means for satisfying claims against, and interests in, a debtor.  Confirmation of a chapter 11 plan by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity holder in the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable right of the Holders of Claims or Equity Interests in classes are to remain unaltered by the reorganization to be effectuated by the plan.  Such Classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.  Accordingly, it is not necessary to solicit votes from the Holders of Claims or Equity Interests in such Classes.  A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor.  Such Classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the Plan.  Any Classes that are receiving a distribution of property of the Estates under the Plan but are not "unimpaired" will be solicited to vote to accept or reject the Plan.

**THE REMAINDER OF THIS SECTION SUMMARIZES THE STRUCTURE AND MEANS FOR IMPLEMENTING THE PLAN AND HOW THE PLAN CLASSIFIES AND TREATS CLAIMS AND EQUITY INTERESTS, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN.    THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD REFER TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.**

**THE PLAN ITSELF AND THE DOCUMENTS THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, THE DEBTORS' ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES–IN–INTEREST.    IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL GOVERN.**

**HOLDERS OF CLAIMS OR EQUITY INTERESTS AND OTHER INTERESTED PARTIES ARE THEREFORE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.**

### B.     GENERALLY

#### 1.     Liquidating Plan of Reorganization

The Plan is a liquidating chapter 11 plan of reorganization that provides for the orderly liquidation of all of the Debtors' assets, the determination of all Claims and the distribution of the proceeds of the assets to creditors. On or prior to the Effective Date, the Debtors shall consummate the Sale. On the Effective Date, the Debtors shall transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust, for and on behalf of the beneficiaries of the Liquidating Trust, with no reversionary interest in the Debtors, the Liquidating Trust Assets.

*UBPA does not support the Plan and denies any obligation to vote to accept the Plan. The Debtors, however, believe that the Bankruptcy Court's ruling on November 5, 2010 indicates that UBPA is bound to support the Plan. Additionally the Debtors reserve the right to (i) abandon any remaining property that constitutes UBPA's collateral such that UBPA shall realize the indubitable equivalent of its remaining secured claim in accordance with section 1129(b)(2))(A)(iii) of the Bankruptcy Code, and (ii) compel UBPA to comply with its obligation to support the Plan.*

#### 2.     The Liquidating Trust

The Liquidating Trust shall be established for the primary purpose of liquidating its assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. The Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan. The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the beneficiaries treated as grantors and owners of the trust. As of the Effective Date, the Liquidating Trust shall be responsible for (i) the winding up of the Debtors' Estates, (ii) liquidating or otherwise reducing to Cash the Transferred Property or the Preserved Collateral, as applicable and in accordance with the Liquidating Trust Agreement, (iii) filing, prosecuting and settling Causes of Action, Avoidance Actions, Transferred Causes of Action (iv) making distributions to Holders of Allowed Claims, (v) overseeing the continued liquidation to Cash of all other Liquidating Trust Assets, and (vi) settling, resolving and objecting to Claims.

### C.     CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified, but the treatment for such unclassified claims are set forth in Article II of the Plan and Article IV.C.2 herein.

The Debtors believe that the Plan has classified all Claims and Equity Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Equity Interest may challenge the classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.

Subject to the occurrence of the Effective Date, the Debtors and their Estates will be deemed substantively consolidated for voting and distribution purposes only. No distributions will be made under the Plan on account of

Intercompany Claims. The assets and liabilities of the Debtors shall be pooled and all Claims shall be satisfied from the assets of a single consolidated estate. Any Claims against one or more of the Debtors (including Claims based upon a guaranty, indemnity, co-signature, surety or otherwise, of Claims against another Debtor) shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to distributions under the Plan only with respect to such single Claim.

The classification of Claims and Equity Interests and the nature of Distributions to members of each Class are summarized below. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims and Equity Interests reflects an appropriate resolution of their Claims and Equity Interests, taking into account the differing nature and priority (including applicable contractual subordination) of Claims and Equity Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Equity Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court. The "cramdown" provisions of section 1129(b) of the Bankruptcy Code, for example, permit confirmation of a chapter 11 plan in certain circumstances even if the Plan has not been accepted by all Impaired Classes of Claims and Equity Interests. The Debtors will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, because of the deemed rejection of Classes 5 and 6. Although the Debtors believe that the Plan could be confirmed under section 1129(b) even if the Plan has not been accepted by all of the Impaired Classes, there can be no assurance that the requirements of such section would be satisfied.

### 1.    Schedule of Treatment of Claims and Equity Interests

| Class | Title | Status | Entitled to Vote |
|-------|-------|--------|------------------|
| 1 | Senior Creditor Claims | Impaired | Yes[6] |
| 2 | Other Secured Claims | ~~Unimpaired~~Impaired | ~~No~~Yes |
| 3 | Other Priority Claims | ~~Unimpaired~~Impaired | ~~No~~Yes |
| 4 | Unsecured Claims | Impaired | Yes |
| 5 | Intercompany Claims | Impaired | No |
| 6 | Equity Interests | Impaired | No |

### 2.    Treatment of Unclassified Claims

**The Debtors' estimates of the various Claims discussed below can be found in the Distribution Analysis attached hereto as Exhibit B.**

- Administrative Claims

Non-Professional Fee Administrative Claims. Each Allowed Administrative Claim shall be, at the Liquidating Trustee's election, either (i) paid by the Debtors in full, in Cash from the Transferred Property (or the proceeds thereof), in such amounts as such Administrative Claim is Allowed by the Bankruptcy Court upon the later of the Effective Date or the date upon which such Administrative Claim is Allowed or (ii) satisfied upon such other terms as may be agreed upon between the Holder of such Administrative Claim and the Liquidating Trustee. Any application for the payment of any Administrative Claims ~~on account of any fees or reimbursement of expenses of any~~(other than Professional~~.~~ Fee Claims) shall be Filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date.

~~(b)~~ Professional Fee Claims. Unless otherwise expressly provided in the Plan, a Professional Fee Claim will be Allowed only if: (i) on or before forty-five (45) days after the Effective Date (the "*Professional Fee Bar Date*"), the entity holding such Professional Fee Claim files with the Court a final fee application and

---

[6]    The Debtors are reserving the right to argue at the Confirmation Hearing that any vote of the Holders of Senior Creditor Claims shall only count if the Debtors have not previously abandoned the Preserved Collateral because such Holders waived the DIP Lender Deficiency Claim and the Prepetition Lender Deficiency Claim under prior agreements and, thus, the abandonment of the Preserved Collateral will eliminate such Holders' Secured Claims, leaving such Holders without any Claims against the Debtors or their Estates. UBPA opposes this conclusion and is reserving all rights in connection therewith.

serves the application on counsel to the Debtors, counsel to the Committee, the Liquidating Trustee, and the U.S. Trustee; and (ii) the Court enters an order allowing the Claim.  The Liquidating Trust shall pay any Allowed Professional Fee Claims within three (3) Business Days of entry of the respective Final Order allowing such Professional Fee Claim.

One (1) Business Day after the Effective Date, each Professional shall provide the Liquidating Trustee with a non-binding estimate of its respective unpaid Professional Fee Claim.  Within three (3) Business Days after the Effective Date, the Liquidating Trustee shall establish a Professional fee escrow account and, using the Plan Fund, fund such escrow account in an amount equal to the aggregate unpaid Professional Fee Claims based on the estimates provided by the Professionals.  The amounts in the Professional fee escrow account shall not be used to pay any other amounts under this Plan until Allowed Professional Fee Claims have been satisfied in accordance with the preceding paragraph.

Any party in interest may file an objection to such application within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes.  Entities holding Professional Fee Claims that do not timely file and serve a fee application by the Professional Fee Bar Date will be forever barred from asserting such Professional Fee Claim against the Debtors, the Estates, the Liquidating Trust, or their respective property.  Notwithstanding any releases provided in this Plan, all Professional Fee Claims shall be subject to potential objections at the hearing on the respective Professional Fee Claim in accordance herewith on grounds that a Professional Fee Claim is not allowable under section 330 of the Bankruptcy Code.

- DIP Facility Claims

Notwithstanding anything to the contrary herein, in full and final satisfaction, settlement, release and discharge of and in exchange for release of the DIP Facility Claim, in accordance with section 1129(a)(9) of the Bankruptcy Code, the DIP Lender has agreed that the DIP Facility Claim shall receive the treatment afforded in Article III.B.1 of the Plan.

- Priority Tax Claims

On, or as soon as reasonably practicable after, the latest of the Effective Date or the date such Priority Tax Claims becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (i) Cash from the Transferred Property (or the proceeds thereof) equal to the unpaid portion of such Allowed Priority Tax Claim or (ii) such other treatment as to which the Debtors and such Holder have agreed upon in writing.

3.    **Classification and Treatment of Classified Claims**

- Class 1 – Senior Creditor Claims

  - Classification:  Class 1 consists of all Senior Creditor Claims.

  - Holders of Allowed Senior Creditor Claims shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Senior Creditor Claims, ~~the Senior Creditor Series of the Liquidating Trust as provided for in~~ distributions of the Preserved Collateral (or the proceeds thereof) from the Liquidating Trust ~~Agreement~~.

  - Voting:  Class 1 is impaired.  Subject to the reservations of rights set forth in this Disclosure Statement and the Plan, Holders of Senior Creditor Claims in Class 1 are entitled to vote to accept or reject the Plan.

Based on the Bankruptcy Court's findings and rulings made at the hearing on November 5, 2010, the Debtors believe that UBPA is obligated to accept the Plan. UBPA, however, disagrees with that interpretation of the November 5, 2010 rulings.

- Class 2 – Other Secured Claims

    - Classification: Class 2 consists of all Other Secured Claims.

    - Treatment: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such Claim becomes an Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive (i) the property securing such Allowed Other Secured Claim, or (ii) such other treatment as to which the Debtors or the Liquidating Trustee and such Holder have agreed upon in writing, upon consultation with the Prepetition Lenders and the DIP Lender.

    - Voting: Class 2 is ~~unimpaired~~impaired. Holders of Other Secured Claims in Class 2 are ~~deemed to accept the Plan and are therefore not~~ entitled to vote to accept or reject the Plan.

- Class 3 – Other Priority Claims

    - Classification: Class 3 consists of all Other Priority Claims.

    - Treatment: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, (i) Cash from the Transferred Property (or the proceeds thereof) equal to the unpaid portion of such Allowed Other Priority Claim, or (ii) such other treatment as to which the Debtors or the Liquidating Trustee and such Holder have agreed upon in writing ~~upon consultation with the Prepetition Lenders and the DIP Lender~~.

    - Voting: Class 3 is ~~unimpaired~~impaired. Holders of Other Priority Claims in Class 3 are ~~deemed to accept the Plan and are not therefore~~ entitled to vote to accept or reject the Plan.

- Class 4 – Unsecured Claims

    - Classification: Class 4 consists of all Unsecured Claims.

    - Treatment: Holders of Allowed Unsecured Claims in Class 4 shall receive a Pro Rata share of the ~~Unsecured Creditor Series of the Liquidating Trust. On the Effective Date, or as soon thereafter as is practicable, the Liquidating Trustee shall make a distribution of the Unsecured Creditor Series of the Liquidating Trust to each Holder of an Allowed Class 4 Claim in an amount equal to such Holder's Pro Rata share of the balance in the~~ Transferred Property ~~transferred to the~~

~~Liquidating Trust remaining after creation of the Disputed Claim Reserve.~~

- ~~In the event of entry of a Final Order determining a Disputed Claim to be an Allowed Claim, the Liquidating Trustee, in his sole discretion, may make an interim distribution to the Holder of such Allowed Claim from the Disputed Claim Reserve to such Holder. The Holders of Class 4 Allowed Claims shall thereafter receive their Pro Rata share of any subsequent distributions from the Liquidating Trust~~ Transferred Property (or the proceeds thereof) remaining after payment of Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims.

- Voting: Class 4 is impaired. Holders of Allowed Unsecured Claims in Class 4 are entitled to vote to accept or reject the Plan.

  Additionally, Holders of Class 4 Claims (along with Holders of Class 2 or 3 Claims) may elect to "opt-out" of the provision of the Plan whereby such Holders release any claims against certain non-Debtor parties. The "opt-out" may be selected by marking the appropriate check box on the Class 4 Ballot.

- Class 5 – Intercompany Claims

  - Classification: Class 5 consists of all Intercompany Claims.

  - Treatment: On the Effective Date, all Intercompany Claims shall be deemed waived and cancelled and Holders of Intercompany Claims shall not receive any distribution on account of such Intercompany Claim under the Plan.

  - Voting: Class 5 is impaired. Because Holders of Intercompany Claims will receive no distributions under the Plan, Class 5 will be deemed to have voted to reject the Plan.

- Class 6 – Equity Interests

  - Classification: Class 6 consists of all Equity Interests.

  - Treatment: On the Effective Date, all Equity Interests shall be cancelled and the Holders of Equity Interests shall not receive or retain any distribution or property on account of such Equity Interests.

  - Voting: Class 6 is impaired. Because Holders of Equity Interests will receive no distribution under the Plan, Class 6 will be deemed to have voted to reject the Plan.

### D.  MEANS FOR IMPLEMENTATION OF THE PLAN

### 1.  Funding of the Plan Fund Into the Liquidating Trust

On or prior to the Effective Date, the DIP Lender shall fund to the Liquidating Trust from the DIP Facility the entire amount of credit provided for under the DIP Facility less amounts previously funded to the Debtors. In addition, on or prior to the Effective Date, the Debtors shall fund to the Liquidating Trust any amounts that have been previously funded pursuant to the DIP Facility and that have not been spent or disbursed by the Debtors; provided, however, that the Debtors' and DIP Lenders' funding of these amounts into the Liquidating Trust

shall be expressly conditioned on the Debtors having remitted to the DIP Lenders and/or Prepetition Lenders (as applicable) any cash collateral other than amounts funded pursuant to the DIP Facility that were not disbursed or expected to be disbursed in accordance with the Budget. ~~The estimated amount of the Plan Fund as of the projected Effective Date shall be set forth in the Plan Supplement~~For the avoidance of doubt, neither the DIP Lenders nor the Prepetition Lenders shall be entitled to receive any amount of the $427,301 that constituted the initial Cash held by the Debtors on the Petition Date since such amount was disbursed or expected to be disbursed in accordance with the Budget.

### 2. Funding of the Liquidating Trust

The Liquidating Trust will be funded initially by the Liquidating Trust Assets, which include, (i) the Preserved Collateral and (ii) the Transferred Property.

### 3. Transfer of Liquidating Trust Assets to the Liquidating Trust

On the Effective Date, the Debtors shall transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust, for and on behalf of the beneficiaries of the Liquidating Trust, with no reversionary interest in the Debtors, the Liquidating Trust Assets.

### 4. The Liquidating Trust

(a) Creation of the Liquidating Trust

(i) On the Effective Date or immediately prior thereto, (i) the Liquidating Trust shall be created and established by the execution and delivery of the Liquidating Trust Agreement and any other necessary action, subject to the provisions of the Plan, (ii) all Transferred Property shall be transferred to the Liquidating Trust free of all Claims, Liens and interests for the benefit of the ~~holders of the Unsecured~~Holders of Claims other than Senior Creditor ~~Series~~Claims, and (iii) all Preserved Collateral shall be transferred to the Liquidating Trust, free of all Claims, Liens and interests for the benefit of ~~holders~~Holders of ~~the~~ Senior Creditor ~~Series~~Claims. The Liquidating Trust shall reduce to Cash or otherwise liquidate the Liquidating Trust Assets and distribute such liquidated assets in accordance with and subject to the terms and provisions of the Plan and the Liquidating Trust Agreement. As provided in Article IV.E of the Plan, upon entry of the Final Decree, the Liquidating Trust shall be dissolved without further action by the Liquidating Trustee.

(ii) As of the Effective Date, the Liquidating Trust shall be responsible for (i) the winding up of the Debtors' Estates, (ii) liquidating or otherwise reducing to Cash the Transferred Property or the Preserved Collateral, as applicable and in accordance with the Liquidating Trust Agreement, (iii) filing, prosecuting and settling Causes of Action, Avoidance Actions, Transferred Causes of Action (iv) making distributions to Holders of Allowed Claims, (v) overseeing the continued liquidation to Cash of all other Liquidating Trust Assets, and (vi) settling, resolving and objecting to Claims.

(iii) All costs and expenses associated with the administration of the Liquidating Trust shall be the responsibility of and paid by the Liquidating Trust ~~from~~in accordance with the Liquidating Trust ~~Assets~~Agreement. The costs and expenses incurred by the Liquidating Trustee in administering, maintaining or liquidating the Preserved Collateral, including the fees and expenses of the Liquidating Trustee's professionals, consultants and agents incurred in connection with the Preserved Collateral and taxes, levies and assessments related to the Preserved Collateral, shall be paid from the Liquidating Trust Assets, and shall be reimbursed to the Liquidating Trust from the proceeds or products of the Preserved Collateral before any distribution of such products or proceeds to the Holders of ~~the~~ Senior Creditor ~~Series~~Claims.

UBPA believes that the Liquidating Trust should bear the carrying costs and costs of liquidation related to the Preserved Collateral (i.e., the Debtors' real property in Centralia, Illinois). That position, however, would require the Liquidating Trust to incur substantial costs that decrease distributions to all creditors other than UBPA. To the extent that such costs do not result in a net benefit to all creditors, it will be appropriate for the Debtors or the

Liquidating Trust to abandon the Preserved Collateral, and no agreement, including the August 26, 2010 settlement, provides that such action by the Liquidating Trustee would be prohibited.

(iv)     The Liquidating Trustee may retain such law firms, accounting firms, experts, advisors, consultants, investigators, appraiser, auctioneers, translators, or other professionals as it may deem necessary (collectively, the "*Liquidating Trustee Professionals*"), in its discretion, and at the sole expense of the Liquidating Trust, to aid in the performance of its responsibilities pursuant to the terms of this Plan including, without limitation, the liquidation and distribution of Liquidating Trust Assets. In no event shall Dr. Haishan Liu or any individual or Entity affiliated with Dr. Liu act as a Liquidating Trustee Professional. The Liquidating Trustee shall maintain an accounting of such costs and expenses.

(v)     Notwithstanding anything herein to the contrary, the Liquidating Trust Agreement shall provide that the aggregate compensation and expenses of the Liquidating Trustee and any Liquidating Trust Professionals (for all services other than those related to the Preserved Collateral which may be reimbursed or otherwise paid from the proceeds of the Preserved Collateral) shall be limited to $150,000; provided, however, that to the extent that the Liquidating Trustee pursues any Cause of Action or Avoidance Action, the Liquidating Trustee may engage counsel to be compensated on a contingency basis to the extent such counsel is not compensated from the $150,000 amount referred to herein; provided, further, such that the proceeds of each individual Cause of Action or Avoidance Action (each referred to as an "Individual Action") may only be distributed as follows:

-not more than (a) thirty-three percent (33%) of the proceeds of each Individual Action may be used for payment of the professionals fees on account of the prosecution of such Individual Action by the individual contingency counsel handling such prosecution, *plus* (b) an amount necessary to reimburse expenses incurred in connection with the prosecution of such Individual Action; and

-the remaining proceeds of each Individual Action shall be distributed solely to Holders of Claims against the Estates which arose prior to the Effective Date in accordance with the priorities established under the Plan.

Accordingly, no proceeds of any Individual Action may be in any way distributed to, used as funding by, or treated as compensation for either the Liquidating Trustee or Liquidating Trustee Professionals; other than payment of amounts described in subparagraph (i) above to the specific contingency counsel prosecuting the particular Individual Action which generated such proceeds and no proceeds of any particular Individual Action may be used or paid in conjunction with any different Individual Action.

(vii)     Distribution of Liquidating Trust Assets:  The Liquidating Trustee is required to distribute to the holders of Allowed Claims on account of their interests in the Liquidating Trust, on a quarterly basis, all unrestricted Cash on hand (including any Cash received from the applicable Debtors on the Effective Date, and treating any permissible investment as Cash), except such amounts (i) as have been reserved on account of Disputed Claims, or are otherwise part of the claims reserve established by the Liquidating Trustee (the "Disputed Claim Reserve"), (ii) as are reasonably necessary to maintain the value of the Liquidating Trust Assets during liquidation, (iii) as are necessary to pay reasonable incurred or anticipated expenses (including, but not limited to, any taxes imposed on or payable by the Debtors or the Liquidating Trust or in respect of the Liquidating Trust Assets), or (iv) as are necessary to satisfy other liabilities incurred or anticipated by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement; provided, however, that the Liquidating Trustee shall not be required to make a distribution pursuant to Article IV.D.1(e) of the Plan if the aggregate, net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such as would make the distribution impracticable as reasonably determined by the Liquidating Trustee, in accordance with applicable law, but only so long as such aggregate amount is less than ten thousand dollars and zero cents ($10,000.00); and provided, further, that the Liquidating Trustee may decide to forego the first periodic distribution to those holders of Liquidating Trust Interests with respect to which the Liquidating Trustee, in their its reasonable judgment, is not administratively prepared to make such distribution, in which case, such distribution shall be made to such holders as soon as practicable after the Liquidating Trustee is administratively prepared to do so.

The Liquidating Trust Agreement shall provide for the establishment of a Liquidating Trust oversight committee (the "*Oversight Committee*") consisting of Gene Laster (Millennium Metals), Bill Lieberman (Jade Sterling), and Don Johnson (King Steel). The Oversight Committee shall have the powers and authority as to be set forth in the Liquidating Trust Agreement, including authority over the assertion of Avoidance Actions and Transferred Causes of Action as set forth in the Liquidating Trust Agreement.

(~~vi~~viii)  For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under Treasury Regulation section 301.7701-4 and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution of an undivided interest in the Liquidating Trust Assets ~~that are attributable to that series of the Liquidating Trust~~ in which they have an interest and then contributed such interests to the Liquidating Trust. The Liquidating Trust Agreement shall (i) state that the primary purpose of the Liquidating Trust is to liquidate the Liquidating Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose and (ii) contain a fixed or determinable termination date that is not more than five (5) years from the date of creation of the Liquidating Trust, which termination date may be extended for one or more finite terms subject to the approval of the Bankruptcy Court upon a finding that the extension is necessary to its liquidating purpose. Each such extension must be approved by the Bankruptcy Court within six (6) months before the beginning of the extended term.

(~~vii~~ix)  The Liquidating Trustee shall be responsible for filing all federal, state and local tax returns for the Liquidating Trust. The Liquidating Trustee shall file all federal tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4. The Liquidating Trustee also will annually send to each ~~holder of a Liquidating Trust Interest~~beneficiary a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The Liquidating Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Liquidating Trust that is required by any governmental unit.

~~(viii)      Tax Reporting for Liquidating Trust:~~

~~(I)      On or before the Effective Date, the Debtors shall provide the Liquidating Trustee with a good faith valuation of the Liquidating Trust Assets as of the Effective Date based on the information available to the Debtors at such time and without performing any additional analysis as to Causes of Action, Transferred Causes of Action or Avoidance Actions. As soon as practicable after the Effective Date, the Liquidating Trustee shall determine the fair market value, as of the Effective Date, of the Liquidating Trust Assets in good faith, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Liquidating Trust (including, without limitation, the Debtors, the Liquidating Trustee, and the holders of the Liquidating Trust Interests (the "Beneficiaries")) for all United States federal income tax purposes.~~

~~(II)      Allocations of Liquidating Trust taxable income among the Beneficiaries shall be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the holders of the Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.~~

~~(III)      Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not~~

contested by the Liquidating Trustee), the Liquidating Trustee shall (A) timely elect to treat any Disputed Claim Reserve as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Liquidating Trustee, the Debtors, and the Liquidating Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(IV)    The Liquidating Trustee shall be responsible for payment, out of the Liquidating Trust Assets, of any taxes imposed on the trust or its assets, including the Disputed Claim Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claim Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (A) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (B) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidating Trustee as a result of the resolution of such Disputed Claims.(ix<u>xii</u>)    The Debtors shall cause the <u>beneficial interests in the</u> Liquidating Trust <del>Interest</del> to be non-transferrable and any such transfer shall be disregarded by the Liquidating Trustee except with respect to a transfer by will or under laws of descent and distribution; <u>provided</u>, <u>however</u>, such transfer will not be effective until and unless the Liquidating Trustee receives written notice of such transfer under the law of descent and distribution.

(b)    The Liquidating Trustee

(i)    On the Effective Date, the <del>proposed</del> Liquidating Trustee shall execute the Liquidating Trust Agreement and any other documents necessary to be appointed the Liquidating Trustee. The Liquidating Trustee, once appointed, shall act as trustee on behalf of the Liquidating Trust to carry out its obligations and exercise its rights in accordance with, and subject to, this Plan and the Confirmation Order. The <u>Liquidating</u> Trustee <u>and the Liquidating Trustee Professionals</u> shall be compensated as set forth in <u>the Plan and</u> the Liquidating Trust Agreement and shall not be required to file a fee application to receive compensation. Any objection to the designation of the Liquidating Trustee shall be raised at the Confirmation Hearing. The Confirmation Order shall state that without the permission of the Bankruptcy Court, no judicial, administrative, arbitration or other action or proceeding shall be commenced against the Liquidating Trustee in its official capacity, with respect to its status, duties, powers, acts or omissions as Liquidating Trustee in any forum other than the Bankruptcy Court. The Liquidating Trustee shall be vested with the rights, powers and benefits set forth in the Liquidating Trust Agreement, which shall include, without limitation, all rights, powers, and benefits afforded to a "trustee" under sections 704 and 1106 of the Bankruptcy Code. Subject to the provisions of the <u>Plan and the</u> Liquidating Trust Agreement, the Liquidating Trustee shall be entitled to hire such professionals as it deems necessary to assist it in carrying out its duties<del>, with the fees and expenses of such professionals to be borne by the Liquidating Trust Assets subject to the provisions of Article IV.D.1(e) of the Plan</del>.

(ii)    On, or as soon as practicable after, the Effective Date, the Plan Fund shall be deposited in a segregated, interest-bearing account of the Liquidating Trust in order to fund the fees and expenses of the Liquidating Trust <u>in accordance with Article IV.D.1(e) of the Plan</u> (including, without limitation, compensation of the Liquidating Trustee and fees and expenses incurred in connection with the duties and actions of such Liquidating Trustee, such as fees and expenses of legal counsel and accountants) and to pay insurance, taxes and other expenses arising in the ordinary course of business in maintaining and disposing of any of the Liquidating Trust Assets. The<del>The</del><u>Subject to Article IV.D.1(e) of the Plan, the</u> Liquidating Trust may pay all such fees and expenses without Bankruptcy Court approval but after satisfaction of all obligations in the Plan. The investment powers of the Liquidating Trustee, other than those reasonably necessary to maintain the value of the Liquidating Trust Assets and to further the liquidating purpose of the Liquidating Trust, are limited to investing in demand and time deposits.

(iii)    Upon any determination by the Liquidating Trustee that it is holding any amount not constituting the Transferred Property or the products or proceeds of Transferred Property, the Liquidating Trustee shall promptly transfer such property so that it is classified as Preserved Collateral or pay such amount to the Holders of Allowed Class 1 Claims.

(iv)    <del>In accordance with this Plan</del><u>Subject to the provisions of the Liquidating Trust Agreement and the powers of the Oversight Committee</u>, the Liquidating Trustee shall be authorized and empowered to pursue and prosecute, to settle, or to decline to pursue, all Transferred Causes of Action and

Avoidance Actions, whether or not such causes of action have been commenced prior to the Effective Date, and shall be substituted as the real party in interest in any such action, commenced by or against the Debtors, the Debtors' Estates or the Committee.  The Liquidating Trustee may pursue or decline to pursue all Transferred Causes of Action and Avoidance Actions, and may settle, release, sell, assign, otherwise transfer or compromise such Transferred Causes of Action and Avoidance Actions in the Liquidating Trustee's business judgment without Bankruptcy Court approval, subject to the provisions of the Liquidating Trust Agreement and the powers of the Oversight Committee.

(v)  The Liquidating Trustee may be removed and replaced ~~for good cause or~~ as provided under the Liquidating Trust Agreement~~, subject to Bankruptcy Court approval~~.

(vi)  Upon the Effective Date and execution of the Liquidating Trust Agreement, the Liquidating Trustee as trustee of the Liquidating Trust, and not personally, shall be vested in all right, title and interest in all Liquidating Trust Assets, and all rights to enforce orders of the Bankruptcy Court entered in this Bankruptcy Proceeding.  The Liquidating Trustee shall liquidate the Liquidating Trust Assets and distribute the proceeds thereof in accordance with this Plan and the Liquidating Trust Agreement.

**5.  Final Administration of Liquidating Trust**

Upon full administration of the Liquidating Trust Assets vested in the Liquidating Trust, and the satisfaction as far as possible of all remaining liabilities of the Liquidating Trust, in accordance with the Plan, the Liquidating Trustee shall file a motion seeking entry of a Final Decree with respect to the remaining Chapter 11 Cases in compliance with Rule 5009-1 of the Local Rules of the Bankruptcy Court.  Upon entry of such Final Decree, the Liquidating Trust shall be deemed terminated without further notice, and the Liquidating Trustee shall thereupon be forever discharged of and released from all power, duties and responsibilities under the Liquidating Trust Agreement and the Plan.  Every effort shall be made to effectuate such termination no later than the time reasonably necessary to accomplish the Liquidating Trust's purpose of liquidating the Liquidating Trust Assets and distributing the proceeds thereof to the beneficiaries in accordance with the Liquidating Trust Agreement and the Plan, and in no event shall the Liquidating Trust continue for more than five (5) years after the Effective Date without further order of the Bankruptcy Court.

**6.  Corporate Action**

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided under the Plan involving the corporate structure of the Debtors shall be deemed authorized and approved without any requirement of further action by the Debtors, the Debtors' shareholders or the Debtors' boards of directors.  The Debtors (and their boards of directors) shall dissolve or otherwise terminate their existence upon the Effective Date.  Notwithstanding the foregoing, Kerry Shiba shall continue to act as the representative of the Debtors for purposes of being heard on issues such as the prosecution of Professional Fee Claim applications and the selection of a successor Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement.

**7.  Preservation of Rights**

The Debtors are currently investigating whether to pursue potential Transferred Causes of Action and Avoidance Actions against other parties or Entities.  Under the Plan, the Liquidating Trustee retain all rights of and on behalf of the Debtors and the Liquidating Trust to commence and pursue any and all Transferred Causes of Action (under any theory of law, including, without limitation, the Bankruptcy Code, and in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Debtors' Chapter 11 Cases) and Avoidance Actions discovered in such investigation to the extent the Liquidating Trustee deems appropriate.  Potential Transferred Causes of Action and Avoidance Actions may but need not (if at all) be pursued by the Debtors prior to the Effective Date and by the Liquidating Trustee after the Effective Date, to the extent warranted.

Except as provided in Article X of the Plan, potential Transferred Causes of Action and Avoidance Actions that may be pursued by the Debtors prior to the Effective Date and by the Liquidating Trust and the Liquidating Trustee after the Effective Date (subject to the rights of the Oversight Committee related thereto), also

include, without limitation, any other Transferred Causes of Action, whether legal, equitable, or statutory in nature, arising out of, or in connection with, the Debtors' businesses or operations, including, without limitation, the following: possible claims against vendors, landlords, sublessees, assignees, customers, or suppliers for warranty, indemnity, back charge/set-off issues, overpayment, or duplicate payment issues, and collections/accounts receivable matters; deposits or other amounts owed by any creditor, lessor, utility, supplier, vendor, landlord, sublessee, assignee, or other Entity; claims against landlords, sublessees and assignees arising from the various leases, subleases, and assignment agreement relating thereto, including, without limitation, claims for overcharges relating to taxes, common area maintenance, and other similar charges; financial reporting; environmental and product liability matters; actions against insurance carriers relating to coverage, indemnity, or other matters; counterclaims and defenses relating to any Claims or other obligations; contract or tort claims which may exist or subsequently arise; and any and all Avoidance Actions pursuant to any applicable section of the Bankruptcy Code arising from any transaction involving or concerning the Debtors; provided, however, that neither the Debtors nor the Liquidating Trustee may pursue any Causes of Action that were acquired by the Purchaser pursuant to the Asset Purchase Agreement or that have been released pursuant to this Plan, the DIP Order or the Sale Order.

Unless a claim against a Creditor or other Entity or Transferred Cause of Action or Avoidance Action is expressly waived, relinquished, released, compromised or settled in this Plan, or any Final Order, the Debtors expressly reserve such claim or Transferred Cause of Action or Avoidance Action for later enforcement by the Liquidating Trust (including, without limitation, claims and Transferred Causes of Action or Avoidance Actions that may be set forth in the Plan Supplement or not specifically identified or which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those which the Debtors no believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Transferred Causes of Action or Avoidance Action upon or after the confirmation or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such claims or Transferred Causes of Action or Avoidance Action have been expressly released in this Plan or other Final Order. In addition, the Liquidating Trust expressly reserves the right to pursue or adopt any claim, crossclaim or counterclaims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any person or entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, subject to the provisions of this Plan or any Final Order.

The Debtors and the Liquidating Trustee do not intend, and it should not be assumed that because any existing or potential Transferred Causes of Action or Avoidance Actions have not yet been pursued by the Debtors or are not set forth herein, that any such Transferred Causes of Action or Avoidance Actions have been waived.

### 8. Cancellation of Notes, Instruments, Debentures and Equity Securities

On the Effective Date, except to the extent provided otherwise in the Plan, all notes, instruments, debentures, certificates, and other documents evidencing Claims and all Equity Interests in any of the Debtors shall be cancelled and deemed terminated and surrendered (regardless of whether such notes, instruments, debentures, certificates, or other documents are in fact surrendered for cancellation to the appropriate indenture trustee or other such Person). On the Effective Date, any indentures to which any Debtor is a party shall be deemed cancelled as permitted by section 1123(a)(5) of the Bankruptcy Code.

### 9. Dissolution of Committee(s)

On the first (1st) Business Date following the Effective Date, and provided the Liquidating Trust has become effective as provided under the Plan, the Committee shall be dissolved and the Committee and its members shall be released and discharged from the rights and duties arising from or related to the Chapter 11 Cases and the retention or employment of the Committee professionals shall terminate, except with respect to final applications for such professionals' compensation. The professionals retained by the Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred after the first (1st) Business Day following the Effective Date, except for services rendered and expenses incurred in connection with the applications of such professionals or Committee members for allowance of

compensation and reimbursement of expenses pending on the Effective Date or timely filed after the Effective Date as provided in this Plan.

### 10. Accounting

Any and all reserves maintained by the Debtors or the Liquidating Trustee, as the case may be, in connection with the distribution of funds on account of the Allowed Claims, may be maintained by bookkeeping entries alone; the Debtors or the Liquidating Trustee, as the case may be, need not (but may) establish separate bank accounts for such purposes.

### E. TREATMENT OF DISPUTED CLAIMS

### 1. Objections to Claims; Prosecution of Disputed Claims

After the Effective Date, the Liquidating Trustee may object (and shall take over, and continue prosecuting and settling or otherwise resolving, any outstanding objections by the Debtors) to the allowance of Disputed Claims filed with the Bankruptcy Court. All objections shall be litigated to Final Order; provided, however, that, as set forth in Article IV.D of the Plan and in the Liquidating Trust Agreement, the Liquidating Trustee shall have the authority and sole discretion to file, settle, compromise, or withdraw any objections to Claims, without approval of the Bankruptcy Court; provided further, however, that the Liquidating Trustee shall not have the authority or discretion to object to the Senior Creditor Claims or any other Claims that have been Allowed by ~~an order~~a Final Order of the Bankruptcy Court before the Effective Date.

~~There~~Except as otherwise provided in the Plan, there shall be no deadline to object to or investigate and review Claims, and any objections to Claims and settlement thereof shall be dealt with as the Debtors or the Liquidating Trustee, as the case may be, in their sole discretion, deem to be appropriate. Further, the Liquidating Trustee shall have the sole and complete discretion to decide not to review and/or object to proofs of Claim to the extent such review and/or objection would be uneconomical.

Unless otherwise provided by the Plan or the Liquidating Trust Agreement, no Bankruptcy Court approval shall be required in order for the Liquidating Trustee to settle and/or compromise any Claim, objection to Claim, cause of action, or right to payment of or against the Debtors, their Estates, or the Liquidating Trust.

### 2. Estimation of Claims

The Debtors or the Liquidating Trustee may at any time request that the Bankruptcy Court estimate any contingent or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trustee previously have objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or Disputed Claim, the amount so estimated shall constitute the maximum allowable amount of such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 3. Payments and Distributions on Disputed Claims

No interest shall be paid on Disputed Claims that later become Allowed Claims or with respect to any distribution to such Holder. No distribution shall be made with respect to all or any portion of any Claim, a portion of which or all of which is a Disputed Claim, pending the entire resolution thereof.

### F. DISTRIBUTIONS

1.  **Means of Cash Payment**

    Cash Payments, made pursuant to the Plan, shall be in U.S. dollars and, at the option and in the sole discretion of the Debtors or the Liquidating Trustee, be made by (a) checks drawn on or (b) wire transfers from a domestic bank selected by the Debtors or the Liquidating Trustee. Cash payments to foreign creditors may be made, at the option of the Debtors or the Liquidating Trustee, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

2.  **Delivery of Distributions**

    Subject to the provisions of Bankruptcy Rule 2002(g), and except as otherwise provided in the Plan, distributions and deliveries to Holders of Allowed Claims shall be made at the address of each such Holder as set forth on the Schedules filed with the Bankruptcy Court, unless superseded by the address set forth on timely filed proof(s) of claim or some other writing Filed with the Bankruptcy Court and served upon the Liquidating Trustee.

3.  **Undeliverable Distributions**

    *   <u>Holding of Undeliverable Distributions</u>:

        If any distribution pursuant to the Plan to any Holder is returned to the Liquidating Trustee as undeliverable, no further distributions shall be made to such Holder unless and until the Liquidating Trustee is notified by such Holder, in writing, of such Holder's then-current address. Upon such an occurrence, the appropriate distribution shall be made as soon as reasonably practicable after such distribution has become deliverable. All Entities ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals of any kind. Nothing contained in the Plan shall require the Debtors or the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim.

    *   <u>Failure to Claim Undeliverable Distributions</u>:

        Any Holder of an Allowed Claim entitled to an undeliverable or unclaimed distribution that does not provide notice of such Holder's correct address to the Debtors and the Liquidating Trustee within the later of six (6) months after (i) the Effective Date or (ii) the date of the initial distribution made by the Debtors or the Liquidating Trustee to such Holder, shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against any of the Debtors, their Estates or the Liquidating Trust. In such cases, the Forfeited Distributions shall be distributed in accordance with the terms of the Plan. Nothing contained in the Plan shall require the Debtors or the Liquidating Trustee to attempt to locate any holder of an Allowed Claim.

4.  **Withholding and Reporting Requirements**

    In connection with the Plan and all distributions thereunder, the Debtors and the Liquidating Trustee shall comply with all tax withholding and reporting requirements imposed by any U.S. federal, state, or local, or non-U.S. taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Debtors and the Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (b) the Debtors and the Liquidating Trustee reserve the option, in their discretion, to not make a distribution to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Debtors or the Liquidating Trustee for the payment and satisfaction of such tax obligations or has, to the Debtors' or Liquidating Trustee's satisfaction, established an exemption therefrom. Any distributions to be made pursuant to the Plan shall, pending the implementation of such withholding and reporting requirements, be treated as undeliverable pursuant to Article VI.C.2 of the Plan. The Liquidating Trustee shall request <u>(in writing)</u> from each beneficiary a properly completed IRS Form W-9 or substitute Form W-9. <u>Any beneficiary that does not provide a completed</u>

### 5. Time Bar to Cash Payments

Checks issued by the Liquidating Trustee on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Liquidating Trustee by the Holder of the Allowed Claim. Any claim relating to such voided check shall be made on or before the later of: (i) six months after the Effective Date; or (ii) one hundred and eighty (180) days after the date of issuance of such check. After such date, all claims relating to such voided checks shall be discharged and forever barred, and the Liquidating Trustee shall treat all such checks as Forfeited Distributions.

### 6. Distributions after Effective Date

Distributions made after the Effective Date to Holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

### 7. Interest

Unless otherwise required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim, provided, however, that the DIP Lender is entitled to interest at the rates set forth in the DIP Facility on the terms set forth in the DIP Order.

### 8. Fractional Dollars; De Minimis Distributions

Notwithstanding anything contained in the Plan to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. The Liquidating Trustee will not make any payment of less than twenty dollars ($20) on account of any Allowed Claim, unless a specific request therefor is made in writing to the Liquidating Trustee on or before ninety (90) days after the Effective Date.

### 9. Setoffs

Consistent with applicable law, the Liquidating Trustee may, but shall not be required to, set-off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim), the claims, rights, and causes of action of any nature that the Debtors, their Estates, or the Liquidating Trust may hold against the Holder of such Allowed Claim (unless such claims, rights, and causes of action have been released by the Debtors pursuant to the Releases or Mutual Releases contained herein); provided, however, that neither the failure to effect such a set-off nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, their Estates, the Liquidating Trustee, or the Liquidating Trust of any such claims, rights, and Causes of Action that the Debtors, their Estates, or the Liquidating Trust may possess against such Holder.

## G. EXECUTORY CONTRACTS

### 1. Rejection of Executory Contracts and Unexpired Leases

Any executory contracts or unexpired leases which have not (i) expired by their own terms on or prior to the Effective Date, or (ii) been assumed, assumed and assigned, or rejected with the approval of the Bankruptcy Court in connection with the Sale or otherwise, shall be deemed rejected by the Debtors as of the Confirmation Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the

rejections of such executory contracts and unexpired leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

### 2. Rejection Damages Claim

Each entity that is a party to an executory contract or unexpired lease that is rejected as of the Confirmation Date pursuant to this Plan and the Confirmation Order will be entitled to file, not later than Rejection Claim Bar Date, a proof of Claim for damages alleged to have been suffered due to such rejection; provided, however, that the opportunity afforded an Entity whose executory contract or unexpired lease is rejected as of the Confirmation Date pursuant to this Plan and the Confirmation Order to file a proof of Claim shall in no way apply to Entities that may assert a claim on account of an executory contract or unexpired lease that was previously rejected by the Debtors for which a prior ~~Bar Date~~bar date was established. Any Entity that has a Claim for damages as a result of the rejection of an executory contract or unexpired lease pursuant to this paragraph of the Plan that does not file a proof of claim in accordance with the terms and provisions of the Plan with the Bankruptcy Court (and serve such proof of Claim upon the Liquidating Trustee) will be forever barred from asserting that Claim against, and such Claim shall be unenforceable against, the Debtors or the Liquidating Trust and the Debtors and Liquidating Trust shall have no obligation to pay the same.

### H. INSURANCE POLICIES

To the extent that any and all insurance policies including any directors and officers liability insurance policies are executory contracts, then notwithstanding anything contained in the Plan to the contrary, such insurance policies shall be deemed assumed and assigned to the ~~respective~~ Liquidating Trust. Unless otherwise determined by the Bankruptcy Court, pursuant to a Final Order, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such policy. For the avoidance of any doubt, all of the Debtors' rights under any insurance policy to which the Debtors may be beneficiaries, including any directors and officers liability insurance policy, that is not an executory contract, shall vest with the Liquidating Trust; provided, however, that the Liquidating Trustee shall not take any action that would impair the coverage currently enjoyed by the Debtors' directors and officers under such directors and officers liability insurance policy.

### I. CONDITIONS PRECEDENT TO PLAN CONFIRMATION AND CONSUMMATION

The Debtors have proposed the Plan, but such proposal is conditioned upon the occurrence or non-occurrence of certain events and conditions. Specifically, there are certain conditions precedent to the Debtors' seeking confirmation of the Plan, and there are additional conditions precedent to the Debtors ultimately consummating the Plan. These conditions, and the circumstances under which such conditions may be waived, are discussed immediately below.

### 1. Acceptance or Rejection of the Plan

- Acceptance by Impaired Classes

An Impaired Class of Claims will have accepted the Plan if the Holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in the Class actually voting have voted to accept the Plan, in each case not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code.

- Elimination of Classes

Any Class that does not contain any Allowed Claims or Equity Interests or any Claims or Equity Interests temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, will be deemed not included in the Plan for purposes of (i) voting to accept or reject the Plan and (ii) determining whether such Class has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

- Nonconsensual Confirmation

The Bankruptcy Court may confirm the Plan over the dissent of any Impaired Class if all of the requirements for consensual confirmation under subsection 1129(a), other than subsection 1129(a)(8), of the Bankruptcy Code and for nonconsensual confirmation under subsection 1129(b) of the Bankruptcy Code have been satisfied. In the event that any impaired Class of Claims or Equity Interests shall fail to accept the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtors reserve the right to (i) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code or (ii) amend the Plan.

**2.      Conditions Precedent to Confirmation**

The occurrence of the Confirmation Date shall be subject to satisfaction of the following conditions precedent:

- The Confirmation Order is entered in form and substance reasonably satisfactory to the Debtors, the Committee, the Prepetition Lenders and the DIP Lender and the Committee; provided, however, that the Debtors shall File the proposed Confirmation Order with the Bankruptcy Court no later than five (5) Business Days prior to the Confirmation Hearing such that UBP Acquisition Corp. has the opportunity to review and comment on the proposed Confirmation Order and present any objections thereto at the Confirmation Hearing.

- All provisions, terms and conditions of the Plan are approved in the Confirmation Order or in another Final Order of the Bankruptcy Court.

- The Debtors obtain authority to take all actions necessary or appropriate to enter into, implement and consummate the Plan and other agreements or documents created in connection with the Plan.

- The provisions of the Confirmation Order are nonseverable and mutually independent.

**3.      Conditions Precedent to Effective Date of the Plan**

The occurrence of the Effective Date and the Consummation of the Plan are subject to satisfaction of the following conditions precedent:

- Confirmation Order.  The Confirmation Order as entered by the Bankruptcy Court shall be a Final Order in full force and effect, in form and substance reasonably satisfactory to the Debtors, the Committee, the Prepetition Lenders and the DIP Lender and the Committee; provided, however, that the Debtors shall File the proposed Confirmation Order with the Bankruptcy Court no later than five (5) Business Days prior to the Confirmation Hearing such that UBP Acquisition Corp. has the opportunity to review and comment on the proposed Confirmation Order and present any objections thereto at the Confirmation Hearing.

- Execution of Documents; Other Actions.  All actions, documents, and agreements necessary to implement the Plan shall have been effected or executed, including the Liquidating Trust Agreement, and the appointment of the Liquidating Trustee shall be approved by the Bankruptcy Court.

- Liquidating Trust Budget.  The Liquidating Trustee shall provide an estimated quarterly budget to the Committee, the DIP Lenders and the Prepetition Lenders,

and such parties have consented to such budget, which consent shall not be unreasonably withheld.

### 4. Waiver of Conditions Precedent

To the extent legally permissible, each of the conditions precedent in Article ~~X~~IX of the Plan may be waived, in whole or in part, by the Debtors with the consent of the Committee~~, the DIP Lender and the Prepetition Lenders~~, which consent shall not be unreasonably withheld. Any such waiver of a condition precedent may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action other than proceeding as if such condition did not exist. The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights. Upon the waiver of any conditions to the Effective Date set forth in Article X of the Plan, and subject to the satisfaction in full of each of the remaining conditions set forth in such Article, the Plan shall become effective in accordance with its terms without notice to third parties or any other formal action.

### 5. The Confirmation Order

If the Confirmation Order is vacated for whatever reason, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, any of the Debtors; (ii) prejudice in any manner the rights of the Debtors or the Estates; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors or the Estates in any respect.

## J. EFFECT OF PLAN CONFIRMATION

### 1. No Discharge of Claims and Termination of Interests

Pursuant to § 1141(d)(3) of the Bankruptcy Code, confirmation of this Plan will not discharge the Debtors. Other than as set forth in Article X of the Plan, no non-Debtors shall receive a discharge under the Plan or the Confirmation Order.

### 2. Termination of Subordination Rights and Settlement of Related Claims

The classification and manner of satisfying all Claims and Equity Interests and the respective distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise, and any and all such rights are settled, compromised, and released pursuant to the Plan. **The Confirmation Order shall permanently enjoin, as of the Effective Date, all Persons from enforcing or attempting to enforce any such contractual, legal, and equitable subordination rights satisfied, compromised, and settled in this manner.**

### 3. Injunction

**Except as otherwise expressly provided in the Plan, all Entities that have held, hold, or may hold Claims against or Equity Interests in the Debtors are permanently enjoined, from and after the Effective Date, from taking any of the following actions against any of the Debtors, their Estates, the Committee or its members solely in their capacities as members of the Committee and not in any other capacity, the Liquidating Trust, the Liquidating Trustee, the Administrative Agent, UBP Acquisition Corp. and any of its affiliates, successors or assigns, including but not limited to Oaktree Capital Management, L.P., Solus Capital Partners, LLC and Dayton Superior Corporation, the Prepetition Lenders and the DIP Lender, or any of their property on account of any Claims or causes of action arising from events prior to the Effective Date including, without limitation, (i) commencing or continuing in any manner any action or other proceeding of any kind; (ii) enforcing, attaching, collecting, or recovering by any manner or in any place or means any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any**

kind; and (iv) asserting any defense or right of setoff, subrogation, or recoupment of any kind against any obligation, debt, or liability due to the Debtors. Notwithstanding the foregoing, nothing herein shall enjoin or otherwise be construed to limit any action or argument against the Administrative Agent, UBP Acquisition Corp. and any of its affiliates, successors or assigns, including but not limited to Oaktree Capital Management, L.P., Solus Capital Partners, LLC, Dayton Superior Corporation, the Prepetition Lenders and the DIP Lender, or any of their property on account of (i) any Administrative Claim asserted by such parties; or (ii) any assertion by such parties that they are entitled to recover any portion of the $427,301 in Cash held by the Debtors as of the Petition Date.

### 4. Terms of Existing Injunctions and Stays

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105, 362 or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. The Confirmation Order will permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, Equity Interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to the Plan.

### 5. Exculpation

NEITHER THE DEBTORS, THEIR ESTATES, THE LIQUIDATING TRUST, THE LIQUIDATING TRUSTEE, THE COMMITTEE AND ITS MEMBERS SOLELY IN THEIR CAPACITIES AS MEMBERS OF THE COMMITTEE AND NOT IN ANY OTHER CAPACITY, THE ADMINISTRATIVE AGENT, THE PREPETITION LENDERS, THE DIP LENDER, UBP ACQUISITION CORP., OAKTREE CAPITAL MANAGEMENT, L.P., SOLUS CAPITAL PARTNERS, LLC, DAYTON SUPERIOR CORPORATION, NOR ANY OF THEIR RESPECTIVE PRESENT OR FORMER OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS, EMPLOYEES, ADVISORS, ATTORNEYS, OR AGENTS ACTING IN SUCH CAPACITY OR THEIR RESPECTIVE AFFILIATES, SHALL HAVE OR INCUR ANY LIABILITY TO, OR BE SUBJECT TO ANY RIGHT OF ACTION BY, THE DEBTORS OR ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST, OR ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RESPECTIVE AGENTS, SHAREHOLDERS, EMPLOYEES, REPRESENTATIVES, FINANCIAL ADVISORS, ATTORNEYS, OR AFFILIATES, OR ANY OF THEIR SUCCESSORS OR ASSIGNS, FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, (A) ANY ACT TAKEN OR OMITTED TO BE TAKEN ON OR AFTER THE PETITION DATE IN CONNECTION WITH THE CHAPTER 11 CASES, (B) THE DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS NECESSARY TO EFFECTUATE THE PLAN, (C) THE SOLICITATION OF ACCEPTANCES AND REJECTIONS OF THE PLAN, (D) THE RELEASES HEREIN OR THE SOLICITATION THEREOF, (E) THE CHAPTER 11 CASES, (F) THE IMPLEMENTATION, NEGOTIATION, FORMULATION AND ADMINISTRATION OF THE PLAN, (G) THE DISTRIBUTION OF PROPERTY UNDER THE PLAN, (H) ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR THE CHAPTER 11 CASES, OR (I) THE SALE, AND IN ALL RESPECTS SHALL BE ENTITLED TO RELY REASONABLY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN, EXCEPT FOR LIABILITY ARISING FROM CONDUCT CONSTITUTING WILLFUL MISCONDUCT OR GROSS NEGLIGENCE PURSUANT TO A FINAL ORDER. THE FOREGOING PARTIES WILL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL IN ALL RESPECTS REGARDING THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN. NOTWITHSTANDING THE FOREGOING, NOTHING HEREIN SHALL EXCULPATE OR OTHERWISE BE CONSTRUED TO LIMIT ANY ACTION OR ARGUMENT AGAINST THE ADMINISTRATIVE AGENT, THE PREPETITION LENDERS, THE DIP LENDER, UBP ACQUISITION CORP., OAKTREE CAPITAL MANAGEMENT, L.P., SOLUS CAPITAL PARTNERS, LLC, OR DAYTON SUPERIOR CORPORATION ON ACCOUNT OF (I) ANY ADMINISTRATIVE CLAIM ASSERTED BY SUCH PARTIES; OR (II) ANY ASSERTION BY SUCH PARTIES THAT THEY ARE ENTITLED TO RECOVER ANY PORTION OF THE $427,301 IN CASH HELD BY THE DEBTORS AS OF THE PETITION DATE.

6. **Releases by the Debtors**

NOTWITHSTANDING ANYTHING CONTAINED ~~IN THE PLAN~~HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE (SUCH THAT THE LIQUIDATING TRUSTEE WILL NOT RECEIVE ANY CLAIM OR CAUSE OF ACTION RELEASED HEREUNDER), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING: (1) THE DISCHARGE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT HERETO; AND (2) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MANAGERS, AND ADVISORS IN FACILITATING THE EXPEDITIOUS IMPLEMENTATION OF THE LIQUIDATION AND ASSOCIATED TRANSACTIONS CONTEMPLATED HEREBY, EACH OF THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS IN POSSESSION, DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH DEBTOR RELEASEE AND TO EACH THIRD PARTY RELEASEE (AND EACH SUCH DEBTOR RELEASEE AND THIRD PARTY RELEASEE SO RELEASED SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE DEBTORS) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, AT EQUITY, WHETHER FOR TORT, ~~FRAUD,~~ CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING THOSE THAT ANY OF THE DEBTORS ~~OR THE REORGANIZED DEBTORS~~ WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES; PROVIDED THAT NOTHING HEREIN SHALL RELEASE JEFF CHURCH, KERRY SHIBA, GREG WALLER, OR DAN SCOULER FROM ANY CLAIMS OR CAUSES OF ACTION FOR FRAUD OR INTENTIONAL MISCONDUCT. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY AVOIDANCE ACTIONS, TRANSFERRED CAUSES OF ACTION OR CAUSES OF ACTION THAT THE DEBTORS' ESTATES OR THE LIQUIDATING TRUSTEE, WHETHER DIRECT, DERIVATIVE OR OTHERWISE, HAVE OR MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES. ANY CLAIM OR CAUSE OF ACTION AGAINST JEFF CHURCH, KERRY SHIBA, GREG WALLER, OR DAN SCOULER FOR FRAUD OR INTENTIONAL MISCONDUCT MUST BE ASSERTED BY NO LATER THAN ONE HUNDRED THIRTY-FIVE (135) DAYS AFTER THE EFFECTIVE DATE, OR SHALL OTHERWISE BE DEEMED WAIVED. ADDITIONALLY, ANY CLAIM OR CAUSE OF ACTION AGAINST FORMER DIRECTORS ROBERT CHARTENER, PETER GUDWIN, MICHAEL STONE, AND/OR RANSOM LANGFORD MUST BE ASSERTED BY NO LATER THAN ONE HUNDRED THIRTY-FIVE (135) DAYS AFTER THE EFFECTIVE DATE, OR SHALL OTHERWISE BE DEEMED WAIVED. FURTHERMORE, NOTHING HEREIN SHALL BE CONSTRUED TO LIMIT ANY ACTION OR ARGUMENT AGAINST THE ADMINISTRATIVE AGENT, THE PREPETITION LENDERS, THE DIP LENDER, UBP ACQUISITION CORP., OAKTREE CAPITAL MANAGEMENT, L.P., SOLUS CAPITAL PARTNERS, LLC, OR DAYTON SUPERIOR CORPORATION ON ACCOUNT OF (I) ANY ADMINISTRATIVE CLAIM ASSERTED BY SUCH PARTIES; OR (II) ANY ASSERTION BY SUCH PARTIES THAT THEY ARE ENTITLED TO RECOVER ANY PORTION OF THE $427,301 IN CASH HELD BY THE DEBTORS AS OF THE PETITION DATE.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED

BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR THE LIQUIDATING TRUSTEE ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

### 7. Mutual Releases by Holders of Claims and Interests

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A THIRD PARTY RELEASEE) SHALL PROVIDE A FULL DISCHARGE AND RELEASE (AND EACH ENTITY SO RELEASED SHALL BE DEEMED RELEASED BY THE RELEASING PARTIES) TO THE THIRD PARTY RELEASEES AND THE DEBTOR RELEASEES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASES OR THE PLAN.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CLAIMS, AVOIDANCE ACTIONS, TRANSFERRED CAUSES OF ACTION OR CAUSES OF ACTION THAT THE RELEASING PARTIES, THE DEBTORS, OR THE LIQUIDATING TRUSTEE, WHETHER DIRECT, DERIVATIVE OR OTHERWISE, MAY HAVE NOW OR IN THE FUTURE AGAINST NON-RELEASED PARTIES, OR RELEASE ANY DIRECT CLAIM OR CAUSE OF ACTION THAT A CREDITOR HOLDING A CLASS 2, 3, OR 4 CLAIM THAT ELECTS TO "OPT-OUT" MAY HAVE AGAINST THE PARTIES DESCRIBED HEREIN INCLUDING, WITHOUT LIMITATION, THE DEBTOR RELEASEES.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE.

### K. MISCELLANEOUS PROVISIONS

Certain additional miscellaneous information regarding the Plan and the Chapter 11 Cases is set forth below.

### 1. Settlement of Claims and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims or controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim with respect thereto, or any distribution to be made on account of such an Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims or controversies, and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and is fair, equitable, and reasonable.

## 2.    Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date to the extent required by applicable law.

## 3.    Exemption from Securities Laws

To the maximum extent provided by § 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance under the Plan of the beneficial interests in the Liquidating Trust will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

## 4.    Section 1146 Exemption

Pursuant to section 1146(c) of the Bankruptcy Code, (a) the creation, modification, consolidation, or recording of any mortgage, deed of trust, lien, pledge, or other security interest; (b) the making, recording, or assignment of any lease or sublease; or (c) the making, recording, or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan and the Sale, including, without limitation, any merger agreements; agreements of consolidation, restructuring, disposition, liquidation, or dissolution; deeds; bills of sale; and transfers of tangible property, will not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales or use tax, or other similar tax. Any transfers from the Debtors to the Liquidating Trust or by the Liquidating Trust to a creditor or other Entity or otherwise pursuant to the Plan shall not be subject to any such taxes, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Unless the Bankruptcy Court orders otherwise, any of the foregoing transactions taken on or prior to the Effective Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

## 5.    Books and Records

On the Effective Date, the Debtors' books and records (excluding any electronic mail correspondence among the Debtors and K&L Gates LLP subject to Privilege other than those referred to in Article XI.F. herein) in any form, including all electronic records (the "*Books and Records*"), shall be transferred to the Liquidating Trust, to the extent such Books and Records were not transferred to the Purchaser under the Asset Purchase Agreement. If the Books and Records were transferred to the Purchaser under the Asset Purchase Agreement, the Purchaser shall provide the Liquidating Trustee reasonable access to the Books and Records upon ten (10) business days notice to the Purchaser requesting such access so as to permit the Liquidating Trustee to carry out his duties under the Liquidating Trust Agreement; provided, however, that (i) such access shall be limited to those Books and Records relating to time period prior to the closing of the transaction contemplated and approved in the Sale Order, and (ii) the Liquidating Trustee shall not have access to any customer-related information that may be included in the Books and Records; provided, further, however, to the extent the Liquidating Trustee in furtherance of its duties under the Liquidating Trust Agreement requires access to the Books and Records relating to the time period after the closing of the transaction contemplated and approved in the Sale Order or to any customer-related information, the Liquidating Trustee may request such reasonable access from the Purchaser.

To the extent the Debtors retained Books and Records and such were transferred to the Liquidating Trust, the Liquidating Trustee shall be free, in his or her discretion to abandon, destroy, or otherwise dispose of the Books and Records in compliance with applicable non-bankruptcy law; provided, however, that in the Liquidating Trustee's discretion, these Books and Records may be destroyed or disposed of beginning two (2) years after the Effective Date notwithstanding any applicable laws, rules, or regulations that would have required the Debtors to retain such Books and Records.

## 6.    Privileges as to Certain Causes of Action

Privileges relating solely to any existing Transferred Causes of Action or Avoidance Actions pursued, investigated or considered by the Debtors prior to the Confirmation Date (not otherwise resolved by a Final

Order) shall be transferred, assigned, and delivered to the Liquidating Trust, without waiver or release, and shall vest with the Liquidating Trust. The Liquidating Trustee shall hold and be the beneficiary of all such Privileges and entitled to assert such Privileges. No such Privilege shall be waived by disclosures to the Liquidating Trustee of the Debtors' documents, information or communications subject to attorney-client privileges, work product protections or immunities or protections from disclosure held by the Debtors. The Liquidating Trustee shall reserve the right to request other materials that maybe subject to Privilege for appropriate reasons, but representatives of the Debtors and the Debtors' Professionals shall maintain the ability to oppose any such request on any grounds or to seek compensation in connection with such production.

### 7. Employee Agreements

On or before the Plan Supplement Filing Date, the Debtors will negotiate employment or consulting contracts with any current employees necessary to wind down the Debtors' Estates, such contracts to be reasonably acceptable to the Committee.

### 8. Unclaimed Property

Notwithstanding any local, state, federal, or other laws or regulations regarding unclaimed property or escheatment of property, all funds or other property possessed by the Debtors on the Effective Date that is unclaimed, subject to escheatment, or potentially subject to escheatment shall be treated as property of such Debtors under this Plan, and shall accordingly be transferred to, vested with, and become the property of the Liquidating Trustee to be held and distributed pursuant to the terms of this Plan free and clear of all such laws or regulations.

### 9. Business Day

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 10. Severability

The provisions of the Plan shall not be severable unless such severance is agreed to by the Debtors and such severance would constitute a permissible modification of the Plan pursuant to section 1127 of the Bankruptcy Code.

### 11. Conflicts

Except as set forth below, to the extent that any provision of the Disclosure Statement, the Liquidating Trust Agreement, or the Confirmation Order (or any exhibits, schedules, appendices, supplements or amendments to the foregoing) or any other order referenced in the Plan, conflict with or are in any way inconsistent with the terms of the Plan, the Plan shall govern and control.

### 12. Evidence

In the event this Plan shall not take effect for whatever reason, nothing here shall constitute an admission or denial with respect to whether any of the Claims or Interests held by the Debtors, Creditors or holders of Interests are (a) entitled to allowance or disallowance, (b) secured or unsecured, (c) entitled to priority treatment under the Bankruptcy Code, (d) liable to subordination, or (e) liable for any claims or causes of action, including but not limited to claims under §§ 506, 510, 522, 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code.

### 13. Further Assurances

The Debtors, the Liquidating Trustee, all Holders of Claims receiving distributions under the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver agreements or documents and take other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

14. **Notices**

All notices, requests, and demands required by the Plan or otherwise, to be effective, shall be in writing, including by facsimile transmission, and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered to all of the following, or in the case of notice by facsimile transmission, when received by all of the following, addressed as follows or to such other addresses as Filed with the Bankruptcy Court:

| To the Debtors: | To the Prepetition Lenders and DIP Lender: |
|---|---|
| K&L Gates LLP<br>c/o Sven T. Nylen<br>70 West Madison Street, Suite 3100<br>Chicago, Illinois 60602<br>Telephone: (312) 372-1121<br>Facsimile: (312) 827-8000<br><br>and<br><br>Saul Ewing LLP<br>c/o Mark Minuti<br>222 Delaware Avenue, Suite 1200<br>P.O. Box 1266<br>Wilmington, DE 19899<br>Telephone: (302) 421-6800<br>Facsimile: (302) 421-6813<br><br>To Counsel for the Official Committee of Unsecured Creditors:<br><br>~~Arent Fox LLP~~<br>~~c/o Andrew Silfen~~<br>~~1675 Broadway~~<br>~~New York, New York 10019-5820~~<br>Benesch, Friedlander, Coplan & Aronoff LLP<br>c/o Raymond H. Lemisch<br>PNC Bank Center<br>222 Delaware Avenue, Suite 801<br>Wilmington, DE 19801<br>Telephone: (302) ~~421-6800~~442-7005<br>Facsimile: (302) ~~421-6813~~442-7012 | Kirkland & Ellis LLP<br>c/o Christopher Greeno, P.C.<br>c/o David A. Agay<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2342<br>Facsimile: (312) 862-2200 |

15. **Filing of Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

16. **Successors and Assigns**

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

**17.**     **Governing Law**

~~Expect~~Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent any document entered into in connection with the Plan so provides, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of Delaware, without giving effect to the principles of conflicts of law.

**18.**     **Closing of Cases**

The Liquidating Trustee shall, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

**19.**     **Section Headings**

The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

**L.**     **RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction after the Effective Date over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Cases or the Plan, or that relates to the following, in each case to the greatest extent permitted by applicable law:

1.     to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan;

2.     to determine any and all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Liquidating Trustee or the Liquidating Trust after the Effective Date; provided, however, that the Liquidating Trustee and the Liquidating Trust shall reserve the right to commence collection actions, actions to recover receivables, and other similar actions in all appropriate jurisdictions;

3.     to ensure that distributions to Holders of Allowed Claims are accomplished as provided in the Plan;

4.     to hear and determine any timely objections to Administrative Claims, Priority Claims and Unsecured Claims or to proofs of Claim and Equity Interests Filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Equity Interest, and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

5.     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

6.     to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

7.      to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

8.      to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

9.      to hear and determine disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan or the extent of any Entity's obligations incurred in connection with or released or exculpated under the Plan;

10.     to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

11.     to determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Liquidating Trust Agreement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement to be executed in connection with the Plan;

12.     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

13.     to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code; and

14.     to enter a Final Decree closing the Chapter 11 Cases.

## M.      MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### 1.      Modification of the Plan

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify the Plan at any time prior to the entry of the Confirmation Order with the consent of the Committee, ~~the Prepetition Lenders and the DIP Lender,~~ which consent shall not be unreasonably withheld; provided, however, that the Debtors must provide notice of any proposed pre-Confirmation Hearing amendments or modifications to UBP Acquisition Corp. at the same time that the Debtors request the Committee's consent to such proposed amendments or modifications. Upon entry of the Confirmation Order, the Debtors ~~may, upon order of the Bankruptcy Court and with the consent of the Committee, the Prepetition Lenders and the DIP Lender, which consent shall not be unreasonably withheld~~or Liquidating Trustee may, after notice and a hearing, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such Holder and the votes of each Class for or against the Plan shall be counted and used in connection with the modified plan.

### 2.      Revocation, Withdrawal, or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization with the consent of the Committee, ~~the Prepetition Lenders and the DIP Lender,~~ which consent shall not be unreasonably withheld. If the Debtors revoke or withdraw the Plan, or if the Confirmation Order confirming the Plan shall not be entered or become a Final Order, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for

consummation of the Plan, shall (1) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity, (2) prejudice in any manner the rights of the Debtors, (3) constitute an admission of any sort by the Debtors, or (4) constitute a release of any Causes of Action possessed or maintained by the Debtors.

## V.

## ACCEPTANCE OR REJECTION OF THE PLAN

### A.    CLASSES ENTITLED TO VOTE

Each Impaired Class of Claims that will receive or retain property or any interest in property under the Plan is entitled to vote to accept or reject the Plan.  Classes ~~1~~ 1, 2, 3, and 4 shall be entitled to vote to accept or reject the Plan.  The Debtors believe UBPA (the sole member of Class 1) is obligated to support the Plan based on the Bankruptcy Court's conclusions made at the November 5, 2010 hearing.  UBPA has taken the position that it has no obligation to vote to accept the Plan or to provide further funding to the Debtors or their bankruptcy estates.  The Debtors, however, believe this position is inconsistent with the Bankruptcy Court's rulings and findings made at the November 5, 2010 hearing.  Additionally, UBPA's vote may be unnecessary if the Debtors' abandon UBPA's remaining collateral.

### B.    ACCEPTANCE BY IMPAIRED CLASSES

An Impaired Class of Claims shall be deemed to have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

### C.    PRESUMED ACCEPTANCE OF THE PLAN

By operation of law, each Class of Claims that is Unimpaired is deemed to have accepted the Plan and, therefore, is not entitled to vote.  There are no such Classes ~~2 and 3 are Unimpaired~~ under the Plan~~, and, therefore, are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code~~.

### D.    PRESUMED REJECTION OF THE PLAN

By operation of law, Holders of Impaired Claims and Impaired Equity Interests that are not entitled to receive or retain any property under the Plan are presumed to have rejected the Plan and, therefore, are not entitled to vote.  Classes 5 and 6 are Impaired under the Plan and are not entitled to receive or retain any property of the Estates under the Plan and, thus, are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

## VI.

## PROCEDURES FOR VOTING ON THE PLAN

The following is a brief summary regarding the acceptance and confirmation of the Plan.  Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.  Additional information regarding voting procedures is set forth in the Notices accompanying this Disclosure Statement.

### A.    VOTING DEADLINE

The Voting Deadline to accept or reject the Plan is [~~         5:00  p.m.~~] (prevailing Wilmington, Delaware time) on [~~        , 2010~~] March 4, 2011  unless the Bankruptcy Court or the Debtors extend the

period during which votes will be accepted by the Debtors, in which case the Voting Deadline for such solicitation shall mean the last time and date to which such solicitation is extended.

**B.   VOTING RECORD DATE**

The Voting Record Date for purposes of determining which Holders of Claims are entitled to vote on the Plan is [~~_____, 2010~~] February 1, 2011.

**C.   VOTING INSTRUCTIONS**

This Disclosure Statement, accompanied by a Ballot to be used for voting on the Plan, is being distributed to Holders of Claims in Classes ~~1~~1, 2, 3, and 4.  Only Holders in these Classes are entitled to vote to accept or reject the Plan and may do so by completing the Ballot and returning it in the envelope provided.  *In light of the benefits of the Plan for each Class of Claims, the Debtors recommend that Holders of Claims in each of the Impaired Classes vote to accept the Plan and return the Ballot to the Debtors' attorneys.*

**BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES WHENEVER POSSIBLE.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.**

*For all Holders:*

By signing and returning a Ballot, each Holder of Claims in Classes ~~1~~1,2, 3, and 4 will also be certifying to the Bankruptcy Court and the Debtors that, among other things:

- such person or entity is the Holder of the aggregate face amount of the Claims set forth in the Ballot and has full power and authority to vote to accept or reject the Plan;

- such Holder has received and reviewed a copy of the Disclosure Statement, the Plan, and related Ballot and acknowledges that the solicitation of votes to accept or reject the Plan is being made pursuant to the terms and conditions set forth therein;

- such Holder has cast the same vote on every Ballot completed by such Holder with respect to holdings of such Class of Claims;

- no other Ballots with respect to such Class of Claims have been cast or, if any other Ballots have been cast with respect to such Class of Claims, such earlier Ballots are thereby revoked;

- the Debtors have made available to such Holder or its agents all documents and information relating to the Plan and related matters reasonably requested by or on behalf of such Holder;

- except for information provided by the Debtors in writing, and by its own agents, such Holder has not relied on any statements made or other information received from any person with respect to the Plan; and

- all authority conferred or agreed to be conferred pursuant to the Ballot, and every obligation of the Holder thereunder, shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustee in bankruptcy and legal representatives of the Holder and shall not be affected by, and shall survive, the death or incapacity of the Holder.

Additionally, Holders of Class 2, 3, or 4 Claims may elect to "opt-out" of the provision of the Plan whereby such Holders release any claims against certain non-Debtor parties.  The "opt-out" may be selected by marking the appropriate check box on the Class 4 Ballot.

**D.   THE CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for [ 11:30 a.m. prevailing Wilmington, Delaware time on , 2010].March 8, 2011, before the Honorable [ ] Judge Mary Walrath, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Western District of Delaware, Wilmington Division, located at 601 West Broadway, Gene Snyder Courthouse, Wilmington, Delaware. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to confirmation of the Plan must be filed and served on or before [ 4:00 p.m. prevailing Wilmington, Delaware time on , 2010]March 4, 2011 (the "*Plan Objection Deadline*"). All objections to the Plan must be filed with the Bankruptcy Court on or before the Plan Objection Deadline and served in a manner so that they are <u>actually received</u> on or before 4:00 p.m. prevailing Wilmington, Delaware time, on the Plan Objection Deadline by the following parties (the "*Notice Parties*"):

| **Co-Counsel to the Debtors and Debtors in Possession** | **Co-Counsel to the Debtors and Debtors in Possession** |
|---|---|
| K&L Gates LLP<br>70 West Madison Street, Suite 3100<br>Chicago, Illinois 60602<br>Telephone: (312) 372-1121<br>Facsimile: (312) 827-8000<br>**Attn: Sven T. Nylen** | Saul Ewing LLP<br>222 Delaware Avenue, Suite 1200<br>P.O. Box 1266<br>Wilmington, DE 19899<br>Telephone: (302) 421-6800<br>Facsimile: (302) 421-6813<br>**Attn: Mark Minuti** |
| **<u>United States Trustee</u>**<br>Office of the United States Trustee<br>844 King Street, Suite 2207<br>Wilmington, DE 19801<br>**Attn: Richard Schepacarter, Esq.** | Co- Counsel to the Official Committee of Unsecured CreditorsCommittee<br>Elliott Greenleaf<br><br>1105 North Market Street<br>Benesch, Friedlander, Coplan & Aronoff LLP<br>PNC Bank Center<br>222 Delaware Avenue, Suite 801<br>Wilmington, DE 19801<br>Telephone: (302) 442-7005<br>Facsimile: (302) 442-7012<br><br>**Attn: Rafael X. ZahralddinRaymond H. Lemisch** |
| **Counsel for the Agent to the Prepetition Lenders and Proposed Debtor in Possession Lenders**<br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, IL 60654<br>Telephone: (312) 862-2342<br>Facsimile: (312) 862-2200<br>**Attn: David A. Agay, Esq.** | Co- Counsel to the Official Committee of Unsecured Creditors<br>Arent Fox LLP<br>1675 Broadway<br>New York, NY 10019-5820<br>Attn: Andrew Silfen |

The Bankruptcy Court shall only consider timely filed and served written objections. All objections must (a) state with particularity the legal and factual grounds for such objection, (b) provide, where applicable, the specific text that the objecting party believes to be appropriate to insert into the Plan, and (c) describe the nature and amount of the objector's claim. Objections not timely filed and served in accordance with these procedures shall be

overruled.  With regard to any timely-filed objection(s), the Debtors shall be allowed to file an omnibus reply ~~on or before the date which is three (3) business days~~ before the Confirmation Hearing.

## VII.

## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### A.  GENERALLY

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied.  If so, the Bankruptcy Court shall enter the Confirmation Order.  The Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before the Confirmation of the Plan is reasonable, or if such payment is to be fixed after the Confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- With respect to each Class of Impaired Claims or Equity Interests, either each Holder of a Claim or Equity Interest of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as practicable.

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee will be paid as of the Effective Date.

The Debtors believe that (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.

### B.  FEASIBILITY

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor.  The Plan contemplates that all assets of the Debtors will

ultimately be liquidated and that the proceeds will be distributed to the creditors pursuant to the terms of the Plan. Since no further financial reorganization of the Debtors will be possible, the Debtors believe that the Plan meets the feasibility requirement. In addition, based upon the availability of the DIP Facility, the Debtors believe that sufficient funds will exist at confirmation to make all payments required by the Plan.

## C.     "BEST INTERESTS" TEST

With respect to each Impaired Class of Claims and Equity Interests, confirmation of the Plan requires that each such Holder either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value that each such Holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

This analysis requires the Bankruptcy Court to determine what the Holders of Allowed Claims in each Impaired Class would receive from the liquidation of the Debtors' assets and properties in the context of chapter 7 liquidation cases. The cash amount available to satisfy unsecured claims of the Debtors would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation cases. Such cash amount would be reduced by the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from the termination of the Debtors' businesses and the use of chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under chapter 7 also would include the fees payable to a trustee in bankruptcy, as well as those payable to attorneys, investment bankers and other professionals that such trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases, such as compensation for attorneys, advisors, accountants and costs and expenses of members of any official committees that are allowed in the chapter 7 cases. In addition, Claims could arise by reason of the breach or rejection of obligations incurred and executory contracts entered into or assumed by the Debtors during the pendency of the Chapter 11 Cases.

The foregoing types of Claims and such other Claims which may arise in the liquidation cases or result from the pending Chapter 11 Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of the liquidation of the Debtors' assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the Plan.

In applying the "best interests" test, it is possible that claims and equity interests in the chapter 7 cases may not be classified according to the seniority of such claims and equity interests. In the absence of a contrary determination by the Bankruptcy Court, all pre-chapter 11 unsecured claims that have the same rights upon liquidation would be treated as one class for the purposes of determining the potential distribution of the liquidation proceeds resulting from the chapter 7 cases of the Debtors. The distributions from the liquidation proceeds would be calculated on a Pro Rata basis according to the amount of the Claim held by each creditor. Therefore, creditors who claim to be third party beneficiaries of any contractual subordination provisions might have to seek to enforce such contractual subordination provisions in the Bankruptcy Court or otherwise. The Debtors believe that the most likely outcome of liquidation proceedings under chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full with interest and no stockholder receives any distribution until all creditors are paid in full with postpetition interest.

The Debtors, with the assistance of their financial advisors, have prepared a hypothetical liquidation analysisan estimated Distribution Analysis, which is annexed to this Disclosure Statement as Exhibit B (the "*Hypothetical Liquidation Analysis*"). After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including: (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; (b) the substantial increases in claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases; and (c) the significantly lower proceeds likely to be realized from a liquidation of the Debtors' assets under a chapter 7 liquidation, The Distribution Analysis

contemplates an additional $1.8 million in funding from UBPA, which may not be obtainable in a chapter 7 proceeding. Since that $1.8 million may not be available in a chapter 7 proceeding, the Debtors believe that ~~Confirmation of the Plan will provide each Holder of an Allowed Claim with more than the amount it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.~~ the Plan, by definition, provides all creditors with an outcome that is superior to any outcome under chapter 7. UBPA has taken the position that it has no obligation to provide additional funding to the Debtors or their bankruptcy estates. The Debtors, however, believe this position is inconsistent with the rulings and findings made by the Bankruptcy Court at the hearing on November 5, 2010.

Although the Debtors believe the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will determine that the Plan meets this test. **THESE ESTIMATES OF VALUE ARE SUBJECT TO A NUMBER OF ASSUMPTIONS AND SIGNIFICANT QUALIFYING CONDITIONS. ACTUAL VALUES AND RECOVERIES COULD VARY MATERIALLY FROM THE ESTIMATES SET FORTH HEREIN.**

### D. ACCEPTANCE BY IMPAIRED CLASSES

The Bankruptcy Code requires, as a condition to Confirmation, that each class of claims or equity interests that is impaired under a plan accept the plan, with the exception described in Article VII.E of the Disclosure Statement. A class that is not "impaired" under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that on the consummation date, the holder of the claim or interest receives cash equal to the allowed amount of such claim or, with respect to any interest, any fixed liquidation preference to which the interest holder is entitled or any fixed price at which the debtor may redeem the security.

### E. NON-CONSENSUAL CONFIRMATION

The Bankruptcy Court may confirm the Plan over the dissent of any Impaired Class if the Plan satisfies all of the requirements for (i) consensual confirmation under section 1129(a), other than section 1129(a)(8), of the Bankruptcy Code and (ii) nonconsensual confirmation under section 1129(b) of the Bankruptcy Code.

To obtain nonconsensual confirmation of the Plan under a procedure commonly known as "cramdown," it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class receives more than it is entitled to for its claims or interests. The Debtors believe that the Plan satisfies this requirement.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." The Bankruptcy Code establishes tests for determining what is "fair and equitable" for secured creditors, unsecured creditors and equity holders, as follows:

#### 1. Secured Claims

Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens with respect to such proceeds as provided in clause (i) or (ii).

#### 2. Unsecured Claims

Either (i) each impaired unsecured creditor receives or retains, under the plan, property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

### 3. Equity Interests

Either (i) each holder of an equity interest will receive or retain, under the plan, property of value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

The Debtors reserve the right to pursue confirmation of the Plan without having previously obtained sufficient acceptances of the Plan from all Classes of Impaired Claims and Equity Interests. In such case, the Debtors may request confirmation of the Plan under section 1129(b) of the Bankruptcy Code notwithstanding that such Class or Classes did not accept the Plan.

**THE DEBTORS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN). ACCORDINGLY, THE DEBTORS WILL DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.**



## VIII.
## ~~VIII.~~
## PLAN-RELATED RISK FACTORS AND

## ALTERNATIVES TO CONFIRMING AND CONSUMMATING THE PLAN

**ALL IMPAIRED HOLDERS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.**

### A. FINANCIAL INFORMATION; DISCLAIMER

Although the Debtors have used their best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and Disclosure Statement. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

### B. CERTAIN BANKRUPTCY CONSIDERATIONS

### 1. Classification Risk

Under Section 1123(a)(4) of the Bankruptcy Code, a plan of reorganization must provide the same treatment for each claim or interest of a particular class, unless the holder of the particular claim or interest agrees to a less favorable treatment of such particular claim or interest. The Debtors can provide no assurance that the Bankruptcy Code will not disapprove of the classifications of Claims and Equity Interests contained in the Plan.

### ~~2. The Debtors May be Unable to Expeditiously Transfer the Assets~~

The estimates of recoveries herein is dependent upon certain assumptions regarding the Debtors' exit of certain locations and the elimination of carrying costs related to such locations and the assets. If the Debtors and UBPA (or a different winning bidder) are unable to expeditiously transfer the assets such that the Debtors can eliminate administrative costs, such continuing administrative costs may decrease creditor recoveries.

**2.** ~~3.~~ **The Debtors May Not be Able to Secure Confirmation of the Plan.**

There can be no assurance that the Debtors will receive the requisite acceptances to confirm the Plan. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of a Claim or Equity Interest of the Debtors might challenge the adequacy of this Disclosure Statement or contend that the balloting procedures and results are not in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, confirmation of the Plan is not likely to be followed by a liquidation or a need for further reorganization, and the value of distributions to non-accepting Holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Debtors believe that the Plan will not be followed by a need for further liquidation and that non-accepting Holders within each Class under the Plan will receive distributions at least as great as they would receive following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such chapter 7 case. The Debtors believe that Holders of unsecured claims would receive no distribution under a liquidation pursuant to chapter 7 of the Bankruptcy Code.

UBPA asserts that the Plan is not confirmable without UBPA's vote to accept the Plan. The Debtors, however, believe that UBPA is bound to support the Plan.

**3.** ~~4.~~ **The Confirmation and Consummation of the Plan Are Also Subject to Certain Conditions as Described Herein.**

If the Plan is not confirmed, it is unclear whether another liquidating plan could be implemented and what distributions Holders of Claims or Equity Interests ultimately would receive with respect to their Claims or Equity Interests. If an alternative liquidating plan could not be agreed to, it is possible that the Debtors would have to liquidate their assets under chapter 7 of the Bankruptcy Code, in which case it is likely Holders of Claims would receive substantially less favorable treatment than they would receive under the Plan.

**4.** ~~5.~~ **The Debtors May Object to the Amount or Classification of a Claim.**

The Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest whose Claim or Equity Interest is subject to an objection. Any such Claim or Equity Interest Holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

**5.** ~~6.~~ **Nonconsensual Confirmation.**

Pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan at the Debtors' request if at least one Impaired Class has accepted the Plan (with such acceptance being determined without including the acceptance of any "insider" in such Class) and, as to each Impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Impaired Classes. See Article VII above. The Debtors believe that the Plan satisfies these requirements, and pursuant to the Plan, will request such nonconsensual confirmation in accordance with section 1129(b) of the Bankruptcy Code in the event Class 1 accepts the Plan.

**6.** ~~7.~~ **Delays of Confirmation and/or the Effective Date**

Any delays of either Confirmation or of the Effective Date could result in, among other things, increased Claims of Professionals. These or any other negative effects of delays of either Confirmation or the Effective Date could endanger the ultimate approval of the Plan by the Bankruptcy Court.

## C. PENDING LITIGATION

The Debtors are involved from time to time in routine litigation that is incidental to their businesses. The Debtors do not believe that the outcome of any such litigation will have a materially adverse effect upon the Debtors.

## D. LIQUIDATION UNDER CHAPTER 7

The Debtors believe that the Plan affords Holders of Claims and Equity Interests the potential for the greatest recovery and, therefore, is in the best interests of such Holders. If, however, the Plan is not confirmed in the Chapter 11 Cases, the Debtors may be forced to liquidate under chapter 7 of the Bankruptcy Code pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of claims against or interests in the Debtors.

As described herein, however, the Debtors believe that in a liquidation under chapter 7 of the Bankruptcy Code, before creditors receive any distribution, additional administrative expenses involved in the appointment of a trustee or trustee and attorneys, accountants and other professionals to assist such trustee would cause a substantial diminution in the value of the Debtors' estates. The assets available for distribution to creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, including (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in a bankruptcy and professional advisors to such trustee, (b) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (c) substantial increases in claims which would be satisfied on a priority basis, **THE DEBTORS HAVE DETERMINED, AS DISCUSSED ON EXHIBIT B OF THIS DISCLOSURE STATEMENT, THAT CONFIRMATION OF THE PLAN WILL PROVIDE EACH CREDITOR AND EQUITY INTEREST HOLDER WITH A RECOVERY THAT IS NOT LESS THAN IT WOULD RECEIVE PURSUANT TO A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

## IX.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and to Holders of Allowed Claims. This discussion is based on the Internal Revenue Code of 1986, Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the IRS as in effect on the date hereof. Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims and Equity Interests, the Holders' status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to any of the issues discussed below. Furthermore, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Allowed Claims.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or the Holders of Allowed Claims in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, regulated investment companies and foreign taxpayers). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed. The Debtors intend to treat the transfers of their assets to Holders of Allowed Claims as taxable transactions for federal income tax purposes, and the following discussion is based on the assumption that such treatment will be respected by the IRS.

**THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR EQUITY INTEREST. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

A.      CONSEQUENCES TO DEBTORS

Under the Plan and in connection with the sale of the Debtors' assets, the Debtors intend to transfer substantially all of their assets (the "*Transfers*") to Holders of Allowed Claims. The Transfers are intended to constitute taxable transactions resulting in the recognition of gain or loss by the Debtors for federal income tax purposes. Net operating losses ("NOLs") and other loss carryforwards of the Debtors may offset most, if not all, of any such gain. In the event that the NOLs and the capital loss carryforwards are not sufficient to offset potential gains arising from the liquidations, the Debtors will be jointly and severally liable for the resulting tax liability. The Debtors have not estimated the amount of tax liability, if any, that will arise with respect to the Plan and the transactions contemplated thereunder.

A corporation or a consolidated group of corporations may incur alternative minimum tax liability even where NOL carryovers and other tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax. It is possible that the Debtors may be liable for the alternative minimum tax.

B.      FEDERAL INCOME TAX TREATMENT OF LIQUIDATING TRUST

1.      Classification of Liquidating Trust

Pursuant to the Plan, the Debtors will transfer the Liquidating Trust Assets to the Liquidating Trust and the Liquidating Trust will become obligated to make Distributions in accordance with the Plan. The Plan provides, and this discussion assumes, that the Liquidating Trust will be treated for federal income tax purposes as a "liquidating trust," as defined in Treasury Regulation Section 301.7701-4(d), and will therefore be taxed as a grantor trust, of which the beneficiaries will be treated as the owners and grantors thereof (the "*Beneficiaries*"). Accordingly, because a grantor trust is treated as a pass-through entity for federal income tax purposes, no tax should be imposed on the Liquidating Trust itself with respect to the income earned or gain recognized by the Liquidating Trust.

Instead, the Beneficiaries will be taxed on their allocable shares of such net income or gain in each taxable year (determined in accordance with the Liquidating Trust Agreement), whether or not they received any distributions from the Liquidating Trust in such taxable year.

Although the Liquidating Trust has been structured with the intention of complying with guidelines established by the IRS in Rev. Proc. 94-45, 1994-2 C.B. 684, for the formation of liquidating trusts, it is possible that the IRS could require a different characterization of the Liquidating Trust, which could result in different and possibly greater tax liability to the Liquidating Trust and/or the Holders of Allowed Claims. No ruling has been or will be requested from the IRS concerning the tax status of the Liquidating Trust and there can be no assurance the IRS will not require an alternative characterization of the Liquidating Trust.

### 2. Tax Reporting

The Liquidating Trustee will file tax returns with the IRS for the Liquidating Trust as a grantor trust in accordance with Treasury Regulation Section 1.671-4(a). The Liquidating Trustee will also send to each Beneficiary a separate statement setting forth the Beneficiary's allocable share of items of income, gain, loss, deduction or credit and will instruct the Beneficiary to report such items on such Beneficiary's federal income tax return.

### 3. Claim Reserve for Disputed Claims

The Liquidating Trust will pay taxes on the taxable net income or gain allocable to Holders of Disputed Claims on behalf of such Holders and, when such Disputed Claims are ultimately resolved, Holders whose Disputed Claims are determined to be Allowed Claims will receive distributions from the Liquidating Trust net of taxes which the Liquidating Trust had previously paid on their behalf.

### C. CONSEQUENCES TO HOLDERS OF CLAIMS

The federal income tax consequences of the Plan to a Holder of a Claim will depend upon several factors, including but not limited to: (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included accrued or unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; and (7) whether the Holder receives distributions under the Plan in more than one taxable year. **HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.**

### 1. Holders of Allowed Claims

Generally, a Holder of an Allowed Claim will recognize gain or loss equal to the difference between the "amount realized" by such Holder and such Holder's adjusted tax basis in the Allowed Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under the Plan in respect of a Holder's Claim, including, to the extent such Holder is a Beneficiary of the Liquidating Trust, the fair market value of each such Holder's proportionate share of the assets transferred to the Liquidating Trust on behalf of and for the benefit of such Holder (but only to the extent that such cash or other property is not allocable to any portion of the Allowed Claim representing accrued but unpaid interest (*see* discussion below)).

It is possible that since a Holder's share of the assets held in the Liquidating Trust may change depending upon the resolution of Disputed Claims, the Holder may be prevented from recognizing any loss in connection with consummation of the Plan until the time that all such Disputed Claims have been resolved. **HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.**

### 2. Distributions in Discharge of Accrued but Unpaid Interest

There is uncertainty regarding the extent to which the receipt of cash or other property should be treated as attributable to unpaid accrued interest. To the extent any property received pursuant to the Plan is considered attributable to unpaid accrued interest, a Holder will recognize ordinary income to the extent the fair market value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the Holder. A Holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property and the holding period of such property should begin on the day following the receipt of such consideration. A Holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full. **HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 3. Character of Gain or Loss; Tax Basis; Holding Period

The character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss recognized by a Holder of an Allowed Claim under the Plan will be determined by a number of factors, including, but not limited to, the status of the Holder, the nature of the Allowed Claim in such Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Allowed Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Allowed Claim. The Holder's aggregate tax basis for any consideration received under the Plan will generally equal the amount realized in the exchange (less any amount allocable to interest as described in the preceding paragraph). The holding period for any consideration received under the Plan will generally begin on the day following the receipt of such consideration. Holders of Claims who recognize capital losses will be subject to limitation on the use of such capital losses.

### D. CONSEQUENCES TO HOLDERS OF EQUITY INTERESTS

Pursuant to the Plan, all Equity Interests in all of the Debtors are being extinguished. A Holder of any Equity Interest extinguished under the Plan should generally be allowed a "worthless stock deduction" in an amount equal to the Holder's adjusted basis in the Holder's Equity Interest. A "worthless stock deduction" is a deduction allowed to a Holder of a corporation's stock for the taxable year in which such stock becomes worthless. If the Holder held the Equity Interest as a capital asset, the loss will be treated as a loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if the Equity Interest was held by the Holder for more than one year and otherwise will be short-term. Any capital losses realized will generally be subject to limitation on the use of such losses.

### E. WITHHOLDING

All Distributions to Holders of Allowed Claims under the Plan are subject to any applicable withholding, including employment tax withholding. The Debtors and/or the Liquidating Trust will withhold appropriate employment taxes with respect to payments made to a Holder of an Allowed Claim which constitutes a payment for compensation. Payers of interest, dividends, and certain other reportable payments are generally required to backup withholding at a rate not in excess of 28% of such payments if the payee fails to furnish such payee's correct taxpayer identification number (social security number or employer identification number), to the payor. The Debtors and/or the Liquidating Trust may be required to withhold a portion of any payments made to a Holder of an Allowed Claim if the Holder (i) fails to furnish the correct social security number or other taxpayer identification number ("TIN") of such Holder, (ii) furnishes an incorrect TIN, (iii) has failed to properly report interest or dividends to the IRS in the past, or (iv) under certain circumstances, fails to provide a certified statement signed under penalty of perjury, that the TIN provided is the correct number and that such Holder is not subject to backup withholding. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder of an Allowed Claim's United States federal income tax liability, and a Holder of an Allowed Claim may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT SUCH HOLDER'S TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

# X.

## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described herein because it provides for a larger distribution to the Holders of Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to the Holders of Claims.  ***Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan***.

***The Committee also recommends that creditors vote to accept the Plan.***

Dated:  ~~September 30, 2010~~January 31, 2011          Respectfully submitted,

 

 

           Universal Building Products, Inc.
           Accubrace, Inc.
           Don De Cristo Concrete Accessories, Inc.
           Form-Co, Inc.
           Universal Form Clamp, Inc.

           By:     _____ /s/
           Gregory Waller
           Name:  Gregory Waller
           Title:     Authorized Officer Signatory of the Debtors

**EXHIBIT A**

**Debtors' ~~First~~Third Modified Joint Liquidating Plan of Reorganization**

**EXHIBIT B**

**Hypothetical** ~~**Liquidation**~~ **Distribution** **Analysis**

**[TO COME]**

Document comparison done by DeltaView on Monday, January 31, 2011 8:31:32 AM

| Input: | |
|---|---|
| Document 1 | PowerDocs://BBLCH_E/484856/13 |
| Document 2 | PowerDocs://BBLCH_E/484856/28 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| <span style="color:blue;text-decoration:underline">Insertion</span> | |
| <span style="color:red;text-decoration:line-through">Deletion</span> | |
| <span style="color:green;text-decoration:line-through">Moved from</span> | |
| <span style="color:green;text-decoration:underline">Moved to</span> | |
| Style change | |
| Format change | |
| <span style="color:#c08040;text-decoration:line-through">Moved deletion</span> | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 451 |
| Deletions | 399 |
| Moved from | 2 |
| Moved to | 2 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 854 |